IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| THE STATE OF OHIO, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| THE UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Civil Case No. 23-cv-517 |
| | ) | Hon. John R. Adams |
| | ) | |
| NORFOLK SOUTHERN RAILWAY | ) | |
| COMPANY, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| NORFOLK SOUTHERN | ) | |
| CORPORATION, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**CONSENT DECREE
BETWEEN PLAINTIFF UNITED STATES OF AMERICA
AND DEFENDANTS**

# TABLE OF CONTENTS

I.      JURISDICTION AND VENUE ................................................................................ 5
II.     APPLICABILITY ................................................................................................... 5
III.    OBJECTIVES ......................................................................................................... 6
IV.     DEFINITIONS ........................................................................................................ 6
V.      PAYMENT OF RESPONSE COSTS .................................................................... 14
VI.     CIVIL PENALTY ................................................................................................. 16
VII.    PERFORMANCE OF CONSENT DECREE OBLIGATIONS ............................. 17
VIII.   COORDINATION AND SUPERVISION OF THE WORK ................................. 20
IX.     PERFORMANCE OF THE WORK ...................................................................... 21
X.      POST REMOVAL LONG-TERM MONITORING .............................................. 27
XI.     COMMUNITY HEALTH PROGRAM ................................................................ 30
XII.    RAIL SAFETY IMPROVEMENTS ..................................................................... 35
XIII.   EMERGENCY PREPAREDNESS ....................................................................... 41
XIV.    LOCAL WATERWAYS REMEDIATION PLAN ............................................... 50
XV.     NATURAL RESOURCE DAMAGES .................................................................. 52
XVI.    REPORTING REQUIREMENTS ......................................................................... 53
XVII.   STIPULATED PENALTIES ................................................................................. 56
XVIII.  FORCE MAJEURE ............................................................................................... 59
XIX.    DISPUTE RESOLUTION .................................................................................... 61
XX.     RESOLUTION OF CLAIMS / COVENANTS BY UNITED STATES ................ 65
XXI.    RESERVATIONS OF RIGHTS BY UNITED STATES ...................................... 65
XXII.   COVENANTS BY SETTLING DEFENDANTS .................................................. 66
XXIII.  EFFECT OF SETTLEMENT; CONTRIBUTION ................................................ 67
XXIV.   RIGHT OF ENTRY / INFORMATION COLLECTION AND RETENTION ....... 69
XXV.    FINANCIAL ASSURANCE ................................................................................. 72
XXVI.   INDEMNIFICATION AND INSURANCE ........................................................... 75
XXVII.  NOTICES ............................................................................................................... 78
XXVIII. EFFECTIVE DATE ............................................................................................... 80
XXIX.   MODIFICATION ................................................................................................... 80
XXX.    TERMINATION .................................................................................................... 82
XXXI.   PUBLIC PARTICIPATION ................................................................................. 83
XXXII.  SIGNATORIES / SERVICE ................................................................................. 84
XXXIII. INTEGRATION .................................................................................................... 85
XXXIV.  26 U.S.C. SECTION 162(F)(2)(A)(II) IDENTIFICATION ................................. 85
XXXV.   HEADINGS ........................................................................................................... 85
XXXVI.  FINAL JUDGMENT ............................................................................................. 85
XXXVII. APPENDICES ....................................................................................................... 85

Plaintiff United States of America, on behalf of the United States Environmental Protection Agency (EPA) and the United States Department of the Interior (DOI), filed a complaint in this action on March 30, 2023, and amended the complaint on May 19, 2023 (collectively, the "Complaint"), alleging that Norfolk Southern Railway Company and Norfolk Southern Corporation (collectively, "Norfolk Southern" or "Settling Defendants"), violated Sections 301 and 311 of the Clean Water Act ("CWA"), 33 U.S.C. §§ 1311 and 1321, and are liable under Section 107 of the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), 42 U.S.C. § 9607.

The Complaint against Settling Defendants alleges that Norfolk Southern train 32N derailed on February 3, 2023.  The Derailment and subsequent actions taken by Norfolk Southern because of the Derailment caused the release of hazardous substances under CERCLA, pollutants and hazardous substances under the CWA, and petroleum-based products including oil.  These Derailment-Associated Materials released onto the ground at the Site and flowed into waters of the United States.  EPA responded to the releases at the Site and oversaw work done by Norfolk Southern, incurring costs in the process.  The Complaint seeks recovery of those costs and damages for injury to, loss of or destruction of natural resources under CERCLA, as well as penalties and injunctive relief under the CWA.

Settling Defendants do not admit any liability to the United States arising out of the transactions or occurrences alleged in the Complaint.

EPA mobilized to the Site with the EPA Superfund Technical Assessment and Response Team within hours of the Derailment.  Settling Defendants also initiated environmental response activities within hours of the Derailment, including but not limited to deploying hazardous response contractors, environmental consultants, and health and safety consultants; installing

1

containment and mitigation measures such as booms; and initiating environmental monitoring and sampling.

EPA issued a Unilateral Administrative Order to Norfolk Southern on February 21, 2023, under CERCLA Section 106, 42 U.S.C. § 9606.  Settling Defendants submitted a notice of intent to comply with the CERCLA Order on February 24, 2023, and state they have remained in full compliance with the CERCLA Order since.  Based on EPA's oversight, EPA currently believes Settling Defendants have been in compliance with the CERCLA Order through at least December 20, 2023 (*Update to EPA Report Submitted Pursuant to Section 2(b) of Executive Order 14108* at 8).

Settling Defendants and EPA began community air monitoring within hours of the Derailment to assess public safety and maintained continuous air monitoring, including during and after the Vent and Burn, for more than eight months after the Derailment, collecting more than 115 million air monitoring data points and more than 45,000 samples (air, water, and soil) in and around the community.  Since at least February 8, 2023, no sustained air monitoring or analytical sample results for contaminants of concern have been found above levels of concern established for the Site.

Settling Defendants, under oversight from EPA and state and local agencies, have remediated and monitored environmental conditions at the Site following the Derailment to ensure the Site is cleaned up to meet relevant federal and state regulations and comply with EPA-approved work plans.  These environmental response efforts have been undertaken in cooperation with the Unified Command, led by EPA, the Ohio Environmental Protection Agency, the Village of East Palestine, the Columbiana County Emergency Management Agency, and other federal, state, and local agencies.

This work includes, but is not limited to, removing more than 177,000 tons of contaminated soil and transporting it offsite for disposal; collecting more than 69 million gallons of wastewater and transporting it offsite for disposal; and sampling and monitoring local air, surface water, groundwater, drinking water, soil, and sediment.  Drinking water samples from the municipal water system and over 1,500 private well samples have consistently shown no impacts from the Derailment and municipal water continues to meet drinking water safety standards.

On October 18, 2023, EPA issued an administrative order under the Clean Water Act directing Settling Defendants to remove sediments in culverted areas of Sulphur Run, and to further delineate, characterize, and, as necessary, remove Hazardous Substances and oil from the sediments in Leslie Run and Sulphur Run.  Settling Defendants submitted a notice of intent to comply with the CWA Order on October 19, 2023, and state they have remained in full compliance with the CWA Order since then.  Based on EPA's oversight, EPA currently believes Settling Defendants have been in compliance with the CWA Order through at least December 20, 2023 (*Update to EPA Report Submitted Pursuant to Section 2(b) of Executive Order 14108* at 9).

The Site-wide confirmation soil sampling effort -- a final doublecheck to ensure that the cleanup has been fully successful, and that no contamination has spread due to cleanup activities -- is underway and will continue into fall 2024, and final steps to address sheens and oil contaminated sediments in Sulphur Run and Leslie Run began in March 2024 and are scheduled to be complete by summer 2024.  Appendix A provides additional detail regarding environmental response and remediation efforts Settling Defendants state they have undertaken since February 2023.

Outside this Consent Decree, Settling Defendants have made public commitments to support the residents of East Palestine and surrounding communities in Ohio and Pennsylvania. Settling Defendants state that they have committed more than $107 million in community support to date, which includes more than $21.4 million in direct financial assistance to affected families.

Settling Defendants have publicly announced commitments to fund more than $2.1 million to the State of Ohio medical facility established in East Palestine, known as the East Liverpool City Hospital's East Palestine Clinic, to provide accessible healthcare services to the residents of East Palestine and surrounding communities and more than $536,000 to fund an Ohio-run Community Resiliency Center to address mental health issues.

To support the safety of rail operations, Settling Defendants have publicly announced investments exceeding $1 billion in technology, equipment, and infrastructure, and state they will invest an additional $1 billion each year in ongoing operations to ensure safety.  Settling Defendants state that they invested over $109 million in defect-detector technologies alone since the Derailment.  Settling Defendants state that they implemented numerous rail safety measures since the Derailment, including but not limited to revisions to new Train Build rules, an expansion of the network of trackside defect-detector systems, enhanced monitoring of Wayside Detectors through the Wayside Diagnostic System, and adoption of a new industrywide rule standardizing hot-bearing trend algorithms.  Appendix B provides additional detail regarding the rail safety measures Settling Defendants state they have undertaken since the Derailment, as well as additional measures they anticipate implementing outside of this Consent Decree.

Neither this Consent Decree nor Settling Defendants' consent to its entry constitutes an admission by Settling Defendants of violations alleged by the United States in the Complaint.

4

The Parties recognize, and the Court by entering this Consent Decree finds, that this Consent Decree has been negotiated by the Parties in good faith and will avoid further litigation among the Parties and that this Consent Decree is fair, reasonable, and in the public interest.

NOW, THEREFORE, before the taking of any testimony, and with the consent of the Parties, IT IS HEREBY ADJUDGED, ORDERED, AND DECREED as follows:

## I.      JURISDICTION AND VENUE

1.      This Court has jurisdiction over the subject matter of this action, pursuant to 33 U.S.C. §§ 1319(b) and 1321(b)(7)(E), 42 U.S.C. § 9613(b), and 28 U.S.C. §§ 1331, 1345, and 1355, and over the Parties.  Venue lies in this District pursuant to 33 U.S.C. §§ 1319(b) and 1321(b)(7)(E), 42 U.S.C. § 9613(b), and 28 U.S.C. §§ 1391(b) and (c) and 1395(a), because the violations alleged in the Complaint are alleged to have occurred in, and Settling Defendants conduct business in, this judicial district.  This Court retains jurisdiction over the subject matter of this action and over the Parties for the purpose of resolving disputes arising under this Consent Decree, entering orders modifying this Consent Decree, or effectuating or enforcing compliance with this Consent Decree.  Settling Defendants may not challenge the terms of this Consent Decree or this Court's jurisdiction to enter and enforce this Consent Decree.

2.      For purposes of this Consent Decree, Settling Defendants agree that the Complaint states claims upon which relief may be granted pursuant to CWA Sections 309 and 311, 33 U.S.C. §§ 1319 and 1321, and CERCLA Section 107, 42 U.S.C. § 9607.

## II.      APPLICABILITY

3.      The obligations of this Consent Decree apply to and are binding upon the United States and upon Settling Defendants and any successors, assigns, or other entities or persons otherwise bound by law.

4.     Settling Defendants shall provide a copy of this Consent Decree to all officers, employees, and agents whose duties might reasonably include compliance with any provision of this Decree, as well as to any contractor retained to perform work required under this Consent Decree.  Settling Defendants shall condition any such contract upon performance of the work in conformity with the terms of this Consent Decree.

5.     In any action to enforce this Consent Decree, Settling Defendants shall not raise as a defense the failure by any of its officers, directors, employees, agents, or contractors to take any actions necessary to comply with the provisions of this Consent Decree.

### III.     OBJECTIVES

6.     The objectives of the Parties in entering into this Consent Decree are to protect public health or welfare or the environment at the Site by the implementation of response actions at the Site by the Settling Defendants, to reimburse response costs of the United States, to implement the injunctive relief to enhance rail safety, to address potential harms related to the Derailment in East Palestine and surrounding communities, and to resolve the civil claims of the United States against Settling Defendants as provided in this Consent Decree.

### IV.     DEFINITIONS

7.     Terms used in this Consent Decree that are defined in CERCLA or the CWA or in regulations promulgated pursuant to CERCLA or the CWA have the meanings assigned to them in CERCLA or the CWA or such regulations, unless otherwise provided in this Decree. Whenever the terms set forth below are used in this Consent Decree, the following definitions apply:

6

"Ambient Temperature (HBD)" means the difference in temperature between the outside wheel bearing assessed by the HBD and the undercarriage of the Railcar to which the wheel bearing is affixed.

"ATSDR" means the United States Agency for Toxic Substances and Disease Registry and any of its successor departments or agencies.

"Automatic Qualifiers" means those individuals who automatically qualify for participation in the Medical Monitoring portion of the Community Health Program, as defined in Paragraph 50.b.(1)-(2).

"CERCLA" means the Comprehensive Environmental Response, Compensation, and Liability Act, as amended, 42 U.S.C. §§ 9601-9675.

"CERCLA Order" means the Unilateral Administrative Order issued by EPA on February 21, 2023, and amended on March 27, 2023, (CERCLA Docket No. V-W-23-C-004) under CERCLA Section 106, 42 U.S.C. § 9606.

"CERCLA Removal Action" means the removal actions described in the CERCLA Order to abate an imminent and substantial endangerment to the public health or welfare or the environment that may be presented by the actual or threatened release of hazardous substances at or from the Site.

"Complaint" means the Complaint and the amended Complaint filed by the United States in this action.

"Consent Decree" or "Decree" means this Decree and all appendices attached hereto (listed in Section XXXVII).

"Critical Alarm" means an alarm (audible announcement) that is transmitted to the train crew, requiring the train crew to bring the train to a halt and set out the Railcar containing the

wheel bearing achieving the Critical Alarm Level for mechanical road truck inspection and any necessary maintenance.

"Critical Alarm Level" means the above-Ambient Temperature (HBD) threshold measurement activating a Critical Alarm.

"CWA" means the Clean Water Act, as amended, 33 U.S.C. § 1251 *et seq*.

"CWA Order" means the Unilateral Administrative Order issued by EPA to Norfolk Southern on October 18, 2023 (Docket No. CWA-1321-5-24-001), under CWA Section 311(c), 33 U.S.C. § 1321(c).

"CWA Removal Action" means the removal actions described in the CWA Order to delineate, characterize, and remove oil and hazardous substances discharged into Sulphur Run and to further delineate, characterize, and as appropriate remove oil and hazardous substances discharged into Leslie Run, and to mitigate or prevent any substantial threat of a discharge of oil or Hazardous Substances in connection with the February 3, 2023, derailment of Norfolk Southern Train 32N in East Palestine, Ohio.

"Day" means a calendar day unless expressly stated to be a business day.  In computing any period of time for a deadline under this Consent Decree, where the last day would fall on a Saturday, Sunday, or federal holiday, the period runs until the close of business of the next business day.

"Derailment" or "East Palestine Derailment" means the event on February 3, 2023, when Norfolk Southern Train 32N's 38 Railcars derailed in East Palestine, Ohio.

"Derailment Area" means the immediate area where the Derailment occurred, located at the rail line northeast of East Taggart Street and North Pleasant Drive intersection in East Palestine, Columbiana County, Ohio (Latitude: 40.8360395 Longitude: -80.5222838).

"Derailment-Associated Materials" means substances released from Norfolk Southern Train 32N at the Site and substances produced as a result of the mixing, burning, or degradation of substances released at the Site, including through performance of the Vent and Burn.

"DOI" means the United States Department of the Interior and any of its successor departments or agencies.

"DOJ" means the United States Department of Justice and any of its successor departments or agencies.

"DOT-111 Tank Car" means a Railcar constructed according to the specifications at 49 C.F.R. § 179.200 *et seq*.

"DOT-117R Tank Car" means a Railcar retrofitted according to the specifications at 49 C.F.R. § 179.202-13.

"Effective Date" means the definition provided in Section XXVIII.

"EPA" means the United States Environmental Protection Agency and any of its successor departments or agencies.

"EPA Orders" means the CWA Order and the CERCLA Order.

"Facility" means Norfolk Southern Train 32N, in its entirety and as to each Railcar, and the Site.

"FEMA" means the Federal Emergency Management Administration and any of its successor departments or agencies.

"First Responder" means a person with specialized training to provide community-based services such as fire response, emergency medical services (EMS), emergencies involving the release or threat of release of hazardous material, or other similar emergencies, primarily within their local and surrounding communities.  This term includes firefighters, law enforcement

9

officers, paramedics, emergency medical technicians, as well as other individuals, including employees or members of a legally organized and recognized volunteer organization, whether compensated or not.

"Flammable Hazardous Materials" means flammable gas, as defined at 49 C.F.R. § 173.115, and flammable liquid, as defined at 49 C.F.R. § 173.120.

"FRA" means the Federal Railroad Administration and any of its successor departments or agencies.

"Future Response Costs" means all costs (including direct, indirect, payroll, contractor, travel, and laboratory costs) that the United States (a) pays from December 1, 2023 through the Effective Date at or in connection with the Site; and (b) pays after the Effective Date in implementing, overseeing, or enforcing this Decree, including: (i) in developing, reviewing, and approving deliverables generated under the CWA Order, the CERCLA Order, or this Consent Decree; (ii) in overseeing Settling Defendants' performance of the Work; and (iii) in enforcing this Decree, including all costs incurred under Section XIX (Dispute Resolution) and all litigation costs.  Future Response Costs also include all Interest accrued after November 30, 2023, on EPA's unreimbursed costs (including Past Response Costs) under CERCLA Section 107(a), and any costs incurred by ATSDR in connection with the Site pursuant to CERCLA Section 104.

"Hazardous Substances" means a substance on the list that appears at 40 C.F.R. § 302.4.

"Hazardous Material" has the meaning set forth in 49 C.F.R. § 171.8.

"High-Hazard Flammable Train" or "HHFT" has the meaning set forth in 49 C.F.R. § 171.8.

10

"Hot Bearing Detector" or "HBD" means a wayside device that utilizes infrared detection to monitor the temperatures of Railcar bearings as they pass over them.

"Incident Command System" means the standardized approach to the command, control, and coordination of on-scene incident management that provides a common hierarchy within which personnel from multiple organizations can be effective, as defined in FEMA's *National Incident Management System* (Oct. 2017).

"Including" or "including" means "including but not limited to."

"Interest" means interest at the rate specified for interest on investments of the Superfund, as provided under CERCLA Section 107(a), compounded annually on October 1 of each year. 42 U.S.C. § 9607(a).  The applicable rate of interest shall be the rate in effect at the time the interest accrues.  The rate of interest is subject to change on October 1 of each year. Rates are available online at https://www.epa.gov/superfund/superfund-interest-rates.

"Key Route" means a track with a combination of 10,000 carloads or intermodal portable tank loads of Hazardous Material, or a combination of 4,000 carloads of poison inhalation hazard, toxic inhalation hazard, anhydrous ammonia, flammable gas, Class 1.1 or 1.2 explosives, environmentally sensitive chemicals, spent nuclear fuel, and high-level radioactive waste over a period of one year.

"National Contingency Plan" or "NCP" means the National Oil and Hazardous Substances Pollution Contingency Plan promulgated pursuant to CERCLA Section 105, 42 U.S.C. § 9605, codified at 40 C.F.R. Part 300, and any amendments thereto.

"NRDAR Fund" means DOI's Natural Resource Damage Assessment and Restoration Fund, established pursuant to 43 U.S.C. §§ 1474b and 1474b-1.  This fund's Treasury account symbol (TAS) is 14X5198.

"Oil Spill Liability Trust Fund" means the trust fund established by the United States Treasury under 26 U.S.C. § 9509.

"Onboard Bearing Temperature Sensor" means bearing temperature sensors installed directly on axle boxes, as opposed to on the tracks.

"Operations Bulletin" is a temporary directive issued by Settling Defendants that supersedes relevant operating rules and automatically expires at the end of each calendar year.

"Paragraph" means a portion of this Decree identified by an Arabic numeral or upper- or lower-case letter.

"Parties" means the United States and Settling Defendants.

"Past Response Costs" means all costs, including but not limited to direct and indirect costs, that EPA, ATSDR on behalf of EPA, or DOJ has paid at or in connection with the Site through November 30, 2023, plus accrued Interest on all such costs through such date.

"Plaintiff" means the United States.

"Railcar" means a car designed to carry freight or non-passenger personnel by rail, and includes a box car, flat car, gondola car, hopper car, and tank car.

"RCRA" means the Solid Waste Disposal Act, as amended, 42 U.S.C. § 6901 *et seq.* (also known as the Resource Conservation and Recovery Act).

"Regional Response Training Center" or "Training Center" refers to the First Responder training center that Settling Defendants are constructing in East Palestine, Ohio.

"Removal Action" means the CERCLA Removal Action, the CWA Removal Action, and this Consent Decree.

"Removal Action Work Plans" means the work plans developed under the CERCLA Order and the CWA Order that are expressly incorporated into this Consent Decree and the work

plans developed under this Consent Decree related to the ongoing CERCLA Removal Action and CWA Removal Action pursuant to Section IX (Performance of the Work).

"Section" means a portion of this Consent Decree identified by a Roman numeral.

"Settling Defendants" means Norfolk Southern Railway Company and Norfolk Southern Corporation.

"Site" means the areal extent of where Derailment-Associated Materials have come to be located, in Ohio and Pennsylvania, as a result of the Derailment and the subsequent emergency response activities, including but not limited to breached Railcars, movement of material in connection with the rerailing process, and the Vent and Burn that occurred on February 6, 2023.

"Superfund" means the Hazardous Substance Superfund established under Section 9507 of the Internal Revenue Code, 26 U.S.C. § 9507.

"Thermal Camera" means a camera that creates an image of an object by capturing infrared radiation emitted from the object in a process that is called thermal imaging.  The created image represents the temperature of the object.

"Track Structure" means that part of the railway right-of-way used to support railroad operations and includes the rail, ties, and ballast.

"Train Build" means the process and protocols associated with assembling engines and Railcars into a train.

"Transportation Rail Incidents Preparedness and Response, Flammable Liquid Unit Training" or "TRIPR FLU Training" refers to a Pipeline and Hazardous Materials Safety Administration initiative that provides first response guidance on rail incidents involving hazard Class 3 flammable liquids.

"Unified Command" means the standardized process enabling multiple organizations to jointly share the overall authority and responsibility for conducting incident operations, as defined in FEMA's *National Incident Management System* (Oct. 2017).

"United States" means the United States of America, acting on behalf of EPA and DOI.

"Vent and Burn" means the controlled burn of certain Railcar contents (including vinyl chloride, from Railcars TILX 402025, OCPX 080235, OCPX 080179, GATX 095098, and OCPX 080370) at the Site on February 6, 2023.

"Wayside Detector" means a device or system installed on the right of way to monitor rolling stock, components, track, or environmental conditions to produce actionable and/or performance data to the handling railroad, or directly to the train crew.

"Wayside Diagnostic System" means the system used by Wayside Help Desk employees to view data and alerts from Settling Defendants' Wayside Detectors and to monitor the performance of trains and Railcars.

"Wayside Help Desk" refers to Settling Defendants' Atlanta-based employees who monitor and analyze detector data and lend remote support to transport train crews 24 hours per day, seven days per week.

"Work" means all obligations of Settling Defendants under Sections VIII (Coordination and Supervision of the Work) and IX (Performance of the Work).

"Work Takeover" means EPA's assumption of the performance of any of the Work in accordance with Paragraph 42.

V.     PAYMENT OF RESPONSE COSTS

8.     <u>Payment by Settling Defendants for Past Response Costs</u>.  Within 30 days after the Effective Date, Settling Defendants shall pay EPA, in reimbursement of Past Response Costs

14

in connection with the Site, $57,165,635.25, plus an additional sum for Interest on that amount calculated from November 30, 2023, through the date of payment.

9. <u>Payment by Settling Defendants for Future Response Costs</u>.

a. Periodic Bills.  On a periodic basis, EPA will send Settling Defendants a bill for Future Response Costs, including a cost summary listing direct and indirect costs paid by EPA, its contractors, subcontractors, and other federal agencies working on behalf of EPA.  Settling Defendants may initiate a dispute under Section XIX regarding a Future Response Cost billing, but only if the dispute relates to one or more of the following issues: (1) whether EPA has made an arithmetical error; (2) whether EPA has included a cost item that is not within the definition of Future Response Costs; or (3) whether EPA has paid excess costs as a direct result of an EPA action that was inconsistent with a specific provision or provisions of the NCP.  Settling Defendants must specify in the Notice of Dispute the contested costs and the basis for the objection.

b. Payment of Bill.  Settling Defendants shall pay the bill, or if they initiate dispute resolution under Section XIX, the uncontested portion of the bill, if any, within 60 Days after receipt of the bill.  Settling Defendants shall pay the contested portion of the bill determined to be owed, if any, within 45 Days after the resolution of the dispute. Each payment must include an additional amount for Interest accrued from the date of the receipt of the bill through the date of payment.

10. Settling Defendants shall make payment by FedWire Electronic Funds Transfer (EFT) to the DOJ account, in accordance with instructions provided to Settling Defendants by the Financial Litigation Unit (FLU) of the United States Attorney's Office for the Northern District of Ohio after the Effective Date.  The payment instructions provided by the FLU will

15

include a Consolidated Debt Collection System (CDCS) number, which Settling Defendants shall use to identify all payments required to be made in accordance with this Consent Decree. The FLU will provide the payment instructions to:

> Norfolk Southern Corporation
> Treasury Department
> 650 W. Peachtree Street NW
> Atlanta, GA 30308
> trdept@nscorp.com

on behalf of Settling Defendants.  Settling Defendants may change the individual to receive payment instructions on their behalf by providing written notice of such change to DOJ and EPA in accordance with Section XXVII (Notices).

11.    Deposit of Payment.  The amounts to be paid pursuant to Paragraphs 8 and 9 shall be deposited by EPA in the Superfund or the Oil Spill Liability Trust Fund, as appropriate.

12.    Notice of Payment.  At the time of payment, Settling Defendants shall send to EPA and DOJ, in accordance with Section XXVII (Notices), a notice of this payment including references to the CDCS Number, Site/Spill ID Number C5XR, and DJ Number 90-11-3-12792.

13.    Interest.  If Settling Defendants fail to make any payment due to EPA under Paragraphs 8 or 9 by the required due date, Interest shall continue to accrue on the unpaid balance through the date of payment.

VI.    CIVIL PENALTY

14.    Within 30 Days after the Effective Date, Settling Defendants shall pay to the United States a total of $15 million as a civil penalty, consisting of (a) $6.8 million for alleged violations of CWA Section 301 and (b) $8.2 million for alleged violations of CWA Section 311; together with Interest accruing from the date on which the Consent Decree is lodged with the Court, at the rate specified in 28 U.S.C. § 1961 as of the date of lodging.

15.     Settling Defendants shall pay the civil penalties due, together with Interest, in accordance with Paragraph 10.

16.     The $8.2 million civil penalty payment and associated Interest provided for in Paragraph 14 will be deposited by EPA in the Oil Spill Liability Trust Fund.

17.     At the time of payment, Settling Defendants shall send notice that payment has been made: (i) to EPA via email at cinwd_acctsreceivable@epa.gov or via regular mail at EPA Cincinnati Finance Office, 26 W. Martin Luther King Drive, Cincinnati, Ohio 45268; (ii) to DOJ via email or regular mail in accordance with Section XXVII; and (iii) to EPA in accordance with Section XXVII. Such notice shall state that the payment is for the civil penalty owed pursuant to the Consent Decree in *United States v. Norfolk Southern Railway Co., et al.* and shall reference the civil action number, CDCS Number, and DOJ case number 90-11-3-12792. Such notice shall also state that $8.2 million of the payment is for CWA civil penalties to be deposited into the Oil Spill Liability Trust Fund pursuant to 33 U.S.C. § 1321(s) and 26 U.S.C. § 9509(b)(8).

18.     Settling Defendants shall not deduct any penalties paid under this Decree pursuant to this Section or Section XVII (Stipulated Penalties) in calculating their federal income tax.

## VII.     PERFORMANCE OF CONSENT DECREE OBLIGATIONS

19.     <u>Approval of Deliverables</u>.  After review of any plan, report, or other item that is required to be submitted for approval pursuant to this Consent Decree, the United States will in writing: (a) approve the submission; (b) approve the submission upon specified conditions or modifications; (c) approve part of the submission and disapprove the remainder; or (d) disapprove the submission.  In the event of disapproval of any portion of the submission, the United States shall include a statement of reasons for such disapproval in its response.

20.     If the submission is approved pursuant to Paragraph 19(a), Settling Defendants shall take all actions required by the plan, report, or other document, in accordance with the schedules and requirements of the plan, report, or other document, as approved.  If the submission is conditionally approved or approved only in part pursuant to Paragraph 19(b) or (c), Settling Defendants shall, upon written direction from the United States, take all actions required by the approved plan, report, or other item that the United States determines are technically severable from any disapproved portions, subject to Settling Defendants' rights under Section XIX (Dispute Resolution).

21.     If the submission is disapproved in whole or in part pursuant to Paragraph 19(c) or (d), Settling Defendants shall, within 45 Days or such other time as the Parties agree to in writing, correct all deficiencies and resubmit the plan, report, or other item, or disapproved portion thereof, for approval, in accordance with the preceding Paragraphs.  If the resubmission is approved in whole or in part, Settling Defendants shall proceed in accordance with the preceding Paragraph.

22.     If a resubmitted plan, report, or other item, or portion thereof, is disapproved in whole or in part, the United States may again require Settling Defendants to correct any deficiencies, in accordance with the preceding Paragraphs, or may itself correct any deficiencies.

23.     If Settling Defendants elect to invoke dispute resolution as set forth in Section XIX concerning a decision by EPA to disapprove, approve on specified conditions, or modify a deliverable, Settling Defendants shall do so by sending a Notice of Dispute in accordance with Paragraph 125 within 30 Days (or such other time as the Parties agree to in writing) after receipt of the applicable decision.

24.     Any stipulated penalties applicable to the original submission, as provided in Section XVII, accrue during the 45 Day period or other specified period, but shall not be payable unless the resubmission is untimely or is disapproved in whole or in part; provided that, if the original submission was so deficient as to constitute a material breach of Settling Defendants' obligations under this Consent Decree, the stipulated penalties applicable to the original submission shall be due and payable notwithstanding any subsequent resubmission.

25.     The following submittals required under this Consent Decree are not subject to approval requirements of this Section:  Discharge and Release Reporting (Paragraph 35), Progress Reports (Paragraph 36), Quarterly Reporting for Long-Term Monitoring Plan (Paragraph 45), Annual Reporting on Community Health Program (Paragraph 54), Thermal Camera pilot test results (Paragraph 63), Train Build Study (Paragraph 65), Track Restoration Coordination Procedure (Paragraph 71), Vent and Burn Coordination Procedure (Paragraph 77), Emergency Response Preparedness Analysis (Paragraph 88), and Reporting Requirements (Section XVI).

26.     Permits.  Where any obligation under this Consent Decree requires Settling Defendants to obtain a federal, state, or local permit or approval, Settling Defendants shall submit timely and complete applications and take all other actions necessary to obtain all such permits or approvals.  Settling Defendants may seek relief under the provisions of Section XVIII (Force Majeure) for any delay in the performance of any such obligation resulting from a failure to obtain, or a delay in obtaining, any permit or approval required to fulfill such obligation, if Settling Defendants have submitted timely and complete applications and have taken all other actions necessary to obtain all such permits or approvals.  Nothing in this Consent Decree constitutes a permit issued under any federal or state statute or regulation.

VIII.   COORDINATION AND SUPERVISION OF THE WORK

27.     Project Coordinator and Supervising Contractor.  EPA has approved Project Navigator, Ltd. as Settling Defendants' Project Coordinator and ARCADIS U.S. Inc. as Settling Defendants' Supervising Contractor.  The Project Coordinator is responsible for administration of all actions by Settling Defendants required as the Work by this Consent Decree.  The Project Coordinator and Supervising Contractor must have sufficient technical expertise to coordinate the Work and carry out their responsibilities.  The Supervising Contractor must have a quality assurance system that complies with the most recent version of Quality Systems for Environmental Data and Technology Programs -- Requirements with Guidance for Use (American National Standard), ANSI/ASQC E4 (Feb. 2014), and must demonstrate this by submitting a copy of the Supervising Contractor's Quality Management Plan, to be prepared in accordance with EPA CIO 2015-5.01.1 for EPA's Quality Management Plan Standard (QMP, March 20, 2024).  To the greatest extent possible, the Project Coordinator shall be present on Site or readily available during performance of the Work.  Notice or communication relating to this Consent Decree from EPA to the Project Coordinator constitutes notice or communication to Settling Defendants.  Settling Defendants may change their Project Coordinator by following the procedures in Paragraph 28.

28.     Procedures for Notice and Disapproval

a.      Settling Defendants shall notify EPA of the name, title, contact information, and qualifications of any new Project Coordinator retained to perform the Work at least 60 days prior to commencement of such Work; shall notify EPA of the names, titles, contact information, and qualifications of any new contractors retained to perform the

Work at least 5 days prior to commencement of such Work; and shall maintain for EPA review a current list of subcontractors performing any Work.

b.      EPA may issue notices of disapproval regarding any proposed Project Coordinator or contractor as applicable.  If EPA issues a notice of disapproval, Settling Defendants shall, within 5 days, submit to EPA a list of supplemental proposed Project Coordinators or contractors, as applicable, including a description of the qualifications of each.

c.      EPA may disapprove the proposed Project Coordinator or contractor, based on objective assessment criteria (e.g., experience, capacity, technical expertise), if they have a conflict of interest regarding the project, or any combination of these factors.

29.      EPA On-Scene Coordinator.  EPA designates Ralph Dollhopf of Emergency Response Branch 1, Region 5, as its On-Scene Coordinator ("OSC").  The OSC has the authorities described in the NCP.  The OSC's absence from the Site is not a cause for stoppage of work.  EPA may change its OSC and will notify Settling Defendants of any such change.

## IX.      PERFORMANCE OF THE WORK

30.      Settling Defendants shall perform the Work in accordance with this Consent Decree, including all EPA-approved, conditionally approved, or modified deliverables relating to the removal actions identified in the EPA Orders, as required by an EPA Order or this Consent Decree (the "Removal Action Work Plans").  The Work includes, at a minimum, all actions necessary to implement the removal actions identified in the EPA Orders.

31.      Transition from EPA Orders.  Upon the Effective Date of this Consent Decree, the Consent Decree shall supersede the EPA Orders.  The Removal Action Work Plans, including all plans, standards, specifications, and schedules set forth in or developed and

approved by EPA pursuant to an EPA Order, shall be incorporated into and become enforceable under this Consent Decree.  Any document that is required to be submitted under this Consent Decree that has been previously submitted by Settling Defendants pursuant to the EPA Orders need not be resubmitted after the date that this Consent Decree supersedes the EPA Orders, unless EPA has not previously approved the document and determines that such document is inadequate under Section VII (Performance of Consent Decree Obligations).

32.     Settling Defendants shall comply with the EPA Orders and shall perform all activities required under the EPA Orders in accordance with the terms of the EPA Orders, until such time as the EPA Orders are superseded by this Decree pursuant to the preceding Paragraph. If this Consent Decree is not entered by the Court, the EPA Orders shall not be superseded and this Consent Decree shall have no effect on the EPA Orders.

33.     Nothing in this Consent Decree shall be deemed to bar the United States from enforcing the EPA Orders for Settling Defendants' failure to comply with an EPA Order as of the Effective Date of this Consent Decree.  With respect to violations of an EPA Order occurring prior to the date that the EPA Orders are superseded by this Consent Decree, EPA, at any time (including after the date that the EPA Orders have been superseded by this Consent Decree), may seek penalties or punitive damages pursuant to CERCLA Sections 106(b) and 107(c)(3), 42 U.S.C. §§ 9606(b) and 9607(c)(3), and CWA Section 311(b)(7)(B), 33 U.S.C. § 1321(b)(7)(B), notwithstanding any correction of such violations.

34.     Emergency Response.  If any event occurs during performance of the Work that causes or threatens to cause a release of Hazardous Substances or Hazardous Materials on, at, or from the Site and that either constitutes an emergency situation or that may present an immediate threat to public health or welfare or the environment, Settling Defendants shall: (a) immediately

take all appropriate action to prevent, abate, or minimize such release or threat of release; (b) immediately notify the OSC or, in the event of their unavailability, the Regional Duty Officer at (312) 353-2318 of the incident or Site conditions; and (c) take such actions in consultation with the OSC or Regional Duty Officer and in accordance with all applicable provisions of this Consent Decree, including the Health and Safety Plan and any other applicable deliverable approved by EPA.

35.    Discharge and Release Reporting.  Upon the occurrence of any event during performance of the Work that Settling Defendants are required to report under CERCLA Section 103, 42 U.S.C. § 9603, or Section 304 of the Emergency Planning and Community Right-to-Know Act ("EPCRA"), 42 U.S.C. § 11004, Settling Defendants shall immediately orally notify the OSC or, in the event of their unavailability, the Regional Duty Officer at (312) 353-2318, and the National Response Center at (800) 424-8802.  Settling Defendants shall also submit a written report to EPA within 7 Days after the onset of such event, (a) describing the event, and (b) all measures taken and to be taken: (1) to mitigate any release or threat of release, (2) to mitigate any endangerment caused or threatened by the release; and (3) to prevent the reoccurrence of any such release or threat of release.  The reporting requirements under this Paragraph are in addition to the reporting required by CERCLA Sections 103 and 111(g), 42 U.S.C. §§ 9603 and 9611(g), or EPCRA Section 304, 42 U.S.C. § 11004.

36.    Progress Reports.  Continuing until issuance of Notice of Completion of Work under Paragraphs 39 and 40, Settling Defendants shall submit written progress reports to EPA on a monthly basis, or at a lesser frequency as otherwise directed in writing by the OSC, regarding Settling Defendants' performance of the Work.  These reports must describe the effectiveness of the Work and all significant developments during the preceding reporting period, including the

actions performed and any problems encountered, results of sampling and tests and other data received during the reporting period, and the developments anticipated during the next reporting period, including a schedule of actions to be performed, anticipated problems, and planned resolutions of past or anticipated problems.

37. <u>Additional Activities</u>. If EPA determines that additional actions not included in the Removal Action Work Plans or other approved plans are necessary to protect public health or welfare or the environment pursuant to CERCLA Section 104, 33 U.S.C. § 9604, or CWA Section 311, 33 U.S.C. § 1321, and such additional activities are consistent with the EPA Orders, EPA will notify Settling Defendants of that determination. Settling Defendants also may request modification of the approved Removal Action Work Plans or other deliverables, consistent with Section XXIX (Modification). Settling Defendants shall, within 30 days thereafter, submit a revised work plan and other deliverables as necessary to EPA for approval. Settling Defendants shall implement the revised Removal Action Work Plan and any other deliverables upon EPA's approval in accordance with the procedures of Section VII (Performance of Consent Decree Obligations) in accordance with the approved provisions and schedule. This Paragraph does not limit the OSC's authority to make oral or written modifications to any plan or schedule pursuant to Section XXIX (Modification).

38. <u>Final Reports</u>.

a. Within 30 Days of completion of the Work relating to the CERCLA Removal Action, Settling Defendants shall submit for EPA review and approval a final report summarizing the CERCLA related removal actions completed pursuant to the Removal Action Workplans or directives. The final report shall conform, at a minimum, with the requirements set forth in NCP Section 300.165, "OSC Reports."

b.      Upon completion of Work relating to the CWA Removal Action, Settling Defendants shall submit for EPA review and approval a final report summarizing the CWA related removal actions completed pursuant to the Removal Action Workplans or directives.

c.      Each final report shall include:

(1)      a good faith estimate of total costs or a statement of actual costs incurred in relation to the applicable Removal Action;

(2)      a listing of quantities and types of materials removed off-Site or handled on-Site and a listing of the ultimate destination(s) of those materials;

(3)      a presentation of the analytical results of all sampling and analyses performed;

(4)      and accompanying appendices containing all relevant documentation generated during the removal actions (e.g., manifests, invoices, bills, contracts, and permits).

d.      Each final report must also include the following certification signed by a responsible corporate official of a Settling Defendant or Settling Defendants' Project Coordinator:

I certify under penalty of perjury that this document and all attachments were prepared under my direction or supervision in accordance with a system designed to assure that qualified personnel properly gather and evaluate the information submitted.  Based on my inquiry of the person or persons who manage the system, or those persons directly responsible for gathering the information, the information submitted is, to the best of my knowledge and belief, true, accurate, and complete.  I have no personal knowledge that the information submitted is other than true, accurate, and complete.  I am aware that there are significant penalties for submitting false information, including the possibility of fine and imprisonment for knowing violations.

39.  <u>Notice of Completion of CERCLA Removal Action</u>.  If after reviewing the Final Report under Paragraph 38.a. EPA determines that all Work related to the CERCLA Removal Action has been fully performed in accordance with this Consent Decree and that no further removal action is required pursuant to 40 C.F.R. § 300.415, EPA will provide notice to Settling Defendants of such determination.

40.  <u>Notice of Completion of CWA Removal Action</u>.  If after reviewing the Final Report under Paragraph 38.b. EPA determines that all Work related to the CWA Removal Action has been fully performed in accordance with this Consent Decree and after consultation with the Governor of Ohio determines that the removal is complete pursuant to 40 C.F.R. § 300.320, EPA will provide notice to Settling Defendants of such determination.

41.  <u>Compliance with Applicable Law</u>.  Nothing in this Consent Decree affects Settling Defendants' obligations to comply with all applicable state and federal laws and regulations, except as provided in CERCLA Section 121(e), 42 U.S.C. § 9621(e), and 40 C.F.R. §§ 300.400(e) and 300.415(j).  In accordance with 40 C.F.R. § 300.415(j), all on-site actions required pursuant to this Consent Decree shall, to the extent practicable, as determined by EPA, considering the exigencies of the situation, attain applicable or relevant and appropriate requirements ("ARARs") under federal environmental or state environmental or facility siting laws.  The CERCLA Removal Action activities conducted in accordance with this Consent Decree, if approved by EPA, will be deemed to be consistent with the NCP as provided under 40 C.F.R. § 300.700(c)(3)(ii).

42.  <u>Work Takeover</u>.

a.  If EPA determines that Settling Defendants: (1) have ceased implementation of any portion of the Work required under this Section; (2) are seriously

26

or repeatedly deficient or late in performing the Work required under this Section; or (3) are implementing the Work required under this Section in a manner that may cause an endangerment to public health or welfare or the environment, EPA may issue a notice of Work Takeover to Settling Defendants, including a description of the grounds for the notice and a period of time ("Remedy Period") within which Settling Defendants shall remedy the circumstances giving rise to the notice.  The Remedy Period will be 20 Days, unless EPA determines in its unreviewable discretion that there may be an endangerment, in which case the Remedy Period will be 10 Days.

   b.    If, by the end of the Remedy Period, Settling Defendants do not remedy to EPA's satisfaction the circumstances giving rise to the notice of Work Takeover, EPA may notify Settling Defendants and, as it deems necessary, commence a Work Takeover.

   c.    EPA may conduct the Work Takeover during the pendency of any dispute under Section XIX (Dispute Resolution) but shall terminate the Work Takeover if and when: (1) Settling Defendants remedy, to EPA's satisfaction, the circumstances giving rise to the notice of Work Takeover; or (2) upon the issuance of a final determination under Section XIX that EPA is required to terminate the Work Takeover.

## X.    POST REMOVAL LONG-TERM MONITORING

43.    Within 120 Days of the issuance of the Notices of Completion under Paragraphs 39 and 40, Settling Defendants shall submit to EPA for review and approval a Post-Removal Long-Term Monitoring Plan.  Settling Defendants shall implement the Post-Removal Long-Term Monitoring Plan in accordance with an approved schedule included therein.  The Post-Removal Long-Term Monitoring Plan shall describe the methodologies to be used to conduct the monitoring and shall include the following elements:

a.     Groundwater monitoring.  Monitoring of groundwater for a period of 10 years for Derailment-Associated Materials utilizing groundwater wells and Sentinel Wells and identifying targeted analytes and specified screening levels.  The 10-year monitoring period will commence following issuance of the Notice of Completion of CERCLA Removal Action pursuant to Paragraph 39.

b.     Surface water monitoring.  Monitoring of Sulphur Run, Leslie Run, and other impacted waterways for a period of 10 years for Derailment-Associated Materials, identifying targeted analytes and specified screening criteria, and including measures related to observed sheening and biological testing, where appropriate, to ensure Derailment-Associated Materials do not travel downstream.  The 10-year monitoring period will commence following issuance of the Notice of Completion of CWA Removal Action pursuant to Paragraph 40.

44.     If any Derailment-Associated Materials related to the Derailment are detected above actionable levels, as defined in the Post-Removal Long-Term Monitoring Plan, as a result of monitoring conducted under the Post-Removal Long-Term Monitoring Plan, Settling Defendants will address the Derailment-Associated Materials using an environmental benefit analysis to assess removal of such material and potential mitigation measures to protect public health and/or the environment, subject to EPA review and approval.

45.     Quarterly Reporting for Post-Removal Long-Term Monitoring Plan.  Following commencement of the Post-Removal Long-Term Monitoring Plan, Settling Defendants will provide EPA with quarterly reports of the long-term monitoring that include at minimum: (a) a summary of monitoring data, including any exceedances of specified screening levels or deviations from established baseline parameters, (b) document trends based on response and

28

long-term monitoring data, (c) technical evaluation and conclusions of the overall quality of waters, and (d) comparisons to any applicable local, state, or federal water quality standards.

46.    Data Management and Sharing.  When implementing the Post-Removal Long-Term Monitoring Program, Settling Defendants shall use the same or similar data management system and associated protocols for the storage, management, retrieval, and analysis as used during implementation of the removal actions.  Upon request by EPA, Setting Defendants shall provide access to data collected as part of the Post-Removal Long-Term Monitoring program.

47.    Private drinking water well monitoring.  Within 90 Days of the Effective Date, Settling Defendants shall establish a Private Drinking Water Well Monitoring Fund ("Private Well Fund") in an interest-bearing account with a deposit of $15 million and submit a Private Drinking Water Well Monitoring Work Plan ("Private Well Work Plan") for review and approval by EPA.  The Private Well Work Plan shall set forth procedures for the Columbiana County Health District and Pennsylvania Department of Environmental Protection, subject to the agreement of those agencies, to manage the Private Well Fund for the continuation of the Private Drinking Water Well Monitoring Program currently operating under the CERCLA Order ("Private Well Program") for a period of 10 years from issuance of the Notice of Completion of the CERCLA Removal Action under Paragraph 39, for all households participating in the Private Well Program as of the Effective Date.  The Private Well Program shall include contingency actions to be taken to address exceedances of specified screening levels, as appropriate. Following exhaustion of the Private Well Fund or the 10th anniversary of the commencement of the Private Well Program monitoring, Settling Defendants may seek termination of this provision pursuant to Section XXX (Termination), with any balance of unexpended funds to be released to Settling Defendants.

XI.     COMMUNITY HEALTH PROGRAM

48.     Settling Defendants shall provide medical exams to enable Qualified Individuals (Monitoring) to monitor their health ("Medical Monitoring Program") and Mental Health Services as described in this Section (jointly, "Community Health Program") for a period of up to 20 years.  Within 30 Days of the date of lodging, Settling Defendants shall deposit $25 million into an interest-bearing account ("CHP Fund") for use in funding costs related to their implementation of the Community Health Program.  During the initial 15 years, the CHP Fund will provide $5.5 million for Mental Health Services (Paragraph 51) and $500,000 for Community Facilitation (Paragraph 52).  The CHP Fund will provide $14 million and accrued interest from the CHP Fund to fund the Medical Monitoring Program (Paragraph 50) during the initial 15 years, and all programs during years 16-20 (Paragraph 55).  Upon the earlier of exhaustion of the CHP Fund or completion of the 20-year Community Health Program, Settling Defendants may seek termination of their obligations under this Section pursuant to Section XXX (Termination).

49.     Within 90 Days of the date of lodging, Settling Defendants shall submit a Community Health Program Plan limited to the elements of the Community Health Program outlined in this Section to EPA for review and approval.  The Community Health Program Plan shall include a date for commencing provision of services under this Section within one year of the Effective Date of this Consent Decree.  The Community Health Program Plan shall also include a process for Qualified Individuals (Monitoring) to enroll in the Medical Monitoring Program (Paragraph 50), proposed annual budgets including estimated costs for the Community Health Program and identification of Settling Defendants' proposed program Administrator of the Community Health Program.

50.     <u>Medical Monitoring Program</u>.  Settling Defendants shall provide as a "Medical Monitoring Exam" the services identified in Paragraph 50.a. to persons meeting the requirements for "Qualified Individuals (Monitoring)" identified in Paragraph 50.b.  These services shall be provided by approved healthcare providers, to be defined in the Community Health Program Plan, within 15 miles of East Palestine, Ohio.  Settling Defendants will make reasonable efforts to accommodate any First Responders not working or residing in Columbiana County, OH, or Beaver or Lawrence Counties, PA, to obtain services under the Medical Monitoring Program at a location within 25 miles of their current workplace.

   a.  A Medical Monitoring Exam shall include the following elements:

   (1)     Routine physical examination;

   (2)     Comprehensive metabolic blood panel;

   (3)     Pulmonary function tests;

   (4)     X-rays;

   (5)     Assessment of results and referral to specialist as warranted based on the Exam; and

   (6)     Additional screenings the Parties agree are appropriate over the course of the Medical Monitoring Program.

   b.  Qualified Individuals (Monitoring) shall include:

   (1)     Individuals who at any point between February 3, 2023, and the date of lodging of this Consent Decree:

        (a)     resided within 2 miles of the Derailment Area; or

(b)     resided within 250 feet from the centerline (in both directions) of Leslie Run from the confluence of Sulphur Run to the confluence of Bull Run;

(2)    First Responders present at the Site in February 2023; and

(3)    Other individuals admitted on a case-by-case basis in accordance with the terms set forth in Appendix C.

c.    Settling Defendants shall provide requesting Qualified Individuals (Monitoring) with 10 Medical Monitoring Exams during the initial 15 years following the Effective Date, on a no greater than once per calendar year basis.

51.    <u>Mental Health Services</u>.  Settling Defendants shall provide the services identified in Paragraph 51.a. to persons meeting the requirements for "Qualified Individuals (Mental Health)" identified in Paragraph 51.b.  These services shall be provided in Columbiana County, OH and Beaver and Lawrence Counties, PA, through in-person and virtual sessions.

a.    Mental Health Services shall include counseling from a certified mental health care provider to address mental health impacts relating to or resulting from the Derailment and/or the Vent and Burn, and associated environmental and physical health concerns, including but not limited to post traumatic stress, anxiety, and services to children and young adults.

b.    Qualified Individuals (Mental Health) shall include:

(1)    Individuals who resided or worked within 2 miles of the Derailment Area at any time from February 3, 2023, through the date of lodging;

(2)     Individuals who resided within Columbiana County, OH or Beaver or Lawrence Counties, PA at any time from February 3, 2023, through the date of lodging of this Consent Decree; and

(3)     First Responders present at the Site in February 2023.

c.   Settling Defendants shall provide requesting Qualified Individuals (Mental Health) with individual and group counseling services during the 15-year period following the Effective Date, subject to availability of funds.  Settling Defendants shall budget $5.5 million from the CHP Fund for Mental Health Services during this period.

52.    <u>Community Facilitation Plan</u>.  Within 60 Days of the date of lodging of the Consent Decree, Settling Defendants shall submit a Community Facilitation Plan to EPA for review and approval that includes establishment of a Coordination Committee of community members that is representative of East Palestine and adjacent communities, including vulnerable populations such as seniors and children, farmworkers, community based organizations, and local government agencies, to help advise, coordinate, and facilitate provision of Community Health Program under this Section.

53.    The Community Facilitation Plan shall also include Settling Defendants' proposal to fund an amount up to $500,000 from the CHP Fund during the initial 15 years of the Consent Decree for: (a) an individual to provide independent facilitation support to (1) advise on and assist community members in understanding health-related studies and assessments being conducted in response to the Derailment, and (2) advise community members on accessing the Community Health Program provided through this Consent Decree; and (b) notification and

outreach efforts to community members regarding availability and enrollment in Community
Health Program.

54.     <u>Annual Reporting on Community Health Program</u>.  Beginning one year after the
start date of implementation of the Community Health Program, Settling Defendants shall
provide EPA with annual reports that include, at minimum:

(a)   the amount of funds spent on the Medical Monitoring Program during
the reporting year, including a breakdown of administrative and non-
administrative costs;

(b)   the amount of funds spent on Mental Health Services during the
reporting year, including a breakdown of administrative and non-
administrative costs;

(c)   the amount of funds spent under the Community Facilitation Plan during
the reporting year, if applicable;

(d)   the number of Qualified Individuals (Monitoring) who received Medical
Monitoring Exams during the reporting year;

(e)   the number of Qualified Individuals (Mental Health) who received
mental health services during the reporting year;

(f)   the number of people admitted into the Medical Monitoring Program
under the case-by-case determinations as specified in Paragraph 50.b(3)
during the reporting year;

(g)   the number of people who applied but were not admitted into the
Medical Monitoring Program under Paragraph 46.b(3) during the
reporting year;

34

     (h)    a description of the types of mental health services offered during the reporting year; and

     (i)    all community facilitation activities performed during the reporting year.

If, after reviewing an Annual Report submitted by Settling Defendants under this Paragraph, EPA requests additional information regarding items (a)-(i), Settling Defendants shall provide the requested information to EPA within 30 days of EPA's request.

     55.    <u>Community Health Program Reassessment</u>.  Following the 14th anniversary of the Effective Date, Settling Defendants shall assess the status of the CHP Fund, the cost of performing Medical Monitoring Exams and Mental Health Services and providing a Community Facilitator, and demand trends for such services and submit a proposal, for EPA review and approval, regarding the frequency of Medical Monitoring Exams to be provided and the budget for Mental Health Services and the Community Facilitator for Consent Decree years 16-20. Settling Defendants shall not be obligated to provide additional funding for the CHP Fund regardless of the status of the CHP Fund at that time.

## XII.    RAIL SAFETY IMPROVEMENTS

     56.    <u>Hot Bearing Detectors</u>.  Within 12 months of the date of lodging, Settling Defendants shall install sufficient additional HBDs on Key Routes to reduce to no greater than 15.05 miles the spacing between (i) two adjacent HBDs or (ii) a HBD and a rail yard.

     57.    Within 12 months of the date of lodging, Settling Defendants will complete installation of 259 HBDs on Key Routes.  Computation of compliance with this Paragraph will include all HBDs installed by Settling Defendants subsequent to the Derailment and prior to the date of lodging (approximately 183 HBDs).

58.     If Settling Defendants complete the HBD spacing requirement set forth in Paragraph 56 prior to exhausting the requirement to install 259 HBDs in Paragraph 57, Settling Defendants shall prioritize placement of the remaining HBDs on Key Routes in a manner providing greater HBD density for approaches to areas with greater population density and environmentally sensitive locations.

59.     Prior to the Derailment, Settling Defendants' HBDs transmitted bearing temperature related data to the Wayside Help Desk after the entire train completed its passage over an HBD.  Settling Defendants shall revise their HBD data transmission protocols on Key Routes to transmit data at a frequency not less than after the passing of every third Railcar to provide near-real-time data to the applicable safety systems, including the Wayside Help Desk. Settling Defendants shall implement the revised HBD data transmission protocol on the following schedule:

> (a)    25% of Key Route HBDs by December 31, 2024;
>
> (b)    50% of Key Route HBDs by December 31, 2025; and
>
> (c)    100% of Key Route HBDs by December 31, 2026.

Nothing in this provision shall preclude Settling Defendants from proposing to the United States alternative data transmission procedures that achieve an equivalent or more frequent transmission of wheel bearing temperature data to the applicable safety systems in accordance with the same deployment schedule set forth above.

60.     After the Derailment, Settling Defendants lowered their Critical Alarm Level to 170° F.  HBD data indicating exceedance of the Critical Alarm Level sets off a Critical Alarm that is transmitted directly to the train crew and requires stoppage of the train and setting out the Railcar triggering the Critical Alarm for mechanical road truck inspection and, as required,

maintenance.  Settling Defendants shall maintain a Critical Alarm Level of no greater than 170°

F for trains on Key Routes, subject to the Operational Modifications provision in Paragraph 164.

61.  <u>Wayside Help Desk</u>.  Settling Defendants operate a Wayside Help Desk where

information transmitted from HBDs and other Wayside Detectors are assessed and

communicated, as appropriate, to train crews.  The Wayside Help Desk operates 24-hours per

day, 7 days per week.

62.  After the Derailment, Settling Defendants increased staffing of the Wayside Help

Desk.  Pursuant to this Consent Decree, Settling Defendants shall maintain the following

minimum staffing levels for the Wayside Help Desk:

>    (a)  At least three staffers (supervisor and/or analysts) will be on duty at
>         the Wayside Help Desk at all times;
>
>    (b)  At least two of those staffers will assess Wayside Diagnostic System
>         alerts ("screen up") at all times; and
>
>    (c)  Wayside Help Desk staffers shall be limited to 8-hour shifts.

63.  <u>Thermal Camera Piloting</u>.  Settling Defendants have commenced efforts to assess

the use of thermal camera technology and Onboard Bearing Temperature Sensors to enhance the

detection of hot bearings and wheels using technology located on the Railcars themselves.  By

December 31, 2026, Settling Defendants shall conduct a pilot test regarding the effectiveness of

thermal camera technology under regular train operating conditions, and report the results of the

pilot test to the United States.

64.  <u>Train Build Rules</u>.  Following the Derailment, Settling Defendants revised their

Train Build operating rules to mitigate the risk of derailments through reduction and control of

in-train forces.  These revisions were initially implemented through an Operations Bulletin and

then codified in Settling Defendants' permanent operating rules.  Subject to the Operational

Modification provision at Paragraph 164, pursuant to this Consent Decree Settling Defendants

shall maintain compliance with the following Train Build rules, as described in Settling

Defendants' March 25, 2023, Systems Operations Bulletin 12 ("OB-12"):

    (a)    trains exceeding 8,000 tons must not operate with more than 33% of the train's total tonnage in the rear 25% of the train's length;

    (b)    blocks of 30 or more empty Railcars must be handled on the rear of trains;

    (c)    blocks of 30 or more Railcars weighing greater than 120 tons must be handled on the head end of trains;

    (d)    mixed freight trains exceeding 10,000 feet must operate with distributed power;

    (e)    intermodal trains exceeding 12,000 feet must operate with distributed power;

    (f)    distributed power units must be placed in certain locations on trains based on tonnage and length, as described in Settling Defendants' OB-12;

    (g)    40 or more Railcars with end-of-car-cushioning units must be handled in a block at the head end of trains; and

    (h)    blocks of double-stacked containers on flatcars must be handled on the head end of trains.

65.    Within one year of the Effective Date, Settling Defendants shall complete a

"Train Build Study" and within 90 Days thereafter submit the Train Build Study to the United

States.  The Train Build Study shall evaluate the impact of variables, including train length, physical characteristics of Settling Defendants' rail network, Railcar placement, and power distribution, on in-train forces, as well as how technology and changes to train marshalling rules might improve the safety of operations.

66.    <u>High-Hazard Flammable Trains</u>.  Regulations set forth at 49 C.F.R. § 174.310 impose additional safety requirements on the operation of "High-Hazard Flammable Trains" (as defined in 49 C.F.R. § 171.8).  These additional requirements include:

(a)    <u>Routing</u>.  Additional planning requirements in accordance with 49 C.F.R. § 172, subpart I;

(b)    <u>Speed Restrictions</u>.  All HHFTs are limited to a maximum speed of 50 mph.  HHFTs are further limited to a maximum speed of 40 mph within the geographic limits of high-threat urban areas (as defined at 49 C.F.R. § 1580.3) unless all Railcars carrying Class 3 flammable liquids meet or exceed specified standards;

(c)    <u>Braking</u>.  Any HHFT operating at a speed in excess of 30 mph must be equipped and operated with either a 2-way end-of-train device or a distributed power system;

(d)    <u>Oil Spill Response Plan</u>.  Operators of HHFTs must comply with additional requirements for petroleum oil transported by rail in accordance with 49 C.F.R. Part 130; and

(e)    <u>HHFT Information Sharing Notification for Emergency Response Planning</u>.  Operators of HHFTs must comply with additional requirements

for information sharing with state and tribal emergency response

commissions in accordance with 49 C.F.R. § 174.312.

67.     Regulations define an HHFT as a single train transporting 20 or more loaded tank

cars of a Class 3 flammable liquid in a continuous block or a single train carrying 35 or more

loaded tank cars of a Class 3 flammable liquid throughout the train consist.  49 C.F.R. § 171.8.

68.     Pursuant to this Consent Decree, Settling Defendants shall comply with the

requirements set forth at 49 C.F.R. § 174.310(a)(1)-(3) and (6)-(7) for any single train

transporting any combination of 20 or more loaded tank cars of a Class 3 flammable liquid (as

defined at 49 C.F.R. § 173.120(a)), a Class 3 combustible liquid (as defined at 49 C.F.R.

§ 173.120(b)), or a Class 2 flammable gas (as defined at 49 C.F.R. § 173.115(a)) in a continuous

block or a single train carrying 35 or more loaded tank cars of a Class 3 flammable liquid, Class

3 combustible liquid, or Class 2 flammable gas throughout the train consist.  Reporting and

notices relating to 49 C.F.R. § 174.310 shall reference the requirements of this Paragraph and

itemize the number of loaded tank cars of a Class 3 flammable liquid, Class 3 combustible liquid,

and Class 2 flammable gas.

69.     DOT-111 Tank Cars.  Within 180 Days of the date of lodging, Settling

Defendants will cease use of any DOT-111 Tank Cars for transportation of Flammable

Hazardous Materials, other than under a common carrier obligation.

70.     Within 180 Days of the date of lodging, Settling Defendants shall submit a

"Customer Tank Car Replacement Plan" to the United States for review and approval, taking

into consideration Settling Defendants' industry and technical expertise.  Settling Defendants

will implement the Customer Tank Car Replacement Plan within 90 Days of approval.  The

Customer Tank Car Replacement Plan shall be designed to encourage customers to use DOT-

40

117R Tank Cars (or similar armored Railcars) in place of DOT-111 Tank Cars for the transportation of Flammable Hazardous Materials and shall include financial incentives as an aspect of the plan.  Settling Defendants may seek designation of the Customer Tank Car Replacement Plan as Confidential Business Information under 40 C.F.R. Part 2 pursuant to the procedures set forth therein.

## XIII.   EMERGENCY PREPAREDNESS

71.    <u>Track Restoration Coordination Procedure</u>.  Settling Defendants will develop and adopt procedures ("Track Restoration Coordination Procedure") to ensure, where appropriate, adequate coordination and consultation amongst Settling Defendants, emergency responders, and relevant government officials, for the purpose of enhancing protection of public health, occupational safety for First Responders, and the environment before tracks are reopened following any derailment involving released Hazardous Material to or adjacent to the Track Structure.  The term "adjacent to" in this Paragraph means within 10 feet of the ballast.

72.    The Track Restoration Coordination Procedure may include multiple response scenarios that will address, as appropriate, the following without limitation:

(a)    Use of Incident Command principles and participation in the Incident Command System, including participation in Unified Command when a Unified Command has been established;

(b)    For incidents involving Unified Command, a consultation process before restoring and reopening tracks for use;

(c)    For incidents where the Incident Command has established incident objectives, ensuring that a decision to restore and reopen tracks aligns with the established incident objectives; and

41

(d)    Information sharing and discussion with relevant government authorities to allow input into Settling Defendants' decisions to restore and reopen tracks.

73.    Settling Defendants will select entities to participate in a "Track Restoration Workgroup" to provide input on Settling Defendants' preparation of the Track Restoration Coordination Procedure.  Within 30 Days of the Effective Date, Settling Defendants will schedule an initial meeting of the Track Restoration Workgroup to establish the framework for the Track Restoration Coordination Procedure.  Settling Defendants shall organize and convene at least three meetings of the Track Restoration Workgroup prior to submitting the initial draft Track Restoration Coordination Procedure to EPA for review and comment.

74.    Within 6 months of the Effective Date, Settling Defendants will provide EPA and the Track Restoration Workgroup with a draft Track Restoration Coordination Procedure for review and comment.  As part of its review of the draft Track Restoration Coordination Procedure EPA may consult with any third party, including members of the Track Restoration Workgroup.  Within 90 Days of receipt, EPA will provide any comments regarding the draft Track Restoration Coordination Procedure for Settling Defendants' consideration.

75.    If within 6 months of the Effective Date, Settling Defendants receive a request by any state, federal, or local authority to provide input on the draft Track Restoration Coordination Procedure, Settling Defendants will meet with and solicit input from such authorities at a mutually convenient time, provided that such a meeting would not unduly delay Settling Defendants' ability to meet their obligations under this Section.  Settling Defendants will provide EPA and the Track Restoration Workgroup with advanced notice of any meetings with third

parties (not including contractors) regarding the draft Track Restoration Coordination Procedure and give EPA and the Track Restoration Workgroup the opportunity to attend those meetings.

76.     Within 12 months of the Effective Date, Settling Defendants shall provide EPA with an electronic copy of the final Track Restoration Coordination Procedure and a transmittal letter that responds to any comments from EPA.

77.     <u>Vent and Burn Coordination Procedure</u>.  Settling Defendants will develop and adopt a "Vent and Burn Coordination Procedure" to ensure appropriate consultation with government agencies, First Responders, Unified Command, and public health officials in advance of any Vent and Burn emergency procedure proposed by Settling Defendants, and to establish standard protocols for consideration of public health and First Responder safety, including communication with the public and other stakeholders that may be affected by the proposed vent and burn.  A vent and burn is an emergency response procedure designed to quickly and effectively release Railcar internal vapor pressure and liquid products to avoid uncontrolled tank rupture and environmental contamination.

78.     Within 6 months of the Effective Date of the Consent Decree, Settling Defendants will convene a workgroup ("Vent and Burn Workgroup") to establish the framework for the Vent and Burn Coordination Procedure.  Settling Defendants will select entities to be included in the Vent and Burn Coordination Workgroup.  Settling Defendants must organize and convene at least three virtual or hybrid Vent and Burn Workgroup meetings within 18 months of the Effective Date.

79.     Within 18 months of the Effective Date, Settling Defendants will provide EPA and the Vent and Burn Workgroup with a draft Vent and Burn Coordination Procedure for review and comment.  As part of its review, EPA may consult with any third party (not including

contractors), including members of the Vent and Burn Workgroup.  EPA will provide any comments regarding the draft Vent and Burn Coordination Procedure within 90 Days of receipt.

80.     If within 18 months of the Effective Date, Settling Defendants receive a request by any state, federal, or local authority to provide input on the draft Vent and Burn Coordination Procedure, Settling Defendants will meet with and solicit input from such authority at a mutually convenient time, provided that the meeting would not unduly delay Settling Defendants' ability to meet their obligations under this Section.  Settling Defendants will provide EPA and the Vent and Burn Workgroup with advanced notice of any meetings with third parties regarding the draft Vent and Burn Coordination Procedure and will give EPA and the Vent and Burn Workgroup the opportunity to attend those meetings.

81.     Within 24 months of the Effective Date, Settling Defendants will provide EPA with an electronic copy of the final Vent and Burn Coordination Procedure that addresses all comments from EPA and the Vent and Burn Workgroup.

82.     <u>Emergency Response Exercise and Training Programs</u>.  Settling Defendants will organize, lead, and perform the following emergency response exercise and training programs, at Settling Defendants' expense:

    a.     <u>Norfolk Southern Annual Exercises</u>.  Settling Defendants will complete annual emergency response exercises, including at least one field exercise and one tabletop exercise each year, to practice implementation of the procedures required pursuant to Paragraphs 71-81 above and applying the National Response Framework ("Annual Exercises").  Annual Exercises may be performed as part of any general emergency response exercises performed by Settling Defendants as part of the TRANSCAER© program.

b.      Additionally, Settling Defendants shall coordinate with EPA and the relevant Area Committee and Sub-area Committee, if applicable, regarding the development, planning, and implementation of the Annual Exercises.  Settling Defendants will provide for EPA review and comment a list of possible locations for the Annual Exercises with the goal of targeting different jurisdictions across Settling Defendants' network.  Each Annual Exercise shall be performed in a location selected by Settling Defendants from Settling Defendants' list.  Settling Defendants will ensure that each Annual Exercise involves the participation of Settling Defendants' representatives who may be involved in implementing the procedures required by Paragraphs 71-81 above.

c.      Settling Defendants will provide EPA with 90 Days advanced notice of each Annual Exercise and EPA on-scene coordinators may observe and participate in the Annual Exercises.  For each Annual Exercise, Settling Defendants will also invite to participate in the exercise all state and local emergency response organizations in the county and all adjoining counties where the Annual Exercise is scheduled to take place. Settling Defendants will provide invitees with notice at least 90 Days prior to the Annual Exercise and inform invitees that the Annual Exercise will be provided at no cost to them.

d.      Within 30 Days of completing each Annual Exercise, Settling Defendants will provide a summary of best practices discussed and any recommended changes to the Vent and Burn Coordination Procedure and Track Restoration Coordination Procedure to the Vent and Burn and Track Restoration Workgroups, respectively.  Settling Defendants may make changes to the Vent and Burn Coordination Procedure and Track Restoration Coordination Procedure after receiving approval from the relevant Workgroup and

sending the proposed changes to EPA.  If Settling Defendants make changes to either Procedure in accordance with this Paragraph, Settling Defendants shall provide an electronic copy of the updated Procedure to EPA.

83.     Area Committee and Sub-area Committee Trainings and Exercises.  Settling Defendants shall participate in any field exercise or other emergency response training they are invited to by a Sub-area Committee or Area Committee, provided they receive notice at least 90-Days prior to such field exercise or emergency response training.

84.     FEMA Training Requirements.  Within 12 months of the Effective Date, Settling Defendants will provide all National Incident Management System (NIMS) training required by FEMA to all Settling Defendants' representatives whose core responsibilities may require them to respond to a derailment involving release of Hazardous Materials.  Settling Defendants shall provide the FEMA recommended and required trainings to any such personnel subsequently hired or retained as soon as practicable, but no later than 12 months after their employment or contract start date, unless the individual previously completed these trainings.  All FEMA recommended or required training will be conducted by NIMS certified instructors and may be conducted virtually.

85.     FEMA training required under Paragraph 84 includes all training required by FEMA as well as the following required and recommended trainings:

(a)     Incident Command System Level 100 through Level 200 for any personnel whose core responsibilities include responding to a derailment or other emergency incident;

(b)     Incident Command System Level 100 through Level 300 for any personnel before they participate in any derailment or emergency incident as a member of any Incident Management Team; and

(c)     Incident Command System Level 400 training for any executive or senior management-level personnel who may be responsible for making funding, personnel, or resource decisions in response to a derailment or other emergency incident (unless they have already completed Incident Command System Levels 100 through 400).

86.     <u>Transportation Rail Incidents Preparedness and Response Trainings</u>.  Settling Defendants will provide the Transportation Rail Incidents Preparedness and Response Flammable Liquid Unit training (TRIPR Training) annually to all personnel whose core job responsibilities relate to emergency response and preparedness.  Annual TRIPR Training will be held at Settling Defendants' Regional Response Training Center once it is open.  Settling Defendants will invite staff from EPA's Emergency Response Program and local emergency response organizations in Ohio, Pennsylvania, and West Virginia, including Local Emergency Planning Committees and State Emergency Response Commissions in each state, to the annual TRIPR Trainings, subject only to Training Center capacity.  Settling Defendants will (i) provide invitees with notice at least 90 Days prior to the TRIPR Training, (ii) offer to provide lodging and mileage expenses to First Responders who attend the TRIPR Training, and (iii) state that the TRIPR Training will be provided at no cost to invitees.

87.     <u>Retention of Exercise and Training Records</u>.  Settling Defendants shall retain records demonstrating that each exercise and training program required under this Consent Decree was completed, including the date and duration of the exercise or training, the number of

47

people who participated in the exercise or training, and the names of non-Norfolk Southern organizations or entities that participated in the exercise or training.  Settling Defendants will also retain certification documents demonstrating that their personnel have completed the FEMA trainings required pursuant to Paragraphs 84 and 85 above.  Settling Defendants will make these training records and certification documents available to EPA upon request.

88.    <u>Emergency Response Preparedness Analysis</u>.  Within 90 Days of the Effective Date, Settling Defendants will provide to EPA an "Emergency Response Preparedness Analysis" that will include, but not be limited to:

(a)    An inventory of Settling Defendants' current response capabilities and resource availability, including the geographic location of existing contracts with emergency response experts and prepositioned emergency response equipment;

(b)    Electronic geographic information system (GIS) maps that identify the geographic locations of all pipeline rights-of-way adjacent to or crossing Norfolk Southern rights-of-way; and

(c)    A description of any existing processes for developing route alternatives to prevent spills or releases from railcars carrying Hazardous Materials in the event of a natural disaster.

For the portion of the Emergency Response Preparedness Analysis that contains the information required under (a) and (b) of this Paragraph, Settling Defendants may use their web-based response application that provides details regarding Settling Defendants' response capabilities.

89.    If EPA provides written recommendations on actions needed by Settling Defendants to address emergency preparedness shortfalls or gaps after receiving the Emergency

Response Preparedness Analysis, Settling Defendants will respond to the EPA recommendations in writing within 90 Days of receipt of such recommendations.  Within 6 months of receipt of EPA's recommendations, Settling Defendants will take all necessary actions to ensure that all material gaps and shortfalls identified in the Emergency Response Preparedness Analysis have been addressed.  Within 14 Days after addressing the identified gaps and shortfalls, Settling Defendants will provide a report to EPA documenting the actions completed.

90.     <u>Updates to Corporate Emergency Response Plan</u>.  Settling Defendants will make the following changes to their Corporate Emergency Response Plan and shall include these changes in all versions of the Corporate Emergency Response Plan and other document(s) used by Settling Defendants when responding to emergencies:

a.      Within 12 months of the Effective Date, Settling Defendants will add language relevant to CWA Section 311 response planning that includes guidelines for (i) responding to derailments near or otherwise impacting waterways or pipelines and (ii) preparations needed for mitigating risks posed by natural disasters;

b.      Settling Defendants will include the final Procedures required under Paragraphs 71-81 above; and

c.      Settling Defendants will make revisions that incorporate any actions taken to address identified gaps and shortfalls in their emergency response capabilities and resource availability, in accordance with Paragraphs 88-89 above.

XIV.   LOCAL WATERWAYS REMEDIATION PLAN

91.     Within 180 Days of the date of lodging, Settling Defendants shall submit for EPA

review and approval a "Local Waterways Remediation Plan."  Settling Defendants shall

implement the Local Waterways Remediation Plan following approval by EPA.  The Local

Waterways Remediation Plan shall contain proposed projects consistent with an estimated

budget of $6 million (including planning for up to a 15% cost overrun contingency) selected to

reduce pollution in and potential recontamination of Sulphur Run and Leslie Run and their

downstream waters and restoring the environmental quality of those waters and related habitat.

Project proposal descriptions will include estimated costs, the proposed schedule for completing

each project, and Settling Defendants' plan for securing any necessary government approvals for

each project.

92.     Design of the Local Waterways Remediation Plan shall prioritize inclusion of

projects that address the following:

(a)     Cleanup of legacy contamination in Sulphur Run and Leslie Run.  Cleanup

of sediments in specific portions of Sulphur and Leslie Runs identified as

containing historical contamination from sources not associated with the

Derailment ("Legacy Contamination").  The components of this project

shall include an investigation workplan for evaluating and collecting data

regarding Legacy Contamination based on parameters established in

consultation with EPA, and a cleanup workplan that describes actions to

remove and mitigate Legacy Contamination in soil or sediment that present

long-term risks to human health or the environment, such as dredging and

excavation, and actions to stabilize and restore impacted riverbanks.  All

50

workplans will be subject to EPA review and approval, and the cleanup

work will be performed pursuant to EPA oversight.

(b)  Control of urban runoff and stormwater management.  Construction of green

or grey infrastructure project(s), or other demonstrably effective stormwater

control measure(s), in East Palestine to reduce or treat stormwater runoff

discharging to Sulphur Run and Leslie Run and abate pollution to the

waterways.

(c)  Educational outreach - preventing stream contamination.  Design and

implement a public outreach campaign, including development of

educational materials, trainings, and other actions to promote community-

led watershed management, for the purpose of educating the public on the

primary sources of nonpoint source pollution and stormwater runoff to

Sulphur Run and Leslie Run and identifying best practices for reducing

nonpoint source pollution of these waterways.

(d)  Aquatic and riparian habitat restoration. Improvement of aquatic and

riparian habitat in and near Sulphur Run and Leslie Run, which may include

funding for restocking of aquatic species, planting native riparian grasses,

shrubs, and/or trees, and removing invasive species.

93.    Projects shall be performed using sound, generally accepted engineering

practices; in a manner consistent with industry standards, regulatory requirements, and natural

channel design techniques; and consistent with the goal of maximizing environmental benefits.

Nothing herein shall be construed as relieving Settling Defendants of the duty to comply with all

51

federal, state, and local requirements that may be applicable to performance of these projects, including the duty to apply for and comply with any federal or state permitting requirements.

94.     Prior to submitting the draft Local Waterways Remediation Plan to EPA, Settling Defendants will make good faith efforts to consult with the State of Ohio, the Commonwealth of Pennsylvania (if relevant to the project), the Village of East Palestine, and any other relevant stakeholders regarding the proposed projects.

<p style="text-align:center">XV.    NATURAL RESOURCE DAMAGES</p>

95.     Within 30 Days of the Effective Date, Settling Defendants shall pay $175,000, plus Interest accrued on that amount from the date of lodging through the date of payment, to the United States for Natural Resource Damages.  Subject to the deduction required by the 1994 CJS Appropriations Act, this recovery shall be deposited in the DOI NRDAR Fund.  All funds received under this Paragraph must be used to restore, rehabilitate, replace and/or acquire the equivalent of the natural resources alleged to be injured as a result of releases of Hazardous Substances at or from the Site, in accordance with this Decree.  The activities for which restoration funds may be applied include: (a) restoration planning, including any further assessment needed to develop and finalize restoration plans; (b) implementation of restoration projects; (c) administrative expenses and indirect costs related to restoration planning or implementation; and (d) operation, maintenance, and monitoring of completed restoration projects and adaptive management to reinstate or enhance the effectiveness of restoration in accordance with 43 C.F.R. § 11.81, and 42 U.S.C. §§ 9607(f) and 9611(i).

96.     DOI, as the Federal Trustee for the Site, has identified implementation of conservation easements to protect at least 20 acres of wetlands habitat as an appropriate use of these funds.  Settling Defendants may not challenge or dispute, in any forum or proceeding, any

<p style="text-align:center">52</p>

decision by the Federal Trustee regarding the use of restoration funds under this Section or the selection or implementation of restoration relating to the Site.

      97.    <u>Payments for Assessment Costs</u>.  Within 30 Days of the Effective Date, Settling Defendants shall pay $5,000, plus Interest accrued on that amount from the date of lodging through the date of payment, to the United States for reimbursement of assessment costs incurred by DOI.  Subject to the deduction required by 1994 CJS Appropriations Act, this recovery shall be deposited in the NRDAR Fund.

      98.    Payments due under this Section shall be made in accordance with provisions set forth in Paragraph 10.  A copy of the paperwork documenting EFT payments and any accompanying correspondence shall be sent by Settling Defendants to the persons listed in Section XXVII (Notices) for notices to DOI, as well as to:

> Bruce Nesslage
> Restoration Fund Manager
> Office of Restoration and Damage Assessment (ORDA)
> Mail Stop 2653, MIB
> 1849 C Street, N.W.
> Washington, D.C. 20240
> Bruce_A_Nesslage@ios.doi.goe

Notices shall reference DJ # 90-11-3-12792 and indicate that the payment relates to the "East Palestine, Ohio Train Derailment" account in the DOI NRDAR Fund at Treasury Symbol 14X5198, and include Settling Defendants' names.

## XVI.   REPORTING REQUIREMENTS

      99.    Settling Defendants shall submit the following reports to EPA and DOJ at the addresses set forth Section XXVII (Notices):

      a.    By July 31st and January 31st of each year after the lodging of this Consent Decree, until termination of this Decree pursuant to Section XXX, Settling Defendants

shall submit electronically a semi-annual report for the preceding 6 months that includes a discussion of Settling Defendants' progress in satisfying its obligations in connection with Sections X through XV, including, at a minimum, a narrative description of activities undertaken and status of removal work, including the completion of any milestones set forth in a Removal Action Work Plan.  Settling Defendants' semi-annual reports only need to reference the information required as part of the reports submitted under Section IX (Performance of the Work), Section X (Post-Removal Long-Term Monitoring), and Section XI (Community Health Program).

b.      The semi-annual report shall also include a description of any non-compliance with the requirements of this Consent Decree and an explanation of the violation's likely cause and of the remedial steps taken, or to be taken, to prevent or minimize such violation.  If the cause of a violation cannot be fully explained at the time the report is due, Settling Defendants shall so state in the report.  Settling Defendants shall investigate the cause of the violation and shall then submit an amendment to the report, including a full explanation of the cause of the violation, within 30 Days of the Day Settling Defendants become aware of the cause of the violation.  Nothing in this Paragraph or the following Paragraph relieves Settling Defendants of their obligation to provide the notice required by Section XVIII (Force Majeure).

c.      By January 31st of each year after the lodging of this Consent Decree, until termination of this Decree pursuant to Section XXX, Settling Defendants shall submit electronically an annual Rail Safety Enhancement Report for the preceding calendar year that includes a discussion of Settling Defendants' progress in developing and implementing the rail safety enhancements enumerated in Appendix B, Section B.

Nothing in this Paragraph requires Settling Defendants to develop, deploy, install, or implement the enhancements enumerated in Appendix B.

100.     Whenever any violation of this Consent Decree or any other event affecting Settling Defendants' performance under this Decree may pose an immediate threat to the public health or welfare or the environment, Settling Defendants shall notify EPA by email in accordance with Section XXVII (Notices) as soon as possible, but no later than 24 hours after Settling Defendants first knew of the violation or event.  This procedure is in addition to the requirements set forth in the preceding Paragraph.

101.     Each report submitted by Settling Defendants under this Section shall be signed by an official of the submitting party and include the following certification:

> I certify under penalty of perjury that this document and all attachments were prepared under my direction or supervision in accordance with a system designed to assure that qualified personnel properly gather and evaluate the information submitted.  Based on my inquiry of the person or persons who manage the system, or those persons directly responsible for gathering the information, the information submitted is, to the best of my knowledge and belief, true, accurate, and complete.  I have no personal knowledge that the information submitted is other than true, accurate, and complete.  I am aware that there are significant penalties for submitting false information, including the possibility of fine and imprisonment for knowing violations.

102.     This certification requirement does not apply to emergency or similar notifications where compliance would be impractical.

103.     The reporting requirements of this Consent Decree do not relieve Settling Defendants of any reporting obligations required by CERCLA, the CWA, or implementing regulations, or by any other federal, state, or local law, regulation, permit, or other requirement.

104.     Any information provided pursuant to this Consent Decree may be used by the United States in any proceeding to enforce the provisions of this Consent Decree and as otherwise permitted by law.

## XVII.  STIPULATED PENALTIES

105.    Settling Defendants shall be liable for stipulated penalties to the United States for violations of this Consent Decree as specified below, unless excused under Section XVIII (Force Majeure).  A violation includes failing to perform any obligation required by the terms of this Consent Decree, including any actions or schedule approved or directed under the EPA Orders or this Consent Decree, according to all applicable requirements of this Consent Decree and within the specified time schedules established by or approved under this Consent Decree.

106.    Late Payment of Response Costs.  If any amounts due to EPA under Paragraph 8 (Payment by Settling Defendants for Past Response Costs) or Paragraph 9 (Payment by Settling Defendants for Future Response Costs) or to DOI under Paragraph 97 (Payment of Assessment Costs) are not paid by the required date, Settling Defendants shall be in violation of this Consent Decree and shall pay to EPA or DOI as applicable, as a stipulated penalty, in addition to the Interest required by Paragraph 13, $7,500 per violation per Day that such payment is late.

107.    Late Payment of Civil Penalty.  If Settling Defendants fail to pay the civil penalty required to be paid under Section VI (Civil Penalty) when due, Settling Defendants shall pay a stipulated penalty of $7,500 per Day for each Day that the payment is late.

108.    Compliance Milestones.

a.    The following stipulated penalties shall accrue per violation per Day for each violation of the requirements identified in subparagraph 108.b:

| Penalty Per Violation Per Day | Period of Noncompliance |
|---|---|
| $1,500 | 1st through 14th Day |
| $3,500 | 15th through 30th Day |
| $5,000 | 31st Day and beyond |

b.      Submission of any required plans or other deliverables and performance of each obligation set forth in this Consent Decree or approved submissions relating to:

(1)      Section IX (Performance of the Work)

(2)      Section X (Post-Removal Long-Term Monitoring)

(3)      Section XI (Community Health Program)

(4)      Section XII (Rail Safety Improvements)

(5)      Section XIII (Emergency Preparedness)

(6)      Section XIV (Local Waterways Remediation Plan)

(7)      Section XV (Natural Resource Damages)

109.    Reporting Requirements.  The following stipulated penalties shall accrue per violation per Day for each violation of the reporting requirements of Sections IX (Performance of the Work), X (Post-Removal Long-Term Monitoring), XI (Community Health Program), and XVI (Reporting Requirements):

| Penalty Per Violation Per Day | Period of Noncompliance |
|---|---|
| $500 | 1st through 14th Day |
| $1,000 | 15th through 30th Day |
| $2,000 | 31st Day and beyond |

110.    Stipulated penalties under this Section shall begin to accrue on the Day after performance is due or on the Day a violation occurs, whichever is applicable, and shall continue to accrue until performance is satisfactorily completed or until the violation ceases.  Stipulated penalties shall accrue simultaneously for separate violations of this Consent Decree.

111.    Settling Defendants shall pay any stipulated penalty within 30 Days of receiving the United States' written demand.

57

112. The United States may, in the unreviewable exercise of its discretion, reduce or waive stipulated penalties otherwise due it under this Consent Decree.

113. Stipulated penalties shall continue to accrue as provided in Paragraph 110, during any Dispute Resolution, but need not be paid until the following:

a. If the dispute is resolved by agreement of the Parties or by a decision of EPA that is not appealed to the Court, Settling Defendants shall pay accrued penalties determined to be owing, together with interest, to the United States within 30 Days of the effective date of the agreement or the receipt of EPA's decision or order.

b. If the dispute is appealed to the Court and the United States prevails in whole or in part, Settling Defendants shall pay all accrued penalties determined by the Court to be owing, together with interest, within 60 Days of receiving the Court's decision or order, except as provided in subparagraph c, below.

c. If any Party appeals the District Court's decision, Settling Defendants shall pay all accrued penalties determined to be owing, together with interest, within 15 Days of receiving the final appellate court decision.

114. Obligations Prior to the Effective Date. Upon the Effective Date, the stipulated penalty provisions of this Decree shall be retroactively enforceable with regard to any and all violations of Paragraphs 48, 49, 52, and 69 that have occurred prior to the Effective Date, provided that stipulated penalties that may have accrued prior to the Effective Date may not be collected unless and until this Consent Decree is entered by the Court.

115. Settling Defendants shall pay stipulated penalties owing to the United States in the manner set forth in Paragraph 10 and with the confirmation notices required by Paragraph 12, except that the transmittal letter shall state that the payment is for stipulated penalties and shall

state for which violation(s) the penalties are being paid. If Settling Defendants fail to pay stipulated penalties according to the terms of this Consent Decree, Settling Defendants shall be liable for interest on such penalties, as provided for in 28 U.S.C. § 1961, accruing as of the date payment became due. Nothing in this Paragraph shall be construed to limit the United States from seeking any remedy otherwise provided by law for Settling Defendants' failure to pay any stipulated penalties.

116. The payment of penalties and interest, if any, shall not alter in any way Settling Defendants' obligation to complete the performance of the requirements of this Consent Decree.

117. <u>Non-Exclusivity of Remedy</u>. Stipulated penalties are not the United States' exclusive remedy for violations of this Consent Decree. Subject to the provisions of Section XXI (Reservations of Rights by United States), the United States expressly reserves the right to seek any other relief it deems appropriate for Settling Defendants' violation of this Decree or applicable law, including but not limited to an action against Settling Defendants for statutory penalties, additional injunctive relief, mitigation or offset measures, and/or contempt. However, the amount of any statutory penalty assessed for a violation of this Consent Decree shall be reduced by an amount equal to the amount of any stipulated penalty assessed and paid pursuant to this Consent Decree.

## XVIII. FORCE MAJEURE

118. "Force majeure," for purposes of this Consent Decree, means any event arising from causes beyond the control of Settling Defendants, of any entity controlled by Settling Defendants, or of Settling Defendants' contractors, that delays or prevents the performance of any obligation under this Consent Decree despite Settling Defendants' best efforts to fulfill the obligation. Given the need to protect public health and welfare and the environment, the

requirement that Settling Defendants exercise "best efforts to fulfill the obligation" includes using best efforts to anticipate any potential force majeure and best efforts to address the effects of any potential force majeure (a) as it is occurring and (b) following the potential force majeure, such that any delay or non-performance is, and any adverse effects of the delay or non-performance are, minimized to the greatest extent possible.  "Force majeure" does not include financial inability to perform any obligation under this Consent Decree.

119.    If any event occurs for which Settling Defendants will or may claim a force majeure, Settling Defendants shall provide notice by email to EPA pursuant to Section XXVII (Notices).  The deadline for the initial notice is 7 Days after Settling Defendants first knew or should have known that the event would likely delay or prevent performance.  Settling Defendants shall be deemed to know of any circumstance of which any contractor of, subcontractor of, or entity controlled by Settling Defendants knew or should have known.

120.    If Settling Defendants seek to assert a claim of force majeure concerning the event, within 7 Days after the notice under Paragraph 119, Settling Defendants shall submit a further notice to EPA that includes (a) an explanation and description of the event and its effect on Settling Defendants' completion of the requirements of the Consent Decree; (b) a description and schedule of all actions taken or to be taken to prevent or minimize the delay and/or other adverse effects of the event; (c) if applicable, the proposed extension of time for Settling Defendants to complete the requirements of the Consent Decree; (d) Settling Defendants' rationale for attributing such delay to a force majeure if it intends to assert such a claim; (e) a statement as to whether, in the opinion of Settling Defendants, such event may cause or contribute to an endangerment to public health or welfare or the environment; and (f) all available proof supporting any claim that the delay was attributable to a force majeure.

121.     Failure to submit a timely or complete notice or claim under Paragraph 119 or 120 regarding an event precludes Settling Defendants from asserting any claim of force majeure regarding that event, provided, however, that EPA may, in its unreviewable discretion, excuse such failure if it is able to assess to its satisfaction whether the event is a force majeure, and whether Settling Defendants have exercised their best efforts, under Paragraph 118.

122.     After receipt of any claim of force majeure, EPA will notify Settling Defendants of its determination whether Settling Defendants are entitled to relief under Paragraph 118, and, if so, the excuse of, or the extension of time for, performance of the obligations affected by the force majeure.  An excuse of, or extension of the time for performance of, the obligations affected by the force majeure does not, of itself, excuse or extend the time for performance of any other obligation.

123.     If Settling Defendants elect to invoke the dispute resolution procedures set forth in Section XIX (Dispute Resolution), they shall do so no later than 15 Days after receipt of EPA's notice.  In any such proceeding, Settling Defendants have the burden of proving that they are entitled to relief under Paragraph 118, that their proposed excuse or extension was or will be warranted under the circumstances, and that they complied with the requirements of Paragraphs 118-120.  If Settling Defendants carry this burden, the delay or non-performance at issue shall be deemed not to be a violation by Settling Defendants of the affected obligation of this Consent Decree identified to EPA and the Court.

## XIX.   DISPUTE RESOLUTION

124.     Unless otherwise provided in this Consent Decree, Settling Defendants must use the dispute resolution procedures of this Section to resolve any dispute arising under this Consent

Decree.  The United States may enforce any requirement of this Consent Decree that is not the subject of a pending dispute under this Section.

125.     A dispute will be considered to have arisen when one or more parties sends a timely written notice of dispute ("Notice of Dispute").  A notice is timely if sent within 30 Days after receipt of the EPA notice or determination giving rise to the dispute, or within 15 Days in the case of a force majeure determination.  Disputes arising under this Consent Decree must in the first instance be the subject of informal negotiations between the parties to the dispute.  The period for informal negotiations may not exceed 20 Days after the dispute arises unless the parties to the dispute otherwise agree.  If the parties cannot resolve the dispute by informal negotiations, the position advanced by EPA is binding unless Settling Defendants initiate formal dispute resolution under Paragraph 126.

126.     <u>Formal Dispute Resolution</u>.

a.     Statements of Position.  Settling Defendants may initiate formal dispute resolution by serving on the United States, within 20 Days after the conclusion of informal dispute resolution under Paragraph 125, an initial Statement of Position regarding the matter in dispute.  The United States' responsive statement of position is due within 20 Days after receipt of the initial Statement of Position.  All statements of position must include supporting factual data, analysis, opinion, and other documentation.  A reply, if any, is due within 10 Days after receipt of the response.  If appropriate, EPA may extend the deadlines for filing statements of position for up to 45 days and may allow the submission of supplemental statements of position.

b.     Formal Decision.  The Director of the Superfund & Emergency Management Division, EPA Region 5, will issue a formal decision resolving the dispute

("Formal Decision") based on the statements of position and any replies and supplemental statements of position.  The Formal Decision is binding on Settling Defendants unless they timely seek judicial review under Paragraph 127.

c.  Compilation of Administrative Record.  EPA shall compile an administrative record regarding the dispute, which must include all statements of position, replies, supplemental statements of position, and the Formal Decision.

127.  Judicial Review.

a.  Settling Defendants may obtain judicial review of the Formal Decision by filing, within 30 Days after receiving it, a motion with the Court and serving the motion on all Parties.  The motion must describe the matter in dispute and the relief requested. The parties to the dispute shall brief the matter in accordance with local court rules.

b.  Review on the Administrative Record.  Judicial review of disputes regarding the following issues must be on the administrative record: (i) the adequacy or appropriateness of deliverables required under the Consent Decree; (ii) the adequacy of the performance of the Removal Actions; (iii) whether a Work Takeover is warranted under Paragraph 42; (iv) determinations about financial assurance under Section XXV; and (v) EPA's selection of modified or further response actions; (vi) any other items requiring EPA approval under the Decree; and (vii) any other disputes that the Court determines should be reviewed on the administrative record.  For any dispute arising under Paragraph 164 and 165 of this Consent Decree, Settling Defendants bear the burden of demonstrating by a preponderance of the evidence that the proposed modification of railroad operational requirements satisfies the conditions set forth in Paragraph 164.  For

all other disputes, Settling Defendants bear the burden of demonstrating that the Formal

Decision was arbitrary and capricious or otherwise not in accordance with law.

       c.      Judicial review of any dispute not governed by Paragraph 127.b is governed

by applicable principles of law.

128.    <u>Escrow Account</u>.  For disputes regarding a Future Response Cost billing, Settling

Defendants shall: (a) establish, in a duly chartered bank or trust company, an interest-bearing

escrow account that is insured by the FDIC; (b) remit to that escrow account funds equal to the

amount of the contested Future Response Costs; and (c) send to EPA copies of the

correspondence and of the payment documentation (e.g., the check) that established and funded

the escrow account, including the name of the bank, the bank account number, and a bank

statement showing the initial balance in the account.  EPA may, in its unreviewable discretion,

waive the requirement to establish the escrow account.  Settling Defendants shall cause the

escrow agent to pay the amounts due to EPA under Paragraph 9, if any, by the deadline for such

payment in Paragraph 9.  Settling Defendants are responsible for any balance due under

Paragraph 9 after the payment by the escrow agent.

129.    The invocation of dispute resolution procedures under this Section shall not, by

itself, extend, postpone, or affect in any way any obligation of Settling Defendants under this

Consent Decree, unless and until final resolution of the dispute so provides.  Stipulated penalties

with respect to the disputed matter shall continue to accrue from the first Day of noncompliance,

but payment shall be stayed pending resolution of the dispute as provided in Paragraph 113.  If

Settling Defendants do not prevail on the disputed issue, stipulated penalties shall be assessed

and paid as provided in Section XVII (Stipulated Penalties).

XX.    RESOLUTION OF CLAIMS / COVENANTS BY UNITED STATES

130.    <u>Resolution of Clean Water Act Claims</u>.  This Consent Decree resolves the civil claims of the United States for the violations of the CWA alleged in the Complaint filed in this action, through the date of lodging.

131.    <u>Covenant for Settling Defendants</u>.  Except as specifically provided in Section XXI (Reservations of Rights by United States), the United States covenants not to sue or to take administrative action against Settling Defendants pursuant to CERCLA Sections 106 and 107(a), 42 U.S.C. §§ 9606 and 9607(a), regarding the CERCLA Removal Action, Past Response Costs, Future Response Costs, and Natural Resource Damages.  These covenants: (a) take effect upon the Effective Date; (b) are conditioned upon the complete and satisfactory performance by Settling Defendants of their obligations under this Consent Decree; (c) extend to the successors of each Settling Defendant but only to the extent that the alleged liability of the successor of the Settling Defendant is based solely on its status as a successor of Settling Defendant; and (d) do not extend to any other person.

XXI.    RESERVATIONS OF RIGHTS BY UNITED STATES

132.    The United States reserves, and this Consent Decree is without prejudice to, all rights against Settling Defendants with respect to all matters not expressly included within Paragraph 131 (Covenant for Settling Defendants).  Notwithstanding any other provision of this Consent Decree, the United States reserves all rights against Settling Defendants with respect to:

a.    liability for failure of Settling Defendants to meet a requirement of this Consent Decree;

b.    liability for performance of response action other than the Work;

c.    liability arising from the past, present, or future disposal, release, or threat of release of Hazardous Substances or Hazardous Materials outside of the Site;

d.    liability for costs incurred or to be incurred by the United States that are not within the definition of Past Response Costs or Future Response Costs;

e.    criminal liability; and

f.    liability under other federal laws, regulations, or permit conditions, except as expressly specified in Paragraph 130.

133.    Subject to Paragraph 130, nothing in this Consent Decree limits any authority of EPA to take, direct, or order all appropriate action to protect human health and the environment or to prevent, abate, respond to, or minimize an actual or threatened release of Hazardous Substances or Hazardous Material on, at, or from the Site, or to request a Court to order such action.

## XXII.  COVENANTS BY SETTLING DEFENDANTS

134.    Subject to Paragraph 135, Settling Defendants covenant not to sue and shall not assert any claim or cause of action against the United States or its contractors or employees, with respect to the Work, Past Response Costs, Future Response Costs, Natural Resource Damages, and this Consent Decree, including but not limited to:

a.    any direct or indirect claim for reimbursement from the Superfund based on CERCLA Sections 106(b)(2), 107, 111, 112, or 113, 42 U.S.C. §§ 9606(b)(2), 9607, 9611, 9612, or 9613, or any other provision of law;

b.    any claim arising out of the Removal Actions at the Site for which the Past Response Costs were incurred, including any claim under the United States Constitution,

the Tucker Act, 28 U.S.C. § 1491, the Equal Access to Justice Act, 28 U.S.C. § 2412, or at common law; or

      c.     any claim pursuant to CERCLA Section 107 or 113, 42 U.S.C. § 9607 or 9613, RCRA Section 7002(a), 42 U.S.C. § 6972(a), or state law for Past Response Costs.

135.    <u>Settling Defendants' Reservation</u>.  The covenants in Paragraph 134 do not apply to any claim or cause of action brought, or order issued, after the Effective Date by the United States to the extent such claim, cause of action, or order is within the scope of a reservation under Paragraphs 132.a through 132.f.

<div align="center">XXIII. EFFECT OF SETTLEMENT; CONTRIBUTION</div>

136.    The Parties agree and the Court finds that: (a) the Complaint filed by the United States in this action is a civil action within the meaning of CERCLA Section 113(f)(1), 42 U.S.C. § 9613(f)(1); (b) this Consent Decree constitutes a judicially approved settlement under which each Settling Defendant has, as of the Effective Date, resolved its liability to the United States within the meaning of CERCLA Sections 113(f)(2) and 113(f)(3)(B), 42 U.S.C. §§ 9613(f)(2) and 9613(f)(3); and (c) each Settling Defendant is entitled, as of the Effective Date, to protection from contribution actions or claims as provided by CERCLA Section 113(f)(2), 42 U.S.C. § 9613(f)(2), or as may be otherwise provided by law, for the "Matters Addressed" in this Consent Decree.

137.    The contribution protection under Paragraph 136 extends to the successors of each Settling Defendant but only to the extent that the alleged liability of the successor of the Settling Defendant is based solely on its status as a successor of the Settling Defendant. The Matters Addressed in this Decree are the Work, Past Response Costs, Future Response Costs, and Natural Resource Damages provided, however, that if the United States brings a claim

<div align="center">67</div>

against Settling Defendants under a reservation in Paragraph 132, the Matters Addressed in this Decree do not include those response costs or response actions or natural resource damages that are within the scope of the claim brought under the reservation.

138.    Each Settling Defendant shall, with respect to any suit or claim brought by it for matters related to this Consent Decree, notify DOJ and EPA no later than 60 days prior to the initiation of such suit or claim.  Each Settling Defendant shall, with respect to any suit or claim brought against it for matters related to this Consent Decree, notify DOJ and EPA within 10 days after service of the complaint on such Settling Defendant.  In addition, each Settling Defendant shall notify DOJ and EPA within 10 days after service or receipt of any Motion for Summary Judgment and within 10 days after receipt of any order from a court setting a case for trial.

139.    In any subsequent administrative or judicial proceeding initiated by the United States for injunctive relief, recovery of response costs, civil penalties, or other appropriate relief relating to the Site, Settling Defendants shall not assert, and may not maintain, any defense or claim based upon the principles of waiver, claim preclusion (res judicata), issue preclusion (collateral estoppel), claim-splitting, or other defenses based upon any contention that the claims raised by the United States in the subsequent proceeding were or should have been brought in the instant case, except with respect to claims that have been specifically resolved pursuant to Section XX (Resolution of Claims / Covenants by United States).

140.    This Consent Decree is not a permit, or a modification of any permit, under any federal, State, or local laws or regulations.  Settling Defendants are responsible for achieving and maintaining complete compliance with all applicable federal, State, and local laws, regulations, and permits; and Settling Defendants' compliance with this Consent Decree shall be no defense to any action commenced pursuant to any such laws, regulations, or permits, except as set forth

herein.  The United States do not, by their consent to the entry of this Consent Decree, warrant or aver in any manner that Settling Defendants' compliance with any aspect of this Consent Decree will result in compliance with provisions of CERCLA or the CWA, or with any other provisions of federal, state, or local laws, regulations, or permits.

141.    This Consent Decree does not limit or affect the rights of Settling Defendants or of the United States against any third parties, not party to this Consent Decree, nor does it limit the rights of third parties, not party to this Consent Decree, against Settling Defendants, except as set forth in Paragraph 136 or otherwise provided by law.

142.    Nothing in this Consent Decree creates any rights in, or grants any defense or cause of action to, any person not a Party to this Consent Decree.  Except as provided in Section XXII (Covenants by Settling Defendants), each of the Parties expressly reserves any and all rights (including pursuant to CERCLA Section 113), defenses, claims, demands, and causes of action that each Party may have with respect to any matter, transaction, or occurrence relating in any way to the Site against any person not a Party hereto.  Nothing in this Consent Decree diminishes the right of the United States under CERCLA Section 113(f)(2) and (3), 42 U.S.C. §§ 9613(f)(2) and (3), to pursue any person not a party to this Consent Decree to obtain additional response costs or response action and to enter into settlements that give rise to contribution protection pursuant to CERCLA Section 113(f)(2).

XXIV. RIGHT OF ENTRY / INFORMATION COLLECTION AND RETENTION

143.    The United States and its representatives, including attorneys, contractors, and consultants, shall have the right of entry into any facility covered by this Consent Decree, at all reasonable times, upon presentation of credentials, and in compliance with all applicable EPA safety requirements, to:

69

a.      monitor the progress of activities required under this Consent Decree;

b.      verify any data or information submitted to the United States in accordance with the terms of this Consent Decree;

c.      obtain samples and, upon request, splits of any samples taken by Settling Defendants or their representatives, contractors, or consultants;

d.      obtain documentary evidence, including photographs and similar data; and

e.      assess Settling Defendants' compliance with this Consent Decree.

144.    Upon request, Settling Defendants shall provide EPA or its authorized representatives splits of any samples taken by Settling Defendants.  Upon request, EPA shall provide Settling Defendants splits of any samples taken by EPA.

145.    Until 5 years after Notice of Completion of the Removal Actions under Paragraphs 39 and 40 for data related to the Removal Actions or liability relating to the claims in the Complaint and 5 years after partial termination of this Consent Decree under Paragraph 170.b. for all other data ("Record Retention Periods"), Settling Defendants shall retain, and shall instruct its contractors and agents to retain, all non-identical copies of the following documents, records, or other information (including documents, records, or other information in electronic form) in their or their contractors' or agents' possession or control, or that come into their or their contractors' or agents' possession or control:

(1)    All records that relate in any manner to Settling Defendants' performance of their obligations under this Consent Decree, including all reports, plans, permits, and documents submitted to EPA in accordance with this Consent Decree, including all underlying research and data, and all data developed

by, or on behalf of, Settling Defendants in the course of performing the Work; and

(2)   All records regarding Settling Defendants' liability and the liability of any other person under CERCLA or the CWA.

Notwithstanding the foregoing in this Paragraph 145, Settling Defendants and the United States may dispose of any physical sample of soil, water, air, sediment, flora, fauna, or wastes, and extracts of samples for analysis taken at the Site after the expiration of its holding time, meaning the time beyond which the analytical results are assumed to be adversely affected but only after (i) providing 30 Days advance written notice of disposal, and (ii) providing the opportunity to retrieve such sample within the 30 Days.

146.   This information-retention requirement shall apply regardless of any contrary corporate or institutional policies or procedures.  At any time during the Record Retention Period, upon request by the United States, Settling Defendants shall provide copies of any documents, records, or other information required to be maintained under this Section.

147.   At the conclusion of a Record Retention Period, Settling Defendants shall notify EPA at least 90 Days prior to the destruction of any documents, records, or other information subject to the requirements of Paragraph 145 and, upon request by EPA, Settling Defendants shall deliver any such documents, records, or other information to EPA.  Settling Defendants may assert that certain documents, records, or other information is privileged under the attorney-client privilege, or any other privilege recognized by federal law.  If Settling Defendants assert such a privilege, it shall provide the following:  (a) the title of the document, record, or information; (b) the date of the document, record, or information; (c) the name and title of each author of the document, record, or information; (d) the name and title of each addressee and

recipient; (e) a description of the subject of the document, record, or information; and (f) the privilege asserted by Settling Defendants.  However, no final documents, records, or other information created or generated pursuant to the requirements of this Consent Decree shall be withheld on grounds of privilege.

148.    Settling Defendants may also assert that information required to be provided under this Section is protected as Confidential Business Information ("CBI") under 40 C.F.R. Part 2.  As to any information that Settling Defendants seeks to protect as CBI, Settling Defendants shall follow the procedures set forth in 40 C.F.R. Part 2.

149.    This Consent Decree in no way limits or affects any right of entry and inspection, or any right to obtain information, held by the United States pursuant to applicable federal or state laws, regulations, or permits, nor does it limit or affect any duty or obligation of Settling Defendants to maintain documents, records, or other information imposed by applicable federal or state laws, regulations, or permits.

## XXV.  FINANCIAL ASSURANCE

150.    In compliance with the CERCLA Order, Settling Defendants secured financial assurance, initially in the amount of $688,749,283 ("Estimated Cost of the Work"), for the benefit of EPA.  Settling Defendants shall maintain Financial Assurance to ensure completion of the Work required under Section IX (Performance of Work).

151.    Settling Defendants shall diligently monitor the adequacy of the financial assurance.  If any Settling Defendant becomes aware of any information indicating that the financial assurance provided under this Section is inadequate, such Settling Defendant shall notify EPA of such information within 7 Days.  If EPA determines that the financial assurance provided under this Section is inadequate, EPA will notify the affected Settling Defendant of

such determination.  Settling Defendants shall, within 30 Days after notifying EPA or receiving notice from EPA under this Paragraph, secure and submit to EPA for approval a proposal for a revised or alternative financial assurance mechanism.  EPA may extend this deadline for such time as is reasonably necessary for the affected Settling Defendant, in the exercise of due diligence, to secure and submit to EPA a proposal for a revised or alternative financial assurance mechanism, not to exceed 60 Days.  Settling Defendants shall follow the procedures of Paragraph 153 (Modification of Amount, Form, or Terms of Financial Assurance) in seeking approval of, and submitting documentation for, the revised or alternative financial assurance mechanism.  Settling Defendants' inability to secure financial assurance in accordance with this Section does not excuse performance of any other requirement of this Consent Decree.

      152.    <u>Access to Financial Assurance</u>.

        a.    If EPA issues a notice of a Work Takeover under Paragraph 42.b, then, in accordance with any applicable financial assurance mechanism, EPA may require: (1) the performance of the Work; and/or (2) that any funds guaranteed be paid in accordance with Paragraph 152.d.

        b.    If EPA is notified that the issuer of a financial assurance mechanism intends to cancel the mechanism, and the affected Settling Defendant fails to provide an alternative financial assurance mechanism in accordance with this Section at least 30 Days prior to the cancellation date, the funds guaranteed under such mechanism must be paid prior to cancellation in accordance with Paragraph 152.d.

        c.    If, upon issuance of a notice of a Work Takeover under Paragraph 42.b, either: (1) EPA is unable for any reason to promptly secure the resources guaranteed under any applicable financial assurance mechanism, whether in cash or in kind, to

continue and complete the Work; or (2) the financial assurance is a demonstration or guarantee, then EPA is entitled to demand an amount, as determined by EPA, sufficient to cover the cost of the remaining Work to be performed. Settling Defendants shall, within 15 Days after such demand, pay the amount demanded as directed by EPA.

d.      Any amounts required to be paid under this Paragraph 152 must be, as directed by EPA: (i) paid to EPA in order to facilitate the completion of the Work by EPA or by another person; or (ii) deposited into an interest-bearing account, established at a duly chartered bank or trust company that is insured by the FDIC, in order to facilitate the completion of the Work by another person.  If payment is made to EPA, EPA may deposit the payment into the Superfund or into a Special Account to be retained and used to conduct or finance response actions at or in connection with the Site, or to be transferred by EPA to the Superfund.

153.    <u>Modification of Amount, Form, or Terms of Financial Assurance</u>.  On any anniversary of the Effective Date, or at any other time agreed to by the Parties, Settling Defendants may request to change the form, terms, or amount of the financial assurance mechanism.  Settling Defendants shall submit any such request to EPA and shall include an estimate of the cost of the remaining Work, an explanation of the bases for the cost calculation, and a description of the proposed changes, if any, to the form or terms of the financial assurance. EPA will notify Settling Defendants of its decision regarding the request.  Settling Defendants may modify the form, terms, or the amount of the financial assurance mechanism only in accordance with: (a) EPA's approval; or (b) any resolution of a dispute on the appropriate amount of financial assurance under Section XIX (Dispute Resolution).  Any decision made by EPA on a request submitted under this Paragraph to change the form or terms of a financial

74

assurance mechanism shall not be subject to challenge by Settling Defendants pursuant to the

dispute resolution provisions of this Consent Decree or in any other forum.  Settling Defendants

shall submit to EPA, within 30 days after receipt of EPA's approval, or consistent with the terms

of the resolution of the dispute, documentation of the change to the form, terms, or amount of the

financial assurance instrument.

154.    <u>Release, Cancellation, or Discontinuation of Financial Assurance</u>. Settling

Defendants may release, cancel, or discontinue any financial assurance provided under this

Section only: (a) if EPA issues a Notice of Completion of Work under Paragraph 39 and 40;

(b) in accordance with EPA's approval of such release, cancellation, or discontinuation; or (c) if

there is a dispute regarding the release, cancellation, or discontinuance of any financial

assurance, in accordance with the agreement or final decision resolving such dispute under

Section XIX.

## XXVI. INDEMNIFICATION AND INSURANCE

155.    <u>Indemnification</u>.

a.      The United States does not assume any liability by entering into this

Consent Decree or by virtue of any designation of Settling Defendants as EPA's

authorized representative under CERCLA Section 104(e)(1), 42 U.S.C. § 9604(e)(1).

Settling Defendants shall indemnify and save and hold harmless the United States, its

officials, agents, employees, contractors, subcontractors, and representatives for or from

any claims or causes of action arising from, or on account of, negligent or other wrongful

acts or omissions of Settling Defendants, their officers, directors, employees, agents,

contractors, subcontractors, and any persons acting on Settling Defendants' behalf or

under their control, in carrying out activities under this Consent Decree, including any

claims arising from any designation of Settling Defendants as EPA's authorized representatives under CERCLA Section 104(e)(1).

      b.      Further, Settling Defendants agree to pay EPA all costs it incurs including attorneys' fees and other expenses of litigation and settlement arising from, or on account of, claims made against the United States based on negligent or other wrongful acts or omissions of Settling Defendants, their officers, directors, employees, agents, contractors, subcontractors, and any persons acting on their behalf or under their control in carrying out activities under this Consent Decree.  EPA may not be held out as a party to any contract entered into by or on behalf of Settling Defendants in carrying out activities under this Consent Decree.  Settling Defendants and any such contractor may not be considered an agent of EPA.

      c.      EPA shall give Settling Defendants notice of any claim for which EPA plans to seek indemnification in accordance with this Paragraph 155 and shall consult with Settling Defendants prior to settling such claim.

156.      Settling Defendants covenant not to sue and shall not assert any claim or cause of action against the United States for damages or reimbursement or for set-off of any payments made or to be made to the United States, arising from or on account of any contract, agreement, or arrangement between any one or more of Settling Defendants and any person for performance of Work or other activities on or relating to the Site, including claims on account of construction delays.  In addition, Settling Defendants shall indemnify and save and hold harmless the United States with respect to any claims for damages or reimbursement arising from or on account of any contract, agreement, or arrangement between any one or more of Settling Defendants and

any person for performance of work at or relating to the Site, including claims on account of construction delays.

157.    <u>Insurance</u>.  In compliance with the EPA Orders, Settling Defendants have provided EPA with certificates of insurance and copies of the following insurance: (a) commercial general liability insurance with limits of liability of $1 million per occurrence; (b) automobile liability insurance with limits of liability of $1 million per accident; and (c) umbrella liability insurance with limits of liability of $5 million in excess of the required commercial general liability and automobile liability limits.  Within 30 Days of the date of lodging, the insurance policy shall be amended to name EPA as an additional insured with respect to all liability arising out of the activities performed by or on behalf of Settling Defendants under this Consent Decree.  Settling Defendants or their contractor shall maintain this insurance and shall resubmit such certificates and copies of policies each year on the anniversary of the Effective Date until the first anniversary after EPA's issuance of the Notice of Completion of Removal Actions under Paragraphs 39 and 40.  In addition, for the duration of this Consent Decree, Settling Defendants shall satisfy, or shall ensure that their contractors or subcontractors satisfy, all applicable laws and regulations regarding the provision of worker's compensation insurance for all persons performing the Work on behalf of Settling Defendants in furtherance of this Consent Decree.  If Settling Defendants demonstrate by evidence satisfactory to EPA that any contractor or subcontractor maintains insurance equivalent to that described above, or insurance covering the same risks but in a lesser amount, then, with respect to that contractor or subcontractor, Settling Defendants need provide only that portion of the insurance described above that is not maintained by the contractor or subcontractor.  Settling Defendants

shall ensure that all submittals to EPA under this Paragraph identify the Site name, city, state, and the Case Number.

<div align="center">XXVII.    NOTICES</div>

158.    All agreements, approvals, consents, deliverables, modifications, notices, notifications, objections, proposals, reports, waivers, and requests specified in this Consent Decree must be in writing unless otherwise specified.  Whenever a notice is required to be given or a report or other document is required to be sent by one Party to another under this Consent Decree, it must be sent as specified below.  Any Party may change the method, person, or address applicable to it by providing notice of such change to all Parties.

| | |
|---|---|
| As to DOJ by email (preferred): | eescdcopy.enrd@usdoj.gov<br>Re: DJ # 90-11-3-12792 |
| As to DOJ by mail: | EES Case Management Unit<br>Environment and Natural Resources Division<br>U.S. Department of Justice<br>P.O. Box 7611<br>Washington, D.C.  20044-7611<br>Re: DJ # 90-11-3-12792 |
| As to EPA by email (preferred): | Dixit.Naeha@epa.gov<br>Dollhopf.Ralph@epa.gov<br>R3_ORC_mailbox@epa.gov |
| As to EPA by mail: | Naeha Dixit<br>Associate Regional Counsel<br>Office of Regional Counsel<br>U.S. Environmental Protection Agency<br>Region 5 (C-14J)<br>77 West Jackson Boulevard<br>Chicago, IL 60604<br><br>Ralph Dollhopf<br>On-Scene Coordinator<br>U.S. EPA, Region 5, Mail Code: SE-AA<br>2565 Plymouth Road<br>Ann Arbor, MI 48105 |

Robin E. Eiseman
Senior Assistant Regional Counsel
U.S. Environmental Protection Agency, Region 3
1600 John F. Kennedy Boulevard
Philadelphia, PA 19103

As to DOI by email (preferred):      Kelly.Bakayza@sol.doi.gov
                                      amber_bellamy@fws.gov

As to DOI by mail:                    Office of the Solicitor
                                      U.S. Department of the Interior
                                      5600 American Blvd., Suite 650
                                      Bloomington, MN 55437
                                      Attention: Kelly Brooks Bakayza

                                      Amber Bellamy
                                      NRDA Case Manager
                                      4625 Morse Road, Suite 104
                                      Columbus, Ohio 43230

As to Settling Defendants by email:  Nabanita.Nag@nscorp.com
(preferred)

As to Settling Defendants by mail:   Nabanita Nag
                                      Executive Vice President Corporate Affairs and
                                      Chief Legal Officer
                                      Norfolk Southern Corporation
                                      650 W. Peachtree Street NW
                                      Atlanta, GA 30308

                                      with a copy to:
                                      Peggy Otum
                                      Wilmer Cutler Pickering Hale and Dorr
                                      One Front Street, Suite 3500
                                      San Francisco, CA 94111
                                      peggy.otum@wilmerhale.com

159.    Any Party may, by written notice to the other Parties, change its designated notice recipient or notice address provided above.

160.     Notices submitted pursuant to this Section shall be deemed submitted upon mailing or transmission by email, unless otherwise provided in this Consent Decree or by mutual agreement of the Parties in writing.

## XXVIII.   EFFECTIVE DATE

161.     The Effective Date of this Consent Decree shall be the date upon which this Consent Decree is entered by the Court or a motion to enter the Consent Decree is granted, whichever occurs first, as recorded on the Court's docket; provided, however, that Settling Defendants hereby agree that they shall be bound to perform duties scheduled to occur prior to the Effective Date.  In the event the United States withdraws or withholds consent to this Consent Decree before entry, or the Court declines to enter the Consent Decree, then the preceding requirement to perform duties scheduled to occur before the Effective Date shall terminate.

## XXIX. MODIFICATION

162.     Except as otherwise set forth in Paragraphs 164 and 165, the terms of this Consent Decree, including any attached appendices, may be modified only by a subsequent written agreement signed by all the Parties.  Where the modification constitutes a material change to this Consent Decree, it shall be effective only upon approval by the Court.  Modest extensions to compliance schedules are considered to be non-material modifications that are effective upon the agreement of the Parties and not subject to approval by the Court.

163.     Any disputes concerning modification of this Consent Decree pursuant to Paragraph 162 shall be resolved pursuant to Section XIX (Dispute Resolution), provided, however, that, instead of the burden of proof provided by Paragraph 127, the Party seeking the

modification bears the burden of demonstrating that it is entitled to the requested modification in accordance with Federal Rule of Civil Procedure 60(b).

164.    Modification of Railroad Operational Requirements.  Paragraphs 60 and 64 incorporate a recognition by the Parties of the importance of maintaining flexibility in imposing operational requirements upon a railroad, in order to enhance safety measures and the effectiveness of such procedures on an ongoing basis.  Settling Defendants may request modification of the requirements set forth in Paragraphs 60 and 64 upon a showing that implementation of the subject procedure(s) either impedes safe operation or does not contribute meaningfully to safe operation of trains transporting Hazardous Materials, or if the modification to the subject procedure(s) provides an equivalent or improved level of rail safety.  Settling Defendants shall provide to the United States a full explanation for such conclusion, including all information considered -- pro and con -- along with any relevant changes in circumstance since the entry of the Consent Decree and identify any procedure or activity Settling Defendants propose in substitution for the subject procedure.

165.    Any request for modification under Paragraph 164 shall be subject to review and approval by DOJ, who may seek technical assistance from and otherwise consult with FRA concerning these matters.  In the event DOJ approves the modification, such modification will take effect upon notice to the Court.  If DOJ does not approve a proposed modification under this Paragraph within 120 Days of a request made under Paragraph 164, Settling Defendants may initiate dispute resolution procedures pursuant to Section XIX (Dispute Resolution).

166.    Modification of Work.  The OSC may modify any Removal Action Work Plan or schedule required under or incorporated into this Consent Decree pursuant to Section IX

(Performance of the Work) in writing or by oral direction.  EPA will promptly memorialize in writing any oral modification, which will be effective on the date of the OSC's oral direction.

167.    If Settling Defendants seek permission to deviate from any approved Removal Action Work Plan or schedule, Settling Defendants' Project Coordinator shall submit a written request to EPA for approval outlining the proposed modification and its basis.  Settling Defendants may not proceed with a requested deviation until receiving oral or written approval from the OSC pursuant to Paragraph 166.

168.    No informal advice, guidance, suggestion, or comment by the OSC or other EPA representatives regarding any deliverable submitted by Settling Defendants relieves Settling Defendants of their obligation to obtain any formal approval required by this Consent Decree, or to comply with all requirements of this Consent Decree, unless it is formally modified.

## XXX.  TERMINATION

169.    <u>Partial Termination A</u>.  After Settling Defendants have completed the requirements of Section XII (Rail Safety Improvements), Section XIII (Emergency Preparedness), Section XIV (Local Waterways Improvement Plan), and Section XV (Natural Resource Damages), have maintained continuous compliance with this Consent Decree for a period of 5 years from the Effective Date, and have paid the civil penalty and any accrued stipulated penalties as required by this Consent Decree, Settling Defendants may serve upon the United States a Request for Partial Termination of the applicable Section, stating that Settling Defendants have satisfied those requirements, together with all necessary supporting documentation.

170.    <u>Partial Termination B</u>.  After Settling Defendants have completed the requirements of Section X (Post-Removal Long-Term Monitoring) or Section XI (Community

Health Program), Settling Defendants may serve upon the United States a Request for Partial

Termination of the applicable Section, stating that Settling Defendants have satisfied those

requirements, together with all necessary supporting documentation.

171.    Following receipt by the United States of a Request for Partial Termination from

Settling Defendants, the Parties shall confer informally concerning the Request and any

disagreement that the Parties may have as to whether Settling Defendants have satisfactorily

complied with the requirements for partial termination of this Consent Decree.  If the United

States agrees that the applicable provisions of the Consent Decree may be terminated, the Parties

shall submit, for the Court's approval, a joint stipulation partially terminating the Consent

Decree.

172.    If the United States does not agree that the Consent Decree may be terminated,

Settling Defendants may invoke Dispute Resolution under Section XIX.  However, Settling

Defendants shall not seek Dispute Resolution of any dispute regarding termination until 90 Days

after service of their Request for Termination.

## XXXI. PUBLIC PARTICIPATION

173.    This Consent Decree shall be lodged with the Court for a period of not less than

30 Days for public notice and comment in accordance with CERCLA Section 122(d)(2), 42

U.S.C. § 9622(d)(2), and 28 C.F.R. § 50.7.  The United States reserves the right to withdraw or

withhold its consent if the comments regarding the Consent Decree disclose facts or

considerations indicating that the Consent Decree is inappropriate, improper, or inadequate.

Settling Defendants consent to entry of this Consent Decree without further notice and agree not

to withdraw from, oppose entry, or appeal the entry of this Consent Decree or to challenge any

provision of the Decree, unless the United States has notified Settling Defendants in writing that it no longer supports entry of the Decree.

174.    If for any reason this Court should decline to approve this Consent Decree in the form presented, this agreement, except for Paragraph 173, is voidable at the sole discretion of any Party and the terms of the agreement may not be used as evidence in any litigation between the Parties.

175.    At EPA's request, Settling Defendants shall participate in community involvement activities, including participation in: (1) meetings that may be held or sponsored by EPA to explain activities at or relating to the Consent Decree; (2) listening sessions to gather concerns or questions from affected community groups; and (3) development of communication materials (e.g. fact sheets, web pages, flyers, webinars) explaining activities relating to the Consent Decree and other efforts by Settling Defendants to aid the community.

## XXXII.    SIGNATORIES / SERVICE

176.    Each undersigned representative of Settling Defendants and the Assistant Attorney General for the Environment and Natural Resources Division of the Department of Justice identified on the DOJ signature page below, certifies that that person is fully authorized to enter into the terms and conditions of this Consent Decree and to execute and legally bind the Party that person represents to this document.

177.    This Consent Decree may be signed in counterparts, and its validity shall not be challenged on that basis.

## XXXIII.   INTEGRATION

178.    This Consent Decree, including deliverables that are subsequently approved pursuant to this Consent Decree, constitutes the entire agreement among the Parties regarding the subject matter of the Consent Decree and supersedes all prior representations, agreements, and understandings, whether oral or written, concerning the subject matter of the Consent Decree herein.

## XXXIV.   26 U.S.C. SECTION 162(f)(2)(A)(ii) IDENTIFICATION

179.    For purposes of the identification requirement in Section 162(f)(2)(A)(ii) of the Internal Revenue Code, 26 U.S.C. § 162(f)(2)(A)(ii), and 26 C.F.R. § 1.162-21(b)(2), performance of Paragraphs 4, 19-20, 26, 43-94, 99, 101, and 143-147, is restitution, remediation, or required to come into compliance with law.

## XXXV.   HEADINGS

180.    Headings to the Sections and Subsections of this Consent Decree are provided for convenience and do not affect the meaning or interpretation of the provisions of this Consent Decree.

## XXXVI.   FINAL JUDGMENT

181.    Upon approval and entry of this Consent Decree by the Court, this Consent Decree shall constitute a final judgment of the Court as to the United States and Settling Defendants.  The Court finds that there is no just reason for delay and therefore enters this judgment as a final judgment under Fed. R. Civ. P. 54 and 58.

## XXXVII.  APPENDICES

182.    The following Appendices are attached to and part of this Consent Decree:

"Appendix A" is Settling Defendants' Statement of Environmental Response and Remediation Activities.

"Appendix B" is Settling Defendants' Statement of Rail Safety Enhancement Measures.

"Appendix C" is the list of factors to be considered in evaluating potential case-by-case participants in the Medical Monitoring Program.

Dated and entered this __ day of _____, 2024.


_____
UNITED STATES DISTRICT JUDGE

Signature page for *Consent Decree between Plaintiff United States of America and Defendants* in *United States v. Norfolk Southern Railway Co. and Norfolk Southern Corp.*, Case No. 23-cv-517 (N.D. Ohio)

FOR THE UNITED STATES OF AMERICA:

_____
Date

TODD KIM
Assistant Attorney General
Environment and Natural Resources Division
U.S. Department of Justice


_____

PATRICIA J. McKENNA
Deputy Section Chief
JEFFREY A. SPECTOR
Senior Attorney
LAUREN GRADY
MATTHEW INDRISANO
TRACI CUNNINGHAM
LAUREN MATOSZIUK
PEDRO SEGURA
Trial Attorneys
Environmental Enforcement Section
Environment and Natural Resources Division
U.S. Department of Justice
P.O. Box 7611, Ben Franklin Station
Washington, DC 20044-7611
Jeffrey.Spector@usdoj.gov
Lauren.Grady@usdoj.gov


REBECCA C. LUTZCO
United States Attorney
Northern District of Ohio

BRENDAN F. BARKER
ELIZABETH A. DEUCHER (OH: 0095542)
Assistant United States Attorneys
Northern District of Ohio
801 West Superior Avenue, Suite 400
Cleveland, Ohio 44113
Phone: (216) 622-3795/3712
Fax: (216) 522-2404
Brendan.Barker@usdoj.gov
Elizabeth.Deucher@usdoj.gov

87

Signature page for *Consent Decree between Plaintiff United States of America and Defendants* in *United States v. Norfolk Southern Railway Co. and Norfolk Southern Corp.*, Case No. 23-cv-517 (N.D. Ohio)

FOR THE U.S. ENVIRONMENTAL PROTECTION AGENCY:

DAVID UHLMANN
Digitally signed by DAVID UHLMANN
Date: 2024.05.22 19:01:07 -04'00'

DAVID M. UHLMANN
Assistant Administrator
Office of Enforcement and Compliance Assurance
U.S. Environmental Protection Agency

KELLY ANN BRANTNER
Digitally signed by KELLY ANN BRANTNER
Date: 2024.05.22 13:31:03 -04'00'

KELLY K. BRANTNER
CATHLEEN G. TIERNEY
Office of Civil Enforcement
Water Enforcement Division
U.S. Environmental Protection Agency
1200 Pennsylvania Ave, NW
MC 2243A Room 3111A
Washington, DC 20460

Signature page for *Consent Decree between Plaintiff United States of America and Defendants* in *United States v. Norfolk Southern Railway Co. and Norfolk Southern Corp.*, Case No. 23-cv-517 (N.D. Ohio)

FOR THE U.S. ENVIRONMENTAL PROTECTION AGENCY:

DEBRA SHORE
Digitally signed by DEBRA SHORE
Date: 2024.05.22 16:40:37 -04'00'
_____
DEBRA SHORE
Regional Administrator
   & Great Lakes National Program Manager
U.S. Environmental Protection Agency, Region 5
77 W. Jackson Blvd.
Chicago, IL 60604

ROBERT KAPLAN
Digitally signed by ROBERT KAPLAN
Date: 2024.05.22 13:03:43 -05'00'
_____
ROBERT KAPLAN
Regional Counsel
U.S. Environmental Protection Agency, Region 5
77 W. Jackson Blvd.
Chicago, IL 60604

McLaughlin, Jolie
Digitally signed by McLaughlin, Jolie
Date: 2024.05.22 09:08:07 -05'00'
_____
JOLIE McLAUGHLIN
NAEHA DIXIT
NICOLE WOOD
Associate Regional Counsel
U.S. Environmental Protection Agency, Region 5
77 W. Jackson Blvd.
Chicago, IL 60604

Signature page for *Consent Decree between Plaintiff United States of America and Defendants* in *United States v. Norfolk Southern Railway Co. and Norfolk Southern Corp.*, Case No. 23-cv-517 (N.D. Ohio)

FOR THE U.S. ENVIRONMENTAL PROTECTION AGENCY:

ADAM ORTIZ
Digitally signed by ADAM ORTIZ
Date: 2024.05.22 11:50:21 -04'00'

_____

ADAM ORTIZ
Regional Administrator
U.S. Environmental Protection Agency, Region 3

DONNA TRAVIA
Digitally signed by DONNA TRAVIA
Date: 2024.05.22 09:02:37 -04'00'

_____

DONNA L. TRAVIA
Acting Regional Counsel
U.S. Environmental Protection Agency, Region 3

ROBIN EISEMAN
Digitally signed by ROBIN EISEMAN
Date: 2024.05.22 09:00:27 -04'00'

_____

ROBIN E. EISEMAN
DOUGLAS FRANKENTHALER
Senior Assistant Regional Counsel
U.S. Environmental Protection Agency, Region 3
1600 John F. Kennedy Boulevard
Philadelphia, PA 19103

Signature page for *Consent Decree between Plaintiff United States of America and Defendants* in *United States v. Norfolk Southern Railway Co. and Norfolk Southern Corp.*, Case No. 23-cv-517 (N.D. Ohio)

FOR NORFOLK SOUTHERN CORPORATION and
NORFOLK SOUTHERN RAILWAY COMPANY:

May 22, 2024
_____
Date

_____
Nabanita Nag
Executive Vice President Corporate Affairs and Chief
Legal Officer
Norfolk Southern Corporation
650 W. Peachtree Street NW
Atlanta, GA 30308

91

APPENDIX A

Settling Defendants' Statement Regarding
Environmental Response and Remediation Activities

Settling Defendants state that they have implemented a multi-faceted approach to environmental response and remediation under the oversight of EPA and with the engagement of federal, state, and local authorities and other stakeholders.  The various monitoring, sampling, investigation, and removal activities have been and continue to be implemented to achieve the common goals of cleaning up the Site to meet relevant Federal and state regulations and ensuring the long-term health of both the environment and the community of East Palestine.

At the one-year mark after the incident, EPA confirmed the removal and offsite disposal of 176,000 tons of soil and more than 50 million gallons of wastewater.[1]  Additionally, more than 1,500 drinking water samples from the municipal water system and private well samples have consistently shown no impacts from the derailment.

Work continues at the Site under EPA-approved work plans, including:

- A site-wide confirmation soil sampling effort – a final doublecheck to ensure that the cleanup of the derailment area has been fully successful, and that no contamination has spread due to cleanup activities – began in September 2023, and will continue through the fall of 2024.  As of mid-May 2024, that work is approximately 64% complete.  This effort is expected to extend into November 2024.

- A mitigation work plan is being implemented in Sulphur and Leslie Runs to address sheens associated with the derailment.  The mitigation work began in April 2024, is anticipated to last until June 2024, and then will be followed by a comprehensive re-assessment of the waterbodies, including surface water and sediment sampling.

- Monitoring of surface water, potable wells, groundwater characterization wells, and sentinel wells will continue until transitioned to long-term monitoring programs.

- Water management, demobilization of equipment and staging areas, and restoration activities are estimated to extend into November 2024.

---

[1] East Palestine Train Derailment: A Year in Review (US EPA), epa.gov/east-palestine-oh-train-derailment/year-review

| Key Site Statistics through May 16, 2024 | |
|---|---|
| **Soil** | <ul><li>More than 176,000 tons (350 million pounds) of contaminated soil excavated and shipped offsite for proper disposal.</li><li>7,977 soil samples collected at the Site.</li><li>Based on soil sampling completed in March and April 2023, USEPA determined that areas in and around East Palestine – including the City Park – were safe for regular use, and both famers and recreational gardeners could safely plant in the spring. USEPA's detailed analysis of the soil sampling data released in October 2023 confirmed that the vent and burn did not significantly contribute to background dioxin deposition in the area.</li></ul> |
| **Air** | <ul><li>More than 115 million air monitoring data points.</li><li>No sustained air monitoring readings or analytical results for the contaminants of concern (vinyl chloride, n-butyl acrylate, and over 70 additional monitored chemicals) have been found above action levels established for the site since the evacuation order was lifted on February 8, 2023.</li></ul> |
| **Drinking Water** | <ul><li>1,907 drinking water samples from private & municipal wells.</li><li>Weekly drinking water samples from the municipal water system and over 1,200 private well samples have consistently shown no impacts from the derailment and municipal water continues to meet drinking water safety standards.</li></ul> |
| **Sulphur & Leslie Runs** | <ul><li>Comprehensive sampling program, including 4,287 surface water samples, 327 sediment samples, and 212 sheen samples, as well as biological monitoring.</li><li>Completed cleaning of five culverted portions of Sulphur Run.</li><li>Removing sheens by working from upstream to downstream, vacuuming out sediments and sheen one area at a time. Work continues in a particular work area until USEPA is satisfied that the sheens have been mitigated.</li></ul> |
| **Groundwater** | <ul><li>1,489 groundwater, seep, and watershed samples from a network of 33 monitoring wells and 25 sentinel wells.</li><li>Based on completion of source area soil removal, establishment of the monitoring well network, and assessment of groundwater delineation efforts to date, on May 15, 2024, USEPA approved a reduction in sampling frequency to monthly.</li></ul> |
| **Wastewater** | <ul><li>More than 69,000,000 gallons of water recovered and transported offsite.</li><li>More than 13,368,091 million gallons of wastewater treated onsite.</li><li>1,312 waste characterization samples.</li></ul> |

2

APPENDIX B

Settling Defendants' Statement Regarding Rail Safety Measures

A.    Settling Defendants state that they have implemented numerous rail safety measures since the Derailment, including but not limited to:

- One month after the Derailment, Settling Defendants reviewed their Train Build rules resulting in revisions designed to enhance train safety and reduce derailments by distributing the greatest weight towards the head-end of the train and by expanding the requirements for the use of distributed-power units to reduce and control in-train forces.

- Settling Defendants operated a network of nearly 1,000 hot bearing detectors ("HBDs") prior to the Derailment, with an average spacing of approximately 13.9 miles between HBDs on its Key Routes.[1]

- Since the Derailment, Settling Defendants have installed an additional 183 HBDs at 123 locations across their Key Routes, including one next-generation Multi-Beam Hot Bearing Detector ("Multi-Beam HBD") capable of measuring up to four times the number of temperature points per axle, as a proof of concept. These installations decreased the average distance between HBDs on Settling Defendants' Key Routes to approximately 12.05 miles.

- Acoustic bearing detectors ("ABDs") are systems designed to analyze the acoustic signatures of the vibration of wheel bearings in passing trains to identify mechanical issues in wheel bearings that correlate with potential malfunction long before they start producing heat.  Since the Derailment, Settling Defendants have installed 17 additional ABDs at 12 locations across their Key Routes.  With these installations, over 90% of Railcars that travel across Settling Defendants' Key Routes annually are monitored by ABDs.

- Since the Derailment, Settling Defendants have deployed 3 additional Digital Train Inspection Portals ("DTIPs"), which are machine vision systems developed by Settling Defendants in collaboration with the Georgia Tech Research Institute, that utilize ultra-high-resolution cameras to provide a 360-degree health check on Railcars.  Settling Defendants are further developing additional algorithms used to

---

[1]  Since the Derailment, the Federal Railroad Administration has affirmed that HBDs have "significantly helped in reducing the number of derailments related to freight car/components" and have had a "definite impact" on limiting derailments related to overheated bearings.  Since 1980, accidents caused by axle and bearing-related factors have "dropped 81 percent . . . due to the use of [HBDs]."

generate alerts during digital inspections of Railcars to enhance the effectiveness of DTIPs installed on its network.

- Since the Derailment, Settling Defendants have enhanced their Wayside Help Desk and Wayside Diagnostic Systems by adding 18 additional employees to the Wayside Help Desk to monitor their expanding network of wayside defect detectors (HBDs, ABDs, and DTIPs); provided employees with standardized communication scripts, additional training, and improved alert notifications; implemented automated alert logs to efficiently collect accurate records; initiated work to develop a detector outage alert system to identify unplanned outages or failures for faster dispatching of maintenance personnel; and generated real-time critical-alert notifications for train crews and dispatchers.

- Since the Derailment, Settling Defendants have enhanced handling procedures for Wayside Detector system data, including: (i) deploying push notifications that send critical alerts directly to train crews and pop-up alerts to dispatchers; (ii) establishing a protocol requiring the Wayside Help Desk to review impact detector data after receiving specific HBD alerts; and (iii) issuing new Operations Bulletins across multiple departments to improve communications between train crews, dispatchers, the Wayside Help Desk, and the mechanical department.

- Since the Derailment, Settling Defendants have deployed enhancements to the Wayside Diagnostic System that facilitate improved decision-making on corrective actions, including (i) generating prior handling flags that allow employees to quickly review handling history for particular equipment; (ii) generating repeat alert flags that indicate the number of detectors on a given trip that produced particular classes of alerts (*e.g.*, braking, wheel heat, etc.); and (iii) establishing a log within the Wayside Diagnostic System containing train handling records.

- Since the Derailment, Settling Defendants have introduced (i) communication scripts to standardize Wayside Help Desk responses to train crew calls; (ii) a new checklist to standardize communications between train crews, dispatchers, and the Wayside Help Desk during stops and field inspections; (iii) enhancements to allow the Wayside Help Desk to quickly see relevant historical information for flagged Railcars; (iv) a program that visibly flags for repair Railcars that have been "Bad Ordered," meaning a mechanical or safety component of the Railcar is in need of repair and is removed from service pending repair, and requires conductors to acknowledge a warning sent to their device; and (v) enhanced email distribution lists and data logs.

- Since the Derailment, Settling Defendants have worked with the Association of American Railroads ("AAR") to adopt a new industrywide rule standardizing hot-bearing trend algorithms and facilitating data-sharing among railroads to detect and prevent bearing failure, and became the first Class I railroad to implement the rule.

- Since the Derailment, Settling Defendants have expanded safety-related trainings and enhanced processes for train crews and mechanical department employees responding to defect detector alerts, including supplying 5,000 handheld infrared thermometers to train crews for field inspections, and enhanced procedures and trainings for Communications & Signals Department employees responsible for installation and maintenance of defect detectors.

- Since the Derailment, Settling Defendants have implemented measures to improve their safety culture and training, including by (i) partnering with Brotherhood of Locomotive Engineers and Trainmen ("BLET"), International Association of Sheet Metal, Air, Rail, and Transportation Workers ("SMART-TD"), and FRA to initiate a Confidential Close Call Reporting System ("C3RS") pilot program for 1,000 Norfolk Southern employees; (ii) establishing agreements with the full Norfolk Southern workforce on paid sick days; (iii) undertaking a pilot program with the Brotherhood of Railroad Signalmen, with technical support from FRA, to perform field visits to consider signal safety; (iv) instituting a bilateral rating system that allows trainers and conductors to rate each other with respect to training programs; (v) developing territory-specific dispatcher knowledge tests; (vi) scheduling a Hazardous Waste Operations and Emergency Response ("HAZWOPER") training for designated Norfolk Southern employees who are members of the Brotherhood of Maintenance of Way Employees Division; (vii) requiring Wayside Help Desk employees without mechanical training to attend a two-week course that includes a power air brake certification, and provides instruction about regulatory requirements and restrictions on freight Railcar inspections and moving defective equipment; and (viii) developing an application that allows employees to document and report safety issues in real-time.

- Since 2015, Settling Defendants have trained over 40,000 First Responders through their Operation Awareness & Response ("OAR") program, which provides instruction to more than 5,000 First Responders every year, and includes instruction through the "NS Safety Train" that models the types of Railcars that First Responders may encounter in a derailment; classroom, web-based, and online resources; tabletop drills; and participation in full-scale exercises.

- Since the Derailment, Settling Defendants have continued to invest in technology to improve the speed of information sharing with First Responders to ensure they receive critical safety information, such as a derailed train's consist information, as soon as possible.  Settling Defendants assisted the AAR in installing AskRail, a tool that allows First Responders on-demand access to consist and emergency response information and protocols, at over 200 Emergency Communications Centers ("ECCs") nationwide, and provided access to Chemtrec—a 24-hour public service hotline for emergency responders.  Settling Defendants cover the AskRail tool in First Responder trainings and OAR trainings, which include a module on the tool including instructions on how to access and utilize AskRail and its features.

3

- Settling Defendants have implemented RapidSOS across its network.  RapidSOS is a digital platform that connects devices over 16,000 emergency response agencies, covering virtually 100% of the emergency response agencies across Settling Defendants' rail network.  RapidSOS provides First Responders with real-time access to train consists, train locations, and emergency response protocols, which facilitates access to cargo and hazmat information and enables First Responders to call for mutual aid.

- Settling Defendants state that they continue to surpass regulatory and industry standards for safety-related track examinations and inspections.


B.    Settling Defendants state they are engaging in the following rail safety assessment and improvement efforts.  Settling Defendants shall provide annual updates regarding the status of these efforts pursuant to Paragraph 99 of this Consent Decree.

- Multi-Beam HBD units are capable of measuring up to four times the number of temperature points per axle as standard HBDs.  Settling Defendants will continue to assess the reliability of Multi-Beam HBDs for use in freight operations.

- To further expand the coverage of ABDs across their Key Routes, Settling Defendants will determine the number of additional ABDs required to provide coverage for 94% of Railcars transporting Hazardous Materials on their Key Routes annually.

- DTIPs use nearly 40 ultra-high-resolution cameras taking on average 1,000 images per Railcar to record vital components on the front, back, top, and bottom of a Railcar.  Machine learning algorithms then evaluate the images to identify potential defects more effectively than is possible through human inspection.  Settling Defendants are developing additional algorithms to further enhance the effectiveness of DTIPs installed on its network.  Settling Defendants anticipate installing no fewer than 18 additional DTIPs on their Key Routes.  Settling Defendants will continue to develop and deploy additional DTIP Algorithms and assess the efficacy of these algorithms to provide DTIP data to the Wayside Help Desk.

- Since the Derailment, Settling Defendants have commenced integrating ABD and DTIP data into the Wayside Diagnostic System to facilitate the analysis of Wayside Detector data in a centralized location.  Settling Defendants will continue to develop software to integrate HBD, ABD, and DTIP data on the Wayside Diagnostic System.

- Settling Defendants will continue to develop the Ballast Line Leadership Program to train frontline supervisors, particularly those who interact most directly with craft employees.  The Program is designed to improve the leadership skills of frontline management by fostering self-awareness and an inclusive environment

4

that promotes trust, communication, and collaboration among Settling Defendants' employees.

- Settling Defendants will continue to develop and deploy field-based training on technical skills, safety, and rules compliance, including by utilizing a field-based training function to provide ongoing training, conducting peer-to-peer discussions during field visits, and identifying and reinforcing best practices for safety behaviors in the field.

- Settling Defendants will continue to enhance and provide advanced training for conductors, including by collaborating with craft employees and SMART union representatives to develop training initiatives, solicit feedback on those initiatives, and increase the training stipend for trainers of conductors; providing additional classroom training for conductors with less than one year of service and recurrent classroom training on critical operational safety rules; and instituting a program pairing trainees with experienced conductors during on-the-job training.

- Settling Defendants will continue to standardize processes for monitoring the dissemination and conduct of training, including by utilizing checklists and other recording tools to standardize conductor training across the network and monitor training completion and competencies, and deploying training videos on safe equipment handling, train movement, and HBD inspection.

- Settling Defendants will continue to escalate employee safety concerns through utilizing a real-time safety-reporting application and administering periodic safety surveys that facilitate the reporting of safety concerns and tracking the resolution of any credible safety issues raised.

- In 2023, 10% of Settling Defendants' annual incentive goals for Executive Compensation were based on measurable and publicly-reported safety metrics -- the FRA's reportable injury rate and reportable train accident rate.  Settling Defendants will continue to incorporate safety metrics into executive compensation.

- Settling Defendants will continue to provide First Responder training through its OAR program and continue to implement RapidSOS across its network.

- Settling Defendants will develop and construct a Regional Response Training Center in East Palestine that will provide ongoing training for First Responders from Ohio, Pennsylvania, West Virginia, and the greater region.

APPENDIX C

<u>Case-by-Case Admissions to Medical Monitoring Program</u>

The Consent Decree provides for a Medical Monitoring Program, as set forth in Paragraph 50.  In addition to the individuals who automatically qualify for participation as defined in Paragraph 50.b.(1)-(2) ("Automatic Qualifiers"), other individuals may also request inclusion in the Medical Monitoring Program on a case-by-case basis.  Determinations regarding acceptance into the Medical Monitoring Program on a case-by-case basis will be made by the Administrator of the Community Health Program to be appointed by Settling Defendants ("Administrator").  Factors to be considered by the Administrator that weigh in favor of case-by-case inclusion in the Medical Monitoring Program include but are not limited to:

- An individual's proximity to the derailment site from February 3-7, 2023;
  - o Individuals will be required to submit an affidavit or written statement with details about when and where the individual came within close proximity of the derailment site.

- Whether an individual received services from the Family Assistance Center in East Palestine, Ohio; and
  - o This includes individuals who filed a claim for assistance at the Family Assistance Center between February 2023 and the date of lodging of this Consent Decree, and members of their household.

- Potential physical harm that onset around the time of the Derailment and resulting cleanup work.
  - o Individuals will be required to submit an affidavit or written statement describing their symptoms, confirming their symptoms manifested between February 3 and October 30, 2023, and stating why they believe their symptoms are linked to the Derailment.

The Administrator of the Community Health Program may not unreasonably limit the number of individuals to be included in the Medical Monitoring Program on a case-by-case basis.  The Medical Monitoring Program, however, is meant to prioritize adequate funding for the First Responders and Automatic Qualifiers to receive the full amount of services over the Community Health Program's existence, and therefore the Administrator may take into consideration the number of Automatic Qualifiers participating in the Medical Monitoring Program when assessing the available funding for additional case-by-case individuals to join the program.  Within one month of the latter of (i) EPA's approval of the Community Health Program Plan or (ii) the Effective Date of the Consent Decree, Settling Defendants will implement a sign-up program for Automatic Qualifiers asking individuals to schedule medical exams in the first year of the Community Health Program.  This will enable the Administrator of the Community Health Program to better identify the level of participation in the Medical Monitoring Program and help assess potential availability for inclusion of case-by-case participants.