IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| THE STATE OF OHIO | ) | |
| | ) | |
| and | ) | |
| | ) | |
| THE UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Civil Case No. 23-cv-517 |
| | ) | Hon. John R. Adams |
| | ) | |
| NORFOLK SOUTHERN RAILWAY | ) | |
| COMPANY | ) | |
| | ) | |
| and | ) | |
| | ) | |
| NORFOLK SOUTHERN | ) | |
| CORPORATION, | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM IN SUPPORT OF
UNITED STATES OF AMERICA'S MOTION TO ENTER CONSENT DECREE**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................................... iii

STATEMENT OF ISSUE TO BE DECIDED.................................................................... v

SUMMARY OF THE ARGUMENT ................................................................................ vi

INTRODUCTION ............................................................................................................ 1

DISCUSSION .................................................................................................................. 3

   A.  Background ............................................................................................................ 3

      1. The Derailment ............................................................................................... 3

      2. The Cleanup .................................................................................................... 5

      3. Litigation and Settlement Negotiations ......................................................... 9

   B.  Relief Secured by the Consent Decree ................................................................. 11

      1. Environmental Cleanup and Payment of U.S. Cleanup Costs ...................... 11

      2. Enhanced Environmental Monitoring, Mitigation Projects, and Recovery of Natural Resource Damages ............................................................................ 12

      3. Civil Penalty.................................................................................................. 13

      4. Rail Safety ..................................................................................................... 13

      5. Community Health ......................................................................................... 16

   C.  Legal Standards Governing Review of the Proposed Consent Decree ............................. 17

   D.  The Court Should Approve the Consent Decree – It Is Fair, Reasonable, and Consistent with Statutory Goals ............................................................................. 18

      1. The Consent Decree Is Fair........................................................................... 18

      2. The Consent Decree Is Reasonable............................................................... 20

      3. The Consent Decree Is Consistent with Relevant Statutory Goals............... 21

   E.  The Points Made by the Comments Do Not Justify Withdrawal or Rejection of the Settlement. ..................................................................................................... 21

      1. Requests for Expansion of the Community Health Program ........................ 23

      2. Rail Safety..................................................................................................... 26

      3. Sufficiency of the Cleanup............................................................................ 28

CONCLUSION............................................................................................................... 29

## TABLE OF AUTHORITIES

Cases                                                                    Page(s)

*Aro Corp. v. Allied Witan Co.*,
  531 F.2d 1368 (6th Cir. 1976) ............................................................ 17

*Burlington N. and Santa Fe Ry. Co. v. United States*,
  556 U.S. 599 (2009) ............................................................... 21, 25

*Citizens for a Better Env't v. Gorsuch*,
  718 F.2d 1117 (D.C. Cir. 1983) ........................................................ 19

*Daigle v. Shell Oil Co.*,
  972 F.2d 1527 (10th Cir. 1992) ........................................................ 24

*Dedham Water Co. v. Cumberland Farms Dairy, Inc.*,
  805 F.2d 1074 (1st Cir. 1986) ......................................................... 25

*E.E.O.C. v. Hiram Walker & Sons, Inc.*,
  768 F.2d 884 (7th Cir. 1985) ......................................................... 20

*Exxon Corp. v. Hunt*,
  475 U.S. 355 (1986) .................................................................. 24

*Kelley v. Thomas Solvent Co.*,
  717 F. Supp. 507 (W.D. Mich. 1989) .................................................... 18

*Key Tronic Corp. v. United States*,
  511 U.S. 809 (1994) .................................................................. 25

*Officers for Justice v. Civil Service Comm'n*,
  688 F.2d 615 (9th Cir. 1982) ......................................................... 20

*Sierra Club v. Coca-Cola Corp.*,
  673 F. Supp. 1555 (M.D. Fla. 1987) ................................................... 21

*United States v. Akzo Coatings of Am., Inc.*,
  949 F.2d 1409 (6th Cir. 1991) ................................................... vii, 17, 18

*United States v. BP Expl. & Oil Co.*,
  167 F. Supp. 2d 1045 (N.D. Ind. 2001) ............................................ 17, 18

*United States v. Cannons Eng'g Corp.*,
  899 F.2d 79 (1st Cir. 1990) ..................................................... 18, 19, 20

*United States v. George A. Whiting Paper Co.*,
  644 F.3d 368 (7th Cir. 2011) ......................................................... 17

*United States v. Hooker Chem. & Plastics Corp.*,
  607 F. Supp. 1052 (W.D.N.Y. 1985) .................................................... 18

*United States v. Lexington-Fayette Urban Cnty. Gov't*,
  591 F.3d 484 (6th Cir. 2010) .................................................. vii, 17, 18

*United States v. Montrose Chem. Corp.*,
  50 F.3d 741 (9th Cir. 1995) .......................................................... 18

*United States v. Telluride Co.*,
  849 F. Supp. 1400 (D. Colo. 1994) .................................................... 20

*Voluntary Purchasing Grps., Inc. v. Reilly*,
  889 F.2d 1380 (5th Cir. 1989) ........................................................ 25

Statutes

33 U.S.C. § 1251 ................................................................................................ 21, 24
33 U.S.C. § 1311 ...................................................................................................... 9
33 U.S.C. § 1319 ................................................................................................. 9, 23
33 U.S.C. § 1321 ................................................................................................. 9, 23
42 U.S.C. § 9604 .................................................................................................... 25
42 U.S.C. § 9606 ............................................................................................... 10, 25
42 U.S.C. § 9607 ............................................................................................... 10, 25
49 U.S.C. § 10702 .................................................................................................. 27
49 U.S.C. § 11101 .................................................................................................. 27

Regulations

49 C.F.R. § 174.310 ............................................................................................... 15

Other Authorities

81 Fed. Reg. 53,935 (Aug. 15, 2016) ..................................................................... 27
Pub. L. No. 114-94, 129 Stat. 1312 (2015) ............................................................ 27

## <u>STATEMENT OF ISSUE TO BE DECIDED</u>

Whether the proposed Consent Decree between the United States and Defendants, lodged with the Court on May 23, 2024 (Dkt. 137-1), is fair, reasonable, and consistent with the public interest and the purposes of the Clean Water Act (CWA) and the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA), and should be approved and entered by this Court as a final judgment.

## SUMMARY OF THE ARGUMENT

The United States seeks Court approval and entry of a proposed Consent Decree that provides broad and substantive relief addressing the injury to and needs of the community of East Palestine, Ohio, following the devastating derailment of Norfolk Southern Train 32N in February 2023.  The settlement requires completion of a comprehensive environmental cleanup under CERCLA and the Clean Water Act, an additional decade of environmental monitoring, adoption of system-wide rail safety measures and emergency response procedures that will specifically reduce the risk from future derailments, a maximalist civil penalty, additional stream and natural resource improvement projects, reimbursement of all taxpayer-funded federal response costs, and an innovative $25 million healthcare program to provide medical monitoring and mental health services to this resilient community and the brave first responders who aided it.  The proposed settlement is valued at nearly $350 million which is above and beyond the roughly $800 million spent by Norfolk Southern on the cleanup to date.  If approved, the Consent Decree will lock in these significant benefits immediately, while its rejection would lead to further litigation that could yield far less relief after years of delay.

The United States has carefully reviewed over 120 public comments on the Consent Decree received from residents, businesses, non-profits, and governmental entities on a broad array of topics.  In general, these comments do not question the primary relief provided by the Consent Decree.  While many comments reflect community concerns as to whether the proposed benefits could be extended further, the comments do not warrant withdrawal of the proposed settlement.  In a hard-fought negotiation like this one, the United States must pursue the overall public interest in achieving a faster and more certain resolution through compromise, even if it cannot induce the defendant to satisfy every desire of community members.

The law is thus that a proposed consent decree in an environmental enforcement case submitted by the United States should be approved and entered where the reviewing court finds it to be "fair, adequate, and reasonable, as well as consistent with the public interest."  *United States v. Lexington-Fayette Urban Cnty. Gov't*, 591 F.3d 484, 489 (6th Cir. 2010) (Clean Water Act case); *accord United States v. Akzo Coatings of Am., Inc.*, 949 F.2d 1409, 1426 (6th Cir. 1991) (CERCLA case).  In assessing the public interest, a "court must consider whether the decree is consistent with the public objectives sought to be attained by Congress" as set forth in the environmental statutes pursuant to which the claims have been brought.  *See id*. at 490.  The proposed Consent Decree is fair, reasonable, and consistent with the public interest and the purposes of the CWA and CERCLA, and should be entered by the Court without delay to provide the community with the benefits secured through this negotiation at the earliest opportunity.

## INTRODUCTION

In the wake of the February 3, 2023, derailment of Train 32N in East Palestine, Ohio, and subsequent release of pollutants, hazardous substances, and oil into the environment, the United States filed this lawsuit, asserting claims against Norfolk Southern Railway Company and Norfolk Southern Corp. (collectively "Norfolk Southern" or "Defendants") under the Clean Water Act (CWA) and the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA).  The intent of the lawsuit is to hold Norfolk Southern responsible for the cleanup of the spilled hazardous substances and oil, and to address the harms resulting from the derailment, to the extent available under federal law.  The United States now seeks Court approval and entry of a proposed Consent Decree resolving its claims.

The proposed Consent Decree is fair, reasonable, and consistent with the public interest and the purposes of the Clean Water Act and CERCLA.  It provides for the completion of a comprehensive environmental cleanup to ensure all derailment-related contamination is addressed, with supplemental long-term monitoring to give the community additional confidence as to its effectiveness; reimbursement of all federal cleanup costs; implementation of substantive rail safety and emergency response provisions to reduce the likelihood of similar future incidents; preservation and improvement of impacted environmental habitats; and payment of what is effectively the maximum civil penalty available for the claims asserted.  And beyond the core environmental and rail safety benefits, the proposed Consent Decree also includes a 20-year, $25 million Community Health Program to provide immediate relief for two of the community's most pressing needs – mental health services and medical monitoring.

After lodging the proposed Consent Decree with this Court, the United States met with many community members in small groups over two days in East Palestine and received over 120 written comments during the 60-day public comment period.  All comments received on or

1

near the deadline and a Response to Comments are attached hereto as Appendices A and B.  The
public comments reflect a general approval of the overall package of relief provided by the
Consent Decree.  Some comments and questions were received regarding the core of the
settlement – the scope of the environmental cleanup and the rail safety provisions.  Many
comments, however, focused on the additional benefits (*e.g.* whether the Community Health
Program should be expanded) and some were even directed at the settlement in Norfolk
Southern' separate class action matter.

Having carefully reviewed and assessed all the public comments, the United States
continues to believe that the Consent Decree is fair, reasonable, and consistent with the public
interest and the purposes of the Clean Water Act and CERCLA.[1]  The proposed Consent Decree
provides extensive relief for violations of the two environmental statutes – a complete cleanup,
long-term monitoring, rail safety measures to reduce the risk of future similar incidents, and a
civil penalty.  And to address the community's current health concerns, the Consent Decree also
includes a multi-year healthcare program that goes above and beyond what is typical of United
States' settlements of environmental cases.  While recognizing that many commenters would like
more health-related relief, the benefits secured through this settlement reflect careful
consideration of the facts of this case, the applicable law, and what the United States believes it
is likely to obtain were it to proceed to trial.  The Consent Decree, once approved, will begin to
address pressing needs of the community now, rather than months or years from now.  The
United States requests that the Court enter the proposed Consent Decree without delay.

---

[1]  As discussed below and in the Response to Comments, as a result of comments received, the United States
is proposing clarifying Consent Decree Paragraph 69 and has worked with Norfolk Southern to
incorporate certain additional items into the Community Health Program Plan.  *See infra* at 27-28;
Response to Comments at 32-33.

## DISCUSSION

**A. Background**

**1. The Derailment**

Norfolk Southern Railway Train 32N derailed on February 3, 2023, at 8:54 p.m. while traveling eastbound through the Village of East Palestine.  Originating in Madison, Illinois, two days earlier, Train 32N approached East Palestine consisting of 3 locomotives and 149 mixed freight cars, all of which had been appropriately inspected and cleared.  NTSB Report at 3-4.[2] On the final leg of its journey, Train 32N encountered three hot bearing detectors ("HBDs"), devices located along the tracks to detect overheated wheel bearings using infrared temperature measurement.  *Id.* at 4.  At 7:47 p.m. on February 3, the train passed over an HBD at mile post 79.8 (Sebring, OH), which recorded a temperature of 38°F above ambient on the left-side wheel bearing on the first axle of the 23rd railcar ("L1 bearing" of "Railcar 23").  *Id.* at 5.  That reading did not result in any alarm or alert to the train crew or the Norfolk Southern Wayside Help Desk in Atlanta.  *Id.*

Between 8:11 p.m. and 8:14 p.m., the train traveled through Salem, Ohio, where four surveillance cameras recorded visible fire on Railcar 23.  *Id.* at 6.  At 8:13 p.m., the train traversed an HBD at mile post 69.01 (Salem), which now recorded the L1 bearing temperature as 103°F above ambient.  *See id.*  In accordance with Norfolk Southern procedures, the L1 bearing generated a "non-critical" alert to the Wayside Help Desk, as it was greater than 90 degrees above ambient.  *Id.* at 7.  A non-critical alert only required the Help Desk to continue monitoring the bearing's temperature and did not require the train crew to stop the train.  *Id.* at 7 n.14.

---

[2]  National Transportation Safety Board, Railroad Investigation Report RIR-24-05, *Norfolk Southern Railway Derailment and Hazardous Materials Release* (June 25, 2024). https://www.ntsb.gov/investigations/AccidentReports/Reports/RIR2405%20CORRECTED.pdf

At 8:52 p.m., after traveling an additional 19.2 miles, the train traversed the HBD at mile post 49.81 (East Palestine), which recorded that the L1 bearing was now 253°F above ambient. *Id.* at 7-8.  Because the temperature exceeded 200 degrees above ambient, the train crew received an automatic "critical" alarm.  *Id.* at 8.  At 8:54 p.m., Train 32N's engineer began using dynamic braking to slow the train to inspect the wheel set as required by Norfolk Southern procedures in response to this alarm.  *Id.*  But before the train could stop, Railcar 23's L1 bearing apparently failed and railcars began decoupling – part of Train 32N had derailed.  *Id.*

The derailment consisted of 38 mixed-freight railcars, including 11 tank cars carrying hazardous materials.  *Id.* at 1.  Fires sparked by the derailment eventually spread to involve 35 railcars and were fueled by materials that spilled from cars that breached during the derailment, including hazardous materials such as butyl acrylate and ethylene glycol monobutyl ether, as well as plastic pellets and other freights.  *Id.* at 1, 13.  The first emergency 911 call was received at 8:56 p.m., and dispatch radioed all available fire and emergency medical services units to respond to the derailment.  *Id.* at 8.  Even as local responders began fighting the fire, it continued to grow in size and intensity and the deputy fire chief ordered an evacuation of approximately 2,000 residents within 1-mile of the derailment site, as the fires burned overnight.  *Id.* at 1, 12.

Shortly after midnight on February 4, a pressure relief device (PRD) actuated on one of the tank cars containing vinyl chloride monomer and continued to vent periodically throughout the day.[3]  *Id.* at 17.  Norfolk Southern contractors became concerned when late that afternoon the PRD vented energetically and continuously for about 70 minutes, which they concluded indicated that vinyl chloride monomer had begun to polymerize within the tank car, obstructing the relief valve critical for safety.  *Id.* at 17-18.  If a PRD cannot vent excess pressure due to

---

[3] PRD actuation occurs when pressure inside a tank car builds up enough to open a spring-loaded valve. NTSB Report at 17.  After the release, the valve closes when pressure in the tank falls low enough.  *Id.* PRDs often actuate when tank cars are exposed to fire.  *Id.*

polymerizing vinyl chloride, the result could be an uncontrolled tank car rupture and explosion capable of propelling metal fragments up to one-half mile. *See id.* at 20-22.

On February 6, in what Norfolk Southern contractors framed as the only way to avoid a catastrophic explosion, the East Palestine fire chief (as Incident Commander) authorized a vent-and-burn of the railcars containing vinyl chloride monomer. *Id*. at 28. In advance of the vent-and-burn, the evacuation zone was extended to a 2 miles x 1 mile area, encompassing additional residents of Ohio and Pennsylvania. *See id*. At 4:37 p.m., Norfolk Southern contractors commenced the vent-and-burn procedure, generating a persistent plume of smoke that Norfolk Southern states likely contained soot, carbon dioxide, carbon monoxide, hydrogen chloride, and phosgene. *Id.* at 29. Two days later, after the train fires were extinguished, the Incident Commander lifted the evacuation order and residents were allowed to return. *Id.* at 31.

### 2. The Cleanup

EPA responders were on site within hours of the derailment and EPA personnel have remained in East Palestine for the past 19 months.[4] Declaration of Ralph Dollhopf, attached as Exhibit 1, at ¶ 10. During the first few weeks, EPA deployed equipment and personnel to monitor outdoor air at the site and around the community and assisted with environmental response efforts conducted by Ohio EPA and Norfolk Southern. *Id*. at ¶¶ 11-12. On February 21, 2023, after determining that hazardous substances released at the site posed an imminent and substantial threat to public health and the environment, EPA issued a CERCLA Unilateral Administrative Order ("CERCLA Order") directing Norfolk Southern to clean up the contamination. *Id*. at ¶¶ 15-16.

---

[4] The "Site" is defined in the Consent Decree as "the areal extent of where Derailment-Associated Materials have come to be located, in Ohio and Pennsylvania, as a result of the Derailment and the subsequent emergency response activities, including but not limited to breached Railcars, movement of material in connection with the rerailing process, and the Vent and Burn that occurred on February 6, 2023." CD ¶ 7.

As a result of the CERCLA Order, direction of the cleanup transitioned to EPA, with Ohio EPA, Columbiana County, and the Village of East Palestine continuing to provide daily input and assistance as part of a coordinated response effort. *Id.* at ¶ 18. The CERCLA Order requires Norfolk Southern to develop and implement a series of workplans, including plans for cleaning up the derailment site and transporting contaminated waste off-site for proper disposal, and plans for testing soil, surface water, sediments, groundwater, drinking water, and air. *Id.* at ¶ 19. All necessary workplans are currently being implemented or already complete. *Id.* at ¶ 20.

Under the CERCLA Order, spilled chemicals at the derailment site were addressed by excavating contaminated soil. *Id.* at ¶¶ 23-25. The majority of this work was complete by October 2023, and a final confirmatory sampling and analysis initiative is currently ongoing (more than 85% complete) to determine the extent of any remaining contamination at the derailment site. *Id.* at ¶¶ 25, 29. Norfolk Southern, under EPA oversight, has removed and disposed of more than 193,000 tons of contaminated soil and more than 73 million gallons of wastewater. *Id.* at ¶ 25. EPA has required Norfolk Southern to conduct this removal of derailment-related contaminants in accordance with conservative criteria to ensure that the site no longer poses a threat to human health and the environment and will not require future cleanups at a later date. *Id.* at ¶ 24.

The CERCLA cleanup also involves a robust environmental monitoring and sampling program for soil, water, and air throughout the community. In the Spring of 2023, Norfolk Southern and EPA collected and analyzed soil samples at 121 locations, including homes, parks, schools, farms, and commercial properties, to determine whether any contaminants had spread in the community due to the derailment, including the fires and vent-and-burn. EPA's analysis of

the results of this soil sampling program found no discernable impacts of derailment-related contamination at these properties.  *Id*. at ¶¶ 31-33.

Under oversight from EPA, Ohio, and local regulators, Norfolk Southern has monitored for and analyzed potential impacts to drinking water and groundwater.  *Id*. at ¶¶ 36-40.  To date there have been no detections of contamination attributable to the derailment in analyses of more than 1,600 total samples collected from over 200 private drinking water wells.  *Id*. at ¶ 37.  Relatedly, Ohio EPA has overseen Norfolk Southern's testing of the municipal drinking water supply, where over 65 rounds of sampling of public municipal wells have not detected contaminants attributable to the derailment in treated water.  *Id*. at ¶ 39.  EPA also instructed Norfolk Southern to install and analyze samples from sentinel wells, placed in strategic locations between the derailment area and private and public drinking water wells for early identification of potential contamination, as well as 48 monitoring wells installed in the derailment area to monitor groundwater in the local aquifers under and around the industrial site where the incident occurred.  *Id*. at ¶¶ 39-40.  These wells continue to be sampled regularly.  *Id*.

EPA and Norfolk Southern also have been testing for contaminants in the air at the derailment site and throughout the community since February 4, 2023.  *Id*. at ¶ 41.  This comprehensive air monitoring/sampling effort has included stationary and mobile air monitoring instruments that provide continuous real-time measurements.  *Id*.  Deployment of air canisters, sorbent tubes, and adsorbent badges to collect air samples, which are then sent to a laboratory for analysis, have also been important cornerstones of the rigorous air science program EPA has required to ensure protection of public health throughout this response and cleanup.  *Id*.  Since the evacuation order was lifted on February 8, 2023, no sustained exceedances of contaminants

of concern above established screening levels have been shown in any air monitoring outside the derailment site.  *Id*.

EPA also issued a Clean Water Act Unilateral Administrative Order ("CWA Order") on October 18, 2023, after persistent oily sheen was observed in Sulphur Run and Leslie Run following initial assessments.  *Id*. at ¶ 45.  The CWA Order requires Norfolk Southern to conduct a more comprehensive assessment and then clean up derailment-related oil and hazardous substances found in the sediment of these streams.  *Id*.  The cleanup work involved disturbing sediment and cleaning areas with sheening along Sulphur Run and portions of Leslie Run.  *Id*. at ¶ 46.  The comprehensive assessment, cleanup, and first reassessment have now been completed for both streams.  *Id*. at ¶ 48.

Results from the first reassessment show that these efforts were effective in the sediment areas targeted for cleanup work, and EPA has now directed Norfolk Southern to conduct additional reassessments to ensure that all areas requiring cleanup are addressed.  *Id*. at ¶ 49.  EPA will only determine the CWA removal action complete when, following consultation with the State, it has verified that designated State water quality standards have been met, there is no derailment contamination in the sediment above established human health screening levels / background levels, there is no longer persistent sheen from the derailment, and Norfolk Southern has otherwise complied with all requirements in the approved workplan.  *Id*. at ¶ 50.

Throughout the entirety of the response action, EPA has prioritized engaging with the community to provide information about the cleanup and the potential impacts of the derailment, as well as to ensure the response action adequately addresses the community's human health and environmental concerns.  EPA opened a Community Welcome Center in East Palestine in February 2023 for community members to meet face-to-face with EPA and public health agency

staff, including technical experts, and have their questions answered.  Declaration of Mark Durno, attached as Exhibit 2, at ¶ 15.  EPA, together with other members in the Unified Command (Ohio, the Village, Columbiana County, and Norfolk Southern), has held and attended public meetings and information sessions, distributed regular newsletters with updates regarding the cleanup activities, and set up a website that includes documents, photos, maps, videos, and monitoring and sampling data in an accessible and interactive format.  *Id*. at ¶ 9.  EPA's public outreach strategy has been informed by input from a community stakeholder group.  *Id*. at ¶ 22.

EPA's timeline for final completion of the CERCLA and Clean Water Act cleanups will be determined by conditions on the ground, including the continued evaluation of soil, groundwater, sediment, surface water, and air data.  Dollhopf. Decl. at ¶ 55.  Significant progress has been made since February 2023, and EPA remains committed to protecting the public health and welfare of affected communities.  *Id*.

### 3.  Litigation and Settlement Negotiations

The United States filed a Complaint on March 30, 2023, and an Amended Complaint on May 19, 2023 (collectively, the "Complaint").  Dkt. 22.  The Complaint is limited to two claims under the Clean Water Act and two claims under CERCLA.[5]  Claim 1, brought under CWA Section 309(b), 33 U.S.C. § 1319, alleges that Defendants unlawfully discharged pollutants into waters of the United States in violation of CWA Section 301, 33 U.S.C. § 1311.  Claim 2 alleges that Defendants discharged oil or hazardous substances into waters of the United States in violation of CWA Section 311, 33 U.S.C. § 1321(b)(3).  While the derailment is the primary event supporting both claims, the United States further alleged that additional discharges occurred due to intermittent releases of pollutants, hazardous substances, and/or oil from the site

---

[5]  The United States evaluated but did not assert claims under the Clean Air Act, the Resource Conservation and Recovery Act, and federal rail safety laws.  The proposed Consent Decree does not resolve or provide a release for any potential claims under such laws.

until completion of a significant portion of the cleanup.  Claims 3 and 4, brought under CERCLA Sections 107 and 113(g)(2), 42 U.S.C. §§ 9607 and 9613(g)(2), seek recovery of all response costs incurred by the United States as it addressed the release and threatened release of hazardous substances at and from the derailment site, as well as a declaratory judgment as to elements of liability for recovery of future response costs and natural resource damages.

Within 16 months from the date of the derailment, and 14 months after initiating this lawsuit, the United States lodged the proposed Consent Decree.  Cognizant of the importance of providing benefits to the community in a timely fashion, the United States recognized that the strict liability nature of its claims under CERCLA and the CWA allowed for settlement here without the need for extensive discovery on liability.  The United States negotiated a Clean Water Act civil penalty using maximalist assumptions regarding elements of the violations such as number of days of discharge and barrels of oil released from the railcars, obviating the need for discovery on those topics.[6]

Moreover, the substantive investigative hearing conducted by the National Transportation Safety Board (NTSB) in June 2023, which included a docket of more than 250 documents, provided a useful roadmap for developing appropriate injunctive relief directed at improving rail safety.  While some noted the risks inherent in negotiating a settlement prior to the issuance of the final NTSB report, the rail safety provisions included in the proposed Consent Decree proved to be more extensive than those recommended by the NTSB in its final report.[7]  The United States' efforts to resolve this matter on an expedited timeline will (subject to the approval of this

---

[6]  CERCLA does not provide for civil penalties for releases of hazardous substances under Sections 106 or 107, 42 U.S.C. §§ 9606-07.  While the United States may seek penalties for non-compliance with an order under CERCLA Section 106, 42 U.S.C. § 9606(b)(1), to date Norfolk Southern has complied with EPA's CERCLA Order.

[7]  While the NTSB report contains recommendations it includes no enforcement mechanism, unlike the Consent Decree which is binding on Defendants.

Court) provide relief to the community – including mental health treatment and medical monitoring – months if not years sooner than via litigation.  Nor did the effort to accelerate provision of these benefits reduce the substantial relief the United States obtained through this Consent Decree, as illustrated below.

### B. Relief Secured by the Consent Decree

#### 1. Environmental Cleanup and Payment of U.S. Cleanup Costs

Pursuant to its CERCLA and CWA Orders, EPA issued directives and approved workplans for Norfolk Southern to clean up the site, and those obligations will be subsumed by the Consent Decree.  CD ¶¶ 30-31.  EPA's On-Scene Coordinators, who have overseen the cleanup to date, will retain their full removal authorities to continue implementation of the CERCLA and CWA removal actions under the Consent Decree.  Defendants will be required to continue the removal work until EPA determines that the cleanup is complete, which means that the oil and hazardous substances released and discharged from the derailment no longer present a threat to human health and the environment.  CD ¶¶ 38-40.

Defendants state they have already spent over $780 million performing the cleanup and expect that figure to increase to over $800 million to complete the remaining work.  Under the Consent Decree, Defendants will also reimburse all CERCLA and CWA Section 311 response costs incurred by the United States.  CD ¶¶ 8-9.  This includes both "past response costs" paid through November 30, 2023 (approximately $57 million) and all future response costs from that date forward, for an estimated total of approximately $100 million.  This settlement ensures that Norfolk Southern and not American taxpayers will pay to clean up the derailment contamination.

## 2. Enhanced Environmental Monitoring, Mitigation Projects, and Recovery of Natural Resource Damages

Under the Consent Decree, EPA will not issue a Notice of Completion for clean-up work until it determines that all work related to the CERCLA and CWA removal actions has been fully performed and no further removal action is needed.  To provide the community with further confidence as to the effectiveness of the final cleanup, Norfolk Southern must monitor groundwater and surface waters for an additional 10 years following completion of the removal actions.  CD ¶¶ 43-46.  Norfolk Southern will also provide $15 million for the continuation of the current private drinking water well monitoring program for up to an additional 10 years.  CD ¶ 47.  For each of these programs, Defendants will develop and implement a monitoring plan, subject to approval by EPA.  If any contaminants of concern related to the derailment are detected above actionable levels during the pendency of these monitoring programs, Norfolk Southern must address the contamination through removal or mitigation measures, subject to EPA review and approval, to protect public health and the environment.  CD ¶¶ 44, 47.

The Consent Decree also requires additional compensation for environmental harm to the waterways and natural resources.  Norfolk Southern will develop and implement a Local Waterways Remediation Plan, subject to EPA review and approval, to maintain and enhance the cleanup efforts in the waterways.  CD ¶¶ 91-94.  The Plan, with a $6 million estimated budget, will be designed to improve the environmental quality of Sulphur Run and Leslie Run through performance of projects that may include addressing pre-derailment pollution, reducing urban runoff and non-point source pollution, restoring aquatic and riparian habitat, and restocking fish and salamanders.  Defendants will also pay $175,000 to the U.S. Department of Interior's (DOI) Natural Resource Damage Assessment and Restoration Fund to be used to restore, replace, or acquire the equivalent of the natural resources injured in the derailment and subsequent cleanup.

CD ¶¶ 95-96.  DOI has identified protection of at least 20 acres of wetlands habitat through application of conservation easements as an appropriate use of these funds, subject to completion of a draft Restoration Plan which will be noticed for public review and comment.

### 3. Civil Penalty

Defendants will pay a $15 million civil penalty.  CD ¶ 14.  The statutory maximum penalty under CWA Section 309(d) for violations of Section 301 is $66,712 for each day of violation, *i.e.* each day that pollutants were discharged to the waters of the United States without a permit.  The statutory maximum penalty under CWA Section 311(b)(7)(A) is $2,304 per barrel of oil discharged.  In light of the statutory penalty limits based on days of discharge and number of barrels discharged, $15 million may fairly be considered the maximum penalty available.

### 4. Rail Safety

The proposed Consent Decree incorporates (making enforceable) and enhances certain rail safety measures undertaken by Norfolk Southern following the derailment, as well as imposes certain additional obligations as follows:

a. <u>Hot Bearing Detectors (HBDs)</u>.  The NTSB identified an overheated wheel bearing as the apparent cause of the derailment.  NTSB Report at 102.  HBDs are located on the track bed and monitor the temperature of a train's wheel bearings as the train passes by, flagging high temperatures that indicate potential safety issues.  Defendants will take the following actions to identify wheel bearing problems more quickly and enhance rail safety: (1) increase the number of HBDs on major routes, reducing spacing between HBDs to 15.05 miles or less; (2) increase the frequency of HBD data transmission to relay alerts after every third railcar, instead of after the entire train (sometimes miles long) has passed the detector; (3) require trains to stop when a HBD detects a temperature more than 170°F above ambient on a railcar and set

out that railcar for inspection and maintenance; and (4) increase staffing for monitoring HBD alerts at Norfolk Southern's Wayside Help Desk.  CD ¶¶ 56-62.

Based on the specific facts here, it is reasonable to conclude that had these measures been in place on February 3, 2023, the consequences of the derailment may have been less severe or the derailment even prevented.  When Train 32N traversed the Salem HBD, Railcar 23's L1 bearing temperature was 103°F above ambient.  Once Train 32N completed its passage through the East Palestine HBD 19.2 miles later, a critical alarm was sent to the engineer to stop the train, as the same bearing now registered 253°F above ambient.  The almost 20-mile gap between the HBDs was significant, as wheel bearing temperature was drastically rising and the bearing failed very soon after transmitting the critical alarm to the train.  As such, there was no time to slow the train to a safe stop and prevent the derailment.

Had an additional HBD been located within 15.05 miles of the Salem HBD (as required by the Consent Decree), it is fair to assume it would have shown a temperature of at least 170°F above ambient and registered a critical alarm to stop the train and set out Railcar 23 for inspection and maintenance (as required by the Consent Decree).  That critical alarm would have reached the engineer within roughly 10 seconds instead of 2 minutes since the data would be sent within 3 railcars of the affected wheel bearing passing the HBD (as required by the Consent Decree) not waiting for the entire train to pass – here an additional 126 railcars and a mid-train locomotive.  Had the requirements of the Consent Decree been in place, Train 32N likely would have been stopped miles before the derailment site and presumably the derailment avoided.

b.  <u>Train build</u>.  The order of cars within a train ("train build") affects the train's distribution of weight and power, and thus its potential for derailment.  For example, the placement of very heavy or very light cars affects the forces that operate on the train as it travels.

These concerns are exacerbated in long trains, which can extend miles in length.  Defendants will take the following actions under the Consent Decree: (1) comply with eight specific train build requirements to mitigate the risk of derailments through reduction and control of in-train forces; and (2) conduct a Train Build Study to better understand the impact of various train build variables on in-train forces and safety of operations.  CD ¶¶ 64-65.

      c.  <u>High Hazard Flammable Train (HHFT) requirements</u>.  HHFTs are regulatorily defined as trains that transport 20 or more tank cars of Class 3 flammable liquids in a single block or at least 35 tank cars of Class 3 flammable liquids in total.  Carriers that operate HHFTs must comply with enhanced safety requirements addressing issues such as speed limits, braking, routing assessments, oil spill response planning, and information sharing with state and tribal emergency response agencies.  49 C.F.R. § 174.310.  Under the Consent Decree, Norfolk Southern will apply HHFT regulations more broadly, including railcars transporting combustible liquids and Class 2.1 flammable gases (such as vinyl chloride), in addition to those carrying flammable liquids, when calculating the number of relevant tank cars needed for HHFT qualification.  CD ¶¶ 66-68.  This will impose greater safety measures than would otherwise be required for transport of these materials.

      d.  <u>DOT-111 tank cars</u>.  DOT-111 tank cars are an older model of tank car that are less well armored than newer DOT-117 tank cars.  DOT-111 tank cars are generally considered to be less safe and several DOT-111 tank cars carrying oil and hazardous materials breached in the derailment.  The NTSB concluded that the failure of the DOT-111s exacerbated the harm from the derailment as the material spilling from them fed the fires and spread contamination.  NTSB Report at xii.  Under the Consent Decree, Defendants will: (1) cease using DOT-111 tank cars owned or leased by them for the transportation of hazardous material; and

(2) develop and implement a plan to encourage their customers to replace their DOT-111 cars with better armored cars, such as DOT-117Rs, for transport of flammable hazardous materials. CD ¶¶ 69-70.

      e.  <u>Emergency preparedness and training</u>.  The proposed Consent Decree requires Defendants to take the following actions to improve their preparation for, and response to, future emergencies: (1) develop and implement procedures that ensure appropriate consultation with emergency responders and government officials when reopening tracks following a derailment or conducting a vent-and-burn; (2) implement additional training exercises, including all FEMA recommended training; and (3) evaluate current emergency response capabilities and eliminate any material gaps identified through this process.  CD ¶¶ 71-90.

### 5. Community Health

Defendants will implement a Community Health Program to address two of the major needs identified by the East Palestine community in the wake of the derailment – (a) medical monitoring to assess latent or long-term health risks and (b) mental health services.  CD ¶¶ 48-55.  Norfolk Southern will retain an Administrator and finance a $25 million fund to implement the Community Health Program over a period of 20 years.  The program will initially provide 10 medical monitoring exams over a period of 15 years to monitor individuals' physical health (physical exams, blood tests, etc.).  CD ¶ 50.  Eligible individuals will be (i) those residing within 2 miles of the derailment site or within 250 feet of an identified segment of Leslie Run, (ii) first responders on site in February 2023, or (iii) those approved on a case-by-case basis.

The program will also include mental health services to address impacts from the derailment and associated environmental risks.  CD ¶ 51.  Mental health services will be available broadly to any resident of Columbiana County, OH, or Beaver and Lawrence County,

PA, and first responders.  A community facilitator will be retained to assist residents in accessing the medical monitoring and mental health services.  CD ¶¶ 52-53.  After 14 years, the status of the Community Health Program will be reassessed to determine the extent of services to be provided for the final 5 years of the program, consistent with the remaining funding.  CD ¶ 55.

### C.  Legal Standards Governing Review of the Proposed Consent Decree

When the United States seeks approval of a proposed consent decree in an environmental enforcement case, the "criteria to be applied" by the reviewing court "are whether the decree is fair, adequate, and reasonable, as well as consistent with the public interest."  *United States v. Lexington-Fayette Urban Cnty. Gov't*, 591 F.3d 484, 489 (6th Cir. 2010) (Clean Water Act case; internal quotations omitted); *accord United States v. Akzo Coatings of Am., Inc.*, 949 F.2d 1409, 1426 (6th Cir. 1991) (CERCLA case).  This standard of review reflects a public policy that strongly favors settlement of disputes without protracted litigation.  *See generally Aro Corp. v. Allied Witan Co.*, 531 F.2d 1368, 1372 (6th Cir. 1976).  Settlements conserve the resources of the courts and the litigants and "should . . . be upheld whenever equitable and policy considerations so permit."  *Id.*

"By its nature, a consent decree eliminates many possible outcomes that would have been better for one side or the other."  *United States v. George A. Whiting Paper Co.*, 644 F.3d 368, 374 (7th Cir. 2011).  Thus, it is typical and unremarkable that "[n]o party in the case got everything it wanted," and a consent decree that settles an environmental enforcement action may reflect a completely appropriate strategic election by the government to negotiate for "extensive relief without the burden of proving its case."  *United States v. BP Expl. & Oil Co.*, 167 F. Supp. 2d 1045, 1054 (N.D. Ind. 2001).

As the Sixth Circuit has emphasized, the "presumption in favor of voluntary settlement . . . is particularly strong" where – as here – the settlement "has been negotiated by the Department of Justice on behalf of a federal administrative agency like EPA which enjoys substantial expertise in the environmental field." *Akzo Coatings*, 949 F.2d at 1436; *Lexington-Fayette*, 591 F.3d at 490 (quoting *Akzo Coatings*). In examining a proposed consent decree like this one, a court need not determine that "the settlement is one which the court itself might have fashioned, or consider[ed] as ideal." *United States v. Cannons Eng'g Corp.*, 899 F.2d 79, 84 (1st Cir. 1990); *accord Akzo Coatings*, 949 F.2d at 1435; *BP Expl.*, 167 F. Supp. 2d at 1050 ("The test is not whether this Court would have fashioned the same remedy nor whether it is the best possible settlement"). Settlements of government-initiated environmental enforcement actions also deserve special deference because they fall within "an area where voluntary compliance by the parties . . . will contribute significantly toward ultimate achievement of statutory goals." *Kelley v. Thomas Solvent Co.*, 717 F. Supp. 507, 516 (W.D. Mich. 1989) (citation and internal quotation omitted).

### D. The Court Should Approve the Consent Decree – It Is Fair, Reasonable, and Consistent with Statutory Goals

#### 1. The Consent Decree Is Fair.

In determining whether a proposed settlement is fair, a court need only ascertain whether the terms of the proposed consent decree reflect a reasonable compromise of the litigation. *See United States v. Montrose Chem. Corp.*, 50 F.3d 741, 747 (9th Cir. 1995). As part of this analysis, courts consider "the strength of the plaintiffs' case, the good faith efforts of the negotiators, the opinions of counsel, and the possible risks involved in litigation if the settlement is not approved." *United States v. Hooker Chem. & Plastics Corp.*, 607 F. Supp. 1052, 1057 (W.D.N.Y. 1985), *aff'd*, 776 F.2d 410 (2d Cir. 1985). In this case, the settlement embodied in

the Consent Decree is the result of good-faith, arms-length bargaining between attorneys for the United States and Norfolk Southern.  After a careful analysis of the strengths and risks of litigation, the Parties arrived at a settlement that ensures the cleanup of the Site to EPA standards, reimburses all federal response costs incurred (which ensures no taxpayer funds are spent on the cleanup), reduces risks of future releases from derailments by requiring rail safety and emergency response improvements, provides environmental benefits as mitigation and compensation for natural resource damages, requires payment of an appropriate civil penalty, and supports public health through provision of mental health services and long-term medical monitoring.  In exchange, Norfolk Southern obtains resolution of the matter and avoids further costly litigation of the United States' claims.

The fairness of the proposed Consent Decree is also inherent in the process by which the settlement was reached.  The Parties engaged in extensive, accelerated negotiations over many months, conducting numerous in-person and virtual settlement meetings and exchanging several letters and consent decree drafts.  Throughout these negotiations, Norfolk Southern was represented by experienced counsel well-versed in environmental law and procedure.

The proposed Consent Decree reflects the Parties' careful and informed assessment of the relative merits of each other's claims and defenses, while taking into consideration the costs and risks associated with litigating what would be a complex case.  Minimizing litigation benefits all Parties and spares the resources of the Court.  *See Cannons*, 899 F.2d at 90 ("all too often, litigation . . . can squander valuable resources").  Not only the Parties, but also the public gains from the "saving of time and money that results from the voluntary settlement of litigation." *Citizens for a Better Env't v. Gorsuch*, 718 F.2d 1117, 1126 (D.C. Cir. 1983).

The settlement also embodies a measure of compromise on the part of both sides.  As with any fair settlement, the Parties benefit from the immediate resolution of the asserted claims and defenses, while foregoing the opportunity to seek unmitigated victory.  *See E.E.O.C. v. Hiram Walker & Sons, Inc.*, 768 F.2d 884, 889 (7th Cir. 1985); *Officers for Justice v. Civil Service Comm'n*, 688 F.2d 615, 624 (9th Cir. 1982) ("Naturally, the agreement reached normally embodies a compromise; in exchange for the saving of cost and elimination of risk, the parties each give up something they might have won had they proceeded with litigation").

### 2.  The Consent Decree Is Reasonable.

The "reasonableness" of a consent decree may be determined through consideration of whether it is technically adequate, compensates the public for the alleged violations, and takes into consideration the risks of litigation.  *United States v. Telluride Co.*, 849 F. Supp. 1400, 1402-03 (D. Colo. 1994).  When determining whether a settlement like this one is reasonable, "the decree's likely efficaciousness as a vehicle for cleansing the environment is of cardinal importance."  *Cannons*, 899 F.2d at 89.  The proposed Consent Decree is more than technically adequate in that it contains specific, tailored relief that addresses the violations alleged in the Complaint, imposes additional steps to reduce the potential for future releases, and will result in the implementation of such measures in far less time than if the Parties had fully litigated the action.

Litigation of these claims could be complicated, time-consuming, and costly, and there is no assurance that a judgment obtained after years of litigation would be more favorable than the negotiated settlement terms included in the Consent Decree.  Even if the United States prevailed, the litigation of the claims would delay the adoption of the rail safety measures and commencement of the Community Health Program.  Resolving this matter through the proposed

Consent Decree will allow the impacted community members to receive mental health services now – upon entry of this Consent Decree – when they are perhaps most needed and not leave them without security of such treatment for years.  Commencement of the medical monitoring program now – upon entry of this Consent Decree – ensures that identification of this critical public and individual health information will be more robust and effective.

### 3.   The Consent Decree Is Consistent with Relevant Statutory Goals.

Another role of a court reviewing an environmental settlement submitted by the United States is to determine "whether the Decree comports with the goals of Congress."  *Sierra Club v. Coca-Cola Corp.*, 673 F. Supp. 1555, 1556 (M.D. Fla. 1987).  The primary objective of the Clean Water Act is to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters," 33 U.S.C. § 1251(a), and CERCLA's is to protect the public health and welfare and the environment, and to clean up the environment, while ensuring responsible parties bear the associated costs.  *See Burlington N. and Santa Fe Ry. Co. v. United States*, 556 U.S. 599, 602 (2009).  The Consent Decree furthers these statutory goals by addressing the obligation under CERCLA and the CWA to cleanup contamination from the derailment, as well as appropriately resolve the CWA violations and take steps to ensure improved compliance with the CWA in the future.

### E.   The Points Made by the Comments Do Not Justify Withdrawal or Rejection of the Settlement.

The United States received 123 public comments during the public comment period or shortly thereafter discussing the proposed Consent Decree, the impact of the derailment and releases on the community and the environment, and/or Norfolk Southern's proposed settlement of the class action relating to private claims against the company.  Of the 123 comments, 72 consisted of a "form" comment (requesting an extension of the timeframe for testing of

groundwater, surface water, and private well water; expansion of the geographic region for automatic qualifiers for medical monitoring; and payment of healthcare claims).[8]  Another 17 comments wholly or primarily addressed concerns with Norfolk Southern's separate class action settlement.[9]  And 7 comments specifically focused on the provision regarding future use of DOT-111 tank cars, which the United States now proposes clarifying.[10]  The remaining comments touched on a broad array of issues.

Appendix A to this memorandum is a compendium of all comments received.  Appendix B is a Response to Comments by the United States, addressing generally by Consent Decree topic, the various issues raised in the comments.[11]  Among the comments the United States received were many that raised concerns with Norfolk Southern's recently announced class action settlement, rather than concerns with this Consent Decree.  Even though the class action comments do not pertain to the federal settlement before this Court, the United States includes them for the Court's information along with Norfolk Southern's summary of those settlement terms (Appendix C).

The United States has carefully reviewed the 123 comments received and concluded that the points presented therein do not warrant withdrawal or rejection of the proposed settlement. The United States concurs with certain commenters that the language in Paragraph 69 of the Consent Decree does not accurately reflect the intended scope on the prohibition on DOT-111

---

[8]  *See* comments A-3, A-5 through A-13, A-15 through A-17, A-36 through A-63, A-65 through A-76, A-78, A-80, A-81, A-83 through A-97, A-101, and A-103.

[9]  *See* comments A-2, A-18, A-20, A-21, A-26 through A-28, A-30 through A-34, A-64, A-79, A-82, A-100, and A-102.

[10]  *See* comments A-106 through A-108, A-112, A-114, A-118, and A-120.

[11]  Evidentiary support for the discussion in the Response to Comments is provided by the exhibits to this *Memorandum*: Exhibit 1 (Decl. of R. Dollhopf), Exhibit 2 (Decl. of M. Durno), Exhibit 3 (Decl. of C. Senior), and Exhibit 4 (Decl. of J. Paschal).

tank cars and a proposed revision is provided below. The vast majority of comments received, however, consisted of good faith requests for the expansion of various benefits provided by the Consent Decree. While the United States does not dispute that such further relief would be beneficial had it been possible to obtain it on top of the relief included in the Consent Decree, the requests do not diminish the sufficiency of the relief obtained through negotiation and in recognition of the risks and limits of obtaining greater relief through ongoing litigation.

### 1. Requests for Expansion of the Community Health Program

The United States brought claims under the Clean Water Act and CERCLA. Our ability to obtain as part of this settlement the broad-based healthcare requested by many commenters is shaped by uncertainty as to the extent of healthcare-related relief we would be able to secure under those statutes at trial and defend on appeal. Despite these challenges, the United States successfully negotiated a multi-year Community Health Program to provide mental health services across three counties and guarantee medical monitoring for first responders and residents residing in the core impact zone (2-mile radius and along the creeks) as well as providing for broader case-by-case inclusion in the medical monitoring program. These healthcare provisions are robust and will result in long-lasting benefits to the community.

CWA Sections 309(b) and 311(e), 33 U.S.C. §§ 1319(b) and 1321(e), allow for expansive injunctive relief. Section 309(b) authorizes "a civil action for appropriate relief … for any violation of [Section 301, et al.]." Section 311(e)(2) similarly provides courts with jurisdiction "to grant any relief under this subsection that the public interest and the equities of the case may require." The stated objective of the CWA, however, is to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters," and that objective is reflected in the national policies also identified in the Act, *e.g.*: eliminate discharge of pollutants, prohibit

discharge of toxic pollutants, provide federal financial assistance to construct publicly owed treatment works, and develop programs for control of nonpoint source. *See* 33 U.S.C. § 1251(a). Similarly, CWA Section 311(e)(1) enumerates aspects of "the public health or welfare of the United States" as "including fish, shellfish, and wildlife, public and private property, shorelines, beaches, habitat and other living and nonliving natural resources[.]"

To date, the United States has not sought healthcare services under these provisions to the extent requested by some commenters and therefore no court has yet granted such relief. The CWA is not a personal injury statute and Sections 309 and 311 do not explicitly provide for individualized, personal-injury type remedies – such as monetary recovery for healthcare costs. When negotiating the Consent Decree, the United States considered the litigation risk in establishing that healthcare is appropriate relief for the alleged CWA violations (discharge of pollutants, hazardous substances, or oil to Sulphur Run or another waterway) and recognized the potential challenge in obtaining an order requiring Norfolk Southern to provide more extensive healthcare services given the facts of this case – *e.g.*, the substantial removal of contamination and the lack of studies or other information clearly linking chronic health issues to the derailment.[12] In light of the above, a settlement that includes mental health services and medical monitoring over a 20-year period is appropriately characterized as fair, reasonable, and consistent with the Clean Water Act's statutory goals.

Likewise, CERCLA is not a private rights tort statute. *See Exxon Corp. v. Hunt*, 475 U.S. 355, 360 (1986) ("Superfund money may not be used to pay for injury to persons or property caused by hazardous wastes"); *see also Daigle v. Shell Oil Co.*, 972 F.2d 1527, 1537 (10th Cir. 1992). CERCLA was enacted in 1980 "in response to the serious environmental and health risks

---

[12] Mental health concerns associated with the derailment and contamination, including anxiety and post-traumatic stress disorder, have been identified and provide a substantive basis for obtaining the mental health services included in the proposed Consent Decree. *See* Durno Decl. at ¶¶ 21-22.

posed by industrial pollution." *Burlington N. & Santa Fe Ry. Co. v. United States*, 556 U.S. 599, 602 (2009). It is primarily a remedial statute designed to protect and preserve public health and the environment from the effects of releases or threatened releases of hazardous substances and gives "the President broad power to command government agencies and private parties to clean up hazardous waste sites." *Key Tronic Corp. v. United States*, 511 U.S. 809, 814 (1994); *see also Voluntary Purchasing Grps., Inc. v. Reilly*, 889 F.2d 1380, 1386 (5th Cir. 1989); *Dedham Water Co. v. Cumberland Farms Dairy, Inc.*, 805 F.2d 1074, 1081 (1st Cir. 1986).

Unlike the CWA, CERCLA is not a regulatory program. Rather, CERCLA responds to actual and threatened releases of hazardous substances by allowing the United States to: (1) conduct removal or remedial cleanup actions with Superfund money and recover costs from potentially responsible parties ("PRPs") (42 U.S.C. §§ 9604, 9607); (2) order or obtain an injunction for PRPs to perform the cleanup (42 U.S.C. § 9606); or (3) enter into settlements with PRPs to clean up the site or pay the costs of cleanup (42 U.S.C. §§ 9607, 9622). Like the CWA, CERCLA also provides for broad injunctive relief aimed at protecting "the public health or welfare or the environment," 42 U.S.C. § 9606, but provision of individual healthcare is not a specifically identified statutory goal.

The United States received numerous comments regarding the scope of the proposed Community Health Program and explains its decision-making in the attached Response to Comments. As discussed therein, the United States believes that this multi-year program provides appropriate relief here, given the nature of this environmental incident and the data on contaminant levels. With regard, however, to comments seeking "more" from the Community Health Program – more funding to cover more people with more services for more time – in light of the above discussed considerations impacting the potential litigation risk in obtaining such

atypical relief, the proposed Consent Decree's $25 million program is an excellent result.  It certainly cannot be considered so insufficient as to render the proposed Consent Decree unable to meet the standard of fair, reasonable, and consistent with the statutory purpose.

The United States further notes that its proposed Consent Decree is not the sole vehicle available to address the healthcare concerns of community members and first responders.  Others, individuals and other governmental entities, likely have different claims that likely will secure different relief.  For example, Appendix C provides a summary from Norfolk Southern describing its recent $600 million class action settlement, which has been widely accepted among potential class members and recently approved by the Court, with non-settlers able to pursue independent tort claims against Norfolk Southern (a number of whom apparently have retained counsel to consider such an action).[13]  The State of Ohio in this matter continues to pursue its claims, which include certain causes of action sounding in negligence and nuisance that may warrant different relief than the United States can secure under CERCLA and the Clean Water Act.  And the Commonwealth of Pennsylvania likewise may have potential claims under its state laws.

### 2.  Rail Safety

The United States received few negative comments regarding rail safety measures included in the Consent Decree, including improvements to Norfolk Southern's HBD system to address what has been identified as the proximate cause of the derailment.  One exception related to the Consent Decree's provisions to facilitate a transition to more resilient tank cars to mitigate against the risk that tank cars containing hazardous materials can breach during a derailment.

---

[13]  The proposed Consent Decree and Norfolk Southern's class action settlement are wholly independent from one another.  By participating in the medical monitoring program residents are not waiving any rights to either join the class action or pursue their own tort claims against Norfolk Southern.  Nor does participating in the class action settlement restrict their ability to obtain medical monitoring or mental health services under the Consent Decree.

CD ¶¶ 69-70.  A number of railcar owners and associations submitted comments requesting the elimination or clarification of these provisions.

The train fire following the derailment was primarily due to DOT-111 tank cars breaching during the accident, and the chemicals contained therein escaping and igniting. Because this model of tank car is less heavily armored than other tank cars, such as the DOT-117, these tank cars are generally considered more susceptible to breaching if involved in a derailment.  DOT-111 tank cars are currently subject to a phaseout pursuant to the Fixing America's Surface Transportation (FAST) Act and their use in transporting flammable hazardous materials is currently scheduled to end in 2029 (with a potential extension until 2031).  *See* Pub. L. No. 114-94, 129 Stat. 1312 (2015); 81 Fed. Reg. 53,935 (Aug. 15, 2016).

Consent Decree Paragraph 69 was negotiated to accelerate this phaseout by Norfolk Southern for its own DOT-111 cars.  It currently states:

> 69.  <u>DOT-111 Tank Cars</u>.  Within 180 Days of the date of lodging, Settling Defendants will cease use of any DOT-111 Tank Cars for transportation of Flammable Hazardous Materials, other than under a common carrier obligation.

Norfolk Southern, however, has direct control of (owns or leases) a very limited number of railcars, with almost all railcars being owned by customers (or their suppliers) and simply transported by the railroad.  Pursuant to the "common carrier obligation," Norfolk Southern cannot refuse to transport railcars that otherwise comply with regulatory requirements.  *See* 49 U.S.C. §§ 11101(a), 10702.  Under the common carrier regulations railroads set tariffs for the transportation of goods.  As such, Paragraph 69 provided an exception from the ban for DOT-111 cars transported by Norfolk Southern under its common carrier obligation.

Commenters noted, however, that while railroads are required to provide transportation in accordance with the common carrier tariff as a minimum term of service, railroads and their

customers primarily enter into contracts for the movement of goods at or below such rates as part of more extensive agreements.  They raised concerns that Paragraph 69, as written, could be interpreted to obligate Norfolk Southern to reject transporting customers' DOT-111 tank cars where there were already contracts in place or could be read as imposing restrictions on future contracts forcing customers to rely on common carrier tariff rates.

In recognition of such concerns, the Parties agree to clarify Paragraph 69, as follows:

> 69. <u>DOT-111 Tank Cars</u>.  Within 180 Days of the date of lodging, Settling Defendants will cease use of any DOT-111 Tank Cars <span style="color:red">owned or leased by or on behalf of Settling Defendants</span> for transportation of Flammable Hazardous Materials<s>, other than under a common carrier obligation</s>.

This proposed language retains the Parties' original negotiated intent, while clarifying that this provision will not interfere with current or future transportation contracts between the railroad and suppliers (who are not parties to this settlement).  As referenced in the attached Response to Comments, the United States received a limited number of comments on additional topics related to the extensive rail safety provisions included in the proposed Consent Decree, but none of the remaining comments raised concerns sufficient to render the proposed Consent Decree unable to meet the standard of being fair, reasonable, and consistent with the statutory purpose.

### 3. Sufficiency of the Cleanup.

The third general category of comments received touched upon the impacts of the derailment on air, soil, and water, as well as various aspects of the cleanup conducted to date by Norfolk Southern pursuant to EPA direction and oversight.  As discussed above and in greater detail in the Response to Comments, EPA has directed a robust, data-driven response, evaluation, and cleanup of the derailment site and surrounding community utilizing conservative protective standards to help ensure that there will not be a need for future cleanups and further disruption to the community.  Extensive sampling and analysis of soil, sediment, water, and air

has been conducted (and continues) to ensure that chemicals associated with the derailment are not present at levels posing a risk to human health or the environment.  As the cleanup work proceeds towards its conclusion, EPA will continue to verify that these conservative CERCLA and CWA cleanup targets are achieved and supported by sound science.

## **CONCLUSION**

The United States empathizes with the concerns expressed about human health risks posed by releases associated with the derailment, the completeness of the cleanup, as well as on a variety of other issues addressed in this complex settlement, and the United States will keep such concerns front of mind while implementing the relief provided by the Consent Decree.[14]  But the points raised by the public comments do not alter the United States' judgment that the settlement embodied in the proposed Consent Decree is fair, reasonable, and consistent with the public interest and the purposes of the Clean Water Act and CERCLA.  More importantly, those comments do not overcome the extent and quality of the cleanup already performed, the data-demonstrated absence of hazardous substances at levels that presently warrant further cleanup, and the propriety of monitoring measures – of both the environment and of those most directly affected by the derailment – that will watch for hidden or late-emerging issues for years to come.

The United States negotiated this settlement expeditiously and secured agreed-upon relief that Norfolk Southern will need to implement under strict deadlines.  While much of the planning for such relief commenced with the lodging of the proposed Consent Decree, including drafting the Community Health Program plan and establishing a $25 million fund for it, actual provision of such relief to the community – mental health services and medical monitoring –

---

[14]  EPA will post this Memorandum and the Response to Comments on its website and the United States will send a link to those documents to each commenter.

must wait on entry of the Consent Decree by this Court.  For these reasons, the Court should

approve and enter the proposed Consent Decree as a final judgment without delay.


Respectfully submitted,

TODD KIM
Assistant Attorney General
Environment and Natural Resources Division


 s/ Jeffrey A. Spector
JEFFREY A. SPECTOR
Senior Attorney
LAUREN GRADY
TRACI N. CUNNINGHAM
LAUREN MATOSZIUK
Trial Attorneys
Environmental Enforcement Section
Environment and Natural Resources Division
U.S. Department of Justice
P.O. Box 7611
Washington, DC  20044-7511
(202) 514-4432
Jeffrey.Spector@usdoj.gov


REBECCA C. LUTZKO
United States Attorney
Northern District of Ohio
BRENDAN F. BARKER
ELIZABETH A. DEUCHER (OH: 0095542)
Assistant United States Attorneys
Northern District of Ohio
801 West Superior Avenue, Suite 400
Cleveland, Ohio 44113
Phone: (216) 622-3795/3712
Fax: (216) 522-2404
Brendan.Barker@usdoj.gov
Elizabeth.Deucher@usdoj.gov

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a copy of the foregoing *Memorandum in Support of United States of America's Motion to Enter Consent Decree* was filed electronically.  Notice of this filing will be sent by operation of the Court's electronic filing system to all parties indicated on the electronic filing receipt.  All other parties will be served by U.S. mail.  Parties may access this filing through the Court's system.

<table>
<tr><td>10/10/24</td><td>s/ Jeffrey A. Spector</td></tr>
<tr><td>Date</td><td>Jeffrey A. Spector</td></tr>
</table>

## LR 7.1(f) CERTIFICATE OF COMPLIANCE

I hereby certify that the foregoing *Memorandum in Support of United States of America's Motion to Enter Consent Decree* has been assigned to the "complex" track and adheres to the page limitations set forth in Local Rule 7.1(f).


|       10/10/24       |       s/ Jeffrey A. Spector       |
| :---: | :---: |
| Date | Jeffrey A. Spector |