# APPENDIX A

# PUBLIC COMMENTS

# PART 1 OF 4

ALL PERSONALLY IDENTIFYABLE INFORMATION
OF PRIVATE CITIZENS, EXCEPT ACTING IN A
PROFESSIONAL CAPACITY, HAS BEEN
REDACTED IN ACCORDANCE WITH LR 8.1(a)

INDEX OF COMMENTS

| Comment # | PDF pg # | Commenter |
|---|---|---|
| A-1 | 5 | Private citizen, East Palestine, OH |
| A-2 | 7 | Private citizen |
| A-3 | 9 | Private citizen, Portland, OR |
| A-4 | 12 | Private citizen, East Palestine, OH |
| A-5 | 15 | Private citizen, East Palestine, OH |
| A-6 | 17 | Private citizen, East Palestine, OH |
| A-7 | 19 | Private citizen, Hudsonville, MI |
| A-8 | 21 | Private citizen, Darlington, PA |
| A-9 | 24 | Private citizen, Wellsville, OH |
| A-10 | 26 | Private citizen, Finleyville, PA |
| A-11 | 28 | Private citizen, Beaver Falls, PA |
| A-12 | 30 | Private citizen, Downington, PA |
| A-13 | 33 | Private citizen, Philadelphia, PA |
| A-14 | 36 | Private citizen, British Columbia, Canada |
| A-15 | 39 | Private citizen, Beaver Falls, PA |
| A-16 | 42 | Private citizen, Beaver, PA |
| A-17 | 45 | Private citizen, Monaca, PA |
| A-18 | 48 | Private citizen, Negley, OH |
| A-19 | 52 | Private citizen, East Palestine, OH |
| A-20 | 57 | Private citizen |
| A-21 | 59 | Private citizen, East Palestine, OH |
| A-22 | 61 | Private citizen, East Palestine, OH |
| A-23 | 63 | Private citizen, Darlington, PA |
| A-24 | 65 | Private citizen, East Palestine, OH |
| A-25 | 67 | Private citizen, Enon Valley, PA |
| A-26 | 70 | Private citizen, East Palestine, OH |
| A-27 | 73 | Private citizen, Negley, OH |
| A-28 | 76 | Private citizen |
| A-29 | 78 | Private citizen, Darlington, PA |
| A-30 | 80 | Private citizen, East Palestine, OH |
| A-31 | 82 | Private citizen, East Palestine, OH |
| A-32 | 86 | Private citizen, Negley, OH |
| A-33 | 90 | Private citizen, Darlington, PA |
| A-34 | 92 | Private citizen, Darlington, PA |
| A-35 | 100 | Private citizen, East Palestine, OH |
| A-36 | 104 | Private citizen, Mount Bethel, PA |
| A-37 | 106 | Private citizen, Lock Haven, PA |
| A-38 | 108 | Private citizen, Bryn Mawr, PA |
| A-39 | 110 | Private citizen, Broomall, PA |
| A-40 | 112 | Private citizen, Powell, OH |
| A-41 | 114 | Private citizen, Indianapolis, IN |
| A-42 | 116 | Private citizen, Baden, OH |

| Comment # | PDF pg # | Commenter |
|-----------|----------|-----------|
| A-43 | 118 | Private citizen, Burlington, VT |
| A-44 | 121 | Private citizen, Twinsburg, OH |
| A-45 | 123 | Private citizen, Pittsburgh, PA |
| A-46 | 125 | Private citizen, Westerville, OH |
| A-47 | 137 | Private citizen, Mentor, OH |
| A-48 | 129 | Private citizen, Allentown, PA |
| A-49 | 131 | Private citizen, California, PA |
| A-50 | 133 | Private citizen, Yellow Springs, OH |
| A-51 | 135 | Private citizen, Bryn Mawr, PA |
| A-52 | 137 | Private citizen, Midland, PA |
| A-53 | 139 | Private citizen, Philadelphia, PA |
| A-54 | 141 | Private citizen, Boardman, OH |
| A-55 | 143 | Private citizen, Doylestown, PA |
| A-56 | 145 | Private citizen, Aliquippa, PA |
| A-57 | 147 | Private citizen, Bethlehem, PA |
| A-58 | 150 | Private citizen, Columbus, OH |
| A-59 | 152 | Private citizen, Danville, PA |
| A-60 | 154 | Private citizen, Milwaukee, WI |
| A-61 | 157 | Private citizen, North Olmsted, OH |
| A-62 | 159 | Private citizen, Springfield, OH |
| A-63 | 161 | Private citizen, Diamond, OH |
| A-64 | 164 | Private citizen, East Palestine, OH |
| A-65 | 168 | Private citizen, Cleveland Heights, OH |
| A-66 | 170 | Private citizen, Hicksville, OH |
| A-67 | 172 | Private citizen, Bala Cynwyd, PA |
| A-68 | 174 | Private citizen, Cincinnati, OH |
| A-69 | 176 | Private citizen, Dublin, OH |
| A-70 | 178 | Private citizen, Cleveland, OH |
| A-71 | 180 | Private citizen, Leechburg, PA |
| A-72 | 182 | Private citizen, Ironton, OH |
| A-73 | 184 | Private citizen, McComb, OH |
| A-74 | 186 | Private citizen, Philadelphia, PA |
| A-75 | 188 | Private citizen, East Springfield, PA |
| A-76 | 190 | Private citizen, Coatesville, PA |
| A-77 | 192 | Private citizen, East Palestine, OH |
| A-78 | 195 | Private citizen, Philadelphia, PA |
| A-79 | 197 | Private citizen, Enon Valley, PA |
| A-80 | 201 | Private citizen, Mckeesport, PA |
| A-81 | 203 | Private citizen, Athens, OH |
| A-82 | 205 | Private citizen, East Palestine, OH |
| A-83 | 208 | Private citizen, Harrison City, PA |
| A-84 | 210 | Private citizen, Marlboro, NJ |
| A-85 | 212 | Private citizen, University Heights, OH |
| A-86 | 214 | Private citizen, Delran, NJ |

| Comment # | PDF pg # | Commenter |
|---|---|---|
| A-87 | 217 | Private citizen, Bradford, PA |
| A-88 | 219 | Private citizen, Pittsburgh, PA |
| A-89 | 221 | Private citizen, Gibsonia, PA |
| A-90 | 223 | Private citizen, Pittsburgh, PA |
| A-91 | 225 | Private citizen, Pittsburgh, PA |
| A-92 | 227 | Private citizen, Fresno, OH |
| A-93 | 229 | Private citizen, Philadelphia, PA |
| A-94 | 232 | Private citizen, Worthington, OH |
| A-95 | 234 | Private citizen, Collegeville, PA |
| A-96 | 236 | Private citizen, Belmont, OH |
| A-97 | 238 | Private citizen, Philadelphia, PA |
| A-98 | 240 | Private citizen, East Palestine, OH |
| A-99 | 246 | Private citizen, Media, PA |
| A-100 | 248 | Private citizen, East Palestine, OH |
| A-101 | 250 | Private citizen, Lambertville, NJ |
| A-102 | 252 | Private citizen |
| A-103 | 257 | Private citizen, Pittsburgh, PA |
| A-104 | 259 | Private citizen, Wantage, NJ |
| A-105 | 280 | Ohio Attorney General's office (June 6, 2024) |
| A-106 | 283 | American Chemistry Council |
| A-107 | 292 | Union Tank Car Co. |
| A-108 | 326 | Railway Supply Institute |
| A-109 | 336 | Environmental Defense Fund |
| A-110 | 341 | Sustainable Englewood Initiatives, Northwestern Pritzker School of Law |
| A-111 | 348 | Village of East Palestine |
| A-112 | 352 | North America Freight Car Assn. |
| A-113 | 357 | Columbiana County Health District |
| A-114 | 360 | American Fuel & Petrochemical Manufacturers |
| A-115 | 373 | Columbiana County Mental Health & Recovery Services Board |
| A-116 | 376 | Ohio Attorney General's office (Aug. 2, 2024) |
| A-117 | 382 | Commonwealth of Pennsylvania |
| A-118 | 390 | Alliance for Chemical Distribution |
| A-119 | 396 | East Liverpool City Hospital |
| A-120 | 400 | Ohio Chemistry Technology Council |
| A-121 | 403 | Shenkan Injury Lawyers |
| A-122 | 409 | Barnes & Thornburg LLP |
| A-123 | Next file | Government Accountability Project |

Comment A-1

**From:**

**Sent:** Tuesday, June 4, 2024 8:50 PM
**To:** ENRD, PUBCOMMENT-EES (ENRD) <PENRD3@ENRD.USDOJ.GOV>
**Subject:** [EXTERNAL] Public Comment EP

While I am not a resident of East Palestine my biggest concerns are that the toxins were released in to the air and I could see the plume from my house on Lower Elkton Road, Leetonia during the burn off. Between the derailment and today I have continued my business as usual driving through East Palestine to go to jobs in PA. I have continued to coach my athletes at track and cross country meets that took place in East Palestine. I have gone to community events such as the 4th of July celebration that took place within the park. I have worked races in East Palestine since the derailment. I have attended church services in East Palestine.

During the early days of the derailment my children and I didn't change our plans of going to school and our appointments such as the dentist in Columbiana. So our exposure to things is unknown at this time but we are potentially affected down the road.

My husband actually drove through the area of the derailment in the early morning before everything was blocked off and before people were being told to leave their homes. He went to bed before hearing about the derailment and when he drove through East Palestine on his way to a job site in PA the next morning he had to reroute several times to get through town because roads were starting to be detoured. He had no idea what was going on and actually asked the next morning before he returned home if there was a plane crash or something because of what he experienced. He did have to detour on his way home as the roads were fully closed and blocked off by then.

My concern is that since we don't know what is going to show up years from now, that when things are settled with lawsuits and cleanup in the near future, people in this area are not forgotten. That we are given the opportunity for monitoring in the years to come at no expense to ourselves. The settlement may provide some benefit to those of us living in the extended area but if we all start getting a specific type of cancer in five or ten years...we need someone to assist the community.

I appreciate your time and that you allowed us the opportunity to comment.

Sincerely,

Comment A-2

| | |
|---|---|
| **From:** | Bonk, Ariel (ENRD) |
| **To:** | Grady, Lauren (ENRD) |
| **Cc:** | Stewart, Geoffrey (ENRD); Spector, Jeffrey (ENRD) |
| **Subject:** | FW: East Palestine claim |
| **Date:** | Friday, June 7, 2024 8:36:54 AM |

Good morning –

This was sent to the public comment box. 90-11-3-12792

-Ariel

**From:**
**Sent:** Friday, June 7, 2024 7:14 AM
**To:** ENRD, PUBCOMMENT-EES (ENRD) <PENRD3@ENRD.USDOJ.GOV>
**Subject:** [EXTERNAL] East Palestine claim

Will the inmates at elkton be eligible to apply for the east palestine settlement money?

Get Outlook for Android

Comment A-3

| | |
|---|---|
| **From:** | Herbert, Ronda (ENRD) |
| **To:** | Grady, Lauren (ENRD) |
| **Cc:** | Stewart, Geoffrey (ENRD) |
| **Subject:** | FW: [EXTERNAL] Ohio and USA v. Norfolk Southern, et. al, D.J. Ref. No. 90-11-3-12792 |
| **Date:** | Friday, June 28, 2024 8:26:56 AM |

Hello Lauren,

This was sent to our public comment inbox, for DJ number 90-11-3-12792.

Thank You

Ronda Herbert

Case Management Unit
Docketing Clerk
Environmental and Natural Resource Division

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

**Sent:** Thursday, June 27, 2024 6:32 PM
**To:** ENRD, PUBCOMMENT-EES (ENRD) <PENRD3@ENRD.USDOJ.GOV>
**Subject:** [EXTERNAL] Ohio and USA v. Norfolk Southern, et. al, D.J. Ref. No. 90-11-3-12792

Dear Assistant Attorney General of the Environment and Natural Resources Division,

I am writing to comment on The State of Ohio and The United States of America v. Norfolk Southern Railway Company, et al., D.J. Ref. No. 90-11-3-12792. This consent decree is missing important measures that are necessary to fully address the needs of affected community members after this catastrophic event.

Though it's clear that the US EPA and DOJ are attempting to hold Norfolk Southern Railways accountable, the consent decree should include additional measures to fully address the needs of the community members of this disaster:

– Increase groundwater, surface water, and well water testing from 10 years to 25 years, to be more in line with Superfund site cleanups. The EPA responded to this disaster with their Superfund SMART response team, assigned the derailment site a Superfund number, and yet the derailment site is not being treated as a Superfund site.

– Expand the radius of affected residents (defined as Qualified Individuals in the consent decree) for Medical Monitoring and Mental Health from two miles to twenty miles, as the vent and burn debris traveled far beyond a two mile radius. Reports have now come out that the debris from the derailment site have traveled across sixteen states, which encompasses over 100 million US citizens. Additionally, reporting of direct and secondary mental trauma are far beyond the two mile radius. Expanding the radius to twenty miles would reach most of the affected residents, and would eliminate the inevitable backlog of case-by-case submissions for Qualified Individuals.

NS_PUBCOM_0000006

– Order Norfolk Southern to pay healthcare claims by affected residents that began immediately after the vent and burn order.

Thank you for your time and consideration making these amendments to the decree. Norfolk Southern Railway must be held fully accountable for their reckless, negligent actions that have upended the lives of countless community members!

Sincerely,

███████████████

Comment A-4

**From:**
**To:** ENRD, PUBCOMMENT-EES (ENRD)
**Subject:** [EXTERNAL] Ohio and USA v. Norfolk Southern, et. al, D.J. Ref. No. 90–11–3–12792
**Date:** Monday, July 8, 2024 7:15:15 PM

Dear Assistant Attorney General of the Environment and Natural Resources Division,

I am writing to comment on The State of Ohio and The United States of America v. Norfolk Southern Railway Company, et al., D.J. Ref. No. 90–11–3–12792. This consent decree is missing important measures that are necessary to fully address the needs of affected community members after this catastrophic event.

Though it's clear that the US EPA and DOJ are attempting to hold Norfolk Southern Railways accountable, the consent decree should include additional measures to fully address the needs of the community members of this disaster:

Immediate meaningful measures for residents who do not believe it's safe to relocate. Buy out homes of those who do not trust the narrative that it's safe. We should not have to sell homes we don't believe are safe to other families who don't grasp the magnitude, nor should we take a loss for our beloved family homes. "MEANINGFUL" because fair market value here will not relocate us to similar living situations in similar pre 2/3/23 environment, not the low crime rate, the small town atmosphere, the beautiful rural amenities that we so valued, from time in nature, playing and swimming in creeks, hunting fishing gardening. Home owners nor renters should bear the burden of the financial changes. We chose to live in a safe rural community with uniquely low cost of living. We are owed at bare minimum the ability to relocate to a new environment that suits our needs anywhere in the country. This includes similar property and home size and amenities, location to desired environment, proximity to schools, grocery store, clean nature, what ever each house hold valued in their living situation. Our determination not Norfolk Southerns. Differential for cost of housing, living, vehicle ownership as well as insurance on homes are cars. Meanful health care is must, thats available anywhere in the country that includes self referal, mental health, and counseling, these are not included in medicare. Everything about our health will forever be changed by this, we will never be able to rule it out as cause or worsening. These are the bare bones of starting to "make it right" This should all be prelawsuits. This should extend at least a 5 miles radius..

For those who want to stay and risk their health and that if their family below must be included.
– Increase groundwater, surface water, and well water testing from 10 years to 25 years, to be more in line with Superfund site cleanups. The EPA responded to this disaster with their Superfund SMART response team, assigned the derailment site a natioal priority list Superfund number, and yet the derailment site is not being treated as a Superfund site.

– Expand the radius of affected residents (defined as Qualified Individuals in the consent decree) for Medical Monitoring and Mental Health from two miles to twenty miles, as the vent and burn debris traveled far beyond a two mile radius. Reports have now come out that the debris from the derailment site have traveled across sixteen states, which encompasses over 100 million US citizens. Additionally, reporting of direct and secondary mental trauma are far beyond the two mile radius. Expanding the radius to twenty miles would reach most of the affected residents, and would eliminate the inevitable backlog of case-by-case submissions for Qualified Individuals.

– Order Norfolk Southern to pay healthcare claims by affected residents that began immediately after the vent and burn order.

Thank you for your time and consideration making these amendments to the decree. Norfolk Southern Railway must be held fully accountable for their reckless, negligent actions that have upended the lives of countless community members!

Sincerely,

Comment A-5

**From:**
**To:** ENRD, PUBCOMMENT-EES (ENRD)
**Subject:** [EXTERNAL] Ohio and USA v. Norfolk Southern, et. al, D.J. Ref. No. 90–11–3–12792
**Date:** Monday, July 8, 2024 7:46:15 PM

Dear Assistant Attorney General of the Environment and Natural Resources Division,

I am writing to comment on The State of Ohio and The United States of America v. Norfolk Southern Railway Company, et al., D.J. Ref. No. 90–11–3–12792. This consent decree is missing important measures that are necessary to fully address the needs of affected community members after this catastrophic event.

Though it's clear that the US EPA and DOJ are attempting to hold Norfolk Southern Railways accountable, the consent decree should include additional measures to fully address the needs of the community members of this disaster:

– Increase groundwater, surface water, and well water testing from 10 years to 25 years, to be more in line with Superfund site cleanups. The EPA responded to this disaster with their Superfund SMART response team, assigned the derailment site a Superfund number, and yet the derailment site is not being treated as a Superfund site.

– Expand the radius of affected residents (defined as Qualified Individuals in the consent decree) for Medical Monitoring and Mental Health from two miles to twenty miles, as the vent and burn debris traveled far beyond a two mile radius. Reports have now come out that the debris from the derailment site have traveled across sixteen states, which encompasses over 100 million US citizens. Additionally, reporting of direct and secondary mental trauma are far beyond the two mile radius. Expanding the radius to twenty miles would reach most of the affected residents, and would eliminate the inevitable backlog of case-by-case submissions for Qualified Individuals.

– Order Norfolk Southern to pay healthcare claims by affected residents that began immediately after the vent and burn order.

Thank you for your time and consideration making these amendments to the decree. Norfolk Southern Railway must be held fully accountable for their reckless, negligent actions that have upended the lives of countless community members!

Sincerely,

Comment A-6

**From:**
**To:** ENRD, PUBCOMMENT-EES (ENRD)
**Subject:** [EXTERNAL] Ohio and USA v. Norfolk Southern, et. al, D.J. Ref. No. 90–11–3–12792
**Date:** Monday, July 8, 2024 6:23:14 PM

Dear Assistant Attorney General of the Environment and Natural Resources Division,

I am writing to comment on The State of Ohio and The United States of America v. Norfolk Southern Railway Company, et al., D.J. Ref. No. 90–11–3–12792. This consent decree is missing important measures that are necessary to fully address the needs of affected community members after this catastrophic event.

Though it's clear that the US EPA and DOJ are attempting to hold Norfolk Southern Railways accountable, the consent decree should include additional measures to fully address the needs of the community members of this disaster:

– Increase groundwater, surface water, and well water testing from 10 years to 25 years, to be more in line with Superfund site cleanups. The EPA responded to this disaster with their Superfund SMART response team, assigned the derailment site a Superfund number, and yet the derailment site is not being treated as a Superfund site.

– Expand the radius of affected residents (defined as Qualified Individuals in the consent decree) for Medical Monitoring and Mental Health from two miles to twenty miles, as the vent and burn debris traveled far beyond a two mile radius. Reports have now come out that the debris from the derailment site have traveled across sixteen states, which encompasses over 100 million US citizens. Additionally, reporting of direct and secondary mental trauma are far beyond the two mile radius. Expanding the radius to twenty miles would reach most of the affected residents, and would eliminate the inevitable backlog of case-by-case submissions for Qualified Individuals.

– Order Norfolk Southern to pay healthcare claims by affected residents that began immediately after the vent and burn order.

Thank you for your time and consideration making these amendments to the decree. Norfolk Southern Railway must be held fully accountable for their reckless, negligent actions that have upended the lives of countless community members!

Sincerely,

Comment A-7

**From:**
**To:** ENRD, PUBCOMMENT-EES (ENRD)
**Subject:** [EXTERNAL] Ohio and USA v. Norfolk Southern, et. al, D.J. Ref. No. 90–11–3–12792
**Date:** Monday, July 8, 2024 5:37:15 PM

Dear Assistant Attorney General of the Environment and Natural Resources Division,

I am writing to comment on The State of Ohio and The United States of America v. Norfolk Southern Railway Company, et al., D.J. Ref. No. 90–11–3–12792. This consent decree is missing important measures that are necessary to fully address the needs of affected community members after this catastrophic event.

Though it's clear that the US EPA and DOJ are attempting to hold Norfolk Southern Railways accountable, the consent decree should include additional measures to fully address the needs of the community members of this disaster:

– Increase groundwater, surface water, and well water testing from 10 years to 25 years, to be more in line with Superfund site cleanups. The EPA responded to this disaster with their Superfund SMART response team, assigned the derailment site a Superfund number, and yet the derailment site is not being treated as a Superfund site.

– Expand the radius of affected residents (defined as Qualified Individuals in the consent decree) for Medical Monitoring and Mental Health from two miles to twenty miles, as the vent and burn debris traveled far beyond a two mile radius. Reports have now come out that the debris from the derailment site have traveled across sixteen states, which encompasses over 100 million US citizens. Additionally, reporting of direct and secondary mental trauma are far beyond the two mile radius. Expanding the radius to twenty miles would reach most of the affected residents, and would eliminate the inevitable backlog of case-by-case submissions for Qualified Individuals.

– Order Norfolk Southern to pay healthcare claims by affected residents that began immediately after the vent and burn order.

Thank you for your time and consideration making these amendments to the decree. Norfolk Southern Railway must be held fully accountable for their reckless, negligent actions that have upended the lives of countless community members!

Sincerely,

Comment A-8

| From: | Herbert, Ronda (ENRD) |
|---|---|
| To: | Grady, Lauren (ENRD) |
| Cc: | Spector, Jeffrey (ENRD); Stewart, Geoffrey (ENRD) |
| Subject: | FW: [EXTERNAL] Ohio and USA v. Norfolk Southern, et. al, D.J. Ref. No. 90-11-3-12792 |
| Date: | Tuesday, July 9, 2024 10:56:55 AM |

Hello Lauren,

This was sent to our public comment inbox, for DJ number 90-11-3-12792.

Thank You

Ronda Herbert

Case Management Unit
Docketing Clerk
Environmental and Natural Resource Division

**From:**

**Sent:** Tuesday, July 9, 2024 10:51 AM
**To:** ENRD, PUBCOMMENT-EES (ENRD) <PENRD3@ENRD.USDOJ.GOV>
**Subject:** [EXTERNAL] Ohio and USA v. Norfolk Southern, et. al, D.J. Ref. No. 90-11-3-12792

Dear Assistant Attorney General of the Environment and Natural Resources Division,

I am writing to comment on The State of Ohio and The United States of America v. Norfolk Southern Railway Company, et al., D.J. Ref. No. 90-11-3-12792. This consent decree is missing important measures that are necessary to fully address the needs of affected community members after this catastrophic event.

Though it's clear that the US EPA and DOJ are attempting to hold Norfolk Southern Railways accountable, the consent decree should include additional measures to fully address the needs of the community members of this disaster:

– Increase groundwater, surface water, and well water testing from 10 years to 25 years, to be more in line with Superfund site cleanups. The EPA responded to this disaster with their Superfund SMART response team, assigned the derailment site a Superfund number, and yet the derailment site is not being treated as a Superfund site.

– Expand the radius of affected residents (defined as Qualified Individuals in the consent decree) for Medical Monitoring and Mental Health from two miles to twenty miles, as the vent and burn debris traveled far beyond a two mile radius. Reports have now come out that the debris from the derailment site have traveled across sixteen states, which encompasses over 100 million US citizens. Additionally, reporting of direct and secondary mental trauma are far beyond the two mile radius. Expanding the radius to twenty miles would reach most of the affected residents, and would eliminate the inevitable backlog of case-by-case submissions for Qualified Individuals.

– Order Norfolk Southern to pay healthcare claims by affected residents that began immediately after the vent and burn order.

Thank you for your time and consideration making these amendments to the decree. Norfolk Southern Railway must be held fully accountable for their reckless, negligent actions that have upended the lives of countless community members!

Sincerely,

Comment A-9

**From:**
**To:** ENRD, PUBCOMMENT-EES (ENRD)
**Subject:** [EXTERNAL] Ohio and USA v. Norfolk Southern, et. al, D.J. Ref. No. 90–11–3–12792
**Date:** Monday, July 8, 2024 10:33:44 PM

Dear Assistant Attorney General of the Environment and Natural Resources Division,

My name is                    and I am writing to comment on The State of Ohio and The United States of America v. Norfolk Southern Railway Company, et al., D.J. Ref. No. 90–11–3–12792. This consent decree is missing important measures that are necessary to fully address the needs of affected community members after this catastrophic event.

Though it's clear that the US EPA and DOJ are attempting to hold Norfolk Southern Railways accountable, the consent decree should include additional measures to fully address the needs of the community members of this disaster:

-Increase the opt out time due to people in the radius not being I formed on exactly everything entailed

– Increase groundwater, surface water, and well water testing from 10 years to 25 years, to be more in line with Superfund site cleanups. The EPA responded to this disaster with their Superfund SMART response team, assigned the derailment site a Superfund number, and yet the derailment site is not being treated as a Superfund site.

– Expand the radius of affected residents (defined as Qualified Individuals in the consent decree) for Medical Monitoring and Mental Health from two miles to twenty miles, as the vent and burn debris traveled far beyond a two mile radius. Reports have now come out that the debris from the derailment site have traveled across sixteen states, which encompasses over 100 million US citizens. Additionally, reporting of direct and secondary mental trauma are far beyond the two mile radius. Expanding the radius to twenty miles would reach most of the affected residents, and would eliminate the inevitable backlog of case-by-case submissions for Qualified Individuals.

– Order Norfolk Southern to pay healthcare claims by affected residents that began immediately after the vent and burn order.

Thank you for your time and consideration making these amendments to the decree. Norfolk Southern Railway must be held fully accountable for their reckless, negligent actions that have upended the lives of countless community members!

Sincerely,

Comment A-10

**From:**
**To:** ENRD, PUBCOMMENT-EES (ENRD)
**Subject:** [EXTERNAL] Ohio and USA v. Norfolk Southern, et. al, D.J. Ref. No. 90-11-3-12792
**Date:** Monday, July 8, 2024 7:38:14 PM

Dear Assistant Attorney General of the Environment and Natural Resources Division,

I am writing to comment on The State of Ohio and The United States of America v. Norfolk Southern Railway Company, et al., D.J. Ref. No. 90-11-3-12792. This consent decree is missing important measures that are necessary to fully address the needs of affected community members after this catastrophic event.

Though it's clear that the US EPA and DOJ are attempting to hold Norfolk Southern Railways accountable, the consent decree should include additional measures to fully address the needs of the community members of this disaster:

– Increase groundwater, surface water, and well water testing from 10 years to 25 years, to be more in line with Superfund site cleanups. The EPA responded to this disaster with their Superfund SMART response team, assigned the derailment site a Superfund number, and yet the derailment site is not being treated as a Superfund site.

– Expand the radius of affected residents (defined as Qualified Individuals in the consent decree) for Medical Monitoring and Mental Health from two miles to twenty miles, as the vent and burn debris traveled far beyond a two mile radius. Reports have now come out that the debris from the derailment site have traveled across sixteen states, which encompasses over 100 million US citizens. Additionally, reporting of direct and secondary mental trauma are far beyond the two mile radius. Expanding the radius to twenty miles would reach most of the affected residents, and would eliminate the inevitable backlog of case-by-case submissions for Qualified Individuals.

– Order Norfolk Southern to pay healthcare claims by affected residents that began immediately after the vent and burn order.

Thank you for your time and consideration making these amendments to the decree. Norfolk Southern Railway must be held fully accountable for their reckless, negligent actions that have upended the lives of countless community members!

Sincerely,

Comment A-11

**From:**
**To:** ENRD, PUBCOMMENT-EES (ENRD)
**Subject:** [EXTERNAL] Ohio and USA v. Norfolk Southern, et. al, D.J. Ref. No. 90-11-3-12792
**Date:** Tuesday, July 9, 2024 7:13:16 AM

Dear Assistant Attorney General of the Environment and Natural Resources Division,

I am writing to comment on The State of Ohio and The United States of America v. Norfolk Southern Railway Company, et al., D.J. Ref. No. 90-11-3-12792. This consent decree is missing important measures that are necessary to fully address the needs of affected community members after this catastrophic event.

Though it's clear that the US EPA and DOJ are attempting to hold Norfolk Southern Railways accountable, the consent decree should include additional measures to fully address the needs of the community members of this disaster:

– Increase groundwater, surface water, and well water testing from 10 years to 25 years, to be more in line with Superfund site cleanups. The EPA responded to this disaster with their Superfund SMART response team, assigned the derailment site a Superfund number, and yet the derailment site is not being treated as a Superfund site.

– Expand the radius of affected residents (defined as Qualified Individuals in the consent decree) for Medical Monitoring and Mental Health from two miles to twenty miles, as the vent and burn debris traveled far beyond a two mile radius. Reports have now come out that the debris from the derailment site have traveled across sixteen states, which encompasses over 100 million US citizens. Additionally, reporting of direct and secondary mental trauma are far beyond the two mile radius. Expanding the radius to twenty miles would reach most of the affected residents, and would eliminate the inevitable backlog of case-by-case submissions for Qualified Individuals.

– Order Norfolk Southern to pay healthcare claims by affected residents that began immediately after the vent and burn order.

Thank you for your time and consideration making these amendments to the decree. Norfolk Southern Railway must be held fully accountable for their reckless, negligent actions that have upended the lives of countless community members!

Sincerely,

Comment A-12

| From: | Herbert, Ronda (ENRD) |
|---|---|
| To: | Grady, Lauren (ENRD) |
| Cc: | Spector, Jeffrey (ENRD); Stewart, Geoffrey (ENRD); Potts, Davis (ENRD) |
| Subject: | FW: [EXTERNAL] Ohio and USA v. Norfolk Southern, et. al, D.J. Ref. No. 90–11–3–12792 |
| Date: | Wednesday, July 10, 2024 9:21:46 AM |

Hello Lauren,

This was sent to our public comment inbox, for DJ number 90-11-3-12792.

Thank You

Ronda Herbert

Case Management Unit
Docketing Clerk
Environmental and Natural Resource Division

**From:**

**Sent:** Wednesday, July 10, 2024 9:11 AM
**To:** ENRD, PUBCOMMENT-EES (ENRD) <PENRD3@ENRD.USDOJ.GOV>
**Subject:** [EXTERNAL] Ohio and USA v. Norfolk Southern, et. al, D.J. Ref. No. 90–11–3–12792

Dear Assistant Attorney General of the Environment and Natural Resources Division,

I am writing to comment on The State of Ohio and The United States of America v. Norfolk Southern Railway Company, et al., D.J. Ref. No. 90–11–3–12792. This consent decree is missing important measures that are necessary to fully address the needs of affected community members after this catastrophic event.

Though it's clear that the US EPA and DOJ are attempting to hold Norfolk Southern Railways accountable, the consent decree should include additional measures to fully address the needs of the community members of this disaster:

– Increase groundwater, surface water, and well water testing from 10 years to 25 years, to be more in line with Superfund site cleanups. The EPA responded to this disaster with their Superfund SMART response team, assigned the derailment site a Superfund number, and yet the derailment site is not being treated as a Superfund site.

– Expand the radius of affected residents (defined as Qualified Individuals in the consent decree) for Medical Monitoring and Mental Health from two miles to twenty miles, as the vent and burn debris traveled far beyond a two mile radius. Reports have now come out that the debris from the derailment site have traveled across sixteen states, which encompasses over 100 million US citizens. Additionally, reporting of direct and secondary mental trauma are far beyond the two mile radius. Expanding the radius to twenty miles would reach most of the affected residents, and would eliminate the inevitable backlog of case-by-case submissions for Qualified Individuals.

– Order Norfolk Southern to pay healthcare claims by affected residents that began immediately after the vent and burn order.

Thank you for your time and consideration making these amendments to the decree. Norfolk Southern Railway must be held fully accountable for their reckless, negligent actions that have upended the lives of countless community members!

Sincerely,

Comment A-13

| | |
|---|---|
| **From:** | Herbert, Ronda (ENRD) |
| **To:** | Grady, Lauren (ENRD) |
| **Cc:** | Spector, Jeffrey (ENRD); Stewart, Geoffrey (ENRD); Potts, Davis (ENRD) |
| **Subject:** | FW: [EXTERNAL] Ohio and USA v. Norfolk Southern, et. al, D.J. Ref. No. 90–11–3–12792 |
| **Date:** | Wednesday, July 10, 2024 12:55:58 PM |

Hello Lauren,

This was sent to our public comment inbox, for DJ number 90-11-3-12792.

Thank You

Ronda Herbert

Case Management Unit
Docketing Clerk
Environmental and Natural Resource Division

**From:** ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

▇▇▇▇▇▇▇▇▇

**Sent:** Wednesday, July 10, 2024 10:56 AM
**To:** ENRD, PUBCOMMENT-EES (ENRD) <PENRD3@ENRD.USDOJ.GOV>
**Subject:** [EXTERNAL] Ohio and USA v. Norfolk Southern, et. al, D.J. Ref. No. 90–11–3–12792

Dear Assistant Attorney General of the Environment and Natural Resources Division,

I am writing to comment on The State of Ohio and The United States of America v. Norfolk Southern Railway Company, et al., D.J. Ref. No. 90–11–3–12792. This consent decree is missing important measures that are necessary to fully address the needs of affected community members after this catastrophic event.

Though it's clear that the US EPA and DOJ are attempting to hold Norfolk Southern Railways accountable, the consent decree should include additional measures to fully address the needs of the community members of this disaster:

– Increase groundwater, surface water, and well water testing from 10 years to 25 years, to be more in line with Superfund site cleanups. The EPA responded to this disaster with their Superfund SMART response team, assigned the derailment site a Superfund number, and yet the derailment site is not being treated as a Superfund site.

– Expand the radius of affected residents (defined as Qualified Individuals in the consent decree) for Medical Monitoring and Mental Health from two miles to twenty miles, as the vent and burn debris traveled far beyond a two mile radius. Reports have now come out that the debris from the derailment site have traveled across sixteen states, which encompasses over 100 million US citizens. Additionally, reporting of direct and secondary mental trauma are far beyond the two mile radius. Expanding the radius to twenty miles would reach most of the affected residents, and would eliminate the inevitable backlog of case-by-case submissions for Qualified Individuals.

– Order Norfolk Southern to pay healthcare claims by affected residents that began immediately after the vent and burn order.

Thank you for your time and consideration making these amendments to the decree. Norfolk Southern Railway must be held fully accountable for their reckless, negligent actions that have upended the lives of countless community members!

Sincerely,

Comment A-14

| **From:** | Herbert, Ronda (ENRD) |
|---|---|
| **To:** | Grady, Lauren (ENRD) |
| **Cc:** | Spector, Jeffrey (ENRD); Stewart, Geoffrey (ENRD); Potts, Davis (ENRD) |
| **Subject:** | FW: [EXTERNAL] Comments Regarding Proposed Consent Degree For "State of Ohio and United States of America v. Norfolk Southern Railway Company, et al.", Case No. 4:23-cv-00517 (DoJ Ref. No. 90–11–3–12792) |
| **Date:** | Wednesday, July 10, 2024 12:58:23 PM |

Hello Lauren,

This was sent to our public comment inbox, for DJ number 90-11-3-12792.

Thank You

Ronda Herbert

Case Management Unit
Docketing Clerk
Environmental and Natural Resource Division

**From:** ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

**Sent:** Wednesday, July 10, 2024 11:38 AM

**To:** ENRD, PUBCOMMENT-EES (ENRD) <PENRD3@ENRD.USDOJ.GOV>

**Subject:** [EXTERNAL] Comments Regarding Proposed Consent Degree For "State of Ohio and United States of America v. Norfolk Southern Railway Company, et al.", Case No. 4:23-cv-00517 (DoJ Ref. No. 90–11–3–12792)

Dear Ms. Thoms and the Environment and Natural Resources Division of the United States Department of Justice:

I am a Canadian clean-air and climate advocate writing to comment on the proposed consent degree regarding the case *State of Ohio and United States of America v. Norfolk Southern Railway Company, et al.*, Case No. 4:23-cv-00517 (DoJ Ref. No. 90–11–3–12792). I applaud your department for seeking to hold Norfolk Southern accountable, but unfortunately the proposed consent decree as written lacks several important measures that are necessary to better address the needs of affected community members after this catastrophic event. To ensure the consent decree provides maximum relief to the affected communities and individuals, it should be modified to include the following:

- Increase groundwater, surface-water, and well-water testing from 10 years to 25 years to align more closely with Superfund site clean-up protocols. I will note that the EPA responded to this disaster with their Superfund SMART response team and assigned the derailment site a Superfund number, yet the derailment site is not yet being properly treated as a Superfund site.
- Expand the radius of affected residents (defined as "Qualified Individuals" in the proposed consent decree) for medical monitoring and mental health from two miles to 20 miles, as the vent and burn debris travelled far beyond a 2-mile radius. Reports have now come out that the debris from the derailment site have reached 16 states and even parts of Canada, which encompasses over 100 million American and Canadian citizens. Additionally, reports of direct and indirect/secondary mental trauma have been received

from people living far beyond the two-mile radius. Expanding the radius to 20 miles would reach most of the affected residents, and would eliminate the inevitable backlog of case-by-case submissions for Qualified Individuals.

- Order Norfolk Southern to pay the healthcare claims by affected residents whose health ailments commenced immediately after, and/or can be accurately and precisely traced to, the vent-and-burn order.
- Order Norfolk Southern to implement enhanced safety and monitoring procedures to reduce the likelihood of such a catastrophe from happening again in the future.

Additionally, I urge your department to go above and beyond the aforementioned additions to ensure the consent decree is as effective as possible.

Thank you for your time and consideration of my comments.

Regards,



Comment A-15

| | |
|---|---|
| **From:** | Herbert, Ronda (ENRD) |
| **To:** | Grady, Lauren (ENRD) |
| **Cc:** | Spector, Jeffrey (ENRD); Stewart, Geoffrey (ENRD); Potts, Davis (ENRD) |
| **Subject:** | FW: [EXTERNAL] Ohio and USA v. Norfolk Southern, et. al, D.J. Ref. No. 90–11–3–12792 |
| **Date:** | Wednesday, July 10, 2024 10:30:29 AM |

Hello Lauren,

This was sent to our public comment inbox, for DJ number 90-11-3-12792.

Thank You

Ronda Herbert

Case Management Unit
Docketing Clerk
Environmental and Natural Resource Division

**From:**

**Sent:** Wednesday, July 10, 2024 10:27 AM
**To:** ENRD, PUBCOMMENT-EES (ENRD) <PENRD3@ENRD.USDOJ.GOV>
**Subject:** [EXTERNAL] Ohio and USA v. Norfolk Southern, et. al, D.J. Ref. No. 90–11–3–12792

Dear Assistant Attorney General of the Environment and Natural Resources Division,

I am writing to comment on The State of Ohio and The United States of America v. Norfolk Southern Railway Company, et al., D.J. Ref. No. 90–11–3–12792. This consent decree is missing important measures that are necessary to fully address the needs of affected community members after this catastrophic event.

Though it's clear that the US EPA and DOJ are attempting to hold Norfolk Southern Railways accountable, the consent decree should include additional measures to fully address the needs of the community members of this disaster:

– Increase groundwater, surface water, and well water testing from 10 years to 25 years, to be more in line with Superfund site cleanups. The EPA responded to this disaster with their Superfund SMART response team, assigned the derailment site a Superfund number, and yet the derailment site is not being treated as a Superfund site.

– Expand the radius of affected residents (defined as Qualified Individuals in the consent decree) for Medical Monitoring and Mental Health from two miles to twenty miles, as the vent and burn debris traveled far beyond a two mile radius. Reports have now come out that the debris from the derailment site have traveled across sixteen states, which encompasses over 100 million US citizens. Additionally, reporting of direct and secondary mental trauma are far beyond the two mile radius. Expanding the radius to twenty miles would reach most of the affected residents, and would eliminate the inevitable backlog of case-by-case submissions for Qualified Individuals.

– Order Norfolk Southern to pay healthcare claims by affected residents that began immediately after the vent and burn order.

Thank you for your time and consideration making these amendments to the decree. Norfolk Southern Railway must be held fully accountable for their reckless, negligent actions that have upended the lives of countless community members!

Sincerely,

Comment A-16

| | |
|---|---|
| **From:** | Herbert, Ronda (ENRD) |
| **To:** | Grady, Lauren (ENRD) |
| **Cc:** | Spector, Jeffrey (ENRD); Stewart, Geoffrey (ENRD); Potts, Davis (ENRD) |
| **Subject:** | FW: [EXTERNAL] Ohio and USA v. Norfolk Southern, et. al, D.J. Ref. No. 90–11–3–12792 |
| **Date:** | Thursday, July 11, 2024 8:44:50 AM |

Hello Lauren,

This was sent to our public comment inbox, for DJ number 90-11-3-12792.

Thank You

Ronda Herbert

Case Management Unit
Docketing Clerk
Environmental and Natural Resource Division

**From:**

**Sent:** Thursday, July 11, 2024 2:11 AM
**To:** ENRD, PUBCOMMENT-EES (ENRD) <PENRD3@ENRD.USDOJ.GOV>
**Subject:** [EXTERNAL] Ohio and USA v. Norfolk Southern, et. al, D.J. Ref. No. 90–11–3–12792

Dear Assistant Attorney General of the Environment and Natural Resources Division,

I am writing to comment on The State of Ohio and The United States of America v. Norfolk Southern Railway Company, et al., D.J. Ref. No. 90–11–3–12792. This consent decree is missing important measures that are necessary to fully address the needs of affected community members after this catastrophic event.

Though it's clear that the US EPA and DOJ are attempting to hold Norfolk Southern Railways accountable, the consent decree should include additional measures to fully address the needs of the community members of this disaster:

– Increase groundwater, surface water, and well water testing from 10 years to 25 years, to be more in line with Superfund site cleanups. The EPA responded to this disaster with their Superfund SMART response team, assigned the derailment site a Superfund number, and yet the derailment site is not being treated as a Superfund site.

– Expand the radius of affected residents (defined as Qualified Individuals in the consent decree) for Medical Monitoring and Mental Health from two miles to twenty miles, as the vent and burn debris traveled far beyond a two mile radius. Reports have now come out that the debris from the derailment site have traveled across sixteen states, which encompasses over 100 million US citizens. Additionally, reporting of direct and secondary mental trauma are far beyond the two mile radius. Expanding the radius to twenty miles would reach most of the affected residents, and would eliminate the inevitable backlog of case-by-case submissions for Qualified Individuals.

NS_PUBCOM_0000026

– Order Norfolk Southern to pay healthcare claims by affected residents that began immediately after the vent and burn order.

Thank you for your time and consideration making these amendments to the decree. Norfolk Southern Railway must be held fully accountable for their reckless, negligent actions that have upended the lives of countless community members!

Sincerely,

Comment A-17

| | |
|---|---|
| **From:** | Herbert, Ronda (ENRD) |
| **To:** | Grady, Lauren (ENRD) |
| **Cc:** | Spector, Jeffrey (ENRD); Stewart, Geoffrey (ENRD); Potts, Davis (ENRD) |
| **Subject:** | FW: [EXTERNAL] Ohio and USA v. Norfolk Southern, et. al, D.J. Ref. No. 90–11–3–12792 |
| **Date:** | Thursday, July 11, 2024 8:45:36 AM |

Hello Lauren,

This was sent to our public comment inbox, for DJ number 90-11-3-12792.

Thank You

Ronda Herbert

Case Management Unit
Docketing Clerk
Environmental and Natural Resource Division

**From:**

**Sent:** Thursday, July 11, 2024 2:32 AM
**To:** ENRD, PUBCOMMENT-EES (ENRD) <PENRD3@ENRD.USDOJ.GOV>
**Subject:** [EXTERNAL] Ohio and USA v. Norfolk Southern, et. al, D.J. Ref. No. 90–11–3–12792

Dear Assistant Attorney General of the Environment and Natural Resources Division,

I am writing to comment on The State of Ohio and The United States of America v. Norfolk Southern Railway Company, et al., D.J. Ref. No. 90–11–3–12792. This consent decree is missing important measures that are necessary to fully address the needs of affected community members after this catastrophic event.

Though it's clear that the US EPA and DOJ are attempting to hold Norfolk Southern Railways accountable, the consent decree should include additional measures to fully address the needs of the community members of this disaster:

– Increase groundwater, surface water, and well water testing from 10 years to 25 years, to be more in line with Superfund site cleanups. The EPA responded to this disaster with their Superfund SMART response team, assigned the derailment site a Superfund number, and yet the derailment site is not being treated as a Superfund site.

– Expand the radius of affected residents (defined as Qualified Individuals in the consent decree) for Medical Monitoring and Mental Health from two miles to twenty miles, as the vent and burn debris traveled far beyond a two mile radius. Reports have now come out that the debris from the derailment site have traveled across sixteen states, which encompasses over 100 million US citizens. Additionally, reporting of direct and secondary mental trauma are far beyond the two mile radius. Expanding the radius to twenty miles would reach most of the affected residents, and would eliminate the inevitable backlog of case-by-case submissions for Qualified Individuals.

– Order Norfolk Southern to pay healthcare claims by affected residents that began immediately after the vent and burn order.

Thank you for your time and consideration making these amendments to the decree. Norfolk Southern Railway must be held fully accountable for their reckless, negligent actions that have upended the lives of countless community members!

Sincerely,

Comment A-18



**Environment and Natural Resources Division**
U.S. Department of Justice

*DEADLINE TO FILE*
*AUG-22-24*

## Fact Sheet

### United States and Norfolk Southern Railroad Settlement Agreement for the East Palestine Train Derailment

➢ The US Department of Justice (DOJ) is accepting public comments through August 2, 2024, on the proposed settlement of its lawsuit against Norfolk Southern. Comments can be submitted to pubcomment-ees@usdoj.gov or by mail to: Assistant Attorney General, US DOJ – ENRD, PO Box 7611, Washington, DC 20004-7611.

➢ DOJ will read all comments it receives and consider whether changes to the settlement are needed. DOJ will tell the Court why it decides to make or not make changes based on the comments.

➢ You can read the full consent decree at: https://www.justice.gov/enrd/consent-decrees.

➢ DOJ representatives will be available at EPA's Welcome Center in East Palestine on July 15 and 16 to answer questions about the proposed settlement. To make an appointment to discuss the settlement call (330) 775-6517 or email R5_EastPalestine@epa.gov

DATE 7-16-24



ASSISTANT ATTORNEYGENERAL
US DOJ - ENRD, P.O. BOX 7611,
WASHINGTON, DC 20004-7611

PLEASE EXCUSE MY WRITING
THANK YOU FOR READING MY LETTER. I AM A 83 YEAR OLD
U.S. NAVY VETERAN.
I HAVE TWO THINGS THAT I FILL, WERE OVER LOOKED.

① THE SMOKE, WITH DANGEROUS CHEMICALS, WERE NOT
CONSIDERED, IN THE SETTLEMENT AGREEMENT.
THE MORNING AFTER, THE VINYL CHLORIDE, WAS SET
ON FIRE; THERE WAS AN INVERSON; THE BLACK
SMOKE, WENT UP; THE INVERSON STOPPED THE SMOKE
FROM RISING ANY FURTHER + THE SMOKE SPREAD OUT,
THEN WENT DOWN, CLOSER TO THE GROUND.
I LIVE ON TOP OF A 240 FT. HILL, AT MY
HOME, THE TOXIC SMOKE WAS AT GROUND LEVEL;
I COULD NOT SEE MY BARN, 200 FT AWAY FROM
MY HOUSE. THE SMOKE NEVER GOT DOWN TO GROUND
LEVEL IN E. PALESTINE; IT WAS EXTREMELY BAD.
HERE, I WALK TO THE CAR, WITH A BOX OF CLOTHES,
AND NEARLY PASSED OUT; I SET DOWN IN THE
CAR AND SHUT THE DOOR; MY DAUGHTER, NOTICED
ME + SAID; ARE YOU OK; I SAID NO, AND
SHE HELPED ME TO THE HOUSE.
I READ ON THE INTERNET. "IF YOU ARE IN
THE SMOKE FROM BURNING VINYL CHLORIDE, FOR
5 MINS. YOU MAY PASS OUT OR ALMOST PASS OUT.
IT SAID GET OUT OF THE SMOKE IMMEDIATELY.
IF YOU ARE IN THE SMOKE FOR 5 MORE MINUTES
YOU ARE "DEAD." IT WAS BAD.
MY DAUGHTER GOT A BAD HEAD ACHE, WALKING TO THE
HOUSE, SHE STILL GETS HEADACHES EVERY DAY.
MY DOGS EYES SWELLED SHUT FOR 3 DAYS, WHEN HE

(OVER)

DATE

OPENED HIS EYES, THEY WERE BLOOD RED
MY GRANDSON & SON-IN-LAW GOT DIZZY.
THE APPLES ON MY APPLE TREES WERE ALL
TOTALLY BLACK, THAT YEAR, THE DEER WOULDN'T
EVEN EAT THEM.
    I STILL FEEL OFF BALANCE & GET OUT-OF
BREATH.
    THE YEAR BEFORE THE RECK, MY DAUGHTER & I
WOULD WALK 3-4 MILES ON A TRAIL, WITH NO PROBLEM.
    ("NO CONSIDERATION FOR SMOKE
    IN THE SETTLEMENT AGREEMENT.
    I THINK IT SHOULD BE CONSIDERED)

(2) I OWN 3.722 ACRES, LONG & NARROW LOT.
MY HOUSE IS IN THE REAR OF THE LOT. THE
SETTLEMENT AGREEMENT USES THE ADDRESS - MAIL BOX -
FOR THE DISTANCE FROM THE TRAIN RECK.
MY PROPERTY WAS SKIPPED OVER. THE TRAIN
RECK IS CLOSER TO THE REAR OF MY PROPERTY.
IF THEY USED THE DISTANCE FROM THE NEAREST
POINT OF MY PROPERTY, I WOULD BE IN THE
3-4 MI RANGE NOT THE 4 TO 7 MI RANGE FROM
MY MAIL BOX

    I DO NOT THINK THAT IS FAIR
    I KNOW IT WOULD BE DIFFICULT TO USE EVERYBODY
    SURVEY TO DETERMINE THE DISTANCE TO THE RECK, BUT
    IF IT IS NOTED, ON THE SETTLEMENT AGREEMENT
    IT SHOULD BE CONSIDERED.

                    THANK YOU
                    ▉▉▉▉▉

THE DEADLINE TO FILE A CLAIM FOR AWARD IS AUG-22-24
IF THIS IS CONSIDERED, WILL THE DEADLINE
FOR THE SETTLEMENT AGREEMENT BE EXTENDED.

    PLEASE LET ME KNOW IF I NEED TO FILE MY
    SETTLEMENT AGREEMENT PRIOR TO 7-22-24

                THANKS AGAIN   ▉▉▉▉

NS_PUBCOM_0000041

Comment A-19

| From: | Herbert, Ronda (ENRD) |
|---|---|
| To: | Grady, Lauren (ENRD) |
| Cc: | Spector, Jeffrey (ENRD); Stewart, Geoffrey (ENRD); Potts, Davis (ENRD) |
| Subject: | FW: [EXTERNAL] DJ Ref. No. 90-11-3-12792 State of OH & USA vs. Norfolk Southern Railway Co. et al. |
| Date: | Tuesday, July 23, 2024 11:44:10 AM |

Hello Lauren,

This was sent to our public comment inbox, for DJ number 90-11-3-12792.

Thank You

Ronda Herbert

Case Management Unit
Docketing Clerk
Environmental and Natural Resource Division

**From:**

**Sent:** Tuesday, July 23, 2024 11:26 AM
**To:** ENRD, PUBCOMMENT-EES (ENRD) <PENRD3@ENRD.USDOJ.GOV>
**Subject:** [EXTERNAL] DJ Ref. No. 90-11-3-12792 State of OH & USA vs. Norfolk Southern Railway Co. et al.

Dear Assistant Attorney General,

I make the following comments in regards to the case of State of Ohio and United States of America vs. Norfolk Southern Railway Company et al., DJ Ref. No. 90-11-3-12792.

*Medical Monitoring Program (page id # 2281, paragraph 50)*
*"approved healthcare providers to be defined in the Community Health Program Plan within 15 miles of East Palestine, OH"*
I contest.

I have been under the care of my healthcare provider for many years. On Feb. 20, 2023 I went to have a physical and get blood work testing due to the train derailment. I continue to have regular check-ups and will continue to do so. I do not believe I (or anyone else) should have to go to some arbitrarily appointed healthcare provider. I already have my healthcare provider and many others do too.

The tests (10 free annual medical monitoring exams including routine physical exams, comprehensive metabolic blood panels, pulmonary function tests, x-rays, and assessment of results) can be carried out by my own trusted provider.

*"annual reporting in Community Healthcare Program" (page id # 2284)*

NS_PUBCOM_0000042

*I contest.*

My healthcare provider should be able to provide reporting to the annual reporting. Perhaps to avoid HIPPA violations, each resident could be assigned a number for the sake of reporting. Residents could inform/instruct their own providers as to the reporting process. Furthermore, this must go beyond just monitoring alone. It starts with monitoring; however, if further tests, care, or treatment is necessary then Norfolk Southern must pay for it as well. It is their responsibility alone. So, perhaps it should be the 'Medical Monitoring AND Testing Program'.

*"Community Health Program Reassessment following the 14th anniversary." (page id #2285)*
I contest.
The settling defendant MUST provide funding regardless of the status of the fund at the time. Again, Norfolk Southern is at fault and if continued monitoring, tests, or treatment is needed, they must provide for it. They are at fault.

*"HHFT High Hazard Flammable Trains, 'max speed 50 mph'" (page id #2289, 66b speed restrictions)*
I contest.
I cannot drive my car with a 14 gallon gas tank full of flammable liquid any faster than 25 mph through my town of East Palestine, OH. How on earth is it ok for an HHFT to go 50 mph from one end of town to the other when the flammable cars can be numerous? And one tank car- one- can hold from 6,500-31,000 gallons of flammable liquid (and this doesn't even consider flammable gasses!). The speed restrictions MUST be lower. We already know what happens when it is not lower and a train derails. DO NOT let this *"max speed 50 mph"* remain. It must be lower for my town and local waterways, for the 35,000 miles of track in 22 states that Norfolk Southern runs, and for every last mile of track that crosses all across our great country. 50 mph IS NOT ACCEPTABLE! Too many waterways could be compromised. Too much land could be polluted and damaged.

*"And sampling and monitoring local air, surface water, ground water, drinking water, soil, and sediment." (page id # 2253, paragraph one)*
*"On October 18, 2023, EPA issued an administrative order under Clean Water Act directing settling defendants to <u>remove sediment in culverted areas of Sulphur Run</u> and further delineate, characterize, and as necessary <u>remove hazardous substances</u> and oil from sediment of Leslie Run and Sulphur Run." (paragraph two)*
I contest.
Not only sediment should be removed but also any substances that penetrated the stream bed sides. Sediment is settled matter to the bottom of a liquid but I question what happened to the hazardous substances that penetrated the sides of the stream beds during several heavy

rains.

Furthermore, how can portions of Sulphur Run that go under Taggart Street, cross James Street, continue under T&M parking lot and continue underground past a realty office, Subway, Doyle's meat market, empty storefront, BAJA Management, Andrew Patton DMD office until it reaches open stream after crossing under Liberty Street be cleaned of hazardous substances and sediment be removed? The area is underground and too small for a human to check and verify it has been cleaned. I have a direct line of sight to this area from my home. I can tell you it is not verifiable unless the ENTIRE portion is dug up and exposed to light to see it.

*"Key site statistics through May 16, 2024: Sulphur & Leslie Runs-*

- *'completed cleanings of five culverted portions of Sulphur Run'*
- *'Removing sheens by working upstream to downstream vacuuming out sediments and sheen one area at a time. Work continues in a particular work area until US EPA is satisfied that the sheens have been mitigated'*

I contest.

The implication that culverted areas of Sulphur Run have been cleaned of hazardous substances seems less than accurate. And why only sheen? There are hazardous substances too.

*Track Safety (page id #2254, paragraph 3)*
*"To support the safety of rail operations, settling defendants have publicly announced investments exceeding $1 billion in technology, equipment, and <u>infrastructure,</u> and state they will invest an additional $1 billion each year in ongoing operations <u>to ensure safety</u>"*

*Appendix B (A. bullet point 16)*
*"Settling defendants state that they continue to surpass regulatory and industry standards for <u>safety related track examinations and inspections.</u>"*

*Railroad Safety Improvements (ENRD Fact Sheet, EPA Newsletter July 10, 2024)*
*"Norfolk Southern will be required to change how it operates to improve rail safety and <u>reduce the chance of future derailments</u>."*

I contest.

On W. Main Street in East Palestine, OH there is an overhead railroad stone bridge in dire need of repair. Rebar is holding support to railroad ties that are slipping. This sorry excuse for safety is on the opposite end of town from the derailment site of Feb. 3, 2023. It is right by City Lake. A derailment there would be yet another catastrophe for this town and contaminate yet another body of water in the USA. And I do not care how much money they publicly declare they have

spent and will spend. That is not the issue. The issue is "making it right" according to their own CEO, Alan Shaw.

I implore you, seriously consider these points of contention. The significant harm caused by Norfolk Southern has affected land, air, water, and the people of the village and surrounding communities. This must not happen anywhere again. Hold Norfolk Southern accountable to the <u>fullest</u> extent of the law. The people of East Palestine, surrounding communities, and all across this great country are depending on you to fight for us.

Thank you in advance for your attention, consideration, and response to this matter.

Most sincerely,



Comment A-20

| | |
|---|---|
| **From:** | Herbert, Ronda (ENRD) |
| **To:** | Grady, Lauren (ENRD) |
| **Cc:** | Spector, Jeffrey (ENRD); Stewart, Geoffrey (ENRD); Potts, Davis (ENRD) |
| **Subject:** | FW: [EXTERNAL] E-Mail ENRD Web Content Manager |
| **Date:** | Monday, July 29, 2024 8:44:09 AM |

Hello Lauren,

This was sent to our public comment inbox, for DJ number 90-11-3-12792.

Thank You

Ronda Herbert

Case Management Unit
Docketing Clerk
Environmental and Natural Resource Division

**From:**
**Sent:** Friday, July 26, 2024 5:36 PM
**To:** ENRD, PUBCOMMENT-EES (ENRD) <PENRD3@ENRD.USDOJ.GOV>
**Subject:** [EXTERNAL] E-Mail ENRD Web Content Manager

This is in regards to the a Norfolk southern railroad disaster. I think norfolk southern should pay the court and attorney fees so I can get the full thirty thousand dollars

Comment A-21

| | |
|---|---|
| **From:** | Herbert, Ronda (ENRD) |
| **To:** | Grady, Lauren (ENRD) |
| **Cc:** | Spector, Jeffrey (ENRD); Stewart, Geoffrey (ENRD); Potts, Davis (ENRD) |
| **Subject:** | FW: [EXTERNAL] Train Derailment Settlement |
| **Date:** | Friday, July 26, 2024 11:10:17 AM |

Hello Lauren,

This was sent to our public comment inbox, for DJ number 90-11-3-12792.

Thank You

Ronda Herbert

Case Management Unit
Docketing Clerk
Environmental and Natural Resource Division

**From:**
**Sent:** Friday, July 26, 2024 9:21 AM
**To:** ENRD, PUBCOMMENT-EES (ENRD) <PENRD3@ENRD.USDOJ.GOV>
**Subject:** [EXTERNAL] Train Derailment Settlement

I live a little over 2 blocks from the Derailment on East Taggart st. We were told that since we were displaced for 11 months because we had symptoms from the derailment .We stayed at the Best Western hotel in columbiana for 11 LONG Months .Now they are telling us since they reimbursed us that they are taking that money OFF OUR Settlement ! We spent roughly 68,000 dollars on hotel food and gas.in those months and for them to say thats our settlement is NOT RIGHT !! If the train would not have derailed we would never have to stay away and NOT be sick.Granted everyones immune system isnt the same but why are we getting punished for staying away ..i feel we are entitled to the same amount everyone is getting regardless of the outcome .. I know people who never got a 1099 and got money for relocating and also people who still are relocated and Norfolk Southern is still paying for them .It would be nice to get a little something for the 11 months we had to stay away !!

Thank you for reading this

Virus-free.www.avg.com

Comment A-22

**From:**
**To:** ENRD, PUBCOMMENT-EES (ENRD)
**Subject:** [EXTERNAL] East Palestine Settlement
**Date:** Friday, July 26, 2024 6:22:24 PM

To Whom It May Concern,

I am a 20-year resident of East Palestine, OH. I have raised all three of my girls in this town, as I have always felt it was a safe place for them to grow up. That feeling of security has been shattered. I now fear for their long-term health and wellbeing as a result of this derailment and the subsequent contamination of our town. We live just a half-mile from "ground zero", and everyone in our home has suffered adverse health effects since that night. My husband was diagnosed with severe congestive heart failure, one daughter had a rash and has started premature puberty at the age of eight, another daughter continues to have severe nosebleeds, and I have been diagnosed with high blood pressure (that landed me in the E.R. one evening because it was at stroke-level). Our household had zero prescription medications on February 2 of 2023... we now have ten between my husband and myself, not to mention the mounting medical bills. My husband lost his physically-demanding (and well-paying) job as a result of his diagnosis, which also resulted in the loss of our medical insurance. With all these new issues and diagnoses, we are struggling, with no end in sight. My request to you is this: please require Norfolk Southern (or the federal government) provide health CARE for the nearby residents, not health monitoring. Monitoring does nothing if we have no means of paying for the treatments once diagnosed. Thank you for your consideration. I look forward to seeing the final outcome of this pursuit.
Sincerely,

Sent from my iPhone

Comment A-23

**From:**
**To:** ENRD, PUBCOMMENT-EES (ENRD)
**Subject:** [EXTERNAL] Train Derailment comment
**Date:** Saturday, July 27, 2024 6:05:49 PM

There was NO wall protecting any of us whatsoever. Whether we were at the site of derailment or 10 miles away. Us here on the PA side took the BRUNT of it as that's the way the wind blew.
NO WALL PROTECTED MY PROPERTY! NO WALL PROTECTED MY CHILDREN!
Living at                              WE HAD AND STILL DON'T HAVE AN
IMAGINARY BUBBLE THAT PROTECTED US IN ANY FORM FROM THE DISASTER
NORFOLK SOUTHERN CAUSED.

WHO was there for my child who suffered major ANXIETY over Norfolk Southern's disaster? I was her mother!

WHO was there throughout the past year, 5 months and 24 days every time my children suffered from pneumonia not once but multiple times. noting they never had it before! I was! Their mother!

WHO was there when MYSELF and TWO of my children had a hard time breathing? NOT NS or the DOJ. ME AGAIN THEIR MOTHER!

I could type and type the disaster over this train derailment the past year 5 months and 24 days but my chest is already starting to hurt with anger and sadness because I'm not just a number! My kids aren't a number! Norfolk Southern stole my piece of mind and MY HOME!!! I WILL NEVER FEEL SAFE ON MY PROPERTY AGAIN BECAUSE SO MANY DIFFERENT OPINIONS ON WHAT IS SAFE AND WHAT IS NOT!

I'm forced to stay due to high interest rates and a poor economy! NOT KNOWING if my kids are taking in carcinogens on a daily basis. AS a mother it's a horrible feeling to feel helpless in all this!

--

Comment A-24

**From:**
**To:** ENRD, PUBCOMMENT-EES (ENRD)
**Subject:** [EXTERNAL] East Palestine Settlement
**Date:** Saturday, July 27, 2024 7:35:29 PM

Dear Mam,

I was very much effected with the derailment living within a mile and working 1.2 miles from the incident. I also have a son and daughter in law that live within a half mile. We were treated as our lives mattered to no one. I am a first grade teacher in East Palestine and it will haunt me forever when the school sent our children out to play on the playground within five days of the burn. The public was told our buildings were thoroughly cleaned, we saw footprints of work boots up the stairwells and in the hallways.Nothing was done right.

Air wasn't being monitored around the schools. I was dizzy one morning and left and found out one of my children from the classroom passed out a couple hours afterwards. I went to the EPA and then they started the monitoring in the area of the school. I saw many children return to school with unexplained headaches, nosebleeds, and rashes. I don't think these problems were occurring more than 10 miles away. Please reconsider what the people of East Palestine should receive because we all know it won't be near what the papers have said.

We lived this daily and are still trying to recover. We doubted our own sanity about health issues we were dealing with and continue to experience. I will be retiring this coming year and have been doing my part to help our community. We need help to keep it going. There are still people who won't come back and several businesses that packed and left. The money would help my son purchase a home and stay to rebuild. He and his wife went to school here. They still haven't began a family. I pray daily that they will have healthy children when they do decide it's the right time. No one can predict the future, but our first responders and the people within East Palestine are the ones that need the consideration of payment.

Sincerely,

Comment A-25

Comment on the United States Proposed Settlement With Norfolk Southern

The Department of Justice (DOJ) should make changes to its proposed settlement of the DOJ lawsuit against Norfolk Southern, for the following reasons:

1. This settlement as limited to its specific environmental claims does not address the true lethal and lasting nature of the damages to the environment and to public health.

2. Much of the environmental damage is permanent, and cannot ever be reversed, and no "cleanup" of deeply contaminated soils and water (such as well water) can be effectuated now or in the future by the railroad.

3. If environmental contamination is found which can be reversed, but Norfolk Southern refuses to take the adequate and required cleanup actions, the settlement does not describe the legal sanctions which the DOJ would seek to attach to such a refusal.

4. Restoring the fish population does not make the aquifer safe, nor does it restore the wetlands.

5. Norfolk Southern should not be in charge of the medical monitoring application process.  Access to this process should automatically be granted to those who have been impacted by the disaster.  All subjects of medical monitoring must have the right to choose their own doctors.

6. Medical personnel enrolled in the Community Health Program should be chosen by those who were victims of the derailment, and whose health has suffered accordingly.

7. Railroad safety improvements should include an absolute duty incumbent on the railroad to record all chemicals being transported on their train.  No chemical aboard the train should be transported *unmanifested* or in any way hidden from the public and/or first responders. Substantial criminal penalties should be imposed for violation of this rule. There is no *de minimis* violation of this safety rule.  Any violation of this  requirement which did happen on the day of the derailment must be described for the benefit of the public, in great detail, by the DOJ, or

other competent government agency, in  review of  a gross violation which can most definitely result in the loss of human life.

8.  The role of the EPA in this disaster and its historical  lack of transparency and integrity in swearing to the safety of the community's air and water should have been fully examined before the EPA became a party joined with the Department of the Interior in bringing suit.

9.  The statement by the DOJ that the facts of the chemical vent and burn did not support a Clean Air Act violation  is ludicrous, and totally false. Scientific authority on this subject describes in detail the enormous damage to the atmosphere and  to land which was done by the East Palestine bomb.

10.  A $15 million penalty imposed on Norfolk Southern  for violating the Clean Water Act is radically insufficient to prevent another such disaster from taking place. It is no more than the relatively minor cost of doing business for a corporation which is now making enormous profits.

11.  Finally, the Union of Concerned Scientists published on May 28, 2024, a statement that the EPA falsified scientific records: "In the days following the train derailment and the spilling of toxic chemicals, in East  Palestine, Ohio, an Environmental Protection Agency (EPA) program manager requested that their staff falsify records related to the collection of data of airborne toxic chemicals near the site."  The Justice Department should be prosecuting the EPA and not whitewashing their failures in the performance of their duties. Some things are too dirty to be cleaned up by the Justice Department.



Comment A-26

| | |
|---|---|
| **From:** | Herbert, Ronda (ENRD) |
| **To:** | Grady, Lauren (ENRD) |
| **Cc:** | Spector, Jeffrey (ENRD); Stewart, Geoffrey (ENRD); Potts, Davis (ENRD) |
| **Subject:** | FW: [EXTERNAL] East Palestine Train Derailment proposed settlement |
| **Date:** | Monday, July 29, 2024 3:33:43 PM |

Hello Lauren,

This was sent to our public comment inbox, for DJ number 90-11-3-12792.

Thank You

Ronda Herbert

Case Management Unit
Docketing Clerk
Environmental and Natural Resource Division

**From:**

**Sent:** Monday, July 29, 2024 2:53 PM
**To:** ENRD, PUBCOMMENT-EES (ENRD) <PENRD3@ENRD.USDOJ.GOV>
**Subject:** [EXTERNAL] East Palestine Train Derailment proposed settlement

Assistant Attorney General, Environment and Natural Resources Division
*State of Ohio and United States of America* v. *Norfolk Southern Railway Company, et al.*, D.J. Ref. No. 90-11-3-12792.

As a resident and homeowner in East Palestine, Ohio I would like to add my voice to the proposed train derailment settlement. I do not think the personal settlement projected amount of $25,000 per person is enough to encompass a lifetime of resulting health issues that could occur due to this train derailing event. I do not see that a health fund has been established for these potential costs. The proposal was agreed to by Norfolk Southern before the NTSB had a chance to present findings. It seems like a rushed agreement in an amount that is agreeable to Norfolk Southern. The NTSB stated this event was 100% avoidable. The vent and burn decision was not warranted. However, that vent and burn decision was a speedy remediation and benefited Norfolk and Southern. Wednesday Feb. 7, 2023 (two days after the burn) I heard then saw a train rolling down the track past my back yard and I could not believe what I saw. My surprised question at that time was: how could N. S cleaned up that horrific wreck, that quickly, to get this train running. Well, N. S. moved the derailed cars off to the side, threw some dirt down and was back in business like nothing ever happened. It wasn't until the government got involved that N. S. was forced to stop and begin remediation. I do not believe the air was okay to breath. Most people would avoid breathing black stinky smoke. Most people would question the safety of our drinking water when they see hundreds of dead fish in the creek. Most people would not like to constantly clean their home of the black dust associated

with trains traveling on the tracks past their house.  I worry a lot about and question the future health of our population.  Is the proposed $25,000 per person really enough to cover that cost?


Sincerely,

Comment A-27

| | |
|---|---|
| **From:** | Herbert, Ronda (ENRD) |
| **To:** | Grady, Lauren (ENRD) |
| **Cc:** | Spector, Jeffrey (ENRD); Stewart, Geoffrey (ENRD); Potts, Davis (ENRD) |
| **Subject:** | FW: [EXTERNAL] Changes to the Proposed Settlement of its lawsuit against Norfolk Southern |
| **Date:** | Monday, July 29, 2024 3:35:25 PM |
| **Attachments:** | Dear Assistant Attorney General.doc |

Hello Lauren,

This was sent to our public comment inbox, for DJ number 90-11-3-12792.


Thank You

Ronda Herbert

Case Management Unit
Docketing Clerk
Environmental and Natural Resource Division


**From:**

**Sent:** Monday, July 29, 2024 2:57 PM
**To:** ENRD, PUBCOMMENT-EES (ENRD) <PENRD3@ENRD.USDOJ.GOV>
**Subject:** [EXTERNAL] Changes to the Proposed Settlement of its lawsuit against Norfolk Southern

To Whom It May Concern: We live 3.3 miles from the train derailment site (Live in East Palestine School District) We have shallow well water (45 feet) and our wells are directly downstream of the contaminated creek at the train derailment site. No one is more directly impacted than the Residents of Negley Ohio!!!!!

Dear Assistant Attorney General, US DOJ:

We own several properties plus 25 acres within five miles of the derailment site.
Imagine our surprise when learning that we are only being compensated for property
damage to one (1) property.  How is that fair, when our tenants are compensated the same
amount as us but they do not own the property?

Why do residents who live within 2 miles of the derailment receive a potential 25,000
dollars in medical/personal injury while residents within 4 miles of the train derailment
only receive a potential 5000 dollars in medical/personal injury?? Seriously??

We also have to live with the well water in the coming years and any soil damage….not
the tenants.

Thank you for your consideration of this matter.

Sincerely,



Comment A-28

| | |
|---|---|
| **From:** | Herbert, Ronda (ENRD) |
| **To:** | Grady, Lauren (ENRD) |
| **Cc:** | Spector, Jeffrey (ENRD); Stewart, Geoffrey (ENRD); Potts, Davis (ENRD) |
| **Subject:** | FW: [EXTERNAL] The amount of money they are offering is an insult for the size of this disaster. I work at EJ bognar on E taggart st Which is ground 0 they have all their toxic waste. Toxic dirt and toxic water tanks in our front yard 50 feet from our bus |
| **Date:** | Monday, July 29, 2024 4:13:48 PM |

Hello Lauren,

This was sent to our public comment inbox, for DJ number 90-11-3-12792.

Thank You

Ronda Herbert

Case Management Unit
Docketing Clerk
Environmental and Natural Resource Division

-----Original Message-----
From:
Sent: Monday, July 29, 2024 3:48 PM
To: ENRD, PUBCOMMENT-EES (ENRD) <PENRD3@ENRD.USDOJ.GOV>
Subject: [EXTERNAL] The amount of money they are offering is an insult for the size of this disaster. I work at EJ bognar on E taggart st Which is ground 0 they have all their toxic waste. Toxic dirt and toxic water tanks in our front yard 50 feet from our busi...

Sent from my iPhone

Comment A-29

| | |
|---|---|
| **From:** | |
| **To:** | ENRD, PUBCOMMENT-EES (ENRD) |
| **Subject:** | [EXTERNAL] Darlington Borough |
| **Date:** | Friday, July 26, 2024 5:06:02 PM |

I live in Darlington Borough which is surrounded by Darlington Township. Not one resident in the Borough received a Settlement

letter in the mail. We have approx. 220 people. Our town is 5 streets running East and West & 3 streets running North & South.

When we called the phone number provided we were told we did not get settlement letters because of two reasons; #! we do not

have mail delivery, we must pick up our mail at the Post Office in town, and only letters went to physical addresses. Well, everyone

in the Borough also has a physical address but not for our mail!. #2 Lady said we do not exist!! Said she has street addresses

in West Virginia & other Counties!! Our town has received NOTHING unlike Darlington Township. We do pay taxes, we do exist.

We have many elderly people and have received nothing about the settlement. I have written State Rep. Delusio and Senator Bob Casey

(Twice) about my questions and have heard nothing back from either one. Understand my concerns because I spoke to DEP people at

the Township building that some homes in the Borough have hand dug wells & that unlike the Township, most wells are less that 44' deep!!!!

I feel our wells need to be tested. I know of none tested in the Borough. Also the DEP men I spoke to told me they had no idea there was a

difference of the Borough and Township. I explained, but yet nothing has been done for us. The plume went directly over the Borough! Just

how do we not exist? Every map I have seen shows us on it!! We need help here too! Please do not let us be forgotten.

Comment A-30

**From:**
**To:** ENRD, PUBCOMMENT-EES (ENRD)
**Subject:** [EXTERNAL] East Palestine Derailment Settlement
**Date:** Friday, July 26, 2024 10:16:45 PM

1. My family and I feel that the 20 mile radius is ridiculous, All those people that are going to receive money have nothing to do with the derailment. It is the people who live here in East Palestine. And maybe a few miles out past us but NOT 20 miles out.
2. We had no choice but to sign the papers without knowing what the settlement amount was.
3. It also SHOULDN'T be PER household it SHOULD be PER person. Because we are the ones living here and dealing with this situation EVERY... SINGLE.. DAY...
4. By the time taxes and lawyer fees are taken out, compensation will do very little for property value and potential illnesses or health issues in the future.
Thank you,

Comment A-31

(Edited to remove personal info)

I'm sure everyone has their own unique story of how the derailment has affected their lives. I believe every story needs to be heard and understood by Norfolk Southern and others outside of our small community. We deserve that. We had futures planned and were working very, very hard to make them positive futures. That is now gone. It is/was very depressing and discouraging. I saw my path, I can no longer see it. There is no short-term fix, this is having a domino effect on our lives that cannot be seen or matter-of-factly stated or proven. We are still in the middle of this and suffering physically, emotionally, mentally, financially, and socially.

Bucket 1 (Direct Payment)
Location Address: XXXXXXXXXX, East Palestine, Ohio 44413.
Two family household:

      XXXXXXXXXXXXX Trust (entity/owner). XXXXXXXXXXX (person) lived there weekends to care for elderly parents.

      XXXXXXXXXXXX (residents).

At time of train derailment, XXXXXXXXXXXX also lived in Madison, Ohio. XXXXXXXXX has since had to sell her home and move full-time to East Palestine as father and mother's health conditions were exacerbated by train derailment.

Bucket 2 (Business) - Does not apply.

Bucket 3 (Personal Injury/Nuisances)
- Evacuated parents from East Palestine to Madison, Ohio (93 miles).
- Utilities in Madison went up as well as having to pay East Palestine utilities.
- Made several trips to EP to get mail, go to doctor appointments in Boardman, Salem, etc. over the next few weeks.
- Bought a lot of water and also brought water from Madison.
- I am still buying water at the condo (in East Palestine) where I am now living. The condo does not have a reverse osmosis system. The water tastes like musty chlorine, it is terrible.
- There was black soot all over home for several months.
- We had to stay inside most of the summer of 2023 due to the smell and other health issues (burning eyes, breathing difficulties, stomach issues, headaches, etc.).
- Home values dropped.

Health symptoms since derailment:
- **Burning eyes/blurry vision** - greatest concern (**please see below**)
- Sore/scratchy throat and cough (to the point of choking).
- Insomnia, brain fog, disorientation, lethargy/fatigue
- Headaches
- Stomach Cramps
- Skin irritation/sporadic rashes/excessive skin tags appearing out of nowhere.
- Metallic taste/smell/sinus issues

NS_PUBCOM_0000104

- Breathing difficulties (I recently, May 2024, visited my brother in Oklahoma and it was noticeably easier to breathe once away from East Palestine). Whatever WAS here, is STILL here!

My main health concern/symptom arising from the train derailment - **Burning Eyes/Blurry Vision**:

- Symptoms include: Itchy, burning, stinging eyes. Blurred/double-vision/sensitivity to light. Redness, pain, watery eyes.
- Went to the eye doctor several times since derailment, once issue occurred around April/May 2023, documents are attached. I went 5/22/23; 6/14/23; 10/23/23; 6/26/24. Professional diagnosis is that "something" is irritating the surface of my eyes causing the issues.
- Can't read road signs.
- Can't see computer screen (I work in the IT industry).
- Can't wear contacts anymore. I have worn contacts since I was 14 years old with no issues (40 years!).
- My "hobby" joy is reading and board games/card games. I can no longer do those things.
- I've been planning my retirement since 20 years old. I did not marry, I did not have children, I spent my life working and planning for retirement so I would not have to struggle like I saw my parents struggle.
- I was making great progress, house was being paid down (was 3.5% interest rate), and on track to have it paid off at 60 years of age.
- Due to parents' health rapidly declining since train derailment, I had to sell my "retirement home" and move back to East Palestine. Got a condo .5 mile from parents. Now I'm in another 30-year mortgage (at a ridiculous 7.99% interest) at 54 years old, I'll be in my 80s before getting it paid off. THAT was not my plan. I have worked my entire life to retire in my 60s. I have 10 to 15 years left to work. I am trying to figure out how to live the rest of my life not being able to see well and still earn a living for the next several years. I have been at my current job for 22 years. I work on computer all day - software design, database maintenance, data analysis. I can no longer see the screen, even the text in emails is unreadable. Magnifying the screen does not help. I have said nothing to my employer, but feel very guilty. It is not fair to them that I am not as productive as I used to be/could still be if not for the train derailment. I do not want to go on disability as it would only pay about half of what I make now and, again, I am in a high mortgage and I care for my parents. This is the domino effect I first mentioned in this document. This has disrupted my life and my future in a very significant and negative way.

Note to DOJ (if you even read this far): The above is the letter I submitted with my settlement claim. My personal opinion is that the settlement amount of $600 million is nowhere near enough for the destruction of our lives this has caused. My father is now near death and I know the train derailment has sped up his decline in health (as well as my mothers). There's nothing we can do about it. The 20-mile range is also ridiculous, the range should be 0-10 miles (or even just 5 miles) as those were the most affected, everyone else has moved on, we are still

struggling with health issues every…single…day. With the small amount being settled for, giving people 20 miles away $250 is taking much needed funds away from those still suffering.

NS_PUBCOM_0000106

Comment A-32

| | |
|---|---|
| **From:** | Herbert, Ronda (ENRD) |
| **To:** | Grady, Lauren (ENRD) |
| **Cc:** | Spector, Jeffrey (ENRD); Stewart, Geoffrey (ENRD); Potts, Davis (ENRD) |
| **Subject:** | FW: PROPOSED NORFOLK SOUTHERN SETTLEMENT |
| **Date:** | Tuesday, July 30, 2024 4:48:03 PM |
| **Attachments:** | image002.png |

Hello Lauren,

This was sent to our public comment inbox, for DJ number 90-11-3-12792.

Thank You

Ronda Herbert

Case Management Unit
Docketing Clerk
Environmental and Natural Resource Division

**From:**

**Sent:** Tuesday, July 30, 2024 4:46 PM
**To:** ENRD, PUBCOMMENT-EES (ENRD) <PENRD3@ENRD.USDOJ.GOV>
**Subject:** [EXTERNAL] PROPOSED NORFOLK SOUTHERN SETTLEMENT

Hello:

I have read that nearly 190,000 (+) households have responded to the class action lawsuit for the Norfolk Southern train disaster in East Palestine, Ohio.

-The proposed $600M that was accepted by the Federal judge was accepted prematurely, as it was before the NTSB had even completed their findings.
-There is no indication of how much the attorneys will take of this amount, (assuming a 30%+ sizeable amount!) and once the math is done, the pittance of a payout that people within 20 miles of wreckage is an insult and will be far from leaving the residents whole. The good people once again get the short end of the caboose.
-Class action attorneys and the derailment website speaks to larger sums of compensation (screenshot below), giving hope for adequate compensation, but these amounts will NEVER be realized based on $600M, attorney fees and with how many people have joined the suit. AGAIN, ALL done before NTSB findings and of course by design by Norfolk Southern to minimize their financial damages, which is the pattern with Norfolk Southern.
-These amounts (taken from the website of the derailment settlement website, is a pie in the sky lie. We will NEVER see these amounts because the settlement is way too small.
-I live and work six geodesic miles from the derailment site. I left my home in fear as the smoke billowed high and the weathermen talked about the winds shifting and pushing the smoke my way. There's no way to measure that fear; it felt and looked like Armageddon. And at the end of the day, based on what is currently happening, I will get no more than a couple hundred bucks of compensation, so the only people who are "winning" here are the

attorneys and the railroad company who negligently put profits before human lives. It's a catastrophe all over again and a nightmare the residents are forced to relive.

**4:21**

household size, acreage, length of displacement, and the nature of property damage, if any. Using these factors, the Settlement Administrator will base your payment on how severely your life was disrupted and any resulting increased risk of future disease.  Below are the **potential, average** lump sum payment amounts based on proximity to East Palestine, Ohio, for households that participate in the Settlement:

| Distance | Estimate per Household |
|---|---|
| 0-2 Miles | Approximately $70,000 |
| 2-4 Miles | Approximately $45,000 |
| 4-7 Miles | Approximately $30,000 |
| 7-10 Miles | Approximately $15,000 |
| 10-15 Miles | Approximately $500 |
| 15-20 Miles | Approximately $250 |

In order to receive a Direct Payment, you

🔒 **eastpalestinetrainsettlement.com**

Thank you for listening.

Sincerely,



NS_PUBCOM_0000109

Comment A-33

| | |
|---|---|
| **From:** | Herbert, Ronda (ENRD) |
| **To:** | Grady, Lauren (ENRD) |
| **Cc:** | Spector, Jeffrey (ENRD); Stewart, Geoffrey (ENRD); Rodriguez, Kaylee (ENRD) |
| **Subject:** | FW: [EXTERNAL] Proposed settlement against Norfolk Southern |
| **Date:** | Wednesday, July 31, 2024 4:21:49 PM |

Hello Lauren,

This was sent to our public comment inbox, for DJ number 90-11-3-12792.

Thank You

Ronda Herbert

Case Management Unit
Docketing Clerk
Environmental and Natural Resource Division

-----Original Message-----
From: ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
Sent: Wednesday, July 31, 2024 4:14 PM
To: ENRD, PUBCOMMENT-EES (ENRD) <PENRD3@ENRD.USDOJ.GOV>
Subject: [EXTERNAL] Proposed settlement against Norfolk Southern

I want to state for the record that I think that it is wrong for Norfolk Southern to ask victims to sign off their rights to compensation without providing them with a finite actual settlement value, they just provide an estimate which could go up or down,most likely down. Additionally the settlement numbers are based on a combination of geographic location and their opinion of wind direction. This is not information that the victim would have onhand,thus we as victims are tasked with making uninformed decisions without knowing the exact financial benefit.
Sincerely,

▮▮▮▮▮▮▮▮▮▮▮▮

Comment A-34



I, ███████████████████ whom resides at this time, and resided on the 3rd of February

2023 at ██████████████████████████ am writing to you to make it known that I am

objecting to the settlement between the United States of America v. Norfolk Southern.

My first objection is in regards to Norfolk Southern Railroad not being liable for the train

derailment, vent and burn, and following cleanup that occurred and is ongoing in East Palestine, Ohio

and the surrounding areas. The train derailment that occurred on the 3rd of February 2023 was found by

the National Transportation Safety Board (NTSB) to have been due to an overheated wheel bearing on

the 32N Norfolk Southern Railroad Company Train. The following vent and burn that was conducted

on the 6th of February 2023 by Norfolk Southern Railroad's contractor was found to have been

unnecessary, and Norfolk Southern Railroad had not passed along viable information to the incident

command. Therefore, they should be held liable for the damages of people's properties, their bodies,

both mentally and physically; and the environmental impacts that occurred and are ongoing as well.

In my own opinion and many others that I have talked to, whom are also residents in East

Palestine and surrounding communities in Pennsylvania, feel that just assigning fines and monetary

agreements are not going to make us whole. We are not just going to be able to forget and "move on"

from the damages they have caused our communities and environment, as they have said several times

our communities need to do. Not having Norfolk Southern admit liability sends a message to other

multi-billion dollar companies that if they want to just be able to do what they want, all they have to do

is have enough money to pay the communities and EPA and they can do whatever they want because they will not be held accountable for their actions. This settlement needs to make it known that they cannot do this to any community, anywhere. Norfolk Southern continues to say that they want to "Make it Right" for the communities involved in this disaster and being liable for their actions here through this disaster and afterwards in a written record is just a small start.

Secondly, Norfolk Southern has not cleaned up their mess, whether EPA or Ohio EPA had been overseeing them or not, as of the 20th of April 2024. This is shown in the testing we (community members and independent researchers) have conducted. We have shown that environmental screening levels are being exceeded and as of the 20th of November 2023 in an area in Sulphur Run that runs under people's homes not only exceeds environmental screening levels, but also nearly exceeds human health screening levels. This shows that the CERCLA Removal Action has not been completed thus far. Some residents also have videos that show the ongoing contamination in Sulphur Run, which runs from the derailment site through the town of East Palestine.

We (residents) have monitored the cleanup of the creeks from shortly after the derailment until the time of this letter and are disappointed in the amount of contamination that still remains. Personally, I have never seen a waterway in such poor condition as I have Sulphur Run. I have witnessed white streaks of sheen and rainbow sheen for over a year and a half, being told over and over again that it will get better, it will be cleaned up, give it time. On the first day of creek cleanup in April of 2024, the contractors on site, in Sulphur Run, had lost containment, bank to bank sheen was able to be recorded by another resident, showing that cleanup was not going as it should. It took two calls, that we are aware of from the EPA for the contractors to shut down the operation that day. As of July 2024, sheen still remains throughout Sulphur Run after we did observations after EPA said they were done with this part of the cleanup. This shows that the Clean Water Act Removal Action has also not been completed. My friends, my family, and myself are all tired of hearing this will happen and that will happen and here we are with this settlement with more promises that we are concerned will never be fulfilled.

NS_PUBCOM_0000139

A few of us continue to monitor Sulphur Run and Leslie Run and the work being done there, but at the same time as we come down to monitor, the work will stop. We have also, on numerous occasions told the EPA that they need to ensure that the banks are also cleaned, as the water rises with rain events, water being rerouted back into the creeks since the derailment, and aerators also blew contamination into the banks when they were operating. We have not seen this happen yet, aside from in one section in Sulphur Run that is very close to a small railroad trestle near the derailment site. We have tried to assist the EPA and Norfolk Southern in cleaning things up, giving our own opinions of what we felt as community members we would be comfortable with and others may be as well, as we communicate a lot with concerned community members, and also provide them with our own scientific data to ensure that our data is similar.

The EPA's Mark Durno, has been very open to hearing our concerns, and communicated with us often, even though we still are not fully happy with the results, but we are working on things, but Norfolk Southern Railroad has been very standoffish. As we talk to community members and are community members ourselves, I feel it would be useful to the community for the EPA and Norfolk Southern, to interact with us in some way to hear what we are comfortable with once their part of the cleanup is complete to their standards. This sort of action, I feel, would help people feel safer that have to live here once the EPA and Norfolk Southern have moved on.

My next objection is in regards to the medical monitoring for residents in East Palestine and surrounding areas. This agreement needs to cover a further area than just two miles. There are many residents in areas of Pennsylvania including, but not limited to, Enon Valley, New Galilee, Darlington, Darlington Township, Chippewa Township, and South Beaver Township who were sickened by the vent and burn and also have experienced mental health issues after the disaster here. These areas are mostly within ten miles of the derailment site. The mapping of the plume by the EPA and the class action preliminary settlement between the residents and businesses v. Norfolk Southern Railroad, both acknowledge a wider area being impacted by these incidents, and thus, the area should be expanded.

Further environmental testing and medical research needs to be done as well to ensure that these incidents did not or will not cause detrimental effects for humans, animals, or the environment for now and in the future. I also feel that instead of water monitoring being conducted for the next ten years, just to err on the side of caution, as we have heard so many times from the EPA, it should go a bit further, maybe fifteen would be more adequate. If people are going to be monitored for twenty years, then the environment should be monitored close to the same length of time to ensure that humans will not be impacted.

Pennsylvanians have also not had much help through all of this, even though we have tried to make our voices heard as well. For many of us in PA we have gone to the EPA, PA DEP, our representatives, township supervisors, and even Norfolk Southern to ask for environmental testing, medical concerns we have had and continue to have, even a bottle of clean water, but for most of us we have not had anyone help. I can testify to this myself, as I had gone to the EPA about four times, at least, asking for them to test my well or soil and they would not; however, they did have their contractor doing testing at my neighbor's farm that is another mile away from the derailment site than I am. I also asked the PA DEP to do soil testing on our property and they just kept telling me I was too far away, outside of the two miles that they were willing to go. My father asked for our property to be put on the list for the testing from either them or the Department of Agriculture that was being set up to get testing done once at the Darlington Clinic that was set up for residents after this incident. I asked for them to put us on the list twice, and once was with the accompaniment of PA Representative Jim Marshall, yet, the next time they had the clinic and after my dad put us on the list, both times they could not find our name on the list. Neither would do testing for us, even after phone calls to the PA DEP and a couple extensive phone conversations. My South Beaver Twp., PA supervisors were asked if they could help us get testing done and they sent us to the Darlington Clinic or told us that they had the same phone numbers we residents do and couldn't be of much help. I met twice with my state representative and asked for help for other residents in my community and myself to no avail either. Then, I turned to

Norfolk Southern Railroad, again we are too far away and they probably wouldn't agree to do testing for us. I asked if they'd at least give us water that we would know wasn't contaminated and they said they couldn't do that because it would give the wrong message.

We have also suffered much of the same health impacts as East Palestine residents, rashes, burning eyes, nose, and throats, coughing, bloody noses, difficulty breathing, and coughing, just to name a few of our symptoms. We have also faced some of the same mental health impacts that East Palestine residents do as well, but you have already covered this treatment in your preliminary agreement so I cannot disagree with that. As I have stated before, I feel that the area for medical monitoring should be a bit further. Expanding the radius would also mean that more funds would be needed to cover the additional residents here, but Norfolk Southern Railroad should have to pay for the damages that they have caused all of us. If the funds do run out that are provided, before the twenty years is up, then Norfolk Southern Railroad should also have to account for the higher amount, so far, we do not know the health impacts that we will actually be faced with or when they could start, and if the cases do arise where we do come up with cancers or illnesses additional money will be needed for treatments, and it should not be on the taxpayer or ourselves to pay for this, but the corporation that did this to us. This is only one step closer to what we should really have set in place for our futures, and what we have been asking for over the course of the last year and a half; a health care program, something like 1881A was for the people in Montana, or a fund like the government set up for Love Canal. As I just stated it should be up to Norfolk Southern Railroad to pay for this incident and what happened to us or will happen to us, but if they can't afford to then something else should be set up.

There should also be some other resources that those in East Palestine and surrounding communities in Pennsylvania should be able to look towards for dealing with medical issues from this disaster, aside from the East Liverpool hospital's clinic, which from the last I had heard, still did not have a toxicologist on staff. Our doctors, both in Ohio and Pennsylvania, have not really had much, if any experience with these types of exposure and problems we are facing before and are not adequate to

NS_PUBCOM_0000142

treat us. There have been many issues that have not been addressed by the clinic, nor by our primary care physicians. Also, people from Pennsylvania, again from the last I understood, could not go to the clinic in East Palestine that was set up for derailment related needs because we are not from Ohio.

The Resiliency Center is another issue for many of us. Many have been traumatized by Norfolk Southern Railroad due to this disaster and do not feel comfortable ever setting foot in the Resiliency Center, as it was told to us, and reported in the media that Norfolk Southern gave money to set it up and just having put their hands in doing this does not make us feel comfortable to go there. It is like having to go back to the one who abused you and caused your trauma to also get help. This is not fair either. We should be able to go to our own doctors, of our own choosing, for mental and medical treatment and to who we feel comfortable and safe with.

My final objection under the medical monitoring is in regards to the dates for symptoms to have occurred. The 3rd of February 2023 is obviously the start date, but from what I have experienced and others continue to experience the date for new symptoms to have risen should be extended from the 30 of October 2023. I have had a couple of new diagnosis myself since the beginning of this year (2024) including PTSD and gallbladder issues that my doctors have given me that I also feel are related to the train derailment, as I did not have these before. I also know many others who are now just starting to be diagnosed this year with exposure to toxins, PTSD, dermatological issues, their hair falling out, cancers, tremors, seizures, etc, and thus the date should be extended. Just with PTSD alone it is known that it may take a year, two years, five years, etc, to develop, and to limit it to just eight months post incident is not a fair judgment.

I would also like to propose an idea, which I have also proposed to the DOJ and EPA, and talked about with some representatives as well. Is there a way to develop a point system, starting with Norfolk Southern Railroad because here we are, for causing derailments or violations. To get my idea across, sort of like a system you have with driver's licenses, for example: if you get pulled over for drinking and driving you get points on your license, if you do it again, you get more points, the next

NS_PUBCOM_0000143

time you harm someone else and you lose your license; I have never done this so I am not sure of the exact rule. Obviously, it would have to be on a different scale due to how large the company is and how many miles they travel and supporting the economy as well, but the thought is there. Many have felt that Norfolk Southern Railroad should lose their operating license, or it should at least be suspended for operating unsafely, but obviously we need railroad companies to keep the economy going as well. So, just an idea to put on the books.

My final objection is to the amounts fines are. For late payments of any kind for this incident, there is no excuses from a company as big as Norfolk Southern Railroad. The fines that these big corporations pay are nothing to them and fines need to be increased here and in the future. This would also encourage Norfolk Southern Railroad and other corporations to be safer and also act more responsibly in and around the communities that they operate in. This needs to start being done somewhere and it should start here and set a precedence for everyone else.

This concludes my objections, I hope you read these, and I hope that you consider them. I thank you for your time and your effort in working on this settlement.



Comment A-35

| **From:** | Herbert, Ronda (ENRD) |
|---|---|
| **To:** | Grady, Lauren (ENRD) |
| **Cc:** | Spector, Jeffrey (ENRD); Stewart, Geoffrey (ENRD); Rodriguez, Kaylee (ENRD) |
| **Subject:** | FW: [EXTERNAL] ████████████ |
| **Date:** | Thursday, August 1, 2024 8:43:18 AM |

Hello Lauren,

This was sent to our public comment inbox, for DJ number 90-11-3-12792.

Thank You

Ronda Herbert

Case Management Unit
Docketing Clerk
Environmental and Natural Resource Division

-----Original Message-----
From: ████████████████████████
Sent: Wednesday, July 31, 2024 9:51 PM
To: ENRD, PUBCOMMENT-EES (ENRD) <PENRD3@ENRD.USDOJ.GOV>
Cc: ████████████████████████████████████████
Subject: [EXTERNAL] ████████████████████████████



July 31, 2024

The Honorable Assistant Attorney General of the United States
U.S. Department of Justice
ENRD, PO Box 7611
Washington, D.C. 20044-7611

Dear Assistant Attorney General,

I am writing to express my deep concern regarding the aftermath of the Norfolk Southern train derailment in East Palestine, Ohio. The incident has had a profound impact on my family and the residents of the area, and I believe that more support and resources are necessary to address their ongoing needs and ensure justice is served.

The derailment not only caused significant environmental damage but also disrupted the lives of many families in East Palestine. We the residents of East Palestine are dealing with the long-term consequences of exposure to hazardous materials, which include health risks and the potential for lasting environmental contamination. The psychological and economic toll on the community cannot be understated.

Given the severity of the situation, I urge the Department of Justice to take the following actions:

1. **Comprehensive Health Monitoring and Medical Support**: Advocate for ongoing health monitoring for residents exposed to hazardous materials and ensure they have access to necessary medical treatments.

2. **Environmental
Remediation**: Work with relevant agencies to guarantee that Norfolk Southern fulfills its obligation to remediate the environmental damage caused by the derailment. This includes thorough cleanup efforts and regular monitoring to prevent further contamination. Not just short term 20+ years.

3.** Community and Economic Support**: Collaborate with federal, state, and local governments to provide economic assistance to affected residents and businesses. This support should aim to revitalize the local economy and address the financial hardships faced by the community.

4.** Transparency and Accountability**: Ensure that Norfolk Southern is held accountable for its actions. The community deserves to know the causes of the incident ( which the DOJ made a tentative agreement before the NTSB final report was out) and the measures being taken to prevent future tragedies like this. This decree seems to have been negotiated behind closed doors without sufficient public input or scrutiny? Which raises concerns about transparency and accountability.

Questions and comments I would like to know and understand better. Please advise.

1. Were the key stake holders such as community organizations, local government officials, and residence involved in the negotiation process? If so, can you tell us who all was involved and when this took place?

2. Are these terms flexible for example, 20 to 40–60 years as we know these chemicals last for decades?

3. Now that the NTSB released their findings, does this change the opinion on violations of federal rail safety laws to include the Norfolk Southern violations of the federal rail safety laws that occurred? (Why was the settlement even considered when the NTSB had not done its final report?

4. Does the DOJ consider the relationship between Norfolk Southern and quest diagnostics a conflict of interest considering the two major shareholders of both of these companies are Vanguard and Blackrock? Were you aware that quest refused to test for vinyl chloride in the residence's? How do we know that the medical monitoring program and results will be done with a code of ethics and integrity?

5. Do you think this is a conflict of interest that the EPA allowed NFS to manage and hire their own contractors for environmental testing and cleanup? Especially after the NTSB report came out on how they try to manipulate and change documentations and reports? This question also stems from the independent scientist, toxicologist and researchers demonstrating much different results.

6. Medical monitoring –" Norfolk Southern will provide details on the application process later this year". We should know all the facts and information regarding this program before any type of settlement is reached.

7. Medical monitoring – how was this amount determined? Is this truly enough as these chemicals last for decades? Please indicate research on how you came up with this information.

8. Medical monitoring- On the resource sheet, it says up to 20 years and then at one point it says 15 years. It also talks about depending on the funds available in the program?? what happens if the funds runs out in $1 – 5$ years? Is that acceptable? It should be more detailed what Norfolk Southern is offering to the residence regarding this. All it shows is medical monitoring/ exams/ tests and mental health services. What about any treatment that someone may need due to this toxic chemical exposure? Not sure our regular insurance will pay for something that was result of Norfolk Southern negligence which was verified by the NTSB.

9. How did you come up with the amount of 25 million into a community health fund? Can you show documentation and research indicating that this is an appropriate amount? Who will be managing the account? Will this fund collect compound interest? Will it be easy to use or access when needed? Will this money be taxed? What happens if there is money left over at the end of the years negotiated? Will it continue to grow and be utilized by the younger generation that was also affected? How will a committee of community members be picked? Will they be qualified to actually Help the residents? Will they be paid out of the fund or will it be a volunteer position?

We the residents of East Palestine have endured significant hardship due to this tragic event. It is imperative that the Department of Justice takes decisive action to support us and ensure we receive the justice and assistance we deserve.

Thank you for your attention to this matter. I trust that you will consider these suggestions/questions and take the necessary steps to aid the residents of East Palestine during this challenging time.

Anxiously awaiting your response.

Sincerely,



Sent from my iPhone

Comment A-36

**From:**
**To:** ENRD, PUBCOMMENT-EES (ENRD)
**Subject:** [EXTERNAL] Ohio and USA v. Norfolk Southern, et. al, D.J. Ref. No. 90–11–3–12792
**Date:** Thursday, August 1, 2024 1:15:19 PM

Dear Assistant Attorney General of the Environment and Natural Resources Division,

I am writing to comment on The State of Ohio and The United States of America v. Norfolk Southern Railway Company, et al., D.J. Ref. No. 90–11–3–12792. This consent decree is missing important measures that are necessary to fully address the needs of affected community members after this catastrophic event.

Though it's clear that the US EPA and DOJ are attempting to hold Norfolk Southern Railways accountable, the consent decree should include additional measures to fully address the needs of the community members of this disaster:

– Increase groundwater, surface water, and well water testing from 10 years to 25 years, to be more in line with Superfund site cleanups. The EPA responded to this disaster with their Superfund SMART response team, assigned the derailment site a Superfund number, and yet the derailment site is not being treated as a Superfund site.

– Expand the radius of affected residents (defined as Qualified Individuals in the consent decree) for Medical Monitoring and Mental Health from two miles to twenty miles, as the vent and burn debris traveled far beyond a two mile radius. Reports have now come out that the debris from the derailment site have traveled across sixteen states, which encompasses over 100 million US citizens. Additionally, reporting of direct and secondary mental trauma are far beyond the two mile radius. Expanding the radius to twenty miles would reach most of the affected residents, and would eliminate the inevitable backlog of case-by-case submissions for Qualified Individuals.

– Order Norfolk Southern to pay healthcare claims by affected residents that began immediately after the vent and burn order.

Thank you for your time and consideration making these amendments to the decree. Norfolk Southern Railway must be held fully accountable for their reckless, negligent actions that have upended the lives of countless community members!

Sincerely,

Comment A-37

**From:**
**To:** ENRD. PUBCOMMENT-EES (ENRD)
**Subject:** [EXTERNAL] Ohio and USA v. Norfolk Southern, et. al, D.J. Ref. No. 90–11–3–12792
**Date:** Thursday, August 1, 2024 1:44:16 PM

Dear Assistant Attorney General of the Environment and Natural Resources Division,

I am- as a person who lives in a community crossed by several train tracks- writing to comment on The State of Ohio and The United States of America v. Norfolk Southern Railway Company, et al., D.J. Ref. No. 90–11–3–12792. This consent decree as I understand it is missing important measures that are necessary to fully address the needs of the disastrously affected community members after this catastrophic event.

I appreciate that the US EPA and DOJ are attempting to hold Norfolk Southern Railways accountable, but the consent decree should include additional measures to fully address the needs of the community members of this disaster:

– Increase groundwater, surface water, and well water testing from 10 years to 25 years, to be more in line with Superfund site cleanups. The EPA responded to this disaster with their Superfund SMART response team, assigned the derailment site a Superfund number, and yet the derailment site is not being treated as a Superfund site.

– Expand the radius of affected residents (defined as Qualified Individuals in the consent decree) for Medical Monitoring and Mental Health from two miles to twenty miles, as the vent and burn debris traveled far beyond a two mile radius. Reports have now come out that the debris from the derailment site have traveled across sixteen states, which encompasses over 100 million US citizens. Additionally, reporting of direct and secondary mental trauma are far beyond the two mile radius. Expanding the radius to twenty miles would reach most of the affected residents, and would eliminate the inevitable backlog of case-by-case submissions for Qualified Individuals.

– Order Norfolk Southern to pay healthcare claims by affected residents that began immediately after the vent and burn order.

Thank you for your time and consideration making these amendments to the decree. Norfolk Southern Railway must be held fully accountable for their reckless, negligent actions that have upended the lives of countless community members!

Sincerely,

Comment A-38

**From:**
**To:** ENRD, PUBCOMMENT-EES (ENRD)
**Subject:** [EXTERNAL] Ohio and USA v. Norfolk Southern, et. al, D.J. Ref. No. 90-11-3-12792
**Date:** Thursday, August 1, 2024 1:17:18 PM

Dear Assistant Attorney General of the Environment and Natural Resources Division,

I am writing to comment on The State of Ohio and The United States of America v. Norfolk Southern Railway Company, et al., D.J. Ref. No. 90-11-3-12792. This consent decree is missing important measures that are necessary to fully address the needs of affected community members after this catastrophic event.

Though it's clear that the US EPA and DOJ are attempting to hold Norfolk Southern Railways accountable, the consent decree should include additional measures to fully address the needs of the community members of this disaster:

— Increase groundwater, surface water, and well water testing from 10 years to 25 years, to be more in line with Superfund site cleanups. The EPA responded to this disaster with their Superfund SMART response team, assigned the derailment site a Superfund number, and yet the derailment site is not being treated as a Superfund site.

— Expand the radius of affected residents (defined as Qualified Individuals in the consent decree) for Medical Monitoring and Mental Health from two miles to twenty miles, as the vent and burn debris traveled far beyond a two mile radius. Reports have now come out that the debris from the derailment site have traveled across sixteen states, which encompasses over 100 million US citizens. Additionally, reporting of direct and secondary mental trauma are far beyond the two mile radius. Expanding the radius to twenty miles would reach most of the affected residents, and would eliminate the inevitable backlog of case-by-case submissions for Qualified Individuals.

— Order Norfolk Southern to pay healthcare claims by affected residents that began immediately after the vent and burn order.

Thank you for your time and consideration making these amendments to the decree. Norfolk Southern Railway must be held fully accountable for their reckless, negligent actions that have upended the lives of countless community members!

Sincerely,

Comment A-39

**From:**
**To:** ENRD, PUBCOMMENT-EES (ENRD)
**Subject:** [EXTERNAL] Ohio and USA v. Norfolk Southern, et. al, D.J. Ref. No. 90–11–3–12792
**Date:** Thursday, August 1, 2024 3:40:18 PM

Dear Assistant Attorney General of the Environment and Natural Resources Division,

I am writing to comment on The State of Ohio and The United States of America v. Norfolk Southern Railway Company, et al., D.J. Ref. No. 90–11–3–12792. This consent decree is missing important measures that are necessary to fully address the needs of affected community members after this catastrophic event.

Though it's clear that the US EPA and DOJ are attempting to hold Norfolk Southern Railways accountable, the consent decree should include additional measures to fully address the needs of the community members of this disaster:

– Increase groundwater, surface water, and well water testing from 10 years to 25 years, to be more in line with Superfund site cleanups. The EPA responded to this disaster with their Superfund SMART response team, assigned the derailment site a Superfund number, and yet the derailment site is not being treated as a Superfund site.

– Expand the radius of affected residents (defined as Qualified Individuals in the consent decree) for Medical Monitoring and Mental Health from two miles to twenty miles, as the vent and burn debris traveled far beyond a two mile radius. Reports have now come out that the debris from the derailment site have traveled across sixteen states, which encompasses over 100 million US citizens. Additionally, reporting of direct and secondary mental trauma are far beyond the two mile radius. Expanding the radius to twenty miles would reach most of the affected residents, and would eliminate the inevitable backlog of case-by-case submissions for Qualified Individuals.

– Order Norfolk Southern to pay healthcare claims by affected residents that began immediately after the vent and burn order.

Thank you for your time and consideration making these amendments to the decree. Norfolk Southern Railway must be held fully accountable for their reckless, negligent actions that have upended the lives of countless community members!

Sincerely,

Comment A-40

| | |
|---|---|
| **From:** | |
| **To:** | ENRD, PUBCOMMENT-EES (ENRD) |
| **Subject:** | [EXTERNAL] Ohio and USA v. Norfolk Southern, et. al, D.J. Ref. No. 90–11–3–12792 |
| **Date:** | Thursday, August 1, 2024 1:27:17 PM |

Dear Assistant Attorney General of the Environment and Natural Resources Division,

I am writing to comment on The State of Ohio and The United States of America v. Norfolk Southern Railway Company, et al., D.J. Ref. No. 90–11–3–12792. This consent decree is missing important measures that are necessary to fully address the needs of affected community members after this catastrophic event.

Though it's clear that the US EPA and DOJ are attempting to hold Norfolk Southern Railways accountable, the consent decree should include additional measures to fully address the needs of the community members of this disaster:

– Increase groundwater, surface water, and well water testing from 10 years to 25 years, to be more in line with Superfund site cleanups. The EPA responded to this disaster with their Superfund SMART response team, assigned the derailment site a Superfund number, and yet the derailment site is not being treated as a Superfund site.

– Expand the radius of affected residents (defined as Qualified Individuals in the consent decree) for Medical Monitoring and Mental Health from two miles to twenty miles, as the vent and burn debris traveled far beyond a two mile radius. Reports have now come out that the debris from the derailment site have traveled across sixteen states, which encompasses over 100 million US citizens. Additionally, reporting of direct and secondary mental trauma are far beyond the two mile radius. Expanding the radius to twenty miles would reach most of the affected residents, and would eliminate the inevitable backlog of case-by-case submissions for Qualified Individuals.

– Order Norfolk Southern to pay healthcare claims by affected residents that began immediately after the vent and burn order.

Thank you for your time and consideration making these amendments to the decree. Norfolk Southern Railway must be held fully accountable for their reckless, negligent actions that have upended the lives of countless community members!

Sincerely,

Comment A-41

**From:**
**To:** ENRD, PUBCOMMENT-EES (ENRD)
**Subject:** [EXTERNAL] Ohio and USA v. Norfolk Southern, et. al, D.J. Ref. No. 90–11–3–12792
**Date:** Thursday, August 1, 2024 1:13:17 PM

Dear Assistant Attorney General of the Environment and Natural Resources Division,

I am writing to comment on The State of Ohio and The United States of America v. Norfolk Southern Railway Company, et al., D.J. Ref. No. 90–11–3–12792. This consent decree is missing important measures that are necessary to fully address the needs of affected community members after this catastrophic event.

Though it's clear that the US EPA and DOJ are attempting to hold Norfolk Southern Railways accountable, the consent decree should include additional measures to fully address the needs of the community members of this disaster:

– Increase groundwater, surface water, and well water testing from 10 years to 25 years, to be more in line with Superfund site cleanups. The EPA responded to this disaster with their Superfund SMART response team, assigned the derailment site a Superfund number, and yet the derailment site is not being treated as a Superfund site.

– Expand the radius of affected residents (defined as Qualified Individuals in the consent decree) for Medical Monitoring and Mental Health from two miles to twenty miles, as the vent and burn debris traveled far beyond a two mile radius. Reports have now come out that the debris from the derailment site have traveled across sixteen states, which encompasses over 100 million US citizens. Additionally, reporting of direct and secondary mental trauma are far beyond the two mile radius. Expanding the radius to twenty miles would reach most of the affected residents, and would eliminate the inevitable backlog of case-by-case submissions for Qualified Individuals.

– Order Norfolk Southern to pay healthcare claims by affected residents that began immediately after the vent and burn order.

Thank you for your time and consideration making these amendments to the decree. Norfolk Southern Railway must be held fully accountable for their reckless, negligent actions that have upended the lives of countless community members!

Sincerely,

Comment A-42

**From:**
**To:** ENRD, PUBCOMMENT-EES (ENRD)
**Subject:** [EXTERNAL] Ohio and USA v. Norfolk Southern, et. al, D.J. Ref. No. 90–11–3–12792
**Date:** Thursday, August 1, 2024 3:44:17 PM

Dear Assistant Attorney General of the Environment and Natural Resources Division,

I am writing to comment on The State of Ohio and The United States of America v. Norfolk Southern Railway Company, et al., D.J. Ref. No. 90–11–3–12792. This consent decree is missing important measures that are necessary to fully address the needs of affected community members after this catastrophic event.

Though it's clear that the US EPA and DOJ are attempting to hold Norfolk Southern Railways accountable, the consent decree should include additional measures to fully address the needs of the community members of this disaster:

– Increase groundwater, surface water, and well water testing from 10 years to 25 years, to be more in line with Superfund site cleanups. The EPA responded to this disaster with their Superfund SMART response team, assigned the derailment site a Superfund number, and yet the derailment site is not being treated as a Superfund site.

– Expand the radius of affected residents (defined as Qualified Individuals in the consent decree) for Medical Monitoring and Mental Health from two miles to twenty miles, as the vent and burn debris traveled far beyond a two mile radius. Reports have now come out that the debris from the derailment site have traveled across sixteen states, which encompasses over 100 million US citizens. Additionally, reporting of direct and secondary mental trauma are far beyond the two mile radius. Expanding the radius to twenty miles would reach most of the affected residents, and would eliminate the inevitable backlog of case-by-case submissions for Qualified Individuals.

– Order Norfolk Southern to pay healthcare claims by affected residents that began immediately after the vent and burn order.

Thank you for your time and consideration making these amendments to the decree. Norfolk Southern Railway must be held fully accountable for their reckless, negligent actions that have upended the lives of countless community members!

Sincerely,

Comment A-43

| From: | Herbert, Ronda (ENRD) |
|---|---|
| To: | Grady, Lauren (ENRD) |
| Cc: | Spector, Jeffrey (ENRD); Stewart, Geoffrey (ENRD); Rodriguez, Kaylee (ENRD) |
| Subject: | FW: [EXTERNAL] Ohio and USA v. Norfolk Southern, et. al, D.J. Ref. No. 90–11–3–12792 |
| Date: | Thursday, August 1, 2024 4:47:52 PM |

Hello Lauren,

This was sent to our public comment inbox, for DJ number 90-11-3-12792.

Thank You

Ronda Herbert

Case Management Unit
Docketing Clerk
Environmental and Natural Resource Division

**From:**

**Sent:** Thursday, August 1, 2024 4:44 PM
**To:** ENRD, PUBCOMMENT-EES (ENRD) <PENRD3@ENRD.USDOJ.GOV>
**Subject:** [EXTERNAL] Ohio and USA v. Norfolk Southern, et. al, D.J. Ref. No. 90–11–3–12792

Dear Assistant Attorney General of the Environment and Natural Resources Division,

I am writing to comment on The State of Ohio and The United States of America v. Norfolk Southern Railway Company, et al., D.J. Ref. No. 90–11–3–12792. This consent decree is missing important measures that are necessary to fully address the needs of affected community members after this catastrophic event.

Though it's clear that the US EPA and DOJ are attempting to hold Norfolk Southern Railways accountable, the consent decree should include additional measures to fully address the needs of the community members of this disaster:

– Increase groundwater, surface water, and well water testing from 10 years to 25 years, to be more in line with Superfund site cleanups. The EPA responded to this disaster with their Superfund SMART response team, assigned the derailment site a Superfund number, and yet the derailment site is not being treated as a Superfund site.

– Expand the radius of affected residents (defined as Qualified Individuals in the consent decree) for Medical Monitoring and Mental Health from two miles to twenty miles, as the vent and burn debris traveled far beyond a two mile radius. Reports have

now come out that the debris from the derailment site have traveled across sixteen states, which encompasses over 100 million US citizens. Additionally, reporting of direct and secondary mental trauma are far beyond the two mile radius. Expanding the radius to twenty miles would reach most of the affected residents, and would eliminate the inevitable backlog of case-by-case submissions for Qualified Individuals.

– Order Norfolk Southern to pay healthcare claims by affected residents that began immediately after the vent and burn order.

For too long our communities have endured unsafe conditions due to corporate greed. We demand better!

Thank you for your time and consideration making these amendments to the decree. Norfolk Southern Railway must be held fully accountable for their reckless, negligent actions that have upended the lives of countless community members!

Sincerely,

Comment A-44

| | |
|---|---|
| **From:** | |
| **To:** | ENRD, PUBCOMMENT-EES (ENRD) |
| **Subject:** | [EXTERNAL] Ohio and USA v. Norfolk Southern, et. al, D.J. Ref. No. 90−11−3−12792 |
| **Date:** | Thursday, August 1, 2024 1:36:34 PM |

Dear Assistant Attorney General of the Environment and Natural Resources Division,

I am writing to comment on The State of Ohio and The United States of America v. Norfolk Southern Railway Company, et al., D.J. Ref. No. 90−11−3−12792. This consent decree is missing important measures that are necessary to fully address the needs of affected community members after this catastrophic event.

Though it's clear that the US EPA and DOJ are attempting to hold Norfolk Southern Railways accountable, the consent decree should include additional measures to fully address the needs of the community members of this disaster:

− Increase groundwater, surface water, and well water testing from 10 years to 25 years, to be more in line with Superfund site cleanups. The EPA responded to this disaster with their Superfund SMART response team, assigned the derailment site a Superfund number, and yet the derailment site is not being treated as a Superfund site.

− Expand the radius of affected residents (defined as Qualified Individuals in the consent decree) for Medical Monitoring and Mental Health from two miles to twenty miles, as the vent and burn debris traveled far beyond a two mile radius. Reports have now come out that the debris from the derailment site have traveled across sixteen states, which encompasses over 100 million US citizens. Additionally, reporting of direct and secondary mental trauma are far beyond the two mile radius. Expanding the radius to twenty miles would reach most of the affected residents, and would eliminate the inevitable backlog of case-by-case submissions for Qualified Individuals.

− Order Norfolk Southern to pay healthcare claims by affected residents that began immediately after the vent and burn order.

Thank you for your time and consideration making these amendments to the decree. Norfolk Southern Railway must be held fully accountable for their reckless, negligent actions that have upended the lives of countless community members!

Sincerely,

Comment A-45

**From:**
**To:** ENRD, PUBCOMMENT-EES (ENRD)
**Subject:** [EXTERNAL] Ohio and USA v. Norfolk Southern, et. al, D.J. Ref. No. 90–11–3–12792
**Date:** Thursday, August 1, 2024 4:01:47 PM

Dear Assistant Attorney General of the Environment and Natural Resources Division,

I am writing to comment on The State of Ohio and The United States of America v. Norfolk Southern Railway Company, et al., D.J. Ref. No. 90–11–3–12792. This consent decree is missing important measures that are necessary to fully address the needs of affected community members after this catastrophic event.

Though it's clear that the US EPA and DOJ are attempting to hold Norfolk Southern Railways accountable, the consent decree should include additional measures to fully address the needs of the community members of this disaster:

– Increase groundwater, surface water, and well water testing from 10 years to 25 years, to be more in line with Superfund site cleanups. The EPA responded to this disaster with their Superfund SMART response team, assigned the derailment site a Superfund number, and yet the derailment site is not being treated as a Superfund site.

– Expand the radius of affected residents (defined as Qualified Individuals in the consent decree) for Medical Monitoring and Mental Health from two miles to twenty miles, as the vent and burn debris traveled far beyond a two mile radius. Reports have now come out that the debris from the derailment site have traveled across sixteen states, which encompasses over 100 million US citizens. Additionally, reporting of direct and secondary mental trauma are far beyond the two mile radius. Expanding the radius to twenty miles would reach most of the affected residents, and would eliminate the inevitable backlog of case-by-case submissions for Qualified Individuals.

– Order Norfolk Southern to pay healthcare claims by affected residents that began immediately after the vent and burn order.

Thank you for your time and consideration making these amendments to the decree. Norfolk Southern Railway must be held fully accountable for their reckless, negligent actions that have upended the lives of countless community members!

Sincerely,

Comment A-46

**From:**
**To:** ENRD, PUBCOMMENT-EES (ENRD)
**Subject:** [EXTERNAL] Ohio and USA v. Norfolk Southern, et. al, D.J. Ref. No. 90–11–3–12792
**Date:** Thursday, August 1, 2024 2:50:15 PM

Dear Assistant Attorney General of the Environment and Natural Resources Division,

I am writing to comment on The State of Ohio and The United States of America v. Norfolk Southern Railway Company, et al., D.J. Ref. No. 90–11–3–12792. This consent decree is missing important measures that are necessary to fully address the needs of affected community members after this catastrophic event.

Though it's clear that the US EPA and DOJ are attempting to hold Norfolk Southern Railways accountable, the consent decree should include additional measures to fully address the needs of the community members of this disaster:

– Increase groundwater, surface water, and well water testing from 10 years to 25 years, to be more in line with Superfund site cleanups. The EPA responded to this disaster with their Superfund SMART response team, assigned the derailment site a Superfund number, and yet the derailment site is not being treated as a Superfund site.

– Expand the radius of affected residents (defined as Qualified Individuals in the consent decree) for Medical Monitoring and Mental Health from two miles to twenty miles, as the vent and burn debris traveled far beyond a two mile radius. Reports have now come out that the debris from the derailment site have traveled across sixteen states, which encompasses over 100 million US citizens. Additionally, reporting of direct and secondary mental trauma are far beyond the two mile radius. Expanding the radius to twenty miles would reach most of the affected residents, and would eliminate the inevitable backlog of case-by-case submissions for Qualified Individuals.

– Order Norfolk Southern to pay healthcare claims by affected residents that began immediately after the vent and burn order.

Among the most heartbreaking consequencesof this tragic event was the loss of wildlife in the area. One must assume the deaths they suffered were extraordinarily confusing and painful. No corporation has a right to abuse living creatures so blatantly, or even to put them at risk for such suffering, just to make a bigger profit.

Thank you for your time and consideration making these amendments to the decree. Norfolk Southern Railway must be held fully accountable for their reckless, negligent actions that have upended the lives of countless community members!

Sincerely,

Comment A-47

**From:**
**To:** ENRD, PUBCOMMENT-EES (ENRD)
**Subject:** [EXTERNAL] Ohio and USA v. Norfolk Southern, et. al, D.J. Ref. No. 90–11–3–12792
**Date:** Thursday, August 1, 2024 1:40:15 PM

Dear Assistant Attorney General of the Environment and Natural Resources Division,

I am writing to comment on The State of Ohio and The United States of America v. Norfolk Southern Railway Company, et al., D.J. Ref. No. 90–11–3–12792. This consent decree is missing important measures that are necessary to fully address the needs of affected community members after this catastrophic event.

Though it's clear that the US EPA and DOJ are attempting to hold Norfolk Southern Railways accountable, the consent decree should include additional measures to fully address the needs of the community members of this disaster:

– Increase groundwater, surface water, and well water testing from 10 years to 25 years, to be more in line with Superfund site cleanups. The EPA responded to this disaster with their Superfund SMART response team, assigned the derailment site a Superfund number, and yet the derailment site is not being treated as a Superfund site.

– Expand the radius of affected residents (defined as Qualified Individuals in the consent decree) for Medical Monitoring and Mental Health from two miles to twenty miles, as the vent and burn debris traveled far beyond a two mile radius. Reports have now come out that the debris from the derailment site have traveled across sixteen states, which encompasses over 100 million US citizens. Additionally, reporting of direct and secondary mental trauma are far beyond the two mile radius. Expanding the radius to twenty miles would reach most of the affected residents, and would eliminate the inevitable backlog of case-by-case submissions for Qualified Individuals.

– Order Norfolk Southern to pay healthcare claims by affected residents that began immediately after the vent and burn order.

Thank you for your time and consideration making these amendments to the decree. Norfolk Southern Railway must be held fully accountable for their reckless, negligent actions that have upended the lives of countless community members!

Sincerely,

Comment A-48

**From:**
**To:** ENRD, PUBCOMMENT-EES (ENRD)
**Subject:** [EXTERNAL] Ohio and USA v. Norfolk Southern, et. al, D.J. Ref. No. 90–11–3–12792
**Date:** Thursday, August 1, 2024 1:36:15 PM

Dear Assistant Attorney General of the Environment and Natural Resources Division,

I am writing to comment on The State of Ohio and The United States of America v. Norfolk Southern Railway Company, et al., D.J. Ref. No. 90–11–3–12792. This consent decree is missing important measures that are necessary to fully address the needs of affected community members after this catastrophic event.

Though it's clear that the US EPA and DOJ are attempting to hold Norfolk Southern Railways accountable, the consent decree should include additional measures to fully address the needs of the community members of this disaster:

– Increase groundwater, surface water, and well water testing from 10 years to 25 years, to be more in line with Superfund site cleanups. The EPA responded to this disaster with their Superfund SMART response team, assigned the derailment site a Superfund number, and yet the derailment site is not being treated as a Superfund site.

– Expand the radius of affected residents (defined as Qualified Individuals in the consent decree) for Medical Monitoring and Mental Health from two miles to twenty miles, as the vent and burn debris traveled far beyond a two mile radius. Reports have now come out that the debris from the derailment site have traveled across sixteen states, which encompasses over 100 million US citizens. Additionally, reporting of direct and secondary mental trauma are far beyond the two mile radius. Expanding the radius to twenty miles would reach most of the affected residents, and would eliminate the inevitable backlog of case-by-case submissions for Qualified Individuals.

– Order Norfolk Southern to pay healthcare claims by affected residents that began immediately after the vent and burn order.

Thank you for your time and consideration making these amendments to the decree. Norfolk Southern Railway must be held fully accountable for their reckless, negligent actions that have upended the lives of countless community members!

Sincerely,

Comment A-49

**From:**
**To:** ENRD, PUBCOMMENT-EES (ENRD)
**Subject:** [EXTERNAL] Ohio and USA v. Norfolk Southern, et. al, D.J. Ref. No. 90–11–3–12792
**Date:** Thursday, August 1, 2024 1:24:14 PM

Dear Assistant Attorney General of the Environment and Natural Resources Division,

I am writing to comment on The State of Ohio and The United States of America v. Norfolk Southern Railway Company, et al., D.J. Ref. No. 90–11–3–12792. This consent decree is missing important measures that are necessary to fully address the needs of affected community members after this catastrophic event.

Though it's clear that the US EPA and DOJ are attempting to hold Norfolk Southern Railways accountable, the consent decree should include additional measures to fully address the needs of the community members of this disaster:

– Increase groundwater, surface water, and well water testing from 10 years to 25 years, to be more in line with Superfund site cleanups. The EPA responded to this disaster with their Superfund SMART response team, assigned the derailment site a Superfund number, and yet the derailment site is not being treated as a Superfund site.

– Expand the radius of affected residents (defined as Qualified Individuals in the consent decree) for Medical Monitoring and Mental Health from two miles to twenty miles, as the vent and burn debris traveled far beyond a two mile radius. Reports have now come out that the debris from the derailment site have traveled across sixteen states, which encompasses over 100 million US citizens. Additionally, reporting of direct and secondary mental trauma are far beyond the two mile radius. Expanding the radius to twenty miles would reach most of the affected residents, and would eliminate the inevitable backlog of case-by-case submissions for Qualified Individuals.

– Order Norfolk Southern to pay healthcare claims by affected residents that began immediately after the vent and burn order.

Thank you for your time and consideration making these amendments to the decree. Norfolk Southern Railway must be held fully accountable for their reckless, negligent actions that have upended the lives of countless community members!

Sincerely,

Comment A-50

**From:**
**To:** ENRD, PUBCOMMENT-EES (ENRD)
**Subject:** [EXTERNAL] Ohio and USA v. Norfolk Southern, et. al, D.J. Ref. No. 90–11–3–12792
**Date:** Thursday, August 1, 2024 1:30:18 PM

Dear Assistant Attorney General of the Environment and Natural Resources Division,

I am writing to comment on The State of Ohio and The United States of America v. Norfolk Southern Railway Company, et al., D.J. Ref. No. 90–11–3–12792. This consent decree is missing important measures that are necessary to fully address the needs of affected community members after this catastrophic event.

Though it's clear that the US EPA and DOJ are attempting to hold Norfolk Southern Railways accountable, the consent decree should include additional measures to fully address the needs of the community members of this disaster:

– Increase groundwater, surface water, and well water testing from 10 years to 25 years, to be more in line with Superfund site cleanups. The EPA responded to this disaster with their Superfund SMART response team, assigned the derailment site a Superfund number, and yet the derailment site is not being treated as a Superfund site.

– Expand the radius of affected residents (defined as Qualified Individuals in the consent decree) for Medical Monitoring and Mental Health from two miles to twenty miles, as the vent and burn debris traveled far beyond a two mile radius. Reports have now come out that the debris from the derailment site have traveled across sixteen states, which encompasses over 100 million US citizens. Additionally, reporting of direct and secondary mental trauma are far beyond the two mile radius. Expanding the radius to twenty miles would reach most of the affected residents, and would eliminate the inevitable backlog of case-by-case submissions for Qualified Individuals.

– Order Norfolk Southern to pay healthcare claims by affected residents that began immediately after the vent and burn order.

Thank you for your time and consideration making these amendments to the decree. Norfolk Southern Railway must be held fully accountable for their reckless, negligent actions that have upended the lives of countless community members!

Sincerely,

Comment A-51

**From:**
**To:** ENRD, PUBCOMMENT-EES (ENRD)
**Subject:** [EXTERNAL] Ohio and USA v. Norfolk Southern, et. al, D.J. Ref. No. 90–11–3–12792
**Date:** Thursday, August 1, 2024 2:33:16 PM

Dear Assistant Attorney General of the Environment and Natural Resources Division,

I am writing to comment on The State of Ohio and The United States of America v. Norfolk Southern Railway Company, et al., D.J. Ref. No. 90–11–3–12792. This consent decree is missing important measures that are necessary to fully address the needs of affected community members after this catastrophic event.

Though it's clear that the US EPA and DOJ are attempting to hold Norfolk Southern Railways accountable, the consent decree should include additional measures to fully address the needs of the community members of this disaster:

– Increase groundwater, surface water, and well water testing from 10 years to 25 years, to be more in line with Superfund site cleanups. The EPA responded to this disaster with their Superfund SMART response team, assigned the derailment site a Superfund number, and yet the derailment site is not being treated as a Superfund site.

– Expand the radius of affected residents (defined as Qualified Individuals in the consent decree) for Medical Monitoring and Mental Health from two miles to twenty miles, as the vent and burn debris traveled far beyond a two mile radius. Reports have now come out that the debris from the derailment site have traveled across sixteen states, which encompasses over 100 million US citizens. Additionally, reporting of direct and secondary mental trauma are far beyond the two mile radius. Expanding the radius to twenty miles would reach most of the affected residents, and would eliminate the inevitable backlog of case-by-case submissions for Qualified Individuals.

– Order Norfolk Southern to pay healthcare claims by affected residents that began immediately after the vent and burn order.

Thank you for your time and consideration making these amendments to the decree. Norfolk Southern Railway must be held fully accountable for their reckless, negligent actions that have upended the lives of countless community members!

Sincerely,

Comment A-52

**From:**
**To:** ENRD, PUBCOMMENT-EES (ENRD)
**Subject:** [EXTERNAL] Ohio and USA v. Norfolk Southern, et. al, D.J. Ref. No. 90–11–3–12792
**Date:** Thursday, August 1, 2024 1:24:16 PM

Dear Assistant Attorney General of the Environment and Natural Resources Division,

I am writing to comment on The State of Ohio and The United States of America v. Norfolk Southern Railway Company, et al., D.J. Ref. No. 90–11–3–12792. This consent decree is missing important measures that are necessary to fully address the needs of affected community members after this catastrophic event.

Though it's clear that the US EPA and DOJ are attempting to hold Norfolk Southern Railways accountable, the consent decree should include additional measures to fully address the needs of the community members of this disaster:

– Increase groundwater, surface water, and well water testing from 10 years to 25 years, to be more in line with Superfund site cleanups. The EPA responded to this disaster with their Superfund SMART response team, assigned the derailment site a Superfund number, and yet the derailment site is not being treated as a Superfund site.

– Expand the radius of affected residents (defined as Qualified Individuals in the consent decree) for Medical Monitoring and Mental Health from two miles to twenty miles, as the vent and burn debris traveled far beyond a two mile radius. Reports have now come out that the debris from the derailment site have traveled across sixteen states, which encompasses over 100 million US citizens. Additionally, reporting of direct and secondary mental trauma are far beyond the two mile radius. Expanding the radius to twenty miles would reach most of the affected residents, and would eliminate the inevitable backlog of case-by-case submissions for Qualified Individuals.

– Order Norfolk Southern to pay healthcare claims by affected residents that began immediately after the vent and burn order.

Thank you for your time and consideration making these amendments to the decree. Norfolk Southern Railway must be held fully accountable for their reckless, negligent actions that have upended the lives of countless community members!

Sincerely,

Comment A-53

**From:**
**To:** ENRD, PUBCOMMENT-EES (ENRD)
**Subject:** [EXTERNAL] Ohio and USA v. Norfolk Southern, et. al, D.J. Ref. No. 90–11–3–12792
**Date:** Thursday, August 1, 2024 2:53:14 PM

Dear Assistant Attorney General of the Environment and Natural Resources Division,

I am writing to comment on The State of Ohio and The United States of America v. Norfolk Southern Railway Company, et al., D.J. Ref. No. 90–11–3–12792. This consent decree is missing important measures that are necessary to fully address the needs of affected community members after this catastrophic event.

Though it's clear that the US EPA and DOJ are attempting to hold Norfolk Southern Railways accountable, the consent decree should include additional measures to fully address the needs of the community members of this disaster:

– Increase groundwater, surface water, and well water testing from 10 years to 25 years, to be more in line with Superfund site cleanups. The EPA responded to this disaster with their Superfund SMART response team, assigned the derailment site a Superfund number, and yet the derailment site is not being treated as a Superfund site.

– Expand the radius of affected residents (defined as Qualified Individuals in the consent decree) for Medical Monitoring and Mental Health from two miles to twenty miles, as the vent and burn debris traveled far beyond a two mile radius. Reports have now come out that the debris from the derailment site have traveled across sixteen states, which encompasses over 100 million US citizens. Additionally, reporting of direct and secondary mental trauma are far beyond the two mile radius. Expanding the radius to twenty miles would reach most of the affected residents, and would eliminate the inevitable backlog of case-by-case submissions for Qualified Individuals.

– Order Norfolk Southern to pay healthcare claims by affected residents that began immediately after the vent and burn order.

-- As a private corporation Norfolk Southern should bear the financial responsibility of the ensuing claims which will continue to accrue across the affected area. Barring that, the financial burden will rest upon the effected innocent individuals and families, and their dependence upon the state and federal governments to make good on their legitimate grievances.

Thank you for your time and consideration making these amendments to the decree. Norfolk Southern Railway must be held fully accountable for their reckless, negligent actions that have upended the lives of countless community members!

Sincerely,

Comment A-54

| | |
|---|---|
| **From:** | |
| **To:** | ENRD, PUBCOMMENT-EES (ENRD) |
| **Subject:** | [EXTERNAL] Ohio and USA v. Norfolk Southern, et. al, D.J. Ref. No. 90–11–3–12792 |
| **Date:** | Thursday, August 1, 2024 1:20:17 PM |

Dear Assistant Attorney General of the Environment and Natural Resources Division,

I am writing to comment on The State of Ohio and The United States of America v. Norfolk Southern Railway Company, et al., D.J. Ref. No. 90–11–3–12792. This consent decree is missing important measures that are necessary to fully address the needs of affected community members after this catastrophic event.

Though it's clear that the US EPA and DOJ are attempting to hold Norfolk Southern Railways accountable, the consent decree should include additional measures to fully address the needs of the community members of this disaster:

– Increase groundwater, surface water, and well water testing from 10 years to 25 years, to be more in line with Superfund site cleanups. The EPA responded to this disaster with their Superfund SMART response team, assigned the derailment site a Superfund number, and yet the derailment site is not being treated as a Superfund site.

– Expand the radius of affected residents (defined as Qualified Individuals in the consent decree) for Medical Monitoring and Mental Health from two miles to twenty miles, as the vent and burn debris traveled far beyond a two mile radius. Reports have now come out that the debris from the derailment site have traveled across sixteen states, which encompasses over 100 million US citizens. Additionally, reporting of direct and secondary mental trauma are far beyond the two mile radius. Expanding the radius to twenty miles would reach most of the affected residents, and would eliminate the inevitable backlog of case-by-case submissions for Qualified Individuals.

– Order Norfolk Southern to pay healthcare claims by affected residents that began immediately after the vent and burn order.

Thank you for your time and consideration making these amendments to the decree. Norfolk Southern Railway must be held fully accountable for their reckless, negligent actions that have upended the lives of countless community members!

Sincerely,

Comment A-55

**From:**
**To:** ENRD, PUBCOMMENT-EES (ENRD)
**Subject:** [EXTERNAL] Ohio and USA v. Norfolk Southern, et. al, D.J. Ref. No. 90–11–3–12792
**Date:** Thursday, August 1, 2024 1:20:18 PM

Dear Assistant Attorney General of the Environment and Natural Resources Division,

I am writing to comment on The State of Ohio and The United States of America v. Norfolk Southern Railway Company, et al., D.J. Ref. No. 90–11–3–12792. This consent decree is missing important measures that are necessary to fully address the needs of affected community members after this catastrophic event.

Though it's clear that the US EPA and DOJ are attempting to hold Norfolk Southern Railways accountable, the consent decree should include additional measures to fully address the needs of the community members of this disaster:

– Increase groundwater, surface water, and well water testing from 10 years to 25 years, to be more in line with Superfund site cleanups. The EPA responded to this disaster with their Superfund SMART response team, assigned the derailment site a Superfund number, and yet the derailment site is not being treated as a Superfund site.

– Expand the radius of affected residents (defined as Qualified Individuals in the consent decree) for Medical Monitoring and Mental Health from two miles to twenty miles, as the vent and burn debris traveled far beyond a two mile radius. Reports have now come out that the debris from the derailment site have traveled across sixteen states, which encompasses over 100 million US citizens. Additionally, reporting of direct and secondary mental trauma are far beyond the two mile radius. Expanding the radius to twenty miles would reach most of the affected residents, and would eliminate the inevitable backlog of case-by-case submissions for Qualified Individuals.

– Order Norfolk Southern to pay healthcare claims by affected residents that began immediately after the vent and burn order.

Thank you for your time and consideration making these amendments to the decree. Norfolk Southern Railway must be held fully accountable for their reckless, negligent actions that have upended the lives of countless community members!

Sincerely,

Comment A-56

| | |
|---|---|
| **From:** | |
| **To:** | ENRD, PUBCOMMENT-EES (ENRD) |
| **Subject:** | [EXTERNAL] Ohio and USA v. Norfolk Southern, et. al, D.J. Ref. No. 90–11–3–12792 |
| **Date:** | Thursday, August 1, 2024 3:59:18 PM |

Dear Assistant Attorney General of the Environment and Natural Resources Division,

I am writing to comment on The State of Ohio and The United States of America v. Norfolk Southern Railway Company, et al., D.J. Ref. No. 90–11–3–12792. This consent decree is missing important measures that are necessary to fully address the needs of affected community members after this catastrophic event.

Though it's clear that the US EPA and DOJ are attempting to hold Norfolk Southern Railways accountable, the consent decree should include additional measures to fully address the needs of the community members of this disaster:

– Increase groundwater, surface water, and well water testing from 10 years to 25 years, to be more in line with Superfund site cleanups. The EPA responded to this disaster with their Superfund SMART response team, assigned the derailment site a Superfund number, and yet the derailment site is not being treated as a Superfund site.

– Expand the radius of affected residents (defined as Qualified Individuals in the consent decree) for Medical Monitoring and Mental Health from two miles to twenty miles, as the vent and burn debris traveled far beyond a two mile radius. Reports have now come out that the debris from the derailment site have traveled across sixteen states, which encompasses over 100 million US citizens. Additionally, reporting of direct and secondary mental trauma are far beyond the two mile radius. Expanding the radius to twenty miles would reach most of the affected residents, and would eliminate the inevitable backlog of case-by-case submissions for Qualified Individuals.

– Order Norfolk Southern to pay healthcare claims by affected residents that began immediately after the vent and burn order.

Thank you for your time and consideration making these amendments to the decree. Norfolk Southern Railway must be held fully accountable for their reckless, negligent actions that have upended the lives of countless community members!

Sincerely,

Comment A-57

| From: | Herbert, Ronda (ENRD) |
|---|---|
| To: | Grady, Lauren (ENRD) |
| Cc: | Spector, Jeffrey (ENRD); Stewart, Geoffrey (ENRD); Rodriguez, Kaylee (ENRD) |
| Subject: | FW: [EXTERNAL] Ohio and USA v. Norfolk Southern, et. al, D.J. Ref. No. 90–11–3–12792 |
| Date: | Thursday, August 1, 2024 2:26:40 PM |

Hello Lauren,

This was sent to our public comment inbox, for DJ number 90-11-3-12792.

Thank You

Ronda Herbert

Case Management Unit
Docketing Clerk
Environmental and Natural Resource Division

**From:**

**Sent:** Thursday, August 1, 2024 2:05 PM
**To:** ENRD, PUBCOMMENT-EES (ENRD) <PENRD3@ENRD.USDOJ.GOV>
**Subject:** [EXTERNAL] Ohio and USA v. Norfolk Southern, et. al, D.J. Ref. No. 90–11–3–12792

Dear Assistant Attorney General of the Environment and Natural Resources Division,

I am writing to comment on The State of Ohio and The United States of America v. Norfolk Southern Railway Company, et al., D.J. Ref. No. 90–11–3–12792. This consent decree is missing important measures that are necessary to fully address the needs of affected community members after this catastrophic event.

Though it's clear that the US EPA and DOJ are attempting to hold Norfolk Southern Railways accountable, the consent decree should include additional measures to fully address the needs of the community members of this disaster:

– Increase groundwater, surface water, and well water testing from 10 years to 25 years, to be more in line with Superfund site cleanups. The EPA responded to this disaster with their Superfund SMART response team, assigned the derailment site a Superfund number, and yet the derailment site is not being treated as a Superfund site.

– Expand the radius of affected residents (defined as Qualified Individuals in the consent decree) for Medical Monitoring and Mental Health from two miles to twenty miles, as the vent and burn debris traveled far beyond a two mile radius. Reports have

now come out that the debris from the derailment site have traveled across sixteen states, which encompasses over 100 million US citizens. Additionally, reporting of direct and secondary mental trauma are far beyond the two mile radius. Expanding the radius to twenty miles would reach most of the affected residents, and would eliminate the inevitable backlog of case-by-case submissions for Qualified Individuals.

– Order Norfolk Southern to pay healthcare claims by affected residents that began immediately after the vent and burn order.

Thank you for your time and consideration making these amendments to the decree. Norfolk Southern Railway must be held fully accountable for their reckless, negligent actions that have upended the lives of countless community members!

Sincerely,

Comment A-58

**From:**
**To:** ENRD, PUBCOMMENT-EES (ENRD)
**Subject:** [EXTERNAL] Ohio and USA v. Norfolk Southern, et. al, D.J. Ref. No. 90–11–3–12792
**Date:** Thursday, August 1, 2024 1:18:17 PM

Dear Assistant Attorney General of the Environment and Natural Resources Division,

I am writing to comment on The State of Ohio and The United States of America v. Norfolk Southern Railway Company, et al., D.J. Ref. No. 90–11–3–12792. This consent decree is missing important measures that are necessary to fully address the needs of affected community members after this catastrophic event.

Though it's clear that the US EPA and DOJ are attempting to hold Norfolk Southern Railways accountable, the consent decree should include additional measures to fully address the needs of the community members of this disaster:

– Increase groundwater, surface water, and well water testing from 10 years to 25 years, to be more in line with Superfund site cleanups. The EPA responded to this disaster with their Superfund SMART response team, assigned the derailment site a Superfund number, and yet the derailment site is not being treated as a Superfund site.

– Expand the radius of affected residents (defined as Qualified Individuals in the consent decree) for Medical Monitoring and Mental Health from two miles to twenty miles, as the vent and burn debris traveled far beyond a two mile radius. Reports have now come out that the debris from the derailment site have traveled across sixteen states, which encompasses over 100 million US citizens. Additionally, reporting of direct and secondary mental trauma are far beyond the two mile radius. Expanding the radius to twenty miles would reach most of the affected residents, and would eliminate the inevitable backlog of case-by-case submissions for Qualified Individuals.

– Order Norfolk Southern to pay healthcare claims by affected residents that began immediately after the vent and burn order.

Thank you for your time and consideration making these amendments to the decree. Norfolk Southern Railway must be held fully accountable for their reckless, negligent actions that have upended the lives of countless community members!

Sincerely,

Comment A-59

**From:**
**To:** ENRD, PUBCOMMENT-EES (ENRD)
**Subject:** [EXTERNAL] Ohio and USA v. Norfolk Southern, et. al, D.J. Ref. No. 90–11–3–12792
**Date:** Thursday, August 1, 2024 3:13:16 PM

Dear Assistant Attorney General of the Environment and Natural Resources Division,

I am writing to comment on The State of Ohio and The United States of America v. Norfolk Southern Railway Company, et al., D.J. Ref. No. 90–11–3–12792. This consent decree is missing important measures that are necessary to fully address the needs of affected community members after this catastrophic event.

Though it's clear that the US EPA and DOJ are attempting to hold Norfolk Southern Railways accountable, the consent decree should include additional measures to fully address the needs of the community members of this disaster:

– Increase groundwater, surface water, and well water testing from 10 years to 25 years, to be more in line with Superfund site cleanups. The EPA responded to this disaster with their Superfund SMART response team, assigned the derailment site a Superfund number, and yet the derailment site is not being treated as a Superfund site.

– Expand the radius of affected residents (defined as Qualified Individuals in the consent decree) for Medical Monitoring and Mental Health from two miles to twenty miles, as the vent and burn debris traveled far beyond a two mile radius. Reports have now come out that the debris from the derailment site have traveled across sixteen states, which encompasses over 100 million US citizens. Additionally, reporting of direct and secondary mental trauma are far beyond the two mile radius. Expanding the radius to twenty miles would reach most of the affected residents, and would eliminate the inevitable backlog of case-by-case submissions for Qualified Individuals.

– Order Norfolk Southern to pay healthcare claims by affected residents that began immediately after the vent and burn order.

Thank you for your time and consideration making these amendments to the decree. Norfolk Southern Railway must be held fully accountable for their reckless, negligent actions that have upended the lives of countless community members!

Sincerely,

Comment A-60

| From: | Herbert, Ronda (ENRD) |
|---|---|
| To: | Grady, Lauren (ENRD) |
| Cc: | Spector, Jeffrey (ENRD); Stewart, Geoffrey (ENRD); Rodriguez, Kaylee (ENRD) |
| Subject: | FW: [EXTERNAL] Ohio and USA v. Norfolk Southern, et. al, D.J. Ref. No. 90–11–3–12792 |
| Date: | Thursday, August 1, 2024 12:58:33 PM |

Hello Lauren,

This was sent to our public comment inbox, for DJ number 90-11-3-12792.

Thank You

Ronda Herbert

Case Management Unit
Docketing Clerk
Environmental and Natural Resource Division

**From:**

**Sent:** Thursday, August 1, 2024 12:56 PM
**To:** ENRD, PUBCOMMENT-EES (ENRD) <PENRD3@ENRD.USDOJ.GOV>
**Subject:** [EXTERNAL] Ohio and USA v. Norfolk Southern, et. al, D.J. Ref. No. 90–11–3–12792

Dear Assistant Attorney General of the Environment and Natural Resources Division,

I am writing to comment on The State of Ohio and The United States of America v. Norfolk Southern Railway Company, et al., D.J. Ref. No. 90–11–3–12792. This consent decree is missing important measures that are necessary to fully address the needs of affected community members after this catastrophic event.

Though it's clear that the US EPA and DOJ are attempting to hold Norfolk Southern Railways accountable, the consent decree should include additional measures to fully address the needs of the community members of this disaster:

– Increase groundwater, surface water, and well water testing from 10 years to 25 years, to be more in line with Superfund site cleanups. The EPA responded to this disaster with their Superfund SMART response team, assigned the derailment site a Superfund number, and yet the derailment site is not being treated as a Superfund site.

– Expand the radius of affected residents (defined as Qualified Individuals in the consent decree) for Medical Monitoring and Mental Health from two miles to twenty miles, as the vent and burn debris traveled far beyond a two mile radius. Reports have

now come out that the debris from the derailment site have traveled across sixteen states, which encompasses over 100 million US citizens. Additionally, reporting of direct and secondary mental trauma are far beyond the two mile radius. Expanding the radius to twenty miles would reach most of the affected residents, and would eliminate the inevitable backlog of case-by-case submissions for Qualified Individuals.

– Order Norfolk Southern to pay healthcare claims by affected residents that began immediately after the vent and burn order.

Thank you for your time and consideration making these amendments to the decree. Norfolk Southern Railway must be held fully accountable for their reckless, negligent actions that have upended the lives of countless community members!

Sincerely,

Comment A-61

**From:**
**To:** ENRD, PUBCOMMENT-EES (ENRD)
**Subject:** [EXTERNAL] Ohio and USA v. Norfolk Southern, et. al, D.J. Ref. No. 90−11−3−12792
**Date:** Thursday, August 1, 2024 3:08:15 PM

Dear Assistant Attorney General of the Environment and Natural Resources Division,

I am writing to comment on The State of Ohio and The United States of America v. Norfolk Southern Railway Company, et al., D.J. Ref. No. 90−11−3−12792. This consent decree is missing important measures that are necessary to fully address the needs of affected community members after this catastrophic event.

Though it's clear that the US EPA and DOJ are attempting to hold Norfolk Southern Railways accountable, the consent decree should include additional measures to fully address the needs of the community members of this disaster:

− Increase groundwater, surface water, and well water testing from 10 years to 25 years, to be more in line with Superfund site cleanups. The EPA responded to this disaster with their Superfund SMART response team, assigned the derailment site a Superfund number, and yet the derailment site is not being treated as a Superfund site.

− Expand the radius of affected residents (defined as Qualified Individuals in the consent decree) for Medical Monitoring and Mental Health from two miles to twenty miles, as the vent and burn debris traveled far beyond a two mile radius. Reports have now come out that the debris from the derailment site have traveled across sixteen states, which encompasses over 100 million US citizens. Additionally, reporting of direct and secondary mental trauma are far beyond the two mile radius. Expanding the radius to twenty miles would reach most of the affected residents, and would eliminate the inevitable backlog of case-by-case submissions for Qualified Individuals.

− Order Norfolk Southern to pay healthcare claims by affected residents that began immediately after the vent and burn order.

Thank you for your time and consideration making these amendments to the decree. Norfolk Southern Railway must be held fully accountable for their reckless, negligent actions that have upended the lives of countless community members!

Sincerely,

Comment A-62

**From:**
**To:** ENRD, PUBCOMMENT-EES (ENRD)
**Subject:** [EXTERNAL] Ohio and USA v. Norfolk Southern, et. al, D.J. Ref. No. 90–11–3–12792
**Date:** Thursday, August 1, 2024 1:13:15 PM

Dear Assistant Attorney General of the Environment and Natural Resources Division,

I am writing to comment on The State of Ohio and The United States of America v. Norfolk Southern Railway Company, et al., D.J. Ref. No. 90–11–3–12792. This consent decree is missing important measures that are necessary to fully address the needs of affected community members after this catastrophic event.

Though it's clear that the US EPA and DOJ are attempting to hold Norfolk Southern Railways accountable, the consent decree should include additional measures to fully address the needs of the community members of this disaster:

– Increase groundwater, surface water, and well water testing from 10 years to 25 years, to be more in line with Superfund site cleanups. The EPA responded to this disaster with their Superfund SMART response team, assigned the derailment site a Superfund number, and yet the derailment site is not being treated as a Superfund site.

– Expand the radius of affected residents (defined as Qualified Individuals in the consent decree) for Medical Monitoring and Mental Health from two miles to twenty miles, as the vent and burn debris traveled far beyond a two mile radius. Reports have now come out that the debris from the derailment site have traveled across sixteen states, which encompasses over 100 million US citizens. Additionally, reporting of direct and secondary mental trauma are far beyond the two mile radius. Expanding the radius to twenty miles would reach most of the affected residents, and would eliminate the inevitable backlog of case-by-case submissions for Qualified Individuals.

– Order Norfolk Southern to pay healthcare claims by affected residents that began immediately after the vent and burn order.

Thank you for your time and consideration making these amendments to the decree. Norfolk Southern Railway must be held fully accountable for their reckless, negligent actions that have upended the lives of countless community members!

Sincerely,

Comment A-63

| From: | Herbert, Ronda (ENRD) |
|---|---|
| To: | Grady, Lauren (ENRD) |
| Cc: | Spector, Jeffrey (ENRD); Stewart, Geoffrey (ENRD); Rodriguez, Kaylee (ENRD) |
| Subject: | FW: [EXTERNAL] Ohio and USA v. Norfolk Southern, et. al, D.J. Ref. No. 90–11–3–12792 |
| Date: | Thursday, August 1, 2024 4:53:52 PM |

Hello Lauren,

This was sent to our public comment inbox, for DJ number 90-11-3-12792.

Thank You

Ronda Herbert

Case Management Unit
Docketing Clerk
Environmental and Natural Resource Division

**From:**

**Sent:** Thursday, August 1, 2024 4:52 PM
**To:** ENRD, PUBCOMMENT-EES (ENRD) <PENRD3@ENRD.USDOJ.GOV>
**Subject:** [EXTERNAL] Ohio and USA v. Norfolk Southern, et. al, D.J. Ref. No. 90–11–3–12792

Dear Assistant Attorney General of the Environment and Natural Resources Division,

I am writing to comment on The State of Ohio and The United States of America v. Norfolk Southern Railway Company, et al., D.J. Ref. No. 90–11–3–12792. This consent decree is missing important measures that are necessary to fully address the needs of affected community members after this catastrophic event.

Though it's clear that the US EPA and DOJ are attempting to hold Norfolk Southern Railways accountable, the consent decree should include additional measures to fully address the needs of the community members of this disaster:

– Increase groundwater, surface water, and well water testing from 10 years to 25 years, to be more in line with Superfund site cleanups. The EPA responded to this disaster with their Superfund SMART response team, assigned the derailment site a Superfund number, and yet the derailment site is not being treated as a Superfund site.

– Expand the radius of affected residents (defined as Qualified Individuals in the consent decree) for Medical Monitoring and Mental Health from two miles to twenty miles, as the vent and burn debris traveled far beyond a two mile radius. Reports have

now come out that the debris from the derailment site have traveled across sixteen states, which encompasses over 100 million US citizens. Additionally, reporting of direct and secondary mental trauma are far beyond the two mile radius. Expanding the radius to twenty miles would reach most of the affected residents, and would eliminate the inevitable backlog of case-by-case submissions for Qualified Individuals.

– Order Norfolk Southern to pay healthcare claims by affected residents that began immediately after the vent and burn order.

Thank you for your time and consideration making these amendments to the decree. Norfolk Southern Railway must be held fully accountable for their reckless, negligent actions that have upended the lives of countless community members!

Sincerely,

Comment A-64

**From:**
**To:** ENRD, PUBCOMMENT-EES (ENRD)
**Subject:** [EXTERNAL] NFS derailment concerns
**Date:** Thursday, August 1, 2024 2:42:42 PM

We are writing concerning the Norfolk Southern train derailment that occurred near the Ohio-Pennsylvania border in East Palestine, Ohio on February 3, 2023. Despite the absence of fatalities, we are deeply troubled by the incident and its direct and long-term impact on our property. The derailment has significantly affected our small home-based business, resulting in minimal sales following the global dissemination of the event via social media. Furthermore, residue from the chemical burn has spread throughout our home, with discernible black marks on the ceiling, basement items, and clothing. These unexpected consequences have also led to potential issues regarding our property's structural integrity, evidenced by the black markings visible on our ceiling after the controlled burn.

The aftermath has jeopardized the warranty of our 2019 roof replacement, potentially voiding five years from its expected lifespan due to chemical erosion. Moreover, the perceived decline in property value resulting from our East Palestine, Ohio address has prompted a decrease in sales, particularly in our clothing business. We have undergone losses in taxes and sales revenue, and the documented damages within our property, coupled with the uncertain impact on our health raise concerns about the safety of our drinking water and air quality.

We have repeatedly requested well testing and air quality assessments, only to be informed that our residence falls outside the immediate testing zone. Despite being 2.06 miles from the incident, the visible effects within our home indicate a need for comprehensive evaluation. The psychological toll, property devaluation, and ongoing property damage have significantly impacted our overall well-being. We adamantly argue for fair compensation reflective of the distinct losses endured, which extend beyond the average compensation per mile. The extensive damage demonstrated in the provided photographs, located beyond the designated radius, underscores the necessity for a resolution that acknowledges these significant and multifaceted impacts.

We firmly assert that homeowners and business owners should not be lumped together with renters in East Palestine, as the losses sustained have substantially altered the value of our property and livelihood. The relevant decrease in property value, business disruption, and overall uncertainty have been both financially and emotionally burdensome. We require an equitable resolution to restore not only our property and business, but also our peace of mind and overall well-being.

In light of these circumstances, we respectfully urge for comprehensive and fair compensation that acknowledges the varied and substantial losses incurred.

**From:**
**To:** ENRD, PUBCOMMENT-EES (ENRD)
**Subject:** [EXTERNAL] NFS Derailment
**Date:** Thursday, August 1, 2024 2:40:54 PM

I am writing in response to the derailment of a Norfolk Southern train carrying hazardous materials near the Ohio-Pennsylvania border in East Palestine, Ohio, on February 3, 2023. While we are thankful that no lives were lost in the incident, we are deeply concerned about its impact on our property and business. We operate a small home-based business and have experienced significant losses after the derailment, with sales declining and inventory stagnating. We attribute this decline in business to concerns about potential contamination following the incident. Our dream of a growing business that someday might allow us the extra income to enjoy life more comfortably has been dissipated. All we have left is debt.

We believe that small businesses like ours should be offered some form of compensation for the adverse effects we have endured. The financial hardships we have faced were unexpected and unappreciated. Subsequent to the derailment, our business suffered noticeable financial setbacks, with a marked decline in sales and stagnant inventory and unforeseen debt. Moreover, the incident has adversely affected both our property value and business profitability.

Notably, we have observed troubling indications of damage within our residence, including markings on our ceiling and discernible residue following a controlled burn. We are apprehensive about the possible health risks posed by the incursion of smoke or residue into our living environment. Our merchandise has also sustained damage, evident by notable markings and discoloration on various products. . Additionally, the devaluation of our property, amplified by the negative stigma associated with the location, and the subsequent business revenue decline, have resulted in substantial financial strain.

Beyond financial implications, we are deeply concerned about the safety and well-being of our property, business, and personal welfare. The association of our products with East Palestine, Ohio in the aftermath of the derailment has impeded sales, substantially impacting our livelihood.

We contend that our compensation should adequately address a range of substantial losses that extend beyond the typical compensation per mile. Our business has been significantly compromised. It is our belief that the compensation should wholly encompass the extent of our losses..

We should not be financially accountable for the restorative expenses prompted by the derailment. The psychological stress and persistent concerns regarding the debt encompassed now by stagnate inventory. It is imperative that we receive equitable compensation to redress the diverse facets of loss we have incurred.

We respectfully appeal for a comprehensive assessment of our losses and a fair compensation reflective of the extent of our damages. We seek a solution that recognizes the profound impact on our property, and business losses. Even though it is a newer business this was for our future and it will now eventually be dissipated, leaving behind nothing but financial debt

NS_PUBCOM_0000186

Comment A-65

**From:**
**To:** ENRD, PUBCOMMENT-EES (ENRD)
**Subject:** [EXTERNAL] Ohio and USA v. Norfolk Southern, et. al, D.J. Ref. No. 90–11–3–12792
**Date:** Thursday, August 1, 2024 1:21:19 PM

Dear Assistant Attorney General of the Environment and Natural Resources Division,

I am writing to comment on The State of Ohio and The United States of America v. Norfolk Southern Railway Company, et al., D.J. Ref. No. 90–11–3–12792. This consent decree is missing important measures that are necessary to fully address the needs of affected community members after this catastrophic event.

Though it's clear that the US EPA and DOJ are attempting to hold Norfolk Southern Railways accountable, the consent decree should include additional measures to fully address the needs of the community members of this disaster:

– Increase groundwater, surface water, and well water testing from 10 years to 25 years, to be more in line with Superfund site cleanups. The EPA responded to this disaster with their Superfund SMART response team, assigned the derailment site a Superfund number, and yet the derailment site is not being treated as a Superfund site.

– Expand the radius of affected residents (defined as Qualified Individuals in the consent decree) for Medical Monitoring and Mental Health from two miles to twenty miles, as the vent and burn debris traveled far beyond a two mile radius. Reports have now come out that the debris from the derailment site have traveled across sixteen states, which encompasses over 100 million US citizens. Additionally, reporting of direct and secondary mental trauma are far beyond the two mile radius. Expanding the radius to twenty miles would reach most of the affected residents, and would eliminate the inevitable backlog of case-by-case submissions for Qualified Individuals.

– Order Norfolk Southern to pay healthcare claims by affected residents that began immediately after the vent and burn order.

Thank you for your time and consideration making these amendments to the decree. Norfolk Southern Railway must be held fully accountable for their reckless, negligent actions that have upended the lives of countless community members!

Sincerely,

Comment A-66

**From:**
**To:** ENRD, PUBCOMMENT-EES (ENRD)
**Subject:** [EXTERNAL] Ohio and USA v. Norfolk Southern, et. al, D.J. Ref. No. 90–11–3–12792
**Date:** Thursday, August 1, 2024 3:51:15 PM

Dear Assistant Attorney General of the Environment and Natural Resources Division,

I am writing to comment on The State of Ohio and The United States of America v. Norfolk Southern Railway Company, et al., D.J. Ref. No. 90–11–3–12792. This consent decree is missing important measures that are necessary to fully address the needs of affected community members after this catastrophic event.

Though it's clear that the US EPA and DOJ are attempting to hold Norfolk Southern Railways accountable, the consent decree should include additional measures to fully address the needs of the community members of this disaster:

– Increase groundwater, surface water, and well water testing from 10 years to 25 years, to be more in line with Superfund site cleanups. The EPA responded to this disaster with their Superfund SMART response team, assigned the derailment site a Superfund number, and yet the derailment site is not being treated as a Superfund site.

– Expand the radius of affected residents (defined as Qualified Individuals in the consent decree) for Medical Monitoring and Mental Health from two miles to twenty miles, as the vent and burn debris traveled far beyond a two mile radius. Reports have now come out that the debris from the derailment site have traveled across sixteen states, which encompasses over 100 million US citizens. Additionally, reporting of direct and secondary mental trauma are far beyond the two mile radius. Expanding the radius to twenty miles would reach most of the affected residents, and would eliminate the inevitable backlog of case-by-case submissions for Qualified Individuals.

– Order Norfolk Southern to pay healthcare claims by affected residents that began immediately after the vent and burn order.

Thank you for your time and consideration making these amendments to the decree. Norfolk Southern Railway must be held fully accountable for their reckless, negligent actions that have upended the lives of countless community members!

Sincerely,

Comment A-67

**From:**
**To:** ENRD, PUBCOMMENT-EES (ENRD)
**Subject:** [EXTERNAL] Ohio and USA v. Norfolk Southern, et. al, D.J. Ref. No. 90–11–3–12792
**Date:** Thursday, August 1, 2024 1:12:15 PM

Dear Assistant Attorney General of the Environment and Natural Resources Division,

I am writing to comment on The State of Ohio and The United States of America v. Norfolk Southern Railway Company, et al., D.J. Ref. No. 90–11–3–12792. This consent decree is missing important measures that are necessary to fully address the needs of affected community members after this catastrophic event.

Though it's clear that the US EPA and DOJ are attempting to hold Norfolk Southern Railways accountable, the consent decree should include additional measures to fully address the needs of the community members of this disaster:

– Increase groundwater, surface water, and well water testing from 10 years to 25 years, to be more in line with Superfund site cleanups. The EPA responded to this disaster with their Superfund SMART response team, assigned the derailment site a Superfund number, and yet the derailment site is not being treated as a Superfund site.

– Expand the radius of affected residents (defined as Qualified Individuals in the consent decree) for Medical Monitoring and Mental Health from two miles to twenty miles, as the vent and burn debris traveled far beyond a two mile radius. Reports have now come out that the debris from the derailment site have traveled across sixteen states, which encompasses over 100 million US citizens. Additionally, reporting of direct and secondary mental trauma are far beyond the two mile radius. Expanding the radius to twenty miles would reach most of the affected residents, and would eliminate the inevitable backlog of case-by-case submissions for Qualified Individuals.

– Order Norfolk Southern to pay healthcare claims by affected residents that began immediately after the vent and burn order.

Thank you for your time and consideration making these amendments to the decree. Norfolk Southern Railway must be held fully accountable for their reckless, negligent actions that have upended the lives of countless community members!

Sincerely,

Comment A-68

**From:**
**To:** ENRD, PUBCOMMENT-EES (ENRD)
**Subject:** [EXTERNAL] Ohio and USA v. Norfolk Southern, et. al, D.J. Ref. No. 90–11–3–12792
**Date:** Thursday, August 1, 2024 1:24:15 PM

Dear Assistant Attorney General of the Environment and Natural Resources Division,

I am writing to comment on The State of Ohio and The United States of America v. Norfolk Southern Railway Company, et al., D.J. Ref. No. 90–11–3–12792. This consent decree is missing important measures that are necessary to fully address the needs of affected community members after this catastrophic event.

Though it's clear that the US EPA and DOJ are attempting to hold Norfolk Southern Railways accountable, the consent decree should include additional measures to fully address the needs of the community members of this disaster:

– Increase groundwater, surface water, and well water testing from 10 years to 25 years, to be more in line with Superfund site cleanups. The EPA responded to this disaster with their Superfund SMART response team, assigned the derailment site a Superfund number, and yet the derailment site is not being treated as a Superfund site.

– Expand the radius of affected residents (defined as Qualified Individuals in the consent decree) for Medical Monitoring and Mental Health from two miles to twenty miles, as the vent and burn debris traveled far beyond a two mile radius. Reports have now come out that the debris from the derailment site have traveled across sixteen states, which encompasses over 100 million US citizens. Additionally, reporting of direct and secondary mental trauma are far beyond the two mile radius. Expanding the radius to twenty miles would reach most of the affected residents, and would eliminate the inevitable backlog of case-by-case submissions for Qualified Individuals.

– Order Norfolk Southern to pay healthcare claims by affected residents that began immediately after the vent and burn order.

Thank you for your time and consideration making these amendments to the decree. Norfolk Southern Railway must be held fully accountable for their reckless, negligent actions that have upended the lives of countless community members!

Sincerely,

Comment A-69

**From:**
**To:** ENRD, PUBCOMMENT-EES (ENRD)
**Subject:** [EXTERNAL] Ohio and USA v. Norfolk Southern, et. al, D.J. Ref. No. 90–11–3–12792
**Date:** Thursday, August 1, 2024 1:15:18 PM

Dear Assistant Attorney General of the Environment and Natural Resources Division,

I am writing to comment on The State of Ohio and The United States of America v. Norfolk Southern Railway Company, et al., D.J. Ref. No. 90–11–3–12792. This consent decree is missing important measures that are necessary to fully address the needs of affected community members after this catastrophic event.

Though it's clear that the US EPA and DOJ are attempting to hold Norfolk Southern Railways accountable, the consent decree should include additional measures to fully address the needs of the community members of this disaster:

– Increase groundwater, surface water, and well water testing from 10 years to 25 years, to be more in line with Superfund site cleanups. The EPA responded to this disaster with their Superfund SMART response team, assigned the derailment site a Superfund number, and yet the derailment site is not being treated as a Superfund site.

– Expand the radius of affected residents (defined as Qualified Individuals in the consent decree) for Medical Monitoring and Mental Health from two miles to twenty miles, as the vent and burn debris traveled far beyond a two mile radius. Reports have now come out that the debris from the derailment site have traveled across sixteen states, which encompasses over 100 million US citizens. Additionally, reporting of direct and secondary mental trauma are far beyond the two mile radius. Expanding the radius to twenty miles would reach most of the affected residents, and would eliminate the inevitable backlog of case-by-case submissions for Qualified Individuals.

– Order Norfolk Southern to pay healthcare claims by affected residents that began immediately after the vent and burn order.

Thank you for your time and consideration making these amendments to the decree. Norfolk Southern Railway must be held fully accountable for their reckless, negligent actions that have upended the lives of countless community members!

Sincerely,

Comment A-70

**From:**
**To:** ENRD, PUBCOMMENT-EES (ENRD)
**Subject:** [EXTERNAL] Ohio and USA v. Norfolk Southern, et. al, D.J. Ref. No. 90–11–3–12792
**Date:** Thursday, August 1, 2024 1:13:17 PM

Dear Assistant Attorney General of the Environment and Natural Resources Division,

I am writing to comment on The State of Ohio and The United States of America v. Norfolk Southern Railway Company, et al., D.J. Ref. No. 90–11–3–12792. This consent decree is missing important measures that are necessary to fully address the needs of affected community members after this catastrophic event.

Though it's clear that the US EPA and DOJ are attempting to hold Norfolk Southern Railways accountable, the consent decree should include additional measures to fully address the needs of the community members of this disaster:

– Increase groundwater, surface water, and well water testing from 10 years to 25 years, to be more in line with Superfund site cleanups. The EPA responded to this disaster with their Superfund SMART response team, assigned the derailment site a Superfund number, and yet the derailment site is not being treated as a Superfund site.

– Expand the radius of affected residents (defined as Qualified Individuals in the consent decree) for Medical Monitoring and Mental Health from two miles to twenty miles, as the vent and burn debris traveled far beyond a two mile radius. Reports have now come out that the debris from the derailment site have traveled across sixteen states, which encompasses over 100 million US citizens. Additionally, reporting of direct and secondary mental trauma are far beyond the two mile radius. Expanding the radius to twenty miles would reach most of the affected residents, and would eliminate the inevitable backlog of case-by-case submissions for Qualified Individuals.

– Order Norfolk Southern to pay healthcare claims by affected residents that began immediately after the vent and burn order.

Thank you for your time and consideration making these amendments to the decree. Norfolk Southern Railway must be held fully accountable for their reckless, negligent actions that have upended the lives of countless community members!

Sincerely,

Comment A-71

| From: | |
| To: | ENRD, PUBCOMMENT-EES (ENRD) |
| Subject: | [EXTERNAL] Ohio and USA v. Norfolk Southern, et. al, D.J. Ref. No. 90–11–3–12792 |
| Date: | Thursday, August 1, 2024 1:15:20 PM |

Dear Assistant Attorney General of the Environment and Natural Resources Division,

I am writing to comment on The State of Ohio and The United States of America v. Norfolk Southern Railway Company, et al., D.J. Ref. No. 90–11–3–12792. This consent decree is missing important measures that are necessary to fully address the needs of affected community members after this catastrophic event.

Though it's clear that the US EPA and DOJ are attempting to hold Norfolk Southern Railways accountable, the consent decree should include additional measures to fully address the needs of the community members of this disaster:

– Increase groundwater, surface water, and well water testing from 10 years to 25 years, to be more in line with Superfund site cleanups. The EPA responded to this disaster with their Superfund SMART response team, assigned the derailment site a Superfund number, and yet the derailment site is not being treated as a Superfund site.

– Expand the radius of affected residents (defined as Qualified Individuals in the consent decree) for Medical Monitoring and Mental Health from two miles to twenty miles, as the vent and burn debris traveled far beyond a two mile radius. Reports have now come out that the debris from the derailment site have traveled across sixteen states, which encompasses over 100 million US citizens. Additionally, reporting of direct and secondary mental trauma are far beyond the two mile radius. Expanding the radius to twenty miles would reach most of the affected residents, and would eliminate the inevitable backlog of case-by-case submissions for Qualified Individuals.

– Order Norfolk Southern to pay healthcare claims by affected residents that began immediately after the vent and burn order.

Thank you for your time and consideration making these amendments to the decree. Norfolk Southern Railway must be held fully accountable for their reckless, negligent actions that have upended the lives of countless community members!

Sincerely,

Comment A-72

**From:**
**To:** ENRD, PUBCOMMENT-EES (ENRD)
**Subject:** [EXTERNAL] Ohio and USA v. Norfolk Southern, et. al, D.J. Ref. No. 90–11–3–12792
**Date:** Thursday, August 1, 2024 3:19:17 PM

Dear Assistant Attorney General of the Environment and Natural Resources Division,

I am writing to comment on The State of Ohio and The United States of America v. Norfolk Southern Railway Company, et al., D.J. Ref. No. 90–11–3–12792. This consent decree is missing important measures that are necessary to fully address the needs of affected community members after this catastrophic event.

Though it's clear that the US EPA and DOJ are attempting to hold Norfolk Southern Railways accountable, the consent decree should include additional measures to fully address the needs of the community members of this disaster:

– Increase groundwater, surface water, and well water testing from 10 years to 25 years, to be more in line with Superfund site cleanups. The EPA responded to this disaster with their Superfund SMART response team, assigned the derailment site a Superfund number, and yet the derailment site is not being treated as a Superfund site.

– Expand the radius of affected residents (defined as Qualified Individuals in the consent decree) for Medical Monitoring and Mental Health from two miles to twenty miles, as the vent and burn debris traveled far beyond a two mile radius. Reports have now come out that the debris from the derailment site have traveled across sixteen states, which encompasses over 100 million US citizens. Additionally, reporting of direct and secondary mental trauma are far beyond the two mile radius. Expanding the radius to twenty miles would reach most of the affected residents, and would eliminate the inevitable backlog of case-by-case submissions for Qualified Individuals.

– Order Norfolk Southern to pay healthcare claims by affected residents that began immediately after the vent and burn order.

Thank you for your time and consideration making these amendments to the decree. Norfolk Southern Railway must be held fully accountable for their reckless, negligent actions that have upended the lives of countless community members!

Sincerely,

Comment A-73

**From:**
**To:** ENRD, PUBCOMMENT-EES (ENRD)
**Subject:** [EXTERNAL] Ohio and USA v. Norfolk Southern, et. al, D.J. Ref. No. 90–11–3–12792
**Date:** Thursday, August 1, 2024 1:13:15 PM

Dear Assistant Attorney General of the Environment and Natural Resources Division,

I am writing to comment on The State of Ohio and The United States of America v. Norfolk Southern Railway Company, et al., D.J. Ref. No. 90–11–3–12792. This consent decree is missing important measures that are necessary to fully address the needs of affected community members after this catastrophic event.

Though it's clear that the US EPA and DOJ are attempting to hold Norfolk Southern Railways accountable, the consent decree should include additional measures to fully address the needs of the community members of this disaster:

– Increase groundwater, surface water, and well water testing from 10 years to 25 years, to be more in line with Superfund site cleanups. The EPA responded to this disaster with their Superfund SMART response team, assigned the derailment site a Superfund number, and yet the derailment site is not being treated as a Superfund site.

– Expand the radius of affected residents (defined as Qualified Individuals in the consent decree) for Medical Monitoring and Mental Health from two miles to twenty miles, as the vent and burn debris traveled far beyond a two mile radius. Reports have now come out that the debris from the derailment site have traveled across sixteen states, which encompasses over 100 million US citizens. Additionally, reporting of direct and secondary mental trauma are far beyond the two mile radius. Expanding the radius to twenty miles would reach most of the affected residents, and would eliminate the inevitable backlog of case-by-case submissions for Qualified Individuals.

– Order Norfolk Southern to pay healthcare claims by affected residents that began immediately after the vent and burn order.

Thank you for your time and consideration making these amendments to the decree. Norfolk Southern Railway must be held fully accountable for their reckless, negligent actions that have upended the lives of countless community members!

Sincerely,

Comment A-74

**From:**
**To:** ENRD, PUBCOMMENT-EES (ENRD)
**Subject:** [EXTERNAL] Ohio and USA v. Norfolk Southern, et. al, D.J. Ref. No. 90–11–3–12792
**Date:** Thursday, August 1, 2024 1:31:39 PM

Dear Assistant Attorney General of the Environment and Natural Resources Division,

I am writing to comment on The State of Ohio and The United States of America v. Norfolk Southern Railway Company, et al., D.J. Ref. No. 90–11–3–12792. This consent decree is missing important measures that are necessary to fully address the needs of affected community members after this catastrophic event.

Though it's clear that the US EPA and DOJ are attempting to hold Norfolk Southern Railways accountable, the consent decree should include additional measures to fully address the needs of the community members of this disaster:

– Increase groundwater, surface water, and well water testing from 10 years to 25 years, to be more in line with Superfund site cleanups. The EPA responded to this disaster with their Superfund SMART response team, assigned the derailment site a Superfund number, and yet the derailment site is not being treated as a Superfund site.

– Expand the radius of affected residents (defined as Qualified Individuals in the consent decree) for Medical Monitoring and Mental Health from two miles to twenty miles, as the vent and burn debris traveled far beyond a two mile radius. Reports have now come out that the debris from the derailment site have traveled across sixteen states, which encompasses over 100 million US citizens. Additionally, reporting of direct and secondary mental trauma are far beyond the two mile radius. Expanding the radius to twenty miles would reach most of the affected residents, and would eliminate the inevitable backlog of case-by-case submissions for Qualified Individuals.

– Order Norfolk Southern to pay healthcare claims by affected residents that began immediately after the vent and burn order.

Thank you for your time and consideration making these amendments to the decree. Norfolk Southern Railway must be held fully accountable for their reckless, negligent actions that have upended the lives of countless community members!

Sincerely,

Comment A-75

**From:**
**To:** ENRD, PUBCOMMENT-EES (ENRD)
**Subject:** [EXTERNAL] Ohio and USA v. Norfolk Southern, et. al, D.J. Ref. No. 90–11–3–12792
**Date:** Thursday, August 1, 2024 1:44:20 PM

Dear Assistant Attorney General of the Environment and Natural Resources Division,

I am writing to comment on The State of Ohio and The United States of America v. Norfolk Southern Railway Company, et al., D.J. Ref. No. 90–11–3–12792. This consent decree is missing important measures that are necessary to fully address the needs of affected community members after this catastrophic event.

Though it's clear that the US EPA and DOJ are attempting to hold Norfolk Southern Railways accountable, the consent decree should include additional measures to fully address the needs of the community members of this disaster:

– Increase groundwater, surface water, and well water testing from 10 years to 25 years, to be more in line with Superfund site cleanups. The EPA responded to this disaster with their Superfund SMART response team, assigned the derailment site a Superfund number, and yet the derailment site is not being treated as a Superfund site.

– Expand the radius of affected residents (defined as Qualified Individuals in the consent decree) for Medical Monitoring and Mental Health from two miles to twenty miles, as the vent and burn debris traveled far beyond a two mile radius. Reports have now come out that the debris from the derailment site have traveled across sixteen states, which encompasses over 100 million US citizens. Additionally, reporting of direct and secondary mental trauma are far beyond the two mile radius. Expanding the radius to twenty miles would reach most of the affected residents, and would eliminate the inevitable backlog of case-by-case submissions for Qualified Individuals.....<> Norfolk and southern has tracks right by my back yard. If there was a derailment, my neighbors and I would not be able to escape.

– Order Norfolk Southern to pay healthcare claims by affected residents that began immediately after the vent and burn order.

Thank you for your time and consideration making these amendments to the decree. Norfolk Southern Railway must be held fully accountable for their reckless, negligent actions that have upended the lives of countless community members!

Sincerely,

Comment A-76

**From:**
**To:** ENRD, PUBCOMMENT-EES (ENRD)
**Subject:** [EXTERNAL] Ohio and USA v. Norfolk Southern, et. al, D.J. Ref. No. 90–11–3–12792
**Date:** Thursday, August 1, 2024 2:49:15 PM

Dear Assistant Attorney General of the Environment and Natural Resources Division,

I am writing to comment on The State of Ohio and The United States of America v. Norfolk Southern Railway Company, et al., D.J. Ref. No. 90–11–3–12792. This consent decree is missing important measures that are necessary to fully address the needs of affected community members after this catastrophic event.

Though it's clear that the US EPA and DOJ are attempting to hold Norfolk Southern Railways accountable, the consent decree should include additional measures to fully address the needs of the community members of this disaster:

– Increase groundwater, surface water, and well water testing from 10 years to 25 years, to be more in line with Superfund site cleanups. The EPA responded to this disaster with their Superfund SMART response team, assigned the derailment site a Superfund number, and yet the derailment site is not being treated as a Superfund site.

– Expand the radius of affected residents (defined as Qualified Individuals in the consent decree) for Medical Monitoring and Mental Health from two miles to twenty miles, as the vent and burn debris traveled far beyond a two mile radius. Reports have now come out that the debris from the derailment site have traveled across sixteen states, which encompasses over 100 million US citizens. Additionally, reporting of direct and secondary mental trauma are far beyond the two mile radius. Expanding the radius to twenty miles would reach most of the affected residents, and would eliminate the inevitable backlog of case-by-case submissions for Qualified Individuals.

– Order Norfolk Southern to pay healthcare claims by affected residents that began immediately after the vent and burn order.

Thank you for your time and consideration making these amendments to the decree. Norfolk Southern Railway must be held fully accountable for their reckless, negligent actions that have upended the lives of countless community members!

Sincerely,

Comment A-77

To Assistant Attorney General Grady, Lauren
    us NJ- EnRD

I think that Norfolk Southern has
done A very good job for our town.
They cleaned up our creeks, helped
with our New water filter system, at
our water plants. they gave us
money, They cleaned the home's
That needed to be cleaned.
    They restored our Train Depot,
They cleaned up all the dirt and
water that was Bad and hauled
it away.
They gave us money for our park.
They set up a Doctor's Office for
The people who needed it.
    I think They did A very, very,
good job for A (BAD Wheel Bearing)
I live on the west side of town.
I didn't go Anywhere that night,
I stayed in my home.    9011-3-12742 corv
                        (over)

In the morning, I looked at my car that is always parked outside and could see a little soot on it and the air had a funny smell.

I have no health problems.

And I thank (God) that it didn't happen in the middle of our town!

Thank You

U.S. ...
ENVIR... ...STICE
RESO... ...URAL
...ON

AUG 0 1 2024

EXECUTIVE OFFICE

NS_PUBCOM_0000213

Comment A-78

**From:**
**To:** ENRD, PUBCOMMENT-EES (ENRD)
**Subject:** [EXTERNAL] Ohio and USA v. Norfolk Southern, et. al, D.J. Ref. No. 90–11–3–12792
**Date:** Thursday, August 1, 2024 5:33:16 PM

Dear Assistant Attorney General of the Environment and Natural Resources Division,

I am writing to comment on The State of Ohio and The United States of America v. Norfolk Southern Railway Company, et al., D.J. Ref. No. 90–11–3–12792. This consent decree is missing important measures that are necessary to fully address the needs of affected community members after this catastrophic event.

Though it's clear that the US EPA and DOJ are attempting to hold Norfolk Southern Railways accountable, the consent decree should include additional measures to fully address the needs of the community members of this disaster:

– Increase groundwater, surface water, and well water testing from 10 years to 25 years, to be more in line with Superfund site cleanups. The EPA responded to this disaster with their Superfund SMART response team, assigned the derailment site a Superfund number, and yet the derailment site is not being treated as a Superfund site.

– Expand the radius of affected residents (defined as Qualified Individuals in the consent decree) for Medical Monitoring and Mental Health from two miles to twenty miles, as the vent and burn debris traveled far beyond a two mile radius. Reports have now come out that the debris from the derailment site have traveled across sixteen states, which encompasses over 100 million US citizens. Additionally, reporting of direct and secondary mental trauma are far beyond the two mile radius. Expanding the radius to twenty miles would reach most of the affected residents, and would eliminate the inevitable backlog of case-by-case submissions for Qualified Individuals.

– Order Norfolk Southern to pay healthcare claims by affected residents that began immediately after the vent and burn order.

Thank you for your time and consideration making these amendments to the decree. Norfolk Southern Railway must be held fully accountable for their reckless, negligent actions that have upended the lives of countless community members!

Sincerely,

Comment A-79

**From:**
**To:** ENRD, PUBCOMMENT-EES (ENRD)
**Subject:** [EXTERNAL] Ohio and USA v. Norfolk Southern, et. al, D.J. Ref. No. 90–11–3–12792
**Date:** Friday, August 2, 2024 2:11:18 PM

Dear Assistant Attorney General of the Environment and Natural Resources Division,

Dear Settlement Administrator,

I strongly object to the terms of this settlement.

I am writing to comment on The State of Ohio and The United States of America v. Norfolk Southern Railway Company, et al., D.J. Ref. No. 90–11–3–12792. This consent decree is missing important measures that are necessary to fully address the needs of affected community members after this catastrophic event.

As a multi-generational and life-long resident of Enon Valley, Pennsylvania, the amount of vast turmoil caused by the preventable train derailment and the purposeful and unnecessary chemical disaster caused by Norfolk Southern is unprecedented and deserves far more attention from this settlement.

I urge you to reconsider the terms of the settlement based on the following findings:
New research has shown the hazardous chemical dispersion caused by the Norfolk Southern decision to burn five tank cars of vinyl chloride was found in 16 states with an impact of 110 million people on American soil and potentially parts of Canada. The 20 mile radius should extend to all exposed areas without decreasing the current proposals for base payments already established.
The National Transportation Safety Board's final report has not been considered in this settlement and is a valuable token to consider.
The NTSB clearly presented factual evidence of Norfolk Southern railway actively withholding important factual information from decision makers as well as providing false information about the polymerization of vinyl chloride leading into the Feb 6 unnecessary chemical burn. This finding should significantly increase the settlement amount or the case should go to trial.
The NTSB revealed the design of the tank cars carrying vinyl chloride monomer (VCM) contain aluminum, which is incompatible with VCM and causes corrosion of pressure relief valves and handles on the doors. These tank cars continue to carry these incompatible materials from Texas to New Jersey and are a considerable risk. Derailments occur at a rate of three per day. According to research by Toxic Free Future, over 36 million pounds of VCM can be found on over 200 railcars at any given moment along this same 2000 mile stretch of rail. The settlement should include action that requires immediate halt of Norfolk Southern rail transport of VCM through East Palestine, Ohio or any town until this important and dangerous issue is remediated.
Vinyl chloride and other chemicals involved in the events of Feb 3-Feb 6 2024 are well-known carcinogens. There has been a failure to declare a public health emergency for the impacted communities, as well as lack of any organized medical response to provide assessment, treatment or ongoing care for the reported medical issues we still face today. The Center for Disease Control (CDC) has publicly confirmed our exposures and has attempted to console us by stating that our cancers will be treatable. The terms of the settlement should account for any and all acute and long term needs of all individuals who feel they were exposed as well as the current rate of any and all cancer treatments and care that have been anticipated by the CDC, which is likely well over the proposed $10,000 per person.

The Environmental Protection Agency (EPA) has failed to provide any accurate residential air or soil assessments. Community scientists and academics have revealed that hazardous chemicals and dioxins continue to maintain a presence in the surrounding areas, over a year later. My family opted to obtain summa canister testing for our indoor and outdoor air, which revealed a presence of vinyl chloride on our outdoor back deck and a high level of acrolein inside our home on multiple floors. Community members need to be provided with adequate testing for our homes and properties for decades to come. Please consider writing this into the terms of the settlement as either a program or complete a cost analysis for a minimum of 20 years to assess residential air quality and soil every 6-12 months. Include a statement of remediation cost to be covered by Norfolk Southern and a timeline for property remediation to be completed by Norfolk Southern.

Questions
Is there a plan for if/when groundwater shows contamination? Is there a study that shows ten years is sufficient or was this arbitrary?
Is there a list of all contaminants you are testing for and at what levels?
Who will have access to well monitoring. Will it be done by a mile radius, zip code, etc.
Who are the approved providers for medical monitoring? Will insurance be billed?
What happens if something is found during the medical monitoring? Who pays then? The class action settlement required that many sign away their future legal rights to go after Norfolk Southern for more funds
How will the "coordination committee" be formed? Who will be on it? Will the public have a say?

Summary of proposed revisions:

Expand the radius of affected residents (defined as Qualified Individuals in the consent decree) for Medical Monitoring and Mental Health from two miles to twenty miles, as the vent and burn debris traveled far beyond a two mile radius. Reports have now come out that the debris from the derailment site have traveled across sixteen states, which encompasses over 100 million US citizens. Additionally, reporting of direct and secondary mental trauma are far beyond the two mile radius. Expanding the radius to twenty miles would reach most of the affected residents, and would eliminate the inevitable backlog of case-by-case submissions for Qualified Individuals.
Order Norfolk Southern to pay healthcare claims by affected residents that began immediately after the vent and burn order.
Host a public hearing to fully understand community impacts and include a meaningful and detailed community engagement plan in the settlement
Increase groundwater, surface water, and well water testing from 10 years to 25 years, to be more in line with Superfund site cleanups. The EPA responded to this disaster with their Superfund SMART response team, assigned the derailment site a Superfund number, and yet the derailment site is not being treated as a Superfund site.
Require that all reports NS must send to the EPA (i.e. Quarterly reports for Long Term Monitoring Plan) be made publicly available (i.e. on a publicly accessible website dashboard) and summarized and presented in a digestible way

I have not been asked to testify in court at the Final Approval Hearing, but should the need arise I would be willing to participate for my community.

Sincerely,
█████████

Thank you for your time and consideration making these amendments to the decree. Norfolk Southern Railway must be held fully accountable for their reckless, negligent actions that have upended the lives of countless community members!

Sincerely,

Comment A-80

**From:**
**To:** ENRD, PUBCOMMENT-EES (ENRD)
**Subject:** [EXTERNAL] Ohio and USA v. Norfolk Southern, et. al, D.J. Ref. No. 90–11–3–12792
**Date:** Friday, August 2, 2024 2:57:15 PM

Dear Assistant Attorney General of the Environment and Natural Resources Division,

I am writing to comment on The State of Ohio and The United States of America v. Norfolk Southern Railway Company, et al., D.J. Ref. No. 90–11–3–12792. This consent decree is missing important measures that are necessary to fully address the needs of affected community members after this catastrophic event.

Though it's clear that the US EPA and DOJ are attempting to hold Norfolk Southern Railways accountable, the consent decree should include additional measures to fully address the needs of the community members of this disaster:

– Increase groundwater, surface water, and well water testing from 10 years to 25 years, to be more in line with Superfund site cleanups. The EPA responded to this disaster with their Superfund SMART response team, assigned the derailment site a Superfund number, and yet the derailment site is not being treated as a Superfund site.

– Expand the radius of affected residents (defined as Qualified Individuals in the consent decree) for Medical Monitoring and Mental Health from two miles to twenty miles, as the vent and burn debris traveled far beyond a two mile radius. Reports have now come out that the debris from the derailment site have traveled across sixteen states, which encompasses over 100 million US citizens. Additionally, reporting of direct and secondary mental trauma are far beyond the two mile radius. Expanding the radius to twenty miles would reach most of the affected residents, and would eliminate the inevitable backlog of case-by-case submissions for Qualified Individuals.

– Order Norfolk Southern to pay healthcare claims by affected residents that began immediately after the vent and burn order.

Thank you for your time and consideration making these amendments to the decree. Norfolk Southern Railway must be held fully accountable for their reckless, negligent actions that have upended the lives of countless community members!

Sincerely,

Comment A-81

**From:**
**To:** ENRD, PUBCOMMENT-EES (ENRD)
**Subject:** [EXTERNAL] Ohio and USA v. Norfolk Southern, et. al, D.J. Ref. No. 90–11–3–12792
**Date:** Friday, August 2, 2024 3:16:15 PM

Dear Assistant Attorney General of the Environment and Natural Resources Division,

I am writing to comment on The State of Ohio and The United States of America v. Norfolk Southern Railway Company, et al., D.J. Ref. No. 90–11–3–12792. This consent decree is missing important measures that are necessary to fully address the needs of affected community members after this catastrophic event.

Though it's clear that the US EPA and DOJ are attempting to hold Norfolk Southern Railways accountable, the consent decree should include additional measures to fully address the needs of the community members of this disaster:

– Increase groundwater, surface water, and well water testing from 10 years to 25 years, to be more in line with Superfund site cleanups. The EPA responded to this disaster with their Superfund SMART response team, assigned the derailment site a Superfund number, and yet the derailment site is not being treated as a Superfund site.

– Expand the radius of affected residents (defined as Qualified Individuals in the consent decree) for Medical Monitoring and Mental Health from two miles to twenty miles, as the vent and burn debris traveled far beyond a two mile radius. Reports have now come out that the debris from the derailment site have traveled across sixteen states, which encompasses over 100 million US citizens. Additionally, reporting of direct and secondary mental trauma are far beyond the two mile radius. Expanding the radius to twenty miles would reach most of the affected residents, and would eliminate the inevitable backlog of case-by-case submissions for Qualified Individuals.

– Order Norfolk Southern to pay healthcare claims by affected residents that began immediately after the vent and burn order.

Thank you for your time and consideration making these amendments to the decree. Norfolk Southern Railway must be held fully accountable for their reckless, negligent actions that have upended the lives of countless community members!

Sincerely,

Comment A-82

| From: | Herbert, Ronda (ENRD) |
|---|---|
| To: | Grady, Lauren (ENRD) |
| Cc: | Spector, Jeffrey (ENRD); Stewart, Geoffrey (ENRD); Rodriguez, Kaylee (ENRD) |
| Subject: | FW: [EXTERNAL] comments |
| Date: | Friday, August 2, 2024 11:02:44 AM |

Hello Lauren,

This was sent to our public comment inbox, for DJ number 90-11-3-12792.

Thank You

Ronda Herbert

Case Management Unit
Docketing Clerk
Environmental and Natural Resource Division

**From:**

**Sent:** Friday, August 2, 2024 10:59 AM
**To:** ENRD, PUBCOMMENT-EES (ENRD) <PENRD3@ENRD.USDOJ.GOV>
**Subject:** [EXTERNAL] comments

To whom it may concern, my name is                , after the derailment, we were
mandated to evacuate our home because of the proximity where my home is located.

I find it very disheartening to find out that you will be taking the reimbursement
money from those who were made to " mandatorily evacuate".from the final payment.
We did not ask for this derailment, nor did we ask to be relocated.

What really bothers me is the fact that less than a 1/2 mile from our home, people
were not made to leave, I know people who did not leave their home, because they were
out of the evac. zone, and will receive more money than myself, because they did not go
anywhere or do anything to get reimbursement money.

That said, I received money for other items, such as having my home pressure
washed, air purifiers purchased for my home, etc. I personally don't have issues with
that part of the money being subtracted from the settlement payment, but I do have
issues with money being taken off for lodging/food/fuel etc while we were MADE TO
MANDATORILY EVAVUATE!! Again, my family didn't ask to be displaced, we were forced,
therefore I ask that any lodgingfood/fuel etc not be deducted from any final payment.

PS. My brother lives within the 2 mile radius, and did not go anywhere, when it's all

NS_PUBCOM_0000223

said and  done, he will probably receive more money than myself, whereas I am only
.493 mile away from this disaster!


Yours Truly

Comment A-83

**From:**
**To:** ENRD, PUBCOMMENT-EES (ENRD)
**Subject:** [EXTERNAL] Ohio and USA v. Norfolk Southern, et. al, D.J. Ref. No. 90–11–3–12792
**Date:** Friday, August 2, 2024 2:33:39 PM

Dear Assistant Attorney General of the Environment and Natural Resources Division,

I am writing to comment on The State of Ohio and The United States of America v. Norfolk Southern Railway Company, et al., D.J. Ref. No. 90–11–3–12792. This consent decree is missing important measures that are necessary to fully address the needs of affected community members after this catastrophic event.

Though it's clear that the US EPA and DOJ are attempting to hold Norfolk Southern Railways accountable, the consent decree should include additional measures to fully address the needs of the community members of this disaster:

– Increase groundwater, surface water, and well water testing from 10 years to 25 years, to be more in line with Superfund site cleanups. The EPA responded to this disaster with their Superfund SMART response team, assigned the derailment site a Superfund number, and yet the derailment site is not being treated as a Superfund site.

– Expand the radius of affected residents (defined as Qualified Individuals in the consent decree) for Medical Monitoring and Mental Health from two miles to twenty miles, as the vent and burn debris traveled far beyond a two mile radius. Reports have now come out that the debris from the derailment site have traveled across sixteen states, which encompasses over 100 million US citizens. Additionally, reporting of direct and secondary mental trauma are far beyond the two mile radius. Expanding the radius to twenty miles would reach most of the affected residents, and would eliminate the inevitable backlog of case-by-case submissions for Qualified Individuals.

– Order Norfolk Southern to pay healthcare claims by affected residents that began immediately after the vent and burn order.

Thank you for your time and consideration making these amendments to the decree. Norfolk Southern Railway must be held fully accountable for their reckless, negligent actions that have upended the lives of countless community members!

Sincerely,

Comment A-84

**From:**
**To:** ENRD, PUBCOMMENT-EES (ENRD)
**Subject:** [EXTERNAL] Ohio and USA v. Norfolk Southern, et. al, D.J. Ref. No. 90–11–3–12792
**Date:** Friday, August 2, 2024 4:08:15 PM

Dear Assistant Attorney General of the Environment and Natural Resources Division,

I am writing to comment on The State of Ohio and The United States of America v. Norfolk Southern Railway Company, et al., D.J. Ref. No. 90–11–3–12792. This consent decree is missing important measures that are necessary to fully address the needs of affected community members after this catastrophic event.

Though it's clear that the US EPA and DOJ are attempting to hold Norfolk Southern Railways accountable, the consent decree should include additional measures to fully address the needs of the community members of this disaster:

– Increase groundwater, surface water, and well water testing from 10 years to 25 years, to be more in line with Superfund site cleanups. The EPA responded to this disaster with their Superfund SMART response team, assigned the derailment site a Superfund number, and yet the derailment site is not being treated as a Superfund site.

– Expand the radius of affected residents (defined as Qualified Individuals in the consent decree) for Medical Monitoring and Mental Health from two miles to twenty miles, as the vent and burn debris traveled far beyond a two mile radius. Reports have now come out that the debris from the derailment site have traveled across sixteen states, which encompasses over 100 million US citizens. Additionally, reporting of direct and secondary mental trauma are far beyond the two mile radius. Expanding the radius to twenty miles would reach most of the affected residents, and would eliminate the inevitable backlog of case-by-case submissions for Qualified Individuals.

– Order Norfolk Southern to pay healthcare claims by affected residents that began immediately after the vent and burn order.

Thank you for your time and consideration making these amendments to the decree. Norfolk Southern Railway must be held fully accountable for their reckless, negligent actions that have upended the lives of countless community members!

Sincerely,

Comment A-85

**From:**
**To:**     ENRD, PUBCOMMENT-EES (ENRD)
**Subject:** [EXTERNAL] Ohio and USA v. Norfolk Southern, et. al, D.J. Ref. No. 90–11–3–12792
**Date:**    Thursday, August 1, 2024 9:48:30 PM

Dear Assistant Attorney General of the Environment and Natural Resources Division,

I am writing to comment on The State of Ohio and The United States of America v. Norfolk Southern Railway Company, et al., D.J. Ref. No. 90–11–3–12792. This consent decree is missing important measures that are necessary to fully address the needs of affected community members after this catastrophic event.

Though it's clear that the US EPA and DOJ are attempting to hold Norfolk Southern Railways accountable, the consent decree should include additional measures to fully address the needs of the community members of this disaster:

– Increase groundwater, surface water, and well water testing from 10 years to 25 years, to be more in line with Superfund site cleanups. The EPA responded to this disaster with their Superfund SMART response team, assigned the derailment site a Superfund number, and yet the derailment site is not being treated as a Superfund site.

– Expand the radius of affected residents (defined as Qualified Individuals in the consent decree) for Medical Monitoring and Mental Health from two miles to twenty miles, as the vent and burn debris traveled far beyond a two mile radius. Reports have now come out that the debris from the derailment site have traveled across sixteen states, which encompasses over 100 million US citizens. Additionally, reporting of direct and secondary mental trauma are far beyond the two mile radius. Expanding the radius to twenty miles would reach most of the affected residents, and would eliminate the inevitable backlog of case-by-case submissions for Qualified Individuals.

– Order Norfolk Southern to pay healthcare claims by affected residents that began immediately after the vent and burn order.

Thank you for your time and consideration making these amendments to the decree. Norfolk Southern Railway must be held fully accountable for their reckless, negligent actions that have upended the lives of countless community members!

Sincerely,

Comment A-86

| | |
|---|---|
| **From:** | Herbert, Ronda (ENRD) |
| **To:** | Grady, Lauren (ENRD) |
| **Cc:** | Spector, Jeffrey (ENRD); Stewart, Geoffrey (ENRD); Rodriguez, Kaylee (ENRD) |
| **Subject:** | FW: [EXTERNAL] Ohio and USA v. Norfolk Southern, et. al, D.J. Ref. No. 90–11–3–12792 |
| **Date:** | Friday, August 2, 2024 2:02:57 PM |

Hello Lauren,

This was sent to our public comment inbox, for DJ number 90-11-3-12792.

Thank You

Ronda Herbert

Case Management Unit
Docketing Clerk
Environmental and Natural Resource Division

**From:** <span style="background:black"> </span>
<span style="background:black"> </span>

**Sent:** Friday, August 2, 2024 1:57 PM
**To:** ENRD, PUBCOMMENT-EES (ENRD) <PENRD3@ENRD.USDOJ.GOV>
**Subject:** [EXTERNAL] Ohio and USA v. Norfolk Southern, et. al, D.J. Ref. No. 90–11–3–12792

Dear Assistant Attorney General of the Environment and Natural Resources Division,

I am writing to comment on The State of Ohio and The United States of America v. Norfolk Southern Railway Company, et al., D.J. Ref. No. 90–11–3–12792. This consent decree is missing important measures that are necessary to fully address the needs of affected community members after this catastrophic event.

Though it's clear that the US EPA and DOJ are attempting to hold Norfolk Southern Railways accountable, the consent decree should include additional measures to fully address the needs of the community members of this disaster:

– Increase groundwater, surface water, and well water testing from 10 years to 25 years, to be more in line with Superfund site cleanups. The EPA responded to this disaster with their Superfund SMART response team, assigned the derailment site a Superfund number, and yet the derailment site is not being treated as a Superfund site.

– Expand the radius of affected residents (defined as Qualified Individuals in the consent decree) for Medical Monitoring and Mental Health from two miles to twenty miles, as the vent and burn debris traveled far beyond a two mile radius. Reports have

now come out that the debris from the derailment site have traveled across sixteen states, which encompasses over 100 million US citizens. Additionally, reporting of direct and secondary mental trauma are far beyond the two mile radius. Expanding the radius to twenty miles would reach most of the affected residents, and would eliminate the inevitable backlog of case-by-case submissions for Qualified Individuals.

– Order Norfolk Southern to pay healthcare claims by affected residents that began immediately after the vent and burn order.

Thank you for your time and consideration making these amendments to the decree. Norfolk Southern Railway must be held fully accountable for their reckless, negligent actions that have upended the lives of countless community members!

Sincerely,



Comment A-87

**From:**
**To:** ENRD, PUBCOMMENT-EES (ENRD)
**Subject:** [EXTERNAL] Ohio and USA v. Norfolk Southern, et. al, D.J. Ref. No. 90–11–3–12792
**Date:** Friday, August 2, 2024 2:57:17 PM

Dear Assistant Attorney General of the Environment and Natural Resources Division,

I am writing to comment on The State of Ohio and The United States of America v. Norfolk Southern Railway Company, et al., D.J. Ref. No. 90–11–3–12792. This consent decree is missing important measures that are necessary to fully address the needs of affected community members after this catastrophic event.

Though it's clear that the US EPA and DOJ are attempting to hold Norfolk Southern Railways accountable, the consent decree should include additional measures to fully address the needs of the community members of this disaster:

– Increase groundwater, surface water, and well water testing from 10 years to 25 years, to be more in line with Superfund site cleanups. The EPA responded to this disaster with their Superfund SMART response team, assigned the derailment site a Superfund number, and yet the derailment site is not being treated as a Superfund site.

– Expand the radius of affected residents (defined as Qualified Individuals in the consent decree) for Medical Monitoring and Mental Health from two miles to twenty miles, as the vent and burn debris traveled far beyond a two mile radius. Reports have now come out that the debris from the derailment site have traveled across sixteen states, which encompasses over 100 million US citizens. Additionally, reporting of direct and secondary mental trauma are far beyond the two mile radius. Expanding the radius to twenty miles would reach most of the affected residents, and would eliminate the inevitable backlog of case-by-case submissions for Qualified Individuals.

– Order Norfolk Southern to pay healthcare claims by affected residents that began immediately after the vent and burn order.

Thank you for your time and consideration making these amendments to the decree. Norfolk Southern Railway must be held fully accountable for their reckless, negligent actions that have upended the lives of countless community members!

Sincerely,

Comment A-88

**From:**
**To:** ENRD, PUBCOMMENT-EES (ENRD)
**Subject:** [EXTERNAL] Ohio and USA v. Norfolk Southern, et. al, D.J. Ref. No. 90–11–3–12792
**Date:** Friday, August 2, 2024 2:58:41 PM

Dear Assistant Attorney General of the Environment and Natural Resources Division,

I am writing to comment on The State of Ohio and The United States of America v. Norfolk Southern Railway Company, et al., D.J. Ref. No. 90–11–3–12792. This consent decree is missing important measures that are necessary to fully address the needs of affected community members after this catastrophic event.

Though it's clear that the US EPA and DOJ are attempting to hold Norfolk Southern Railways accountable, the consent decree should include additional measures to fully address the needs of the community members of this disaster:

– Increase groundwater, surface water, and well water testing from 10 years to 25 years, to be more in line with Superfund site cleanups. The EPA responded to this disaster with their Superfund SMART response team, assigned the derailment site a Superfund number, and yet the derailment site is not being treated as a Superfund site.

– Expand the radius of affected residents (defined as Qualified Individuals in the consent decree) for Medical Monitoring and Mental Health from two miles to twenty miles, as the vent and burn debris traveled far beyond a two mile radius. Reports have now come out that the debris from the derailment site have traveled across sixteen states, which encompasses over 100 million US citizens. Additionally, reporting of direct and secondary mental trauma are far beyond the two mile radius. Expanding the radius to twenty miles would reach most of the affected residents, and would eliminate the inevitable backlog of case-by-case submissions for Qualified Individuals.

– Order Norfolk Southern to pay healthcare claims by affected residents that began immediately after the vent and burn order.

Thank you for your time and consideration making these amendments to the decree. Norfolk Southern Railway must be held fully accountable for their reckless, negligent actions that have upended the lives of countless community members!

Sincerely,

Comment A-89

**From:**
**To:** ENRD, PUBCOMMENT-EES (ENRD)
**Subject:** [EXTERNAL] Ohio and USA v. Norfolk Southern, et. al, D.J. Ref. No. 90–11–3–12792
**Date:** Thursday, August 1, 2024 6:45:17 PM

Dear Assistant Attorney General of the Environment and Natural Resources Division,

I am writing to comment on The State of Ohio and The United States of America v. Norfolk Southern Railway Company, et al., D.J. Ref. No. 90–11–3–12792. This consent decree is missing important measures that are necessary to fully address the needs of affected community members after this catastrophic event.

Though it's clear that the US EPA and DOJ are attempting to hold Norfolk Southern Railways accountable, the consent decree should include additional measures to fully address the needs of the community members of this disaster:

– Increase groundwater, surface water, and well water testing from 10 years to 25 years, to be more in line with Superfund site cleanups. The EPA responded to this disaster with their Superfund SMART response team, assigned the derailment site a Superfund number, and yet the derailment site is not being treated as a Superfund site.

– Expand the radius of affected residents (defined as Qualified Individuals in the consent decree) for Medical Monitoring and Mental Health from two miles to twenty miles, as the vent and burn debris traveled far beyond a two mile radius. Reports have now come out that the debris from the derailment site have traveled across sixteen states, which encompasses over 100 million US citizens. Additionally, reporting of direct and secondary mental trauma are far beyond the two mile radius. Expanding the radius to twenty miles would reach most of the affected residents, and would eliminate the inevitable backlog of case-by-case submissions for Qualified Individuals.

– Order Norfolk Southern to pay healthcare claims by affected residents that began immediately after the vent and burn order.

Thank you for your time and consideration making these amendments to the decree. Norfolk Southern Railway must be held fully accountable for their reckless, negligent actions that have upended the lives of countless community members!

Sincerely,

Comment A-90

**From:**
**To:** ENRD, PUBCOMMENT-EES (ENRD)
**Subject:** [EXTERNAL] Ohio and USA v. Norfolk Southern, et. al, D.J. Ref. No. 90–11–3–12792
**Date:** Friday, August 2, 2024 2:16:14 PM

Dear Assistant Attorney General of the Environment and Natural Resources Division,

I am writing to comment on The State of Ohio and The United States of America v. Norfolk Southern Railway Company, et al., D.J. Ref. No. 90–11–3–12792. This consent decree is missing important measures that are necessary to fully address the needs of affected community members after this catastrophic event.

Though it's clear that the US EPA and DOJ are attempting to hold Norfolk Southern Railways accountable, the consent decree should include additional measures to fully address the needs of the community members of this disaster:

– Increase groundwater, surface water, and well water testing from 10 years to 25 years, to be more in line with Superfund site cleanups. The EPA responded to this disaster with their Superfund SMART response team, assigned the derailment site a Superfund number, and yet the derailment site is not being treated as a Superfund site.

– Expand the radius of affected residents (defined as Qualified Individuals in the consent decree) for Medical Monitoring and Mental Health from two miles to twenty miles, as the vent and burn debris traveled far beyond a two mile radius. Reports have now come out that the debris from the derailment site have traveled across sixteen states, which encompasses over 100 million US citizens. Additionally, reporting of direct and secondary mental trauma are far beyond the two mile radius. Expanding the radius to twenty miles would reach most of the affected residents, and would eliminate the inevitable backlog of case-by-case submissions for Qualified Individuals.

– Order Norfolk Southern to pay healthcare claims by affected residents that began immediately after the vent and burn order.

Thank you for your time and consideration making these amendments to the decree. Norfolk Southern Railway must be held fully accountable for their reckless, negligent actions that have upended the lives of countless community members!

Sincerely,

Comment A-91

From:
To:          ENRD, PUBCOMMENT-EES (ENRD)
Subject:     [EXTERNAL] Ohio and USA v. Norfolk Southern, et. al, D.J. Ref. No. 90–11–3–12792
Date:        Friday, August 2, 2024 2:04:19 PM

Dear Assistant Attorney General of the Environment and Natural Resources Division,

I am writing to comment on The State of Ohio and The United States of America v. Norfolk Southern Railway Company, et al., D.J. Ref. No. 90–11–3–12792. This consent decree is missing important measures that are necessary to fully address the needs of affected community members after this catastrophic event.

Though it's clear that the US EPA and DOJ are attempting to hold Norfolk Southern Railways accountable, the consent decree should include additional measures to fully address the needs of the community members of this disaster:

– Increase groundwater, surface water, and well water testing from 10 years to 25 years, to be more in line with Superfund site cleanups. The EPA responded to this disaster with their Superfund SMART response team, assigned the derailment site a Superfund number, and yet the derailment site is not being treated as a Superfund site.

– Expand the radius of affected residents (defined as Qualified Individuals in the consent decree) for Medical Monitoring and Mental Health from two miles to twenty miles, as the vent and burn debris traveled far beyond a two mile radius. Reports have now come out that the debris from the derailment site have traveled across sixteen states, which encompasses over 100 million US citizens. Additionally, reporting of direct and secondary mental trauma are far beyond the two mile radius. Expanding the radius to twenty miles would reach most of the affected residents, and would eliminate the inevitable backlog of case-by-case submissions for Qualified Individuals.

– Order Norfolk Southern to pay healthcare claims by affected residents that began immediately after the vent and burn order.

Thank you for your time and consideration making these amendments to the decree. Norfolk Southern Railway must be held fully accountable for their reckless, negligent actions that have upended the lives of countless community members!

Sincerely,

Comment A-92

**From:**
**To:**      ENRD, PUBCOMMENT-EES (ENRD)
**Subject:**  [EXTERNAL] Ohio and USA v. Norfolk Southern, et. al, D.J. Ref. No. 90–11–3–12792
**Date:**    Thursday, August 1, 2024 9:48:25 PM

Dear Assistant Attorney General of the Environment and Natural Resources Division,

I am writing to comment on The State of Ohio and The United States of America v. Norfolk Southern Railway Company, et al., D.J. Ref. No. 90–11–3–12792. This consent decree is missing important measures that are necessary to fully address the needs of affected community members after this catastrophic event.

Though it's clear that the US EPA and DOJ are attempting to hold Norfolk Southern Railways accountable, the consent decree should include additional measures to fully address the needs of the community members of this disaster:

– Increase groundwater, surface water, and well water testing from 10 years to 25 years, to be more in line with Superfund site cleanups. The EPA responded to this disaster with their Superfund SMART response team, assigned the derailment site a Superfund number, and yet the derailment site is not being treated as a Superfund site.

– Expand the radius of affected residents (defined as Qualified Individuals in the consent decree) for Medical Monitoring and Mental Health from two miles to twenty miles, as the vent and burn debris traveled far beyond a two mile radius. Reports have now come out that the debris from the derailment site have traveled across sixteen states, which encompasses over 100 million US citizens. Additionally, reporting of direct and secondary mental trauma are far beyond the two mile radius. Expanding the radius to twenty miles would reach most of the affected residents, and would eliminate the inevitable backlog of case-by-case submissions for Qualified Individuals.

– Order Norfolk Southern to pay healthcare claims by affected residents that began immediately after the vent and burn order.

Thank you for your time and consideration making these amendments to the decree. Norfolk Southern Railway must be held fully accountable for their reckless, negligent actions that have upended the lives of countless community members!

Sincerely,

Comment A-93

| From: | Herbert, Ronda (ENRD) |
| To: | Grady, Lauren (ENRD) |
| Cc: | Spector, Jeffrey (ENRD); Stewart, Geoffrey (ENRD); Rodriguez, Kaylee (ENRD) |
| Subject: | FW: [EXTERNAL] Ohio and USA v. Norfolk Southern, et. al, D.J. Ref. No. 90-11-3-12792 |
| Date: | Friday, August 2, 2024 1:54:37 PM |

Hello Lauren,

This was sent to our public comment inbox, for DJ number 90-11-3-12792.

Thank You

Ronda Herbert

Case Management Unit
Docketing Clerk
Environmental and Natural Resource Division

**From:**

**Sent:** Friday, August 2, 2024 1:49 PM
**To:** ENRD, PUBCOMMENT-EES (ENRD) <PENRD3@ENRD.USDOJ.GOV>
**Subject:** [EXTERNAL] Ohio and USA v. Norfolk Southern, et. al, D.J. Ref. No. 90-11-3-12792

Dear Assistant Attorney General of the Environment and Natural Resources Division,

I am writing to comment on The State of Ohio and The United States of America v. Norfolk Southern Railway Company, et al., D.J. Ref. No. 90-11-3-12792. This consent decree is missing important measures that are necessary to fully address the needs of affected community members after this catastrophic event.

Though it's clear that the US EPA and DOJ are attempting to hold Norfolk Southern Railways accountable, the consent decree should include additional measures to fully address the needs of the community members of this disaster:

– Increase groundwater, surface water, and well water testing from 10 years to 25 years, to be more in line with Superfund site cleanups. The EPA responded to this disaster with their Superfund SMART response team, assigned the derailment site a Superfund number, and yet the derailment site is not being treated as a Superfund site.

– Expand the radius of affected residents (defined as Qualified Individuals in the consent decree) for Medical Monitoring and Mental Health from two miles to twenty miles, as the vent and burn debris traveled far beyond a two mile radius. Reports have

NS_PUBCOM_0000248

now come out that the debris from the derailment site have traveled across sixteen states, which encompasses over 100 million US citizens. Additionally, reporting of direct and secondary mental trauma are far beyond the two mile radius. Expanding the radius to twenty miles would reach most of the affected residents, and would eliminate the inevitable backlog of case-by-case submissions for Qualified Individuals.

– Order Norfolk Southern to pay healthcare claims by affected residents that began immediately after the vent and burn order.

Thank you for your time and consideration making these amendments to the decree. Norfolk Southern Railway must be held fully accountable for their reckless, negligent actions that have upended the lives of countless community members!

Sincerely,

Comment A-94

**From:**
**To:** ENRD, PUBCOMMENT-EES (ENRD)
**Subject:** [EXTERNAL] Ohio and USA v. Norfolk Southern, et. al, D.J. Ref. No. 90–11–3–12792
**Date:** Thursday, August 1, 2024 9:18:19 PM

Dear Assistant Attorney General of the Environment and Natural Resources Division,

I am writing to comment on The State of Ohio and The United States of America v. Norfolk Southern Railway Company, et al., D.J. Ref. No. 90–11–3–12792. This consent decree is missing important measures that are necessary to fully address the needs of affected community members after this catastrophic event.

Though it's clear that the US EPA and DOJ are attempting to hold Norfolk Southern Railways accountable, the consent decree should include additional measures to fully address the needs of the community members of this disaster:

– Increase groundwater, surface water, and well water testing from 10 years to 25 years, to be more in line with Superfund site cleanups. The EPA responded to this disaster with their Superfund SMART response team, assigned the derailment site a Superfund number, and yet the derailment site is not being treated as a Superfund site.

– Expand the radius of affected residents (defined as Qualified Individuals in the consent decree) for Medical Monitoring and Mental Health from two miles to twenty miles, as the vent and burn debris traveled far beyond a two mile radius. Reports have now come out that the debris from the derailment site have traveled across sixteen states, which encompasses over 100 million US citizens. Additionally, reporting of direct and secondary mental trauma are far beyond the two mile radius. Expanding the radius to twenty miles would reach most of the affected residents, and would eliminate the inevitable backlog of case-by-case submissions for Qualified Individuals.

– Order Norfolk Southern to pay healthcare claims by affected residents that began immediately after the vent and burn order.

Thank you for your time and consideration making these amendments to the decree. Norfolk Southern Railway must be held fully accountable for their reckless, negligent actions that have upended the lives of countless community members!

Sincerely,

Comment A-95

**From:**
**To:**  ENRD, PUBCOMMENT-EES (ENRD)
**Subject:**  [EXTERNAL] Ohio and USA v. Norfolk Southern, et. al, D.J. Ref. No. 90–11–3–12792
**Date:**  Thursday, August 1, 2024 7:10:15 PM

Dear Assistant Attorney General of the Environment and Natural Resources Division,

I am writing to comment on The State of Ohio and The United States of America v. Norfolk Southern Railway Company, et al., D.J. Ref. No. 90–11–3–12792. This consent decree is missing important measures that are necessary to fully address the needs of affected community members after this catastrophic event.

Though it's clear that the US EPA and DOJ are attempting to hold Norfolk Southern Railways accountable, the consent decree should include additional measures to fully address the needs of the community members of this disaster:

– Increase groundwater, surface water, and well water testing from 10 years to 25 years, to be more in line with Superfund site cleanups. The EPA responded to this disaster with their Superfund SMART response team, assigned the derailment site a Superfund number, and yet the derailment site is not being treated as a Superfund site.

– Expand the radius of affected residents (defined as Qualified Individuals in the consent decree) for Medical Monitoring and Mental Health from two miles to twenty miles, as the vent and burn debris traveled far beyond a two mile radius. Reports have now come out that the debris from the derailment site have traveled across sixteen states, which encompasses over 100 million US citizens. Additionally, reporting of direct and secondary mental trauma are far beyond the two mile radius. Expanding the radius to twenty miles would reach most of the affected residents, and would eliminate the inevitable backlog of case-by-case submissions for Qualified Individuals.

– Order Norfolk Southern to pay healthcare claims by affected residents that began immediately after the vent and burn order.

Thank you for your time and consideration making these amendments to the decree. Norfolk Southern Railway must be held fully accountable for their reckless, negligent actions that have upended the lives of countless community members!

Sincerely,

Comment A-96

**From:**
**To:** ENRD, PUBCOMMENT-EES (ENRD)
**Subject:** [EXTERNAL] Ohio and USA v. Norfolk Southern, et. al, D.J. Ref. No. 90–11–3–12792
**Date:** Thursday, August 1, 2024 5:47:16 PM

Dear Assistant Attorney General of the Environment and Natural Resources Division,

I am writing to comment on The State of Ohio and The United States of America v. Norfolk Southern Railway Company, et al., D.J. Ref. No. 90–11–3–12792. This consent decree is missing important measures that are necessary to fully address the needs of affected community members after this catastrophic event.

Though it's clear that the US EPA and DOJ are attempting to hold Norfolk Southern Railways accountable, the consent decree should include additional measures to fully address the needs of the community members of this disaster:

– Increase groundwater, surface water, and well water testing from 10 years to 25 years, to be more in line with Superfund site cleanups. The EPA responded to this disaster with their Superfund SMART response team, assigned the derailment site a Superfund number, and yet the derailment site is not being treated as a Superfund site.

– Expand the radius of affected residents (defined as Qualified Individuals in the consent decree) for Medical Monitoring and Mental Health from two miles to twenty miles, as the vent and burn debris traveled far beyond a two mile radius. Reports have now come out that the debris from the derailment site have traveled across sixteen states, which encompasses over 100 million US citizens. Additionally, reporting of direct and secondary mental trauma are far beyond the two mile radius. Expanding the radius to twenty miles would reach most of the affected residents, and would eliminate the inevitable backlog of case-by-case submissions for Qualified Individuals.

– Order Norfolk Southern to pay healthcare claims by affected residents that began immediately after the vent and burn order.

Thank you for your time and consideration making these amendments to the decree. Norfolk Southern Railway must be held fully accountable for their reckless, negligent actions that have upended the lives of countless community members!

Sincerely,

Comment A-97

**From:**
**To:** ENRD, PUBCOMMENT-EES (ENRD)
**Subject:** [EXTERNAL] Ohio and USA v. Norfolk Southern, et. al, D.J. Ref. No. 90–11–3–12792
**Date:** Friday, August 2, 2024 4:34:15 PM

Dear Assistant Attorney General of the Environment and Natural Resources Division,

I am writing to comment on The State of Ohio and The United States of America v. Norfolk Southern Railway Company, et al., D.J. Ref. No. 90–11–3–12792. This consent decree is missing important measures that are necessary to fully address the needs of affected community members after this catastrophic event.

Though it's clear that the US EPA and DOJ are attempting to hold Norfolk Southern Railways accountable, the consent decree should include additional measures to fully address the needs of the community members of this disaster:

– Increase groundwater, surface water, and well water testing from 10 years to 25 years, to be more in line with Superfund site cleanups. The EPA responded to this disaster with their Superfund SMART response team, assigned the derailment site a Superfund number, and yet the derailment site is not being treated as a Superfund site.

– Expand the radius of affected residents (defined as Qualified Individuals in the consent decree) for Medical Monitoring and Mental Health from two miles to twenty miles, as the vent and burn debris traveled far beyond a two mile radius. Reports have now come out that the debris from the derailment site have traveled across sixteen states, which encompasses over 100 million US citizens. Additionally, reporting of direct and secondary mental trauma are far beyond the two mile radius. Expanding the radius to twenty miles would reach most of the affected residents, and would eliminate the inevitable backlog of case-by-case submissions for Qualified Individuals.

– Order Norfolk Southern to pay healthcare claims by affected residents that began immediately after the vent and burn order.

Thank you for your time and consideration making these amendments to the decree. Norfolk Southern Railway must be held fully accountable for their reckless, negligent actions that have upended the lives of countless community members!

Sincerely,

Comment A-98

| | |
|---|---|
| **From:** | Herbert, Ronda (ENRD) |
| **To:** | Grady, Lauren (ENRD) |
| **Cc:** | Spector, Jeffrey (ENRD); Stewart, Geoffrey (ENRD); Rodriguez, Kaylee (ENRD) |
| **Subject:** | FW: Public Comment CASE No. 23-cv-517 United States Settlement with Norfolk Southern Railway Inc. |
| **Date:** | Friday, August 2, 2024 12:20:49 PM |

Hello Lauren,

This was sent to our public comment inbox, for DJ number 90-11-3-12792.

Thank You

Ronda Herbert

Case Management Unit
Docketing Clerk
Environmental and Natural Resource Division

**From:**

**Sent:** Friday, August 2, 2024 12:07 PM
**To:** ENRD, PUBCOMMENT-EES (ENRD) <PENRD3@ENRD.USDOJ.GOV>
**Subject:** [EXTERNAL] Public Comment CASE No. 23-cv-517 United States Settlement with Norfolk Southern Railway Inc.



08-02-2024

Assistant Attorney General
US DOJ
ENRD, PO Box 7611, Washington, DC 20044-7611
pubcomment-ees.enrd@usdoj.gov

**CASE No. 23-cv-517**

Subject: Request for Comprehensive Settlement Terms In RE: United States Settlement with Norfolk Southern
Re: Request for Medical Monitoring, Treatment, and Healthcare Payment Due to Toxic Chemical Exposure Indefinitely

Dear Assistant Attorney General:

I am writing to discuss the terms of the settlement related to the February 3, 2023 Norfolk Southern Train Derailment and Toxic Chemical Spill & February 6, 2023  Vent and Burn in East Palestine, Ohio during which harmful chemicals were intentionally and unnecessarily burned.

Incident Background:

On February 3, 2023, Norfolk Southern Inc. Railway experienced a Train Derailment and Toxic Chemical Spill in East Palestine, OH. The subsequent handling of the spill, including unsafe venting and burning procedures, led to significant environmental contamination and adverse health effects for the community. As a result, many of us, including myself, have suffered health problems due to this exposure.

My 15 year old daughter has been severely impacted by this fire with symptoms of PTSD including flashbacks of a previous building fire on our former property Nov. 11-09-2020. This incident resulted in the loss of her animals as well as her sister's vehicle.   We moved to East Palestine 2.5 years ago.  She has been attending counseling consistently from Insight Counseling in East Palestine, Ohio since the train derailment.  She has been diagnosed with depression, anxiety, sleep deprivation, recurrent nose bleeds and atypical anorexia.

I am writing to seek your assistance regarding a serious issue concerning the health of the East Palestine, Ohio and surrounding communities, following a toxic chemical spill caused by the negligence of Norfolk

Southern Inc. The spill was compounded by unnecessary venting and burning of the chemicals, resulting in prolonged exposure to hazardous substances.

While I appreciate the initial offer to include medical monitoring as part of the settlement, I believe it is imperative that the settlement also comprehensively address the full scope of the community's needs.

Specifically, I am requesting that the settlement terms be expanded to cover not only ongoing medical monitoring but also continuous medical treatment and lifetime payments for healthcare costs for the following reasons:

NS_PUBCOM_0000290

**Risk of Future Cancer: The exposure to the chemicals in question:**

Vinyl chloride
· Ethylene glycol monobutyl ether
· Ethylhexyl acrylate
· Isobutylene
· Butyl acrylate

—burning vinyl chloride creates phosgene gas, a chemical warfare agent used in World War One that has been banned by the Geneva Convention.  Burning butyl acrylate also produces poisonous gases. Reports also note the presence of Benzene another, potent carcinogen.

These chemical exposures raise significant concerns about long-term health effects, including an increased risk of developing cancer.   The potential for such serious health issues necessitates not only monitoring but also proactive and ongoing medical treatment and payment for healthcare operations.

**Financial Burden of Ongoing Treatment:**  Given the serious nature of these exposures and the potential for future health complications, the cost of continuous healthcare treatment and management can be substantial. It is crucial that the settlement includes provisions to cover these expenses to ensure that community members are not financially burdened by the long-term effects of this exposure.

**Quality of Life and Peace of Mind**: The fear of developing cancer or other serious health conditions in the future can have a profound impact on East Palestine, Ohio residents.  A comprehensive settlement that provides for both ongoing treatment and lifetime payments will offer essential support and peace of mind, ensuring that we can focus on our health and well-being rather than financial concerns.

In light of these factors, I respectfully request that the settlement be revised to include provisions for:

**Lifetime Coverage of Medical Treatment**: Comprehensive coverage for all medical treatments, therapies, and necessary interventions related to the condition and potential long-term effects of exposure to the harmful chemicals including:

- **Long-term continuous health monitoring every 6 months**
- **Treatment programs**
  - All necessary medical treatments related to the exposure to be provided. This includes diagnostic tests, consultations with specialists, and any required therapies, medications or interventions to address health conditions caused by the toxic

chemicals.
- **Payment for healthcare costs funded indefinitely by Norfolk Southern**
- **Ongoing weekly counseling not subject to availability of funds**

Section XI. 48 Refers to providing qualified individuals a Community Health Program for:

**" a period of UP TO 20 years"**

This statement is very vague and misleading and appears to be allowing Norfolk Southern to prematurely terminate their obligations.

Section XI. 53

**a) "an individual to provide independent facilitation support"**

Residents are unaware of important factors such as

- Who this **individual** works for
- Their experience and qualifications and
- How much he or she will be compensated.

This fund can rapidly deplete due to compensation for all employees facilitating this Community Health Program with no transparency within this consent decree regarding a program budget.

Based on your proposal the residents of East Palestine, Ohio are unaware of the initial budget for the program's facilitation support role.  This tactic lacks transparency and may instigate misuse of funds by Settling Defendants.

Therefore there should not be an option to terminate this health program based on exhausted resources.  The program should be continually funded for the lifetime of all qualified individuals or a said agreed upon terms.

It is essential that the responsible corporation, Norfolk Southern, funds the medical monitoring and treatment program indefinitely. The program should not be terminated or reduced due to depletion of funds. The company must continue to support the program as long as needed to ensure that all affected individuals receive the care required for their health and well-being.

I am confident that a revised settlement that addresses these needs will be in the best interest of all parties involved and will provide the necessary support for our community's long-term health and well-being.

The negligence of Norfolk Southern has had a profound and ongoing impact on the health of the community. It is crucial that adequate and sustained measures are taken

to address this situation.

Thank you for your attention to this urgent matter. I look forward to your response and hope for a resolution that provides justice and adequate support for those affected by this incident.

Sincerely,



Comment A-99

**From:**
**To:** ENRD, PUBCOMMENT-EES (ENRD)
**Subject:** [EXTERNAL] Ohio and USA v. Norfolk Southern, et. al, D.J. Ref. No. 90–11–3–12792
**Date:** Friday, August 2, 2024 5:40:14 PM

Dear Assistant Attorney General of the Environment and Natural Resources Division,

I am writing to comment on The State of Ohio and The United States of America v. Norfolk Southern Railway Company, et al., D.J. Ref. No. 90–11–3–12792. The vent and burn debris from the derailment site extended beyond a two-mile radius traveling across sixteen states.

The US EPA and DOJ must hold Norfolk Southern Railways accountable to fully address the needs of the community members of this disaster:

– Increase groundwater, surface water, and well water testing from 10 years to 25 years, which is in line with Superfund site cleanups.
– Expand the radius of affected residents (defined as Qualified Individuals in the consent decree) for Medical Monitoring and Mental Health to twenty miles.
– Order Norfolk Southern to pay healthcare claims by affected residents that began immediately after the vent and burn order.

Thank you for your time and consideration making these amendments to the decree. Norfolk Southern Railway must be held fully accountable for their reckless, negligent actions that have upended the lives of countless community members!

Sincerely,

Comment A-100

**From:**
**To:** ENRD, PUBCOMMENT-EES (ENRD)
**Subject:** [EXTERNAL] Train Settlement
**Date:** Monday, August 5, 2024 7:56:33 AM

Hello,

My children and I live one half mile from the derailment site. My ten year old daughter is epileptic and my eleven year old daughter started developing bloody noses after the derailment. We opted to relocate during the most intense part of the cleanup as every time we returned to town my daughter would get a bloody nose, 17 nosebleeds in the last school year alone. She never had them before.

We took advantage of Norfolk's relocation plan. We had a hard time finding furnished places to stay at and some were at outrageous prices. It was not a vacation and it was an extremely stressful year to say the least.

I am writing you today to ask that the relocation expenses that Norfolk agreed to pay during the clean up not be taken out of individual settlements. It's not fair to us residents who were doing what we thought best for our children and families. Like I said it was extremely hard finding furnished places to stay in and now we are being punished by having those expenses taking out of our settlement. We were not on vacation, we were trying to stay safe and healthy.

I urge you to consider changing that part of the settlement.

Thank you for listening and if you have any questions please don't hesitate to contact me.

Sincerely,

Comment A-101

| | |
|---|---|
| **From:** | |
| **To:** | ENRD, PUBCOMMENT-EES (ENRD) |
| **Subject:** | [EXTERNAL] Ohio and USA v. Norfolk Southern, et. al, D.J. Ref. No. 90–11–3–12792 |
| **Date:** | Friday, August 2, 2024 5:19:14 PM |

Dear Assistant Attorney General of the Environment and Natural Resources Division,

I am writing to comment on The State of Ohio and The United States of America v. Norfolk Southern Railway Company, et al., D.J. Ref. No. 90–11–3–12792. This consent decree is missing important measures that are necessary to fully address the needs of affected community members after this catastrophic event.

Though it's clear that the US EPA and DOJ are attempting to hold Norfolk Southern Railways accountable, the consent decree should include additional measures to fully address the needs of the community members of this disaster:

– Increase groundwater, surface water, and well water testing from 10 years to 25 years, to be more in line with Superfund site cleanups. The EPA responded to this disaster with their Superfund SMART response team, assigned the derailment site a Superfund number, and yet the derailment site is not being treated as a Superfund site.

– Expand the radius of affected residents (defined as Qualified Individuals in the consent decree) for Medical Monitoring and Mental Health from two miles to twenty miles, as the vent and burn debris traveled far beyond a two mile radius. Reports have now come out that the debris from the derailment site have traveled across sixteen states, which encompasses over 100 million US citizens. Additionally, reporting of direct and secondary mental trauma are far beyond the two mile radius. Expanding the radius to twenty miles would reach most of the affected residents, and would eliminate the inevitable backlog of case-by-case submissions for Qualified Individuals.

– Order Norfolk Southern to pay healthcare claims by affected residents that began immediately after the vent and burn order.

Thank you for your time and consideration making these amendments to the decree. Norfolk Southern Railway must be held fully accountable for their reckless, negligent actions that have upended the lives of countless community members!

Sincerely,

Comment A-102

| | |
|---|---|
| **From:** | |
| **To:** | ENRD, PUBCOMMENT-EES (ENRD) |
| **Subject:** | [EXTERNAL] East Palestine Train Derailment - Public Comment |
| **Date:** | Friday, August 2, 2024 8:22:27 PM |

DOJ:

These are my arguments against the current Settlement terms:

(1) One cannot make an educated decision about their legal rights without knowing what is to be gained or lost from the decision. To compel people to do this without that information (i.e. what $ they will get) is nothing short of manipulation. Manipulation is the act of misleading others on the basis of incorrect or specious information. The court and Norfolk Southern Railroad (NFS) and the Environmental Protection Agency (EPA) are manipulating members of this class action. Manipulation is wrong. We ask our taxpayer-funded government to protect us from manipulation.

(2) It is wrong to set different deadlines for opt-out members of class action and members of class action who make other choices. What is the rationale? Opt out members should be given a chance to rethink their decision, especially after new information about the extent of derailment chemical travel has been learned. For example, EPA said, without testing crops, that gardening is safe. Then private testing shows crops have large quantities of forever chemicals in them., The EPA's name is mud to this community. Airborne air travel has been reported to go towards Virginia and Michigan.

(3) This settlement does not give enough consideration to those in the rural environments surrounding the town. Residents eat wild game regularly, and it is a giant part of the yearly diet. The deer, ducks, squirrel and other animals I subsist from are drinking the poison that washed down North Fork of Beaver Creek, adjacent to my Camp Creek. NFS poisoned our food. The wild food poisoning issue has never been acknowledged. This is a lifestyle that cannot be changed. These wild and other domestically-grown products also nurture the people of East Palestine and other surrounding towns. The impact cannot be measured. Small farmers are out of business. No one wants to share a honey extractor with anyone near East Palestine. A few thousand dollars doesn't make up for what has been lost.

The EPA falsely claimed in 2023 that gardening was safe. We find with Chemical Engineer Smith and the ▉▉▉▉▉▉ 's garlic that vegetables are not safe. Our lives are forever affected, and likely shortened.

Looking at the cold, institutional form, none of these issues are acknowledged, nor are surrounding communities, and it is disgusting. People beyond the mile perimeter are certainly affected!



Virus-free.www.avast.com

**From:**
**To:** ENRD, PUBCOMMENT-EES (ENRD)
**Subject:** [EXTERNAL] Train Derailment Settlement Public Comment Part 2
**Date:** Friday, August 2, 2024 8:48:13 PM

DOJ:

I would like to add this:

Friends and neighbors have still not received their paperwork. Even if they wanted to opt out, they may no longer do so, according to the arbitrary and weird deadlines set by NFS.

This includes residents of Negley, OH, whose homes are 3 miles from the derailment site. A few of them that I know of experienced downtime from work, burning face, throat and chest, and now has cancer. These people have lived there for decades and were never notified. Therefore, they missed the deadlines. It is wrong to set deadlines that the stupid bureaucracy can't even honor.

Please make a note of the imperfection of this court's order.



 Virus-free.www.avast.com

**From:**
**To:** ENRD, PUBCOMMENT-EES (ENRD)
**Subject:** [EXTERNAL] Public Comment #3
**Date:** Friday, August 2, 2024 9:11:46 PM



I have one more comment about the shortcomings of the bureaucracy administering this derailment mess:

How is the distance circumference determined and how is distance relevant? How is it determined that people over 20 miles will not experience health effects? How is it scientifically determined that people over so many miles only deserve $250? Is there a scientific or medical rationale for this number? No explanations have been provided for this number. These people are expected to sign away rights on this basis. Scientific research independent of NFS shows widespread poisoning (Virginia, Maine, Canada, Great Lakes) and damage of animals, crops, and reputations.

 Virus-free.www.avast.com

Comment A-103

**From:**
**To:** ENRD, PUBCOMMENT-EES (ENRD)
**Subject:** [EXTERNAL] Ohio and USA v. Norfolk Southern, et. al, D.J. Ref. No. 90-11-3-12792
**Date:** Friday, August 2, 2024 5:15:15 PM

Dear Assistant Attorney General of the Environment and Natural Resources Division,

I am writing to comment on The State of Ohio and The United States of America v. Norfolk Southern Railway Company, et al., D.J. Ref. No. 90-11-3-12792. This consent decree is missing important measures that are necessary to fully address the needs of affected community members after this catastrophic event.

Though it's clear that the US EPA and DOJ are attempting to hold Norfolk Southern Railways accountable, the consent decree should include additional measures to fully address the needs of the community members of this disaster:

– Increase groundwater, surface water, and well water testing from 10 years to 25 years, to be more in line with Superfund site cleanups. The EPA responded to this disaster with their Superfund SMART response team, assigned the derailment site a Superfund number, and yet the derailment site is not being treated as a Superfund site.

– Expand the radius of affected residents (defined as Qualified Individuals in the consent decree) for Medical Monitoring and Mental Health from two miles to twenty miles, as the vent and burn debris traveled far beyond a two mile radius. Reports have now come out that the debris from the derailment site have traveled across sixteen states, which encompasses over 100 million US citizens. Additionally, reporting of direct and secondary mental trauma are far beyond the two mile radius. Expanding the radius to twenty miles would reach most of the affected residents, and would eliminate the inevitable backlog of case-by-case submissions for Qualified Individuals.

– Order Norfolk Southern to pay healthcare claims by affected residents that began immediately after the vent and burn order.

Thank you for your time and consideration making these amendments to the decree. Norfolk Southern Railway must be held fully accountable for their reckless, negligent actions that have upended the lives of countless community members!

Sincerely,

Comment A-104

| From: | Herbert, Ronda (ENRD) </O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=51964C3E62E64E9FB7C7C8230D62B187-RHERBERT> |
|---|---|
| To: | Grady, Lauren (ENRD) |
| CC: | Spector, Jeffrey (ENRD); Stewart, Geoffrey (ENRD); Rodriguez, Kaylee (ENRD) |
| Sent: | 8/5/2024 9:09:11 AM |
| Subject: | FW: [EXTERNAL] FW: Consent Decree Errors That Require A Delay in Approval |
| Attachments: | Air Dispersion MOdel Table 1 14June2024.pdf; Figure 1 Apocalyptic fire 18June2024.pdf; Op-ED Release #1 22 Mar 2023.pdf; Table 2 Chemical Fire Products 20Feb2024.pdf |

Hello Lauren,

This was sent to our public comment inbox, for DJ number 90-11-3-12792.

Thank You

Ronda Herbert

Case Management Unit
Docketing Clerk
Environmental and Natural Resource Division

**From:** George R. Thompson, Ph.D. <georgethompson@chemply.com>
**Sent:** Saturday, August 3, 2024 11:35 AM
**To:** ENRD, PUBCOMMENT-EES (ENRD) <PENRD3@ENRD.USDOJ.GOV>
**Subject:** [EXTERNAL] FW: Consent Decree Errors That Require A Delay in Approval

I sent the following document summarizing my objection to the pending East Palestine Cout Decree last evening before the time deadline, as indicated on my email submission below. For some reason, I later received a notification that my submission was undeliverable. I see no error in the email address, but I am sending it again today to an alternative address to assure it is in fact received. Thank you for extending your consideration in accepting this submission.

Best regards,

George R. Thompson, PhD
President & CEO
Chemical Compliance Systems, Inc.

████████████████████████

georgethompson@chemply.com

The information contained in this e-mail is intended only for the individual or entity to who it is addressed. Its contents (including any attachments) may contain confidential and/or privileged information. If you are not an intended recipient, you must not use, disclose, disseminate, copy or print its contents. If you received this e-mail in error, please notify the send by reply e-mail and delete and destroy the message. Internet communications cannot be guaranteed to be timely, secure, error or virus-free. The sender does not accept liability for any errors or omissions.

**From:** George R. Thompson, Ph.D. <georgethompson@chemply.com>
**Sent:** Friday, August 2, 2024 10:51 PM
**To:** 'pubcomment-ees.enrd@usdol.gov' <pubcomment-ees.enrd@usdol.gov>
**Subject:** Consent Decree Errors That Require A Delay in Approval

To Whom It May Concern,

I am an independent toxicologist with 55 years of experience in chemical and product hazard assessments. I have published 21 books on hazardous chemicals, have served as an expert witness in 54 lawsuits, and came out of retirement and invested over 500 hours in analyzing the hazards of cargo chemicals on the East Palestine OH train and researched the highly hazardous chemicals generated by the incomplete combustion from the fires.  I have tabulated by results in a free presentation of approximately 40 PPT charts, if the Cour would like to either view this presentation at your time and convenience using the following Zoom link:

https://us06web.zoom.us/j/87258844697?pwd=aGZzSldXWXhqRVprUWVFUjlUMzIzUT09

The attached Op-Ed summarizes my overall assessment of what is the worst toxicological disaster in my 55 years of experience, but the details in my presentation are in stark contrast to the chemical and medical information previously provided to the Court. .

In this current submission, I summarize just five of my major concerns regarding the health and safety for exposed individuals and the environment seemly underestimated by the Court as evidenced by the sections in the Decree.

## 1.  The 20-Mile Exposure Radius defined in the Settlement Agreement is NOT Supported by the Known Science *(see Table 1)*

The dynamics of air dispersion from the two East Palestine OH train derailment fires have been independently evaluated using the NOAA HYSPLIT Air Dispersion Module and undermine whatever logic led to the focus on just a 20-mile radius around East Palestine.  In this analysis, predicted plume dispersion commenced at 2:00 AM on Saturday 4 February 2023 and concluded at 2:00 PM on Tuesday 7 February 2023.  The plume analysis is of particular importance since it identifies where the carbon particles with the hundreds of bound highly chemicals would be carried and dispersed as they fell from the sky. The first derailment burn occurred late on Friday 3 February 2023.  The second, "controlled" burn was initiated on Monday 6 February 2023 to avoid the erroneously feared Vinyl Chloride tank explosion.

The plume from the initial fire first headed SE over Pittsburgh about 50 miles away by 10:00 AM 2/4/23 (**Table 1**).  However, the plume expanded into the NE and extended over Lake Erie (about 95 miles away) and Lake Ontario (over 250 miles away) by 10: 00 PM that first day.  This NE plume continued to expand across NW New York State and southern Canada through Sunday 5 February 2023.

After the so-called "controlled" burn was ignited on Monday 6 February 2023, three separate plumes formed by 6:00 AM:  (1) a small mass over southern Canada, (2) a large mass in central New York along Lake Erie, and (3) a third plume east from East Palestine into Pennsylvania.  By 2:00 PM the eastern Ohio plume drifted across northern West Virginia, and Virginia, central Pennsylvania to Maryland and Washington, D.C. (285 miles away).  During this same time, the New York plume expanded SE across New York, NE Pennsylvania, NW New Jersey, and western Vermont (over 600 miles away).  On Tuesday 7 February 2023, the northerly plume from East Palestine crossed eastern Ohio, and Lake Erie into southern Canada across the Ontario peninsula to Lake Heron (over 300 miles away).

This independent plume dispersion analysis identified over **126,000 square miles** affected in over 8 states, plus additional thousands of square miles in southern Canada.  The distance of the dispersed plumes from East Palestine were not circular, as assumed at a 20-mile radius in the settlement, but was expansive, 600 miles eastwardly, at least 300 miles northernly, and 285 miles southernly across eight different states and much of southern Canada from Lake Heron to Lake Ontario.

Most of the millions of people living in this vast area do not even recognize that they were probably exposed to "forever" chemicals that can shorten their lives, affect their homes and gardens, pollute farm animals and grounds, thereby affecting our food chain, as well as polluting many community water supplies.  The final Consent Agreement needs to additionally require Norfolk Southern notify the potentially affected public, as well as state and federal agencies, in the vast extent of the pollution dispersion, miles beyond East Palestine, and require that Norfolk Southern fund additional testing and research in the much more extensive exposure zone.  This additional research and analysis must be overseen by an independent panel of experts to assure proper tests are run using appropriate protocols, with release of interim and final results to the public.

## 2.  Exposures to Highly Hazardous Chemicals Produced by These Fires Are Unprecedented *(see Figure 1 & Table 2)*

Independent toxicological analyses of the chemicals and products on the railcars before, and highly hazardous chemicals released after, the fires revealed the East Palestine Ohio train derailment and fires were unprecedented and may become the worst chemical medical disaster in history.  Of the 52 railcars listed on the initial Norfolk Southern manifest, 17 were identified by Norfolk Southern as burned and another 15 were identified as "impinged."  The 52 cars contained 24 different chemicals or products.  In their original shipped state, 20/52 railcars contained inert/safe products (e.g., plastic pellets, semolina flour, flakes/powder, metal products,

automobiles, frozen vegetables, etc.).  The remaining 32 cars contained various types of chemical products.

Prior to the fires, railcar contents included <u>eight</u> chemicals that are known to cause cancer, eight that are allergens, five that cause kidney and liver disease, three that can cause lung diseases, and three that can produce reproductive effects.  Subsequent chemicals produced and released into the air by the fires included an additional <u>120</u> chemicals known to cause cancer, five that are allergens, 13 that are toxic to the kidney and liver, 11 that cause reproductive effects, 65 that cause brain effects, 45 that damage the heart, 22 that cause asthma, 9 that are corrosive to skin/eyes/throat/lungs, 5 that disrupt hormones, and 3 that are absorbed through the skin (**Table 2**).  The 17 railcars reported by NS as burned contained 5,360,000 pounds of chemicals,  the 15 additional "impinged" cars contained 3,220,000 pounds of material, for a total poundage of <u>8,580,000 pounds of hazardous materials released by the fires into the air</u>, and many cause diseases that can be delayed in their onset by 10-20 years.  For example,  according to the World Trade Center Health Program, 2,974 people died on 9/11, but 4,343 have died since 9/11 from their exposures, and over 71,000 individuals have been diagnosed with physical and mental health conditions in the past 20 years brought on by exposure to the dust, smoke, debris, and trauma of the 9/11 attacks.  Similarly, deaths, physical, and mental health conditions will continue to develop in individuals exposed across thousands of square miles to the fire plumes from the East Palestine disaster for decades to come.

Toxicologic chemical hazard assessments are routinely evaluated on the basis of exposure to a <u>single</u> hazardous chemical at levels that are then compared to OSHA, EPA, or other agency designated "safe" levels.  That usual paradigm is NOT applicable to the chemical "stew" released by the East Palestine fire (**Figure 1**) .  Literally hundreds of highly toxic chemicals were created and released simultaneously by the incomplete combustion and fire plume that then dispersed, not just into 20 miles surrounding the East Palestine community, but across the thousands of square miles in eight states and southern Canada.  There is no precedent for assessing the potential health and environmental effects of such a complex, apocalyptic event.  The closest approximation would be the burn pits our military personnel were exposed to in Iraq and Afghanistan.  The broad-based medical symptoms of those exposed individuals are similar to the 95 reported symptoms in individuals in East Palestine, but symptoms from the Gulf War Syndrome have not yet been fully defined, understood, nor even clinically agreed upon over the past 34 years.

Many highly hazardous causative chemicals from the East Palestine fire were either not analyzed for, or were sampled at inappropriate times or using inappropriate tests.  Independent chemical sampling has revealed "forever" dioxin chemicals in home-grown garlic and home heating furnace filter wipe samples.  Polynuclear aromatic hydrocarbons (PAHs) have been independently identified in East Palestine stream sediments and streambeds.  The severe and extensive long-term health effects from both dioxins, PAHs and other emission products from the East Palestine fires are listed in the attached **Table 2**.

Independent compilation and analyses of the 1,500 pages of East Palestine dioxin-related test results found buried on the EPA Website further warrant additional health assessments by independent scientists who can also compile other various sources of existing data, as well as extend their sampling to otherl areas beyond the 20-mile radius restriction stipulated in the proposed Consent Decree.

## 3. The Expected Latency Period from Large Population Exposures to the Fire-Generated Chemical "Stew" Prevents Delayed Health Injuries from Being Accurately Estimated *(see Table 2)*

The potential of a disaster is often gauged by the short-term impact, rather than the potential for cumulative losses over the long-term.  For example, the 9/11 terrorist attack Is most remembered for the 2,974 deaths that occurred on that disastrous day.  Few people are aware that in the 20 years since 9/11, 4,343 survivors and first responders died (an increase of 143%), according to the World Trade Center Health Program.  In addition, over 71,000 people have been diagnosed with physical, and mental health conditions brought on by exposures to the dust, crushed glass, asbestos and the multitude of chemicals created by the initial fires, as well as the 9/11 3-month long smoldering fires.  Cancers like mesothelioma are just now starting to be diagnosed.

<u>The East Palestine apocalypse is a much more insidious disaster.</u>   There were no immediate deaths in Ohio.  The federal EPA Administrator and the Ohio Department of Health announced within a few days after the derailment and fires that the air, water, and soil in East Palestine were "safe".  Suffering residents were dumbfounded!  Now a year later, these agency statements have been proven false!  Cumulated test results have documented that all three environmental media have been significantly polluted by emissions from this apocalypse.

Two months after the disaster, seven workers from the Centers for Disease Control came to East Palestine to evaluate the local health conditions.  All seven went home due to a "mystery illness" they contracted while in East Palestine.  In late February 2024 (a year after the derailment and fires), a graduate student on

assignment from Texas A&M University came to East Palestine to conduct her research.  She immediately experienced the same headaches, irritated nose and throat with labored breathing experienced by local residents.  Similarly,  an Internet report from a family in Canada near Niagara Falls, reported intense headaches and irritated respiratory systems during the East Palestine Ohio disaster.   The East Palestine symptoms have not lonely persisted for over 18 months now, but serious diseases like breast cancer, brain tumors/cancers and nonresponsive bronchial injuries are cumulating.  These facts portend that latency periods for medical injuries are already beginning to be manifest.

Analysis of the Chemical Fire Products (**Table 2**) reveals the following concerns about long-term (delayed) toxicological effects from these chemical exposures, whether in and around East Palestine, or at far-reaching remote locations affected by the plume dispersion of the "chemical stew":

- More than 120 released chemicals are known to cause cancer
- 21 different body organs & organ systems are known to develop cancer from these chemical exposures
- The 13 petroleum trace elements are known to <u>promote</u> cancers actually caused by other chemicals
- The fire-produced chemicals cause serious noncancerous diseases in 9 different body organs

The timeline of diseases produced from the 9/11 terrorist attacks progressed from PTSD and anxiety at 1-6 months, to decreased birth weights of babies of pregnant women at 5-9 months, respiratory issues start to increase from 2-8 years,  cancer diagnoses begin to rise at 2-10 years, drug and alcohol abuse grows at 2-10 years due to chronic PTSD,  cardiovascular disease steadily increases at  8-16 years, and latent cancers (e.g., male breast cancers, mesothelioma) evolve at 11-20 years.   Although a single case of male breast cancer and another case of two brain tumors/cancers in a second individual have already been reported in East Palestine, other predominant symptoms are thus far closely following the 9/11 sequence of symptoms and disease development.

The Court must assure that Norfolk Southern fund an East Palestine Health Center Program, similar to the World Trade Center Health Program.  That East Palestine program must offers free enrollment by anyone within the NOAA HYSPLIT Air Dispersion Model predicted exposure area and provide an active health monitoring and advisory support service for the next 30 years.   Over the past year, disaster "seeds" for large scale future illnesses have been planted, and the Court must help assure that those already injured, but not yet aware of their medical injuries, are properly included in the Norfolk Southern funding requirements.

## 4.  Information Presented to the Court and the Public Has Been Misleading, Incomplete, and Inaccurate

To illustrate this point, I will provide independent analyses and responses to 10 questions posed in this case.   The so-called expert's statement will be in italics; my responses are in bold:

1. What chemicals were released during the derailment and vent and burn?
   *"There was a fairly short list of chemicals released during the derailment itself.  In addition,… the fire that resulted and the vent and burn also released vinyl chloride into the atmosphere and products of combustion and heat decomposition also released products primarily into the atmosphere.*
   **This is a gross misrepresentation of the magnitude of this complex chemical apocalypse!  There were 24 different products in the 52 cars of this derailment.  Of the 24 products, 8 were carcinogens (including vinyl chloride), 16 additional products were other hazardous chemicals or products.  The fires released <u>119 chemicals</u> that are known carcinogens.  The railcars designated on the Norfolk Southern manifest that burned contained 5,330,000 pounds of materials, and the cars listed as "impinged" contained an additional 3,220,000 pounds of materials, for <u>a total of 8,580,000 pounds of chemicals released</u> into the atmosphere.   The chemicals involved in this disaster were not a "short list."**

2. What were the amounts of contamination at different distances from the derailment?
   *"The farther from the derailment, the lower the concentrations were….At the time of the derailment, there was very low wind speed and the plume of the materials from the derailment moved up high into the air before it contacted the community.*
   **This statement ignores the fact that on the day of the derailment there was a temperature inversion, so the plume rose only to about 3,000 feet and spread at that level over a very large area.  Numerous residents of East Palestine, and as far south as West Virginia, reported a black**

dust deposit on their cars, patios, and grounds frm the fallout.  This material was never tested for the large spectrum of highly hazardous chemicals generated by the derailment fires.

3. **How does the amount of contamination compare to regulatory limits, health limits and or background rates?**

*"A number of agencies have looked at the levels that were found and compared them to their published regulatory limits…The Ohio EPA tested ground water and showed no contaminations at all. The USEPA also did air tests and soil tests at various distances from the derailment site and found that levels were very low.  Although they were detectable, they were very low and in the range of, or less than, background levels for those materials."*

These comments do not reflect the unprecedented nature of this East Palestine disaster. Historically and legally, chemical exposure causation is based upon identifying a single chemical that produces the alleged medical symptoms and comparing the measured exposure level to government regulatory limits.   In this East Palestine case, the plume of derailment fire emissions contained <u>hundreds of chemicals</u>, many of which individually <u>produce the same medical injuries</u> – cancer, respiratory irritation/corrosion, individual organ toxicity, neurological symptoms, etc.  It is meaningless to say an individual chemical is at a low, "safe," level when exposure from this fire may be to 20 similarly toxic chemicals that produce the same injury.  For example, the fire plume at East Palestine (<u>Figure 1</u>) contained at least 10 chemicals that each produce irritation of the skin/eyes/nose/throat/lungs, 6 chemicals that are known to cause nasopharyngeal cancer, 7 chemicals known to cause lung cancer, etc.   If one of these chemicals does not exceed its governmental level, it does not mean the combination of chemicals producing that specific toxicity will not cause that illness.  This disaster at East Palestine is not only unprecedented because of its emissions complexity, but it is also unprecedented in the geographical area encompassed.  In addition, East Palestine residents have experienced at least four different chemical exposure/releases ( Fire #1, Fire #2, track soil remediation, stream bank remediation).

4. **How does the level of contamination compare to similar communities?**

*"Levels found in East Palestine were similar to those found in Columbiana because the industrial activity that has occurred in northeast  Ohio over many decades has spread a number of chemicals around the environment, so they are present there all the time. But the derailment itself has not contributed to a significant increase of those chemicals in East Palestine."*

This attempted distraction to "industrial activity" is not only unsound, but it is noncontributory towards defining an honest and meaningful Consent Decree.   The train derailment and fire in East Palestine involved chemicals that are not historic to northeast Ohio.  Do both Columbiana and East Palestine historically equivalent have vinyl chloride "hotspots" from previous "industrial activity over many decades"?   How about the dioxin levels detected in East Palestine?  Are they also "present [in Columbiana] all the time?  The forever chemicals identified in East Palestine are <u>not</u> from historic industrial activity, but may remain in the community forever.  The serious nature of this minimizing and distracting opinion undermines the serious dangers that are resulting from the train derailment and fires.

5. **Were there carcinogens release?**

*"Some of the chemicals that were released are known to be associated with cancer.  In particular, vinyl chloride is known to be a human liver carcinogen.  The levels people in East Palestine were exposed to were so small that I don't expect any kind of cancer, or any other health effects, to have resulted from this.*

This misleading statement ignores the fact that there were 7 other chemical carcinogens in the railcars (i.e., EGMB. petroleum lube oil, fuel additives, benzene, paraffin wax, & hydraulic cement). There was also no mention that the fires released over <u>120 chemicals known to cause cancer</u> in 21 different organs or organ systems of the body and dozens of other chemicals released by the fires promote cancer development.  At least two East Palestine residents have already been diagnosed with cancer - one man with  cancer of the breast , and one man with two tumors/cancers in his brain.  The rapid development of these cancers can readily be attributed to the carcinogens released by the fires along with the cancer promoting chemicals.

6. **What are the health impacts associated with chemicals from the derailment?**

*"Based upon my best judgment, there will not be any long-term health impacts of chemical exposure from the derailment to members of East Palestine."*

**This simplistic statement ignores the actual deaths of over 43,000 fish in East Palestine streams, chickens, foxes, and cats within the first week or so after the derailment. It also does not account for the 95 reported medical symptoms reported by residents of East Palestine and surrounding communities, nor the family in Canada near Niagara Falls that experienced the same irritation symptoms as East Palestine residents during the week of the fires were burning and plume dispersion showed the cloud traversed southern Canada. It also does not account for the two cases of cancer already diagnosed in East Palestine, not the illness still being experienced by residents and visitors 18 months after the catastrophe.**

7. **How much higher would contamination levels have to be in order to be at a dangerous level?**

*"The amount of contamination that would be associated with measurable health effects would depend upon the individual chemicals and to some extent on the characteristics of exposure. I can tell you that the chemical contaminations that have been clearly associated with health effects in communities have been hundreds of times greater than the measured levels that we are now finding in East Palestine."*

**This reasoning of one-chemical-one-effect does NOT apply to the complex apocalypse that occurred in East Palestine, as previously stated. In my 55 years of experience, I know of no other incident where 8,500,000 pounds of diverse, hot chemicals were released as a "chemical stew" over a community and dispersed over a massive geographic area like occurred in East Palestine. This is unprecedented and is so complex that historic procedures for adequately performing a credible exposure hazard analysis and justly rendering legal decisions are the basis for creating inspired new methods and procedures. Causation in hazard analyses and legal judgments must both abandon the one-chemical-one-effect presumption and create methods and procedure, criteria and definitions that will fairly and logically provide a defensible basis to evaluate highly complex mixture exposure assessments as well as fair and just legal decisions. IN this case, the Court needs to give substantially more time for these creative demands to be rendered.**

8. **What are the chances of someone developing an illness like cancer in the future because of this chemical exposure?**

*"Because there's some small levels of chemicals that evolved, the risk to due to those chemical exposures is not zero either, but it is very small. It is much, much smaller than 1%. I would personally not expect one person to develop cancer as a result of the exposure to the chemicals in East Palestine. We know that there are lots of things people are exposed to all the time that are more likely to cause cancer and so the result of the exposure to chemicals from the train derailment is much less of a risk than those other exposures."*

**This opinion is belied by the fact that two men in East Palestine have already developed unique cancers in just 18 months after the derailment and fire. Coincidentally I guess, the train released 8 chemical carcinogens and the fires released another 119 chemicals known to cause cancer, as well as numerous other chemicals that promote the development of cancer. Were the early EPA detection results of dioxins buried from public view until recently presented to the Court? FYI, dioxins are known to cause cancer of the breast, pancreas and colon, and the first breast cancer in a man identified in an East Palestine resident that lived very near Ground Zero. As previously stated (see #3 Above), the large number of fire released chemicals that each cause a specific organ cancer greatly increases the risk that a cancer can develop in that organ – toxic effects are often additive.**

9. **How will levels of chemical contamination increase or decrease over time?**

*" Any chemical distribute around the community will decrease over time…levels will continue to decrease over time…they will never get more than now."*

**A number of the chemicals released by the fires are "forever" chemicals – they disappear very slowly from the environment and linger long in our body fat once absorbed by inhalation, from drinking water, or from contaminated food consumption. Long-standing environmental depositions**

NS_PUBCOM_0000323

in East Palestine have been discovered in railroad beds, stream banks, and stream                          sediments.  Special remediation is required to remove the sources of toxic chemicals.

10. **How would you respond to claims it's too early to know the long-term health effects of the derailment?**

*"Yes, it is too early for some things, but it's not too early to predict the overall health effects that will occur from this.  Certainly, if we're thinking of one potential cancer that occurs 20 years from now, it's too soon to count that, but we pretty well know what exposures resulted from this train derailment, and we can pretty well predict that people will be safe in the long term."*

**There are two major errors in this statement.  First, many of the chemicals released by the fire were not tested for in the air, water, soil, homes, and public areas, even when requested.    In some cases, sampling protocols and analytical procedures were not credible.   This leaves a huge gap in confidence for residents that have been are suffering health effects, but do not know what they were exposed to, and are told that there is no pollution in their environment.  Second, with hundreds of chemicals released in the massive, week-long plume, prediction of future health effects from potentially hundreds of chemical exposures is uncertain at best, and misleading at worst.**

**The scientific and medical assumptions upon which this Consent Decree is based are highly flawed, are incomplete, and utilize faulty assumptions when credible, supplemental data can be developed as a basis for a more credible Decree.   The Court priority should be full protection and coverage for the citizens of East Palestine, not rushing to a quick decision to avoid headlines for Norfolk Southern and clear the deck of a very complex issue!   The residents of East Palestine are still looking thorough the mist of deceit and deception while hoping to find the truth.**

## 5.  Newly Funded Research at Six Universities Will Provide Critical Information Not Previously Available to the NTSB

The National Institute of Environmental Health Sciences (NIEHS) funded six research projects specific to the East Palestine Ohio train derailment and associated chemical exposures in 2024:

1. *Case Western Reserve University* – Federick Ray Schumacher, Ph.D. Principal Investigator
   This research team will talk to East Palestine residents to better understand their experiences and concerns during and after the disaster and initiate a long-term follow-up study to better understand the impact of chemical exposures on health caused by DNA damage.
2. *Texas A&M University* – Natalie Johnson, Ph.D. Principal Investigator
   This team will utilize a mobile air sampling strategy to rapidly characterize potential health risks from hazardous volatile organic chemical (VOC) exposures in the after math and recovery phases of this disaster.
3. *University of California, San Diego* – Beatrice Golomb, M.D., Ph.D. Principal Investigator
   These researchers have conducted interviews with affected East Palestine residents to assess the 2–3-year health impacts of being exposed to a mixture of toxins.
4. *University of Kentucky* – Erin Hayes, Dr. P.H.
   This research team will utilize an online survey to collect longitudinal measures of health symptoms, stress, and well-being of East Palestine residents and establish a research network to help disseminate research findings to the community.
5. *University of Pittsburgh* – Peng Gao, Ph.D. Principal investigator
   This team will collect soil, water, and sediment samples to assess the extent of chemical contamination and document the ongoing impact on the region's local environment and highly contaminated waterways.
6. *University of Pittsburgh* – Juliane Beier,  Ph.D. and Maureen Lichtveld M.D., M.P.H.  Principal Co-Investigators
   This project will collect water and air samples in the homes of East Palestine residents And collect blood samples and other health data to assess impacts of vinyl chloride and other chemicals on the liver.

The Ohio Rural Health Association has scheduled a virtual webinar on 14 August 2024 where each of

these universities will report the current status of their research projects.  Their findings can significantly affect the scope of injuries and damages, expand the size of the class action members,  and  further document the damages to be covered – particularly damages related to latent and delayed health effects that can be manifest decades from now, or even in future generations.  Much of the research previously presented to the Court was conducted by Norfolk Southern and their contractors and focused predominantly on a narrow range of chemicals rather than the large numbers of "forever"  chemicals produced by the fire.  The University of California group in particular has prior experience in assessing health effects in mixtures of fire-generated highly hazardous chemicals.  The Court must allow sufficient time for this highly complex, apocalyptic disaster to be thoroughly researched and analyzed to assure maximum protection for exposed individuals and the environment has been more completely considered before the Consent Decree is approved.

Please let me know when you would like to see the PPT presentation, or if I can be of help in any other way.

Best regards,

George R. Thompson, PhD
President & CEO
Chemical Compliance Systems, Inc.

georgethompson@chemply.com

The information contained in this e-mail is intended only for the individual or entity to who it is addressed. Its contents (including any attachments) may contain confidential and/or privileged information. If you are not an intended recipient, you must not use, disclose, disseminate, copy or print its contents. If you received this e-mail in error, please notify the send by reply e-mail and delete and destroy the message. Internet communications cannot be guaranteed to be timely, secure, error or virus-free. The sender does not accept liability for any errors or omissions.

## Table 1.  East Palestine OH Train Derailment & Fire

# Plume Disbursement

| Date | Time | Plume Location and Description |
|---|---|---|
| Saturday 2/4/23 | 0200-0400 | Plume starts SE into western PA towards Pittsburgh |
| | 1000-1200 | Plume initially SE into PA over Pittsburgh |
| | 1200-1400 | Plume SE & expands to NE into western PA over Pittsburgh & slightly beyond |
| | 1600-1800 | Plume shifts NNE into western NY to Lake Erie & expands eastward in NW PA & W NY |
| | 2000-2200 | Plume extends over Lake Erie & eastern Lake Ontario |
| Sunday 2/5/23 | 0600-0800 | Plume expanded NE across western PA, western NY & Lake Erie to Lake Ontario |
| | 1000-1200 | Plume extended NE across western PA, western NY, Lake Erie to Lake Ontario – larger plume mass |
| | 1600-1800 | Plume expanded NE further into southern Canada across 2 Great Lakes, NW NY & southern Canada – longer modeled plume |
| Monday 2/6/23 | 0000-0200 | Smaller plume over western PA & western NY to Lake Erie, small plume in southern Canada |
| | 0400-0600 | Small mass of Plume over southern Canada, large mass in central NY along Lake Erie, Third plume east from East Palestine (3 separate plume portions) |
| | 0800-1000 | Plume east into central PA, re-connects with central NY mass = large, combined mass, Canada plume above VT |
| | 1000-1200 | Large plume mass now in central PA/NY, Canada mass much smaller, no plume in eastern NY or southern VT |
| | 1400-1600 | Eastern OH plume SE across northern WV & VA, central PA to MD & Washington D.C., NY plume in SE NY/NE PA/NW NJ/ W VT |
| | 1600-1800 | OH plume SE across SW PA, northern WV & VA, to MD & near Washington D.C., NJ plume very small |
| | 2000-2200 | OH plume SSE across SE PA, NW WV, NJ plume gone |
| Tuesday 2/7/23 | 0600-0800 | OH plume SSE across northern WV, northern OH plume across Lake Erie, large plume masses both north & south |
| | 1000-1200 | OH plume SE across NE WV, northern plume across eastern OH & Lake Erie into southern Canada across southern Ontario peninsula to Lake Heron |
| | 1200-1400 | OH mass SSE across NE WV, northern OH plume massive & crosses Lake Erie into Canada |

# Figure 1. The East Palestine Apocalyptic Fire – A Chemical "Stew"



NS_PUBCOM_0000327

# Independent Expert Predicts East Palestine OH Train Derailment Chemical Release Deaths May Become Worse Than 9/11

Independent expert analyses of the chemicals in the railcars, and their subsequent fire, following the train derailment in East Palestine Ohio identified over 100 highly toxic chemicals that have the potential to result in long-term medical injuries and environmental contamination.  Dr. George Thompson, a toxicologist with over 50 years experience in chemical hazard assessments, published 21 books on hazardous chemicals, and served as an expert witness in 52 cases, predicts the long-term human health effects from this accident may be worse than occurred from 9/11.  The fire potentially released 500-1,000 tons of highly toxic soot, ash, and hazardous chemicals into a massive smoke and mushroom cloud that slowly dissipated hundreds of miles beyond the derailment area contaminating farmland, animals, and communities in perhaps 5 different states.

Recent reports have stated that the delayed deaths for firefighters from 9/11 will shortly surpass accumulated deaths since 9/11.  Dr. Thompson fears that similar delayed deaths from the East Palestine chemical release will accrue in eastern Ohio, Pennsylvania, West Virginia, Virginia, Maryland and possibly Delaware.  One of the railcar chemicals has been detected at low levels in the Ohio River bordering West Virginia, and "pollen" dust, that contained "some soil particles," was observed in Eastern West Virginia, particularly Berkeley and Washington Counties, in West Minster Maryland, and on Maryland's Eastern Shore.   The impact of soot/ash chemical contaminants on farmland across these states remains unknown.

Of the 52 railcars identified in the Norfolk Southern manifest, 27 cars contained 12 different chemicals, and 8 cars contained 4 petroleum products.   The precise identification of the railcars burned in the subsequent derailment fire is still awaiting clarification from Norfolk Southern.  Of the railcar chemicals, eight cause cancer, allergies, and aquatic toxicity in the rivers.  However, the number of additional toxic chemicals released by the fire included nearly 100 that cause cancer, 65 that produce brain/central nervous system effects, 45 that cause heart disease, 42 that cause lung toxicity, 22 that cause asthma, and 11 that cause reproductive effects.  The potential human health and environmental hazards from the chemicals released by the fire far exceeded hazards from the railcar contents themselves.  Dr. Thompson indicated that a question remains regarding the geographic area of concern, since the massive mushroom cloud created from the fire, and observed from space, would have impacted an area far greater than the community of East Palestine Ohio.

Shortly after the fire began, local citizens experienced health effects that persist now, six weeks after the initial incident.  One woman and her husband, for example, experienced nose, eye, throat, larynx, and lung irritation within hours after the fire started.  They have continued to suffer severe coughing and wheezing for the past six weeks, and still do not see an end to their injuries. Another East Palestine resident recently removed and folded his outdoor U.S. flag.  Within hours, he developed a severe rash from the dust that had been on his flag.  Residents must continue to be diligent about NOT vacuuming any dust in or around their homes or vehicles, since the vacuum exhaust will again spread the contaminated dust leading to another round of skin, eye, nose, throat and lung irritation and absorption.

Within hours after the fire ignition, animals in the greater area of East Palestine were killed. Five chickens raised 10 miles northwest of East Palestine died within hours.   One fox near East

NS_PUBCOM_0000328

Palestine died, and several others became sick.  Dozens of frogs and hundreds of fish in local streams died from the contamination.  Cows in Pennsylvania reportedly developed diarrhea, and at least one railcar chemical was reportedly detected at levels below those of concern in the West Virginia Ohio River, approximately 265 miles south of East Palestine.   A local farmer that raises pigs was unable to sell his pigs at market- they did not want any livestock from the area of exposure.

Dr. Thompson stated, "this train derailment and chemical release by the fire is the most complex and hazardous chemical release accident I have seen in my 50 years of experience as a toxicologist.  My greatest fear is that cumulative long-term health effects across a broad cross section of the Atlantic States will progressively result in thousands of deaths from cancer, heart, kidney, and lung diseases over the next 10-20 years that could potentially exceed those from 9/11."

## Table 2. Chemical Fire Products in East Palestine OH Train Derailment

| Chemical or Product | Chemicals Released by Fire | Health Hazards from Emitted Pollutants |
|---|---|---|
| 1. Polypropylene | Soot<br>Ash/Particulates w/ Persistent Free Radicals<br>Polycyclic Aromatic Hydrocarbons (PAHs)<br>Carbon Monoxide<br>Dioxins<br><br><br>Aldehydes | **Cancers –** lung & bladder **– Asthma, Heart Disease, Death**<br>**Lung Inflam. & Cancer –** lung **– Asthma, Cardiovascular Disease, COPD, Persistent in Air**<br>**Cancers –** lung, skin, bladder, scrotum **– Male/Female Reproduction, COPD; Cardiovascular Disease; Confusion; Mutagens**<br>**Headache, Nausea, Dizziness, Malaise, Seizures, Coma**<br>**Cancer –** breast, pancreas, colon **- Liver/Immune/Cardiovascular Diseases, Chloracne; Persist. Env. Pollut.s; Hormone Disruptors**<br>**Cancer –** nasopharynx **- Cardiovascular Disease, S/E/T/L** (skin, eyes, nose, throat, lungs) **Irritant, Headache, Dizziness, Fainting** |
| 2. Polyethylene | Soot<br>Ash/Particulates w/ Persistent Free Radicals<br>Polycyclic Aromatic Hydrocarbons (PAHs)<br>Carbon Monoxide<br>Dioxins<br><br><br>Aldehydes | **Cancers –** lung & bladder **– Asthma, Heart Disease, Death**<br>**Lung Inflam. & Cancer –** lung **- Asthma, Cardiovascular Disease, COPD, Persistent in Air**<br>**Cancers –** lung, skin, bladder, intestine **– Male/Female Reproduction COPD; Cardiovascular; Confusion; Mutagens**<br>**Headache, Nausea, Dizziness, Malaise, Seizures, Coma**<br>**Cancer –** breast, pancreas, colon **- Liver/Immune/Cardiovascular Diseases, Chloracne; Persist. Env. Pollut.s; Hormone Disruptors**<br>**Cancer –** nasopharynx **- Cardiovascular Disease, S/E/T/L Irritant, Dizziness, Fainting** |

NS_PUBCOM_0000330

| | | |
|---|---|---|
| 3. **Vinyl Chloride** *Stabilized (Phenol)* [Highly mobile in soils & water] | Hydrochloric Acid Formaldehyde Phosgene Dioxins<br><br>Carbon Monoxide Phenol Methane | **Corrosive S/E/T/L** **Cancer** – nose, blood – **Corrosive S/E/T/L, Allergen** **Extreme Irritant** – skin/eye/nose/throat/lung inflame & edema; **Death** **Cancer** – breast, pancreas, colon - **Liver/Immune/Cardiovascular Diseases, Chloracne; Persist. Env. Pollut.s; Hormone Disruptors, S/E/T/L Irritant,** **Headache, Nausea, Dizziness, Malaise, Seizures, Coma** **Corrosive** – skin, eyes, nose, throat, lungs; **Liver/Kidney/CNS Damage** **Headache, Dizziness, Nausea, Loss of Coordination, Cognitive Impairment, Heart Palpitations, Asphyxia** |
| 4. **Dipropylene Glycol** | Aldehydes<br><br>Ketones<br><br>Carbon Monoxide | **Cancer** – nasopharynx - **Cardiovascular Disease, S/E/T/L Irritant, Headache, Dizziness, Fainting** **Irritants S/E/T/L** , **>Blood Sugar, Breathing Difficulty, Pain, Headache, Nausea, Dizziness, Confusion, Coma** **Headache, Nausea, Dizziness, Malaise, Seizures, Coma** |
| 5. **Propylene Glycol** | Propylene Oxide<br><br>Formaldehyde Acetaldehyde Carbon Monoxide | **Cancer** – nose; **Mutagen, S/E/T/L Irritant; Nausea, Emesis, Abdomen Pain; Headache, Dizziness, Fainting** **Cancer** – nose, blood - **Corrosive S/E/T/L, Allergen** **Cancer** – nasopharynx - **Cardiovascular Disease, S/E/T/L Irritant, Headache, Dizziness, Fainting** **Headache, Nausea, Dizziness, Malaise, Seizures, Coma** |
| 6. **Diethylene Glycol** | Aldehydes<br><br>Ketones<br><br>Formic Acid<br><br>Carbon Monoxide | **Cancer** – nasopharynx - **Cardiovascular Disease, S/E/T/L Irritant, Headache, Dizziness, Fainting** **Irritants S/E/T/L, >Blood Sugar, Breathing Difficulty, Pain, Headache, Nausea, Dizziness, Confusion, Coma** **Irritant S/E/T/L, Headache, Dizziness, Nausea, Emesis, Kidney Damage, Skin Absorbed** **Headache, Nausea, Dizziness, Malaise, Seizures, Coma** |

NS_PUBCOM_0000331

| | | |
|---|---|---|
| 7. Ethylene Glycol Monobutyl Ether | Aldehydes<br><br>Ketones<br><br>Formic Acid<br><br>Acetic Acid<br>Carbon Monoxide | Cancer – nasopharynx - **Cardiovascular Disease, S/E/T/L Irritant, Headache, Dizziness, Fainting**<br>**Irritants S/E/T/L, >Blood Sugar, Breathing Difficulty, Pain, Headache, Nausea, Dizziness, Confusion, Coma**<br>**Irritant S/E/T/L, Headache, Dizziness, Nausea, Emesis, Kidney Damage, Skin Absorbed**<br>**Irritant S/E/T/L, Lung edema, Bronchitis**<br>**Headache, Nausea, Dizziness, Malaise, Seizures, Coma** |
| 8. Semolina (Flour) | Soot<br>Ash/Particulates w/ Persistent Free Radicals<br>Polycyclic Aromatic Hydrocarbons (PAHs)<br>Acrylamide<br>Carbon Monoxide<br>Dioxins<br><br><br>Aldehydes | **Cancers**– lung & bladder – **Asthma, Heart Disease, Death**<br>**Lung Inflam. & Cancer** – lung - **Asthma, Cardiovascular Disease, COPD, Persistent in Air**<br>**Cancers** – lung, skin, bladder, scrotum – **Male/Female Reproduction COPD; Cardiovascular Disease; Confusion; Mutagens**<br>**Cancers** – ovarian, kidney, endometrial<br>**Headache, Nausea, Dizziness, Malaise, Seizures, Coma**<br>**Cancer** – breast, pancreas, colon - **Liver/Immune/Cardiovascular Diseases, Chloracne; Persist. Env. Pollut.s; Hormone Disruptors**<br>**Cancer** – nasopharynx - **Cardiovascular Disease, S/E/T/L Irritant, Headache, Dizziness, Fainting** |
| 9. Ethylhexyl Acrylate | Carbon Monoxide<br>Nitrogen Oxides<br>Methane<br><br>MEHQ | **Headache, Nausea, Dizziness, Malaise, Seizures, Coma**<br>**Irritant S/E/T/L, Bronchitis, Asthma, Lung Edema, COPD**<br>**Headache, Dizziness, Weakness, Loss of Coordination & Judgment, Mood Changes, Memory Loss, Asphyxiant**<br>**Corrosive & Poisonous Fumes** |
| 10. Polyvinyl (Alcohol) | Organic Acids | **Corrosive S/E/T/L, Allergens, Liver Disease, Nephropathy, Coagulation Disorders and Nervous System Disorders.** |

NS_PUBCOM_0000332

| | | |
|---|---|---|
| | Aldehydes | **Cancer –** nasopharynx **- Cardiovascular Disease, S/E/T/L Irritant, Headache, Dizziness, Fainting** |
| | Alcohol | **Confusion, Poor Judgment, Emesis, Seizures, Hepatitis, Liver Cirrhosis, Cancer –** breast, mouth, throat, esophagus, liver, colon, rectum |
| | Carbon Monoxide | **Headache, Nausea, Dizziness, Malaise, Seizures, Coma** |
| **11. Petroleum Lube Oil** *(Distillate Oil)* | Soot | **Cancers –** lung & bladder **– Asthma, Heart Disease, Death** |
| | Ash/Particulates w/ Persistent Free Radicals | **Lung Inflam. & Cancer –** lung **- Asthma, Cardiovascular Disease, COPD, Persistent in Air** |
| | Polycyclic Aromatic Hydrocarbons (PAHs) | **Cancers –** lung, skin, bladder, scrotum **– Male/Female Reproduction, COPD; Cardiovascular Disease; Confusion; Mutagens** |
| | Carbon Monoxide | **Headache, Nausea, Dizziness, Malaise, Seizures, Coma** |
| | Nitrogen Oxides (NO$_X$) | **Inflammation of Airway, Lung Edema, Bronchitis, Bronchiolitis, Emphysema, COPD, Headache, Fatigue, Dizziness, Blue Skin/Lips, Increased Respiratory Infect.s, Air Acidification** |
| | Sulfur Oxides (SO$_X$) | **Cancer –** lung, larynx **- Irritant S/E/T/L, Asthma, Bronchitis, Air Acidification, Sulfur Particulates** |
| | Aldehydes | **Cancer –** nasopharynx **- Cardiovascular Disease, S/E/T/L Irritant, Headache, Dizziness, Fainting** |
| | Substituted Benzenes | **Cancers –** blood, kidneys, lungs, liver **- S/E/T/L Irritant, Bronchitis, Headache, Narcolepsy, Fainting, Hand Coordination** |
| | [Trace Elements >13] | **Cancers (12/13 Elements) –** bladder, brain, bronchi, kidney, lung, nose, skin, trachea **– Cancer Promotor** |
| | [Many Other Toxins = Mercaptans, Phenols, Pyridines, Pyrroles, Indoles & Carbazoles] | **Similar Hazards to Other Listed Petroleum Constituent Hazards (See #'s 14 , 15, and above for #11): Many of These Toxin Emissions May Be Bound to Soot & Particulate Emissions** |

NS_PUBCOM_0000333

| | | |
|---|---|---|
| **12. Isobutylene** | Carbon Monoxide | **Headache, Nausea, Dizziness, Malaise, Seizures, Coma** |
| **13. Butyl Acrylates** *Stabilized (MEHQ)* | Carbon Monoxide<br>Nitrogen Oxides<br>Methane<br><br>MEHQ | **Headache, Nausea, Dizziness, Malaise, Seizures, Coma**<br>**Irritant S/E/T/L, Bronchitis, Asthma, Lung Edema, COPD**<br>**Headache, Dizziness, Weakness, Loss of Coordination & Judgment, Mood Changes, Memory Loss, Asphyxiant**<br>**Corrosive & Poisonous Fumes** |
| **14. Petro Oil, NEC** *(Residual Oil)* | Soot<br>Ash/Particulates w/ Persistent Free Radicals<br>Polycyclic Aromatic Hydrocarbons (PAHs)<br>Carbon Monoxide<br>Nitrogen Oxides (NO$_X$)<br><br><br><br>Sulfur Oxides (SO$_X$)<br><br>Aldehydes<br><br>Substituted Benzenes<br><br>[Trace Elements $\geq$13]<br><br>[Many Other Toxins = Mercaptans, Phenols, Pyridines, Pyrroles, Indoles & Carbazoles] | **Cancers –** lung & bladder **– Asthma, Heart Disease, Death**<br>**Lung Inflam. & Cancer –** lung **- Asthma, Cardiovascular Disease, COPD, Persistent in Air**<br>**Cancers –** lung, skin, bladder, scrotum **– Male/Female Reproduction, COPD; Cardiovascular Disease; Confusion; Mutagens**<br>**Headache, Nausea, Dizziness, Malaise, Seizures, Coma**<br>**Inflammation of Airway, Lung Edema, Bronchitis, Bronchiolitis, Emphysema, COPD, Headache, Fatigue, Dizziness, Blue Skin/Lips, Increased Respiratory Infect.s, Air Acidification**<br>**Cancer –** lung, larynx **- Irritant S/E/T/L, Asthma, Bronchitis, Air Acidification, Sulfur Particulates**<br>**Cancer –** nasopharynx **- Cardiovascular Disease, S/E/T/L Irritant, Headache, Dizziness, Fainting,**<br>**Cancers –** blood, kidneys, lungs, liver **- S/E/T/L Irritant, Bronchitis, Headache, Narcolepsy, Fainting, Hand Coordination**<br>**Cancers (12/13 Elements) –** bladder, brain, bronchi, kidney, lung, nose, skin, trachea **– Cancer Promotor**<br>**Similar Hazards to Other Listed Petroleum Constituent Hazards (See #'s 11, 15, and above for #14):  Many of These Toxin Emissions May Be Bound to Soot & Particulate Emissions** |
| **15. Additives, Fuel** | Soot<br>Ash/Particulates w/ | **Cancers –** lung & bladder **– Asthma, Heart Disease, Death**<br>**Lung Inflam. & Cancer –** lung **- Asthma, Cardiovascular** |

NS_PUBCOM_0000334

| | | |
|---|---|---|
| | Persistent Free Radicals | **Disease, COPD, Persistent in Air** |
| | Polycyclic Aromatic Hydrocarbons (PAHs) | **Cancers** – lung, skin, bladder, scrotum – **Male/Female Reproduction, COPD; Cardiovascular Disease; Confusion; Mutagens** |
| | Carbon Monoxide | **Headache, Nausea, Dizziness, Malaise, Seizures, Coma** |
| | Nitrogen Oxides ($NO_X$) | **Inflammation of Airway, Lung Edema, Bronchitis, Bronchiolitis, Emphysema, COPD, Headache, Fatigue, Dizziness, Blue Skin/Lips, Increased Respiratory Infect.s, Air Acidification** |
| | Sulfur Oxides ($SO_X$) | **Cancer** – lung, larynx - **Irritant S/E/T/L, Asthma, Bronchitis, Air Acidification, Sulfur Particulates** |
| | Aldehydes | **Cancer** – nasopharynx - **Cardiovascular Disease, S/E/T/L Irritant, Headache, Dizziness, Fainting,** |
| | Substituted Benzenes | **Cancers** – blood, kidneys, lungs, liver - **S/E/T/L Irritant, Bronchitis, Headache, Narcolepsy, Fainting, Hand Coordination** |
| | [Trace Elements $\geq$13] | **Cancers (12/13 Elements)** – bladder, brain, bronchi, kidney, lung, nose, skin, trachea – **Cancer Promotor** |
| | [Many Other Toxins = Mercaptans, Phenols, Pyridines, Pyrroles, Indoles & Carbazoles] | **Similar Hazards to Other Listed Petroleum Constituent Hazards (See #'s 11 , 14, and above for #15); Many of These Toxin Emissions May Be Bound to Soot & Particulate Emissions** |
| **16. Benzene (Empty?)** | | |

| 17. Paraffin Wax | Soot<br>Toluene<br><br>Benzene<br>Formaldehyde | **Cancers**– lung & bladder – **Asthma, Heart Disease, Death**<br>**Kidney & Liver Damage, Reprod. & Neonatal Effects,**<br>   **Headaches, Nausea, Dizziness, Insomnia, Skin**<br>   **Absorption, Reprod. Toxin**<br>**Cancer** – blood – **Anemia, Neonatal Effects,**<br>**Cancer** – nose, blood - **Corrosive S/E/T/L, Allergen** |
| --- | --- | --- |
| 18. Flakes, Powder | **Depends Upon Type of Flakes** | **TBD** |
| 19. Hydraulic Cement | | |
| 20. Malt Liquors | **Depends Upon Burn Status** | **TBD** |
| 21. Balls, CTN, MEDCL (?) | **Depends Upon Ball Composition** | **TBD** |
| 22. Sheet Steel | **Depends Upon Steel Composition** | **TBD** |
| 23. VEGETABLE, FROZEN | Soot<br>Ash/Particulates w/<br>   Persistent Free Radicals<br>Polycyclic Aromatic<br>   Hydrocarbons (PAHs)<br><br>Carbon Monoxide<br>Nitrogen Oxides ($NO_X$)<br><br><br><br>Sulfur Oxides ($SO_X$)<br><br>Aldehydes<br><br>Substituted Benzenes | **Cancers – lung & bladder – Asthma, Heart Disease, Death**<br>**Cancer –** lung **- Lung Inflam., Asthma, Cardiovascular**<br>   **Disease, COPD, Persistent in Air**<br>**Cancers –** lung, skin, bladder, scrotum **– Male/Female**<br>   **Reproduction, COPD; Cardiovascular Disease;**<br>   **Confusion; Mutagens**<br>**Headache, Nausea, Dizziness, Malaise, Seizures, Coma**<br>**Inflammation of Airway, Lung Edema, Bronchitis,**<br>   **Bronchiolitis, Emphysema, COPD, Headache, Fatigue,**<br>   **Dizziness, Blue Skin/Lips, Increased Respiratory**<br>   **Infect.s, Air Acidification**<br>**Cancer –** lung, larynx **- Irritant S/E/T/L, Asthma, Bronchitis,**<br>   **Air Acidification, Sulfur Particulates**<br>**Cancer –** nasopharynx **- Cardiovascular Disease, S/E/T/L**<br>   **Irritant, Headache, Dizziness, Fainting,** |

NS_PUBCOM_0000336

| | | |
|---|---|---|
| | [Trace Elements >13]<br><br>[Many Other Toxins = Mercaptans, Phenols, Pyridines, Pyrroles, Indoles & Carbazoles] | **Cancers –** blood, kidneys, lungs, liver - **S/E/T/L Irritant, Bronchitis, Headache, Narcolepsy, Fainting, Hand Coordination**<br>**Cancers (12/13 Elements) –** bladder, brain, bronchi, kidney, lung, nose, skin, trachea **– Cancer Promotor**<br>**Similar Hazards to Other Listed Petroleum Constituent Hazards (See #'s 11, 14, 15):  Many of These Toxin Emissions May Be Bound to Soot & Particulate Emissions** |

NS_PUBCOM_0000337

Comment A-105



**DAVE YOST**
OHIO ATTORNEY GENERAL

Administration
Office 614-728-5458
Fax 614-466-5087

June 06, 2024

Todd Kim
Assistant Attorney General
Environmental and Natural Resources Division
U.S. Department of Justice
P.O. Box 7611,
Washington, DC 20044-7611
pubcomment-ees.enrd@usdoj.gov

> Re: Request for Extension of Comment Period for the *Proposed Consent Decree Under the Comprehensive Environmental Response, Compensation, and Liability Act and the Clean Water Act* in *State of Ohio and The United States of America v. Norfolk Southern Railway Company, et al.,* Case No. 4:23-cv-00517, D.J. Ref. No. 90-11-3-12792

The State of Ohio respectfully requests no less than an additional 30 days to submit comments on the *Proposed Consent Decree Under the Comprehensive Environmental Response, Compensation, and Liability Act and the Clean Water Act* in *State of Ohio and The United States of America v. Norfolk Southern Railway Company, et al.,* Case No. 4:23-cv-00517, D.J. Ref. No. 90-11-3-12792. *See* 89 Fed. Reg. 46908 (May 30, 2024). Ohio asks the Department of Justice to extend the comment period to no earlier than August 1, 2024.

Ohio, a Co-Plaintiff and Co-Trustee of natural resources that were impacted in the underlying action, has begun its review of the federal consent decree between the United States and Norfolk Southern Railway Company and Norfolk Southern Corporation. Ohio will continue its review throughout the month of June, as the consent decree spans 100 pages including its appendix, is highly technical and imposes requirements for railway safety and environmental protection. Even more time is necessary to complete the review, though, because the NTSB has not yet issued final findings, determined a final probable cause or provided final recommendations on the derailment, chemical release and related fires in East Palestine.

The NTSB plans to vote on the findings, a final probable cause and final recommendations on June 25, 2024. Ohio will need at least until August 1, 2024 to review those findings and recommendations to determine whether comments on the proposed consent decree are warranted and, if so, finalize the comments for submittal.

1

NS_PUBCOM_0000003

For these reasons, the United States should grant an extension at least until August 1, 2024 to comment on the *Proposed Consent Decree Under the Comprehensive Environmental Response, Compensation, and Liability Act and the Clean Water Act* in *State of Ohio and The United States of America v. Norfolk Southern Railway Company, et al.*, Case No. 4:23-cv-00517.

Yours,

Jonathan R. Fulkerson
Deputy Attorney General
Office of Ohio Attorney General Dave Yost
30 E. Broad Street, 17th Floor
Columbus, Ohio 43215
Jonathan.Fulkerson@OhioAGO.gov

2

Comment A-106



## Comments of the American Chemistry Council

Notice of Lodging of Proposed Consent Decree
*The State of Ohio and The United States of America v. Norfolk Southern Railway Company,*
*et al.*, D.J. Ref. No. 90–11–3–12792

The American Chemistry Council (ACC) respectfully submits these comments on the proposed Consent Decree lodged by the Department of Justice (DOJ) in the lawsuit entitled *State of Ohio and United States of America v. Norfolk Southern Railway Company, et al.* (Case No. 4:23–cv–00517). ACC has significant concerns with specific provisions of the Consent Decree that directly impact our members and requests a meeting with DOJ to discuss these issues further.

ACC represents the leading companies in the business of chemistry. Our members provide innovative products and services that make people's lives better, healthier, and safer. As a $639 billion enterprise, the business of chemistry is a key element in the nation's economy and a large user of the U.S. freight transportation system. In 2022, our industry shipped more than 2.3 million carloads of chemical products, including some classified as hazardous materials, on freight railroads. ACC and its members are committed to the safe transportation of our products throughout the supply chain. The February 3, 2023, train derailment in East Palestine, Ohio is a strong reminder that more work is needed to improve freight rail and hazmat transportation safety.

The proposed Consent Decree would settle Clean Water Act (CWA) and Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA) claims brought by the United States against Norfolk Southern Railway Company and Norfolk Southern Corporation (Norfolk Southern) related to the East Palestine incident. While ACC welcomes the proposed agreement, we have significant concerns with two specific provisions that address the use of DOT-111 tank cars (Paragraphs 69 and 70). These Tank Car Provisions inappropriately impose obligations and burdens on ACC member companies and other third parties that are neither signatories to the Consent Decree nor parties to the underlying litigation. The provisions conflict with both Federal law and Department of Transportation (DOT) regulations governing the use of tank cars, allow Norfolk Southern to breach or terminate existing contracts with shippers, and threaten to impede interstate commerce, disrupt national supply chains, and increase prices for a broad selection of consumer goods. In addition, while tank car performance is critical to the safe transportation of hazardous materials, these provisions are unlikely to improve overall rail safety and may simply shift potential risks to other parts of the rail network.

As discussed more fully below, ACC believes that the Tank Car Provisions do not serve the public interest. We urge DOJ to either withdraw paragraphs 69 and 70 from the proposed Consent Decree or significantly modify the provisions so that the interests of third parties are not adversely affected. In addition, ACC would appreciate the opportunity to meet with DOJ to further discuss our concerns.

**The Tank Car Provisions Impose Obligations and Burdens on Third Parties**

Contrary to U.S. law, the obligations imposed by the Tank Car Provisions fall directly to ACC member companies and other third parties. Rail customers, not railroads, provide the tank cars used to transport their products. They either own cars directly or lease them through a supplier and are ultimately responsible for maintaining their fleet.

According to data from the Association of American Railroads (AAR), approximately 17,000 DOT-111 tank cars are currently used to transport flammable liquids in the U.S (AAR Status Report: North American Flammable Liquid Tank Car Fleet, May 2024). ACC member companies collectively own or lease more than 7,000 of these cars. If the proposed Consent Decree is approved as written, shippers will be prohibited from deploying these cars on Norfolk Southern routes or will be subjected to a "Customer Tank Car Replacement Plan" developed by Norfolk Southern without shipper input.

On its face, Paragraph 69 requires Norfolk Southern to "cease use" of the specified cars. However, the impact of this obligation falls, not to Norfolk Southern, but to shippers that rely on Norfolk Southern to transport their products. To the extent that DOT-111 cars are forced out of service prior to the FAST Act deadlines, shippers would need to secure replacement cars. Presumably, even shipments that are already under contract would be refused by Norfolk Southern – requiring shippers to scramble to rearrange the deployment of cars and potentially leaving them without enough cars to ship materials to locations serviced by Norfolk Southern. In addition, some shippers will be left with owned or leased DOT-111 cars that they cannot use.

Paragraph 70 also impacts ACC members and other third parties. The provision requires Norfolk Southern to develop and implement a Customer Tank Car Replacement Plan designed to "encourage" its customers to use DOT-117 or equivalent tank cars in place of DOT-111 cars for the transportation of Flammable Hazardous Materials. The provision specifically requires the use of "financial incentives as an aspect of the plan." Such incentives almost certainly entail substantial additional costs (i.e., higher rates or surcharges) for ACC members and other shippers.

The provision requires the Federal Government to review the plan "taking into consideration *Settling Defendants' industry and technical expertise* (emphasis added)." It fails to include a similar requirement to consider relevant data and expertise from the *rail*

2

NS_PUBCOM_0000031

*equipment industry* that produces such cars and the *shipper industries* that use the cars and would be paying the fees.

These provisions actually burden and impose obligations on a large number of parties, including ACC members, who are not parties to this case and who have not agreed to the Consent Decree in general, nor to paragraphs 69 or 70 in particular. It is well settled law that "a court may not enter a consent decree that imposes obligations on a party that did not consent to the decree" (*Local No. 93 v. City of Cleveland*, 478 U.S. 501, at 529). It is improper for the Consent Decree to prohibit rail shippers from using tank cars that fully comply with existing regulatory requirements, particularly where existing regulation already requires the phaseout of DOT-111 cars within specified times frames.

**Paragraphs 69 and 70 Provide Significant Economic Benefits to Norfolk Southern**
As noted above, paragraph 69 would presumably permit, or even require, Norfolk Southern to breach existing contracts with shippers.  Shippers would be required to ship any DOT-111 cars carried by Norfolk Southern at posted and non-negotiable tariff rates which apply to common carrier traffic (the only traffic permitted under the Consent Decree to use DOT-111 cars for flammable liquids). Also, as previously described, the Customer Tank Car Replacement Plan would almost certainly raise prices for all flammable liquid shipments in DOT-111 cars, again without the shippers having the ability to negotiate favorable rates. Together, these provisions will gift a potentially significant financial windfall to Norfolk Southern, the defendant in the litigation, at the expense of third parties.

Norfolk Southern stands to benefit from the Tank Car Provisions due to a lack of competition in the freight rail industry. The railroad industry has consolidated from 40 major railroads in 1980 to just six today, with the four biggest railroads, including Norfolk Southern, controlling well over 90 percent of all rail traffic. As a result, more than 75 percent of rail stations that pick up or receive freight are served by a single major railroad, leaving many customers with no competitive choice for rail service.

Chemical shippers are particularly impacted. In a survey of ACC members, companies reported that 73% of their facilities with inbound rail transportation and 65% of their facilities with outbound transportation are captive to a single railroad (ACC Rail Issues Survey, December 2012), meaning there is no alternative railroad available to service those facilities. For many shipments, other transportation modes such as trucking are not viable. ACC members, therefore, will have little choice but to abide by the terms imposed by the Consent Decree and Norfolk Southern's Customer Tank Car Replacement Plan.

**ACC Members Are Upgrading Their Tank Car Fleets Ahead of FAST Act Deadlines**
Chemical shippers own or lease the rail tank cars used to ship their products. They have made significant investments in recent years to upgrade their fleets and will continue to do

NS_PUBCOM_0000032

so. In particular, ACC members are in the process of upgrading tank cars used to transport Class 3 flammable liquids, replacing cars built to earlier DOT standards (DOT-111 cars) with cars built to newer standards (DOT-117 cars).

The FAST Act, signed into law December 4, 2015 (Pub. L. No. 114-94), mandates a commodity-specific phaseout schedule based on risk-based priorities and railcar production capacity. Deadlines for unrefined petroleum products and ethanol range from January 1, 2018, to May 1, 2025. For Packing Group I flammable liquids other than unrefined petroleum products and ethanol, the phase out deadline is May 1, 2025.  For Packaging Group II and III (the lowest hazard groups), the deadline is May 1, 2029. DOT adopted these deadlines in a final rule that went into effect August 15, 2016 (81 Fed. Reg. 53935).

Chemical shippers have made significant progress towards meeting these deadlines. According to data from the Association of American Railroads (AAR), nearly 27,000 DOT-117 compliant cars are in service to transport "other" flammable liquids, while approximately 17,000 still require upgrades (AAR Status Report: North American Flammable Liquid Tank Car Fleet, May 2024). ACC members have plans in place to complete their upgrades by the FAST Act deadlines and, where feasible, are pursuing accelerated schedules for their fleets. These actions require significant long-term planning and capital expenditures. The timeframes depend on numerous factors including availability of raw materials, supply chain efficiency, tank car shop capacity and production lead times.

Congress established the statutory deadlines following extensive consultation with industry partners and a review of relevant data. Recognizing that an unrealistic deadline would threaten to disrupt supply chains for critical products, the FAST Act specifically authorizes DOT to *extend* the May 1, 2029, deadline for Packing Group II and II materials for up to two years if the Agency determines that insufficient shop capacity exists to feasibly meet the deadline. The law does not authorize DOT to *accelerate* this deadline and expressly provides that these cars "may be used, regardless of train composition until the [specified] end dates" (Pub. L. No. 114–94 §7304).

**The Consent Decree Contradicts the FAST Act and Imposes Unworkable Requirements**
Paragraph 69 of the proposed Consent Decree seeks to override this carefully established phaseout schedule by imposing an arbitrary 180-day deadline for Norfolk Southern to "cease use of *any* DOT-111 Tank Cars for transportation of Flammable Hazardous Materials, other than under a common carrier obligation" (*emphasis added)*. This provision would prohibit Norfolk Southern from carrying or accepting any shipments that move under contract rather than common carrier tariffs. Most rail traffic moves under contract. A report from the Government Accountability Office (GAO) found that, in 2014, about 76 percent of

4

regulated freight and 85 percent of chemical traffic was shipped under contract (GAO-17-166, Freight Rail Pricing, December 2016).

The 180-day deadline to cease the use of DOT-111 cars is simply not feasible. There is no existing inventory of unutilized DOT-117 cars available for purchase or lease, and the rail equipment industry has limited capacity to manufacture new cars and retrofit existing cars to meet the DOT-117 standards. Furthermore, the proposed 180-day deadline does not provide adequate lead time to acquire new cars that are produced. ACC members report that it currently takes a full year from the time a car is ordered to receive final delivery.

The Railway Supply Institute testified last year to the Senate Committee on Commerce, Science and Transportation that accelerating the deadline to replace or retrofit all DOT-111 cars in flammable liquid service to May 1, 2028, "may be feasible." However, further acceleration beyond this date "risks substantial disruption to industry and supply chains nationwide" (Patty Long, Statement for the Record:  Hearing on Improving Rail Safety in Response to the East Palestine Derailment, March 22, 2023). This estimate was based on data on tank North American manufacturing capacity, with consideration of raw material supplies, labor markets, and projections of capacity utilization for construction, repairs, and maintenance of all types of rail cars, as well as for other federally required mandates such as adhering to tank car inspection and qualification intervals. ACC is not aware of any new data that would support a significantly earlier deadline.

In our March 2023, testimony to the Senate Commerce Committee, ACC offered support for an accelerated phaseout deadline based on the rail equipment industry's capacity to manufacture new cars and retrofit existing cars to meet DOT-117 standards (Chris Jahn, Statement for the Record:  Hearing on Improving Rail Safety in Response to the East Palestine Derailment, March 22, 2023). We remain open to a collaborative, data driven process to establish a workable schedule through legislation or rulemaking. However, we strongly oppose the imposition of an arbitrary deadline through a Consent Decree that was negotiated without consideration of relevant data and without participation of the parties directly impacted by the decision.

**The Tank Car Provisions Would Impact the Entire U.S. Rail Network**
While the proposed Tank Car Provisions specifically apply only to Norfolk Southern, they will inevitably impact the entire rail network. Tank cars are regularly interchanged between railroads, and it would be unworkable to establish a designated fleet of tank cars specifically for use on Norfolk Southern routes.

ACC member companies shipped more than 5700 carloads of flammable liquids on Norfolk Southern in 2023, with approximately 2600 shipped in DOT-111 cars. Nearly three quarters of the total were interline moves, either initiated on another railroad and

NS_PUBCOM_0000034

transferred to Norfolk Southern or transferred from Norfolk Southern to another railroad. (ACC member survey – June 2024). Paragraph 69 of the Consent Decree would prohibit Norfolk Southern from accepting DOT-111 cars carrying flammable liquid from other railroads, potentially leading to stranded cars and added congestion to the national rail network.

**The Tank Car Provisions Could Shift DOT-111 Cars to Other Railroads**

As discussed above, Railway Supply Institute data indicates that the earliest potentially feasible deadline to replace or retrofit all DOT-111 cars in flammable liquid service would be May 1, 2028. Because existing shop capacity cannot be dedicated exclusively to replacing DOT-111 tank cars, the Tank Car Provisions of the proposed Consent Decree are unlikely to significantly alter the total number of new or retrofitted DOT-117 cars placed into flammable liquid service, either before the requirements take effect or in subsequent years.

However, the requirements could potentially alter where DOT-117 cars are used. Shippers might allocate newly acquired DOT-117 cars to Norfolk Southern routes instead of to other railroads. In addition, companies might shift the allocation of their existing DOT-111 fleet away from Norfolk Southern to the extent feasible.

As a result, the Tank Car Provisions are unlikely to reduce overall safety risks and may simply shift the use of DOT-111 cars to flammable liquid service on other railroads. The provisions, therefore, do not provide a net safety benefit to the public, while almost certainly imposing a net economic burden on the public instead.

**The Tank Car Provisions Could Disrupt Supply Chains for Essential Products**

The Tank Car Provisions largely impact shipments of flammable liquids other than refined petroleum products and ethanol. These materials include multiple chemical products with a wide range of beneficial end uses, including water treatment and the production of food, fuels, pharmaceuticals, and construction materials.

One important example of such materials is pyrolysis gasoline (Pygas), a co-product formed in the process of thermal cracking of hydrocarbons. Pygas is shipped primarily by rail, and its derivatives support end-use applications such as mechanical goods, sealants and caulking compounds, print inks, coatings, wind turbine blades and electronics.

Unwarranted restrictions on rail shipments of flammable liquid materials could disrupt critical supply chains across the U.S., harming manufacturing, the economy and, ultimately, U.S. consumers. In testimony to the Senate Commerce Committee, the Railway Supply Institute warns:

NS_PUBCOM_0000035

*If DOT-111 tank cars are forced to be prematurely withdrawn from flammable liquids service and placed in storage, there will be a shortage of cars needed to move flammable liquids. This could potentially have substantial adverse consequences on the supply chain for a variety of fuels, including gasoline, diesel, jet fuel, and other commodities such as toluene and xylene* (RSI 2023).

As discussed above, most ACC member company facilities are served by a single major railroad and have limited ability to shift to other transportation modes. Therefore, the Consent Decree's restrictions on the use of DOT-111 cars could prevent shippers from meeting the needs of critical downstream markets.

**The Tank Car Provisions Exceed the Appropriate Scope of the Consent Decree**

ACC is concerned that DOJ is attempting to use this Consent Decree negotiated with a single railroad to achieve broader regulatory objectives without going through a formal notice-and-comment rulemaking process.

Following the East Palestine derailment, the Administration publicly stated its desire to accelerate the FAST Act deadlines for flammable liquids other than crude oil and ethanol. In a February 21, 2023, press release, Transportation Secretary Buttigieg called on the rail industry to:

*Require the owners of tank cars they operate to expedite the phase-in of safer (DOT 117) tank cars in advance of the Congressionally mandated 2029 deadline.*

He further called on Congress to:

*Speed up the phase-in of safer (DOT 117) tank cars to carry hazardous materials.*

Since that time, Congress has not acted to revise the FAST Act deadlines for DOT-111 cars used to transport flammable liquids, nor has DOT initiated a rulemaking proceeding to do so. However, DOJ now seeks to bypass the legislative and regulatory processes by establishing *de facto* regulations through an agreement with a single entity that is largely unaffected by the requirements. The Tank Car Provisions, which restrict shipper use of DOT-approved cars but have no meaningful impact on the defendant in this case, have no reasonable relationship to the settlement of CWA and CERCLA claims against Norfolk Southern.

**Conclusion**

ACC welcomes the proposed Consent Decree to settle response, recovery, and damage claims and penalties related to the East Palestine derailment. However, we strongly object to Paragraphs 69 and 70, which address the use of DOT-111 tank cars. These provisions inappropriately impose obligations and burdens on ACC member companies and other

7

third parties. The provisions do not serve the public interest and should be removed from the Consent Decree or modified so that third party interests are not adversely affected.

To discuss ACC's request for a meeting, or if you have any questions about this submission, please contact Jeff Sloan, Senior Director of Regulatory Affairs (202-249-6710, jeffrey_sloan@americanchemistry.com) or Matthew King, Assistant General Counsel (202-249-7012, Matthew_King@americanchemistry.com).

8

Comment A-107



David C Weber
600 University Street, Suite 1601
Seattle, WA 98101
206.315.4811
DWeber@bdlaw.com

July 25, 2024

**VIA EMAIL**

Todd Kim, Esq.
Assistant Attorney General
Environmental and Natural Resources Department
U.S. Department of Justice
U.S. DOJ–ENRD
P.O. Box 7611
Washington, DC 20044-7611
pubcomment-ees.enrd@usdoj.gov

> RE: Union Tank Car Company's Comments on Proposed Consent Decree;
> *The State of Ohio and The United States of America* v. *Norfolk Southern Railway Company, et al.*, D.J. Ref. No. 90-11-3-12792.

Dear Assistant Attorney General Kim,

I am writing on behalf of Union Tank Car Company ("Union Tank") with Union Tank's comments on the proposed consent decree filed in *The State of Ohio and The United States of America* v. *Norfolk Southern Railway Company, et al.* (Civil Case No. 4:23–cv–517 (JRA)) ("Proposed Consent Decree"). The Proposed Consent Decree was filed with the court on May 23, 2024, and was published in the Federal Register on May 30, 2024 (89 Fed. Reg. 46908). On June 14, 2024, in response to the State of Ohio's request for an extension to the comment period, the United States filed an Amended Notice of Lodging of Proposed Consent Decree, reflecting an extension of the current comment deadline to August 2, 2024.

Union Tank owns and operates one of the largest fleets of privately owned railroad tank cars in North America. Union Tank leases tank cars and other rail cars to North American manufacturers and shippers of chemical products, including liquid fertilizers, liquified petroleum gas and other petroleum products, food products and other bulk plastics. Union Tank's customers lease the company's tank cars and other rail cars to ship products vital to the economy on Class I railroads, such as Norfolk Southern Railway.[1]

---

[1] Union Tank was also named by Norfolk Southern as a Third-Party Defendant in the United States' CERCLA lawsuit that is the subject of the Proposed Consent Decree. A DOT-111 tank car owned by Union Tank was punctured in
*Continued...*

NS_PUBCOM_0000046



July 25, 2024
Page 2

   The Proposed Consent Decree includes provisions that would require Norfolk Southern to "implement an array of specified rail safety procedures." Improved rail safety procedures are, of course, to be lauded and supported. Union Tank is dedicated to safety in all aspects of its operations and does not object to those settlement terms that only impact Norfolk Southern. However, paragraphs 69 and 70 in the Proposed Consent Decree (the "DOT-111 Provisions") impact all of the industry and its customers, are inconsistent with congressional legislation which provides a phase out schedule for the DOT-111 tank cars, and will negatively affect the entire rail car industry, its customers, and the U.S. economy. In addition, in a perverse way, these provisions may well benefit Norfolk Southern

   As further described below, the DOT-111 Provisions are likely to have significant unintended consequences that are inconsistent with the public interest. In addition to Union Tank providing these comments, it requests an opportunity to meet with DOJ to provide the background necessary to more fully understand the likely consequences of these provisions. Union Tank understands that other industry stakeholders intend to request an opportunity to engage with DOJ on industry concerns prior to submission of the Proposed Consent Decree to the Court and believes a joint informational session would significantly benefit all parties.

   The DOT-111 provisions set forth in paragraphs 69 and 70 of the Proposed Consent Decree provide:

   69. <u>DOT-111 Tank Cars</u>. Within 180 Days of the date of lodging, Settling Defendants will cease use of any DOT-111 Tank Cars for transportation of Flammable Hazardous Materials, other than under a common carrier obligation.

   70. Within 180 Days of the date of lodging, Settling Defendants shall submit a "Customer Tank Car Replacement Plan" to the United States for review and approval, taking into consideration Settling Defendants' industry and technical expertise. Settling Defendants will implement the Customer Tank Car Replacement Plan within 90 Days of approval. The Customer Tank Car Replacement Plan shall be designed to encourage customers to use DOT-117R Tank Cars (or similar armored Railcars) in place of DOT-111 Tank Cars for the transportation of Flammable Hazardous Materials and shall include financial incentives as an aspect of the plan. Settling Defendants may seek designation of the Customer Tank Car Replacement Plan as Confidential Business Information under 40 C.F.R. Part 2 pursuant to the procedures set forth therein.

---

the East Palestine derailment. On March 6, 2024, the Court granted Union Tank's motion to dismiss Norfolk Southern's Third-Party Complaint. *State of Ohio v. Norfolk Southern Corporation et al.*, 2024 WL 964597 (N.D. Ohio Mar. 6, 2024) (ECF No. 113).



Beveridge
& Diamond

July 25, 2024
Page 3

## 1. Executive Summary

The proposed DOT-111 Provisions would upset the congressionally mandated ongoing phase out of DOT-111 tank cars used to ship certain hazardous material products that began in 2018. These dates, including one upcoming on May 1, 2025 and the final May 1, 2029 deadline, were set by Congress for the orderly phase out of the use of these tank cars for these vital commodities, following extensive analysis and review with input from experts in the industry.[2] From a policy standpoint, paragraphs 69 and 70 appear to have far-ranging (and potentially unintended) consequences for shippers of materials by rail, for their customers, for the companies that provide rail cars to shippers, such as Union Tank, and to the economy in general if they are included in the final Consent Decree and are given the force of law.

These provisions also appear to enable Norfolk Southern to unfairly shift costs of its Consent Decree obligations onto others not signatories to the Proposed Consent Decree. While the short-term impact of this shift is on shippers, the long-term impact would be on the American public in the form of increased costs of goods and commodities made more expensive by disruptions in critical supply chains. These unintended outcomes are not in the public interest. We are aware that the railroad industry is both vital and complex, and accidents of any kind focus public attention – as they should – on any perceived failure by the operator. We write these comments, however, to bring to the attention of the federal government the consequences from the wording of two provisions which we believe are not well understood, and which should be corrected now before the government seeks judicial approval.

In short, the DOT-111 Provisions should be omitted from a revised Proposed Consent Decree in deference to the ongoing phase out deadlines already established by Congress. Any phase out should be consistent with the Congressional mandate, be coordinated with the Pipeline and Hazardous Materials Safety Administration ("PHMSA") and other knowledgeable agencies, as well as regulated stakeholders (such as Union Tank) in an effort to address these concerns and to identify potential feasible alternatives to paragraphs 69 and 70.

Provided below are specific comments and context.

## 2. Although on its face the Proposed Consent Decree only applies to Norfolk Southern, the restrictions it proposes on the use of DOT-111 tank cars will necessarily affect the entire rail industry.

Fundamentally, "[t]he freight rail industry is not a combination of discrete, unconnected railroads. Rather, it is a single interconnected system of six Class I railroads and hundreds of short line

---

[2] Union Tank was one such industry expert providing information through its participation as a member of the Railway Supply Institute. Moreover, the rail equipment supplies, and the shipper industries (rather than the railroads) have the most relevant expertise when it comes to railroad tank cars.



July 25, 2024
Page 4

railroads that own and maintain over 160,000 route-miles of track throughout North America."³ It is not just the track that is connected—at any given moment, approximately five to ten percent of the line-haul locomotives being operated by the six Class I railroads are actually owned or leased by another railroad and a significant number of railcars that originated with one railroad will be interchanged and transported to or from their final destination by another railroad.⁴

As Norfolk Southern interchanges with other Class I railroads, any restrictions on its use of certain cars will affect other railroads. The two DOT-111 Provisions in the Proposed Consent Decree would be highly disruptive to critical supply chains that are heavily dependent on this interconnected ship-by-rail transportation system. The interconnected nature of North American rail means that movement of commodities – many of which are critical for America's clean potable water, food production, and the nation's infrastructure – is inexorably tied to and relies on the ability to move railcars carrying these commodities *between* railroads.⁵ As such, any restrictions on Norfolk Southern's use of DOT-111 tank cars will affect other railroad's use of those same tank cars.

Paragraph 69 would require Norfolk Southern, within 180 days of the lodging of the Consent Decree, to "cease use of any DOT-111 Tank Cars for transportation of Flammable Materials, other than under a common carrier obligation." Paragraph 70 requires Norfolk Southern to create and submit a tank car replacement plan within 180 days of the lodging of the Consent Decree. Upon approval by the United States, Norfolk Southern would have a mere 90 days to implement the tank car replacement plan. The plan would "include financial incentives as an aspect of the plan" to encourage customers to use cars other than DOT-111 tank cars, such as DOT-117R tank cars, or "similar armored" cars.⁶

It is our understanding that most of the commodities the DOT-111 Provisions purport to cover are not moved via Norfolk Southern's common carrier obligation, but pursuant to private contracts. To the extent paragraph 69 is intended to apply only to the small number of DOT-111 tank cars owned by Norfolk Southern, the plain language of paragraph 69 is much broader and bans Norfolk Southern's "use" of "any" DOT-111 tank cars, other than under a common carrier obligation. This appears to restrict Norfolk Southern from accepting any DOT-111 tank car in flammable liquids service on its rail line – regardless of who owns it, unless that acceptance is required under its common carrier obligation.

---

³ Comments of the Association of American Railroads and the American Short Line and Regional Railroad Association, Greenhouse Gas Emissions Standards for Heavy Duty Vehicles – Phase 3, p. 2 EPA-HQ-OAR-2022-0985.

⁴ *Id.*

⁵ According to the American Chemistry Council, nearly seventy-five percent of the 5,400 carloads of flammable liquids on Norfolk Southern's network were "interline moves," which means they were either initiated on another railroad and transferred to Norfolk Southern or transferred from Norfolk Southern to another railroad.

⁶ We note that DOT-117R tank cars are not the only approved DOT-117 class specifications (others include DOT-117J and DOT-117P), and that there are other DOT tank car types that exceed DOT-117 specifications (e.g., DOT-105 pressure tank cars).



Beveridge
& Diamond

July 25, 2024
Page 5

Moreover, because the majority of commodities are moved under private contract – i.e., outside common carrier obligations – this "common carrier obligation" carve out is extremely limited. As such, the impact of paragraph 69 extends well beyond DOT-111 tank cars owned by Norfolk Southern and appears to cover the vast majority of shipments using DOT-111 tank cars for these commodities.[7]

Additionally, the DOT-111 Provisions will likely enable Norfolk Southern to unfairly shift costs of its Consent Decree obligations onto others (i.e., shippers, other railroads, and ultimately the American public). The Proposed Consent Decree appears to grant Norfolk Southern the ability to increase the tariff rates it charges shippers through the "financial incentives" the DOT-111 Provisions requires Norfolk Southern to include in its car replacement plan required in paragraph 70. Such incentives would adversely impact others not parties to the Consent Decree. A better approach as it relates to financial incentives might be, for example, to require Norfolk Southern to give a significant discount to shippers using upgraded tank cars. Regardless of the ultimate financial incentives proffered by Norfolk Southern, there would appear to be an inescapable impact to existing contractual relationships between scores of third parties. These consequences, even if unintended, are not in the public interest.

## 3. The DOT-111 Provisions in the Proposed Consent Decree are incompatible with the terms of the Fixing America's Surface Transportation Act ("FAST Act").

The industry-wide phase out of DOT-111 tank cars for flammable liquids shipments is underway and, as further explained below, replacements cannot be built and put in service quickly. The FAST Act, signed into law December 4, 2015 (Pub. L. No. 114-94), mandates a commodity-specific phaseout schedule based on risk-based priorities and railcar production capacity. Deadlines for unrefined petroleum products and ethanol range from January 1, 2018, to May 1, 2023. For flammable liquids other than unrefined petroleum products and ethanol, the phase out deadlines are May 1, 2025, for Packing Group I and May 1, 2029, for Packing Group II and III (the lowest hazard groups). DOT implemented these deadlines in a final rule that went into effect August 15, 2016.

These deadlines were set by Congress following significant study and input from industry and relevant stakeholders and accounted for both the safety benefits and the economic impact of the phase-out. These carefully calibrated deadlines set by Congressional legislation and implemented by PHMSA (49 U.S.C. §§ 173.241-42; 81 Fed. Reg. 53935) should not be undermined by a consent decree used to resolve litigation. *See Conservation Nw. v. Sherman*, 715 F.3d 1181, 1187 (9th Cir. 2013) ("where a consent decree does promulgate a new substantive rule, or where the changes wrought by the decree are permanent rather than temporary, the decree may run afoul of statutory rulemaking procedures even though it is in form a judicial act. . . . [Thus,] a district court abuses its discretion when it enters a consent decree that permanently and substantially amends an agency rule that would have otherwise

---

[7] If paragraph 69 is intended to be limited only to DOT-111 tank cars owned by Norfolk Southern, it must be modified to explicitly identify DOT-111 tank cars owned only by Norfolk Southern. Such clarification, however, would not address the potential unintended impacts of paragraph 70.

NS_PUBCOM_0000050



July 25, 2024
Page 6

been subject to statutory rulemaking procedures.") (citation omitted; quotation omitted); *see also Local No. 93 Int'l Ass'n Firefighters v. City of Cleveland*, 478 U.S. 501, 529 (1986) (consent decree may not "impose duties or obligations on a third party").

### 4. The timelines under the Proposed Consent Decree for implementation of the DOT-111 Provisions are impractical and unworkable.

The Proposed Consent Decree requires Norfolk Southern to fully implement paragraph 69 of the DOT-111 Provisions before year end and paragraph 70 only months later. Due to the interconnected nature of North American rail, these provisions will require Union Tank and other railcar companies to phase out DOT-111 tank cars on a similar schedule. Simply put, the tank car industry does not have the capacity to replace DOT-111 tank cars on that timeline. The direct and immediate implication of these provisions would be to restrict the availability of commodities by tank cars to the U.S. businesses that rely on them and to the American public. This would have ripple effects and unintended consequences to important supply chains, many of which can *only* be safely served by rail.

The constraints on the ability of the tank car industry to upgrade and replace DOT-111s is ***not*** simply a question of industry making financial investments or incurring additional costs. As Congress and the relevant regulatory agencies understood, the phase out of DOT-111 tank cars requires significant long-term planning. This complex planning began in 2016 and allowed the industry to successfully meet the prior phase-out deadlines set by the FAST Act in 2018, 2020 and 2023.[8] As there is a finite amount of infrastructure, facilities, and resources available to build and upgrade tank cars, there is not sufficient industrial capacity to accomplish the phase out of these tank cars on an accelerated timeline. Moreover, much of this infrastructure is already committed to the critical task of ensuring all tank cars meet their federally required 10-year qualification interval, which is a fundamental element for ensuring that commodities are being shipped safely.

In 2023, following the East Palestine derailment, the Railway Supply Institute ("RSI"), of which Union Tank is a member, testified before Congress on the feasibility of industry to accelerate the final phaseout deadline of DOT-111 tank cars under the Fact Act.[9] RSI explained that it undertook an analysis to estimate the industry's capacity to build new tank cars or to carry out retrofits of existing tank cars in conformance with the DOT-117R standard. Based on that analysis, RSI's preliminary conclusion was that an acceleration of the final FAST Act deadline by ***one (1) year*** to May 1, 2028 (as proposed in H.R. 1633) <u>may</u> be technically and operationally feasible. RSI's analysis in 2023 showed that it would not be feasible to accelerate the final FAST Act deadline further, particularly to 2025, absent the significant adverse consequences described above.

---

[8] *See*, Department of Transportation's mandatory FAST Act DOT-111 phase-out report to Congress "Fleet Composition of Rail Tank Cars Carrying Flammable Liquids: 2023 Report" at https:/doi.org/10.21949/1529270.

[9] *See*, Patty Long, RSI, Statement for the Record: Hearing on Improving Rail Safety in Response to the East Palestine Derailment, U.S. Senate Commerce Committee (March 22, 2023) (copy attached).



Beveridge
& Diamond

July 25, 2024
Page 7

In passing the FAST Act, Congress looked carefully at all of these interrelated issues, and had the benefit of input from all relevant stakeholders, not just the parties to this Proposed Consent Decree. As noted, the statute requires DOT-111 tank cars to be phased out of service for transporting flammable liquids by a final May 1, 2029, deadline. The Congressional deadlines in the FAST Act were carefully developed from a study by all stakeholders in the ship by rail industry. Under CERCLA, a proposed consent decree must be lodged in the district court and approved to become enforceable. 42 U.S.C. § 9622(d)(1)(A). When deciding whether to approve and enter the proposed Consent Decree, the court is tasked with determining whether the settlement is not arbitrary or capricious or otherwise not in accordance with law. *See* 42 U.S.C. § 9613(j); *U.S. v. Akzo Coatings of America, Inc.*, 949 F.2d 1409, 1435 (6th Cir. 1991). Paragraphs 69 and 70 are inconsistent with the provisions of the FAST Act and are therefore "not in accordance with law."

## 5. The unintended consequences of the DOT-111 Provisions in the Proposed Consent Decree are unreasonable and contrary to the public interest.

The court will review whether the DOT-111 Provisions are in the public interest. A proposed consent decree must be "fair, adequate, and reasonable, as well as consistent with the public interest." *U.S. v. Lexington-Fayette Urban Cnty. Gov't*, 591 F.3d 484, 489 (6th Cir. 2010) (quotation omitted); *see also Akzo Coatings*, 949 F.2d at 1426 (establishing "three-part test of (1) fairness, (2) reasonableness, and (3) consistency with CERCLA's goals" for review of consent decree).

Courts reject consent decrees that are not reasonable or in the public interest. *See, e.g.*, *U.S. v. City of Akron*, 794 F.Supp.2d 782 (N.D. Ohio 2011) (Adams, J.) (denying a Clean Water Act proposed consent decree and finding that it was unfair, unreasonable, inadequate, and inconsistent with public interest); *Utah v. Kennecott Corp.*, 801 F.Supp. 553 (D. Utah 1992) (finding a consent decree was not fair or reasonable and was inconsistent with the purposes of CERCLA); *Kelly v. Wagner*, 930 F.Supp. 293, 297-98 (E.D. Mich. 1996) (denying a proposed consent decree and finding the inclusion of a "covered matters" definition was unfair and inconsistent with the purpose of CERCLA as it affected the potential liability of non-settling third-parties). The unintended consequences of the DOT-111 Provisions are the type of issues that courts have considered in finding consent decrees unreasonable or contrary to the public interest. DOJ and EPA should reconsider these provisions since their inclusion may cause the court to reject entry of the Proposed Consent Decree.

## 6. Union Tank recommends that DOJ and EPA omit the DOT-111 Provisions or engage with stakeholders to identify alternatives to paragraphs 69 and 70.

The best solution for the public interest and to align with congressional mandates is to omit the DOT-111 Provisions in a revised Proposed Consent Decree in deference to the ongoing phase out deadlines established by Congress under the FAST Act. As an alternative step, we urge DOJ and EPA to work with the other knowledgeable agencies, such as PHMSA and the Federal Railroad Administration ("FRA"), and with the other regulated industry stakeholders with interests that will be significantly impacted by the DOT-111 Provisions. This includes tank car manufacturers and suppliers, railcar owners,



July 25, 2024
Page 8

shippers, and their industry representatives (e.g., Railway Supply Institute, North America Freight Car Association[10], American Chemistry Council, and Ohio Chemistry Technology Council).

These other regulated industry stakeholders, especially the rail equipment and shipper industries, can offer their expertise to craft potential alternatives to the DOT-111 Provisions. For example, a recent peer-reviewed study of lading protocols established that changes in tank car lading (e.g., how full a tank car is filled) can increase the puncture resistance of a DOT-111 tank car to a level that makes it equivalent to a DOT-117R tank car.[11] These industry stakeholders can also provide recommendations on the elements Norfolk Southern should be required to consider for its paragraph 70 Customer Tank Car Replacement Plan.

Norfolk Southern is not the right entity to chart a course for the use and phase out of DOT-111 tank cars in the future. And, given this tragic accident, they should not be rewarded for their own conduct by having this responsibility. They do not manufacture, retrofit, repair, own, load and use DOT-111 tank cars to ship these vital commodities. Norfolk Southern is not an expert in capacity constraints, supply chain challenges, or of the detailed (and in progress) plans to accomplish the mandated phase-out DOT-111 tank cars. In layman's terms, Norfolk Southern is only the moving company responsible to move the DOT-111 tank cars built, owned, maintained and packaged for shipment by others from point A to point B. Paragraph 70 should be stricken, and any revised provision should include input from the rail equipment and shipper industries, as well as PHMSA and FRA before any substitute provision is crafted.

\*\*\*\*

Union Tank appreciates the United States' commitment to meaningfully respond to comments submitted on the Proposed Consent Decree, and, if necessary, withdraw and amend the Proposed Consent Decree. ECF No. 142 (Amended Notice of Lodging of Proposed Consent Decree). We also ask that this letter be placed in the administrative record for the Consent Decree.

For the reasons above, Union Tank urges DOJ and EPA to meet with those industry stakeholders that will be directly impacted by the DOT-111 Provisions to better understand why they are unworkable and not in the public interest. Alternatively, Union Tank respectfully requests that the DOT-111 Provisions be omitted from the final Proposed Consent Decree.

---

[10] The North America Freight Car Association ("NAFCA"), of which Union Tank is a member, represents those companies that own or lease nearly 70% of all private railcars currently in service.

[11] Kirkpatrick, SW. "Effects of Lading Conditions on Puncture Resistance and Release Probability of HAZMAT Tank Cars." *Proceedings of the 2024 Joint Rail Conference.* Columbia, South Carolina, USA. May 13–15, 2024. V001T05A003. ASME. https://doi.org/10.1115/JRC2024-122799 (copy attached).


Beveridge
& Diamond

July 25, 2024
Page 9

Thank you for the opportunity to submit these comments. Please contact me at (206) 315-4811 or dweber@bdlaw.com if you have any questions about these comments.

Sincerely yours,

David C. Weber
Principal

cc: Katharine K. Suprenuk, President, Marmon Railcar Leasing - UTLX & Procor, suprenukk@utlx.com
Patrica A. Charles, Senior VP, Regulatory & External Affairs, Marmon Holdings, Inc., patricia.charles@marmon.com
John C. Cruden, jcruden@bdlaw.com
C. Dylan Sanders, dsanders@bdlaw.com
Casey T. Clausen, cclausen@bdlaw.com
Amy M. Johnston, johnston@millercanfield.com

List of Attachments:

1. Patty Long, RSI, Statement for the Record: Hearing on Improving Rail Safety in Response to the East Palestine Derailment, U.S. Senate Commerce Committee (March 22, 2023).
2. Kirkpatrick, SW. "*Effects of Lading Conditions on Puncture Resistance and Release Probability of HAZMAT Tank Cars*." Proceedings of the 2024 Joint Rail Conference. Columbia, South Carolina, USA. May 13–15, 2024. V001T05A003. ASME. https://doi.org/10.1115/JRC2024-122799.

Attachment 1

NS_PUBCOM_0000055



*Support, Connection, Advocacy*
**2001 K Street, NW | Suite 300 | Washington, DC 20006 | phone (202) 367-1126 | fax (202) 367-2210 | www.rsiweb.org**

**Statement for the Record**

**Patty Long**
**President**
**Railway Supply Institute**

**To the United States Senate Committee on Commerce, Science, and Transportation**

**Hearing on:**

**"Improving Rail Safety in Response to the East Palestine Derailment"**

**Wednesday, March 22, 2023**

Chairman Cantwell and Members of the Subcommittee:

On behalf of the Railway Supply Institute ("RSI") and its members, thank you for convening this hearing to examine opportunities to improve rail safety in response to the February 3, 2023, derailment in East Palestine, Ohio.

RSI is the international trade association of the railway supply industry. The domestic railway supply industry has been a dynamic and vital part of the U.S. economy for more than 200 years, encompassing more than 682,400 direct, indirect, and induced jobs across all 50 states.[1] RSI members provide all types of goods and services to freight and passenger railroads, rail shippers, and freight car manufacturers and lessors. RSI is the only trade association representing the entire rail supply industry—manufacturers, distributors, and service providers to the freight car, locomotive, maintenance-of-way, communications, signaling, leasing, and passenger rail industries. RSI members collectively build more than ninety-five percent (95%) of all new railroad tank cars and own and supply for lease more than seventy percent (70%) of railroad tank cars operating in North America.

The members of the RSI's Committee on Tank Cars ("RSI-CTC") build, own, and/or lease the majority of tank cars operating in North America. The RSI-CTC members consist of: American Industrial Transport; CIT Rail; GATX Corporation; The Greenbrier Companies; SMBC Rail Services, LLC; Trinity Rail Group, LLC; and Union Tank Car Company. RSI-CTC members have significant expertise in tank car engineering, design, manufacturing, maintenance, repair, and compliance practices, and the RSI-CTC works closely with railroads and shippers through the Association of American Railroads' ("AAR") Tank Car Committee and other technical committees (*e.g.*, the Equipment Engineering Committee).

---

[1] Oxford Economics, "Rail Supply Industry: Manufacturing and Services Keeping the American Economy on Track," (January 2023), available at https://www.rsiweb.org/data-technical-resources/rail-supply-economic-impact-study/.

1

As leaders of the supply industry, RSI and its members have a personal stake in the safe transportation of rail freight, including the movement of flammable liquids and other hazardous materials by rail. RSI and its members work with railroads, shippers, federal regulators, and the AAR to design and maintain safe rail freight equipment, including tank cars. This includes RSI's long-standing participation in the RSI-AAR Railroad Tank Car Safety Research and Test Project ("Tank Car Safety Project") with the North American railroads. Through the Tank Car Safety Project, the RSI-CTC contributes funding, technical resources, and thought leadership to the detection, prevention, and mitigation of equipment-related factors in train accidents. In addition, the RSI-CTC has a long history of collaboration with regulators from both the United States and Canada to undertake various research initiatives and to enhance the regulations applicable to the transport of rail freight and the movement of hazardous materials by rail.

In the wake of the East Palestine derailment and other recent incidents, RSI and its members have increased our commitment to enhancing the safe transportation of rail freight and the movement of flammable liquids and other hazardous materials by rail. The National Transportation Safety Board ("NTSB") is continuing its role of conducting an independent accident investigation of East Palestine and certain policy changes may be premature until the NTSB has completed its investigation of the causal and root factors in this incident. RSI urges Congress to ensure the results and recommendations of the NTSB investigation are fully considered and to focus any reforms and additional safety measures on the root cause of the derailment.

**Rail is the Safest Way to Transport Hazardous Materials, Including Flammable Liquids**

The production, transportation, and use of hazardous materials are essential to the U.S. economy and a modern society. From the chlorine used to purify drinking water, to the chemicals used in fertilizers, to the petroleum products that warm our houses and fuel our cars, hazardous materials are a critical part of daily life. According to the U.S. Department of Transportation, "rail transportation of hazardous materials in the United States is recognized to be the safest land-based method of moving large quantities of chemicals over long distances."[2] More than 99.9% of all hazardous materials moved by rail reaches its destination without a release caused by a train accident.[3]

Hazardous materials safety is a shared responsibility, which is why RSI works closely with the railroads, shippers, government agencies, and other industry stakeholders. RSI supports an approach that looks holistically at rail safety and commends Congress for doing the same. RSI agrees that safe transportation of hazardous materials by rail requires simultaneous focus on the entire integrated system—railway infrastructure, track maintenance, railway operations, technology innovations, such as track wayside detectors and on-board condition monitoring systems, product classification, equipment standards, and human factors.

**Acceleration of FAST Act Timelines to Phase Out DOT-111s in Flammable Liquid Service**

RSI and its members support the U.S. DOT's requirement to use tank cars that have enhanced safety features to transport flammable liquid products, such as those meeting the newer DOT-117 standard. During the development of the DOT-117 standard, RSI was one of the key industry leaders encouraging the federal government to develop this specification and advocated in favor of enhanced safety features on tank cars

---

[2] U.S. DOT, Federal Railroad Administration, "Hazardous Materials Transportation," last updated March 8, 2023.
[3] AAR, "Railroad Hazmat Safety Record" (citing AAR's Analysis of FRA Train Accident Database and PHMSA Hazardous Materials Incident Database, as of March 2023).

NS_PUBCOM_0000057

transporting flammable liquids. RSI further supports the phase-out of DOT-111 specification tank cars in flammable liquids service, as set forth by the 2015 Fix America's Surface Transportation ("FAST") Act.

RSI's members have played a critical role in ensuring the timely replacement or retrofit of DOT-111s in flammable liquids service to meet the FAST Act deadlines. Since 2015, tank car manufacturers have added more than 48,000 newly manufactured DOT-117s to the North American fleet to replace DOT-111s. The rail industry has already phased out all DOT-111's and CPC-1232's engaged in flammable liquid service transporting crude oil. The deadline for the phase-out of all legacy DOT-111's in flammable liquid service transporting ethanol is May 1, 2023. As required by the FAST Act, RSI and its members are committed to phasing out the remaining DOT-111 tank cars transporting other Class 3 flammable liquids in Packing Group I by May 1, 2025. Further, we are committed to phase out the remaining DOT-111 tank cars transporting other Class 3 flammable liquids in Packing Groups II and III by May 1, 2029, as set forth in the FAST Act.

RSI is aware that Congress is considering acceleration of the FAST Act phase-out timelines. Should Congress move forward with such an acceleration, RSI urges Congress to consider a range of factors that impact industry's capacity to build new tank cars or to retrofit existing tank cars. Such factors include industry labor and supply chain conditions, current tank car facility certifications and reduced manufacturing footprints which cannot be quickly expanded, and other federally required mandates (such as adhering to tank car inspection and repair intervals and the federal requirements for the construction of new tank cars to transport materials that are toxic-by-inhalation). In addition, tank car manufacturers must maintain the ability to meet demand for other tank car types such as DOT-105s, and DOT-112s for materials such as, liquefied petroleum gas, and other commodities. Steady demand also exists for other class tank cars carrying hazardous and non-hazardous materials (e.g., sulfuric acid, sodium hydroxide liquid, liquid fertilizers, biodiesel, vegetable oil, and corn syrup). Many of these materials are the essential building-blocks for downstream manufacturing of other products.

RSI has collected and aggregated data from its members that make up the RSI-CTC to estimate the industry's capacity as of March 2023 to build new tank cars or to carry out retrofits of existing tank cars.[4] This analysis is included as Appendix A to these comments and identifies the critical assumptions and context factored into RSI's capacity analysis.

Based on the AAR's 2022Q3 flammable liquids report, there are approximately 35,500 existing DOT-111 tank cars in the North American fleet in flammable liquids service that cannot be used to ship flammable liquids after May 1, 2029 (the FAST Act phase-out date). As noted in Appendix A, even if the industry did nothing but build and/or retrofit DOT-117's—which, as noted above, is not feasible or could result in a serious economic harm to industries relying on materials that are the building-blocks used to manufacture downstream products—it would take several years to replace all of these cars. Thus, if DOT-111 phase-out timelines are accelerated too quickly, it will cause a shortage of cars needed to move other critical materials.

Further, following phase out of DOT-111s transporting crude oil and ethanol, the remaining DOT-111 tank cars in flammable liquids service are primarily transporting specialty petrochemical products, such as aviation jet fuel, diesel fuel, gasoline, methanol, petroleum distillates, xylene, and toluene. These products are offered into transportation by hundreds of companies and in much smaller volumes (e.g., one to five tank cars in a shipper's fleet). The shippers of these products have defined tank car specifications and requirements that differ from one shipper to another. Consequently, there will be smaller new car orders for

---

[4] In this context, retrofit means modifying an existing DOT-111 tank car to meet the DOT-117R specification requirements by adding one or more of the following: thermal protection, a steel jacket, full height head shields, improved top fittings protection, a specified pressure relief valve, and a disengaging bottom outlet valve handle.

3

NS_PUBCOM_0000058

these cars from multiple shippers that have varying requirements in valves, fittings, interior coatings, paint, and requirements for length and width of the car to meet the shipper's specific infrastructure requirements. The result is several engineering design and supply-side factors that require consideration and may impact total production capacity. Simply stated, given the variety of specialty-chemical tank cars, each with unique shipper requirements, engineering design work and production flow to replace these tank cars will not be at the same capacity realized for the crude oil and ethanol builds in earlier years.

Additionally, the same facilities that are responsible for retrofitting the DOT-111 tank cars are the same facilities responsible for performing required inspection and repair activities necessary to maintain compliance of the existing freight and tank car fleet. Tank cars undergo scheduled maintenance per DOT regulations and AAR rules at least once every 10-years (commonly referred to as "requalification").[5] Many of the tank car facilities that are AAR-certified to perform maintenance activities are the same facilities that will be called upon to retrofit certain of the existing DOT-111 cars mentioned above.

In addition to regulatory compliance requirements for tank cars, tank car facilities also handle the routine maintenance of other freight car types (*e.g.*, open- and closed-top hopper cars and gondola cars). Examples may include freight car componentry, interior coatings and linings, exterior paint, general repair, and other service-related events. Capacity is needed to ensure the North American tank car fleet operates efficiently, and railcar shortages are minimal. Any modification to the FAST Act timelines must account for these factors, including the required scheduled maintenance activities (*e.g.*, requalification) that are necessary to maintaining the North American fleet.

Based on the capacity analysis provided in Appendix A, the RSI believes that an acceleration to May 1, 2028, may be feasible for total phase out of DOT-111's in flammable liquids service, however, further acceleration beyond that date risks substantial disruption to industry and supply chains nationwide and may trigger railcar shortages across the nation.

**Conclusion**

RSI and its members are committed to the safe transportation of rail freight including the movement of flammable liquids and other hazardous materials by rail, and we stand ready to support this Committee as it works to strengthen rail safety. We appreciate the opportunity to provide these comments and will continue working with Congress, the U.S. DOT, and our industry partners to enhance rail safety.

---

[5] 49 C.F.R. Part 180, Subpart F.

4

# Appendix A

NS_PUBCOM_0000060



Support, Connection, Advocacy

Revised April 2023

2001 K Street, NW | Suite 300 | Washington, DC 20006 | phone (202) 367-1126 | fax (202) 367-2210 | www.rsiweb.org

### Tank Car Manufacturing and Retrofit Capacity Analysis
Prepared by the Railway Supply Institute

The Railway Supply Institute ("RSI") is the international trade association of the railway supply industry. Its members supply all types of goods and services to freight and passenger railroads, rail shippers, and freight car manufacturers and lessors. RSI members collectively build more than ninety-five percent (95%) of all new railroad tank cars and own and supply for lease over seventy percent (70%) of railroad tank cars operating in North America.[1]

RSI has collected and aggregated data from its members that make up the RSI Committee on Tank Cars ("RSI-CTC")[2] to estimate the industry's capacity as of March 2023 to build new tank cars (see Section I below) or to carry out retrofits of existing tank cars (see Section II below) in conformance with the DOT-117R standard as shown below.[3] Based on the assumptions and context described below, RSI's preliminary conclusion is that an acceleration of the FAST Act deadlines to May 1, 2028 (as proposed in H.R. 1633) may be technically and operationally feasible. *See* attachment A for detailed analysis. Further, RSI's preliminary analysis at this time is that it would not be feasible to accelerate the FAST Act deadlines further, particularly to 2025, absent the significant adverse consequences described below.

### I.   New Tank Car Build Capacity

**Critical Assumptions:** To analyze new build capacity, RSI members assumed the following:

- **Current Footprint.** Current tank car facility certifications and manufacturing footprints will remain the same (*i.e.*, as they exist in March 2023). No greenfield facilities will be constructed.

- **Supply Chain.** Manufacturers continue to face supply chain challenges and disruptions, including delayed procurement of materials and componentry. Longer lead times can delay production and cause planning challenges. RSI assumes supply chain conditions will be relatively similar in the next several years to those present as of March 2023. It is possible supply chain challenges may gradually abate during 2024/2025. As was witnessed by tank car manufacturers during the COVID pandemic, additional, unforeseen supply chain disruptions could affect new tank car build capacity.

- **Labor Conditions.** The rail industry continues to face labor challenges/shortages. RSI assumes labor conditions will be relatively similar in the next several years to those present as of March 2023. It is possible labor shortages may gradually abate during 2024/2025. Additional, unforeseen labor shortages could affect new tank car build capacity.

---

[1] The remaining 30% of tank cars are owned by shippers and other car lessors.

[2] The RSI-CTC is made up of RSI-member companies that build, own, and/or lease the majority of the tank cars in the North America. RSI-CTC members consist of: American Industrial Transport; CIT Rail; GATX Corporation; The Greenbrier Companies; SMBC Rail Services, LLC; Trinity Rail Group, LLC; and Union Tank Car Company.

[3] 49 C.F.R. §179.202-13 (identifying specific tank car features required for the 117R specification)

- **Freight Cars**. Freight car manufacturing capacity would not be converted to tank car manufacturing capacity.

| Estimated Total Number of New Tank Car Builds: US, Canada, and Mexico[4] | | | | |
|------|---------|------------------------------------|-------------------------------------|------------|
| Year | Booked | Estimated Baseline Demand for Tank Cars (All Types) | Estimated Additional Tank Car New Build Capacity (All Types) | Estimated Total Capacity |
| 2023 | 9,277 | (included in booked) | 1,642 | 10,919 |
| 2024 | ~1,790 | 8,000 | 5,210 | 15,000 |
| 2025 | ~1,500 | 8,000 | 5,500 | 15,000 |
| 2026 | ~1,500 | 8,000 | 6,000 | 15,500 |
| 2027 | ~1,500 | 8,000 | 7,000 | 16,500 |
| 2028 | ~1,500 | 8,000 | 8,000 | 17,500 |
| 2029 | ~1,500 | 8,000 | 8,000 | 17,500 |

NOTE: The table above does not include retrofit capacity estimates, which are discussed in the Section II, below.

**Fundamental Context for New Build Capacity Estimates:**

- **Allocation of Open Capacity.** Allocation of 100% of open capacity to manufacturing new tank cars for flammable liquid service is not feasible from both an economic and technical perspective.
  - A significant portion of non-DOT-117 tank cars must be built to meet demand from rail traffic growth and replacement of tank cars that have reached the end of their useful life. **Ordinary replacement/growth demand for tank cars in North America is approximately 8,000 tank cars per year.**
  - Allocation of 100% of open capacity to manufacturing new DOT-117s could have substantial adverse downstream supply chain impacts and unintended consequences on the movement of critical commodities across the North American rail network.
    - Manufacturers must maintain the ability to meet demand for other tank car specification types such as DOT-105s and DOT-112s for natural gas liquids, home heating fuels, and other pressurized commodities and DOT-111s for a wide array of crucial building block chemicals. Steady demand also exists for other class tank cars carrying non-hazardous commodities (*e.g.*, liquid fertilizers, vegetable oil, corn syrup). *See* Attachment B for data on historical allocation of new builds based on tank car deliveries.

- **Impact of Unique Engineering Requirements for Tank Cars Carrying Specialty Chemicals.** Given the variety of specialty-chemical tank cars, each with unique shipper design and commodity-specific requirements, engineering design work and production flow will not be at the capacity realized for the crude oil and ethanol builds in earlier years. Specialty-chemical tank cars in flammable liquid service must undergo specific engineering work that differs between commodities to meet individual shipper requirements (*e.g.*, with respect to length and width dimensions to fit the shipper's loading and offloading infrastructure, weight limitations, and any special valving, fittings, coating, lining, and insulation requirements to safely ship the product).

---

[4] All numbers are approximate. RSI cannot estimate the total manufacturing or retrofit capacity for the entire industry as not all tank car manufacturers and companies with tank car repair facilities are RSI members.

Revised April 2023

- **Other Federally Required Mandates.** The industry capacity also is dependent on the construction of new tank cars for materials toxic-by-inhalation (*i.e.*, HM-246 standard) by 2027. This requirement may impact DOT-117 production/retrofits prior to 2027.

## II.  Existing Tank Car Retrofit Capacity

Based on the Association of American Railroad's 2022Q3 flammable liquids report, there are approximately 35,500 existing DOT-111 tank cars in flammable liquids service in the North American fleet that by May 1, 2029 (the FAST Act phase-out date) must be (1) retrofitted to the DOT-117R standard, (2) replaced with a DOT 105, 109, 112, 114, 117, or 120 specification tank car, (3) transferred to a non-flammable liquid service; or (4) decommissioned.

**Monthly Capacity:** Using the assumptions below, RSI-member companies estimate their aggregate monthly capacity to perform full-scope retrofits to modify an existing tank car that is feasible to convert to a DOT-117R100W is approximately 230-260 tank cars per month.

**Critical Assumptions:** In addition to those assumptions listed above in Section I, to analyze DOT-117R retrofit capacity, RSI members assumed the following:

- **Retrofit Defined.** Retrofit means modifying an existing DOT-111 tank car to meet the DOT-117R specification requirements by adding one or more of the following: thermal protection, a steel jacket, full height head shields, improved top fittings protection, a specified pressure relief valve, and a disengaging bottom outlet valve handle.

- **Existing Tank Cars with Most DOT-117R features.** Approximately 5,000 existing DOT-111 tank cars were built between ~2012-2014 with nearly all of the features of a DOT-117R. These tank cars (known as jacketed CPC-1232s) are currently equipped with full height head shields and top fittings protection and only require the addition of a disengaging bottom outlet valve handle to meet the baseline DOT-117R specification requirements. RSI assumes these limited scope retrofits could occur during the next scheduled maintenance event; and therefore, these retrofits are not included in the monthly retrofit capacity estimate below.[5]

- **Fleet Compliance and Maintenance.** Tank car facilities will continue to meet required compliance obligations necessary to maintain compliance of the existing tank car fleet. (See below). In addition to regulatory compliance requirements, tank car facilities also handle the routine maintenance of tank cars and in some cases freight cars. Examples may include tank car fittings modifications, freight car componentry, interior coatings and linings, exterior paint, general repair, and other service-related events. Capacity is needed to ensure the industry fleet operates efficiently, and railcar shortages are minimal.

**Fundamental Context for Retrofit Capacity Estimates:**

- **What happens if DOT-111 phase-out deadlines are accelerated too quickly, making compliance infeasible?** If DOT-111 tank cars are forced to be prematurely withdrawn from flammable liquids service and placed in storage, there will be a shortage of cars needed to move flammable liquids. This could potentially have substantial adverse consequences on the supply chain for a variety of fuels, including gasoline, diesel, jet fuel, and other commodities such as toluene and xylene.

---

[5] Limited scope retrofit in this context refers to the addition of a disengaging bottom outlet valve handle to a jacketed CPC-1232 tank car to meet the DOT-117R specification.

NS_PUBCOM_0000063

Revised April 2023

- **Required Compliance Obligations.** Tank cars undergo periodic inspection and tests per DOT regulations and AAR rules at least once every 10-years (commonly referred to as "requalification").[6] Many of the tank car facilities that are AAR-certified to perform such scheduled and non-scheduled maintenance activities are the same facilities that will be called upon to retrofit certain of the existing DOT-111 cars to the DOT-117R specification mentioned above. In some cases, these same facilities may also be responsible for manufacturing new tank cars. If the tank car industry cannot meet required compliance obligations, car owners will be forced to withdraw cars from service, place such units in storage, and await availability of shop capacity to perform needed inspections, repairs, and evaluations prior to returning to active service. Significant adverse impacts on the downstream supply chain and movement of critical materials for downstream manufacturing would likely result. The peak years for scheduled maintenance activities are 2023 and 2024.

- **Out-of-Service Time/Limiting Factors.** It takes between two to three months to perform a full-scope retrofit on a tank car to meet the DOT-117R standard based on the following conditions: railroad service, labor, and the supply chain of parts. Retrofit capacity may be further limited by other steps in the retrofit process (*e.g.*, tank car cleaning, painting, and coating and lining processes).

- **Limited Scope Retrofits.** Limited scope retrofits are planned to occur during scheduled maintenance activities. Accelerated retrofit of tank cars that only require minor modifications will cause significant disruption as it would require unplanned moves to a tank car facility, resulting in unplanned additional out-of-service time of two-three months per tank car.

---

[6]  49 C.F.R. Part 180, Subpart F.

4

NS_PUBCOM_0000064

# Attachment A

# Tank Car Capacity Analysis - Detailed Table

| Year | Booked | Estimated Baseline Demand for Tank Cars (All Types)[1] | Estimated Additional Tank Car New Build Capacity (All Types)[2, 3] | Estimated Total Capacity[4] | Cumulative Additional Tank Car New Build Capacity (100% to DOT-117s)[5] | Cumulative Additional Tank Car New Build Capacity (85% to DOT-117s)[6] | Annual Estimated Retrofit Capacity (230/mo)[7] | Cumulative Retrofit Capacity | Total Cumulative Capacity[8, 9] |
|---|---|---|---|---|---|---|---|---|---|
| 2023 | 9,277 | (included in booked) | 1,642 | 10,919 | 1,642 | 1,396 | 2,760 | 2,760 | 4,156 |
| 2024 | ~1,790 | 8,000 | 5,210 | 15,000 | 6,852 | 5,824 | 2,760 | 5,520 | 11,344 |
| 2025 | ~1,500 | 8,000 | 5,500 | 15,000 | 12,352 | 10,499 | 2,760 | 8,280 | 18,779 |
| 2026 | ~1,500 | 8,000 | 6,000 | 15,500 | 18,352 | 15,599 | 2,760 | 11,040 | 26,639 |
| 2027 | ~1,500 | 8,000 | 7,000 | 16,500 | 25,352 | 21,549 | 2,760 | 13,800 | 35,349 |
| 2028 | ~1,500 | 8,000 | 8,000 | 17,500 | 33,352 | 28,349 | 2,760 | 16,560 | 44,909 |
| 2029 | ~1,500 | 8,000 | 8,000 | 17,500 | - | - | - | - | - |

Notes

[1] Represents the estimated number of new tank car builds necessary to replace natural attrition in the fleet (e.g., tank cars at end of life) and accommodate modest growth. This amount will vary depending on yearly demand.

[2] Represents the additional manufacturing capacity available to respond to regulatory change based on the current manufacturing footprints.

[3] Additional new build capacity in 2023 will continue to decrease from 1,642 as the year progresses.

[4] Given the supply chain and labor constraints that impact the industry, the 50% increase from ~10,000 to ~15,000 in 2024 is an aggressive expansion of capacity and likely represents a best-case scenario.

[5] Allocating 100% of all additional new build capacity to DOT-117s is not feasible for the reasons explained in this white paper.

[6] Represents cumulative additional tank car new build capacity if 85% is allocated to DOT-117s and 15% is reserved for all other tank car types.

[7] Represents industry capacity for retrofits, but RSI can not predict whether car owners will elect to retrofit or replace with a new build. Therefore it is unlikley that retrofits will continue at the steady rate of 230 per month because car owners are likely to select new builds for a larger section of the legacy DOT-111 fleet that remains in service as of 2022Q3.

[8] Represents the sum of Column H (85% of add'l new build capacity allocated to DOT-117s) and Column J.

[9] A May 1, 2028 phase out deadline for DOT-111s in flammable liquids service is feasible based on the assumptions in this table and attached white paper.

[10] Represents total cumulative capacity assuming 85% allocation of additional to new build capacity to DOT-117s (sum of Column H and Column J)



Estimated Tank Car Capacity - New Builds (DOT-117s) & Retrofits (DOT-117Rs)[10]

~35,500 DOT-111s in flammable liquids service remaining for FAST Act phase-out

NS_PUBCOM_0000065

# Attachment B



Source: American Railcar Institute and AAR "Status of North American Flammable Liquid Fleet 3rd Quarter 2022" (Dec. 19, 2022)

NS_PUBCOM_0000066

Attachment 2

NS_PUBCOM_0000067

Proceedings of the 2024 Joint Rail Conference
JRC2024
University of South Carolina
Columbia, SC, USA

# JRC2024-122799

# Effects of Lading Conditions on Puncture Resistance and Release Probability of HAZMAT Tank Cars

Steven W. Kirkpatrick
Applied Research Associates, Inc.
Los Altos, CA, USA

## ABSTRACT

The derailment on February 3, 2023, in East Palestine, Ohio resulted in both a significant release of hazardous materials (HAZMAT) and fires. As a result of the derailment, and subsequent NTSB and FRA investigations, there will likely be a renewed interest in the safety of transporting HAZMAT in DOT-111 general-purpose tank cars. However, the past regulatory efforts related to the transport of high-hazard flammable commodities in DOT-111 tank cars was focused on the tank car design. There was limited consideration of alternative loading and operational conditions that could have an equally significant impact on the safety and probability of release for these tank cars.

The past regulatory responses to safety concerns for HAZMAT transport in railroad tank car safety have developed requirements for strengthening of the tank shell. The March 2009 regulations on poison inhalation hazard (PIH) tank cars (Federal Register, 74 FR 1769) required commodities to be shipped in tank cars with higher pressure ratings (thicker tank walls). Similarly, the July 2015 regulations on high-hazard flammable tank cars (Federal Register, 80 FR 26643) requires the use of DOT-117 tank cars for these commodities instead of the DOT-111 tank cars previously used. The DOT-117 has both a thicker tank shell and requires an external protective jacket compared to the DOT-111 tank. These simple upgrades in the tank thickness/strength, are easy requirements to specify. The upgrades to the tank structure are also relatively simple to evaluate, either in terms of the expected reduction in the conditional probability of release (CPR), or for improved puncture resistance in an impact test or analysis.

The effects of different tank car commodities and loading conditions have been evaluated in past tank car safety studies. The effects of the loading conditions, such as the internal pressure and the magnitude of the outage volume (vapor space above the lading), can produce significant changes in the puncture resistance. However, these effects have not been sufficiently considered as a factor for improving safety of HAZMAT transport by rail.

The objective of this study is to evaluate the potential for reductions in HAZMAT releases from modifications to the tank loading conditions. Validated tank car impact and puncture analysis methodologies are used to evaluate the effect of these modifications (e.g., larger outage volumes). For example, we analyze the loading conditions required for a DOT-111 tank car to have an equivalent tank shell puncture resistance as a DOT-117 tank car loaded with crude oil at nominal operating conditions. These relative comparisons could be applied by decision makers to make informed choices on the best approaches for improved railroad HAZMAT safety.

The results of the study show that the CPR for a DOT-111A100W1 can be significantly reduced, when loaded with larger outage volumes than required to meet the 1% minimum outage requirement. Applying these findings show that there are simple methods that can be applied to improve the safety of HAZMAT transport by rail. For example, shipping HAZMAT commodities in tank cars that are larger in volume than required based on the minimum 1% outage requirement and gross rail load (GRL) limit, will reduce releases and increase safety.

## INTRODUCTION AND BACKGROUND

Accident statistics show that the rail industry's safety performance has improved over the previous decades. The Federal Railroad Administration (FRA) Railroad Accident and Incident Reporting System (RAIRS) shows that the number of accidents per year with at least one car releasing HAZMAT has decreased significantly, as shown in Figure 1 (FRA, 2023). This 40-year trend in improved safety for HAZMAT transportation by rail has been supported by significant tank car safety research programs. These research programs include the Railway Supply Institute (RSI) and Association of American Railroads (AAR) supported Railroad Tank Car Safety Research and Test Project

NS_PUBCOM_0000068

(RSI-AAR, 2021), the Next Generation Railroad Tank Car (NGRTC) Program (Kirkpatrick, 2009a), and the Advanced Tank Car Cooperative Research Program (ATCCRP) (Kirkpatrick, 2018).

A major effort in the RSI-AAR Railroad Tank Car Safety Research and Test Project has been the collection and statistical analysis of extensive information about tank car performance in train accidents [e.g., (Barkan, Ukkusuri, & Waller, 2005), (Saat & Barkan, 2005)]. In over 50 years, the effort has collected data on more than 50,000 damaged tank cars and 31,000 accidents (Saat & Barkan, 2005). Analysis of these accident data allows for the assessment of the CPR of a tank car carrying hazmat in a train accident for a given tank car design (Treichel, et al., 2019). The CPR is available for the existing tank car types in the database, allowing for an assessment of the change of CPR when the hazmat shipment is moved by a tank car with different design features. However, this approach cannot provide information on CPR for a novel tank car design or loading condition that varies from existing practices.



**Figure 1. Number of Rail Accidents Releasing Hazardous Materials (FRA, 2023).**

A major effort in the NGRTC and ATCCRP programs was tank car impact testing and subsequent development and validation of detailed finite element models of tank car equipment that can accurately predict the puncture resistance under specified impact conditions. The initial focus was on a few idealized impact conditions such as a normal impact on the tank (an impact that is perpendicular to the tank surface) with idealized impactors (e.g., 6-inch by 6-inch square). However, with the improved puncture modeling capabilities, alternative impact conditions were investigated, and tank impact protection schemes were evaluated.

These research programs have vastly improved our understanding of, and modeling capabilities for, tank car impact damage and puncture resistance. In addition, they have supported the development of improved tank car designs and informed the federal rulemaking process for tank cars.

The first major change in tank car regulations in the past two decades was initiated after a series of three accidents involving releases of poison inhalation hazard (PIH) materials. These accidents were: (1) Minot, ND, on January 18, 2002 (NTSB, 2004); (2) Macdona, TX, on June 28, 2004 (NTSB, 2006); and (3) Graniteville, SC, on January 6, 2005 (NTSB, 2005). The resulting March 2009 regulations on poison inhalation hazard (PIH) tank cars (Federal Register, 74 FR 1769) required commodities to be shipped in tank cars with higher pressure ratings (thicker tank walls).

The second major change in tank car regulations was initiated by several accidents with releases and fires of flammable materials in the early 2010s. The advances in extraction technologies produced a significant and rapid increase in the number of shipments of crude oil starting around 2010. In 2009, more than 10,000 tank cars transported crude oil in the United States. In 2013, that number increased to nearly 500,000 tank cars (NTSB, 2015). Similarly, a push for more renewable fuel sources resulted in more than 290,000 tank cars transporting ethanol in 2013. The rapid increase in rail traffic with flammable liquids resulted in several high profile accidents with significant releases and fires included: (1) Cherry Valley, IL, on June 19, 2009 (NTSB, 2012); (2) Casselton, ND, on December 30, 2013 (NTSB, 2017); (3) Aliceville AL, on November 7 2013 (FRA, 2013); and (4) Lac-Mégantic, Quebec, on July 6, 2013 (TSB, 2014). The resulting July 2015 regulations on high-hazard flammable tank cars (Federal Register, 80 FR 26643) requires the use of DOT-117 tank cars for these commodities instead of the DOT-111 tank cars previously used. The DOT-117 has both a thicker tank shell and requires an external protective jacket compared to the DOT-111 tank. Note that this regulatory change was applied to high-hazard flammable commodities. Other hazmat commodities were still allowed for transport in DOT-111 tank cars. However, the high-profile derailment on February 3, 2023, in East Palestine, Ohio (NTSB, 2023) with significant HAZMAT releases has resulted in both NTSB and FRA investigations. As a result, there will likely be a renewed interest in evaluating the safety for transportation of HAZMAT in DOT-111 general-purpose tank cars.

The 2009 and 2015 regulatory changes for HAZMAT tank cars both resulted in upgrades in the tank thickness/strength to enhance the puncture protection. These structural changes were logical choices, are easy changes to specify. They are also relatively simple to evaluate, either in terms of the expected reduction in CPR, or for improved puncture resistance in an impact test or analysis. What was not considered in the regulatory changes, is whether a modification to the loading conditions (e.g., changes to the minimum outage volume requirements) could have resulted in equivalent gains for reducing hazmat releases. This is believed to be particularly significant for the tank cars carrying flammable liquids that currently have a 1% minimum outage volume requirement. The objective of this study is to evaluate the potential for reductions in HAZMAT releases from modifications to the tank loading conditions.

 Copyright © 2024 by ASME

NS_PUBCOM_0000069

In the remainder of this paper, we first will provide some additional background on the loading conditions for HAZMAT in railroad tank cars. We then describe the methodologies that are used to analyze the puncture resistance of tank cars with different designs and loading conditions. The assessments of the puncture resistance of various tank cars under their nominal loading condition are used to develop a correlation model that predicts the CPR of a tank car from the relative puncture energy. This correlation model is then applied to assess the expected change in CPR that would be provided by changing the loading conditions from the nominal levels.

## TANK CAR LOADING CONDITIONS

Tank car filling limits are controlled by federal regulations and vary by commodity (Campbell, 2023). PIH commodities require a minimum outage of 5% at the reference temperature. Anhydrous Ammonia (AA) requires a minimum outage of 2% at the reference temperature. All other commodities require a minimum outage of 1% at the reference temperature. The reference temperature is 46°C (115°F) for a non-insulated tank, 43°C (110°F) for a tank car having a thermal protection system, incorporating a metal jacket, or 41°C (105°F) for an insulated tank (Campbell, 2023). These minimum outages at the reference temperature represent a worst-case lower bound condition for puncture resistance. However, this condition will not often occur in service.

The outage at loading is significantly larger than the minimum requirement to allow for thermal expansion of the lading from the initial loading temperature to the reference temperature. For example, fuel oil has a coefficient of expansion factor of 0.00045 per unit volume, per °F rise in temperature (Campbell, 2023). If a non-insulated tank car is loaded at the Stock Tank Condition temperature (60°F) there is a potential 55°F temperature rise. Using the fuel oil expansion coefficient this corresponds to an expansion of the oil volume of 2.5%. As a result, an oil tank car would need to be loaded with an outage of approximately 3.5% to meet the minimum outage requirement.

Ethanol similarly has a coefficient of expansion factor of 0.00061 per unit volume, per °F rise in temperature. The ethanol would expand the 3.3% between the stock loading temperature and reference temperature. Thus, an ethanol car would need to be loaded with an outage of approximately 4.3% to meet the minimum outage requirement.

In addition to the minimum outage requirements, for some commodities and tank car volumes, the outage will be determined by the load limit rather than the minimum outage requirement. This occurs when the lading has sufficient density that the loaded tank reaches its GRL limit prior to the amount that would be allowed by the minimum outage. This commonly occurs when a commodity is shipped in a tank car that was not specifically optimized for it. As a result, these commodity/tank combinations would be shipped at the larger outage volumes. Examples of potential loading conditions for HAZMATS that are still approved for transport in DOT-111 tank cars include:

- Sodium Hydroxide Solution (Caustic Soda) is a common commodity transported by rail with over 80,000 tank car originations in 2021 (AAR, 2021). Caustic Soda has a 12.6 lb./gal density and would optimally ship in a 17,600-gallon car matching the minimum 1% outage requirement. However, when shipped in a 20,600-gallon car, this would have 18% outage.
- Butyl Acrylate, with over 3,700 tank car originations in 2021 (AAR, 2021), has a 7.9 lb./gal density and commonly be shipped in a 23,500-gallon car matching the minimum 1% outage requirement at a 263,000 lb. gross rail load (GRL). However, the 2023 East Palestine, OH derailment contained a load of Butyl Acrylate shipped in a 23,500-gallon DOT 111A100W1 tank car which resulted in a 24.6% outage.
- Ammonium Nitrate Solution, with over 7,700 tank car originations in 2021 (AAR, 2021), has a 9.6 lb./gal density, is commonly shipped in a 20,500-gallon car, and is limited by tank volume (limited to 93% of weight limit by the 1% minimum outage requirement). However, when shipped in a 23,500-gallon car it would have 8% outage.
- Methylene diphenyl diisocyanate (MDI) has a 9.0 lb./gal density and is commonly shipped in 23,500-gallon tank car matching the minimum 1% outage requirement when loaded to the tank Gross Rail Load (GRL). However, when shipped in a 25,800-gallon car, it would have an outage of 12%.

The loading and reference temperatures are two potential conditions that could be used in the analysis of the tank puncture resistance. However, the NGRTC and ATCCRP programs adopted the approach of selecting a nominal temperature condition that would be more representative of a potential service condition for a tank car and provide a better average estimate of the tank puncture resistance. For PIH cars, a nominal temperature of 78°F was selected. For example, a chlorine tank car was typically analyzed with an initial 100-psi internal pressure (chlorine vapor pressure at 78°F) and outage volume of 10.6%. For the general-purpose tank cars loaded based on the minimum outage constraint, the 78°F nominal temperature would result in outages of 3.2% and 2.7% respectively for fuel oil and ethanol.

## ANALYSIS METHODOLOGIES

The analysis methodologies developed in the NGRTC and ATCCRP programs all required the capability to model the effects of the loading conditions and changing internal pressure in the tank as the impact deforms the tank and changes the internal volume. A reduction in the tank volume will compress the gasses in the outage volume. As the tank deformations increase, the tank will approach a shell full condition and the pressure will rapidly increase. This pressure rise has been

Copyright © 2024 by ASME

NS_PUBCOM_0000070

measured in the full-scale impact tests and the model validated against the data (Krishnamurthy, et al., 2022).

The effects of the lading conditions on puncture resistance have been evaluated in past studies, including an FRA-funded study performed in collaboration with the ATCCRP program (Kirkpatrick, 2013). An example from that study is a series of impact analyses evaluating the effects of outage volume for an unpressurized DOT-111A100W1 tank car (no jacket). The tanks in the analyses were modeled as initially unpressurized with a control volume algorithm used to include the pressure-volume effects. Control volume curves were generated representative of a tank filled with an incompressible liquid to various levels up to as much as 99% of the tank capacity (minimum 1% outage condition). The control volume pressure curves (gauge pressure) for outage volumes between 1% and 18% are shown in Figure 2 and are generated assuming the outage volume contains an ideal gas initially at one atmosphere (absolute pressure).



Figure 2. Control volume pressure curves for various outages between 1 and 18 percent.

A comparison of the impact deformations at the point of the tank shell penetration (puncture) for the 1%, 3%, and 9% outage volumes are shown in Figure 3. The figure shows the changes in the tank deformations at the time the tank shell is punctured and the mode of puncture in the impact patch. The comparison clearly shows that the larger outage volumes allow for a larger ram displacement before the tank is punctured. The comparison of the corresponding force-deflection behaviors and puncture energies with the different outage volumes is shown in Figure 4. The comparison shows that tanks with outage volumes between 1% and 18% are punctured at similar force levels (392,000 to 467,000 lbs) but at significantly different displacements (16 to 65 inches) resulting in a wide range of puncture energies between 256,000 and 1,370,000 ft-lbs.



(a) Deformation at puncture for 1% outage

(b) Deformation at puncture for 3% outage

(c) Deformation at puncture for 9% outage

Figure 3. Calculated impact and puncture behaviors for different outage volumes.



Figure 4. Force-deflection curves and puncture energies for different outage volumes.

Copyright © 2024 by ASME

NS_PUBCOM_0000071

The above example illustrates that the loading conditions of the tank have a significant impact on the puncture resistance through increased impact energy dissipation. However, changing the requirements on loading has not been significantly considered as an option in safety regulations or operations. This may potentially have been a result of the difficulty of quantifying the effect of the loading conditions on the CPR, which is a key safety metric used by the railroads. The methodology for calculating the CPR of a tank design does not account for the outage volume of the tank (Treichel, et al., 2019). Instead, it is the value based on the distribution of all of the lading conditions for that tank in service. In the following section we develop an approach to evaluate the effect of the outage volume on the CPR.

## EVALUATING RELATIVE PUNCTURE RESISTANCE

For this investigation, the relative puncture energies of different tank types (or tank conditions) are determined using the approach of the FRA tank car impact analysis study (Kirkpatrick, 2013). In that study, analyses were performed over a wide range of impact conditions on various tank designs with various commodities. The impact conditions included a range of different size and shape impactors and both normal and 45-degree oblique impacts. Thus, each tank configuration is evaluated using a suite of 20 different impact scenarios.

An example of this approach in the FRA study was an evaluation of the effects of temperature on puncture resistance for chlorine shipped in a DOT-105J600 tank car (Kirkpatrick, 2013). The suite of impact conditions was analyzed for the tank design at both the conditions for the nominal temperature (78°F) and the reference temperature (105°F). For each impact scenario, the calculated puncture energy calculated for the tank car at the reference temperature is divided by the puncture energy for the tank car at the nominal temperature. These normalized puncture energies are plotted in Figure 5. Each of the markers represents the normalized puncture energy for a specific impact condition (size, shape, and orientation of the impactor). The bottom axis indicates the impactor characteristic size. This parameter was developed to characterize the effective size of the impactor and is equal to the square root of the area of the impactor face (Kirkpatrick, 2013). This impactor characteristic size parameter was shown to provide a strong linear correlation to the puncture force for all the different impactor sizes and shapes analyzed (in normal impacts), as shown in Figure 6.

The average normalized puncture energy over all of the impact scenarios is indicated by the solid line in Figure 5. On average, the puncture energy for the DOT-105J600 chlorine tank car at a temperature of 105°F is 80% of that for a lading condition of chlorine at 78°F. Thus, the higher internal pressure and reduced outage volume (vapor space above the lading) at 105°F reduced the puncture energies for the tank car by 20% on average.

## CPR REGRESSION MODEL

The methodology for estimating CPR was developed from analyses of a comprehensive tank car accident database within the RSI-AAR Tank Car Safety Program (Treichel, et al., 2019).

Previously, the application of this accident database was the only methodology available to evaluate the effects of various tank car parameters (e.g., tank thickness or head shields and jackets) on CPR.



Figure 5. Normalized side impact puncture energies at 105 °F.



Figure 6. Correlation of side impact puncture forces with ram characteristic size.

In 2016, a previous study developed a correlation between the puncture energy of a tank for a specific impact condition (normal impact with a 12x12-inch square impactor), to estimate the change in CPR for different variations on a general purpose (DOT-111) tank car design (Jeong, Perlman, Alexy, & Gonzalez III, 2016) (Jeong, Carolan, & Perlman, 2016). In this study, we expand on that approach with the hope of developing a more generalized methodology with wider application.

One of the limitations of the previous effort to correlate CPR to the calculated tank puncture energy is that the energy was estimated from a single idealized impact scenario (Jeong, Carolan, & Perlman, 2016). For the application in that study, it was more appropriate since they were only considering

Copyright © 2024 by ASME

NS_PUBCOM_0000072

comparisons of various design changes based on the DOT-111 tank car (e.g., tank material, tank shell thickness, addition of a jacket). However, when comparing a larger set of tank types and loading conditions, the results from a single impact scenario could be misleading. For example, some car types may have a higher relative puncture resistance against large impactors than against small impactors.

The approach applied to develop the average puncture energy for various tank cars and loading conditions is the same as that in the above example. The same set of normal and oblique impacts using different size and shape impactors was performed for each of the tank and loading conditions of interest. The resulting puncture energies for each tank car design can then be normalized and compared.

The first series of analyses were performed on common tank designs and lading commodities using the nominal loading conditions for those tank designs. A comparison of the normalized puncture energies for these nominal tank and loading conditions is shown in Figure 7. The comparison is made for a range of both PIH and general-purpose tank cars. In this figure, the puncture energies are normalized by those of the DOT-105J500 tank car loaded with chlorine at the nominal loading condition (100-psi and 10.6% outage corresponding to 78°F). This tank car was the baseline car used for the initial NGRTC research efforts. Many of these analyses were previously assessed in the FRA tank impact study (Kirkpatrick, 2013). However, some additional comparisons have been added, such as the DOT-117A100W, for which the specification did not exist at the time of the original study.

Another important factor is that in the original FRA impact analyses for general-purpose tank cars, the analyses were primarily performed at the worst-case conditions corresponding to the minimum outage condition of 1%. The comparisons shown in Figure 7 apply a 3% outage that is assumed to be the nominal condition for crude oil and ethanol tank cars (the majority of DOT-111 and DOT-117 tank car shipments).

The average normalized puncture energies calculated for the various tanks and commodities at the nominal loading conditions are then used to develop a relationship with the CPR. The corresponding average shell CPR in a nominal 26 mph derailment that derails 11 cars is plotted against the normalized average puncture energies in Figure 8. The data was then fit to obtain a model for the average shell CPR using a negative exponential model with an offset in the form:

$$f(x) = A + Be^{(Cx+D)} - Ex \qquad (1)$$

where x is the relative puncture energies. This form of a negative exponential model is similar to those used previously in studies to correlate CPR and tank thickness (Barkan, Ukkusuri, & Waller, 2005). The corresponding regression coefficients are as follows: A=0.0096; B=3.8 C=-12.1; D=3.3; and E=0.005. Therefore, the average CPR can be estimated from the average puncture energy for a given tank car and commodity according to the equation:

$$CPR_{shell}(x) = 0.0096 + 3.8e^{(-12.1x+3.3)} - 0.005x \qquad (2)$$



**Figure 7. Comparison of relative puncture performance of various tank car designs.**



**Figure 8. Correlation of average shell CPR to relative shell puncture energies.**

An important factor in developing the model for CPR, shown in Figure 8, is that the puncture energy analyses included are common tank/commodity combinations under nominal conditions such that these are representative of the typical conditions in the RSI-AAR tank car safety program accident

Copyright © 2024 by ASME

NS_PUBCOM_000073

database used to develop the statistical CPR formulations. In particular, for this study, it is important that the variations of general-purpose tank cars (DOT-111, DOT-117, and CPC-1232 tank cars) represent the historical fleet in service conditions. For these tank cars, the crude oil and ethanol shipments would constitute a large percentage of the historical accident and release data. These commodities were typically shipped in purpose-built tank car with a capacity optimized for the expected lading. Ethanol has a relatively low density of 789 kg/m³ compared to other petroleum products (e.g., medium crude oil has a density between 850-900 kg/m³). Thus, many of these crude oil and ethanol shipments would be loaded at or near a level controlled by the minimum outage condition. As described in an above section (Tank Car Loading Conditions), this would be outage levels of 3.5% for fuel oil and 4.3% for ethanol at loading. In addition, as the temperature increases the outage volume would be reduced. Thus, a comparisons of alternative loading conditions relative to the CPR developed from the CPR regression model based on the nominal condition with a 3% outage should provide a reasonable estimate for the potential changes to CPR that could be achieved under alternative loading conditions (e.g., higher minimum outage requirements).

A supplemental validation of using the 3% outage as the nominal condition for these tanks is provided by an analysis of waybill data for DOT-111 tank car shipments in 2010-2011 performed (Student, 2011). The results of that analysis, including more than 400,000 shipments, is shown in Figure 9. Although the data indicates that the nominal value for the outage may be closer to 4%, the assumption of using 3% for this study is reasonable.



**Figure 9. DOT-111 tank car outage levels from waybill analyses (2010-2011).**

Other factors that can influence the relative energies of different tank designs in the correlation model shown in Figure 8 are the tank material and initial pressure. For example, the analyses of the DOT-111 tanks were performed using A516-70 steel as tank shell material. However, a significant fraction of DOT-111 tank cars in the fleet are fabricated with TC128B steel. If TC128B steel was substituted for the A516-70 steel in the DOT-111 tank car analyses, the relative puncture energies for

those cars would likely be increased by a small amount. Similarly, if the vapor pressure for the chlorine and AA tank cars was lowered (lower nominal temperature), all of those pressure car designs would see an increase in the relative puncture energies. However, the largest increase would likely be for the DOT-112J340 AA tank car since it has the highest ratio of the initial pressure (125 psi) to the tank pressure rating (340 psi). A further investigation and analysis of these factors could further improve the correlation.

## CPR FOR THE DOT-111 AT DIFFERENT OUTAGES

Having established the baseline correlation between the average shell puncture energy for a tank car design and the shell CPR, we can now evaluate the expected effects of alternative loading conditions (e.g., larger outage volume) for which CPR data is not available. By determining the relative puncture energy for that new tank/loading condition, the expected change in CPR can be found using the correlation in Figure 8.

A comparison of the normalized puncture energies for different general purpose tank car designs with different outage volumes is shown in Figure 10. For this comparison, all of the tank car configurations are normalized relative to the DOT-111A100W1 tank car at the nominal loading condition with a 3% outage.



**Figure 10. Comparison of relative puncture performance of various general purpose tank designs.**

Copyright © 2024 by ASME

NS_PUBCOM_0000074

The comparisons show significant effects of the various tank configurations on the normalized shell puncture energies. The DOT-111 tank at the minimum 1% outage corresponding to the reference temperature punctures on average at 60% of the energy for the DOT-111 tank at the nominal 3% outage loading condition. Similarly, the DOT-111 loaded at 6%, 9%, and 12% outages have on average 36%, 70%, and 97% higher shell puncture energies, respectively, than the DOT-111 tank at the nominal 3% outage loading condition.

The evaluations of different tank designs, shown in Figure 10, indicate that the DOT-111A100W3 tank design with a standard 11-gauge A1011 steel jacket has on average a 20% higher shell puncture energy than the unjacketed baseline DOT-111 tank car at the nominal loading conditions. However, the DOT-117 tank car with the jacket and thicker 9/16-inch TC128B tank shell has on average a 56% higher shell puncture energy than the baseline DOT-111 tank car.

To estimate the effects of the outage volume on the expected shell CPR for the DOT-111 tank car we first convert the normalized puncture energies to be relative to the DOT-105J500 tank car with nominal chlorine loading conditions to be consistent with those in Figure 7 and Figure 8. The resulting average normalized puncture energies for the DOT-111 loaded at 6%, 9%, 12%, and 15% outages are respectively 0.77 0.88, 0.97, and 1.10. These values are indicated by the vertical lines on Figure 11. From the regression model (solid red line in Figure 8 and Figure 11), the expected shell CPRs for the DOT-111 loaded at 6%, 9%, 12%, and 15% outages would be approximately 0.015, 0.0075, 0.0055, and 0.0043, respectively. These represent 76%, 88%, 91%, and 93% reductions in the CPR for the 6%, 9%, 12%, and 15% outage levels, respectively. We also see that the DOT-111 would be expected to have on average a higher puncture energy and lower shell CPR compared to the DOT-117 at nominal loading conditions when the DOT-111 has an outage of approximately 10% or above.

## EVALUATION OF HEAD IMPACT PUNCTURE RISK

Similar assessments on the effects of lading for head impacts is ongoing. However, there are various factors that complicate the head impact assessments. For example, the previous FRA impact study included far fewer head impact assessments than those for shell impacts.

A preliminary regression model based on the head impacts from the FRA impact study (Kirkpatrick, 2013), combined with analyses of other tank head and loading conditions is shown in Figure 12. In this example, the general-purpose tank head evaluations were performed at a worst case 1% outage levels used in the FRA tank impact study.

The relative head puncture energies for the correlation in Figure 7 were based on a limited set of offset head impactors against a fully constrained tank head. Impacts were performed using the 3-, 6-, 9-, and 12-inch square impactors. An example of the head impact and puncture response is shown in Figure 13.



**Figure 12.  Correlation of average head CPR to Relative head puncture energies.**



**Figure 13.  Calculated puncture behavior of a head and head shield.**



**Figure 11.  Effect of DOT-111 outage levels on expected shell CPR.**

Copyright © 2024 by ASME

The comparison of CPR versus relative head puncture energies, shown in Figure 12, indicates that any significant increase in the relative puncture energy for the DOT-111 tank head should result in significant reductions in head CPR since the tank head design is in the steep portion of the regression curve. In this comparison, we see that the distribution of CPRs show a binary distribution with the DOT-111 and CPC1230 tank head designs without head shields have a higher head CPR value and all of the designs with head shields have low CPRs.

Additional insight into the head CPR distribution can be obtained by the Head CPR model regression formulas provided in the RSI-AAR Tank Car Safety Study (Treichel, et al., 2019). The model for the head CPR is in the form:

$$CPR_{Head} = e^{L(X_i)} / [1 + e^{L(X_i)}] \qquad (3)$$

where the expression $L(X_i)$ for the head CPR is obtained from the formula:

$$
\begin{aligned}
L_{Head} = {}& -1.5145 \ (Intercept) \qquad (4) \\
& -3.0699 \times Head\ shield - Full\ (yes = 1) \\
& -2.8387 \times Head\ shield - Half/jacket\ (yes = 1) \\
& -6.6773 \times Head\ shield - Half/no\ jacket\ (yes = 1) \\
& -1.6871 \times Jacket - no\ head\ shield\ (yes = 1) \\
& -0.3447 \times Head\ thickness\ (inches) \\
& +0.5572 \times Heater\ coils\ (yes = 1) \\
& +0.000433 \times Train\ speed\ (mph) \\
& -0.2281 \times Impact\ opportunity\ factor\ (scalar) \\
& -0.7613 \times Derailment\ vs.\ collision\ (Der. = 1) \\
& +0.00709 \times Train\ speed\ x\ impact\ opportunity
\end{aligned}
$$

The terms of significance for the above head CPR estimates are the coefficient of -3.07 included when a half inch thick head shield is added compared to a coefficient of -0.3447 multiplied by the head thickness in inches. From past analyses performed under the ATCCRP program, we have seen that adding a half inch of steel to the head thickness should be approximately equivalent to adding the half inch head shield (Kirkpatrick, 2017). Thus, we would expect that the coefficient on the head thickness (in inches) to have a magnitude approximately two times the coefficient on the addition of the head shield, rather than being an order of magnitude smaller. It is likely, that there were insufficient head punctures on designs with head shields in the RSI-AAR database for the regression algorithm to accurately resolve these coefficients. This issue with the formula for calculating tank head CPR values makes the calculation of head CPRs based on relative puncture energies difficult.

## CONCLUSIONS AND FUTURE WORK

This study applied a methodology of characterizing the puncture resistance of a tank car through detailed modeling of tank car puncture behaviors over a wide range of impact conditions and comparing the relative puncture energies over those impacts. A regression model was then developed between the relative puncture energies of various tank car designs under nominal loading conditions and the CPR. The model was then applied to assess the expected change in CPR for alternative tank loading conditions.

The analyses demonstrated that there would be a significant reduction in the shell CPR if the minimum outage in the tank car was higher than the current 1% minimum outage. Specifically, a DOT-111A100W1 tank car loaded at 6%, 9%, 12%, and 15% outages would have approximately 76%, 88%, 91%, and 93% reduction in the CPR, respectively, compared to the tank loaded at a nominal 3% outage corresponding to the 1% minimum outage requirement for the reference temperature. We also see that the DOT-111 would be expected to have on average a higher puncture energy and lower shell CPR compared to the DOT-117 at nominal loading conditions when the DOT-111 is loaded with an outage of approximately 10% or above.

One factor that should be noted is that for a commodity that is currently loaded based on the minimum outage of 1% (nominal outage of approximately 3%), the reduction in lading to achieve a 10% nominal outage will require a corresponding 7% increase in the number of tank car shipments to transport an equivalent volume of the lading if the same volume tank car is used. This higher number of shipments will have a proportional increase in the number of releases.

The results of this study also indicate that there would be a safety benefit to shipping commodities in tank cars that are larger in volume than the optimized tank car designed to meet the minimum 1% outage requirement at the tank car GRL. Substituting a larger volume tank car will result in greater puncture resistance. For HAZMAT commodities shipped in DOT-111 tank cars, selection of a larger volume tank car, when possible, with result in a higher level of safety. Similarly, a shipper who is placing an order for new tank cars should consider purchasing a design with an increased capacity above that for the design the just satisfies the 1% minimum outage requirement for the intended use. Although there is likely a small incremental cost increase, it may be well justified by the increased safety benefits.

A more thorough evaluation of head puncture resistance is required to assess the total CPR (shell, head, and fittings) for the relative tank configurations. However, increased outage volumes will similarly result in reductions for the head CPR. At a minimum, the analyses indicate that a DOT-111 tank retrofitted with a head shield and operated with outage volumes of 9% or greater should have a total CPR equal to or less than the DOT-117 tank at the current nominal outage level.

Finally, future regulatory activities related to HAZMAT transport by rail should give more consideration to the loading conditions. Modifications to loading conditions, such as increasing the minimum outage requirements, may provide similar safety benefits for certain tank car and commodity combinations at a much lower cost than necessitating the replacement of a portion of the tank car fleet.

## ACKNOWLEDGMENTS

The basis for this study was research was supported by the FRA (Contract DTFR53-11-C-00017 and Contract No. 693JJ622C000002). The study also uses results from analyses from other research projects performed under the ATCCRP

Copyright © 2024 by ASME

NS_PUBCOM_0000076

program and funded by the Association of American Railroads (AAR).

The analysis methodologies used in this report build on the work previously performed under NGRTC Project funded by The Dow Chemical Company. The development of the puncture modeling methodologies and the testing used to validate the models and develop the constitutive and failure models were performed under the NGRTC project.

The analyses of ethylene oxide tank cars in this report were performed under Contract No. 5058 with the American Chemistry Council on behalf of its Ethylene Oxide Panel.

Finally, some of the puncture analyses of general-purpose tank cars were performed for the Union Tank Car Company (UTLX).

The views and opinions expressed herein are those of the author and do not necessarily state or reflect the views of the Department of Transportation or the Federal Railroad Administration and shall not be used for advertising or product endorsement purposes.

## REFERENCES

AAR. (2021). *Annual Report of Hazardous Materials Transported by Rail.* Washington DC: Association of American Railroads Bureau of Explosives.

Barkan, C. P., Ukkusuri, S. V., & Waller, S. T. (2005). Optimizing the design of railway tank cars to minimize accident-caused releases. In *Computers & Operations Research.* Elsevier Ltd.

Campbell, D. (2023, November 30). *Tank Car Filling Limit & Filling Density Standards.* Retrieved from US Department of Transportation, FRA Web Site: https://railroads.dot.gov/sites/fra.dot.gov/files/fra_net/3438/Filling%20Limits%20Presentation%20-%20Dennis%20Campbell.pdf

FRA. (2013). *Accident Investigation Report HQ-2013-1050: Alabama & Gulf Coast Railway LLC (AGR), Aliceville, AL, November 7, 2013.* Washington DC: Federal Railroad Administration Office of Safety.

FRA. (2023). *Railroad Accident/Incident Reporting System (RAIRS).* Federal Railroad Administration.

FRA. (2023). *Railroad Accident/Incident Reporting System (RAIRS).* . Washington DC: Federal Railroad Administration.

Jeong, D. Y., Carolan, M. E., & Perlman, B. (2016). On railroad tank car puncture performance: Part II - Estimating metrics. *Proceedings of the 2016 Joint Rail Conference JRC2016.* Columbia, South Carolin: ASME.

Jeong, D. Y., Perlman, B., Alexy, K., & Gonzalez III, F. (2016). On railroad tank car puncture performance: Part I - Considering metrics. *Proceedings of the 2016 Joint Rail Conference JRC2016.* Columbia, South Carolina: ASME.

Kirkpatrick, S. W. (2009a). *Detailed Puncture Analyses of Various Tank Car Designs.* ARA Final Technical Report, Prepared for the Next Generation Railroad Tank Car (NGRTC) Project.

Kirkpatrick, S. W. (2009b). Detailed Impact Analyses for Development of the Next Generation Rail Tank Car - Part 1 – Model Development and Assessment of Existing Tank Car Designs. *Proceedings of the ASME 2009 Rail Transportation Division Fall Conference, Paper No. RTDF2009-18016.* Ft. Worth, TX: ASME.

Kirkpatrick, S. W. (2009c). Detailed Impact Analyses for Development of the Next Generation Rail Tank Car - Part 2 –Development of Advanced Tank Car Protection Concepts. *Proceedings of the ASME 2009 Rail Transportation Division Fall Conference, Paper No. RTDF2009-18017.* Fort Worth, TX: ASME.

Kirkpatrick, S. W. (2013). *Detailed Puncture Analyses Tank Cars - Analysis of Different Impactor Threats and Impact Conditions.* Federal Railroad Administration, Report No. DOT/FRA/ORD-13/17.

Kirkpatrick, S. W. (2017). *Advanced Tank Car Collaborative Research Program (ATCCRP) Research Report – TWP-4 Assessing Puncture Resistance for Sandwich Tank Car Designs; TWP-5 Composite Materials for Protection Systems; TWP-22 Advanced Head Protection Concepts.* Washington, DC: AAR.

Kirkpatrick, S. W. (2018). *Advanced Tank Car Collaborative Research Program (ATCCRP) – Executive Summary and Conclusions.* ATCCRP Final Report.

Krishnamurthy, A., Trevithick, S., Carolan, M., Spangenberg, U., Wilson, N., Eshraghi, S., & Kirkpatrick, S. W. (2022). *Review of Tank Car Side Impact Tests and Analyses 2007-2020.* Federal Railroad Administration Office of Research Development and Technology, Report No. DOT/FRA/ORD-22/14.

NTSB. (2004). *Derailment of Canadian Pacific Railway Freight Train 292-16 and Subsequent Release of Anhydrous Ammonia Near Minot, North Dakota; January 18, 2002.* National Transportation Safety Board.

NTSB. (2005). *Collision of Norfolk Southern Freight Train 192 with Standing Norfolk Southern Local Train P22 with Subsequent Hazardous Materials Release at Graniteville, South Carolina, January 6, 2005.* National Transportation Safety Board, Railroad Accident Report NTSB/RAR-05/04.

NTSB. (2006). *Collision of Union Pacific Railroad Train MHOTU-23 with BNSF Railway Company Train MEAP-TUL-126-D with Subsequent Derailment and Hazardous Materials Release, Macdona, Texas, June 28, 2004.* National Transportation Safety Board, Railroad Accident Report NTSB/RAR-06/03.

NTSB. (2012). *Railroad Accident Report: Derailment of CN Freight Train U-70691-18 with Subsequent Hazardous Materials Release and Fire, Cherry Valley, Illinois, June 19, 2009.* Washington DC: National Transportation Safety Board.

Copyright © 2024 by ASME

NS_PUBCOM_0000077

NTSB. (2013). *Railroad Accident Brief: Derailment and hazardous materials release and fire, Tiskilwa, Illinois, October 7, 2011.* National Transportation Safety Board, NTSB/RAB-13/02.

NTSB. (2015). *Most Wanted Transportation Safety Improvements.* Washington DC: National Transportation Safety board.

NTSB. (2017). *BNSF Railway Train Derailment and Subsequent Train Collision, Release of Hazardous Materials, and Fire - Casselton, North Dakota.* Washington DC: National Transportation Safety Board.

NTSB. (2023). *Norfolk Southern Railway Train Derailment with Subsequent Hazardous Material Release and Fires East Palestine, Ohio, February 3, 2023,* . Washington DC: National Transportation Safety Board, Preliminary Report RRD23MR005.

RSI-AAR. (2021). *The RSI-AAR Railroad Tank Car Safety Research and Test Project - Continuously Improving Tank Car Safety.* Washington DC: RSI.

Saat, M. R., & Barkan, C. (2005). Release Risk and Optimization of Railroad Tank Car Safety Design. *Transportation Research Record: Journal of the Transportation Research Board.*

Treichel, T. T., Ghosh, L., Saat, M. R., Barkan, C. P., Liu, X., Kirkpatrick, S. W., . . . Zhou, X. (2019) *Conditional Probability of Release (CPR) Estimates for Railroad Tank Cars in Accidents.* RSI-AAR Railroad Tank Car Safety Research and Test Project Report RA-19-01.

TSB. (2014). *Runaway and Main-Track Derailment, Montreal, Maine & Atlantic Railway, Freight Train MMA-002 Mile 0.23, Sherbrooke Subdivision Lac-Mégantic, Quebec 06 July 2013.* Gatineau QC, Canada: Transportation Safety Board of Canada.

Copyright © 2024 by ASME

NS_PUBCOM_0000078

Comment A-108



**RAILWAY SUPPLY INSTITUTE**

*Support, Connection, Advocacy*

**2001 K Street, NW | Suite 300 | Washington, DC 20006 | phone (202) 367-1126 | fax (202) 367-2210 | www.rsiweb.org**

July 26, 2024

*Via Email: pubcomment-ees.enrd@usdoj.gov*

Todd Kim, Esq.
Assistant Attorney General
Environmental and Natural Resources Department
United States Department of Justice
U.S. DOJ—ENRD
P.O. Box 7611
Washington, DC 20044-7611

**RE:    Comments by the Railway Supply Institute regarding the Notice of Lodging of Proposed Consent Decree for *The State of Ohio and The United States of America* v. *Norfolk Southern Railway Company, et al.,* D.J. Ref. No. 90-11-3-12792**

Dear Assistant Attorney General Kim:

The Railway Supply Institute ("RSI"), on behalf of its Committee on Tank Cars ("RSI-CTC"), submits the following comments on the proposed Consent Decree lodged by the United States Department of Justice ("DOJ") in the action *The State of Ohio and The United States of America v. Norfolk Southern Railway Company, et al.,* D.J. Ref. No. 90-11-3-12792 ("Consent Decree"), for which the DOJ published notice in the Federal Register on May 30, 2024.[1] The proposed Consent Decree would settle Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA") and Clean Water Act ("CWA") claims brought by the United States against Norfolk Southern Railway Company and Norfolk Southern Corporation (collectively, "Norfolk Southern") related to the February 3, 2023, train derailment in East Palestine, Ohio. RSI welcomes the proposed Consent Decree but has significant concerns about the broad impacts that Paragraphs 69 and 70, pertaining to tank cars, will have on the industry and the domestic supply chain and requests a meeting with DOJ to discuss these issues further.

RSI is the international trade association of the railway supply industry and acts on behalf of the suppliers to North American freight and passenger railroads and these suppliers' 240,000 plus employees. RSI is the only trade association representing the entire rail supply industry—manufacturers, distributors, and service providers to the freight car, locomotive, maintenance-of-way, communications, signaling, leasing, and passenger rail industries. Its members provide all types of

---

[1] Notice of Lodging of Proposed Consent Decree Under the Comprehensive Environmental Response, Compensation, and Liability Act and the Clean Water Act, 88 Fed. Reg. 46908 (May 30, 2024).

NS_PUBCOM_0000081

goods and services to freight and passenger railroads, rail shippers, and freight car manufacturers and lessors. RSI members supply over half of all rail cars operating in North America for lease. In addition, RSI members collectively build more than ninety-five percent of all new railroad tank cars and own and supply for lease over seventy percent of railroad tank cars operating in North America.

The RSI-CTC consists of member companies that build, own, and/or lease most of the tank cars in North America.[2] The RSI-CTC has a demonstrated commitment to safe rail transportation by tank car. This includes its long-standing participation in the Railroad Tank Car Safety Research and Test Project with the North American Class I Railroads (through the Association of American Railroads) whereby the RSI-CTC contributes funding, technical resources, and thought leadership to the detection, prevention, and mitigation of equipment-related factors in train accidents.

I.    **Executive Summary**

RSI welcomes the proposed Consent Decree settling CERCLA and CWA claims against Norfolk Southern but is concerned that the two provisions on the use of tank cars—Paragraph 69 and Paragraph 70 (collectively, the "Tank Car Provisions")—are not in the public interest and should be struck from the agreement or modified for the reasons discussed below.

Paragraph 69 prohibits Norfolk Southern's "use" of any DOT-111 tank car for the transportation of a flammable gas or flammable liquid (defined in the proposed Consent Decree as "Flammable Hazardous Materials") "other than under a common carrier obligation." Paragraph 70 requires Norfolk Southern to develop, submit, and implement a "Customer Tank Car Replacement Plan" to "encourage customers to use DOT-117R Tank Cars (or similar armored Railcars) in place of DOT-111 Tank Cars for the transportation of Flammable Hazardous Materials" and explicitly requires the plan to include financial incentives.

RSI is concerned that these provisions require the replacement of DOT-111 tank cars on a timeline that is not feasible, thereby imposing unworkable requirements for nonparties to the Consent Decree that will likely impact the entire North American rail network. As discussed in more detail below, following the phase-out of DOT-111 tank cars transporting crude oil and ethanol, the remaining DOT-111 tank cars in flammable liquid service are primarily transporting specialty petrochemical products, such as aviation jet fuel, diesel fuel, gasoline, methanol, petroleum distillates, xylene, and toluene. The prohibition contemplated by Paragraph 69 imposes an arbitrary 180-day deadline to replace DOT-111 tank cars and does not account for the numerous factors that make such an accelerated phase-out infeasible. With most chemicals shipping under transportation contracts rather than pursuant to published tariff rates (i.e., under the "common carrier obligation"), these shipments will be subject to the prohibition in Paragraph 69, resulting in potential supply chain disruptions. With such consequences at risk, requirements to accelerate the phase-out of DOT-111 tank cars are better suited to the legislative and regulatory process, where all impacted stakeholders can participate.

In addition, Paragraph 70 permits Norfolk Southern to raise rates or impose surcharges on DOT-111 tank cars to "incentivize" shippers to use tank cars that meet or exceed a DOT-117 specification. Rather than enhancing safety, these provisions afford Norfolk Southern a financial windfall that offsets some of the costs it will otherwise incur under the proposed Consent Decree

---

[2] The companies that comprise the RSI-CTC are: American Industrial Transport; CIT Rail; GATX Corporation; The Greenbrier Companies; SMBC Rail Services, LLC; Trinity Rail Group, LLC; and Union Tank Car Company.

2

requirements, leaving nonparties and, ultimately, the American people with the financial burden. For these reasons, and the lack of direct nexus between these provisions and environmental clean-up, RSI urges DOJ to withdraw or modify the Tank Car Provisions to eliminate these concerns.

## II.   The Far-Reaching Impacts of the Tank Car Provisions Amount to Rulemaking Without Proper Process

In light of the impacts of Paragraphs 69 and 70 on nonparties, these provisions are akin to rulemaking through Consent Decree. RSI is concerned that the requirements imposed by the Tank Car Provisions bypass both the legislative process and the notice-and-comment rulemaking process, using this proposed Consent Decree—negotiated with a single party—to achieve broader policy objectives for the rail industry. Given the interconnectedness of the North American rail system, the phase-out of DOT-111 tank cars in flammable liquids service (and flammable gas service as contemplated by this proposed Consent Decree) should be addressed holistically in the risk-based manner prescribed by Congress under the Fixing America's Surface Transportation ("FAST") Act, which was signed into law on December 4, 2015.[3] A piecemeal accelerated phase-out (as contemplated here) upsets the carefully calibrated FAST Act deadlines, with potentially significant and unintended consequences to industry, the economy, and the American people.

If the agreement is entered without deletion or modification to the Tank Car Provisions, the Consent Decree will substantially impact the rights and obligations of nonparties who neither had insight into the Consent Decree negotiation process between Plaintiffs and Norfolk Southern nor agreed to the outcome. The United States Supreme Court has made clear that "a court may not enter a consent decree that imposes obligations on a party that did not consent to the decree."[4] Making substantial changes that affect the rights and obligations of nonparties is appropriately carried out through legislation by Congress or rulemaking by federal agencies. A court abuses its discretion when it enters a consent decree amending an agency rule that would have otherwise been subject to statutory rulemaking procedures.[5] Including the Tank Car Provisions in this Consent Decree sets the troubling precedent of permitting rulemaking by consent decree, which is not in the public interest.

## III.   The Tank Car Provisions will Impact the Entire North American Rail Network

The Tank Car Provisions of the proposed Consent Decree purport to impose obligations on Norfolk Southern, but in reality, will impose obligations on and shift burdens to nonparties, creating impacts across the entire North American rail network.

Paragraphs 69 and 70 do not account for the fact that "[t]he freight rail industry is not a combination of discrete, unconnected railroads. Rather, it is a single interconnected system of six Class I railroads and hundreds of short line railroads that own and maintain over 160,000 route-miles

---

[3] Pub. L. No. 114-94.

[4] *Local No. 93, Intern. Assn of Firefighters, AFL-CIO C.L.C. v. City of Cleveland*, 478 U.S. 501 at 529 (1986).

[5] *Conservation Nw. v. Sherman*, 715 F.3d 1181, 1187 (9th Cir. 2013) ("where a consent decree does promulgate a new substantive rule, or where the changes wrought by the decree are permanent rather than temporary, the decree may run afoul of statutory rulemaking procedures even though it is in form a judicial act. . . . [Thus,] a district court abuses its discretion when it enters a consent decree that permanently and substantially amends an agency rule that would have otherwise been subject to statutory rulemaking procedures").

3

of track throughout North America."[6] It is not just the track that is connected. At any given moment, approximately five to ten percent of the line-haul locomotives being operated by the six Class I railroads are owned or leased by another railroad, and a significant number of railcars that originated with one railroad will be interchanged and transported to or from their final destination by another railroad.[7] By statutory obligation, the law requires railroads to interchange traffic from other rail carriers to ensure the viability of an interconnected rail transportation system.[8]

Tank cars are routinely interchanged between railroads as a shipment is transported to its destination. According to the American Chemistry Council, nearly seventy-five percent of the 5,400 carloads of flammable liquids shipped by ACC members on Norfolk Southern's network in 2023 were "interline moves," which means they were either initiated on another railroad and transferred to Norfolk Southern or transferred from Norfolk Southern to another railroad. Due to the interconnected nature of the North American rail network, it is artificial to assume the tank car requirements of the proposed Consent Decree will be limited to traffic on Norfolk Southern routes.

## IV.  The Tank Car Provisions Impose Unfeasible Requirements and Disregard the Congressionally-Mandated FAST Act Deadlines

RSI and its members support the United States Department of Transportation's ("DOT") requirement to use tank cars with enhanced safety features to transport flammable liquid products, such as those meeting or exceeding the DOT-117 specification (DOT-105J, DOT-112J, and DOT-120J). During the DOT's development of the DOT-117 specification, RSI was one of the key industry leaders encouraging the federal government to establish this specification and strongly advocated for enhanced safety features on tank cars transporting flammable liquids.

RSI has long supported the phase-out of DOT-111 specification tank cars in flammable liquid service, as set forth by the FAST Act. The FAST Act imposes a risk-based, commodity-specific phase-out schedule that accounts for various factors, including railcar production and retrofit capacity tank car facilities. Under the FAST Act, Congress first mandated the use of DOT-117s (or other tank cars exceeding this standard) for crude oil and ethanol service, with DOT-111 phase-out deadlines ranging from January 1, 2018, to May 1, 2025. The phase-out deadlines for flammable liquids other than crude oil and ethanol under the Act are May 1, 2025 (for Packing Group I, high hazard) and May 1, 2029 (for Packing Groups II and III, medium to low hazard). Congress carefully determined these phase-out deadlines with input from a broad range of stakeholders during the legislative process and after years of notice and comment rulemaking that accounted for the safety benefits and economic costs of such a phase-out.[9]

---

[6] *Comments of the Association of American Railroads and the American Short Line and Regional Railroad Association*, Greenhouse Gas Emissions Standards for Heavy Duty Vehicles – Phase 3, p. 2 EPA-HQ-OAR-2022-0985.

[7] *Id.*

[8] 49 U.S.C. § 10742. ("A rail carrier providing transportation subject to the jurisdiction of the Board under this part shall provide reasonable, proper, and equal facilities that are within its power to provide for the interchange of traffic between, and for the receiving, forwarding, and delivering of passengers and property to and from, its respective line and a connecting line of another rail carrier ... providing transportation subject to chapter 137.")

[9] PHMSA published its Advanced Notice of Rulemaking for HM-251 on September 6, 2013, and its final rule implementing the FAST Act on August 15, 2016.

4

RSI's members have played and will continue to play a critical role in ensuring the timely replacement or retrofit of DOT-111 tank cars in flammable liquids service to meet the FAST Act deadlines. Since 2015, tank car manufacturers have added more than 52,000 newly manufactured DOT-117s to the North American fleet and retrofitted another 47,000 tank cars to the DOT-117R specification to replace DOT-111 tank cars as of the first quarter of 2024.[10] The rail industry has already phased out all legacy DOT-111 tank cars in flammable liquid service transporting crude oil and all legacy DOT-111 tank cars in flammable liquid service transporting ethanol. RSI and its members are committed to phasing out the remaining DOT-111 tank cars transporting other Class 3 flammable liquids. Data from the Association of American Railroads ("AAR") show that nearly 27,000 tank cars that are compliant with the DOT-117 specification are in service to transport "other" flammable liquids, while approximately 17,000 still require upgrades.[11]

Congress examined the relevant data and considered the interests of the American people, shippers, carriers, car tank owners and lessors, and other parties when it developed the FAST Act phase-out deadlines. Upgrading the North American fleet requires significant long-term planning and capital investment. The ability to manufacture new tank cars to a DOT-117 specification or retrofit existing tank cars to the DOT-117R specification depends on a variety of factors, including but not limited to industry labor and supply chain conditions, availability of trained and qualified personnel, access to raw materials, existing tank car facility certifications, tank car shop capacity and production lead times, and other federally required mandates (such as adhering to tank car inspection and repair intervals and the federal requirements for the construction of new tank cars to transport materials that are toxic-by-inhalation).[12]

Paragraph 69 of the proposed Consent Decree seeks to override the carefully crafted Congressional phase-out schedule by imposing a 180-day deadline for Norfolk Southern to "cease use of any DOT-111 Tank Cars for transportation of Flammable Hazardous Materials, other than under a common carrier obligation." The vast majority of tank cars are privately owned by tank car lessors or, in some cases, shippers. Railroads, including Norfolk Southern, own relatively few tank cars to support railroad operations (e.g., diesel fuel and fuel oil). Therefore, Norfolk Southern's "use" presumably includes the railroad's ability to accept or carry freight in tank cars owned or leased by nonparties and is not limited to the railroad's "use" of tank cars for its operations (e.g., transporting diesel fuel for Norfolk Southern locomotives).

RSI understands that Paragraph 69 would prohibit Norfolk Southern from carrying or accepting shipments that move under a rail transportation contract (compared to freight moving under a tariff, which is part of the common carrier obligation). According to the Government Accountability Office, most rail traffic moves under contract and, therefore, would be subject to this provision. In 2014, about seventy-six percent of regulated freight was shipped by contract, and eighty-five percent of chemical traffic was shipped by contract.[13] RSI understands that percentage may be even higher today.

---

[10] AAR Status Report: North American Flammable Liquid Tank Car Fleet (May 31, 2024) (this includes DOT-120 tank cars).

[11] AAR Status Report: North American Flammable Liquid Tank Car Fleet, Appendix 1 (May 31, 2024).

[12] Patty Long, RSI, Statement for the Record: Hearing on Improving Rail Safety in Response to the East Palestine Derailment, U.S. Senate Commerce Committee (March 22, 2023).

[13] GAO-17-166, FREIGHT RAIL PRICING: Contracts Provide Shippers and Railroads Flexibility, but High Rates Concern Some Shippers at p. 14–15 (December 2016).

Accordingly, Paragraph 69 operates as a *de facto* acceleration of the FAST Act for a portion of the North American fleet moving on Norfolk Southern track.

Fundamentally, a 180-day deadline to cease using DOT-111 tank cars is not feasible as these tank cars cannot simply be swapped in and out of service or manufactured in such a compressed timeline to ensure replacement tank cars are available by November 2024. Extensive planning and logistics are required to move tank cars in and out of interchange and from one commodity service to another (if possible). More importantly, there is no inventory of unutilized DOT-117 cars available for purchase or lease, and the tank car manufacturing industry has limited capacity to manufacture new cars and retrofit existing cars to meet or exceed the DOT-117 specification. Tank car manufacturers cannot dedicate 100% of manufacturing capacity to DOT-117s; instead, they must maintain the ability to meet demand for other types of tank cars carrying hazardous and non-hazardous materials (e.g., sulfuric acid, sodium hydroxide liquid, liquid fertilizers, biodiesel, vegetable oil, and corn syrup). Many of these materials are the essential building blocks for downstream manufacturing of other products.

A 180-day deadline does not provide adequate lead time to acquire new or retrofitted tank cars. Based on the tank car order backlog, it can take up to a year from when a tank car is ordered to receive final delivery. It takes several months to perform a full-scope retrofit on a tank car to meet the DOT-117R standard based on factors including railroad service, labor, and the parts supply chain. Retrofit capacity may be further limited by other steps in the retrofit process (e.g., tank car cleaning, painting, and coating and lining processes), thus extending the out-of-service time for any given tank car.

Finally, RSI notes that the facilities responsible for retrofitting DOT-111 tank cars to the DOT-117 specification also perform the required inspection and repair activities necessary to maintain compliance with the existing freight and tank car fleet. Tank cars undergo scheduled maintenance per DOT regulations and AAR rules at least once every ten years (commonly referred to as "requalification").[14] Should shippers be required to procure DOT-117 tank cars or "similarly armored" tank cars at the accelerated pace the proposed Consent Decree requires, this could cause a shortage of tank cars and potentially divert resources for the manufacture of new and the maintenance of other existing rail cars.

The prohibition contemplated by Paragraph 69 imposes an arbitrary 180-day to replace DOT-111 tank cars and fails to account for the numerous factors that make such an accelerated phase-out infeasible.

## V.     The Tank Car Provisions Could Disrupt Supply Chains for Essential Products

At first blush, Paragraph 69 appears only to apply to Norfolk Southern's "use" of DOT-111 tank cars for transportation of flammable gases and flammable liquids, with a carve-out for common carrier traffic. However, as noted above, Norfolk Southern's "use" presumably includes the railroad's ability to accept or carry freight moving under a private contract and, therefore separate from freight moving under the common carrier obligation.

---

[14] 49 C.F.R. Part 180, Subpart F.

NS_PUBCOM_0000086

A rail carrier must provide service "on reasonable request,"[15] known as the common carrier obligation. Congress, the Surface Transportation Board ("STB"), and courts regard freight moving under a rail transportation contract as distinct from a railroad's common carrier obligation. Federal law distinguishes freight moving under the common carrier obligation from freight moving under a contract. According to 49 U.S.C. § 10709(a), railroads are permitted to "enter into a contract with one or more purchasers of rail services to provide specified services under specified rates and conditions," and if they enter into such contracts, it is not a violation of the common carrier obligation (as explicitly stated in § 11101(a) above). Furthermore, "a rail carrier that enters into a contract as authorized by § 10709 remains subject to the common carrier obligation set forth in section 11101, with respect to rail transportation not provided under such a contract." Accordingly, federal law and the implementing STB regulations distinguish between rail transportation provided under a Section 10709 contract and the common carrier obligation.[16]

Under this statutory and regulatory framework, shippers have two options for arranging transport with railroads: "a contract—which is a private agreement of terms, conditions, and rates for moving freight—or a tariff, which is a published rate railroads are required to provide to shippers when requested."[17] Should they go the contract route, railroads and shippers may enter into confidential contracts. The STB has no authority to review the terms or rates for freight shipped by contract.[18]

As currently drafted, Paragraph 69 of the proposed Consent Decree would apply to traffic moving under a rail transportation contract—thereby prohibiting the use of DOT-111 tank cars—but it would not apply to traffic moving under a tariff (which would fall into the common carrier obligation as this term is used in the Consent Decree). As noted above, most regulated freight—particularly chemicals—are shipped under contract and, therefore, would be subject to the prohibition in Paragraph 69. Furthermore, to the extent that the proposed Consent Decree prevents Norfolk Southern from accepting in interchange DOT-111 tank cars that are subject to rail transportation contracts with other carriers, this provision will have industry-wide consequences on shippers, lessors, and nonparty carriers—none of whom are parties to this consent decree. If instead Paragraph 69 applies to *only* DOT-111 tanks cars that Norfolk Southern *owns*, Paragraph 69 should be revised to clarify that this is the case for the avoidance of doubt on how this provision impacts nonparties to the Consent Decree.

Given that DOT-111 tank cars have already been phased-out out of crude oil service and ethanol service, the Tank Car Provisions primarily impact shipments of chemical products with a wide range of beneficial end uses, including water treatment, and the production of food, fuels, pharmaceuticals, and construction materials. As RSI explained in testimony to Congress, "If DOT-111 tank cars are forced to be prematurely withdrawn from flammable liquids service and placed in storage, there will be a shortage of cars needed to move flammable liquids. This could have substantial adverse consequences on the supply chain for various fuels, including gasoline, diesel, jet fuel, and other

---

[15] 49 U.S.C. § 11101(a).

[16] 49 C.F.R. § 1300.1.

[17] Government Accountability Office, "Freight Rail Pricing: Contracts Provide Shippers and Railroads Flexibility, but High Rates Concern Some Shippers," GAO-17-166, (Dec. 2016).

[18] 49 U.S.C. § 10709(c)(1).

7

commodities such as toluene and xylene."[19] Thus, RSI is concerned that the restrictions in the proposed Consent Decree on rail shipments of flammable liquid materials could disrupt critical supply chains across the United States, harming the economy and, ultimately, United States consumers.

## VI.     Paragraphs 69 and 70 Confer an Economic Benefit on Norfolk Southern

If a shipper cannot procure a replacement tank car quickly enough to meet the 180-day deadline in Paragraph 69 (or find an alternative route with another carrier), a shipper likely would have to ship a DOT-111 at the higher tariff rates which apply to common carrier traffic, allowing the railroad to enjoy a financial benefit.

In addition, the "Customer Tank Car Replacement Plan" contemplated by Paragraph 70 directs Norfolk Southern to use financial incentives to encourage the replacement of DOT-111 tank cars with tank cars that meet or exceed the DOT-117R specification for transportation of flammable liquids and flammable gases.[20] Paragraph 70 requires the United States to review the plan "taking into consideration *Settling Defendants' industry and technical expertise*" (emphasis added). It fails to include a similar requirement to consider relevant data and expertise from the nonparty tank car manufacturers and lessors who produce and supply the "replacement tank cars" and the shippers who use the tank cars, which will be subject to the "financial incentives."

This requirement will likely have the unintended result of increased rates or surcharges for transporting flammable liquids or flammable gasses in DOT-111 tank cars, regardless of whether the freight moves under contract or tariff. While Norfolk Southern could offer a discount on using DOT-117 tank cars (or other tank cars that exceed the DOT-117 specification), it is unlikely to take this approach when given the opportunity to raise rates. This will particularly impact routes where shippers have no alternative and must use Norfolk Southern to move their products. Accordingly, these provisions afford Norfolk Southern a financial windfall that could effectively offset some of the costs it will otherwise incur under the proposed Consent Decree requirements, leaving nonparties and, ultimately, the American people with the financial burden.

## VII.    Conclusion

RSI supports the proposed Consent Decree to settle the EPA claims related to the East Palestine derailment and to require Norfolk Southern to remediate and mitigate the public health and environmental risks associated with the incident. However, the Tank Car Provisions serve a different purpose and impose unworkable requirements that are likely to adversely impact the rail industry, domestic supply chain, and, ultimately, the American people and amount to a rulemaking by consent decree in conflict with the FAST Act. RSI urges DOJ to delete the Tank Car Provisions from this proposed Consent Decree as they are not in the public interest. Should DOJ retain the Tank Car Provisions, RSI respectfully urges DOJ to modify the provisions to avoid adverse effects on the supply

---

[19] Hearing on "Improving Rail Safety In Response to the East Palestine Derailment," United States Senate Committee on Commerce, Science, and Transportation, p. 3 (March 22, 2023).

[20] Although the proposed Consent Decree uses the phrase "DOT-117R Tank Cars (or similar armored Railcars)", we assume that DOJ intends that any tank car that meets or exceeds the DOT-117 specification would be appropriate to replace a DOT-111. While DOT-117R, DOT-117J, and DOT-117P are all part of the DOT-117 class, other tank cars such as DOT-105s (which are pressure tank cars) contain additional safety features that make them "overbuilt" as compared to a DOT-117 tank car, thus exceeding the DOT-117 specification.

8

chain and to ensure the burden of implementing the proposed Consent Decree remains with Norfolk Southern.

Please contact Lee Verhey, Executive Director of the RSI-CTC at verhey@rsiweb.org or 817.937.7573 to discuss RSI's request for a meeting, or if you have any questions about these comments.

Sincerely,

Lee Verhey
Executive Director of the RSI Committee on Tank Cars
Railway Supply Institute

9

NS_PUBCOM_0000089

Comment A-109



July 29, 2024

Submitted via email to: pubcomment-ees.enrd@usdoj.gov
Todd Kim
Assistant Attorney General
U.S. DOJ-Environment and Natural Resources Division
P.O. Box 7611
Washington, DC 20044

**Re:** The State of Ohio and The United States of America v. Norfolk Southern Railway Company, et al., Civil Case No. 23-cv-517 (D.J. Ref. No. 90–11–3–12792)

Dear Mr. Kim,

On the evening of February 3, 2023, an eastbound Norfolk Southern Railway (NS) train derailed 38 railcars in East Palestine, Ohio. The derailed equipment included five hazardous materials tank cars carrying vinyl chloride, a known carcinogen not found in nature. According to the National Transportation Safety Board (NTSB), the train derailed because a wheel bearing on a hopper car overheated and caused an axle to separate.[1] Three days later, with information provided by Norfolk Southern and its contractors, the local fire chief authorized a vent and burn of the five derailed VCM tank cars. In their investigation, NTSB has since declared the vent and burn unnecessary and the fault of Norfolk Southern, who did not effectively communicate to those at the scene the doubts from the vinyl chloride shipper that polymerization (which could lead to an explosion) would result.[2]

The Department of Justice has proposed a consent decree to settle the United States' claims against Norfolk Southern concerning the derailment.[3] In these comments, we advocate for changes to the decree to better serve the communities affected by this preventable tragedy. In summary, and at the minimum, the following changes should be made to the decree:

---

[1]NTSB, "Meeting of June 25, 2024," at 1,
https://www.ntsb.gov/investigations/Documents/East%20Palestine%20Ohio%20Board%20Meeting%20Summary%20with%20Amendments.pdf

[2]*Id. at* 1-2,
https://www.ntsb.gov/investigations/Documents/East%20Palestine%20Ohio%20Board%20Meeting%20Summary%20with%20Amendments.pdf

[3] 89 Fed. Reg. 46908 (May 30, 2024)

257 Park Avenue South     **T** 212.505.2100     New York, NY / Austin, TX / Bentonville, AR / Boston, MA / Boulder, CO / Raleigh, NC / Sacramento, CA
New York, NY 10010       **F** 212.505.2375     San Francisco, CA / Washington, DC / Beijing, China / La Paz, Mexico / London, UK
                        **EDF.org**            Totally chlorine free. 100% post-consumer recycled paper.

1. Expand the Medical Monitoring Plan to cover individuals outside of the 2-mile radius derailment.
2. Increase community engagement and implement processes for public comment on all plans and procedures EPA must review and/or approve.
3. Make the data that Norfolk Southern must report to EPA publicly available and easy to understand.
4. Revise the Formal Dispute Resolution Procedure.

## Medical Monitoring Plan Expansion

The train derailment released vinyl chloride, along with butyl acrylate, isobutylene, ethylene glycol, and ethylhexyl acrylate.[4] The effects of the spill and the unnecessary vent and burn of 115,000 gallons of vinyl chloride are still being studied and understood. EPA's own plume map shows the soot from the vent and burn impacting about a 50-mile radius around the derailment.[5] Recent analysis of air monitoring shows air pollution from the train spanning 16 states.[6]

Acute exposure to vinyl chloride affects the respiratory system and central nervous system and can cause dizziness, drowsiness, headaches, and giddiness. Inhaling vinyl chloride has been shown to increase the risk of liver cancer.[7] Of equal concern are the other poisonous gases that can be formed when vinyl chloride is burned. When released into the air, vinyl chloride can break down and form hydrochloric acid and formaldehyde.[8] It is unsurprising that air monitoring done after February 8, 2023 showed "no sustained air monitoring readings or analytical results" for vinyl chloride,"[9] since the half-life of the chemical is only a few hours.[10]

---

[4] https://www.epa.gov/system/files/documents/2023-02/TRAIN%2032N%20-%20EAST%20PALESTINE%20-%20derail%20list%20Norfolk%20Southern%20document.pdf

[5] EPA, "Retrospective Soot Deposition Analysis for the East Palestine Derailment Incident Response," (May 31, 2023), https://www.epa.gov/system/files/documents/2023-06/IMAAC%20Retrospective%20Analysis%20for%20the%20East%20Palestine%20Derailment%20-%20FINAL%20Technical%20Memo.pdf

[6] E&E News, Ellie Borst, "Air Pollution from Ohio Train Crash Spanned 16 States – Study," (June 20, 2024), https://subscriber.politicopro.com/article/eenews/2024/06/20/air-pollution-from-ohio-train-crash-spanned-16-states-study-00164236

[7] EPA, "Vinyl chloride," https://19january2017snapshot.epa.gov/sites/production/files/2016-09/documents/vinyl-chloride.pdf

[8] Agency for Toxic Substances and Disease Registry, "Public Health Statement, Vinyl Chloride," (July 2006), https://www.atsdr.cdc.gov/ToxProfiles/tp20-c1-b.pdf

[9] Appendix A of the consent decree

[10] EPA, "Vinyl chloride," https://19january2017snapshot.epa.gov/sites/production/files/2016-09/documents/vinyl-chloride.pdf

NS_PUBCOM_0000112

Researchers are looking at the long-term health effects of the spill and vent and burn. Preliminary findings from one University of Kentucky study show that individuals outside of a 10-mile radius of the derailment are showing symptoms that they did not experience before the derailment, including respiratory issues like shortness of breath and gastrointestinal issues.[11] Based on the data collected so far, and the fact that studies about the health effects of the spill and vent and burn are ongoing, the monitoring plan should not be limited to individuals in a two-mile radius of the derailment.

## Meaningful Community Engagement

One of the three founding principles of The Office of Environmental Justice in the Department of Justice (DOJ) is "ensuring meaningful engagement with impacted communities." We urge DOJ to amend the consent decree in order to uphold and this principle, and to acknowledge and help the affected community to the maximum extent possible.

The consent decree should include a process for community engagement and public comment on every plan the EPA is slated to review or approve for Norfolk Southern, including:

- The Post Removal Long Term Monitoring Plan (Section 43), which should specifically engage communities on which waterways besides Sulphur Run and Leslie Run should be monitored (Section 43a)
- Private Drinking Water Well Monitoring Workplan (Section 47)
- Community Health Program Plan (Section 49)
  - o Medical Monitoring Program
  - o Mental Health Services
- Community Facilitation Plan (Section 52)
- Track Restoration Coordination Procedure (Section 71)
- Vent and Burn Coordination Procedure (Section 77)

The community should also be notified of and invited to participate in Norfolk Southern Annual exercises (Section 82) that showcase their Track Restoration Coordination Procedure and Vent and Burn Coordination Procedure.

The consent decree also requires Norfolk Southern to hire individuals (which the EPA must approve) who will lead the CERCLA and Clean Water Act cleanup (Section 27), administer the Community Health Program (Section 49), and facilitate the Community Facilitation Plan (Section 53). These individuals, as well as EPA's on-site coordinator, Ralph Dollhopf (Section 29), should plan for robust community engagement and be willing and able to communicate in a transparent manner with the public.

## Data Transparency for the Public

The consent decree requires Norfolk Southern to provide EPA with various data, reports, and procedures. All such information that Norfolk Southern gives EPA, including any additional information that the company gives EPA relating to the decree, should be made publicly available and easily accessible (i.e. on a publicly available website dashboard) and be summarized and presented in a digestible way (i.e. in layman's terms).

---

[11] Haynes, Erin, "East Palestine Train Derailment Health Tracking Study, https://www.nationalacademies.org/documents/embed/link/LF2255DA3DD1C41C0A42D3BEF0989AC AECE3053A6A9B/file/D6FECEA686ED6FFB59981460EFA436F388245D51BBD0?noSaveAs=1

3

The data, reporting, and other information that should be publicly and accessibly presented include:

- Discharge and release reporting (Section 35)
- Progress reports on Completion of Work under CERCLA (Section 36)
- Additional Activities Plan (Section 37)
- CERCLA Removal Action final report (Section 38 a)
- CWA Removal Action final report (Section 38 b)
- Quarterly reports for Long-Term Monitoring Plan (Section 45)
- Annual Reports on Community Health Program (Section 54)
- Track Coordination Procedure (Section 76)
- Vent and Burn Coordination Procedure (Section 77)

Formal Dispute Resolution Process Efficiency

The consent decree outlines a cumbersome dispute resolution process. For example, the "formal" dispute resolution process imposes heavy administrative burdens that the United States government would have to overcome if Norfolk Southern initiates a formal dispute resolution process, and which could weaken the consent decree, especially if Norfolk Southern decides to initiate many disputes. These administrative burdens include the United States' obligation to provide a responsive statement of position, including supporting factual data, analysis, opinion and other documentation, within 20 days after Norfolk Sothern provides an initial Statement of Position about a dispute that the company chooses to lodge.

We note that EPA and Norfolk Southern first have to enter an informal negotiation process before entering a formal dispute process, but due to the cumbersome nature of the formal process the government may be induced to settle disputes in informal negotiations to avoid prolonged formal proceedings.

DOJ should amend the consent decree to streamline the dispute processes, to help ensure that this decree results in robust compliance and enforcement.

Sincerely,

s/ Gioia Kennedy
Gioia Kennedy
*Project Manager, Petrochemicals*
Environmental Defense Fund
257 Park Ave S
New York, NY 10010
gkennedy@edf.org

4

Comment A-110

Northwestern
PRITZKER SCHOOL OF LAW

Bluhm Legal Clinic
375 East Chicago Avenue
Chicago, Illinois 60611-3069

legalclinic@law.northwestern.edu
Office 312. 503. 8576
Fax 312. 503. 8977
www.law.northwestern.edu

July 30, 2024

Assistant Attorney General
U.S. DOJ—ENRD
P.O. Box 7611
Washington, DC 20044–7611
pubcomment-ees.enrd@usdoj.gov

**Via U.S. Mail & email**

Re: Proposed Consent Decree in *The State of Ohio and The United States of America v. Norfolk Southern Railway Company, et al.*, Case No. 4:23–cv–00517; D.J. Ref. No. 90–11–3–12792.

Dear Assistant Attorney General,

I write on behalf of Sustainable Englewood Initiatives ("SEI"), the Northwestern Pritzker School of Law Environmental Advocacy Center, and the under-signed individuals and organizations, to provide comments on the proposed consent decree lodged in the matter of *The State of Ohio and The United States of America v. Norfolk Southern Railway Company, et al.*, Case No. 4:23–cv–00517; D.J. Ref. No. 90–11–3–12792 (the "Proposed Consent Decree"). The undersigned are each deeply committed to ensuring that public safety and environmental protection are prioritized in rail operations nationwide and are particularly concerned with the public health impacts of, and high safety risks created by, the operations of Norfolk Southern in handling the 2023 East Palestine derailment and its operational influence on other railroad operators in Chicagoland communities. As we wrote less than a month after the derailment, in a March 6, 2023, letter to Regional Administrator Shore, the federal government's strong, focused response has been laudable, and, we believe, can catalyze improvements that help communities through which rail lines run throughout the country. We write now to express our appreciation for the tremendous effort undertaken by the Department of Justice ("DOJ") and U.S. Environmental Protection Agency ("EPA") to negotiate the Proposed Consent Decree and to offer specific proposals to ensure that it leads to broader improvements in rail safety that center and benefit other communities, like those in Englewood and throughout Chicagoland.

First and foremost, we recognize and support the focus of the Proposed Consent Decree on delivering relief and resources to the Ohio and Pennsylvania communities directly harmed by the February 2023 Norfolk Southern derailment in East Palestine. The Proposed Consent Decree terms and other response and recovery actions aimed at near-term remediation and long-term health monitoring are important and commendable. We also deeply appreciate the complexity and ambition of this agreement, as necessary to respond to this catastrophe as robustly and effectively as possible under U.S. EPA's statutory authorities. We do note, however, that DOJ and EPA should consider whether the geographic limits applicable to many of the Proposed Consent Decree's provisions should be revised in recognition of images provided by the National Transportation Safety Board that showed large cloud of fumes traveling across as many as 16 States.

While this carefully crafted settlement is understandably rooted within the specific events that precipitated the East Palestine derailment and redress for those directly impacted, it must be recognized that such a tragedy could happen anywhere that train tracks run through communities. Events even during this public comment period underscore how important it is to improve rail operations with respect to handling



Northwestern
PRITZKER SCHOOL OF LAW

Bluhm Legal Clinic
375 East Chicago Avenue
Chicago, Illinois 60611-3069

legalclinic@law.northwestern.edu
Office 312. 503. 8576
Fax 312. 503. 8977
www.law.northwestern.edu

hazardous cargo: a derailment in Matteson, Illinois, caused evacuations in June,[1] and hazardous materials burned for more than 12 hours after a derailment in North Dakota.[2] Of most direct relevance to the Proposed Consent Decree, Norfolk Southern's own trains have derailed twice in recent weeks—once within U.S. EPA Region 5 in Detroit,[3] and another Norfolk Southern train carrying hazardous materials derailed in Bethlehem, Pennsylvania.[4] The Proposed Consent Decree represents an invaluable opportunity to decrease the risk of such tragedies recurring.

We write to request specific changes to the Proposed Consent Decree and to present important considerations for the settling government agencies in overseeing its implementation. We offer these recommendations with the aim of centering community knowledge and community empowerment as a part of reducing the risk of something like the East Palestine derailment happening again anywhere Norfolk Southern trains carry hazardous or explosive materials. The Proposed Consent Decree should further focus the required broader operational improvements and risk reduction strategies in densely populated urban areas where tracks run right through residential neighborhoods, often low-income neighborhoods home to marginalized communities of color and where Norfolk Southern shares tracks with passenger services like Amtrak and Metra.

We write in the hopes that this Proposed Consent Decree can be sharpened to better protect such places like in the Englewood neighborhood in Chicago. Chicago is well known to be the largest rail freight hub in the country and Norfolk Southern operates a massive and growing intermodal freight yard in Englewood. In Englewood, Norfolk Southern's yard sits next to schools and parks:

---

[1] https://www.dailymail.co.uk/news/article-13577487/train-derailment-matteson-illinois-chicago-suburbs-evacuations.html

[2] https://apnews.com/article/train-derailment-hazardous-material-north-dakota-a45add68f13836222234a5eb6e25693a

[3] https://www.youtube.com/watch?v=Bo2YT5EARnc

[4] https://www.wfmz.com/news/area/lehighvalley/multiple-train-cars-derail-in-bethlehem-under-hill-to-hill-bridge/article_324ac04a-3b01-11ef-8494-bb15f2176fe9.html

NS_PUBCOM_0000116



**Bluhm Legal Clinic**
375 East Chicago Avenue
Chicago, Illinois 60611-3069

legalclinic@law.northwestern.edu
Office 312. 503. 8576
Fax 312. 503. 8977
www.law.northwestern.edu



*The Norfolk Southern Intermodal Yard and associated operations are in the process of expanding in Englewood such that they now cover the entire area framed on the east and west by the rail lines indicated on this GoogleMaps image, from the top of the image to the bottom.*

The risk of hazardous train derailments in Chicago is not new. Indeed, the subject was explored in depth with respect to trains carrying crude oil.[5] And the community in Englewood has seen derailments in the past, though, thankfully, it has been spared thus far from the sort of cascading hazardous releases as seen in East Palestine.[6]

With this perspective, we ask that the Proposed Consent Decree be revised in targeted ways to both maximize the nationwide benefits of its Rail Safety Improvements provisions and to incorporate community notification and input in Norfolk Southern's required planning and processes. Cementing the prioritization of operational improvements in densely populated areas and formalizing additional public

---

[5] https://www.chicagomag.com/chicago-magazine/may-2016/bomb-trains/.

[6] *See* National Transportation Safety Board, Railroad Accident Brief, Accident No. DCA-05-MR-013, *available at* https://www.ntsb.gov/investigations/AccidentReports/Reports/RAB0607.pdf; & National Transportation Safety Board, Derailment of Northeast Illinois Regional Commuter Railroad Train 519 in Chicago, Illinois, October 12, 2003. Railroad Accident Report NTSB/RAR-05/03 (2005), *available at* https://www.jonroma.net/media/rail/accident/usa/ntsb/RAR0503.pdf.

3



Northwestern
PRITZKER SCHOOL OF LAW

Bluhm Legal Clinic
375 East Chicago Avenue
Chicago, Illinois 60611 3069

legalclinic@law.northwestern.edu
Office 312. 503. 8576
Fax 312. 503. 8977
www.law.northwestern.edu

involvement will maximize the benefits of the Proposed Consent Decree in terms of protecting the most people possible from the risks of similar future catastrophes. Specifically, we propose the following:

> Paragraph 58, in the "Rail Safety Improvement" section, helpfully requires Norfolk Southern to prioritize the rollout of new Hot Bearing Detectors "on Key Routes in a manner providing greater HBD density for approaches to areas with greater population density and environmentally sensitive locations." Such prioritization is important and should be further detailed to require prioritization of not just "environmentally sensitive locations," but also "vulnerable populations," like the schools that sit adjacent to Norfolk Southern operations in Englewood. This paragraph could also be strengthened by requiring prioritization of Hot Bearing Detector deployment in Key Routes that have the greatest of the density of train traffic, including passenger trains.

> Locations for the "Annual Exercises" required in paragraph 82 should be selected by prioritizing the same set of factors as discussed in paragraph 58, including the above additions, to ensure that the Settling Defendants are practicing and testing their response strategies and processes in the places where a potential safety incident is most likely and would have the greatest impact on the most vulnerable.

> The "Thermal Camera Piloting" required under paragraph 63 should also be conducted with similar prioritization as required for the Hot Bearing Detector roll-out. To ensure that safety innovations are being distributed first – and not last – to the most vulnerable populations most burdened by the risk of train safety incidents, the language in Paragraph 58, with the above additions, should be replicated in paragraph 63.

> The "Train Build Study" in paragraph 65 requires consideration of the "physical characteristics of Settling Defendants' rail network," as part of an analysis to determine "how technology and changes to train marshalling rules might improve the safety of operations." The required Study should also assess the physical and social surroundings of Settling Defendants' rail network. Additionally, the concept of "safety of operations" in this paragraph must be defined, ideally explicitly in the text, as inclusive of daily and routine harms and risks to public safety created by Settling Defendants' operations, not only safety harms of rare, catastrophic incidents. As such, this Study should be required to examine and make recommendations on how railyard air pollution and nuisance impacts, like noise and odor, can be reduced and must evaluate those impacts with consideration of the rail lines' physical and social context to assess those impacts in conjunction with other sources and as they are experienced by the specific communities that experience them.

> The provisions aimed at reforming how the Settling Defendants respond to and resume operations after an incident should be refined to ensure community involvement and create mechanisms for public input within planning requirements.

   o In particular, Paragraph 71 sets out a "Track Restoration Coordination Procedure" that requires coordination with "emergency responders and relevant government officials." To that list should be added "relevant community leaders and institutions." This would for example, require coordination with the principal of a school located on the border of a Norfolk Southern facility so that school could take steps to protect its students or could provide information to Norfolk Southern to minimize public health risks.

NS_PUBCOM_0000118



**Northwestern**
PRITZKER SCHOOL OF LAW

Bluhm Legal Clinic
375 East Chicago Avenue
Chicago, Illinois 60611-3069

legalclinic@law.northwestern.edu
Office 312. 503. 8576
Fax 312. 503. 8977
www.law.northwestern.edu

- o The "Track Restoration Workgroup" required by paragraph 73 should be national in its scope and should be required to include community representation.

- o The requirement to meet and solicit input on the "Track Restoration Coordination Procedure" in paragraph 75 should not be triggered only by requests from a "state, federal, or local authority," but also by requests made by community-based or other non-governmental organizations. It is crucial that this particular procedure be informed by the public and be worthy of public confidence, so this is a particularly important revision to provide transparency, public accountability, and public input.

- o Similarly, paragraph 77 requires Settling Defendants to develop a "Vent and Burn Coordination Procedure" to ensure "appropriate consultation with government agencies, First Responders, Unified Command, responsible railroad contractors and public health officials" prior to executing any Vent and Burn procedures. The Vent and Burn Coordination Procedure must also "establish standard protocols," for Vent and Burn practices "including communication with the public, railroad operators and operations and other stakeholders that may be affected." There are no requirements as to which "entities" Settling Defendants select for the Workgroup required to review the Vent and Burn Coordination Procedure under paragraph 78, however. This means there is no assurance of public input or transparency for the detailed requirements for review and development of that Procedure in the paragraphs that follow. Settling Defendants should be required to include community and public representatives in this Workgroup. Relatedly, the final Vent and Burn Coordination Procedure should be explicitly required in the Proposed Consent Decree to include consideration of protecting public buildings and public spaces and to assessing and mitigating impacts on vulnerable populations whenever considering a Vent and Burn. Public participation in the process to develop the Vent and Burn Coordination Procedure should surface such concerns, but they should also be expressly named and required in the relevant text of the Proposed Consent Decree.

We wish to add our collective hope the Proposed Consent Decree will take in consideration key findings in the National Transportation Safety Board - East Palestine Derailment report dated June 25, 2024. We appreciate that Norfolk Southern has recently announced its intent to implement the NTSB recommendations and believe that the recommendations in that report will add significantly to the Proposed Consent Decree provisions aimed at requiring comprehensive communication, new operational protocols, and environmental care. In particular, it is important to note that for the first time ever, NTSB added an amendment to its recommendations to address environmental protection in its official report and recognized the need for federal guidance about the "circumstances" when the vent and burn method should be used. This reference to the need to evaluate the circumstances appropriate for vent and burns is most significant for Chicagoans, as the City of Chicago entered into a September 2023 Voluntary Compliance Agreement with the Department of Housing and Urban Development, requiring it to consider cumulative impacts in policy, implementation, and new ordinances, and which recognizes that environmental threats will have different impacts based on their social and demographic context. The City's Cumulative Impacts Assessment conducted under that settlement agreement includes an environmental justice index map that highlights environmentally vulnerable communities, largely Black and Brown census tracks that are sensitive to high-risk industries, land uses, and zoning variances. Englewood and other neighborhoods adjacent to Norfolk Southern's operations in Chicago are highlighted as among the most disproportionately burdened by cumulative impacts.

NS_PUBCOM_0000119



PRITZKER SCHOOL OF LAW

Bluhm Legal Clinic
375 East Chicago Avenue
Chicago, Illinois 60611-3069

legalclinic@law.northwestern.edu
Office 312. 503. 8576
Fax 312. 503. 8977
www.law.northwestern.edu

We thank you again for the tremendous federal effort that this Proposed Consent Decree represents. We are hopeful that it will deliver both real relief for the people near East Palestine and real reform for Norfolk Southern's operations around the country, better protecting the Englewood community and the Greater Chicagoland communities from the risk of future rail disasters and the daily deleterious health impacts of living near rail operations. We would welcome the opportunity to discuss these concerns further and can be contacted as indicated below.

Respectfully,

*John Paul Jones*

John Paul Jones
Founder and President
Sustainable Englewood Initiatives
&
Community Coordinator
Norfolk Southern Intermodal Station Advisory
Committee
sustainableenglewoodin@gmail.com

*Robert A. Weinstock*

Robert Weinstock
Director, Environmental Advocacy Center
Clinical Associate Professor of Law
Northwestern Pritzker School of Law
375 E. Chicago Ave.
Chicago, IL 60611
(312) 503-1457
robert.weinstock@law.northwestern.edu

M Hadden

Ald. Maria Hadden
Chairwoman of the Chicago City Council
Committee on Environmental Protection and
Energy

*Laura MiSweet*

Laura MiSweet
President and Lead Steward
Cherry's Place
misweet.cherrysplace@gmail.com

6

Comment A-111



PRIDE. TRADITION. PROGRESS.

July 31, 2024

**VIA ELECTRONIC MAIL** (pubcomment-ees.enrd@usdoj.gov)

United States Department of Justice
Assistant Attorney General – Environment and Natural Resources Division
P.O. Box 7611
Washington, D.C. 20044-7611

      **Re:**    **DOJ Notice of Lodging of Proposed Consent Decree in *The State of Ohio and***
              ***The United States of America v. Norfolk Southern Railway Company, et al.*, Case**
              **No. 4:23-cv-00517**

To whom it may concern:

Pursuant to the U.S. Department of Justice's (DOJ) notice of lodging of a proposed consent decree in *The State of Ohio and The United States of America v. Norfolk Southern Railway Company, et al.*, Case No. 4:23-cv-00517, the Village of East Palestine hereby provides the DOJ with written comments.

Serving as the unfortunate ground zero for Norfolk Southern's 2023 derailment and subsequent vent and burn, the Village of East Palestine has been immensely affected by the disaster and continues to be affected each and every day. Since the disaster, the Village has been a steady advocate for its community and residents. With this goal in mind, the Village appreciates the opportunity to comment on the proposed consent decree (the "Proposed Decree") in the DOJ's enforcement case against Norfolk Southern Railway Company and Norfolk Southern Corporation (collectively, "Norfolk Southern").

First, while the Village is encouraged that the Proposed Decree provides for the creation of a Community Health Program (the "Program"), the allocation currently proposed for the Program is woefully insufficient. The Proposed Decree allocates $25M for the Program in its entirety, with $14M of that fund going towards the Medical Monitoring and $5.5M going towards Mental Health Services, both to be used over the first fifteen years of the Program.[1] However, based on figures from the East Liverpool City Hospital ("ELCH"), if every Qualified Individual under the Proposed

---

[1] Consent Decree between Plaintiff United States of America and Defendants at ¶ 48, *The State of Ohio and The United States of America v. Norfolk Southern Railway Company, et al.*, No. 23-00517 (N.D. Ohio March 13, 2023) [hereinafter "Proposed Decree"].

NS_PUBCOM_0000121

Decree utilizes the medical monitoring and mental health services covered in the Proposed Decree, the cost will exceed $5M *every year*.[2] This means the $19.5M allocated for medical monitoring and mental health services may only sustain the Program for a portion of the fifteen years it is supposed to cover.

Second, the current allocation for the Program is made further deficient by the fact that the Proposed Decree does not provide for certain testing essential to detecting latent symptoms.[3] Specifically, the Proposed Decree does not provide for a combined blood-count ("CBC") test or a urinalysis. To date, every medical facility that has been involved in medical monitoring associated with the Norfolk Southern derailment has included these tests in their medical monitoring exams. These tests are essential to the medical monitoring needed here because they are particularly informative when it comes to kidney function. Toxins and chemicals are filtered through the kidneys,[4] so this would be an essential part of the puzzle in discovering latent symptoms and diseases caused by the derailment.

Third, the Proposed Decree does not provide for medical treatment of any kind.[5] Given the considerable unknowns regarding how the released toxins will affect Village residents and first responders, the Village strongly opposes any consent decree that does not provide for treatment. Without designated funding for medical treatments for conditions caused by the derailment, Qualified Individuals will have to rely on their own insurance, workers' compensation, or pay out-of-pocket for these procedures. This will result in Village community members and businesses shouldering derailment-related medical costs through increased taxes, prices of goods, operating costs for businesses, and co-pays and deductibles for residents – or worse, foregoing necessary medical treatment due to financial hardship. Further, the Proposed Decree does not specify how medical treatments for Village employees will be paid, allowing for the possibility that the Village takes on these costs through workers' compensation coverage. The Proposed Decree should include mechanisms that ensure these costs fall squarely on the actor responsible for the disaster: Norfolk Southern.

Fourth, the Village objects to the Proposed Decree because it does not provide for any system of centralized data management and sharing between medical facilities that are conducting medical monitoring.[6] Medical monitoring is only a useful tool when it is coupled with effective data collection and analysis. Without these components, it will be impossible to detect larger health patterns and chronic conditions, such as cancer clusters, in the future. As such, the Village requests that the Proposed Decree be revised to clearly define a "lead" organization, who is responsible for administering the Program, coordinating with other medical facilities, and managing the associated data (or delegating such responsibilities to another responsible party). The Village strongly

---

[2] This estimate does not include the costs of specialty services, advanced diagnostics, and treatment of any long-term health effects of the train derailment.

[3] Proposed Decree at ¶ 50(a).

[4] Chemscape, *Workplace Chemical Hazards & Occupational Renal Disease*,
https://www.chemscape.com/resources/chemical-management/health-effects/kidney-
damage#:~:text=How%20Is%20the%20Kidney%20Affected,Renal%20Disease%20in%20the%20Workplace? (last visited July 25, 2024).

[5] *See generally* Proposed Decree at pp. 30, Sec. XI: Community Health Program.

[6] *See id.*

NS_PUBCOM_0000122

believes the medical monitoring plan will only be effective with more definitive organizational and data management structures.

Fifth, and finally, the Proposed Decree requires groundwater monitoring for a period of 10 years, and further allocates $15M in funds to the Private Drinking Water Well Monitoring Fund to be used for ten years to monitor private water wells and fund contingency actions needed because of exceedances of specified screening levels at those wells.[7] The Proposed Decree does not clearly address or provide for steps to be taken by Norfolk Southern in the event groundwater contamination is found, other than to vaguely require Norfolk Southern to conduct an environmental benefit analysis and coordinate further with U.S. EPA.[8] The Groundwater Characterization Work Plan and Sentinel Monitoring Well Installation and Groundwater Sampling Work Plan ("the Plans") do not include these details either. The Village of East Palestine requests that the Proposed Decree be revised to clearly require, and address how, Norfolk Southern will be held accountable for addressing any groundwater contamination that is later revealed, particularly any such contamination that may reach the wells of a public water system such as that of the Village.[9]

The Village of East Palestine would like to thank the U.S. DOJ for the opportunity to comment on the Proposed Decree filed in Case No. 4:23-cv-00517. As a party uniquely affected by the derailment and its aftermath, and as a local community that may very well be asked to serve on a coordination committee as contemplated by the Proposed Decree, the Village submits these comments in furtherance of the most just resolution for the East Palestine community and those that surround it. We look forward to working with the DOJ as our comments are considered.

Sincerely,

Chad M. Edwards
Village Manager, East Palestine

cc: t.conaway@eastpalestine-oh.gov
t.spratt@eastpalestine-oh.gov
k.a.drabick@eastpalestine-oh.gov
cschirra@brickergraydon.com

---

[7] *Id.* at ¶ 47.
[8] Id. at ¶ 44.
[9] *Id.*

3

NS_PUBCOM_0000123

Comment A-112



July 31, 2024

**Via Email:** *pubcomment-ees.enrd@usdoj.gov*

**PRESIDENT**
Ben Sweat
Chief Operating Officer
Poet Ethanol Products
9530 E. 37TH N.
Wichita, KS 67226
813-303-1385
E-mail bensweat@poetpb.com

**VICE PRESIDENT**
Kevin Zimski
Corporate Rail Fleet Manager
Cargill
15407 McGinty Road West
Wayzata. MN 55391-2399
952-742-9035
E-mail kevin_zimski@cargill.com

**SECRETARY / TREASURER**
Mark Huston
Director North America Transportation
400 Main Street, Suite 107
Kansas City MO 64112
816-218-2328
E-mail mark.huston@ldcom.com

**EXECUTIVE DIRECTOR**
Darrell R Wallace
North America Freight Car Association
17884 Westhampton Woods Drive
Wildwood, MO 63005
(314) 724-8041
E-mail drwallace@hotmail.com

Todd Kim, Esq.
Assistant Attorney
General, Environment and Natural Resources Division
U.S. DOJ—ENRD, P.O.
Box 7611, Washington, DC 20044–7611

Re: *State of Ohio and United States of America v. Norfolk Southern Railway Company, et al.,* D.J. Ref. No. 90–11–3–12792 - Comments of the North America Freight Car Association on Proposed Consent Decree

Dear Sir:

The North America Freight Car Association ("NAFCA")[1] hereby submits the following comments on the proposed Consent Decree lodged with the United States District Court for the Northern District of Ohio in the action *The State of Ohio and The United States of America v. Norfolk Southern Railway Company, et al.,* D.J. Ref. No. 90-11-3-12792 ("Consent Decree"). In Notices published in the Federal Register dated May 30, 2024 and June 14, 2024, the United States Department of Justice solicited comments on the Consent Decree, which is for the purpose of settling Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA") and Clean Water Act ("CWA") claims brought by the United States against Norfolk Southern Railway Company and Norfolk Southern Corporation (collectively, "NS") related to the February 3, 2023, train derailment in East Palestine, Ohio.

NAFCA is a trade organization made up of private (non-railroad owned) railcar manufacturers, owner/lessors, owner/lessees, lessees, and other rail shippers and entities that support the railcar industry. NAFCA's 40 members include some of the largest railcar manufacturers and lessors in the industry, as well as railcar shippers who collectively lease

---

[1]     http://www.nafcahq.com/home.

NAFCA Comments on Proposed Consent Decree
July 31, 2024
Page 2

or own hundreds of thousands of railcars that are furnished to the Class I railroads in order to receive rail transportation service. Combined, NAFCA's members own or lease 802,581 private rail cars out of the approximately 1,600,000 railcars currently in service, including tens of thousands of railroad tank cars. NAFCA promotes the safe, efficient, and economical ownership and use of private railcars. Its members' extensive and collective knowledge of the rail car industry enable it to investigate relevant issues and to educate public policy makers, regulators and the media regarding operational, regulatory, economic, and legal matters that affect private railcars. NAFCA strives to ensure its members and all private car owners and operators are subject to reasonable, equitable and lawful practices and rules affecting the use, repair, and principles of compensation for the use of private railcars by railroads.

NAFCA's comments on the Consent Decree are limited to voicing NAFCA's strong objections to proposed paragraphs 69 and 70, both of which should be deleted from the final version. Each of these provisions, if finalized as written, would be extremely disruptive to industry stakeholders beyond NS and are contrary to existing law, regulations and policies governing railroads and their customers. NAFCA's specific comments are as follows:

Paragraph 69

Under paragraph 69, within 180 days of the final Consent Decree being lodged, NS would agree to "cease use of any DOT-111 Tank Cars for transportation of Flammable Hazardous Materials, other than under a common carrier obligation." There are numerous problems with this provision. First, the vast majority of DOT-111 Tank Cars NS "uses" to transport Flammable Hazardous Materials are supplied to it by its customers as a condition for receiving rail service. If the intent of the Consent Decree is for NS to cease transporting DOT-111 Tank Cars for its customers – as opposed to NS ceasing to use only such cars that it owns for its purposes – then this provision would result in substantial harm to many third parties. These include the customers that supplied NS the DOT-111 Tank Cars, the customers' lessors if applicable, other Class I railroads with whom NS interchanges such cars as part of joint line rail movements, and the end users of the products being transported. None of these entities are parties to the litigation and the Consent Decree, but all would be significantly harmed by Paragraph 69's implementation.

Second, as noted in the comments submitted by the Railway Supply Institute ("RSI") and NAFCA member Union Tank Car Company ("Union Tank"), most railroad tank cars, including DOT-111 Tank Cars, are transported pursuant to rail transportation contracts as opposed to common carrier tariffs. Consequently, implementing Paragraph 69 would require the disruption of existing contractual relationships between NS and other parties.

Third, and perhaps most significant, Paragraph 69 is objectionable because it would unilaterally usurp the current established and detailed process for phasing out DOT-111

NAFCA Comments on Proposed Consent Decree
July 31, 2024
Page 3

Tank Cars that was arrived at after years of extensive debate by Congress, the agencies with jurisdiction, and affected industry stakeholders. As explained in detail in the comments of RSI and Union Tank, which NAFCA supports, the phase out of DOT-111 Tank Cars is already covered in the Fixing America's Surface Transportation ("FAST") Act, Pub. L. No. 114-94, and by regulations promulgated by the Pipeline and Hazardous Materials Safety Administration ("PHMSA") after years of notice and comment rulemaking. Having participated in that multi-year process to establish the DOT-111 Tank Car phase out process and timeline, NAFCA and its members are committed to carrying out the transition on the promulgated timeline, if not sooner voluntarily if conditions warrant. Neither the Consent Decree nor Paragraph 69 provide any legal basis or justification for summarily amending the current PHMSA regulations, or the FAST Act itself for that matter, which would result in wide ranging impacts on the entire railroad industry, not just NS as the subject of the litigation.

Paragraph 70

Under Paragraph 70, "within 180 Days of the date of lodging, [NS] shall submit a 'Customer Tank Car Replacement Plan' to the United States for review and approval, taking into consideration [NS's] industry and technical expertise. [NS] will implement the Customer Tank Car Replacement Plan within 90 Days of approval. The Customer Tank Car Replacement Plan shall be designed to encourage customers to use DOT 117R Tank Cars (or similar armored Railcars) in place of DOT-111 Tank Cars for the transportation of Flammable Hazardous Materials and shall include financial incentives as an aspect of the plan. [NS] may seek designation of the Customer Tank Car Replacement Plan as Confidential Business Information under 40 C.F.R. Part 2 pursuant to the procedures set forth therein."

Viewed in its best light, Paragraph 70 appears to proceed from the naive assumption that a plan can be developed whereby DOT-111 Tank Cars are phased out using financial incentives that properly compensate NS's customers for enduring the cost and inconvenience of shifting to DOT 117R Tank Cars earlier than they are required to by the FAST Act and PHMSA regulations. As explained in the comments of RSI, Union Tank, and the American Chemistry Council ("ACC") however, this is simply not reality. Rather, the market power possessed by NS as one of only six Class I railroads would instead result in "financial incentives" in the form of increased line haul rates and surcharges that force customers to make a switch to their economic detriment. NS, ironically the defendant which should bear the costs of its actions that resulted in the lawsuit and Consent Decree, would stand to gain economically from such a plan.

NAFCA adds that Paragraph 70 is arguably contrary to applicable law and could force a result counter to the objectives of Paragraph 69. Specifically, if, as expected, NS attempted to implement a Customer Tank Car Replacement Plan that utilized higher linehaul rates and surcharges placed on the movement of DOT-111 Tank Cars pursuant to existing contracts, this could run afoul of the rules prohibiting unilateral changes to

NAFCA Comments on Proposed Consent Decree
July 31, 2024
Page 4

material contract terms. Moreover, the legality of rates and charges a railroad may assess its customers for common carrier transportation is in the exclusive province of the Surface Transportation Board ("STB") pursuant to 49 U.S.C. §10501(b). All such rates and charges must be reasonable, as determined by the STB's rules and procedures. *See, e.g.,* 49 U.S.C. §10702 and §10704. Whether DOJ could legally approve a Customer Tank Car Replacement Plan with financial incentives in the form of higher rail rates and surcharges without STB oversight is therefore questionable. In any case, the inclusion of such features in a plan under Paragraph 70 could result in some NS customers refusing to renew, or to not enter into rail transportation contracts in order to preserve STB review. This would result in an increase in the number of common carrier DOT-111 Tank Car movements, which Paragraph 69 explicitly excludes from its terms.

For all the reasons stated in these comments, NAFCA requests that Paragraphs 69 and 70 be stricken from the final Consent Decree. NAFCA appreciates the opportunity to submit these comments on the proposed Consent Decree, and it supports the Comments submitted by RSI, Union Tank, and ACC.

Respectfully submitted,

Ben Sweat
NAFCA President

Comment A-113

**DOJ/USEPA vs. Norfolk Southern Settlement**

**Northern District of Ohio, Eastern Division Court: Civil Case No.23-cv-517**

Columbiana County Health District Comments August 1, 2024 submitted by Health Commissioner, Wesley J. Vins, DPA

**Comments:**

1. **Clarification of 'participating' in the sampling program settlement language below is needed.**

There are about 240 homes listed in the potable water sampling program that have been sampled at least once since February of 2023, but not all of these homes are currently 'participating' by having their wells sampled every 45 to 60 days. There are currently about 120 homes actively participating and our concern is that this language could be interpreted to make the sampling for 10 years only available to 120 homes and not 240.

Well sampling on Page 29 of the settlement: *47. Private drinking water well monitoring. Within 90 Days of the Effective Date, Settling Defendants shall establish a Private Drinking Water Well Monitoring Fund ("Private Well Fund") in an interest-bearing account with a deposit of $15 million and submit a Private Drinking Water Well Monitoring Work Plan ("Private Well Work Plan") for review and approval by EPA. The Private Well Work Plan shall set forth procedures for the Columbiana County Health District and Pennsylvania Department of Environmental Protection, subject to the agreement of those agencies, to manage the Private Well Fund for the continuation of the Private Drinking Water Well Monitoring Program currently operating under the CERCLA Order ("Private Well Program") for a period of 10 years from issuance of the Notice of Completion of the CERCLA Removal Action under Paragraph 39, for all households participating in the Private Well Program as of the Effective Date. The Private Well Program shall include contingency actions to be taken to address exceedances of specified screening levels, as appropriate. Following exhaustion of the Private Well Fund or the 10th anniversary of the commencement of the Private Well Program monitoring, Settling Defendants may seek termination of this provision pursuant to Section XXX (Termination), with any balance of unexpended funds to be released to Settling Defendants.*

2. **Clarification of 'Parties' in the Medical Monitoring Program settlement language below is needed and the section should designate medical professionals in the decision process.**

Medical Monitoring Program Page 31 of the settlement: *50. (a)6 Additional screenings the Parties agree are appropriate over the course of the Medical Monitoring Program.* The inclusion of medical professionals (physician and toxicology) are necessary to assure an appropriate standard of care for affected residents

NS_PUBCOM_0000150

3. The Private drinking water well monitoring as described in the settlement (page 29. section 47) is underfunded at $15 Million and lacks the length of time necessary to adequately monitor ground water to the satisfaction of the impacted community. Consideration for funding the program at $30 Million for a minimum of 20 years is requested.

4. Residents located in the UAO priority zones need to be specifically identified in the settlement as remaining eligible for private drinking water well sampling.

5. The overall Community Health Program is underfunded and limited in scope. Consideration for greater funding and an expanded scope of service is requested along with the incorporation of a comprehensive long-term disease registry, including professional management component.

6. The Medical Monitoring Program as described in the settlement (page 31. section 50) is underfunded at $25 Million and lacks the scope of services necessary to adequately monitor and treat the health of the impacted residents and first responders. The eligibility for persons to participate is overly prescriptive and limits broader community participation. Consideration of greater funding for an expanded program scope at a minimum of 20 years is requested.

7. All workers that were within 2 miles of the derailment should be made eligible for medical monitoring (page 31, section 50) the same as they are described as eligible for mental health services in the consent decree (page 32, section 51).

8. Urinalysis and a Complete Blood Count (CBC) need to be added to the medical monitoring elements (page 31, section 50 a.)

9. Provisions for expanded medical provider recommended screenings and testing beyond those listed in on page 31, section 50 a. should be included when it is determined to be medically necessary by the provider.

NS_PUBCOM_0000151

Comment A-114

**BEFORE THE**
**UNITED STATES DEPARTMENT OF JUSTICE**

---

Proposed Consent Decree Under the Comprehensive Environmental
Response, Compensation, and Liability Act and the Clean Water Act
Case No. 4:23-cv-00517

---

**COMMENTS OF**
**AMERICAN FUEL & PETROCHEMICAL MANUFACTURERS**

---

1

NS_PUBCOM_0000199

## I.    Introduction

On May 23, 2024, the Department of Justice ("DOJ") lodged a proposed Consent Decree ("Proposed CD") with the United States District Court for the Northern District of Ohio in the lawsuit entitled "State of Ohio and United States of America v. Norfolk Southern Railway Company, et al" (Case No. 4:23-cv-00517).[1] American Fuel & Petrochemical Manufacturers ("AFPM") respectfully submits these comments opposing section XII of the Proposed CD, specifically paragraphs 69 and 70. While AFPM is supportive of elements of the Proposed CD related to environmental response and remediation we have significant concerns with elements of the Proposed CD that address rail safety and competition issues. AFPM's comments highlight that the Proposed CD:

- Imposes obligations and tens of millions of dollars burdens on third parties (namely rail shippers who own the tank cars used to ship flammable liquids) that are not party to the Proposed CD.
- Will result in negative economic impacts, is not in the public interest and condones a differential pricing regime that would enrich Norfolk Southern ("NS") and interfere with the jurisdiction of the Surface Transportation Board ("STB").
- Conflicts with completed Congressional legislation and the current Hazardous Materials Regulations ("HMR")[2] and undermines in-progress legislative and regulatory actions, all of which must go through the appropriate legislative or regulatory process through the relevant committees or agencies.
- Includes provisions beyond the authority Congress delegated to Environmental Protection Agency's ("EPA) under the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA") and the Clean Water Act ("CWA"), raising jurisdictional issues related to rail safety and competition that are solely regulated by the United States Department of Transportation ("US DOT") and STB authority.

## II.   AFPM's Interest in the Proposed Consent Decree and Commitment to Rail Safety

AFPM is a trade association representing the United States refining, petrochemical and midstream energy infrastructure industries. AFPM members make the fuels and petrochemicals that make modern life possible and keep America moving. To produce these essential goods and bring them to market, AFPM members depend on safe and efficient rail transportation to move their feedstocks and products to and from refineries and petrochemical facilities. More than two and half million carloads of fuel, petrochemical feedstocks and products — including crude oil, natural gas liquids, refined products, petrochemicals and plastics — move by rail every year.

AFPM members prioritize the safety of our people, communities and products above everything else, and that includes the safety of our products in transit. As freight rail shippers, we

---

[1] *See 89 FR 50635,* "Notice of Lodging of Proposed Consent Decree Under the Comprehensive Environmental Response, Compensation, and Liability Act and the Clean Water Act" Notice; Document No. 2024-13065, published June 14, 2024. *See also* "Proposed Consent Decree" Case: 4:23-cv-00517-JRA Document Number: 138-1. Filed May 23, 2024.

[2] *See* 49 CFR Subtitle B Chapter 1 Subchapter C.

2

have made significant investments to support and improve the safety and efficiency of the rail transportation system.[3] In the context of this Proposed CD, it must be noted U.S. rail shippers, many from the fuel and petrochemical industries, have invested hundreds of millions of dollars into upgrading over 100,000 tank cars since 2012.

Rail safety is a shared responsibility that includes railroads, shippers, emergency responders, and the regulatory agencies who have been delegated responsibility for that oversight. The primary goal of rail safety policy is to reduce or eliminate the risk of derailments. When AFPM members entrust their products to rail carriers, there is an expected duty of care and vigilance. When railroads fall short of their duty, they should be held accountable and the flaws in their operation that led to that failure should be remedied. These flaws must be remedied through a combination of US DOT and Congress action that all rail carriers are held to the same standard. This would facilitate consistent safety standards designed by experts and backed by data, which gives assurance to shippers as well as communities adjacent to shipping lanes. AFPM appreciates the opportunity to comment on this important issue and improve rail safety for all.

## III.    Background and Summary of Consent Decree Provisions

Following the February 3, 2023, derailment, EPA issued a Unilateral Administrative Order to NS on February 21, 2023, under CERCLA Section 106, 42 U.S.C. § 9606.[4] NS submitted a notice of intent to comply with the CERCLA Order on February 24, 2023, and has maintained continuous air monitoring and remediation under EPA and local oversight.[5] EPA also issued an administrative order under the CWA on October 18, 2023, directing NS to remediate areas impacted by the derailment.[6]

On February 8, 2023, residents and businesses of the affected community of East Palestine initiated several class action lawsuits. The class action lawsuits were consolidated,[7] and rail shippers and tank car manufacturers (e.g., Oxy Vinyl LP, GATX Corp., Dow Chemical Inc.) filed motions to have the suits against them dismissed as the derailment was caused by circumstances outside of their control. NS argued against the motions claiming that the rail shippers should share in the responsibility because it was their products that caused the damage. The court disagreed with NS and summarily dismissed the claims against the rail shippers holding that NS was solely responsible for the derailment and subsequent release of hazardous chemicals. NS settled the consolidated suit and agreed to pay $600 million in damages.

On March 14, 2023, Ohio Attorney General filed a 58-count civil lawsuit in federal court seeking to hold NS financially responsible for the East Palestine derailment.[8] The suit cited the company's escalating accident rate, which had risen 80% in the past 10 years. It also cited that at least 20 NS derailments since 2015 have involved chemical discharges. The lawsuit stated, "[t]he derailment was entirely avoidable and the direct result of NS's practice of putting its own profits

---

[3] Read more about AFPM's commitment to rail safety HERE.

[4] *See* Unilateral Administrative Order issued February 21, 2023

[5] *See* Notice of Intent to Comply: East Palestine Train Derailment Site CERCLA Docket No. V-W-23-C-004 issued February 23, 2023.

[6] *See* Clean Water Act Administrative Order issued October 18, 2023

[7] *In re: East Palestine Train Derailment*, 4:23-cv-00242 (N.D. Ohio).

[8] *Ohio vs Norfolk Southern Corporation et al.*, 4:23-cv-00517 (N.D. Ohio).

NS_PUBCOM_0000201

above the health, safety and welfare of the communities in which NS operates." NS again sought to shift the blame to the rail shippers by filing a complaint against the rail shippers alleging that everyone involved in shipping hazardous chemicals bears some responsibility under federal regulations to make sure they get to their destination safely. On March 6, 2024, the court (once again) threw out NS's claim finding that the railroad didn't show that the derailment was caused by anything the other companies could control. The court thus recognized that NS alone was responsible for the derailment. In so holding, the court stated:

> "[Norfolk Southern] does not allege that [rail shippers] exercised control over the condition which resulted in the derailment that led to the release of the hazardous chemicals on February 3, 2023... [L]iability [is] imposed on the product owner only where there has been some culpability and reasonable action on the part of said product owner would have prevented the release... Norfolk Southern...fail[ed] to assert any 'culpability or lack of due care, which contributed in any way to the release, or a failure of the shipper to exercise reasonable action which would have prevented the release.'"[9]

On May 23, 2024, the DOJ issued the Proposed CD that required significant environmental requirements as well as selected requirements related to improving rail safety. Once finalized, NS would be required to make safety improvements, pay for health monitoring services, fund long-term environmental monitoring, pay significant fines and reimburse the government for emergency response and environmental remediation efforts resulting from NS's negligence.

Specifically, the Proposed CD would require NS to reimburse the United States government for all its response costs under CERCLA and CWA, as well as to pay a civil penalty of $15 million. Additionally, the Proposed CD obligates NS to provide funding for a community health program for up to 20 years, and requires NS, within 90 days of the effective date of the settlement of the CD to provide funding for drinking water monitoring for 10 years. Pursuant to the Proposed CD with 12 months, NS also must install 259 hot bearing detectors on Key Routes to be no greater than 15 miles from the nearest adjacent hot bearing detector.

Per the Proposed CD, in order to improve safe operation of freight trains, NS must apply additional operational controls to trains defined as a High-Hazard Train ("HHT")[10], which would, *inter alia*, restrict train speed to 40 mph within the geographic limits of high-threat urban areas and add other operational requirements. Pursuant to the Proposed CD, NS must also complete a "Train Build Study" within a year of the effective date and submit the Train Build Study to the United States. The study would evaluate how variables (such as train length, railcar placement, etc.) and technology might improve the safety of operations.

The Proposed CD also requires NS to phase out the use of DOT-111 tank cars for transportation of hazardous flammable materials ahead of Congressional mandated and regulatory defined phase-out schedule and institute a "Customer Tank Car Replacement Plan" to incentivize upgrade to DOT-117 tank cars. Such a provisions would effectively pass the responsibility and

---

[9] *See Id.* at pages 10-12.
[10] *See* pages 39-40 of Proposed CD.

4

burden of compliance for these tank car provisions to rail shippers who are not parties to the Proposed CD, and by extension, consumers.[11]

## IV.     Comments on the Proposed Consent Decree

The derailment of a NS freight train and subsequent response to that derailment was devasting to the community of East Palestine, Ohio and the DOJ and EPA's Proposed CD seeks to address these impacts. The stated objective of the Proposed CD is:

> *"to protect public health or welfare or the environment at the site by the implementation of response actions at the site by the Settling Defendants, to reimburse response costs of the United States, to implement the injunctive relief to enhance rail safety, to address potential harms related to the Derailment in East Palestine and surrounding communities, and to resolve the civil claims of the United States against Settling Defendants as provided in this Consent Decree."*

AFPM members generally support the objective of the Proposed CD but note that some elements (namely Section XII entitled "Rail Safety Improvements" and more specifically paragraphs 69 and 70) go beyond the authority of the federal agencies who are parties to the Proposed CD and impose requirements and cost on parties (rail shippers) other than the settling defendants (NS). Such overreaching ultimately will negatively impact refiners and petrochemical manufacturers as well as multiple supply chains and the consumers they support.

### A.     The Proposed Consent Decree Imposes Obligations and Burdens on Third Parties that are not Party to the Proposed CD and will Cause Negative Economic Impacts for Consumers that are not in the Public Interest

The Proposed CD would require NS to phase-out all DOT-111 tank cars in flammable liquid service only 180 days after the finalization of the decree. The Proposed CD would also require NS to create a "Customer Tank Car Replacement Plan" within 90 days of its finalization to encourage customers, through "financial incentives", to use alternative tank cars. These two tank car provisions in the Proposed CD are unworkable, out of step with the realities of the rail tank car market, and not in the public interest.

The Proposed CD does not consider the realities of rail markets and would cause a tank car shortage that would have serious economic effects on a variety of industries and supply chains. Specifically, the Proposed CD doesn't consider the current tank car backlog, the competition for shop space and tank car materials with concurrent retrofits of other fleets, and lead times needed to secure raw materials to build or retrofit tank cars. AFPM members report there is a 10 to 12-month backlog on procuring new tank cars and leasing agreements require 10-year commitments. Per the Railway Supply Institute ("RSI") — a trade association representing rail car manufacturers — there are only six facilities in North America authorized to manufacture new rail cars and 23 authorized to make the retrofits necessary to upgrade existing DOT-111 tank cars to new standards. In addition, shop space and tank car materials are further constrained as tank car owners are concurrently upgrading the tank car fleet that transports various "Toxic-by-inhalation" materials

---

[11] *Id* pages 40-41.

NS_PUBCOM_0000203

by 2028.[12] By phasing out DOT-111 tank cars in only 180 days after the finalization of the Proposed CD and using encouraging NS to use differential pricing to effectively prohibit rail shippers from using federal authorized tank cars, DOJ will trigger a tank car shortage that will directly impact the fuel and petrochemical supply chains.

Regarding tank car specifications and phase out timelines, the Proposed CD ignores the realities of tank car markets and the economics that go into a phase out and turn-over of an entire rail fleet. While DOJ ignores these factors, they have been extensively considered in supporting the below-referenced rulemaking actions (*See* Section C). Below is a summary of current — as required by the "Fixing America's Surface Transportation Act" ("FAST Act")[13] — and proposed phase-out (in pending legislation) timelines. It should be noted that the table below only addresses DOT-111 tank car phase-out for flammable liquids in packaging group II and III and does not include other upgrades to the flammable liquid tank car fleet that have already been completed.

| Comparison of DOT-111 Tank Car Phase-Out Schedules for Flammable Liquids | | | |
|---|---|---|---|
| **Tank Car Type** | **Original Timeline** HM-251 Phase-out Deadline[14] | **Current Timeline** FAST Act Phase-out Deadline[15] | **Proposed Timelines** Proposed Legislative Phase-out Deadline[16] |
| DOT-111s | PG II – May 1, 2023 PG III – May 1, 2025 | PG II & III – May 1, 2029* | PG II & III – December 31, 2027** |
| *Extendable up to May 1, 2031, if the US DOT Secretary finds that insufficient retrofitting shop capacity. | | | |
| **Extendable up to December 31, 2028, if the US DOT Secretary finds that insufficient retrofitting shop capacity. | | | |

To ensure adequate shop capacity to complete all needed retrofits, Section 7304 of the FAST Act, requires the Bureau of Transportation Statistics ("BTS") to release an annual report on "Fleet Composition of Rail Tank Cars Carrying Class 3 Flammable Liquids."[17] With this provision the FAST Act clearly recognized concerns regarding the potential devastating ramifications should a timeline not be feasible. Per the BTS, while all flammable tank cars in service are currently in compliance with scheduled deadlines, this report ensures that future phase-outs are feasible given tank car manufacturing rates. This report helps inform policy makers about fleet turnover progress and the FAST Act requires the US DOT secretary to use this report to potentially extend deadlines if tank car shop capacity is insufficient.

[12] *See* 85 FR 75680, "Hazardous Materials: Adoption of Miscellaneous Petitions To Reduce Regulatory Burdens" Final Rule, published December 28, 2020.
[13] *See Public Law 114–94*, "Fixing America's Surface Transportation Act" signed December 4, 2015.
[14] Applies only to tank cars in a "High-Hazard Flammable Train" (HHFT), a train that has "a continuous block of 20 or more tank cars loaded with a flammable liquid or ≥35 tank cars loaded with a flammable liquid in a train consist."
[15] US DOT issued a notice (HM-251C) implementing this, that supersedes HM-251. While the original timeline applied to tanks cars in HHFTs, the FAST timeline applies to a single tank car containing the denoted commodity.
[16] *See* S.576, "Railway Safety Act of 2023" introduced March 1 2023. *See* also HR. 8896, "Railroad Safety Enhancement Act of 2024" introduced July 11, 2024.
[17] *See* most recent annual report for BTS "Fleet Composition of Rail Tank Cars Carrying Class 3 Flammable Liquids" published September 2023.

6

The DOJ's proposed phase out of DOT-111 tank cars in flammable liquid service and the "Customer Tank Car Replacement Plan" are not only beyond EPA's authority and the agency's expertise but are impossible to achieve based on extensive regulatory analysis as well as BTS status report of tank car market. It is readily apparent that shop capacity is not capable of meeting the 180-day timeline and the "Customer Tank Car Replacement Program." Such a phase out would have detrimental effects on the entire rail network and substantially impact consumers.

Expediting the timeline without assurance of shop capacity could result in a deficit of tank cars in flammable liquid service. Numerous types of flammable liquid materials are moved via rail in DOT-111 tank cars.[18] It is clear that flammable liquids essential to the refining and petrochemical industries would be negatively impacted by DOJ's proposed timeline.[19] This would include fuels, products and byproducts of the refining and petrochemical manufacturing processes such as gasoline, diesel, jet fuel, naphtha, benzene, methanol, petroleum lubes, heating oil, xylene, styrene, petroleum distillates, octanes, etc. that are frequently moved by rail. A rail car shortage brought about by accelerated, unachievable tank car phase out schedules could shut down refiners and petrochemical manufacturers, raising the prices of fuels and petrochemicals that are the building blocks essential to manufacturing the goods that make modern life possible. RSI noted their concern in testimony to the Senate Commerce Committee, warning that"

*"If DOT-111 tank cars are forced to be prematurely withdrawn from flammable liquids service and placed in storage, there will be a shortage of cars needed to move flammable liquids. This could potentially have substantial adverse consequences on the supply chain for a variety of fuels, including gasoline, diesel, jet fuel, and other commodities such as toluene and xylene."[20]*

As President Biden's Executive Order on Promoting Competition in the American Economy explained, "[a] fair, open, and competitive marketplace has long been a cornerstone of the American economy, while excessive market concentration threatens basic economic liberties, democratic accountability, and the welfare of workers, farmers, small businesses, startups, and consumers."[21] In the DOJ's comments to the STB on a recent rulemaking the DOJ cited this Executive Order and encouraged the STB to take additional steps, including robust enforcement, to address consolidation and anticompetitive conduct in the rail industry.[22] Unfortunately, the DOJ's Proposed CD is misaligned with DOJ's previous position on anti-competitive behavior — specifically in a rail industry with just six major rail carriers.

---

[18] For example, in 2022 over 865,000 Flammable liquid tank car shipments were made in the United States and Canada. *See* Tank Car Resource Center - Tank Car 101.

[19] According to The American Chemistry Council, ~35,500 DOT-111 tank cars were needed to be replaced or upgraded as of April 2023. Based on current capacity, the RSI estimates that between 5,000-8,000 cars per year can be built or retrofitted. *See* Tank Car Manufacturing Capacity and Railway Supply Institute - Progress. This estimate is optimistic as per Association of American Railroads' "Status report – North American Flammable Liquid Tank Car Fleet" published March 28, 2024, in 2023, 4,589 new and retrofitted DOT-117 tank cars were added to the fleet.

[20] RSI Statement for the Record on "Improving Rail Safety in Response to the East Palestine Derailment" submitted March 22, 2023, page 3.

[21] *See* "Executive Order on Promoting Competition in the American Economy" published July 9, 2021.

[22] *See* Docket No. EP 711 (Sub-No. 1), Comment of the United States Department of Justice Filed February 28, 2022.

NS_PUBCOM_0000205

The Proposed CD effectively allows NS to use the "excessive market concentration" created by rail consolidation to "greenlight" differential pricing — the railroad's practice of using their monopolistic pricing power to effectively refuse authorized shipments of hazardous materials by pricing themselves out of the market. It has been AFPM members experience that Class I railroads have begun implementing a practice where they price shipments of certain materials, and/or shipments of certain types of tank cars prohibitively high so that rail shippers cannot economically ship those materials by rail.

The "Customer Tank Car Replacement Plan" proposed by DOJ effectively endorses rail carriers' unlawful practice of using their pricing power over captive shippers[23] to refuse lawfully authorized shipments of hazardous materials. The DOJ encourages NS to use "financial incentives" to flout their common carrier obligation. [24] While this provision is focused on specifically NS, other Class I railroads will cite this decree as a rationale to price their service for "undesirable" products or tank cars in a manner that is effectively prohibitive. It is highly likely that such practices will also be applied to other hazardous materials shipped that railroads would rather not carry despite their common carrier obligations which the STB has found to be a violation thereof.

The Proposed CD's "Customer Tank Car Replacement Plan" usurps STB's authorities on rail competition, rail pricing and the common carrier obligation (i.e., Common Carrier Obligations, Market Dominance, Differential Pricing). This is an area that is outside of EPA's authority and expertise. Further, STB is not mentioned once in the Proposed CD, and it is clear, based on the content of the Proposed CD, that it was not consulted on the provisions related to differential pricing of tank car shipments.

B.    <u>The Proposed Consent Decree is not the Appropriate Venue for Rail Safety Provisions and Such Efforts Must Proceed via the Appropriate Legislative or Regulatory Process and Relevant Committees or Agencies</u>

The East Palestine derailment has understandably raised concerns about rail safety and the emergency and environmental responses to this type of derailment. This derailment has led to bi-partisan calls to address the root causes and contributing factors that led to this accident to ensure no community faces such a preventable disaster again. AFPM members are committed to ensuring

---

[23] Because of rail consolidation, ~75 percent of customers who ship products and feedstocks by rail are only served by a single railroad. This is also known as being a "Captive Shipper."

[24] Common carrier obligation requires "a rail carrier providing transportation or service subject to the jurisdiction of the Surface Transportation Board under this part shall provide the transportation or service on reasonable request." *See* 49 U.S. Code § 11101. The common carrier obligation binds railroads to transport any freight that has been properly tendered on "reasonable terms and conditions" including hazardous materials. *See Union Pac. R.R.—Pet. for Declaratory Order,* FD 35219, slip op. at 4 (STB served June 11, 2009); *Strohmeyer—Acquis. & Operation Application—Valstir Indus. Track in Middlesex & Union Ctys., N.J.,* FD 35527, slip op. at 2 (STB served Oct. 20, 2011), *aff'd sub nom. Riffin v. STB,* 733 F.3d 340 (D.C. Cir. 2013) (upholding Board's determination that railroads have a common carrier obligation to carry hazardous materials); Radioactive Materials, Missouri-Kansas-Texas R.R. Co., 357 I.C.C. 458, 464 (1977); *Classification Ratings on Chemicals, Conrail,* 3 I.C.C.2d 331, 337-38 (1986); *U.S Energy Research and Development Admin. v. Akron, Canton & Youngstown R.R. Co.,* 359 I.C.C. 659 *pet. for review den. Akron, Canton & Youngstown R.R. Co. v.* ICC, 611 F.2d 1162, 1169 (6th Cir. 1979); *Trainload Rates on Radioactive Materials, Eastern RRs,* 362 I.C.C. 756 (1980) *aff'd by Consolidated Rail Corp. v. ICC,* 646 F.2d 642 (D.C. Cir. 1981).

8

rail safety and in recent years, U.S. rail shippers, many from the fuel and petrochemical industries, have invested hundreds of millions of dollars into upgrading over 53,000 newly constructed and 47,000 retrofitted tank cars. These sizable investments have led to an over 80 percent reduction in probability of spill resulting from a derailment since 2013.[25] While these investments help, rail safety improvements in the appropriate venue should focus on derailment prevention efforts first and foremost.

The experts in US DOT's Pipeline and Hazardous Materials Safety Administration ("PHMSA") and Federal Railroad Administration ("FRA") and Congress's relevant committees, not the DOJ and EPA, are the appropriate entities to address rail safety issues. These agencies have promulgated regulations and passed legislation to improve rail safety. Rail safety improvements should be implemented through notice and comment rulemaking by PHMSA and FRA. These actions are supported by robust analysis and research to ensure rail safety measures adequately determine a need for regulation, confirm the remedy appropriately addresses any failures, and properly balance the costs and benefits of any implemented rail safety efforts. These same entities, which have the expertise necessary to make such determinations, are also currently developing and moving forward additional policies to update requirements to address the safety issues specific to the East Palestine derailment. For these reasons, Section XII of the Proposed CD is not in the public interest.

US DOT, PHMSA and FRA are not even mentioned in the Proposed CD, and it is clear, based on the content of the Proposed CD, they were not consulted in its drafting. EPA and DOJ do not have expertise in rail safety and as such including those provisions in the proposed CD is not justified. The finalized decree must focus on issues germane to EPA's authority such as emergency management, response and CERCLA cleanup and monitoring. Section XII "Rail Safety Improvements" should not be included in a final decree.

## C.    The Proposed Consent Decree Conflicts and Interferes with Completed and In-Progress Government, Industry and Congressional Rail Safety Improvements

Putting aside the fact that the rail safety provisions in the proposed CD are beyond the authority Congress delegated to EPA in CERCLA and the CWA, and the agency's expertise, the rail safety improvements in Section XII undermine and ignore both completed (*e.g.,* tank car phase out timelines and operational controls for rail safety) and in-progress rail safety improvements (*e.g.,* revision of "high-hazard" train definitions and potential wayside detector regulation).[26]

Specifically, the Proposed CD ignores completed efforts such as PHMSA and FRA's "Hazardous Materials: Enhanced Tank Car Standards and Operational Controls for High-Hazard Flammable Trains" (HM-251)[27], Congress's "Fixing America's Surface Transportation Act"

---

[25] *See* also Tank Car Resource Center - Progress, Accessed July 10, 2024.

[26] Wayside detectors provide valuable information regarding the health and operation of trains as they pass by the detectors. There are no federal standards on placement of wayside detectors or protocols that dictate what constitutes a rail emergency that would warrant slowing or stopping a train. Class I railroads have differing protocols of what constitutes an emergency and placement of wayside detector is left up to them.

[27] *See 80 FR 26644,* "Hazardous Materials: Enhanced Tank Car Standards and Operational Controls for High-Hazard Flammable Trains" Final Rule, published May 8, 2015.

("FAST Act"),[28] PHMSA and FRA's subsequent "Hazardous Materials: FAST Act Requirements for Flammable Liquids and Rail Tank Cars" (HM-251C),[29] as well as numerous other rail safety rulemakings. These actions were specifically authorized by Congress and developed by the rail safety experts at PHMSA and FRA, accompanied by rigorous regulatory impact analyses. The Proposed CD ignores the extensive research and analysis completed pursuant to these actions. The Proposed CD also ignores voluntary efforts by industry, particularly rail shippers, to upgrade large flammable liquid tank car fleets ahead of proposed timelines and prior to regulatory action.[30]

Beyond completed actions the Proposed CD ignores current in-progress Congressional action to further improve rail safety as a result of the East Palestine derailment. To date, there have been several bills introduced, most notably the Railway Safety Act of 2023 and the House Railroad Safety Enhancement Act of 2024 (H.R.8896).[31] The Proposed CD also does not consider recently initiated and in development rulemaking "Hazardous Materials: Enhancing Safety for High-Hazard Trains" (HM-251G) to address the circumstances of the East Palestine derailment.[32] Below is a timeline of just some of actions taken by these parties to address rail safety which the Proposed CD completely ignores.

- **October 2011** – Voluntary Action by Rail Shippers and Tank Car Manufacturers to upgrade rail fleets.
- **September 2013** – US DOT publishes HM-251 Advanced Notice of Proposed Rulemaking.
- **July 2014** – US DOT publishes HM-251 Notice of Proposed Rulemaking.
- **May 2015** – US DOT publishes HM-251 Final Rulemaking.
- **December 2015** – The FAST Act is signed into law.
- **July 2016** – US DOT publishes HM-251C final rule implementing the revisions in the FAST Act.
- **March 2023** – Senate Railway Safety Act introduced
- **May 2023** – Senate Railway Safety Act Passed out of committee.
- **September 2023** – US DOT initiates a new Rulemaking "Hazardous Materials: Enhancing Safety for High-Hazard Trains" (HM-251G).
- **July 2024** – House Railroad Safety Enhancement Act of 2024 introduced.

---

[28] *See Public Law 114–94,* "Fixing America's Surface Transportation Act" signed December 4, 2015.

[29] *See 81 FR 53935,* "Hazardous Materials: FAST Act Requirements for Flammable Liquids and Rail Tank Cars" Final Rule, published August 15, 2016.

[30] As part of a commitment to safety, AFPM members made an significant capital investments in tank cars upgrades meeting industry standards prior to federal government action. This effort was supported by US DOT and Canadian Transport Ministry as part of the Association of American Railroads Tank Car Committee.

[31] *See* S.576, "Railway Safety Act of 2023" introduced March 1 2023. *See* also HR. 8896, "Railroad Safety Enhancement Act of 2024" introduced July 11, 2024.

[32] PHMSA plans to amend the HMR to implement regulatory requirements and operational controls on a larger set of newly designated High-Hazard Trains thus ensuring more stringent standards for more classes of hazardous materials than railroads currently follow. Projected publication is October 2024. *See* also RIN: 2137-AF65.

10

D.   The Consent Decree Violates the Interstate Commerce Commission Termination Act Jurisdictional Provision.

The language of the Interstate Commerce Commission Termination Act ("ICCTA")[33] provides the broad jurisdiction of the STB, which states that "[e]xcept as otherwise provided in this part, the remedies provided under this part with respect to regulation of rail transportation are exclusive and preempt the remedies provided under Federal or State law."[34] Transportation is defined to include railroad equipment "related to the movement of passengers or property, or both, by rail, regardless of ownership or an agreement concerning use."[35] The plain meaning of this language is that the remedies of the ICCTA are exclusive if it involves the control or use of rail transportation.

Here, the Proposed CD seeks to use another federal law to regulate NS's use of the shippers' rail cars; there is no question that such an action "would have the effect of preventing or unreasonably interfering with railroad transportation."[36] As a result, Proposed CD with respect to its interference with the regulation of rail cars as discussed herein is invalid because these two federal laws cannot be harmonized. This conclusion is supported by the STB that has addressed the intersection of a federal law cause of action and the ICCTA.[37]

E.   The Proposed Consent Decree Imposes Provisions Beyond the Authority Congress Delegated to EPA in either CERCLA or the CWA, raising jurisdictional questions related to rail safety and rail competition

The Proposed CD settles claims brought by the United States under sections 309 and 311 of the CWA, 42 U.S.C. 1311 and 1321 and sections 107 and 113 of CERCLA, 42 U.S.C. 9607 and 9613, against NS related to the train derailment in East Palestine, Ohio. Given the proposed CD is predicated on the CWA and CERCLA, the decree must focus on efforts germane to EPA's authority under these statutes.

The Proposed CD must focus on environmental response and remediation of this derailment. In that regard, AFPM supports efforts that directly address the factual circumstances associated with the East Palestine derailment that are within EPA's jurisdiction. NS should be held responsible for the environmental damage caused by this derailment and its "inaccurate representation ... that the tank cars were at risk of catastrophic failure from a polymerization reaction, which created unwarranted urgency and led to the unnecessary decision to vent and burn five derailed vinyl chloride monomer tank cars."[38] The National Transportation Safety Board found that NS's decision to vent and burn hazardous materials tank cars was "unnecessary" and based on incomplete and misleading information provided by NS. This vent and burn led to

---

[33] *See* 49 U.S.C. § 10101 et seq.

[34] *See* 49 U.S.C. § 10501(b).

[35] *See* 49 U.S.C. § 10102(9).

[36] Union Pac. R.R. Co. v. Chi. Transit Auth., 647 F.3d 675, 679 (7th Cir.2011) (quoting CSX Transp., Inc.-Petition for Declaratory Order, STB Finance Docket No. 34662, 2005 WL 1024490, at *3 (S.T.B. May 3, 2005)).

[37] *See* United States EPA —Petition for Declaratory Order, FD 35803, slip op. at 8 (STB served Dec. 30, 2018).

[38] *See* NSTB Abstract for Norfolk Southern Railway Derailment and Hazardous Materials Release East Palestine, Ohio February 3, 2023, RRD23MR005.

11

significant environmental damage identified in the decree and the Proposed CD should, and does, address this.

As stated above, US DOT, the regulatory agency responsible for rail safety, is not referenced in, or a party to, the Proposed CD. Some of the safety improvements required in the Proposed CD would be the responsibility of parties not identified as the target of the CD (*e.g.,* rail shippers). Regarding the rail safety elements of this Proposed CD, AFPM asserts that EPA has no authority to mandate such changes. While AFPM does not oppose data-driven rail safety improvements, any such changes must be pursued through either congressional legislation or notice and comment rulemaking by the appropriate regulatory agency. The proposed CD is not the appropriate venue for such rail safety improvements.

## V.     Conclusion

AFPM members, and other rail shippers, are all too familiar with the railroad's practice of shifting blame, liability and cost of compliance of safety improvements from themselves to their customers. Following derailments the railroads are quick to point out safety improvements out of their span of control or cost of compliance (*e.g.,* tank car specifications) and dismiss improvements that they would be responsible for (*e.g.,* regulation of hotbox detectors) that could prevent the derailment from happening in the first place. Prior to, and increasingly following, the East Palestine derailment, AFPM members have experienced railroads using their considerable bargaining power in contract negotiations over captive shippers to include onerous rail liability in private contracts. Such requirements effectively absolve railroads from any, and all, liability and require rail shippers to accept responsibility for actions beyond their control.

AFPM appreciates the DOJ's consideration of AFPM's comments on this important issue. AFPM generally supports the objective of the Proposed CD and holding NS accountable for the East Palestine derailment and subsequent response and remediation, but the Proposed CD goes beyond the delegated authority of the federal agencies who are party to this agreement, imposes requirements and cost on parties (rail shippers) other than the settling defendant (NS) and will embolden and increase the railroads' practice of shifting liability to their customers. In the final CD DOJ must avoid perpetuating the railroads preferred strategy of shifting blame and liability to their customers and hold railroads accountable for derailments and the associated damage.

AFPM members are committed to rail safety and support efforts to improve it and to avoid derailments like East Palestine, but any such efforts must be pursued through either congressional legislation or by notice and comment rulemaking by the appropriate regulatory agency with expertise in rail safety.

12

NS_PUBCOM_0000210

Comment A-115

| | |
|---|---|
| **From:** | Marcy Patton |
| **To:** | ENRD, PUBCOMMENT-EES (ENRD) |
| **Subject:** | [EXTERNAL] State of Ohio and United States of America vs. Norfolk Southern Railway Company |
| **Date:** | Friday, August 2, 2024 2:23:18 PM |

TO: Assistant Attorney General, Environment and Natural Resources Division

RE: State of Ohio and United States of America vs. Norfolk Southern Railway Company, et al., D.J. Ref. No. 90-11-3-12792

Dear Assistant Attorney General:

On behalf of the Columbiana County Mental Health and Recovery Services Board (CCMHRSB), we would like to acknowledge the support of Norfolk Southern Railway Company over the past year in the mental health recovery efforts for the East Palestine area of Columbiana County following the February 2023 train derailment. Specifically, Norfolk Southern assisted CCMHRSB in funding the purchase and renovation of a space for a community resiliency center. The East Palestine Resiliency Center provides a holistic environment for individuals impacted by the derailment to receive a variety of services including mental health and substance use counseling, EMDR therapy, support and therapy groups, yoga, Tai Chi, creative arts therapies, animal therapy, chair massage, educational sessions, and more. The Center is focused on providing various pathways to resilience for individuals impacted by the derailment through collaboration between local partners and services. While these services are currently being funded through a time-limited federal SAMHSA Emergency Response Grant (SERG), state and local funding, Norfolk Southern has joined in these efforts through their funding of the physical space needed to house the services offered. In addition, they have expressed their ongoing commitment to helping address mental health needs in the community. We are grateful for the assistance provided to CCMHRSB and the East Palestine Resiliency Center thus far, and we look forward to continued collaboration to sustain needed behavioral health services and supports in Columbiana County.

Respectfully,

*Marcy Patton, M.S.Ed., LPCC/S, LICDC-CS*

Executive Director

Columbiana County Mental Health & Recovery Services Board

27 Vista Drive

P.O. Box 500

Lisbon, OH 44432

mpatton@ccmhrsb.org

(330) 424-0195, Ext. 103     Work

(330) 424-8033     FAX

(330) 692-2541   Mobile

NOTICE: This email and its attachments, if any, may contain confidential or proprietary information and are intended solely for authorized use by the intended recipient(s) only. Any other use of this email is prohibited. If you have received this email in error, you are hereby notified that any retention, disclosure, copying, forwarding, distribution (in whole or in part and whether electronically, written and/or orally) and/or taking any action in reliance on this email, its contents and/or any attachments thereto is strictly prohibited. If you received this e-mail in error, please notify the sender by replying to this message and permanently delete this email, and any attachments thereto, from your system immediately.

NS_PUBCOM_0000217

Comment A-116



**DAVE YOST**

OHIO ATTORNEY GENERAL

Administration
Office 614-728-5458
Fax 614-466-5087

August 2, 2024

Todd Kim
Assistant Attorney General
Environmental and Natural Resources Division
U.S. Department of Justice
P.O. Box 7611
Washington, DC 20044-7611
pubcomment-ees.enrd@usdoj.gov

> Re: Comments on the *Proposed Consent Decree Under the Comprehensive Environmental Response, Compensation, and Liability Act and the Clean Water Act in State of Ohio and The United States of America v. Norfolk Southern Railway Company, et al.,* Case No. 4:23-cv-00517, D.J. Ref. No. 90-11-3-12792

Ohio provides the following comments on the *Proposed Consent Decree Under the Comprehensive Environmental Response, Compensation, and Liability Act and the Clean Water Act in State of Ohio and The United States of America v. Norfolk Southern Railway Company, et al.,* Case No. 4:23-cv-00517, D.J. Ref. No. 90-11-3-12792. *See* 89 Fed. Reg. 50635 (June 14, 2024). Ohio's comments focus on four key areas: (A) the NTSB's findings and rail safety improvements; (B) the federal consent decree's local waterways remediation plan; (C) the federal consent decree's force majeure provision; and (D) the federal consent decree's environmental and public health obligations.

I met with the East Palestine community at their high school auditorium on June 15, 2024. The residents shared their concerns about the water they drink, the garden vegetables they eat and the air they breathe. These concerns are in East Palestine homes and backyards—places where residents should find security and peace, not alarm and dread. Instead, residents live with the fear that medical treatment will not be available to address potential diseases that may take years to develop.

In providing the detailed comments below, the State of Ohio considers the concerns raised by the community, and the number of sources of air, surface-water, groundwater, and soil pollution, some of which involved hazardous material at the site. The volume of material released alone is concerning. The variety of pathways

discharging pollutants into the environment—directly impacting a whole town and surrounding areas—only exacerbates the concern. The federal consent decree seeking to address the harm caused at the site deserves more scrutiny and should be amended.

**A. <u>NTSB's Recommended Rail Safety Improvements, Federal Decree Section XII</u>**

*NTSB's Findings Regarding Norfolk Southern's Derailment and the Subsequent Vent and Burn*

According to the NTSB, on February 3, 2023, Norfolk Southern's train 32N, including 38 mixed freight railcars, derailed in East Palestine, Columbiana County, Ohio, which set in motion releases from the train. The impact of the derailment also punctured three tank cars carrying flammable and combustible hazardous materials. A fire ignited, causing the release of lading from these breached tank cars. Emergency responders established a one-mile evacuation zone, affecting about 2,000 residents.

The derailed cars included five tank cars carrying vinyl chloride monomer, a compressed liquified flammable gas and a hazardous material. Over the next day, four of these vinyl chloride cars were exposed to fires, and the tanks' automatic pressure relief devices released an unknown quantity of material.

Acting on information provided by Norfolk Southern and its contractors that polymerization was occurring, the evacuation zone was expanded, and a vent and burn was performed on all five vinyl chloride cars. This resulted in a fiery, plume-like explosion at the site.

While there have been many reports surrounding the derailment and vent and burn since February 2023, the NTSB handed down its findings and recommendations just over a month ago on June 25, 2024. A month before the NTSB acted, the federal government lodged the federal consent decree on May 23, 2024.

Ohio questions why the federal government proposed to resolve its case before the NTSB concluded its investigation. After all, the NTSB is the federal agency responsible for investigating the causation for the derailment. Had the federal government not rushed to resolve its case before the NTSB concluded its investigation, Ohio's recommendations in this Section may not have been necessary.

*NTSB's Rail Safety Improvements*

Section XII should be amended to include the following language from the

NS_PUBCOM_0000234

NTSB Railroad Investigation Report dated June 25, 2024 and rereleased on July 23, 2024, NTSB/RIR-24-05, as the first two paragraphs under the Section:

[New First Paragraph of Section XII]. In addition to each of the following requirements in this Section XII, Settling Defendants shall incorporate into their railroad operations and shall comply with all findings, recommendations, industry standards, and applicable rules and regulations as set forth in the NTSB Railroad Investigation Report dated June 25, 2024 and rereleased on July 23, 2024, NTSB/RIR-24-05.

[New Second Paragraph of Section XII]. Settling Defendants shall also:

(a) Review and revise Settling Defendants' procedures to immediately provide emergency responders with an accurate copy of the train consist when first aware of an accident. (NTSB R-24-28).

(b) Update Settling Defendants' submissions to the Pipeline and Hazardous Materials Safety Administration's Incident Database to accurately reflect the cause of package failures following the East Palestine derailment. (NTSB R-24-29).

(c) Adopt policies to ensure that Settling Defendants' emergency response contractors keep detailed records of information used to make decisions involving hazardous materials and share this information with shippers, relevant chemical associations, and other entities that provide hazardous materials guidance. (NTSB R-24-30).

(d) Develop a policy to ensure that the expertise of manufacturers and shippers of hazardous materials involved in transportation accidents or incidents is communicated to Settling Defendants' on-scene representatives and contractors and shared with the full incident command. (NTSB R-24-31).

## B. Local Waterways Remediation Plan, Federal Decree ¶¶91-94

Additionally, federal consent decree ¶94 (Local Waterways Remediation Plan) merely asks Norfolk Southern to "make good faith efforts to consult with the State of Ohio [and others]." It cannot stand as written. Ohio EPA—because of its delegated authority under 33 U.S.C. 1251(b) of the Clean Water Act—should be at the table planning and approving the remediation plans required in federal consent decree ¶¶91-93. Moreover, as a part of the Local Waterways Remediation Plan, Paragraph ¶92 asks Norfolk Southern to "prioritize" cleanup of legacy contamination in Sulphur Run and Leslie Run, address runoff and stormwater management control, provide educational outreach and develop aquatic and riparian

NS_PUBCOM_0000235

habitat restoration. The federal consent decree only allocates $6 million for all projects. While all the projects are redeemable projects, the funds should cover legacy contamination of the rivers first because ¶92(a) aims to remove "soil or sediment that present long-term risks to human health or the environment." If legacy contamination exhausts the fund, Norfolk Southern should provide additional funding for the remaining projects.

### C. Force Majeure, Federal Decree ¶118

The definition of "force majeure" should be amended to 1) expand its "financial inability" language and 2) exclude a failure to obtain a permit or other approval from any State of Ohio permitting authority. The provision should be rewritten as:

> *"Force majeure" does not include financial inability or any unanticipated or increased costs associated with performing any obligation under this Consent Decree, and it does not include a failure to obtain permits or other approvals from any State of Ohio permitting authority.*

### D. Environmental and Public Health Obligations, Federal Decree ¶¶47-55

#### *Coordinated Review among State and Local Agencies*

Ohio law tasks state and local agencies with identifying, managing and treating catastrophes like Norfolk Southern's Train 32N derailment. In addition to programmatic overview and hands-on assessments, these agencies compile data that is vital to the long-term health of the people affected by the derailment and provide baseline research for other similar disasters impacting public health. Paragraph 49 of the federal consent decree states that only U.S. EPA reviews and approves the Community Health Program. U.S. EPA should work in tandem with state and local agencies to review and approve the plan, which presumably includes medical monitoring under Paragraph 50.

Similarly, for Mental Health Services in Paragraph 51, state and local agencies should have a seat at the table with U.S. EPA to review and approve that plan. And likewise for the other programs—the Community Facilitation Plan (Paragraph 52), the Annual Reporting (Paragraph 54) and the Community Health Program Reassessment (Paragraph 55)—each of the applicable local and state agencies should be included in the reporting and reassessing required by the federal consent decree.

4

NS_PUBCOM_0000236

### *Expansion of Private Well Program*

Paragraph 47 of the federal consent decree contains a clause that limits the "Private Well Program" to "all households participating [in that program] "as of the Effective Date." This clause appears to exclude program participation for those either unaware of the program or victims of migrating contaminants in the years ahead. Ohio requests that U.S. EPA expand the program to include all potential private wells impacted and potentially impacted by leaving the program open to participation throughout its duration. Depending on the number of additional private wells that Paragraph 47 does not currently contemplate, the Private Well Fund eligibility criteria should be expanded accordingly.

### *Insufficient Funds for Medical Monitoring and Mental Health*

The $14 million allocated to cover medical monitoring is a paltry sum compared to the apparent need for medical monitoring that will last until 2045. *See* Paragraph 48 that provides an easy exit plan for Norfolk Southern—"[u]pon the earlier of exhaustion of the CPH [Community Health Program] Fund or completion of the 20-year Community Health Program, Settling Defendants may seek termination of their obligations." So, if the funds dry up, as can be expected, Norfolk Southern is off the hook. This needs to be corrected.

### **E. Conclusion**

For these reasons, the United States should amend the *Proposed Consent Decree Under the Comprehensive Environmental Response, Compensation, and Liability Act and the Clean Water Act* in *State of Ohio and The United States of America v. Norfolk Southern Railway Company, et al.,* Case No. 4:23-cv-00517 as provided in this comment.

Yours,

*Dave Yost*

Dave Yost
Ohio Attorney General
30 E. Broad Street, 17th Floor
Columbus, Ohio 43215

5

Comment A-117



JOSH SHAPIRO
GOVERNOR

MICHELLE A. HENRY
ATTORNEY GENERAL

COMMONWEALTH OF PENNSYLVANIA

*Sent via email to pubcomment-ees.enrd@usdoj.gov.*

August 2, 2024

Assistant Attorney General
US DOJ – ENRD
PO Box 7611
Washington, DC 20044-7611

RE: Commonwealth of Pennsylvania's comments on the United States and Norfolk Southern
Railroad Settlement Agreement for the East Palestine Train Derailment; 89 Federal Register
50635 (June 14, 2024); *The United States of America v. Norfolk Southern Railway
Company, et al.*, D.J. Ref. No. 90-11-3-12792.

To Assistant Attorney General, Environmental and Natural Resources Division:

The Commonwealth of Pennsylvania appreciates this opportunity to submit the following
comments on the U.S. Department of Justice's ("US DOJ") proposed consent decree with
Norfolk Southern Railroad ("NSR") for the East Palestine train derailment as per the notice of
comment period provided at 89 Federal Register 50635 (June 14, 2024).[1]

The Commonwealth commends the US DOJ for taking a meaningful step towards providing
relief for individuals affected by the February 3, 2023 derailment and by NSR's troubling
response to that derailment. We particularly applaud the rail safety provisions included in the
decree aimed at addressing safety issues, the failure to identify failing wheel bearings;
delayed transmission of train consist information to first responders; use of tank cars with
documented poor derailment performance; the failed communication and decision-making
process leading up to the deliberate breach of five tank cars containing vinyl chloride monomer;
and the assessing of a large penalty for the violations of the law. Strong rail safety measures are
an important step to avoiding similarly devastating derailments from recurring.

Despite those significant aspects of the agreements, the Commonwealth remains concerned
that the agreement does too little to protect the health of our residents and our public natural
resources generally and specifically by: 1. failing to address health care treatment costs for
present or future adverse health impacts related to the toxic plumes of contaminants that filled
our air following the derailment and the vent and burn; 2. establishing an inappropriately limited

---

[1] The proposed consent decree is available at https://www.justice.gov/enrd/consent-decrees.

range of applicability of the decree's health and environmental monitoring provisions, thus precluding many impacted Pennsylvania residents from coverage; and 3. failing to incorporate recommendations made by the National Transportation Safety Board ("NTSB") in the NTSB Final Report on the derailment, dated June 25, 2024.[2]

As a result, the Commonwealth submits the following comments regarding issues important to Pennsylvania which NSR needs to address.

<div align="center">Background of the Agreement</div>

The proposed consent decree settles claims brought by the United States under section 309 and 311 of the Clean Water Act, 42 U.S.C. §§ 1311, 1321, and sections 107 and 113 of the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), 42 U.S.C. §§ 9607, 9613, against Norfolk Southern Railway Company and Norfolk Southern Corporation related to the February 3, 2023 train derailment in East Palestine, Ohio. The proposed consent decree would require Norfolk Southern: (i) to reimburse all CERCLA and CWA response costs incurred by the United States; (ii) pay a civil penalty of $15 million for violating CWA §§ 301 and 311; (iii) establish a $25 million community health monitoring program for qualifying members of the public impacted by the derailment; (iv) implement an array of specified rail safety procedures; (v) develop and adopt programs for coordination of rail track restoration and vent and burn procedures; (vi) implement a $6 million local waterways remediation plan; (vii) pay $175,000 for natural resource damages; and (viii) implement compliance and future monitoring requirements in the various work plans approved under EPA's Unilateral Administrative Orders and CWA Order.

<div align="center">Specific Concerns</div>

1. <u>Payment of health care treatment costs should be required.</u>

The US DOJ proposed consent decree does not include a requirement that NSR pay for health care treatment costs of those individuals for whom derailment related exposures are substantially likely to be a significant factor in aggravating, contributing to or causing an individual's health condition. Any such costs should be borne by NSR – not by the innocent victims.

Many of the wide array of contaminants released into the environment immediately after the derailment and resulting from the vent and burn of five tank cars were extremely hazardous. These hazardous materials included at least 6 types of Class 3 flammable liquids, combustible liquids and Division 2 flammable gases. The fire resulting from the derailment ignited lading from tank cars containing benzene, butyl acrylates, ethylene glycol monobutyl ether and other hazardous contaminants.[3] One class of those contaminants includes vinyl chloride monomers ("VCM").

---

[2] National Transportation Safety Board's Railroad Investigation Report; NTSB/RIR-24-05, June 25, 2024.
[3] A detailed account of the hazardous materials involved in the derailment is provided in Section 1.8 of the National Transportation Safety Board's ("NTSB") Railroad Investigation Report; NTSB/RIR-24-05, June 25, 2024.

NS_PUBCOM_0000240

Five tank cars contained VCM, known human carcinogens. In the days after the derailment, these tank cars were exposed to fires and released VCM from pressure relief devices. Some of the releases were "energetic."[4] When five tank cars were intentionally breached, huge black smoke plumes resulted. The air pathway of those huge plumes covered significant portions of western Pennsylvania, up to a 20 mile distance from the site. (Please see the attached soot deposition map.) VCM were released into the atmosphere and VCM and its combustion products traveled through Pennsylvania's air where they were deposited as soot.

The health risks associated with inhalation exposure to VCM are well documented and include increased risk of a rare form of liver cancer as well as primary liver cancer, brain and lung cancers, lymphoma and several forms of leukemia.[5] In addition to cancers, there are other adverse health effects from VCM exposure including liver damage and adverse reproductive and development effects. The cumulative risks from multiple contaminant exposures add to these risks.

Cancers such as those caused by exposure to VCM do not occur immediately after exposure; they usually take many years up to several decades to manifest clinically. Because of the long latency periods for cancers, the individuals exposed to the hazardous contaminants released during and after the derailment may not have health conditions related to that exposure for a long period. Such cancers are obviously devastating to the impacted individuals and families. Additionally, health care costs of cancer treatment can be financially devastating. Any such costs should be borne by NSR – not by the innocent victims.

NSR should be required to establish a health care treatment fund to cover health care costs for Pennsylvania residents and workers for whom derailment related exposures are substantially likely to be a significant factor in aggravating, contributing to or causing an individual's adverse health condition. There are various mechanisms for establishing such a fund and for ensuring the equitable distribution of the fund. Such funds have been successful in reimbursing health care treatment costs in the past for environmental disasters and provide a road map for mechanisms to pay for such costs here.

Further and specifically, Pennsylvania residents and workers living/working within a 20 mile radius of the derailment should be eligible to participate in NSR coverage of relevant health care treatment costs.

2. Stronger monitoring provisions are needed by Pennsylvania residents.

The medical monitoring provisions of the Community Health Program of the proposed consent decree apply to "qualified individuals" as defined in paragraph 50.b. That definition is limited in part to individuals who resided within 2 miles of the derailment area during a specific time period.

---

[4] *Id*, at page 17.

[5] See U.S. EPA Snapshot, Vinyl Chloride, at https://19january2017snapshot.epa.gov/sites/production/files/2016-09/documents/vinyl-chloride.pdf. See also Agency for Toxic Substance and Disease Registry, *Medical Management Guidelines for Vinyl Chloride*, available at
https://wwwn.cdc.gov/TSP/MMG/MMGDetails.aspx?mmgid=278&toxid=51.

3

Pennsylvania objects to the limitations of this definition. The definition of qualified individuals excludes many Pennsylvania residents who were adversely impacted by the derailment and its aftermath. As demonstrated by the attached plume soot deposition map, and stated above, the black toxic clouds traveled through large swaths of Pennsylvania where it likely deposited its dangerous soot. Pennsylvania residents in the path of those plumes and those who were otherwise adversely impacted should be covered by any NSR health monitoring requirements.

Similarly as stated above for health care treatment costs, NSR health monitoring requirements should include Pennsylvania residents and workers living/working within a 20 mile radius of the derailment.

Likewise, the environmental monitoring required under paragraph 43 to 47 must not be limited to only a 2-mile, or other limited, radius. That monitoring must be expansive enough to ensure that Pennsylvanians are receiving adequate information about the consequences of this unprecedented event. Finally, while the long-term monitoring plans under paragraphs 43 to 47 are subject to the U.S. EPA's approval, Pennsylvania Department of Environmental Protection should also have the opportunity to review and approve those plans prior to implementation.

3. NSR should be required to implement all relevant recommendations of NTSB Final Report.

The notice of the proposed US DOJ consent decree was filed prior to the June 2024 public hearing conducted by the NTSB. The notice was also filed prior to the issuance of the NTSB Final Report in July 2024.

Pennsylvania is reviewing the findings from that report and asserts that any settlement with NSR should address every relevant finding in that report. The following are a few examples of such items that may not be included in the US DOJ proposed consent decree.

The NTSB Final Report addressed the failed placards that became unreadable after the fires and explosions and thus were useless for first responders.[6] A settlement with NSR should address the hazards created by illegible placards. NSR should immediately commence use of placards for hazardous materials identification that can survive a fire or accident.

Further, NSR should immediately be required to conduct routine inspections of wheel bearings and wheel bearing detectors on a regularly scheduled basis, followed by required interventions to fix any defects found during the inspection. As pointed out in the NTSB Final Report, one of the wheel bearings that failed during the derailment was last reconditioned in June 2011 – *thirteen years prior to the derailment.*[7] Clearly, NSR's current inspection interval is not adequate. In addition, according to the NTSB Final Report, NSR has no way to track whether a railcar has been submerged in water deep enough that the water entered the bearings. Again, regular appropriately timed inspections could possibly catch these bearings prior to failures.

---

[6] *Id*, at page 78.
[7] *Id*, at page 48. Reconditioning includes disassembling, cleaning, inspecting, repairing as needed and reassembling.

NS_PUBCOM_0000242

## Conclusion[8]

Thank you for this opportunity to express our concerns with the consent decree. We are happy to discuss any of the above with you in detail as appropriate. Please feel free to reach out to Ann Johnston, Assistant Chief Deputy Attorney General, Civil Environmental Enforcement Unit at 717-497-3678.

Sincerely,

JOSH SHAPIRO
Governor

FOR THE COMMONWEALTH OF
PENNSYLVANIA
MICHELLE A. HENRY
Attorney General

---

[8] There are additional provisions of the proposed consent decree that the Commonwealth asserts should be applicable to Pennsylvania resources. For example, any plan such as the Local Waterways Remediation Plan should explicitly include Little Beaver Creek in the southwest corner of Pennsylvania where sampling proved positive for derailment related contaminants. As currently worded, paragraph 91 of the proposed decree includes Little Beaver Creek as it is fits within the term "downstream waters " but it should be included explicitly. Furthermore, provisions such as those in the Natural Resource Damages provisions should be expanded to include reparations for Pennsylvania's state forest lands, which lie directly in the path of the black smoke plumes resulting from the derailment and vent and burn.

5

# ATTACHMENT

# SOOT DEPOSITION MAP

NS_PUBCOM_0000244



## Reference Map

Legend

- East Palestine Derailment Location
- One Mile Evacuation Area
- 1x2-mi Area of Operation
- East Palestine Boundary

East Palestine, Ohio Train Derailment Response

IMAAC Model - Soot Surface Deposition over 10 hours (1500 - 0100) 2/6/23

Prepared By: U.S. EPA Region 5 GIS Unit
Prepared For: Environmental Unit
Date: 3/8/2023

Comment A-118



4201 Wilson Blvd., Suite 0515
Arlington, VA 22203
(703) 527-6223

August 2, 2024

Todd Kim, Esq.
Assistant Attorney General
Environment and Natural Resource Department
United States Department of Justice
U.S. DOJ – ENRD
P.O. Box 7611
Washington, DC 20044

The Alliance for Chemical Distribution submits the following comments in response to the Notice of Lodging of Proposed Consent Decree for *The State of Ohio and The United States of America v. Norfolk Southern Railway Company, et al.*, **D.J. Ref. No. 90-11-3-12792**.

## About ACD

The Alliance for Chemical Distribution (ACD) supports and champions the chemical distribution experts the world depends on to safely, reliably, responsibly, and sustainably move the chemical products essential to our daily lives. ACD's more than 400 chemical distribution industry members are primarily small, multi-generational family-owned businesses. They provide critical chemical products used in medicine and health care, food and agriculture, clean water and sanitation, energy production, electronics, communication, and more to over 750,000 end users.

As leaders of the $27 billion chemical distribution industry, ACD member companies have the extensive expertise, commitment to safety and sustainability, and access to a deep well of resources needed to ensure chemicals are moved safely and responsibly when and where they are needed. ACD owners and operators have a personal stake in the health, safety, and security of their employees, companies, and communities. They demonstrate their commitment through strict adherence to the highest standards in quality, safety, sustainability, and performance through compliance with ACD Responsible Distribution™.

The comprehensive Code of Management Practice, a condition of Responsible Distribution, requires each member company to have an active program designed to continuously improve safety and reduce incidents. This dedication, in addition to relationships with employees, involvement in local communities, including participation in Local Emergency Planning Committees (LEPCs), and careful compliance with numerous regulations on the federal, state, and local levels, empowers ACD members to navigate the ever-changing complexities of moving essential chemicals around the nation and the globe.

Moving goods through rail is critical to chemical distribution as it is the safest form of transportation for hazardous materials. The U.S. relies on this movement to transport

EMPOWERED **PERFORMANCE.** UNRIVALED **EXPERTISE.**

acd-chem.com

chemicals that are essential to every industry including public safety, infrastructure, agriculture, and transportation. Transporting these goods must be done with extreme care, especially considering the size and speed freight locomotives can reach. We are well reminded of the need for this extreme care when accidents occur, such as the derailment that took place on February 3, 2023, in East Palestine Ohio.

ACD recognizes the importance of the U.S. Department of Justice's (DOJ) proposed consent decree that would settle Clean Water Act and Comprehensive Environmental Response, Compensation, and Liability Act claims brought by the United States against Norfolk Southern Railway Company and Norfolk Southern Corporation (NS) related to the East Palestine incident. The derailment was an avoidable disaster with severe environmental repercussions, and NS must be held responsible. However, ACD is concerned with paragraph 70 of the proposed consent decree, which would require NS to establish a "Customer Tank Car Replacement Plan." ACD urges the DOJ to remove this requirement as it would impose obligations on third parties that are not subject to the proposed consent decree, drive up costs for shippers, and ignore the reality of tank car availability in the United States.

## The Proposed Consent Decree Imposes Requirements on Third Parties

Consent decree agreements are settlements that resolve disputes, requiring consent from each party involved in the agreement. The need for consent was ruled on by the Supreme Court as it decided "a court may not enter a consent decree that imposes obligations on a party that did not consent to the decree."[1] However, paragraph 70 contradicts this legal requirement as it establishes an obligation that will directly involve shippers who are not subject to this consent decree.

Paragraph 70 does this by requiring NS to develop a Customer Tank Car Replacement Plan to incentivize shippers to phase out the use of DOT-111 tank cars when transporting flammable hazardous materials. Shippers who use these tank cars on NS tracks will face direct repercussions of this replacement plan.

The severity of this impact is compounded when considering the extreme consolidation of railroad networks and the lack of alternatives for shippers. In fact, it is estimated that roughly 80 percent of shippers are forced to rely on a single railroad.[2] This means the majority of shippers that will be subject to this replacement plan will be unable to choose another rail provider, thus being forced to either participate in the established replacement plan or suffer consequences for not updating their railcars. Either outcome will directly impact shippers despite not being a party to this consent decree.

Also, the consent decree includes a requirement for the Federal Government to review the plan once drafted. In this review, the Federal Government will take the industry and technical

---

[1] Local No. 93, Intern. Assn of Firefighters, AFL-CIO C.L.C. v. City of Cleveland, 478 U.S. 501 at 529 (1986).
[2] American Fuel and Petrochemical Manufacturers, "Freight Rail in America: Can a Market Be 'Free' if There's Almost No Competition?" AFPM, https://www.afpm.org/newsroom/blog/freight-rail-america-can-market-be-free-if-theres-almost-no-competition

EMPOWERED **PERFORMANCE.** UNRIVALED **EXPERTISE.**

acd-chem.com

expertise of NS into consideration. However, there is no requirement for the Federal Government to consider expertise from shippers or the rail equipment industry. This further demonstrates the lack of collaboration on the replacement plan with the parties that will ultimately be obligated to undertake the bulk of the responsibility.

The proposed Customer Tank Car Replacement Plan conflicts with U.S. law as it places obligations on parties that have not consented to the decree, and as such it should not be included.

### Paragraph 70 Provides Economic Benefits to Norfolk Southern

In addition to establishing burdensome obligations on third parties, the proposed establishment of a Customer Tank Car Replacement Plan will serve as a financial benefit for NS as it provides the railroad with a mechanism to charge higher prices to shippers utilizing DOT-111 tank cars.

As stated in the proposed consent decree, the replacement plan must "encourage customers to use DOT-117R Tank Cars (or similar armored Railcars) in place of DOT-111 Tank Cars for the transportation of Flammable Hazardous Materials and *shall include financial incentives* as an aspect of the plan (emphasis added)." This requirement to include a financial aspect to the replacement plan will undoubtedly result in higher costs charged to shippers who continue to utilize DOT-111 tank cars to transport Flammable Hazardous Materials, regardless of their ability to upgrade their cars. This will likely permit NS to add additional surcharges to their current tariffs and contracts, giving the railroad an avenue to expand its profits at the expense of shippers. This has the opposite effect of what the consent decree is intended to achieve. The decree should emphasize establishing consequences for NS; instead, paragraph 70 creates an opportunity for the railroad to financially benefit at the expense of shippers.

### Shippers Are Updating Tank Cars as Quickly as Practicable

Paragraph 70 operates on the assumption that shippers can simply transition to DOT-117 tank cars and that shippers are only an incentive away from making that shift. While this may be true for a limited number of shippers, the vast majority are not able to expedite the rate of updating their rail cars beyond what is being done currently. This is because the necessary capacity does not exist, updating rail cars is extremely expensive, and many shippers lease or rent their cars and therefore must wait until the expiration of their current contracts before utilizing different rail cars.

Currently, roughly 17,000 DOT-111 tank cars transport flammable liquids.[3] This is a significant proportion of tank car capacity, and there are not enough production facilities to smoothly transition to DOT-117 tank cars before the May 1, 2029, deadline set forth by the 2015 Fixing America's Surface Transportation (FAST) Act. There are only six facilities that can manufacture

---

[3] American Chemistry Council, "Tank Car Manufacturing Capacity," ACC, https://www.americanchemistry.com/better-policy-regulation/transportation-infrastructure/resources/tank-car-manufacturing-capacity

EMPOWERED **PERFORMANCE.** UNRIVALED **EXPERTISE.**

acd-chem.com

new rail cars and 23 that can modify existing tank cars to the DOT-117R100W standard.[4] Combined with this is a significant backlog of orders, surpassing 45,000 in July 2024 among members of the Railway Supply Institute (a trade association that represents the railway supply industry).[5] There is no additional capacity; therefore, it is not practical to expect any acceleration in the current phaseout of DOT-111 tank cars.

Moreover, when shippers who own their railcars are able to secure an appointment with a facility, the average cost of a new DOT-117 tank car is roughly $135,000; and the cost to retrofit an existing tank car typically runs between $30,000 and $60,000.[6] This adds another factor that makes it exceedingly difficult for shippers to phase out DOT-111 tank cars. This is especially true of ACD members as the majority are small businesses that are less likely to have these kinds of finances readily available.

Lastly, a significant portion of rail cars are not owned by shippers. In 2014, it was estimated that roughly 80 percent of tank cars were owned by lessors, not the shippers that operate them.[7] These shippers cannot modify the tank cars they are utilizing and have entered into contracts obligating them to continue using their current rail cars until they expire. Permitting NS to move forward with a replacement plan will burden these shippers who lease their rail cars despite their inability to make immediate changes to their fleets.

### Paragraph 70 Could Disrupt the Supply Chain

Tank cars are used to ship a myriad of critical goods. These materials include chemicals such as methanol, toluene, and xylene which are flammable liquids permitted to be shipped in DOT-111 tank cars.

The FAST Act of 2015, established a phaseout deadline of May 1, 2029, for DOT-111 tank cars when transporting Packing Group II and III flammable liquids. This act extended the previous phaseout period proposed by the U.S. Department of Transportation (DOT) which would have prohibited all flammable liquids from being transported in DOT-111 tank cars by May 1, 2025.[8] After receiving significant input from experts and stakeholders, Congress recognized the need to allocate shippers, tank car owners, and tank car manufacturers and retrofitters adequate time to phase out DOT-111 tank cars. In fact, Congress was so concerned with a possible shortage of tank cars that it included a mechanism for the DOT to further extend the phaseout

---

[4]Ibid

[5] Railway Supply Institute, "ARCI 2024 2nd Quarter Reporting Statistics," RSI, https://www.rsiweb.org/wp-content/uploads/2024/07/ARCI-Summary-2nd-Quarter-2024.pdf

[6] Funk, Josh, "NTSB derailment investigation renews concerns about detectors, tank cars and Norfolk Southern image," Associated Press, https://apnews.com/article/east-palestine-train-derailment-norfolk-southern-ntsb-eac7b24d7a03e4afcfa9f07b1f53f723, and, Hays, Kristen and Terry Wade, "Greenbrier says rapid phase-out of older oil-by-rail tank cars doable," Reuters, https://www.reuters.com/article/business/energy/greenbrier-says-rapid-phase-out-of-older-oil-by-rail-tank-cars-doable-idUSL2N0PY2XX/

[7] Place, Eric and Feldman, Rich, "The Man Behind the Exploding Trains," Sightline Institute, https://www.sightline.org/2014/03/04/the-man-behind-the-exploding-trains/

[8] US Department of Transportation, "DOT Announces Final Rule to Strengthen Safe Transportation of Flammable Liquids by Rail," US DOT, https://www.transportation.gov/briefing-room/dot-announces-final-rule-strengthen-safe-transportation-flammable-liquids-rail-1.

EMPOWERED **PERFORMANCE.** UNRIVALED **EXPERTISE.**

acd-chem.com

deadline beyond 2029. Paragraph 70 of this proposed consent decree directly contradicts FAST Act requirements and disregards this congressionally mandated phaseout period.

It is necessary to permit DOT-111 tank cars to remain in service to keep a fluid supply chain. Forcing NS to adopt a tank car replacement plan in an effort to expedite the rate of phasing out DOT-111 tank cars poses the risk of prematurely taking these tank cars out of service and creating a tank car shortage, disrupting the ability of shippers to get critical materials to their end-users.

### Conclusion

ACD appreciates the opportunity to provide input as the DOJ finalizes its consent decree with NS. In the wake of the devastating East Palestine derailment, it is paramount that steps are taken to address the impacts of the catastrophe and to prevent a similar derailment from occurring in the future.

ACD urges the DOJ to remove paragraph 70 from this consent decree. The inclusion of a Customer Tank Car Replacement Plan would directly impact parties other than those consenting to the decree. Moreover, this program would financially hurt shippers, push an impossible phaseout timeline, and jeopardize the supply chain.

If you have questions or need additional information, please do not hesitate to contact me.

Sincerely,

Jennifer C. Gibson
Senior Vice President, Regulatory Affairs
Alliance for Chemical Distribution
4201 Wilson Boulevard, Suite 0515
Arlington, VA 22203

EMPOWERED **PERFORMANCE.** UNRIVALED **EXPERTISE.**

acd-chem.com

Comment A-119

| From: | Herbert, Ronda (ENRD) |
|---|---|
| To: | Grady, Lauren (ENRD) |
| Cc: | Spector, Jeffrey (ENRD); Stewart, Geoffrey (ENRD); Rodriguez, Kaylee (ENRD) |
| Subject: | FW: ELCH Comments to DOJ Settlement with NSR Consent Decree |
| Date: | Monday, August 5, 2024 10:01:29 AM |
| Attachments: | image001.png |

Hello Lauren,

This was sent to our public comment inbox, for DJ number 90-11-3-12792.

Thank You

Ronda Herbert

Case Management Unit
Docketing Clerk
Environmental and Natural Resource Division

**From:** Stephanie Conn (ELOH) <sconn1@primehealthcare.com>
**Sent:** Friday, August 2, 2024 5:17 PM
**To:** ENRD, PUBCOMMENT-EES (ENRD) <PENRD3@ENRD.USDOJ.GOV>
**Cc:** Gretchen Nickell (ELOH-RVP) <gnickell@primehealthcare.com>
**Subject:** [EXTERNAL] ELCH Comments to DOJ Settlement with NSR Consent Decree

Good Afternoon –

Below are East Liverpool City Hospital's comments regarding the consent decree between the Department of Justice and Norfolk Southern Railroad. Please feel free to reach out to Dr. Gretchen Nickell or me if there are any questions.

- The Consent Decree calls for *Medical Monitoring* for First Responders and community members to include:
    - 10 free medical monitoring exams per year in include:
        - Routine physical exam
        - Comprehensive Metabolic Panel blood test
        - Pulmonary Function test
        - X-Rays
        - Assessment of results
    - Free counseling for Mental Health Services
        - It should be noted that, unlike the medical services listed above, there are no further definitions or visit caps per year for mental health services.
    - ELCH's *conservative* estimate for routine health monitoring, basic diagnostic exams (x rays and blood work), and mental health services is $1,052.63 per person per year. Total *potential* patient population is 4,718 residents and 275 first responders.
        - For a 20-year time frame of providing these very basic services to the total

        potential population, the estimated cost would be $105,115,631.80 (4,993 potential patients x $1,052.63 x 20).

- ▪ This leaves a shortfall of $80,115,631 if all potential patients access the benefits of the Consent Decree. At a cost of $5,255,781.59, the $25M set forth in the settlement would be depleted in less than 5 years.
- ▪ These estimates do not factor in the cost of specialty services, advanced diagnostics, and treatment of any long-term health effects of the train derailment.

- ○ The screenings identified in the settlement do not include Urinalysis and Complete Blood Count lab work. These are additional tests recommended by toxicologists and are screenings that have been conducted on train derailment victims.

- Because the Consent Decree only provides access for medical screening and mental health, there is no current funding structure for long-term health conditions, including the diagnosis and treatment of said health conditions.
  - ○ Without designated funding, patients would have to access their personal health insurance, workers compensation, or self-pay.
    - ▪ Personal health insurance will impact local employers' operating costs as well as patients' personal deductibles and copays, creating significant financial burden to both employer and patient.
      - In some cases, health insurance may deny claims as conditions are train-derailment related, thus placing the financial burden solely on the patient and / or healthcare provider if patient unable to pay for services.
    - ▪ Increases in workers compensation claims will result in additional financial burden to employers and local government, thereby affecting tax-payers indirectly.
    - ▪ Patient self-pay is often inability for patients to financially fund their health care costs, resulting in increased burden and financial losses to the local healthcare system, further jeopardizing the ability to continue providing services to the community.
- The Consent Decree also does not address the current outstanding problem of a "train derailment registry" of patients experiencing health effects of the train derailment. Currently, there is no centralized repository of data identifying the true number of individuals reporting health concerns related to the disaster. Due to the insufficient data, it is difficult to reasonably project accurate estimates of what can be expected in terms of cancer clusters and other chronic conditions 5-20 years from the present.
  - ○ We propose a registry be created by either a healthcare provider or the third-party administrator of the health care funds. Should it be the healthcare provider, we recommend the healthcare provider either be the sole provider of healthcare services under the consent decree or be listed as the preferred provider of services at the minimum.

Best Regards,
-Stephanie Conn

**Stephanie D. Conn, MSN, RN**

**Chief Executive Officer**
**East Liverpool City Hospital**
**425 W. 5ᵗʰ St. | East Liverpool, OH 43920**
**T 330.386.2002 | C 740.624.2673**

East Liverpool City Hospital

*sconn8@primehealthcare.com*

*The information contained in this email may be confidential and/or legally privileged, including HIPAA Protected Health Information or information that is proprietary or trade secret. It has been sent for the sole use of the intended recipient(s). If you are not the intended recipient, you are hereby notified that any unauthorized review, use, disclosure, dissemination, distribution, or copying of this communication is strictly prohibited. If you received this communication in error, please inform the sender and destroy all copies of the message. The organization accepts no liability for any damage caused by transmittance of this email. Thank you.*

Comment A-120



**THE VOICE OF OHIO'S HIGH-TECH CHEMISTRY COMMUNITY...
MAKING A BETTER WORLD FOR ALL OHIOANS.**

Ohio Chemistry Technology Council

**JENN KLEIN, PRESIDENT**

**Board of Directors**
Chair – Heather Rutz
*Cenovus Lima Refinery*
Vice Chair – Chuck Almroth
*Jones-Hamilton Company*
Treasurer – MJ Rea-Jordan
*Univar Solutions*
Past Chair – Hadley Stamm
*LANXESS*
Lee Bowers
*RPM International*
James Bull
*Capital Resin Corporation*
Joseph Bush
*Syensqo*
Fernando Carvalho
*Ashland*
Jed Dowdy
*INEOS*
Mike Flaherty
*Emery Oleochemicals*
Zach Fries
*McGean*
Mario Gonzalez
*Solvay*
Elizabeth Grove
*The Lubrizol Corporation*
Jennifer Harrington
*DuPont*
Steel Hutchinson
*GFS Chemicals*
Jonathan Kammerer
*Americas Styrenics*
Kyle Kohlhaas
*Dover Chemical Corporation*
Todd LeClair
*PPG*
Matthew O'Connor
*Zaclon LLC*
Rob Paxton
*Shepherd Chemical Company*
Rich Rogers
*Covestro*
Ray Somich
*Synthomer*
Terry Snell
*BASF*
Jeffrey VanMatre
*Kraton Polymers*

August 2, 2024

Todd Kim, Esq.
Assistant Attorney General
Environmental and Natural Resources Department
U.S. Department of Justice
U.S. DOJ–ENRD
P.O. Box 7611
Washington, DC 20044-7611
pubcomment-ees.enrd@usdoj.gov

RE:     *The State of Ohio and The United States of America* v. *Norfolk Southern Railway Company, et al.;* D.J. Ref. No. 90-11-3-12792.

Dear Assistant Attorney General Kim,

The Ohio Chemistry Technology Council (OCTC) appreciates the opportunity to comment on the proposed Consent Decree referenced above. OCTC represents the chemistry industry in the public policy arena in Ohio and works to promote the highest standards of environmental, health, safety and security performance. Ohio is the third largest chemical manufacturing state in the United States. The chemistry industry in Ohio employs over 40,000 people, pays an average wage of over $100,000, and generates more than $31 billion of economic impact.

While OCTC welcomes the agreement to settle Clean Water Act and Comprehensive Environmental Response, Compensation, and Liability Act claims related to the devastating train derailment in East Palestine, OH, we have significant concerns with specific provisions of the Consent Decree that address the use of DOT-111 tank cars (Paragraphs 69 and 70). These provisions directly impact Ohio businesses and could disrupt supply chains for downstream products, including essential materials used in water treatment, food production, electronics, and numerous other applications.

The Tank Car Provisions inappropriately impose obligations and burdens on Ohio businesses and other third parties that are not signatories to the proposed Consent Decree. Rail customers, not railroads, provide the tank cars used to transport their products. They either own or lease cars and are ultimately responsible for the costs of maintaining their fleet.

If the proposed Consent Decree is approved, shippers would be prohibited from using specified cars on Norfolk Southern routes. Paragraph 69 requires Norfolk Southern to "cease use of any DOT-111 Tank Cars for transportation of

NS_PUBCOM_0000310



**THE VOICE OF OHIO'S HIGH-TECH CHEMISTRY COMMUNITY...**
**MAKING A BETTER WORLD FOR ALL OHIOANS.**

**JENN KLEIN, PRESIDENT**

Flammable Hazardous Materials, other than under a common carrier obligation" within 180 days. This would impact most flammable liquid shipments, since a large majority of rail traffic moves under contract rather than common carrier tariffs.

The 180-day deadline is simply not feasible. There is no existing inventory of unutilized cars that meet the most recent DOT standards, and the rail equipment industry has limited capacity to produce new cars. OCTC members are already phasing out the use of DOT-111 cars for transporting flammable liquids. Under an existing schedule adopted by Congress, shippers and tank car owners have until May 1, 2029, to fully transition their fleets. By overriding this carefully established timeline, the proposed Consent Decree risks creating tank car shortages and supply chain disruptions throughout the country.

While the proposed Tank Car Provisions specifically apply to Norfolk Southern, they will inevitably impact the entire rail network. Tank cars are regularly interchanged between railroads, and it would be unworkable to establish a designated fleet of tank cars specifically for use on Norfolk Southern routes.

OCTC is also concerned that, under Paragraph 70, any DOT-111 cars that continue in use to ship flammable liquids will be subjected to a "Customer Tank Car Replacement Plan" developed by Norfolk Southern, which will undoubtedly impose substantial new costs on rail shippers. This provides a financial windfall to Norfolk Southern at the expense of OCTC members, downstream businesses, and ultimately consumers.

The tank car provisions in Paragraphs 69 and 70 inappropriately impose obligations and burdens on OCTC member companies and other third parties. We strongly believe that these provisions do not serve the public interest and should be removed from the Consent Decree.

Thank you for your consideration of this important issue. Ohio is a global leader in the industry of chemistry, and we welcome any and all opportunities to collaborate with our public officials. Please feel free to reach out with any questions at (614) 224-1730 or jklein@ohiochemistry.org.

Sincerely,

Jenn Klein
President
Ohio Chemistry Technology Council

NS_PUBCOM_0000311

Comment A-121



P.O. Box 7255 New Castle, PA 16107
6550 Lakeshore St., West Bloomfield, MI 48323
Phone: (248) 562-1320 • Fax: (888) 769-1774
rshenkan@shenkanlaw.com
Scott Rankin – Of Counsel (Licensed in Ohio)

August 2, 2024

*VIA EMAIL TO PUBCOMMENT-EES.ENRD@USDOJ.GOV*

Assistant Attorney General, US DOJ-ENRD
P.O. Box 7611
Washington, D.C.20044-7611

RE: **PUBLIC COMMENT OF PROPOSED CONSENT DECREE**

TO WHOM IT MAY CONCERN:

This firm represents the following individuals who respectfully wish to submit this public comment: ███████████████████████████████████████
███████████████████████████████████████████████████
███████████████████████████████████████████████████
█████████████████████████████

The following is a Public Comment to the proposed "Consent Decree between Plaintiff United States of American and Defendants" filed on May 23, 2024 in *The State of Ohio and The United States of America v. Norfolk Southern Railway Company and Norfolk Southern Corporation*, 23-cv-517 (N.D. Ohio, Eastern Division), as permitted by notices in the Federal Register at 89 FR 46908 and 89 FR 50635 and by paragraph 173 of the Consent Decree

The proposed Consent Decree is inappropriate, improper, and inadequate. The settlement occurred well-prior to the NTSB's findings establishing, *inter alia*, that the explosion was unnecessary. Moreover, there were over a dozen burned Ford electric, lithium battery trucks which were not included in the calculus of the clean-up and carcinogenic effect on the community.

There is (alleged) bias and (alleged) improper matters relating to Mark Durno, the local director of the EPA who is involved with the handling/overseeing of the East Palestine disaster. While the Department of Justice had public meetings to obtain public comment locally, they were not advertised and they included Mark Durno's attendance, which was a chilling effect for the attendance and candid speaking-out about the critical nature of this settlement.

Of note, the U.S. Department of Justice's fact sheet included in the EPA's July 10 newsletter included a typo in the email address to send public comments on the proposed settlement. As a result of this deficiency, additional notice should be sent to the general public. Moreover, the time for public comment is far too short. An additional comment period should be provided to mitigate this mishap occasioned by the EPA.

While these individuals wish to voice their own comments, they incorporate by reference the comments submitted by George Thompson, PhD. and that of the Government Accountability Project. Some of the other/additional reasons supporting this comment are set forth below.

## Section VI. Civil Penalty

Para. 14 – The Consent Decree provides a civil penalty of $15 million for violations of the Clean Water Act. If this is not the maximum civil penalty the amount should be increased to the maximum. This derailment caused substantial damages to people, property, and natural resources in at least two states. Further, such a small penalty has no deterrent effect, as the Settling Defendants' (hereafter "Norfolk") annual revenue is approximately $12 billion dollars per year.

## Section VIII. Coordination and Supervision of the Work and IX Performance of the Work

The term "Work" is never clearly defined in the Consent Order. It is defined in Section IV as "all obligations of Settling Defendants under Sections VIII (Coordination and Supervision of the Work) and IX (Performance of the Work)", and in para. 30 as "The Work includes, at a minimum, all actions necessary to implement the removal actions identified in the EPA Orders." Accordingly, the Consent Decree is unclear as to what "Work" Norfolk Southern is required to complete. There should be strict parameters placed on the means, methods, staffing, time-frame, and scope of work to be performed and the supervision of such work should be by a competent independent body who monitors such "work," has enforcement power, and files comprehensive reports which are filed in Court. Ultimate court approval should be necessary.

## Section X. Post Removal Long-Term Monitoring

Para. 43 – Norfolk is required to create and submit the Post-Removal Long-Term Monitoring Plan (for monitoring of groundwater and surface water). This plan should be created by environmental experts and the enforcement agencies presently involved the aftermath of this catastrophe, certainly not by Norfolk.

Para. 43 – The Post-Removal Long-Term Monitoring Plan only provides for monitoring of groundwater and surface water for 10 years. This is an arbitrary and seemingly an inadequate period of time.

Para. 47 – Norfolk is required to submit a Private Drinking Water Well Monitoring Work Plan setting forth procedures for the PA DEP and Columbiana County Health District to manage the Private Well Fund for continuation of the Private Drinking Water Well Monitoring Program currently operating under the EPA's previous CERCLA Order for 10 years. This plan should be created by environmental experts and the enforcement agencies presently involved the aftermath of this catastrophe, certainly not by Norfolk.

Para. 47 – Norfolk is required to establish a Private Drinking Water Well Monitoring Fund of $15 million to fund the above-mentioned water well monitoring. If this money is exhausted before the 10-year period ends, then Norfolk may seek termination of this provision. Norfolk should not be permitted to request termination of water well monitoring if the $15 million is

exhausted, but should be required to fully fund the program, certainly without such a low financial limitation.

## Section XI, Community Health Program

Para. 48 – Norfolk is required to provide medical exams to Qualified Individuals for up to 20 years, and fund this with $25 million, but can seek termination of their obligations if the fund is exhausted. Norfolk should not be permitted to request termination of the medical exams if the fund is exhausted, but should be required to fully fund the program, certainly without such a low financial limitation. If any public funds are spent relating to this public benefit, Norfolk should be responsible to reimburse the government.

Para. 49 – Norfolk is required to create and submit a Community Health Program Plan. This should be created by doctors and other medical experts, not by Norfolk.

Para. 50(a) – sets out the scope of the Medical Monitoring Exams. The scope only requires a (1) routine physical examination, (2) comprehensive metabolic blood panel, (3) pulmonary function tests, (4) x-rays, and (5) additional screenings the parties agree are appropriate. The results are assessed and referred to a specialist if warranted. This is not an adequate blood panel. A comprehensive metabolic blood panel is not the ideal test to identify toxic chemicals in the blood or urine as a result of exposure to hazardous chemicals. Adequate and sufficiently frequent medical tests for toxic chemicals should be required and be readily available to "Qualified Individuals."

Para. 50(b) – defines "Qualified Individuals" (who are eligible for Medical Monitoring Exams). The definition includes first responders present at the site in February 2023, and people who reside within 2 miles of the Derailment Area, or reside within 250 feet from centerline of Leslie Run from the confluence of Sulphur Run to the confluence of Bull Run. It also permits individuals not within the definition of "Qualified Individuals" to request inclusion in Medical Monitoring. This definition is too narrow. It should include all people who reside or work within 20 miles of the Derailment Area, and the funding required should be increased.

Para. 50(c) - Qualified individuals are provided with 10 Medical Monitoring Exams during the initial 15 years. These should likely be annual exams and over a longer period of time, as to be determined by medical experts, independent from Norfolk.

Para. 51(b) - defines Qualified Individuals who are eligible for Mental Health Services. These include (1) individuals who reside or work within 2 miles of the Derailment Area, (2) individuals who reside within Columbiana County, Beaver County, or Lawrence County. This is too narrow in scope. It should include all people who reside or work within 20 miles of the Derailment Area, and the funding required should be increased.

Para. 51(c) - Norfolk only has to provide Qualified Individuals with Mental Health Services for 15 years "subject to availability of funds", and are required to budget $5.5 million for these services. This requirement should not be subject to the availability of funds, and Norfolk should be required to provide for these services for at least the full 15-year period.

Para. 55 – Norfolk is required to perform an assessment of the $25 million dollar fund and the cost of providing the Medical Monitoring Exams and Mental Health Services 14 years from the Effective Date of the Consent Decree, and submit a proposal for years 16-20, but shall not be required to provide additional funding for these purposes. This assessment should be done by the EPA or medical experts or a neutral third party, not by Norfolk. Further, Norfolk should be required to provide additional funding for these services if required.

## Section XII Rail Safety Improvements

Para. 69 - requires Norfolk to cease use of DOT-111 Tank Cars for transportation of Flammable Hazardous Materials "other than under a common carrier obligation". There should be no exception to this rule. The Consent Decree is inadequate because it does not require an increased frequency of inspections of train cars nor details the methods of such inspections.

The Consent Decree is inadequate because it does not address requiring a minimum number of Norfolk employees/agents to operate a train nor the training of such persons.

## Section XIII, Emergency Preparedness

Para. 71-81 - require Norfolk to develop and adopt procedures (Track Restoration Coordinate Procedure) to ensure adequate coordination and consultation among Norfolk, government officials, and emergency responders in case a derailment with release of hazardous materials and regarding any decision to vent and burn. As part of this, Norfolk is required to select entities to participate in a workgroup to provide input on these procedures. The Consent Decree should set out entities who are required to participate in such a workgroup, including but not limited to federal and state governmental agencies who would be involved in responding to a derailment with release of hazardous materials.

## XV, Natural Resource Damages

Para. 95-96 – Norfolk should be required to pay more than $175,000 to the United States for Natural Resource Damages to restore "the equivalent of the natural resources alleged to be injured as a result of the releases of Hazardous Substances at or from the Site…". As stated in the Consent Decree, this will only fund conservation easements to protect 20 acres of wetland habitat. The effects of the derailment and burn caused substantial damage to natural resources over a wider area than 20 acres.

I am available to supplement this public comment and to provide any clarification as may be necessary. I respectfully reserve all rights to augment this correspondence. Thank you for your courtesy and attention to this matter.

Respectfully submitted,
SHENKAN INJURY LAWYERS, LLC.

Richard Shenkan

*Attorney for*

## Automatic reply: Objection to Norfolk/DOJ Settlement

ENRD, PUBCOMMENT-EES (ENRD) <PUBCOMMENT-EES.ENRD@usdoj.gov>

Fri 8/2/2024 9:07 PM

To:rshenkan shenkanlaw.com <rshenkan@shenkanlaw.com>

Please accept this automatic reply as acknowledgment of receipt of written comments relating to this proposed Consent Decree.  Your comments will be reviewed by the attorney handling the case.  Thanks!

NS_PUBCOM_0000317

Comment A-122

| From: | Herbert, Ronda (ENRD) </O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=51964C3E62E64E9FB7C7C8230D62B187-RHERBERT> |
|---|---|
| To: | Grady, Lauren (ENRD) |
| CC: | Spector, Jeffrey (ENRD); Stewart, Geoffrey (ENRD); Rodriguez, Kaylee (ENRD) |
| Sent: | 8/6/2024 12:14:25 PM |
| Subject: | FW: Public Comments |
| Attachments: | Norfolk Federal Register republished June 14 (comment period ends August 2).pdf |

Hello Lauren,

This was sent to our public comment inbox, for DJ number 90-11-3-12792.

Thank You

Ronda Herbert

Case Management Unit
Docketing Clerk
Environmental and Natural Resource Division


**From:** Runnels, Michael <Michael.Runnels@btlaw.com>
**Sent:** Tuesday, August 6, 2024 11:49 AM
**To:** ENRD, PUBCOMMENT-EES (ENRD) <PENRD3@ENRD.USDOJ.GOV>
**Subject:** [EXTERNAL] Public Comments

Good morning,
Where would I find the Public Comments for the attached document? Any assistance would be greatly appreciated.
Thanks,

**Michael Runnels** | Litigation Docket and Court Services Coordinator
Barnes & Thornburg LLP
2121 N. Pearl Street Suite 700, Dallas, TX 75201
Direct: (214) 647-4227 | Mobile: (469) 358-3004

 

Atlanta | Boston | California | Chicago | Delaware | Indiana | Michigan | Minneapolis | Nashville | New Jersey
New York | Ohio | Philadelphia | Raleigh | Salt Lake City | South Florida | Texas | Washington, D.C.

Visit our Subscription Center to sign up for legal insights and events.


**CONFIDENTIALITY NOTICE:** This email and any attachments are for the exclusive and confidential use of the intended recipient. If you are not the intended recipient, please do not read, distribute or take action in reliance upon this message. If you have received this in error, please notify us immediately by return email and promptly delete this message and its attachments from your computer system. We do not waive attorney-client or work product privilege by the transmission of this message.

Case: 4:23-cv-00517-JRA Doc #: 162-6 Filed: 10/10/24 411 of 411. PageID #: 2956

November 2024 Pension (EA–2F) Examination will be discussed.

A determination has been made as required by section 10(d) of the Federal Advisory Committee Act, 5 U.S.C. 1009, that the portions of the meeting dealing with the discussion of questions that may appear on the Joint Board's examinations and the review of the May 2024 EA–2L and EA–1 Examinations fall within the exceptions to the open meeting requirement set forth in 5 U.S.C. 552b(c)(9)(B), and that the public interest requires that such portions be closed to public participation.

The portion of the meeting dealing with the discussion of the other topics will commence at 12 p.m. on July 11, 2024, and will continue for as long as necessary to complete the discussion, but not beyond 1 p.m. Time permitting, after the close of this discussion by Committee members, interested persons may make statements germane to this subject. Persons wishing to make oral statements should contact the Designated Federal Officer at *nhqjbea@ irs.gov* and include the written text or outline of comments they propose to make orally. Such comments will be limited to 10 minutes in length. Persons who wish to attend the public session, including those requiring special accommodations, should contact the Designated Federal Officer at *nhqjbea@ irs.gov* or (202) 317–3648 to register and obtain access instructions. Notifications of intent to make an oral statement or to attend the meeting must be submitted by July 1, 2024. In addition, any interested person may file a written statement for consideration by the Joint Board and the Advisory Committee by sending it to *nhqjbea@irs.gov.*

Dated: June 11, 2024.

**Thomas V. Curtin, Jr.,**
*Executive Director, Joint Board for the Enrollment of Actuaries.*
[FR Doc. 2024–13137 Filed 6–13–24; 8:45 am]
**BILLING CODE 4830–01–P**

## DEPARTMENT OF JUSTICE

### Notice of Lodging of Proposed Consent Decree Under the Comprehensive Environmental Response, Compensation, and Liability Act and the Clean Water Act

On May 23, 2024, the Department of Justice lodged a proposed Consent Decree with the United States District Court for the Northern District of Ohio in the lawsuit entitled *State of Ohio and United States of America* v. *Norfolk Southern Railway Company, et al.,* Case No. 4:23–cv–00517.

The proposed Consent Decree settles claims brought by the United States under sections 309 and 311 of the Clean Water Act ("CWA"), 42 U.S.C. 1311 and 1321 and sections 107 and 113 of the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), 42 U.S.C. 9607 and 9613, against Norfolk Southern Railway Company and Norfolk Southern Corporation ("Defendants") related to the February 3, 2023, train derailment in East Palestine, Ohio. The proposed Consent Decree would require Norfolk Southern: (i) to reimburse all CERCLA and CWA section 311 response costs incurred by the United States; (ii) pay a civil penalty of $15 million for violating CWA sections 301 and 311; (iii) establish a $25 million community health program for qualifying members of the public impacted by the derailment; (iv) implement an array of specified rail safety procedures; (v) develop and adopt programs for coordination of rail track restoration and vent and burn procedures; (vi) implement a $6 million local waterways remediation plan; (viii) pay $175,000 for natural resource damages; and (ix) implement compliance and future monitoring requirements in the various work plans approved under EPA's Unilateral Administrative Orders and CWA Order.

On May 30, 2024, the Department of Justice published a notice in the **Federal Register** opening a public comment period on the Consent Decree for a period of 30 days. 89 FR 46908. By this notice, the Department of Justice is extending the public comment period by an additional 35 days, through August 2, 2024. Comments should be addressed to the Assistant Attorney General, Environment and Natural Resources Division, and should refer to *State of Ohio and United States of America* v. *Norfolk Southern Railway Company, et al.,* D.J. Ref. No. 90–11–3–12792. All comments must be submitted no later than August 2, 2024. Comments may be submitted either by email or by mail:

| To submit comments: | Send them to: |
|---|---|
| By email ....... | *pubcomment-ees.enrd@ usdoj.gov.* |
| By mail ......... | Assistant Attorney General, U.S. DOJ—ENRD, P.O. Box 7611, Washington, DC 20044–7611. |

Any comments submitted in writing may be filed by the United States in whole or in part on the public court docket without notice to the commenter.

During the public comment period, the proposed Consent Decree may be examined and downloaded at this Justice Department website: *https:// www.justice.gov/enrd/consent-decrees.* If you require assistance accessing the consent decree, you may request assistance by email or by mail to the addresses provided above for submitting comments.

**Laura Thoms,**
*Assistant Section Chief, Environmental Enforcement Section, Environment and Natural Resources Division.*
[FR Doc. 2024–13065 Filed 6–13–24; 8:45 am]
**BILLING CODE 4410–15–P**

## NATIONAL ARCHIVES AND RECORDS ADMINISTRATION

**[NARA–2024–029]**

### Records Management; General Records Schedule (GRS); GRS Transmittal 35

**AGENCY:** National Archives and Records Administration (NARA).

**ACTION:** Notice of new General Records Schedule (GRS) Transmittal 35.

**SUMMARY:** NARA is issuing revisions to the General Records Schedule (GRS). The GRS provides mandatory disposition instructions for records common to several or all Federal agencies. Transmittal 35 includes only changes we have made to the GRS since we published Transmittal 34 in June 2023. All other GRS remain in effect.

**DATES:** This transmittal is effective June 14, 2024.

**ADDRESSES:** You can find all GRS schedules and FAQs at *http:// www.archives.gov/records-mgmt/ grs.html* (in Word, PDF, and CSV formats). You can download the complete current GRS, in PDF format, from the same location.

**FOR FURTHER INFORMATION CONTACT:** For more information about this notice or to obtain paper copies of the GRS, contact Eddie Germino, Regulatory and External Policy Program Manager, by email at *regulation_comments@nara.gov* or by telephone at 301.837.3758.

Writing and maintaining the GRS is the GRS Team's responsibility. This team is part of Records Management Operations in the Office of the Chief Records Officer, at NARA. You may contact NARA's GRS Team with general questions about the GRS at *GRS_Team@ nara.gov.*

Your agency's records officer may contact the NARA appraiser with whom your agency normally works for support