IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

THE STATE OF OHIO )
)
and )
)
THE UNITED STATES OF AMERICA, )
)
Plaintiffs, )
)
v. )  Civil Case No. 23-cv-517
)  Hon. John R. Adams
)
NORFOLK SOUTHERN RAILWAY )
COMPANY )
)
and )
)
NORFOLK SOUTHERN )
CORPORATION, )
)
Defendants. )
_____ )

**UNITED STATES OF AMERICA'S RESPONSE TO COMMENTS
SUBMITTED REGARDING PROPOSED CONSENT DECREE**

## TABLE OF CONTENTS

INTRODUCTION ............................................................................................................... 1

Consent Decree Section IX – Performance of the Work ............................................... 3
   Cleanup of Sulphur Run ............................................................................................ 4
   Air and Soil Assessments ......................................................................................... 6
   Agriculture and Wildlife .......................................................................................... 9
   Analysis of Chemicals Produced by Fires and Potential Exposures ...................... 12

Consent Decree Section X: Post-Removal Long-Term Monitoring ........................... 17
   Length of Monitoring .............................................................................................. 17
   Comments Specific to Private Well Monitoring ..................................................... 19
   Screening for Contaminants .................................................................................... 21

Consent Decree Section VI – Civil Penalty ................................................................ 22

Consent Decree Section XI – Community Health Program ......................................... 24
   Sufficiency of Funding ............................................................................................ 24
   Inclusion in Medical Monitoring Program ............................................................. 27
   Implementation of the Community Health Program ............................................... 30
   Content of the Medical Monitoring Exams ............................................................. 31
   Data Collection and Assessment ............................................................................ 32
   Community Facilitation Plan ................................................................................... 33
   Healthcare Treatment .............................................................................................. 34

Consent Decree Section XII – Rail Safety ................................................................. 38
   General Concerns with Section XII ......................................................................... 40
   Hot Bearing Detectors / Thermal Cameras / Train Build ....................................... 42
   DOT-111 Tank Car Provisions ............................................................................... 44
   Requirements Conflicting with Existing Regulation .............................................. 47
   Requirements Already Covered by Existing Law ................................................... 49
   Requirements on Third-Parties not a Party to the Proposed Consent Decree ........ 49

Consent Decree Section XIII – Emergency Preparedness ........................................... 51

Consent Decree Section XIV – Local Waterways Remediation Plan .......................... 54

Consent Decree Section XV – Natural Resource Damages ......................................... 54

Consent Decree Section XVIII – Force Majeure ......................................................... 57

Consent Decree Section XIX – Dispute Resolution .................................................... 57
   Dispute Resolution .................................................................................................. 58
   Force Majeure ......................................................................................................... 60

Comments Regarding Public Participation ................................................................. 62
   Community Engagement Around the Cleanup ......................................................... 62
   Public Engagement Regarding Cleanup Data ......................................................... 65
   Negotiation of the Consent Decree ......................................................................... 66
   Requests for Additional Public Engagement in the Consent Decree ...................... 67
   Comment Regarding a Possible Conflict of Interest ............................................... 69

Comment Not Directly Related to the Proposed Consent Decree ............................... 70

## INTRODUCTION

The United States lodged a proposed Consent Decree with Norfolk Southern on May 23, 2024.  Dkt. 137.  The proposed Consent Decree provides that it is subject to a period of public notice and comment for at least 30 days.  CD ¶ 173.  The United States published notice of the proposed Consent Decree in the Federal Register on May 30, 2024.  89 Fed. Reg. 46,908.  The State of Ohio submitted a request that the comment period be extended for an additional 30 days (A-105[1]), and the United States concurred.  On June 14, 2024, a supplemental notice was published in the Federal Register extending the public comment period through August 2, 2024.  89 Fed. Reg. 50,635.

During the public comment period or shortly thereafter, the United States received 123 written comments from individuals, organizations, businesses, and governmental entities.  Comments were received from many local residents, as well as individuals located as far away as Oregon (A-3) and Canada (A-14).  Some 73 of the comments followed a "form" format, some with modest personalization (*e.g.*, A-4).  Almost none of the comments addressed only a single topic, with the more wide-ranging comments including discussion on up to a dozen topics.  In this Response to Comments, the United States addresses the comments received by topic area, roughly coinciding with the sections of the Consent Decree, and references quotes from the specific commenters providing input on those areas.

A significant number of comments did not address specific provisions of the proposed Consent Decree but rather commented on aspects of the cleanup to date and coordination between EPA and the community.  The United States has responded herein to questions and

---

[1]  A complete compendium of the public comments received (anonymized for individual commenters) is attached to the *Memorandum in Support of Motion to Enter* as Appendix A.  Citations herein refer to Appendix A and the comment's position in the index to the Appendix.

issues raised in those comments.  A number of comments were also received that discussed the separate class action settlement recently entered into by Norfolk Southern.  Because that settlement is wholly separate from this action and Consent Decree, the United States has not provided a response to comments on that topic.  Instead, a summary of the class action settlement provided by Norfolk Southern is attached to the *Memorandum* as Appendix C.

Generally speaking, while the individual comments raised questions or concerns regarding specific issues, most appeared positively inclined towards the Consent Decree as a whole but sought enhancements or clarifications of their concerns.  For example, the Commonwealth of Pennsylvania, while providing some specific instances where it believed that the proposed Consent Decree did not go far enough, commended the "US DOJ for taking a meaningful step towards providing relief for individuals affected by the … derailment" and stated that it "particularly applaud[s] the rail safety provisions included in the decree addressing safety issues" (A-117).  Conversely, the American Fuel & Petrochemical Manufacturers stated that it "is supportive of elements of the Proposed CD related to environmental response and remediation" while having concerns regarding certain rail safety provisions (A-114).

Finally, the United States notes that Norfolk Southern itself received some positive comments for its past efforts.  One individual commenter stated her belief that Norfolk Southern had done a "very, very good job" and recited numerous improvements that Norfolk Southern has funded within the Village of East Palestine (A-77), noting specifically the creek cleanup, the new water filter system at the water plant, house and structure cleaning, restorations to the train depot, and the new medical facility all funded by Norfolk Southern.  *Id.*

The Columbiana County Mental Health and Recovery Services Board (CCMHRSB) likewise wrote a public comment to "acknowledge the support of the Norfolk Southern Railway

Company over the past year" – specifically that Norfolk Southern assisted in funding the purchase and renovation of a community resiliency center, now known as the East Palestine Resiliency Center (A-115). CCMHRSB noted that this center provides counseling for a variety of mental health and substance abuse issues, furnishing services to build resilience in those impacted by the derailment. *Id.* The commenter stated that they "are grateful for the assistance provided to CCHMRSB and the East Palestine Resiliency Center thus far, and we look forward to continued collaboration to sustain needed behavioral health services and support in Columbiana County." *Id.*

### Consent Decree Section IX – Performance of the Work

**While the United States did not receive comments specifically addressing the completion of the cleanup work under the proposed Consent Decree, a number of comments were submitted touching on the cleanup and environmental monitoring conducted to date, including issues relating to the cleanup of Sulphur Run, how air and soil assessments were conducted, and their findings regarding various contaminants, and how derailment-associated contaminants may have impacted agriculture and wildlife.**

The ongoing removal actions represent a whole of government approach to a complex, nationally significant, and high-profile incident. Declaration of Ralph Dollhopf, *Memorandum* Exhibit 1, at ¶ 55. EPA, along with other federal, state, and local governments, deployed hundreds of highly skilled scientists, public health experts, and staff from across the nation to ensure a comprehensive and coordinated response. *Id.* EPA has directed Norfolk Southern to engage in a robust, data-driven response, evaluation, and cleanup of the Site. *Id.* The cleanups performed under the CERCLA and CWA orders have utilized conservative, protective standards to help ensure that there will not be a need for future cleanups and further disruption to the community. *Id.*

*Cleanup of Sulphur Run*

Several comments were received that expressed concerns regarding the cleanup of Sulphur Run.  EPA's and Ohio EPA's review of the surface water samples collected under the CERCLA *Surface Water Sampling and Analysis Plan* preliminarily indicated that stream cleanup work under the CERCLA Order was effective at removing CERCLA hazardous substances. Dollhopf. Decl. at ¶ 44.  However, visual observation of surface water, as well as sampling conducted under the *Sulphur Run Characterization Work Plan* and *Leslie Run and Downstream Creeks Characterization Work Plan*, indicated that there was contamination in the sediment caused by the derailment, which became visible as oil sheen on the surface of the streams when sediments were disturbed.  *Id*.  EPA subsequently issued the CWA Order which required a more comprehensive assessment and removal of derailment-related oil and CWA hazardous substances in Sulphur Run and Leslie Run.  This process involved agitating sediment and then cleaning areas where oil sheens were generated in the streambeds and banks along Sulphur Run and the portions of Leslie Run where oil sheens were observed.

One commenter asked, "why only sheen?" (A-19) and another suggested the need to "ensure that the banks are also cleaned, as the water rises with rain events, water being rerouted back into the creeks since the derailment, and aerators also blew contamination into the banks when they were operating" (A-34).  EPA's CWA Order addresses sheen because oil sheen was observed when sediment was disturbed.  Dollhopf. Decl. at ¶ 45.  EPA will not determine that the removal action is complete until it ensures that oil and CWA hazardous substances discharged from the derailment no longer present a risk to public health or welfare.  Dollhopf. Decl. at ¶ 50.

4

Portions of Sulphur Run flow underground or are culverted as they pass through East

Palestine.  Comment A-19 asked:

> [H]ow can portions of Sulphur Run that go under Taggart Street, cross James
> Street, continue under T&M parking lot and continue underground past a realty
> office, Subway, Doyle's meat market, empty storefront, BAJA Management,
> Andrew Patton DMD office until it reaches open stream after crossing under
> Liberty Street be cleaned of hazardous substances and sediment be removed?  The
> area is underground and too small for a human to check and verify it has been
> cleaned.

Similarly, Comment A-34 stated that "[community members and independent researchers] . . .

have shown that environmental screening levels are being exceeded and as of the 20th of

November 2023 in an area in Sulphur Run that runs under people's homes not only exceeds

environmental screening levels, but also nearly exceeds human health screening levels."

Pursuant to EPA's CWA Order, Norfolk Southern was required to clean the culverted

portions of Sulphur Run.  Dollhopf Decl. at ¶¶ 45-46.  The cleanup addressed five culverts

ranging from a length of 150 feet to approximately 800 feet long.  *Id*. at ¶ 47.  Norfolk Southern,

under EPA's direction and oversight, completed the initial cleanup of Sulphur Run, including the

culverts, in June 2024.  *Id.* at ¶ 48.  Each culvert was initially investigated remotely utilizing

drone and robotic technologies to access hard to reach areas, identify potential health and safety

hazards, and evaluate the integrity of the culverts.  *Id*. at ¶ 47.  Culverts then were cleaned by

removal of sediments or removal of oil sheen produced from sediment agitation.  *Id*.

Norfolk Southern has completed a subsequent reassessment of both streams under the

Clean Water Act Order, and the results indicate that the efforts described above were effective in

the sediment areas that were targeted for cleanup work.  *Id*. at ¶ 49.  However, EPA is requiring

Norfolk Southern to conduct additional reassessments in 2024 and 2025 to ensure that any

needed cleanup is addressed.  *Id*.  EPA will continue to evaluate response activity and data

relating to previous assessments and reassessments and will require Norfolk Southern to continue cleanup work in the stream channels and bank areas along the impacted streams until the Clean Water Act removal action is complete.  *Id.*

*Air and Soil Assessments*

Two commenters expressed concerns about the scope of the testing and assessment performed to date, including concerns about contamination present in air, soil, and drinking water wells.  One stated that EPA has failed to provide "any accurate residential air or soil assessments" (A-79).  That commenter requested that the proposed Consent Decree include a program or cost analysis for a minimum of 20 years of assessment of residential air quality and soil on a semi-annual or annual basis.  *Id.*  Another commenter said that "[w]e have repeatedly requested well testing and air quality assessments, only to be informed that our residence falls outside the immediate testing zone.  Despite being 2.06 miles from the incident, the visible effects within our home indicate a need for comprehensive evaluation" (A-64).[2]  As discussed below, given the results from testing to date and the continued testing that is ongoing until all removal actions are completed, there is no sound scientific basis for an additional 20 years of residential air or soil sampling, beyond what is provided for in the Consent Decree.  Residential well testing is discussed below at pages 19-22.

Air assessments have been conducted by EPA and Norfolk Southern since early February 2023.  *See* Dollhopf Decl. at ¶ 11.  Within the first 24 hours after the derailment, EPA On-Scene Coordinators arrived to assess the incident, and they deployed air monitoring instruments in various locations surrounding the train fire.  *Id.*  Additional air monitoring technologies were

---

[2]  A third commenter also stated that air was not initially being monitored at the school where they worked and that they and certain students experienced health symptoms (A-24).  The commenter noted however that EPA started monitoring in the area of the school after they notified EPA of the potential issue.

deployed in and around East Palestine during the following days and weeks, and air monitoring continued to occur at the derailment area and in the community 24 hours per day, 7 days per week through the completion of the major soil excavation work in fall 2023. *Id*.

Since then, air sampling and monitoring have continued in targeted locations where invasive work (i.e., soil excavation or loading or sediment removal) is being performed. *Id*. The air monitoring network has included stationary and mobile air monitoring instruments that provide continuous real-time measurements of air contamination. *Id*. at ¶ 41. Deployments of air canisters, sorbent tubes, and adsorbent badges to collect air samples, which are then sent to a laboratory for analysis, have also been important cornerstones of the rigorous air science program EPA has required to ensure protection of public health and worker safety throughout this response and cleanup. *Id*.

A map of the roaming air monitoring occurring in and around East Palestine in early February 2023 is attached as Dollhopf Declaration Exhibit B, and maps of the air monitoring and sampling locations that were operating in East Palestine as of April 2023 are attached as Dollhopf Declaration Exhibit C. The over 115 million air measurements taken to date demonstrate that there is no ongoing exposure to the community from contaminants released by the derailment, vent-and-burn, or subsequent cleanup. Dollhopf Decl. at ¶ 42. Since the evacuation order was lifted on February 8, 2023, there have not been any sustained exceedances in community air above established screening levels for the derailment contaminants of concern, vinyl chloride and butyl acrylate. *Id.*

Some residents have expressed concern about current indoor air quality. With regard to contaminants infiltrating home from outdoor air, the air monitoring and sampling data mentioned above show that there are no ongoing exposures to contamination released from the derailment,

vent-and-burn, or cleanup work in outdoor air.  Under such conditions, no such contaminants appear available to migrate indoors from outdoor air.  *Id*. at ¶ 43.

With respect to concerns from community members regarding the possible migration of volatile organic compounds from soil/groundwater at the derailment area into the air inside homes – something known as vapor intrusion – source removal has mitigated any such risk.  Over 193,000 tons of contaminated soil has been removed from the site.  *Id*.  This source removal significantly decreases the possibility of volatile organic compounds migrating from the soil or groundwater into peoples' homes.  *Id*.  EPA also continues to evaluate potential vapor intrusion pathways within industrial areas closest to the derailment area as part of its final confirmation sampling program and will continue to ensure that all necessary cleanup activities are done to eliminate threats to human health and the environment from the derailment contamination.  *Id*.  Under Consent Decree Paragraph 39, Norfolk Southern is required to continue to conduct air monitoring at the Site while cleanup activities are ongoing, until EPA makes a finding that no further removal action is required.

Commenter A-79 also stated that "[m]y family opted to obtain summa canister testing for our indoor and outdoor air, which revealed a presence of vinyl chloride on our outdoor back deck and a high level of acrolein inside our home on multiple floors."  Through its conversations with community members, EPA has been made aware of many concerns regarding hazardous substances based on third-party testing.  Declaration of Mark Durno, *Memorandum* Exhibit 2, at ¶ 25.  In each case, EPA has reviewed the information and provided feedback and follow-up as necessary.  *Id*.  Through this process, EPA has not encountered any data that indicates that chemicals released by the derailment, vent-and-burn, or subsequent cleanup are present at unsafe levels in the community away from the derailment area.  *Id*.  In the example provided, EPA met

8

with the family who had independent air sampling conducted, reviewed their data and report, and determined that the chemicals detected were not derailment related.  *Id.*

Regarding soil data, off-site soil sampling was conducted in accordance with the Phase I – Preliminary Residential/Commercial/Agricultural Soil Sampling Plan ("Phase I Soil Sampling Plan") which involved collecting off-site soil samples at various properties in and around East Palestine for dioxins and semi-volatile organic compounds to determine whether there was evidence of impact by these chemical compounds as a result of soot and ash from the derailment fires and the February 6, 2023, vent-and-burn.  Dollhopf Decl. at ¶ 31.  This sampling is discussed further below (see "Agriculture and Wildlife" section) but based on their review of this soil sampling data, EPA's scientists concluded that there was no discernable soil contamination caused by the derailment at the locations tested.  *Id.* at ¶ 33.[3]

*Agriculture and Wildlife*

Several public comments relayed concerns regarding the safety of commercial crops, home gardens, and wildlife after the vent-and-burn:

> Residents eat wild game regularly, and it is a giant part of the yearly diet.  The deer, ducks, squirrel and other animals I subsist from are drinking the poison that washed down North Fork of Beaver Creek, adjacent to Camp Creek . . .  Small farmers are out of business.  No one wants to share a honey extractor with anyone near East Palestine. . . .  The EPA falsely claimed in 2023 that gardening was safe.  We find with Chemical Engineer Smith and the [NAME REDACTED]'s garlic that vegetables are not safe.  (A-104).

> Among the most heartbreaking consequences of this tragic event was the loss of wildlife in the area.  One must assume the deaths they suffered were extraordinarily confusing and painful.  (A-46).

> The apples on my apple trees were all totally black that year, the deer wouldn't even eat them.  (A-18).

---

[3] The report and corresponding validated data can be found on EPA's website at https://www.epa.gov/east-palestine-oh-train-derailment/phase-one-residential-commercial-and-agricultural-soil-sampling.

Separately, three public comments expressed concerns regarding the deposition of dioxins in the community following the vent-and-burn.  One commenter stated that "dioxins continue to maintain a presence in the surrounding areas, over a year later" (A-79).  Dr. George Thompson made several mentions of dioxins, claiming that "[i]ndependent chemical sampling has revealed 'forever' dioxin chemicals in homegrown garlic and home heating furnace filter wipe samples" (A-104).  *See also* Government Accountability Project (A-123).

In March and April 2023, under the Phase I Soil Sampling Plan, Norfolk Southern and EPA collected and analyzed soil samples at 121 locations within the one-mile by two-mile evacuation area, as well as an extended one-mile area extending to the southeast of the Site in Pennsylvania.  Dollhopf Decl. at ¶ 31.  Twenty-five additional locations were sampled to determine the range of normal "background" levels of contamination for soils in the area.  *Id*.  A map showing the locations of the properties sampled under the Phase I Soil Sampling Plan is attached as Dollhopf Decl. Exhibit A.  The sampled properties included homes, parks, schools, farms, and commercial/industrial properties, as well as a home garden just across from the derailment area and the farm closest to the derailment area.  *Id*. at ¶ 32.  The sampling area was larger than the area originally proposed by Norfolk Southern and was informed by an event reconstruction plume map generated at EPA's request by the Interagency Modeling and Atmospheric Assessment Center, a federal interagency partnership led by the Federal Emergency Management Agency (FEMA), which used meteorological and other modeling inputs to estimate the vent-and-burn smoke plume area and the concentrations of soot that may have deposited in the plume area.  *Id*.

Two soil samples were collected at each location: one from the top inch of soil (to test for more recent contamination) and the other from 1 to 6 inches below the surface (to test for older

contamination). *Id.* at ¶ 33. For nearly all locations, including the home garden and farm closest to the derailment area, results of the Phase I Soil Sampling Plan showed levels of dioxins and semi-volatile organic compounds (SVOCs) within typical background ranges for the area. *Id.* The only exceptions were a handful of outlier data points associated with commercial and industrial properties, as well as properties next to roadways, areas expected to have increased concentrations of these chemicals because the combustion of fuel (oil, diesel, leaded gas) is a source of dioxin production. *Id.* Based on their review of this soil sampling data, EPA's scientists concluded that there was no discernable soil contamination caused by the derailment at the 121 locations tested.[4] *Id.*

EPA's findings are consistent with similar findings made by Ohio and Pennsylvania after they tested crops in the area for derailment-related contamination. *Id.* at 34. In the spring of 2023, the Ohio Department of Agriculture and the Ohio State University College of Food, Agriculture, and Environmental Sciences collected 31 plant tissue samples from agricultural areas within a 5-mile radius of the derailment area and analyzed them for 26 different SVOCs associated with the derailment. *Id.* According to the State of Ohio, the Ohio State University's analysis of samples "did not find reportable levels of SVOCs in the inner [within 1-3 miles of the derailment area] or background radius [within 3-5 miles of the derailment area] zones attributable to the train derailment." *See* Ohio Emergency Management Authority, East Palestine Train Derailment: Testing & Results, https://ema.ohio.gov/media-publications/east-palestine-derailment-info/testing-results. The State of Ohio stated that this analysis "shows plant materials

---

[4] *See* EPA, *Phase One Residential, Commercial, and Agricultural Soil Sampling Results*, https://www.epa.gov/east-palestine-oh-train-derailment/phase-one-residential-commercial-and-agricultural-soil-sampling; *see also* EPA, *Summary of Phase 1 Dioxin Results for the East Palestine Derailment Incident*, available at: https://www.epa.gov/system/files/documents/2023-10/phase-1-soil-sampling-technical-memo-20230914pdf.pdf

from agricultural sites in the East Palestine area are not contaminated with semi-volatile organic compounds (SVOCs) associated with the train derailment."[5]  *Id.*

According to the Commonwealth of Pennsylvania, the Pennsylvania Department of Agriculture took tissue samples from triticale, grass, hay, spelts, garlic, and blueberry bushes in Beaver and Washington counties to determine levels of 26 SVOCs present and similarly "found no compounds present above reportable limits for that substance."  *See* Shapiro Administration Releases Results of Crop Samples Showing No Contamination on PA Farms Near Norfolk Southern Train Derailment (June 27, 2023), https://www.media.pa.gov/Pages/ Agriculture_details.aspx?newsid=1324.  Pennsylvania Agriculture Secretary Russel Redding stated that these samples "give additional reassurance that contamination from the derailment has not spread into crops grown in the region."  *Id.*

With respect to concerns regarding the derailment's impact on wildlife, immediately after the derailment there were acute impacts to aquatic life when spilled material discharged into the local streams.  EPA, however, is not aware of any evidence that links the derailment to deaths of non-aquatic species.  Dollhopf Decl. at ¶ 14.

<u>Analysis of Chemicals Produced by Fires and Potential Exposures</u>

Dr. George Thompson, who identifies himself as a toxicologist, submitted a comment discussing his views on chemicals produced by the derailment fires and vent-and-burn and potential exposures.  He says that the "20-mile exposure radius" is not supported by the known

---

[5] *See* Ohio Dept. of Agriculture & Ohio State University, Agricultural Plant Tissue Sampling Results, East Palestine, Ohio, Columbiana County, at 5-6 (May 16, 2023) (hereinafter, "Ohio Plant Sampling Results"), available at https://content.govdelivery.com/attachments/OHIOGOVERNOR/2023/05/16/file_attachments/2499518/East%20Palestine%20Plant%20Tissue%20Sampling%20Results%20for%20ODA%20-%202023-05-15%20%282%29.pdf; Ohio Emergency Management Authority, East Palestine Train Derailment: Testing & Results, https://ema.ohio.gov/media-publications/east-palestine-derailment-info/testing-results.

science and that persons over a 126,000 square mile area were exposed to harmful levels of chemicals from the derailment, resulting in latent disease risk.  Dr. Thompson suggests a requirement to "notify the potentially affected public, as well as state and federal agencies, in the vast extent of the pollution dispersion, miles beyond East Palestine," and require testing and research in "the much more extensive exposure zone" (A-104).

It is unclear, however, if Dr. Thompson is referring to the proposed Consent Decree in this matter or the class action settlement (described in Appendix C).  For instance, none of the relief in the proposed Consent Decree involves a 20-mile radius and none of the EPA-approved cleanup plans use a 20-mile radius.  Additionally, Dr. Thompson refers to an "expert statement," but there have been no expert reports or disclosures in this case.  His comment asserts numerous facts without citation and the source of his information is unclear.  Although it is uncertain whether his concerns relate to this Consent Decree or the class action settlement, because he sent a public comment, we address them here.

Dr. Thompson describes a 126,000 square mile area based on NOAA HYSPLIT (National Oceanic and Atmospheric Administration Hybrid Single-Particle Lagrangian Integrated Trajectory) air dispersion modeling and alleges that millions of people in this area were probably exposed to chemicals from the fires during or after the derailment.  He discusses several instances of persons in East Palestine as well as in Canada experiencing illnesses.  For example, he references an "internet report" from a family near Niagara Falls, Canada experiencing headaches and respiratory symptoms.  Dr. Thompson analogizes the East Palestine derailment to the September 11 terrorist attacks on New York, noting that persons present at the attacks experienced latent symptoms.

- Dr. Thompson's Assessment of Chemicals Potentially Created by the Derailment Rests on Faulty Assumptions

Dr. Thompson's statements rest on the assumption that "hundreds of highly toxic chemicals were created and released simultaneously by the incomplete combustion and fire plume that then dispersed, not just into 20 miles surrounding the East Palestine community, but across the thousands of square miles in eight states and southern Canada" (A-104).  Figure 1 and Table 2 of his comment show the chemicals he says were released from the fire.  However, much of what is listed in his Table 2 are large classifications of chemicals such as "aldehydes" and "ketones" rather than specific chemicals.  Declaration of Constance Senior, *Memorandum Exhibit 3*, at ¶ 8.

Any assessment of the danger posed by air emissions from fires such as the ones following the East Palestine derailment must address the following critical elements: (a) what harmful products of incomplete combustion were actually formed; and (b) what were the concentrations of the harmful products.  *Id*.  The chemical reactions that occurred within the confined areas of the rail cars and in the open areas associated with the pool fires were a combination of pyrolysis (chemical decomposition when organic materials are heated in the absence of oxygen) and oxidative combustion (when the materials chemically react with oxygen in the air, releasing heat and light).  *Id*. at ¶ 12.  Complete combustion forms a known set of products; incomplete combustion produces a wider range of products that depends on temperature, oxygen availability, and other variables.  *Id*. at ¶ 13.  Under the conditions that were present during burning of the contents of rail cars in East Palestine, pyrolysis and incomplete combustion make it difficult to know specifically what chemical compounds were actually

released into the air and at what concentrations.  *Id.* at ¶ 16.  Therefore, it is not reasonable to assume that all chemicals that could possibly have formed were in fact formed.[6]  *Id.* at ¶ 7.

The best source of information as to what chemicals were created is real-time air monitoring.  *Id.* at ¶ 16.  During the vent-and-burn, EPA conducted air monitoring both within and outside the evacuation zone.  *See* Dollhopf Decl. at ¶ 15.  EPA's air monitors did not detect exceedances of contaminants of concern above established screening levels outside the evacuation zone during the vent-and-burn, although the air monitors did detect particulate matter exceedances.  The products of the fires mixed with air, which diluted their concentrations in the air downwind of the derailment.  Senior Decl. at ¶ 19.  The farther downwind the distance, the greater the degree of dilution.  *Id.*

- Plume Dispersion Modeling Does Not Support the Conclusion That There Were Harmful Concentrations of Pollutants Over a 165,000 Square Mile Area

Dr. Thompson's comment references "independent" NOAA HYSPLIT modeling. NOAA HYSPLIT modeling is used to model the dispersion or trajectory of a pollutant.  *Id.* at ¶¶ 19, 21.  Dr. Thompson does not say whether he performed this modeling himself or who performed the modeling or provide any data from it.  David Gay and colleagues recently published work using NOAA HYSPLIT modeling of the East Palestine derailment pollution dispersion from February 3 to February 8, 2023.  *See* David A. Gay et al., *Widespread Impacts to Precipitation of the East Palestine Ohio Train Accident*, Environmental Research Letters, 2024, 19:074022.  This comment response will assume that Dr. Thompson is referring to that work.

---

[6] Dr. Thompson's comment also assumes that the full load of each car burned.  In fact, not every derailed tank car spilled its entire load (*see* NTSB Norfolk Southern Railway Derailment and Hazardous Materials Release, RIR-24-05, Section 1.7) and a significant amount of what spilled went into the soil at the Site and the local waterways.  Senior Decl. at ¶ 10.  This difference in the amount of material burned would impact the amount and number of chemical byproducts formed.  *Id.* at ¶ 11.

15

Gay *et al.* correlate elevated chloride levels and elevated pH levels in precipitation samples taken under the National Atmospheric Deposition Program during the same time period, over a similar geographical region predicted from NOAA HYSPLIT modeling.  *See generally* Gay *et al*., *supra*.  The authors inferred that the historically high chloride and pH levels seen were likely a result of the vinyl chloride monomer vent-and-burn and other chemicals burned in the derailment.  *See id*.  It should be noted that only trajectories were modeled, and chemical reactions were not included in the model runs.  *See id*.  If Gay *et al*. are correct, their research only provides evidence that emitted chemicals from the burn could have been transported over a large area.  Senior Decl. at ¶ 22.  It does not, however, provide information on concentrations of chemicals in the air.  *Id*.  As mentioned above, the concentration of a chemical is key to assessing risk of harm.  *Id*. at ¶ 9.  This research does not provide a reasonable basis for the conclusions drawn by Dr. Thompson.  *Id*. at ¶ 22.

In summary, Dr. Thompson's comment relies on assumptions that are not supported by data.  His comment unreasonably assumes that every possible chemical byproduct that could have been formed was in fact formed, that every chemical byproduct that was formed spread over 165,000 sq. miles, and that every chemical byproduct that was formed then persisted at levels that are harmful.  *See id*. at ¶ 7.  These conclusions are not supported by data. Dr. Thompson presents some anecdotal evidence of health effects, but his assumptions of chemical creation and concentration, so as to draw conclusions about exposures, are not supported by monitoring data.  Requiring notification, testing, and research for the population across a significant section of the United States is not justified by any data seen to date.

## Consent Decree Section X: Post-Removal Long-Term Monitoring

**Various comments were received regarding the post-removal long-term monitoring provisions for groundwater, surface water, and private drinking well water, including comments regarding the length of the proposed monitoring, what contaminants would be screened for, and who would be eligible for the private drinking well water monitoring.**

Section X of the proposed Consent Decree requires long-term monitoring following completion of the CERCLA and CWA removal actions at the Site.  After EPA determines in accordance with Consent Decree Paragraphs 39 and 40 that Norfolk Southern has fully performed the removal actions and that no further cleanup under the removal action is required, Norfolk Southern will commence long-term monitoring.  CD ¶ 43.  This long-term post-removal monitoring will include groundwater monitoring for 10 years, surface water monitoring for 10 years, and private drinking water well monitoring for up to 10 years.  CD ¶¶ 43, 47.  The ongoing cleanup actions require Norfolk Southern to remove and mitigate derailment-related contamination that poses a threat to human health and the environment, and the long-term monitoring provisions are meant to give additional confidence to the community.

*Length of Monitoring*

Several public comments received expressed concern about the length of monitoring:

> Increase groundwater, surface water, and well water testing from 10 years to 25 years, to be more in line with Superfund site cleanups.  The EPA responded to this disaster with their Superfund SMART response team, assigned the derailment site a Superfund number, and yet the derailment site is not being treated as a Superfund site.  (*e.g.*, A-103 [form comment]).

> The Post-Removal Long-Term Monitoring Plan only provides for monitoring of groundwater and surface water for 10 years.  This is an arbitrary and seemingly an inadequate period of time.  …  Norfolk is required to establish a Private Drinking Water Well Monitoring Fund of $15 million to fund the above-mentioned water well monitoring.  If this money is exhausted before the 10-year period ends, then Norfolk may seek termination of this provision.  Norfolk should not be permitted to request termination of water well monitoring if the $15 million is exhausted, but should be required to fully fund the program, certainly without such a low financial limitation.  Shenkan Injury Lawyers (A-121).

17

> The Private drinking water well monitoring as described in the settlement (page 29, section 47) is underfunded at $15 Million and lacks the length of time necessary to adequately monitor ground water to the satisfaction of the impacted community.  Consideration for funding the program at $30 Million for a minimum of 20 years is requested.  Columbiana County Health District (A-113).

> Is there a study that shows ten years is sufficient or was this arbitrary?  (A-79).

CERCLA cleanups can be as short as a few days or as long as a few decades.  This is because each cleanup is different.  In general, "remedial actions" are long-term cleanups, while "removal actions" can require immediate cleanup of hazardous substances.  In East Palestine, EPA ordered Norfolk Southern to perform a CERCLA removal action to immediately clean up the hazardous substances at the site.[7]  Commenters' proposal for 25 years of long-term monitoring, however, appears to be drawn from long-term remedial actions.

Although it is EPA's intent to require Norfolk Southern to remove and mitigate derailment related contamination that poses a threat to human health and the environment, long-term monitoring provisions have also been included to give additional confidence to the community.  Dollhopf Decl. at ¶ 53-54.  It is atypical to have long-term environmental monitoring for this amount of time following a removal action that addresses the source of the contamination.  *Id*.  In light of ongoing concerns raised by the community, however, the United States negotiated the inclusion of 10 years of additional long-term monitoring in this settlement.  There is no sound scientific basis, however, to require monitoring for 25 years as requested by certain commenters.

---

[7]  Later in the year, EPA also ordered Norfolk Southern under Clean Water Act authority to remove oil and hazardous substances from the impacted waterways.

In addition to long-term monitoring of groundwater and surface water, the proposed

Consent Decree also extends the ongoing private drinking water well monitoring program for up

to an additional 10 years.  Limiting the funding for the Drinking Water Well Monitoring

Program to $15 million was necessary for Norfolk Southern to agree on including the program in

the proposed Consent Decree.  Finally, and most importantly, if contamination is found at

actionable levels at any time during any of the long-term post-removal monitoring, Norfolk

Southern will be required to address the contamination.  CD ¶ 44.

*Comments Specific to Private Well Monitoring*

Monitoring of private wells is currently available to eligible households on a voluntary

basis.  Dollhopf. Decl. at ¶ 37.  The monitoring program began in February 2023 and since that

time analysis of sampling has not detected contamination attributable to the derailment.  *Id*.

Under the proposed Consent Decree, Norfolk Southern would establish a Private Drinking Water

Well Monitoring Fund of $15 million in order to continue that program for up to 10 years.  CD ¶

47.

Several commenters requested clarification of eligibility for the Private Well program:

Who will have access to well monitoring.  Will it be done by mile radius, zip
code, etc.  (A-79).

Understand my concerns because I spoke to DEP people at the Township
building that some homes in the Borough have hand dug wells & that unlike
the Township, most wells are less than 44' deep!!!!  I feel our wells need to be
tested.  I know of none tested in the Borough.  (A-29).

I can testify to this myself, as I had gone to the EPA about four times, at least,
asking for them to test my well or soil and they would not; however, they did
have their contractor doing testing at my neighbor's farm that is another mile
away from the derailment site than I am.  (A-34).

We have repeatedly requested well testing and air quality assessments, only to
be informed that our residence falls outside the immediate testing zone.

19

Despite being 2.06 miles from the incident, the visible effects within our home indicate a need for comprehensive evaluation.  (A-64).

Clarification of "participating" in the sampling program settlement language below is needed.  There are about 240 homes listed in the potable water sampling program that have been sampled at least once since February of 2023, but not all of these homes are currently "participating" by having their wells sampled every 45 to 60 days.  There are currently about 120 homes actively participating and our concern is that this language could be interpreted to make the sampling for 10 years only available to 120 homes and not 240. . . .  Residents located in the UAO priority zones need to be specifically identified in the settlement as remaining eligible for private drinking water well sampling.  Columbiana County Health District (A-113).

The designation of households eligible for private well testing was based on an initial well testing program established in coordination with EPA, Ohio EPA, the Ohio Department of Health, Columbiana County, and the Pennsylvania Department of Environmental Protection in February 2023, which was then later expanded to include additional private well sampling, as more information about surface water and groundwater was collected and analyzed under the CERCLA Order.  Dollhopf Decl. at ¶ 37.  To date, no contamination attributable to the derailment has been observed through monitoring of these private wells.  *Id.*

Households "participating" in the Private Well Program include all households that have registered for the program at some point, even if they are no longer having their well monitored.  Households that were previously monitoring under the program but have stopped are included in the additional 10 years if they so desire.  EPA must approve the Private Drinking Water Well Monitoring Work Plan and, it is EPA's intent to require that such households are eligible.  *Id.* at ¶ 38.

One commenter asked about how the Private Drinking Water Well Monitoring Work Plan would be drafted:

Norfolk is required to submit a Private Drinking Water Well Monitoring Work Plan setting forth procedures for the PA DEP and Columbiana County

> Health District to manage the Private Well Fund for continuation of the
> Private Drinking Water Well Monitoring Program currently operating under
> the EPA's previous CERCLA Order for 10 years.  This plan should be created
> by environmental experts and the enforcement agencies presently involved the
> aftermath of this catastrophe, certainly not by Norfolk.  Shenkan Injury
> Lawyers (A-121).

The standard practice under response orders and Consent Decrees where a responsible party is

performing the cleanup work is for that party to propose a plan for the United States' review and

approval.  *See* Dollhopf Decl. at ¶ 19.  To date, Norfolk Southern has hired environmental

experts to produce the plans it has submitted to EPA for review and approval.  *Id*.  Details of this

process are found at Paragraphs 19-25 of the Consent Decree.  After submission of the proposed

plan, the United States will either (a) approve the submission; (b) approve the submission upon

specified conditions or modifications; (c) approve part of the submission and disapprove the

remainder; or (d) disapprove the submission.  CD ¶ 19.  Paragraphs 20-22 provide additional

details as to the process that takes place for any submissions that are approved upon specified

conditions or modification or disapproved in whole or in part.  Past practice has found this

procedure to be effective by both integrating the performing party into the planning process to

facilitate smooth implementation of the work, while retaining review and revision authority for

EPA.  Dollhopf Decl. at ¶ 19.  While Norfolk Southern will generate the initial draft, the United

States will not approve plans that are deficient.  *Id*.

*Screening for Contaminants*

Comment A-79 asked: "Is there a plan for if/when groundwater shows contamination?  Is

there a list of all contaminants you are testing for and at what levels?"  Monitoring under

Section X of the Consent Decree will be for "Derailment-Associated Materials," defined as

"substances released from Norfolk Southern Train 32N at the Site and substances produced as a

result of the mixing, burning, or degradation of substances released at the Site, including through

performance of the Vent and Burn." CD ¶ 7. The Post-Removal Long-Term Monitoring Plan required by Paragraph 43 will include a proposed list of constituents and screening levels and requires EPA approval. As discussed above, if after the removal actions are completed, contamination is found at actionable levels during the 10 years, Norfolk Southern will be required to address the contamination.

**Consent Decree Section VI – Civil Penalty**

**The United States received public comments regarding the sufficiency of the $15 million civil penalty in the proposed Consent Decree.**

The proposed Consent Decree requires Norfolk Southern to pay a $15 million civil penalty to address violations of Clean Water Act Section 301 and Section 311. The $15 million penalty likely reflects the approximate maximum civil penalty that could be obtained at trial. Section 301 provides for a statutory maximum of $64,618 per day of violation. 33 U.S.C. § 1319(g)(2)(A) and 40 C.F.R. § 19.4. A day of violation is each day there was a discharge of pollutants to the waters of the United States, not in compliance with an applicable permit. Here, there is direct evidence of releases of pollutants to the waterways for only the five days following the derailment. Subsequently, occasional seeps of contaminants that potentially pose a threat of further contamination to the waterways were identified. The penalty amount was calculated by assessing the statutory maximum to a set number of days where the evidence was strongest, while applying a penalty amount below the statutory maximum for a longer period where evidence of discharge was circumstantial, and thus subject to greater litigation risk.

CWA Section 311 provides for a statutory maximum penalty of $2,304 per barrel of oil discharged. 33 U.S.C. § 1321(b)(7)(A) and 40 C.F.R. § 19.4. In calculating the penalty under Section 311, the United States included the full contents of the four tank cars that released oil, for a total of 1,980 barrels. Although the penalty only applies to oil discharged and not oil

recovered from the tank cars, the United States did not discount its penalty demand to address any such amounts as that figure remained uncertain when negotiations commenced. The $15 million penalty conservatively captures the total amount of days in which there were discharges to waterways and the full amount of oil emptied from the four tank cars.

Certain individuals and organizations provided public comments asserting their view that $15 million is too small of a civil penalty to serve as an effective deterrent for future violations of the Clean Water Act:

> A $15 million penalty imposed on Norfolk Southern for violating the Clean Water Act is radically insufficient to prevent another such disaster from taking place. It is no more than the relatively minor cost of doing business for a corporation which is now making enormous profits. (A-25).

> The Consent Decree provides a civil penalty of $15 million for violations of the Clean Water Act. If this is not the maximum civil penalty the amount should be increased to the maximum. … Further, such a small penalty has no deterrent effect, as the Settling Defendants' … annual revenue is approximately $12 billion dollars per year. Shenkan Injury Lawyers (A-121).

> [T]he $15 million civil penalty for violating the Clean Water Act is insufficient to address the extensive damage to local waterways, due to the unauthorized discharge of pollutants and hazardous substances to U.S. waters including East Palestine creeks Sulphur and Leslie Runs, Little Beaver Creek, and downstream impacts on the Ohio River and groundwater in the region. These waterways continue to show evidence of continued contamination to the present. Therefore, the settlement must impose stricter penalties and comprehensive remediation measures. Government Accountability Project (A-123).

The United States understands that commenters are concerned that the penalty in this matter have a deterrent effect. Deterrence of future violations is also a concern of the United States. That is why this settlement penalizes Norfolk Southern with what can be described as the maximum civil penalty available under the Clean Water Act. The $15 million civil penalty obtained through the Consent Decree includes the maximum number of days of discharge of a pollutant resulting from the derailment and captures the penalty amount for the full contents of the four

23

tank cars that were released.  The proposed Consent Decree captures the full scope of deterrence available under the Clean Water Act for the violations in the Complaint.

## <u>Consent Decree Section XI – Community Health Program</u>

**The United States received numerous public comments regarding the breadth, content, and implementation of the Community Health Program.**

<u>*Sufficiency of Funding*</u>

The proposed Consent Decree provides for implementation of a $25 million Community Health Program in Section XI.  The Community Health Program consists of three components: a medical monitoring program (CD ¶ 50); provision of mental health services (CD ¶ 51); and a community facilitation plan (CD ¶¶ 52-53).  Norfolk Southern has already placed $25 million in a dedicated interest-bearing account pursuant to Paragraph 48.  Pursuant to the Consent Decree, the three elements of the Community Health Program are set to have the following budgets for the initial 15 years of the program: (a) medical monitoring - $14 million; (b) mental health - $5.5 million; and (c) community facilitation - $500,000.  Pursuant to Paragraph 55, a financial assessment will be conducted in year 14 of the program to allocate remaining funds among the program elements and determine the scope of benefits to be provided during years 16-20 of the program.

A number of comments were received regarding the sufficiency of the $25 million funding for the Community Health Program and concerns were raised about the program ending before 20 years if funding is exhausted.  Comments questioning whether $25 million is adequate included general statements from governmental entities such as the Columbiana County Health Department ("underfunded at $25 million") (A-113), the Village of East Palestine ("[money] allocated for medical monitoring and mental health services may only sustain the Program for a portion of the fifteen years it is supposed to cover") (A-111), and the State of Ohio (funding

"allocated to cover medical monitoring is a paltry sum compared to the apparent need for medical monitoring that will last until 2045") (A-116), as well as somewhat more specific cost analyses from the East Liverpool City Hospital (A-119) and the Government Accountability Project (A-123). One individual questioned: "How did you come up with the amount of $25 million into a community health fund?" (A-35).

A related area of comments questioned the structure of Norfolk Southern's Community Health Program obligation as the lesser of 20 years or $25 million. Various commentors stated that a guaranteed lifetime for the program was needed, including the Columbiana County Health Department ("a minimum of 20 years is requested") (A-113) and the Shenkan Injury Lawyers ("This requirement should not be subject to the availability of funds, and Norfolk should be required to provide for these services for at least the full 15-year period.") (A-121). Others questioned whether the cost cap rendered the asserted 20-year program length illusory, with the State of Ohio stating it "provides an easy exit plan for Norfolk Southern … [and] if the funds dry up, as can be expected, Norfolk Southern is off the hook" (A-116). Individuals also raised concerns about the impact of the cost cap (Norfolk Southern "MUST provide funding [for the full 20 years] regardless of the status of the fund" (A-19); "there should not be an option to terminate this health program based on exhausted resources" (A-98) and asked: "What happens if the funds run out in 1-5 years? Is that acceptable?" (A-35).

As an initial matter, the scope of the Community Health Program must be viewed through the lens of how likely the United States is to obtain such relief at trial through claims under the Clean Water Act and CERCLA. The United States received comments from an individual and the Government Accountability Project stating that "the program should be continually funded for the lifetime of all qualified individuals" (A-98 and A-123). As discussed

25

in the *United States' Memorandum*, in light of the comprehensive nature of the cleanup and the difficulty in directly linking any specific chronic illnesses or disease to the releases from the derailment at this time, achieving the extent of the specific relief requested by commenters – lifetime medical monitoring or monitoring for a guaranteed length of time – may have proved difficult at trial. *See Memorandum* at 22-25.

The United States was required to weigh the benefits to the community from a defined program against the delay and litigation risks present in seeking to obtain more open-ended benefits. After significant negotiation efforts, the United States concluded that $25 million plus interest is a realistic funding level to provide the full 20 years of the proposed Community Health Program, based on cost estimates of services to be provided and estimated community participation rates.

Norfolk Southern has engaged Epiq Systems, Inc. to serve as Community Health Program Administrator. Epiq's Medical Monitoring and Consulting team has extensive experience administering medical monitoring and consultation programs as a court-appointed neutral, including appointments as administrator for programs associated with the Deepwater Horizon Medical Benefits Class Action Settlement; the National Football League Players' Concussion Injury Litigation Class Action Settlement; and the National Collegiate Athletic Association Student-Athlete Concussion Injury Litigation Class Action Settlement. *See* Declaration of Jonathan Paschal, *Memorandum* Exhibit 4, at ¶ 2.

As provided in additional detail in the attached Declaration, Epiq assessed the eligible population, estimated participation rates, and calculated costs for the medical exams. The eligible population of Qualified Individuals (Monitoring), not including those admitted on a case-by-case basis was determined to be 6,171 individuals, consisting of 5,412 residents in the 2-

26

mile zone based on census data (*id*. at ¶ 7), 163 individuals in the Leslie Run zone based on aerial mapping (*id*. at ¶ 8), and 596 first responders based on reimbursement records (*id*. at ¶ 9). Participation rate information was informed by an assessment of similar medical monitoring programs, including the Fernald Medical Monitoring Program near Cincinnati, and ranged from 30% participation in Year 1, reducing over time to 13.7% participation for Years 7-15.  *Id*. at ¶¶ 10-14.

Assumed costs for medical exams are based on the national Medicare reimbursement rate for the specified service, multiplied by an outpatient/physician services multiplier, based on a Congressional Budget Office report (using the top of the multiplier range).  *Id*. at ¶¶ 17-18.  The estimated cost of each medical monitoring exam was calculated as $813.34, including $360.13 for a 60-minute physical exam and $453.21 for the additional tests and services.  *Id*. at ¶ 18.  The total estimate also included items for medical inflation (2.035% annually) and administrative costs.  *Id*. at ¶¶ 19-20.  Pursuant to the proposed Consent Decree, Norfolk Southern has already deposited the $25 million in an interest-bearing account.  Taking into consideration the interest generated by that funding, the above cost calculation provides a sufficiently reliable estimate that the $25 million community health fund should prove adequate to fund a full 20-year program for all individuals falling within the Consent Decree definition of Qualified Individuals (Monitoring), as well as hundreds of individuals potentially included on a case-by case basis.  *Id*. at ¶¶ 21-22.

*Inclusion in Medical Monitoring Program*

A number of public comments were received that asserted that the 2-mile radius for automatic inclusion in the program was too limited and should be extended.  Many commenters submitted a "form" comment that requested the radius be expanded "from two miles to twenty miles, as the vent and burn debris traveled far beyond the two mile radius" and that doing so

"would eliminate the inevitable backlog of case-by-case submissions for Qualified Individuals." (*e.g.*, A-103 [form]).  The Shenkan Injury Lawyers and Pennsylvania likewise proposed that "residents and workers living/working within a 20-mile radius of the derailment" should be automatically included (A-117, A-121).  The Environmental Defense Fund and an individual were less specific as to the outer limit of a proposed radius but thought it "should be a bit further."  (A-109, A-34).  The Columbiana County Health District did not argue for an extension of the 2-mile radius but stated that not just residents but "[a]ll workers that were within 2 miles of the derailment should be made eligible" (A-113).

The United States engaged in robust negotiations with Norfolk Southern regarding the definition of "Qualified Individual (Monitoring)" before agreeing to a two-part structure whereby those with the most direct geographic nexus to the derailment and release of pollutants would be automatically eligible for medical monitoring, while other individuals would be admitted on a case-by-case basis in accordance with prescribed criteria.  CD ¶ 50 and Appx. C.  With a defined budget ($25 million), the United States concluded that the top priority for establishing inclusion in the medical monitoring program was to ensure that those with the highest potential for developing chronic illness or disease be provided medical monitoring services for the full 20-year period.

The United States further concluded that a two-phase process was most likely to capture the largest percentage of at-risk individuals.  The first phase provides for automatic inclusion in the medical monitoring program for individuals who resided within 2-miles of the derailment site and those first responders on site addressing the derailment in February 2023.  Based on geographic proximity, these individuals would have been at the greatest risk of exposure to potentially dangerous chemicals during the train fire.  An initial evacuation zone with a 1-mile

radius was established on the night of the derailment and subsequently extended to a 2-miles x 1-mile zone prior to implementation of the vent-and-burn.  The evacuation zone was the basis for the automatic inclusion zone, although the United States determined it was appropriate to apply conservative risk criteria and extend the automatic inclusion zone to a full 2-mile radius.  This extension also had the benefit of bringing the majority of the more densely populated portions of the community within the zone and, therefore, automatically included in the program.

On a basic level, those residing outside the 2-mile zone would be at a lesser risk of exposure to higher concentrations of any derailment-related pollutants simply due to the air dispersion inherent in transporting the contaminants further distances.  Neither soil sampling nor air monitoring conducted found impacts outside the evacuation zone from the vent-and-burn. And there have been no sustained exceedances since the evacuation order was issued on February 8, 2023.  Dollhopf Decl. at ¶¶ 42-43.  But the United States also incorporated an understanding that assumptions regarding the correlation of proximity and risk would not guarantee that all individuals who should appropriately be included in the medical monitoring program would be captured by a strictly geographic selection process.

Providing a robust case-by-case component at the second phase allows for those outside the immediate impact zone to also participate through a showing of proximity to the derailment site during the period of highest risk (which would encompass non-resident workers during that period) and those asserting the onset of physical harm in the months following the derailment (to capture more sensitive populations even if located somewhat further away).  The case-by-case admission process allows for a personalization of risk factors in the assessment for inclusion in the plan.  While the United States understands the position of those commenters who believe more individuals should be automatically included in the medical monitoring program, we

29

believe the combination of a core automatic zone plus case-by-case additions should provide for inclusion of appropriate participants without extending monitoring (and the cost of such monitoring) to those at less risk but who perhaps might conclude that their qualification for the program implies a heightened risk warranting participation.

<u>*Implementation of the Community Health Program*</u>

The United States also received comments raising a variety of questions and concerns regarding the specifics of how the Community Health Program would be carried out. Specifically, some commenters asked that participants in the medical monitoring program "have the right to choose their own doctors" (A-25) and stated that the exams "can be carried out by my own trusted provider" (A-19). Under the proposed Consent Decree, Norfolk Southern is required to draft a proposed Community Health Program Plan (CD ¶ 49) for EPA review and approval.

Norfolk Southern submitted the proposed plan to EPA on August 21, 2024, and EPA is currently assessing the document. Durno Decl. at ¶ 32. Complex issues relating to recruiting, credentialing, and contracting with providers are addressed in the draft plan and will impact the ability or willingness of specific providers to participate in the medical monitoring program. In performing this review, EPA is incorporating input received from the community. *Id*. While some uncertainty regarding the implementation of the medical monitoring program remains pending approval of the Community Health Program Plan by EPA, the United States concluded that expediting commencement of the medical monitoring program, by working out certain specific details with Norfolk Southern concurrent with the lodging and approval process for the Consent Decree, provided greater benefit to the community in contrast to delaying initiating the Consent Decree approval process until finalization of a rather complex administrative arrangement for provision of the benefits from multiple providers. This parallel two-track

process – EPA approval of the Community Health Program Plan and Court approval of the Consent Decree – allows for the quickest distribution of services to the community, ideally before the end of this calendar year.

_Content of the Medical Monitoring Exams_

Certain commenters raised issues regarding the makeup of the suite of testing to be provided under the medical monitoring exams.  Consent Decree Paragraph 50.a. states as follows:

> A Medical Monitoring Exam shall include the following elements:
>
> (1)   Routine physical examination;
> (2)   Comprehensive metabolic blood panel;
> (3)   Pulmonary function tests;
> (4)   X-rays;
> (5)   Assessment of results and referral to specialist as warranted based on the Exam; and
> (6)   Additional screenings the Parties agree are appropriate over the course of the Medical Monitoring Program.

Some commenters requested that additional testing be part of medical monitoring exams.  Both the Village of East Palestine and the Columbiana County Health District (CCHD) requested that the monitoring should include complete blood-count tests or urinalysis (A-111, A-113).  The Shenkan Injury Lawyers opined that "[a] comprehensive metabolic blood panel is not the ideal test to identify toxic chemicals in the blood or urine as a result of exposure to hazardous chemicals" (A-121).  And CCHD also noted that "[p]rovisions for expanded medical provider recommended screenings and testing beyond those listed … should be included when it is determined to be medically necessary by the provider" (A-113).

The Consent Decree provides for additional tests to be added to those explicitly identified in the settlement.  CD ¶ 50(a)(6).  The United States and Norfolk Southern have independently communicated with community stakeholders following the lodging of the proposed Consent

31

Decree and both have been advised of the recommendation for urinalysis and complete blood count tests as part of the exams. Durno Decl. at ¶¶ 32-33. In response, Norfolk Southern has already included urinalysis and complete blood count tests as elements of the monitoring exams in its draft Community Monitoring Program Plan. *Id.* at ¶ 33. In implementing the proposed Consent Decree, additional tests recommended by participating medical providers would likewise be given serious consideration for inclusion under this catchall provision. The possibility that addition of other tests may be appropriate does not counsel in favor of delaying entry of the Consent Decree.

*Data Collection and Assessment*

Certain commenters noted that the medical monitoring exams will generate data regarding the health of the participants which may be of benefit to assessing the public health of the larger community. East Liverpool City Hospital noted that to date "there is no centralized repository of data identifying the true number of individuals reporting health concerns related to the disaster" and that this lack of data makes it "difficult to reasonably project accurate estimates of what can be expected in terms of cancer clusters and other chronic conditions 5-20 years from the present" (A-119). To address this concern the Hospital proposed "a registry be created by either a healthcare provider or the third-party administrator of the health care funds." The Village likewise noted that the Consent Decree "does not provide any system of centralized data management and sharing between medical facilities, which is necessary to detect health patterns" (A-111), and an individual posited that their "healthcare provider should be able to provide reporting to the annual reporting. Perhaps to avoid HIPPA violations, each resident could be assigned a number for the sake of reporting." (A-19).

The United States concurs that there could be significant public health benefits derived from the assessment of the data collected from the medical monitoring exams which if

effectively utilized might be able to identify potentially harmful health trends in the broader community.  While the Consent Decree does not require Norfolk Southern to establish a "patient registry" to collate and evaluate such data – and recognizing concerns among some in the community that Norfolk Southern should not be the entity responsible for identifying potential continuing harm – following communications with stakeholders, Norfolk Southern has incorporated into its draft Community Health Program Plan the concept of public health data tracking.  Durno Decl. at ¶ 35.  Under this concept, the Administrator will facilitate the sharing of data between providers (subject to participant consent) and entities or organizations identified to conduct data tracking and analysis, such as the National Institutes of Health grantees.  *Id*.

*Community Facilitation Plan*

Consent Decree Paragraphs 52 and 53 require Norfolk Southern to submit and implement, subject to EPA review and approval, a Community Facilitation Plan that will establish a Coordination Committee of community members who will retain a Community Facilitator to inform, advise, and assist community members on accessing the benefits of the Consent Decree's Community Health Program, as well as other health-related assessments and studies.  Comments were received from the Government Accountability Project (A-123) and an individual asking questions regarding who the facilitator will work for and how they will be compensated, how the committee will be picked, and identifying concerns that the facilitator program not deplete the Community Health Program budget.

As noted above, the Consent Decree requires Norfolk Southern to submit a proposed Community Facilitation Plan for EPA review and approval.  Norfolk Southern did so on July 22, 2024, and EPA is currently assessing the draft plan.  Durno Decl. at ¶ 32.  The make-up of the Coordination Committee is part of EPA's review of the draft document and EPA has been engaging in community outreach with local stakeholders as it prepares comments for Norfolk

33

Southern.  *Id.*  Regarding concerns about facilitation-related costs impacting the funding available for medical monitoring or mental health services, the Consent Decree identifies a budget of $500,000 for the initial 15 years for services required under the Community Facilitation Plan.  CD ¶ 53.  As with the other elements of the Community Health Plan, funding needs will be reassessed for the final 5 years of the Community Health Plan based on available monies remaining from the $25 million fund.

*Healthcare Treatment*

The proposed Consent Decree resolves the United States' claims against Norfolk Southern under the Clean Water Act and CERCLA, two statutes primarily focused on environmental cleanup and remediation.  The United States, however, was able to successfully negotiate for the inclusion of certain healthcare treatment for residents impacted by the derailment – specifically mental health treatment (CD ¶ 51).  As part of the Community Health Program (Section XI), "counseling from a certified mental health care provider to address mental health impacts relating to or resulting from the Derailment and/or Vent and Burn, and associated environmental and physical health concerns, including but not limited to post-traumatic stress, anxiety, and services to children and young adults," will be made widely available to those potentially impacted by the derailment events for a period of up to 15-years and with a program budget of $5.5 million.  These services will be made available not only to First Responders present at the Site in February 2023 and individuals residing or working within 2-miles of the derailment site at any time between February 2023 and May 2024 (the date of lodging of the proposed Consent Decree), but also to all individuals who resided anywhere within Columbiana County, Ohio, and Beaver or Lawrence Counties, Pennsylvania, during that time period.

A number of public comments, however, were received from government entities and individuals requesting that the Consent Decree also include treatment for physical health

conditions, including conditions that may arise sometime in the future.  These included

comments from the Commonwealth of Pennsylvania (Consent Decree "fail[s] to address health

care treatment costs for present or future adverse health impacts related to the toxic plumes of

contaminants that filled our air" and "NSR [should] pay for health care treatment costs of those

individuals for whom derailment related exposures are substantially likely to be a significant

factor in aggravating, contributing to or causing an individual's health condition" (A-117)) and

the Village of East Palestine ("Without designated funding for medical treatments for conditions

caused by the derailment, Qualified Individuals will have to rely on their own insurance,

workers' compensation, or pay out-of-pocket for these procedures. . . . The proposed Decree

should include mechanisms that ensure these costs fall squarely on the actor responsible for the

disaster: Norfolk Southern" (A-111)).

Individuals, likewise, noted their desire that medical treatment be provided under the

Consent Decree, such as "Lifetime Coverage of Medical Treatment: Comprehensive coverage

for all medical treatments, therapies, and necessary interventions related to the condition and

potential long-term effects of exposure to the harmful chemicals" (A-98).  The Government

Accountability Project commented on the appropriateness of additional assistance for those

currently asserting a need for medical treatment: "Residents continue to suffer from severe health

issues including rashes, seizures, and new cancers[.] …  Many of these health impacts will not be

addressed by the proposed $25 million community health program as patients in the health

program will have to seek outside care from specialists not available at the clinics" (A-123).

And an individual noted the uncertainty of what health care treatment might be needed in the

future: "so far we do not know the health impacts what we will actually be faced with or when

they could start, and if the cases do arise where we do come up with cancers or illnesses

additional money will be needed for treatments, and it should not be on the taxpayer or ourselves to pay for this, but the corporation that did this to us" (A-34).

Other individuals noted that while the medical monitoring provided under the proposed Consent Decree is beneficial, the lack of funding for follow-up treatment leaves the relief incomplete:

> Please require Norfolk Southern (or the federal government) provide health CARE for the nearby residents, not health monitoring.  Monitoring does nothing if we have no means of paying for the treatments once diagnosed.  (A-22).

> [C]hemical exposures raise significant concerns about long-term health effects, including an increased risk of developing cancer.  The potential for such serious health issues necessitates not only monitoring but also proactive and ongoing medical treatment and payment for healthcare operations.  (A-98).

> [T]his must go beyond just monitoring alone.  It starts with just monitoring; however, if further tests, care, or treatment is necessary then Norfolk Southern must pay for it as well.  It is their responsibility alone[.] (A-19).

> Advocate for ongoing health monitoring for residents exposed to hazardous materials and ensure they have access to necessary medical treatments. … Not sure our regular insurance will pay for something that was result of Norfolk Southern negligence which was verified by the NTSB.  (A-35).

> What happens if something is found during the medical monitoring? Who pays then?  (A-79)

The United States empathizes with those raising concerns regarding the possible need for healthcare treatment at some future date to address harms potentially related to the derailment.  As discussed in the *Memorandum in Support for United States' Motion to Enter Consent Decree*, however, neither the Clean Water Act nor CERCLA explicitly provide for individualized, personal injury-type remedies.  *See Memorandum* at 22-25.  The Clean Water Act and CERCLA are primarily focused on remedying environmental harms.  While the Clean Water Act and CERCLA provide broad latitude for identifying and imposing appropriate injunctive relief, it is

36

by no means assured that a Court would award the healthcare requested by the commenters, and that such an award would be upheld on appeal. The United States has not previously sought and therefore no court has yet granted as injunctive relief healthcare of such extent pursuant to the federal statutes under which the United States has brought its claims in this action – CERCLA and the Clean Water Act. Moreover, there are challenging evidentiary issues for establishing Norfolk Southern's potential liability for future injuries due to the comprehensive nature of the cleanup conducted and the difficulties in linking future harms to the derailment-associated contaminants.

In light of such litigation risk, the United States continues to believe that obtaining access to medical monitoring and mental health services in the near term, through timely approval of the Consent Decree, outweighs the uncertain outcome of pursuing additional healthcare treatment through litigation, trial, and likely appeal. EPA, working in collaboration with the National Institutes of Health (NIH), The Agency for Toxic Substances and Disease Registry (ATSDR), and FEMA, identified medical monitoring as important for identifying developing healthcare concerns potentially related to the derailment and determining what if any treatment is needed. *See* Durno Decl. at ¶¶ 13, 27, 29. While under the Nation's current regulatory framework individuals now have far greater access to insurance coverage for healthcare needs, proactive screenings such as those provided by the medical monitoring program are more likely to not be included in such coverage. Medical monitoring provided by the Consent Decree will fill the gap between concern and evidence of harm by providing, at no cost to the recipient, a suite of tests designed to identify slower-developing harms potentially associated with the derailment. The medical monitoring would then presumably provide a basis for treatment under the impacted individual's health insurance.

Moreover, the Consent Decree provides residents throughout three counties with mental health care benefits. Such benefits will likewise address an immediate need – current mental health impacts from the derailment and subsequent environmental concerns. *See id*. at ¶ 28. Mental health care benefits do not face the same evidentiary issues as does the physical healthcare treatment sought by some commenters and thus is subject to less litigation risk. Like with physical healthcare, however, our ability to obtain such benefits is not explicitly provided for by the statutes and recovery is not assured. Such substantive and needed benefits would be at risk were the United States to have rejected the compromise proposal and instead sought greater healthcare treatment through continued litigation.

The United States also notes that additional relief may be obtainable through other avenues such as co-Plaintiff State of Ohio's negligence claim (Ohio did not comment on healthcare treatment not being included in the proposed Consent Decree) or resolution of future personal injury claims brought by harmed individuals. While Pennsylvania and East Liverpool have stated concerns that the United States' proposed Consent Decree does not include medical treatment, those entities have not yet resolved potential claims they may have against Norfolk Southern that may provide an additional basis for obtaining such relief.

### Consent Decree Section XII – Rail Safety

**Public comments were received regarding various provisions included in Consent Decree Section XII (Rail Safety Improvements), including general objections to the inclusion of any rail safety provisions, specific concerns regarding the scope of the DOT-111 railcar prohibition and Customer Tank Car Replacement Plan, as well as modest comments on certain other rail safety provisions.**

Section XII of the United States' proposed Consent Decree sets forth a series of provisions designed to reduce the possibility of future derailments and associated harms therefrom throughout the entirety of Norfolk Southern's rail system. These provisions include various measures to make Norfolk Southern's wayside detection system for the identification of

38

overheating wheel bearings more robust and effective.  The proposed Consent Decree provides for: installation of sufficient additional hot bearing detectors ("HBDs") to reduce the spacing between two HBDs (or an HBD and a rail yard) to no greater than 15.05 miles (CD ¶ 56); installation of 259 HBDs between the date of derailment and one year from the date of lodging of the proposed Consent Decree (CD ¶¶ 57-58); expedited data transmission from HBDs to Norfolk Southern's Wayside Help Desk in Atlanta where HBD data is assessed (every third car instead of after the entire train, which can be miles long, passes an HBD) (CD ¶ 59); a revised Critical Alarm Level to require stoppage of a train and setting out of a suspect railcar (CD ¶ 60); and enhanced staffing at the Wayside Help Desk (CD ¶¶ 61-62).

In addition to the HBD-related provisions, Section XII also provides for the following rail safety measures: piloting of thermal camera technology for use in assessing overheating wheel bearings (CD ¶ 63); imposition of train build rules to mitigate the risk of derailment in longer trains through the reduction and control of in-train forces through car placement based on various factors and a requirement for a Train Build Study to further evaluate such factors (CD ¶¶ 64-65); expansion of High-Hazard Flammable Train regulations, which impose additional safety requirements, to additional categories of trains including those carrying flammable gases such as vinyl chloride (CD ¶¶ 66-68); and Norfolk Southern halting use of DOT-111 tank cars and developing a Customer Tank Car Replacement Plan to encourage its customers to likewise transition from DOT-111 tank cars to more heavily armored DOT-117A tank cars (CD ¶¶ 69-70).

Public comments relating to the proposed rail safety provisions in Consent Decree Section XII included positive statements, such as from Governor Shapiro on behalf of the Commonwealth of Pennsylvania:

39

> We particularly applaud the rail safety provisions included in the decree aimed at addressing safety issues, including the failure to identify failing wheel bearings [and] use of tank cars with documented poor derailment performance[.]  Strong rail safety measures are an important step to avoiding similarly devastating derailments from recurring.  (A-117)

Similarly, Union Tank Car Company, while raising the specific concerns regarding the DOT-111 provisions discussed below, noted that "[i]mproved rail safety procedures are, of course, to be lauded and supported" (A-107).

One individual stressed the importance of ordering "Norfolk Southern to implement enhanced safety and monitoring procedures to reduce the likelihood of such a catastrophe from happening again in the future" (A-14).  And the comment from Sustainable Englewood Initiatives included the request that "the Proposed Consent Decree be revised in targeted ways to … maximize the nationwide benefits of its Rail Safety Improvements provisions" (A-110).  These comments are consistent with the approach taken by the United States in negotiating injunctive relief in this Consent Decree.  The rail safety provisions are not limited in application to East Palestine or even Ohio but apply to Norfolk Southern's operations throughout the United States – a scope that will provide rail safety benefits in 22 states and the District of Columbia.

*General Concerns with Section XII*

The comment provided by the American Fuel and Petrochemical Manufacturers (AFPM), however, took the converse view, stating the belief that the "Proposed Consent Decree is not the Appropriate Venue for Rail Safety Provisions and Such Efforts Must Procced via the Appropriate Legislative or Regulatory Process and Relevant Committees or Agencies" and requesting the Section XII (Rail Safety Improvements) be removed in its entirety from the proposed Consent Decree (A-114).  This position appears to be predicated on the belief that the U.S. Department of Transportation's (DOT) Federal Railroad Administration (FRA) and Pipeline and Hazardous Materials Safety Administration (PHMSA), as "the appropriate entities to address

40

rail safety issues," lacked a role in the development of the proposed Consent Decree.  *Id*.  This is incorrect.

The Department of Justice acknowledges and greatly appreciates the specialized knowledge regarding rail safety issues possessed by FRA and PHMSA, and such knowledge was invaluable in the development of the Consent Decree.  The Train Build provision (CD ¶ 64) addresses concerns raised by FRA in its May 2, 2023, Safety Advisory (*Accident Mitigation and Train Length*), 88 Fed. Reg. 27,570.  And the expansion of the High-Hazard Flammable Train regulations to encompass flammable gases such as vinyl chloride (CD ¶ 68) was explicitly recommended by PHMSA in its March 22, 2023, Safety Advisory (*Notice for Legacy DOT-111 and CPC-1232 Tank Cars*).[8]  The Department of Justice has consulted as appropriate with DOT, particularly seeking advice and information from FRA since the earliest days of this matter.  While the proposed Consent Decree refers generally to "the United States" as the entity receiving the Train Build Study (CD ¶ 65) and approving the Customer Tank Car Replacement Plan (CD ¶ 70), the appropriate federal agencies will be consulted as part of the review process.

AFPM also comments that the "Proposed Consent Decree Conflicts and Interferes with Completed and In-Progress Government, Industry and Congressional Rail Safety Improvements," arguing that any effort to address the circumstances of the East Palestine derailment should await "recently initiated and in-development rulemaking."  While recognizing that industrywide rulemaking will be invaluable for enhancing rail safety nationwide, the United States rejects the implication that it is prohibited from obtaining appropriate injunctive relief to address the risks associated with the violations in this case caused by this defendant.

---

[8] https://www.phmsa.dot.gov/news/phmsa-safety-advisory-notice-dot-111-tank-cars-flammable-liquid-service

Here, pursuant to the proposed Consent Decree, Norfolk Southern has agreed to take substantive actions to reduce the likelihood of future derailments of its trains carrying hazardous materials.  There is no prohibition to its doing so and Norfolk Southern enhancing its own rail safety in no way interferes with future industrywide requirements that might require all railroads to take similar steps.  The rulemaking process will continue to proceed independently, but in the meantime, the remedy provided under the Consent Decree should discourage the cause of the violation at issue here.

*Hot Bearing Detectors / Thermal Cameras / Train Build*

Sustainable Englewood Initiatives (SEI) included three proposed revisions to the rail safety provisions in Section XII in its comment (A-110).  First, SEI comments that it is "helpful" that the HBD rollout will prioritize greater HBD density for approaches to areas with greater population density and environmentally sensitive areas (CD ¶ 58) but posits including "vulnerable populations" to the list of priority areas as an improvement.  There are two provisions addressing deployment of HBDs.  Paragraph 57 requires Norfolk Southern to install sufficient additional HBDs to reduce the distance between HBDs (or HBDs and railyards) to no more than 15.05 miles.  Paragraph 58 requires Norfolk Southern to install 259 HBDs between the date of derailment and one year from the date of lodging.

The prioritization factors in Paragraph 58 come into play only if Norfolk Southern has completed its density obligations under Paragraph 57, but not yet the numerical obligation under Paragraph 58.  It is anticipated that the number of "excess" HBDs after completion of the density requirement will be minimal, if any.  While the United States agrees that inclusion of vulnerable populations in a prioritization scheme is a positive recommendation, the limited practical effect does not warrant revising the Consent Decree.  That said, Norfolk Southern has been notified of

42

this comment and has agreed to consider the presence of vulnerable populations when considering what if any areas of greater population density are prioritized for additional HBDs.

SEI similarly requests that the roll-out of the thermal camera piloting also take into consideration vulnerable populations. Use of thermal cameras for detecting hot wheel bearings is a new technology currently being assessed by Norfolk Southern in conjunction with the Georgia Institute of Technology ("Georgia Tech"). The Consent Decree requires Norfolk Southern to conduct a pilot test of this new technology under regular train operating conditions by December 31, 2026. CD ¶ 63. The hoped for benefit of thermal cameras is that as they are located on the railcars themselves, they will be able to more accurately assess wheel bearing temperatures than HBDs, which are located on the tracks and attempt to capture accurate temperature readings as trains pass overhead. Because they are located on the railcars and not the tracks, thermal cameras will not be prioritized for specific geographic locations, as is being done with the HBDs, since they will travel wherever the train goes.

Finally, SEI also requested that the Train Build Study (CD ¶ 65) be expanded to address "routine harms and risks to public safety [from railyard air pollution, noise, and odors], not only rare, catastrophic incidents." The United States acknowledges the importance of evaluating potential harms to neighboring communities from railyard operations. This Consent Decree, however, resolves claims specifically relating to the East Palestine derailment. The train at issue here was over 150 cars long and concerns have been raised regarding the potential exacerbation of the risk of derailment caused by longer trains. The Train Build Study required by the Consent Decree is included to specifically address that concern. We do not believe inclusion of additional risks that while important were not at issue in this specific action warrants revision of the negotiated agreement.

<u>*DOT-111 Tank Car Provisions*</u>

Paragraphs 69 and 70 of the proposed Consent Decree provide mechanisms for accelerating the phase-out of DOT-111 tank cars.  On March 22, 2023, in the wake of the East Palestine derailment, PHMSA issued a *Safety Advisory Notice for DOT-111 Tank Cars in Flammable Liquid Service*.[9]  PHMSA issued the safety advisory to:

> [R]e-emphasize previously raised concerns about the survivability of DOT-111 tank cars and encourage tank car owners and shippers of flammable liquids to voluntarily upgrade their tank car fleets to the newest, and safest, available tank car design authorized for flammable liquid service – the DOT-117 specification tank car.

Paragraph 69 is intended to require Norfolk Southern to cease using for flammable liquid service the small number of DOT-111 tank cars that it owns or leases, while Paragraph 70 requires Norfolk Southern to develop and implement a Customer Tank Car Replacement Plan to encourage the voluntary upgrades among its tank car owning and using customers proposed by PHMSA.

The United States received a number of comments from DOT-111 tank car owners/suppliers and customers of Norfolk Southern that currently use DOT-111 tank cars raising concerns about the scope and impact of Paragraphs 69 and 70 on their businesses.  *See* A-106 (American Chemistry Council); A-107 (Union Tank Car Co.); A-108 (Railway Supply Institute); A-112 (North American Freight Car Association); A-114 (American Fuel and Petrochemical Manufacturers); A-118 (Alliance for Chemical Distribution); and A-120 (Ohio Chemistry Technology Council).  In its *Memorandum*, the United States acknowledges that the language of Paragraph 69 could be interpreted as imposing a broader cessation of use

---

[9] https://www.phmsa.dot.gov/news/phmsa-safety-advisory-notice-dot-111-tank-cars-flammable-liquid-service

requirement than intended by the Parties and has proposed revised language that explicitly limits that provision to tank cars owned or leased by Norfolk Southern.  *See Memorandum* at 25-27.

Commenters have raised a parade of horribles regarding the potential impact of Paragraph 70.  The American Chemistry Council stated that the "Customer Tank Car Replacement Plan would almost certainly raise prices on all flammable liquid shipments in DOT-111 cars . . . without shippers having the ability to negotiate favorable rates" (A-106).  The Railway Supply Institute (RSI) opined that it "permits Norfolk Southern to raise rates or impose surcharges on DOT-111 tank cars to 'incentivize' shippers to use tank cars that meet or exceed a DOT-117 specification" (A-108).  The North American Freight Car Association (NAFCA) worried that the "financial incentives" would consist of "increased line haul rates and surcharges that force customers to make a switch to their economic detriment" (A-112).  The Alliance for Chemical Distribution (ACD) suspected that it "will likely permit [Norfolk Southern] to add additional surcharges to their current tariffs and contracts, giving the railroad an avenue to expand its profits at the expense of shippers" (A-118).  And the American Fuel and Petrochemical Manufacturers warned that the United States' proposal "effectively endorses rail carriers' unlawful practice of using pricing power over captive shippers to refuse lawfully authorized shipments of hazardous materials [and] encourages [Norfolk Southern] to . . . flout their common carrier obligation" (A-114).

But there is simply nothing in Paragraph 70 that provides Norfolk Southern any additional power to break existing contracts or unilaterally raise prices in future arrangements.  As NAFCA recognized, there are "rules prohibiting unilateral changes to material contract terms" (A-112).  Indeed, NAFCA does appear to understand the purpose and anticipated effect of this provision:

> Viewed in its best light, Paragraph 70 appears to proceed from the naive assumption that a plan can be developed whereby DOT-111 Tank Cars are phased out using financial incentives that properly compensate [Norfolk Southern's] customers for enduring the cost and inconvenience of shifting to DOT 117R Tank Cars earlier than they are required to by the FAST Act and PHMSA regulations.

*Id*.  RSI similarly noted that "Norfolk Southern could offer a discount on using DOT-117 tank cars" (A-108).  And regarding what it would take for customers to move from DOT-111s to DOT-117s, ACD acknowledged that at least a "limited number" of shippers are "only an incentive away from making that shift" (A-118).

If the Replacement Plan devised by Norfolk Southern and approved by the United States includes elements that its customers find unappealing, it will simply be unsuccessful in encouraging a quicker phase-out of DOT-111's.  But it is our goal that a plan can be crafted that effectively facilitates at least a limited number of suppliers' voluntary transition from DOT-111s to safer tank cars.

Union Tank Car, the owner of one of the DOT-111 tank cars that ruptured in the derailment, recommended that rail equipment and shipper industries participate in the design of any plan (A-108).  The United States agrees that communication between Norfolk Southern and its tank car suppliers would likely be beneficial to the development of an effective Replacement Plan.  The United States has flagged this recommendation for Norfolk Southern and anticipates requesting from Norfolk Southern information on its outreach efforts to suppliers as part of the United States review and approval process for the plan.  The United States does not believe, however, that Union Tank Car's recommendation warrants a revision to the proposed Consent Decree.

**The United States also received comments that suggested additional rail safety relief terms beyond those included in the Consent Decree that commenters believed might enhance rail safety.**

*Requirements Conflicting with Existing Regulation*

Some commenters posed concerns that the Consent Decree did not address the speed limit of trains in urban areas, railroad structures that they believed were in need of repair, the frequency of inspections of rail cars or wheel bearings, or the enforcement scheme under which railroad violations are pursued (A-19, A-121, A-34).  While we appreciate the novel thinking of these commenters, including the commenter who suggested that FRA or other regulatory agencies could implement a point system similar to the system used by several states to enforce traffic laws (A-34), the proposed Consent Decree is not the place to pursue these solutions.

Importantly, rail transport is a highly regulated area, and in many cases, Congress has delegated areas of railroad regulation to FRA and PHMSA to carry out their statutory duty to regulate railroads.  One such case is train speed limits.  FRA sets speed limits based on the tracks and types of trains.  *See e.g.*, 49 C.F.R. Part 213 (setting maximum operating speeds for certain classes of railroad track).  FRA has also stated that the decision to not set individual speed limits within towns is an intentional choice because "the safest train maintains a steady speed" because speeding and slowing increases forces within the train.[10]

Similarly, FRA has also created a comprehensive regulatory scheme setting safety standards for inspection and maintenance of railroad tracks and structures at 49 C.F.R. Part 213 and inspection and maintenance of railcars and railcar components such as those at 49 C.F.R. §§ 179, 231, and 232.  Furthermore, FRA and PHMSA have enforcement processes through

---

[10]  Federal Railroad Administration, Track Frequently Asked Questions, available at: https://railroads.dot.gov/divisions/track/track-frequently-asked-questions

which violations of railroad regulations are pursued and wrongdoing is deterred and corrected. Where FRA and PHMSA in their expertise have chosen against or in favor of a specific action, DOJ and EPA must take care not to impose a condition on a railroad that might make its operations less safe or have unintended consequences.  This is especially true where these concerns were not identified as the causes of the derailment.  *See* National Transportation Safety Board (NTSB) Final Report.[11]  NTSB did not identify excessive speed, track conditions, or a deficient enforcement scheme as a cause of the derailment.  NTSB also determined there was not sufficient evidence to conclude whether the inspection on the Railcar 23 L-1 bearing was inadequate but noted that the bearing may not have been showing visible problems at the time of the inspection.  *Id*.

The United States is cognizant of potential conflicts and risks when imposing injunctions on a defendant whom another federal agency principally regulates.  The three major statutes governing rail operations are the Federal Rail Safety Act (FRSA), the Interstate Commerce Commission Termination Act (ICCTA), and the Hazardous Materials Transportation Act (HMTA).  These three statutes all contain robust provisions establishing that they are the exclusive means for governing rail operations.  *See* 49 U.S.C. § 20106(a)(1), 49 U.S.C. § 10501(b), 49 U.S.C. § 5125(b).  While these statutes do not bar enforcement of CERCLA or CWA claims against a railroad company, these statutes would support arguments that remedies under those statutes should not conflict with the laws or the regulations passed thereunder by DOT, FRA, and the Surface Transportation Board.  *See* 49 U.S.C. § 20106(a)(1), 49 U.S.C. § 10501(b), 49 U.S.C. § 5125(b).

---

[11] Nat'l Trans. Safety Bd., Railroad Inv. Rep. RIR-24-05, available at:
https://www.ntsb.gov/investigations/AccidentReports/Reports/RIR2405%20CORRECTED.pdf

_Requirements Already Covered by Existing Law_

Another commenter was interested in including requirements that were covered by recently enacted rules, including a requirement to keep an accurate record of all materials being transported on a train (A-25).  Railroads previously were only required to keep accurate train consist information, update it accordingly, and provide that information to train crews.  49 C.F.R. § 174.26.  Under the FAST Act Requirements for Real-Time Train Consist Information final rule, which became effective on July 24, 2024, however, "railroads that carry hazardous materials [must] generate in electronic form, maintain, and provide to first responders, emergency response officials, and law enforcement personnel, certain information regarding hazardous materials in rail transportation" which should enhance emergency response operations.  89 Fed. Reg. 52,957 (June 24, 2024).  The Real-Time Train Consist Information final rule, in combination with the regulations already in place, should address this commenter's concern.

_Requirements on Third-Parties not a Party to the Proposed Consent Decree_

Another individual commenter raised concerns, shared by the NTSB during the course of its investigation, that some of the tank cars involved in the accident, and otherwise approved for Vinyl Chloride Monomer (VCM) service, contained aluminum.  The Safety Data Sheet noted that aluminum is incompatible with VCM due to the potential for an exothermic reaction.  _See_ NTSB Final Report.  NTSB noted that testimony during the hearing raised questions about the scientific basis for this warning, but nonetheless recommended to the American Association of Railroads (AAR) that it "revise the MSRP, M-1002, Specifications for Tank Cars, to establish criteria and procedures for manufacturers of tank car service equipment to demonstrate compatibility of [Pressure Relief Devices] and other AAR-approved service equipment with intended ladings."  NTSB Final Report.

49

A consent decree, however, may not bind third-parties who are not a party to the decree. *See Local No. 93, Int'l Ass'n of Firefighters v. City of Cleveland,* 478 U.S. 501, 522 (1986). Including a requirement in the proposed Consent Decree to cease hauling VCM in tank cars containing aluminum, which is apparently what the commenter sought, would bind and impact a number of third-parties who are not parties to the proposed Consent Decree.  The offeror or shipper of a hazmat commodity, and not the railroad, is responsible for ensuring that the tank car is appropriate for the material based on the hazardous materials regulations.  *See* 80 Fed. Reg. 26,653 (May 8, 2015), 49 C.F.R. 173.24(e)(1).  Therefore, including limitations on the tank cars in which offerors may package VCM, beyond limits required under current regulations, would impose requirements on third-parties who have not agreed to this settlement and would be impermissible.  *See Local No. 93, Int'l Ass'n of Firefighters*, 478 U.S. at 522.

The Commonwealth of Pennsylvania also commented and stated that the Consent Decree "should address every relevant finding in [the NTSB report]" (A-117).[12]  Pennsylvania's comment specifically noted two recommendations: (i) increased wheel bearing inspections (addressed above) and (ii) hazardous materials placards that failed due to the fires.  Pennsylvania states that Norfolk Southern should immediately begin using placards that will survive an accident or fire.  *Id*.  As discussed above, the shipper of a hazardous materials product is responsible for packaging the product for transport, and for applying placards to the railcar.  *See* 49 C.F.R. 172.508(a).  Accordingly, requiring Norfolk Southern to utilize different placarding would impermissibly bind third parties in a settlement to which they are not a party.

---

[12]  Most of the recommendations in the report were not directed at Norfolk Southern and the Consent Decree is not an available vehicle to force the AAR, the State of Ohio, or FRA to implement the recommendations that the NTSB made to those entities.  *See* NTSB Final Report (making recommendations to a number of entities and not just to Norfolk Southern); *Local No. 93, Int'l Ass'n of Firefighters*, 478 U.S. at 522.

Furthermore, hazardous materials placarding is the subject of extensive PHMSA regulations covering the size, coloring, placement, and durability of the placarding. 49 C.F.R. Part 172, Subpart F. So, as discussed above, any attempts by DOJ or EPA to substitute its judgment in the place of PHMSA, which is the entity delegated responsibility for regulating hazardous materials, would be subject to heightened litigation risk, and could have unintended consequences and place first responders in even greater danger if such efforts conflict with existing requirements in a manner that generates uncertainty.

### Consent Decree Section XIII – Emergency Preparedness

**The United States received several public comments related to the consent decree's Track Restoration Coordination Procedure and Vent and Burn Coordination Procedure provisions, as well as the consent decree provision requiring Norfolk Southern to perform annual training exercises. The public comments primarily focused on third-party participation in these provisions.**

Consent Decree Section XIII (Emergency Preparedness) includes a number of provisions to improve Norfolk Southern's emergency response capabilities, and to enhance coordination between Norfolk Southern, emergency responders, government agencies, and other stakeholders during future derailments. After the East Palestine train derailment, concerns were raised about the company's decision to rebuild the train tracks for use while there was still significant contamination underneath and around the train tracks. This decision resulted in inefficiencies, potential exposure to contamination, and increased costs to both the company and the government because the train tracks needed to be disassembled and rebuilt a second time so that the contamination underneath and around the train tracks could be removed. To prevent delays in cleanup and inefficiencies in the future, the Consent Decree requires Norfolk Southern to develop a Track Restoration Coordination Procedure to help ensure that Norfolk Southern appropriately consults with relevant government stakeholders before any decision is made to restore train tracks following a derailment involving spilled hazardous materials. CD ¶¶ 71-76.

One commenter stated that the procedure should also include coordination with "relevant community leaders and institutions" (A-110).  The United States agrees that communication with relevant community leaders is important, and the procedure will include a process for coordinating with local officials, where appropriate.  CD ¶¶ 73-74.  The United States does not believe it is necessary to also include a separate process for coordinating with non-governmental institutions, however, as non-government institutions do not play a direct role in the cleanup of hazardous materials.  In addition, often spilled hazardous materials require immediate action, and having a separate coordination process for non-government entities may cause undue delay.

After the derailment, concerns were also raised about deficiencies in Norfolk Southern's communication and consultation with the Incident Command and other stakeholders related to the February 6, 2023 "vent and burn" of five railcars containing vinyl chloride.  Following its investigation of the East Palestine train derailment, the NTSB recommended that Norfolk Southern "establish a policy of communicating all expert opinions to the full incident command and share information collected by its emergency response contractors with entities that provide hazardous materials guidance."  NTSB Report at xiv.  Consistent with NTSB's recommendation, the Consent Decree requires Norfolk Southern to develop a Vent and Burn Coordination Procedure to help ensure that, in the future, there is better communication and consultation with the Incident Command and other stakeholders in any future situations where Norfolk Southern is contemplating a vent-and-burn.  CD ¶¶ 77-81.

The Consent Decree sets forth a process that Norfolk Southern must follow when developing the Vent and Burn Coordination Procedure and Track Restoration Coordination Procedure.  As part of the process, Norfolk Southern must convene workgroups with relevant experts to provide input on the proposed procedures.  The United States received two comments

stating that the Consent Decree should specify the entities that must be included in the workgroups (A-110, A-121).  While the Consent Decree does not specify which entities must be included in the workgroups, it does contain provisions that allow relevant local, state, and federal authorities to provide input on the procedures before they are final.

Specifically, pursuant to Paragraphs 74 and 79, Norfolk Southern must give EPA the opportunity to review and comment on the proposed procedures.  Paragraphs 74 and 79 make clear that "EPA may consult with any third party" as part of its review.  Additionally, Paragraphs 75 and 80 of the Consent Decree require Norfolk Southern to meet with any state, federal, or local authority that requests to provide input on the proposed procedures.  One commenter stated that Norfolk Southern should also be required to meet with any community-based organizations or NGOs that want to provide input on the proposed procedures (A-110).  It would not be practicable, however, to require Norfolk Southern to meet with any organization wanting to provide input on these procedures while also ensuring that the procedures are finalized in a reasonable timeframe.  The United States believes that requiring Norfolk Southern to consider comments by EPA, workgroup members, and any government entity that chooses to provide input is sufficient to ensure that the procedures are comprehensive and in the public interest.

Paragraph 82 of the Consent Decree also requires Norfolk Southern to complete annual training exercises to practice implementing the Track Restoration and Vent and Burn Coordination Procedures.  Norfolk Southern will send EPA a list of possible locations for the annual exercises.  Under Consent Decree Paragraph 82.c., for each annual exercise, Norfolk Southern must invite local emergency response organizations in the applicable county and all adjoining counties to participate in the exercise.  One commenter stated that the community should also be notified of and invited to participate in the exercises (A-109).

The purpose of these exercises is primarily for Norfolk Southern's emergency responders and other emergency response organizations to practice implementing the Track Restoration and Vent and Burn Coordination Procedures.  However, Paragraph 82.b of the consent decree requires Norfolk Southern to coordinate with EPA and its area committees and sub-area committees, if applicable.  Paragraph 83 also requires Norfolk Southern to participate in field exercises and emergency response trainings when invited by a sub-area committee or area committee.  EPA's emergency response area committees and sub-area committees may include local community groups in their planning initiatives.  As part of its area planning and its participation of exercises under the Consent Decree, EPA may invite certain community groups involved in emergency planning activities to participate in these exercises.

### Consent Decree Section XIV – Local Waterways Remediation Plan
### Consent Decree Section XV – Natural Resource Damages

**The United States received limited comments regarding the sufficiency of the Local Waterways Remediation Plan and recovery of Natural Resource Damages.**

Section XIV of the proposed Consent Decree requires Norfolk Southern to implement a Local Waterways Remediation Plan.  This program was included in the Consent Decree to mitigate environmental harm caused by Norfolk Southern's violations of the Clean Water Act.  While Norfolk Southern will complete its cleanup of Sulphur Run and Leslie Run under the Consent Decree, it is not sufficient for Norfolk Southern to simply clean up its mess.  The United States believes some additional mitigation is warranted to address impacts to the waterways from these violations beyond the remediation addressed through the cleanup.  Section XIV is structured to require performance by Norfolk Southern of environmental projects with an estimated budget of $6 million.  It identifies four potential projects and directs Norfolk Southern

to "prioritize" inclusion of the projects in the Local Waterways Remediation Plan, while leaving final makeup of the suite of projects to Norfolk Southern (subject to EPA approval).  CD ¶ 92.

The four prioritized projects are: (1) cleanup of legacy contamination from sources not associated with the derailment in portions of Sulphur Run and Leslie Run; (2) construction of stormwater control measures to reduce discharges and carried pollution to the waterways; (3) educational outreach to promote community efforts to reduce nonpoint source pollution to the waterways; and (4) improvement of aquatic and riparian habitat in and near Sulphur Run and Leslie Run.  These projects were selected to improve and maintain the quality of the waterways following the completion of the mandated cleanup as mitigation of the environmental harm caused by the derailment's discharge of pollutants and oil to the site.

The United States' Amended Complaint includes a CERCLA claim for natural resource damages ("NRD") under 42 U.S.C. § 107.  Amended Complaint at ¶¶ 215-219.  The Department of the Interior, acting through the Fish and Wildlife Section, conducted assessment activities to evaluate the scope of potential damages to natural resources such as wildlife, fish, biota, and habitat controlled or held in trust by the United States from the derailment, associated releases, and the cleanup addressing such releases.  Section XV of the proposed Consent Decree resolves this claim by requiring Norfolk Southern to pay $175,000 into DOI's Natural Resource Damages Assessment and Restoration Fund.  CD ¶ 95.  DOI has identified implementation of conservation easements to protect at least 20 acres of wetlands habitat in Northeast Ohio as an appropriate use of the funds, subject to completion of a draft Restoration Plan which will be made available for public review and comment.  CD ¶ 96.

The United States received public comments regarding the sufficiency of both potential recoveries.  Regarding the Local Waterways Remediation Plan, the State of Ohio indicated its

preference that "the funds should cover legacy contamination of the rivers first" to reduce potential long-term risks to human health and the environment (A-116).  Ohio further stated that if the full $6 million is exhausted on legacy contamination, Norfolk Southern should be required to provide additional funding for the remaining projects.  Shenkan Injury Lawyers commented regarding the NRD recovery, stating that the "effects of the derailment and burn caused substantial damage to natural resources over a wider area than 20 acres" and thus more funding is warranted than only that needed to preserve 20 acres of wetlands (A-121).

The United States believes the scope of the mitigation and NRD recoveries are appropriate.  Given that EPA intends to require that Norfolk Southern remove and mitigate derailment related contamination that poses a threat to human health and the environment, Dollhopf Decl. at ¶ 53, the over $6 million in additional projects required by the Consent Decree is an appropriate amount of mitigation under the Clean Water Act.  This relief is intended to address injury beyond the cleanup itself.  Similarly, NRD is residual to remediation.  Here, the cleanup is comprehensive and there is no data indicating that chemicals released by the derailment, vent-and-burn, or subsequent cleanup resulted in damages to natural resources beyond those sought in the Consent Decree.

The Local Waterways Remediation Plan requires submission of a proposed plan by Norfolk Southern that identifies specific projects to be completed.  While the projects included in the plan will have an estimated budget of $6 million, the Consent Decree requires that Norfolk Southern complete the agreed-upon projects regardless of final cost.  The United States agrees with Ohio on the beneficial nature of a project removing pre-derailment contamination from the creeks.  But the other identified proposed projects are likewise beneficial in their focus on preventing recontamination of newly cleaned areas by surface runoff.  Assessing the potential

litigation risk for achieving such recoveries led the United States to conclude that a $6 million program incorporating flexibility for project selection was an appropriate result.

Ohio also commented that while the Consent Decree requires Norfolk Southern to "make good faith efforts to consult with the State of Ohio [and others]" prior to submitting the draft Local Waterways Remediation Plan to EPA (CD ¶ 94), Ohio should also be "at the table planning and approving the remediation plans" in accordance with 33 U.S.C. § 1251(b) (A-116). The requirement that Norfolk Southern seek to consult with Ohio in development of the Plan is wholly consistent with Clean Water Act Section 101(b)'s recitation that it is the policy of the United States to recognize that the States have the primary responsibility to restore, preserve, and enhance land and water resources.  As Ohio is not a party to the proposed Consent Decree, however, its participation in the review process cannot be mandated by the United States.

### Consent Decree Section XVIII – Force Majeure
### Consent Decree Section XIX – Dispute Resolution

**The United States received limited public comments regarding how the Consent Decree's Force Majeure and the Dispute Resolution provisions are drafted.**

Throughout the proposed Consent Decree, the United States included certain provisions that are standardized, to the extent possible, across all environmental consent decrees negotiated by the United States.[13]  These provisions are formulated based on the United States' extensive experience in drafting and implementing settlements of claims under CERCLA and the CWA. These standard provisions reflect the United States' collective understanding of the most effective way of ensuring that polluters are held accountable, clean-ups are completed, penalties are paid, and communities are restored as closely as possible to their pre-existing condition.

---

[13]  EPA's *Model Remedial Design/Remedial Action Consent Decree* is publicly available at
https://cfpub.epa.gov/compliance/models/view.cfm?model_ID=81

Additionally, in its role enforcing the Nation's environmental laws and regulations, the United States has a responsibility to ensure that its enforcement of laws is consistent and fair.  One way that the United States does this is by utilizing certain standard consent decree terms in all settlements.  The force majeure and dispute resolution provisions contained in the proposed Consent Decree are two of these standard provisions.  *See* Consent Decree, Sections XVIII and XIX.

*Dispute Resolution*

The Environmental Defense Fund submitted a comment suggesting that the formal dispute resolution process outlined by the proposed Consent Decree should be streamlined because it posed administrative burdens which the commenter worried would result in less than robust enforcement (A-109).  The dispute resolution process for the proposed Consent Decree is laid out in Section XIX and is the sole vehicle that Defendants must use to resolve a dispute arising under the Consent Decree unless otherwise stated.  CD ¶ 124.

As the commenter notes, the initial phase of the dispute resolution process is an informal process under which one or more parties send a timely written notice of dispute.  CD ¶ 125. Once this notice has been delivered, the parties enter a 20-day period of informal negotiations. *Id*.  If the parties cannot resolve the dispute in this period, EPA's position on the dispute is final unless the Defendants initiate formal dispute resolution.  *Id*.  Formal dispute resolution does, as the commenter also notes, require the exchange of position papers with supporting evidence.  CD ¶ 126(a).  Once all statements of position are received, the dispute is submitted to the Director of the Superfund & Emergency Management Division of EPA Region 5 who will issue a formal decision.  CD ¶ 126(b).  This decision is final unless Defendants seek judicial review.  *Id*.

The commenter focuses on two aspects of the formal dispute resolution process as being "cumbersome" – the timeline and the requirement to submit a position paper and evidence (A-

109). The formal dispute resolution process does proceed on a somewhat accelerated timeline, as it must. Under the proposed Consent Decree, "the United States may enforce any requirement of the Consent Decree *that is not the subject of a pending dispute*." CD ¶ 124 (emphasis added). It is not in the interest of enforcing the Consent Decree or the community who is awaiting completion of the cleanup to have disputes languishing unresolved, and thus unenforceable, for lengthy periods of time. The timeline of the formal dispute resolution process ensures that disputes are received and resolved timely so that the clean-up can proceed expeditiously and with certainty.

Similarly, the requirement to submit a position paper and evidence ensures that disputes which can be resolved without judicial involvement are resolved without the even higher administrative burdens of judicial enforcement. At the time formal dispute resolution is commenced, the parties will have been in informal negotiations regarding the dispute for at least 20 days. *See* CD ¶ 125. The United States' position will be known and evidence that supports that position will have been located as part of the informal process. From there, assembling a statement of position will not pose a severe administrative burden.

Finally, this dispute resolution provision tracks with dispute resolution provisions in other recent CERCLA consent decrees. The United States is well accustomed to handling the demands of enforcing consent decrees and participating in dispute resolution. The United States' substantial experience utilizing these procedures provides it with confidence that these provisions do not risk a substantive administrative burden warranting revision. From the earliest days of this derailment, the United States and EPA have made the clean-up and recovery in East Palestine a priority. That certainly will not change for the sake of avoiding dispute resolution.

*Force Majeure*

The Ohio Attorney General submitted a public comment expressing his concerns with the phrasing of the Consent Decree's force majeure provision.  Specifically, the commenter proposed amending the force majeure provision to state:

> "Force majeure" does not include financial inability or any unanticipated or increased costs associated with performing any obligation under this Consent Decree, and it does not include a failure to obtain permits or other approvals from any State of Ohio permitting authority.  (A-116).

The force majeure provision set forth Section XVIII of the proposed Consent Decree notes that there is a "need to protect public health and welfare and the environment," and thus requires Defendants to use "best efforts to anticipate any potential force majeure and best efforts to address the effects of any potential force majeure (a) as it is occurring and (b) following the potential force majeure."  CD ¶ 118.  If Defendants intend to assert a claim of force majeure, they are obligated to timely notify EPA of the basis and evidence supporting its claim of force majeure.  CD ¶¶ 119-20.  After any such claim, EPA makes a determination and notifies Defendants whether they are entitled to relief under force majeure.  CD ¶ 122.

The proposed Consent Decree currently provides that "'[f]orce majeure' does not include financial inability to perform any obligation under this Consent Decree."  *Id*.  The United States notes from a factual perspective that the scenarios raised by the commenter's proposed additional language – force majeure based on unanticipated / increased costs or failure to obtain a permit – are unlikely to be relevant here.  Norfolk Southern is nearing completion of the cleanup work with only confirmatory sampling remaining, so it is highly unlikely that concerns about unanticipated or increased costs would arise.  As to additional projects required under the Consent Decree, these for the most part include set budgets – $25 million for the Community Health Program, $10 million for private well monitoring, $6 million for the Local Waterways

Remediation Plan – and thus will not be subject to unexpected changes in costs.  Similarly, there do not appear to be additional projects required under the Consent Decree that will require a permit to be issued by the State.

That said, the force majeure provision included in the Consent Decree is "standard" across most consent decrees that the United States enters into to resolve claims relating to CERCLA and the Clean Water Act.  Based upon the vast experience that the United States has with this provision, it believes it adequately protects the public's interests in having the requirements of the consent decree completed in a timely manner.  Any claim for force majeure, whether based on unanticipated or increased costs or any other reason, must still be received timely, reviewed, and approved by EPA before Defendants are granted additional time to complete their obligations under the proposed Consent Decree.

In many cases, force majeure is a fact-intensive inquiry that is not subject to blanket inclusions or exclusions under the proposed Consent Decree.  For example, the commenter raises concerns that a failure to obtain permits from the State of Ohio could give rise to a valid force majeure claim.  As courts have noted, however, part of the permitting process is entirely outside of the control of the Defendants.  *See*, *e.g.*, *U.S. v. Kelley*, 145 F.R.D. 432, 437 (E.D. Mi. 1993) (recognizing "the Company could not act by itself to obtain a permit").  Delay caused solely by the State of Ohio, or any other permitting authority, could give rise to a meritorious force majeure claim.  Therefore, it is improper to amend the consent decree to create a blanket exclusion for situations which require factual determinations based on facts that are currently unknown.

## Comments Regarding Public Participation
## (not tied to specific Consent Decree provisions)

**The United States received various public comments raising concerns with transparency and communication between the United States and the public regarding performance of the cleanup, results of sampling and monitoring, the negotiation of the Consent Decree, and implementation of Consent Decree provisions.**

### *Community Engagement Around the Cleanup*

EPA has provided for meaningful public participation during its response action in East Palestine and will continue to engage with the community while the cleanup is ongoing.  *See* Durno Decl. generally and at ¶ 21.  One commenter summed up her feelings on the generally positive relationship between EPA and the community throughout the cleanup process, while expressing a desire for more outreach from both EPA and Norfolk Southern:

> The EPA's Mark Durno, has been very open to hearing our concerns, and communicated with us often, even though we still are not fully happy with the results, but we are working on things, but Norfolk Southern Railroad has been very standoffish.  As we talk to community members and are community members ourselves, I feel it would be useful to the community for the EPA and Norfolk Southern, to interact with us in some way to hear what we are comfortable with once their part of the cleanup is complete to their standards.  This sort of action, I feel, would help people feel safer that have to live here once the EPA and Norfolk Southern have moved on.  (A-34)

Shortly after the derailment, EPA and other federal agencies began engaging with the community of East Palestine through a broad range of venues and tools.  Durno Decl. at ¶ 9.  EPA met with residents and responded to resident concerns through three main ways: meetings with a community-based network, engagement at community-based public meetings and events, and individual assistance at EPA's Welcome Center and via a hotline.  *Id*.  EPA provided updates and essential information through newsletters, open houses, public meetings, community events, videos of site work and presentations, and a robust website that hosts sampling results and detailed explanations of response activities.  *Id*.

Since the start of the response, EPA has convened over 30 meetings with the community-based network, comprised of 40 trusted community leaders representing civic and faith-based organizations, local government, and residents.  *Id*. at ¶¶ 10, 22.  FEMA, with support from EPA and local officials, conducted the initial outreach to assemble this group in February 2023 and EPA's community involvement team expanded the group throughout the response.  *Id*. at ¶ 22.  Feedback from this network informed EPA's communications with the community, particularly the content of newsletters and initiation of public information sessions, including a series of three public health sessions during June 2023.  *Id*.

EPA's newsletter, first issued in March 2023, is mailed to over eight thousand addresses and provides updates on the response, answers to frequently-asked-questions, and notice of health resources and upcoming community events.[14]  *Id*. at ¶ 18.  EPA has attended or held over 40 events including five town halls, four community meetings, ten informational sessions, 18 community events, and six open houses.  *Id*. at ¶ 10.

Beginning on February 13, 2023, EPA's Community Involvement Coordinators staffed a 12-hour hotline, and at the end of February 2023 EPA opened a storefront "Community Welcome Center" in East Palestine to ensure residents were able to meet face-to-face with Agency staff to ask questions and learn about the response.  *Id*. at ¶ 15.  Originally open 12 hours a day, 7 days a week, the Welcome Center has had more than 1,100 visitors and received more than 1,400 phone calls.  *Id*. at ¶ 17.  Beginning in late February 2023, the Center for Disease Control (CDC) and state health staff were also on site to answer health questions from residents.  *Id*. at ¶ 15.  The Welcome Center currently remains open by appointment.  *Id*. at ¶ 17.  EPA intends to provide advance notice if the Welcome Center is moved, altered, or closed.  *Id*.

---

[14] The newsletter was initially issued weekly, and with decreasing but regular frequency as the response has continued.  Durno Decl. at ¶ 18.

In response to resident concerns about possible health effects from the derailment, there was significant outreach regarding public health concerns.  *Id.* at ¶¶ 11-15, 22, 26.  In June 2023, EPA held three public health information sessions to provide resources for additional information and a forum for discussion of residents' concerns.  *Id.* at ¶¶ 11-14.  Several central themes arose in comments and questions during the sessions.  Residents asked about exposure to dioxins, vinyl chloride, and benzene, and long-term chronic symptoms.  *Id.* at ¶ 26.  Residents also noted the rise in mental health issues – from anxiety to substance abuse – and the need for support groups and referral services.  *Id.* at ¶ 28.

In addition to federal agencies, state and local partners attended the public health sessions.  Participants included a University of Kentucky researcher, the Columbiana County Health Commissioner, the Ohio Department of Health, the Pennsylvania Department of Health, the Pennsylvania Bureau of Emergency Preparedness and Response, the Cincinnati Drug and Poison Control Center, the Community Action Agency for Columbiana County, and the Columbiana County Mental Health and Recovery Services Board.  *Id.* at ¶¶ 12-14.  ATSDR attended and explained the Assessment of Chemical Exposures (ACE) investigation it conducted and preliminary results.  *Id.* at ¶¶ 13.  The CDC also provided an overview of the contaminants released from the derailment and associated acute health symptoms and long-term effects from exposure to such chemicals.  *Id.*

In collaboration with the Ohio Department of Health, ATSDR conducted an ACE investigation to evaluate the derailment's impact on the community's health and assess ongoing needs.[15]  *Id.*  From February 21 to March 31, 2023, community members shared information in-

---

[15] Ohio Department of Health, Assessment of Chemical Exposure Investigation Results, https://www.columbiana-health.org/wp-content/uploads/ACE-Community-Fact-Sheet-OH-Final.pdf (last visited April 19, 2024).  The survey sample may not represent the entire community because most

person at the health resource center, through a weblink, or in response to door-to-door canvassing.  *Id*.  EPA encouraged visitors at the Welcome Center to record their health concerns through the ACE investigation.  *Id*. at ¶¶ 13, 15.  Residents reported concerns with potential long-term health effects for themselves and their children.  *Id*. at ¶ 26.

Section XI of the Consent Decree (Community Health Program) was created in response to resident concerns about health impacts of potential exposures from the derailment.  Under the Community Health Program, mental health care services will be provided to eligible residents at no cost, and medical monitoring will be available to eligible residents and first responders for up to 20 years.  *See* CD ¶¶ 50-51.  In addition, the proposed Consent Decree requires creation of a Coordination Committee that is representative of the East Palestine community, including vulnerable populations, such as seniors and children, farmworkers, community-based organizations, and local government agencies.  CD ¶ 52.  The Coordination Committee will help advise, coordinate, and facilitate the Community Health Program.  *Id.*  EPA will continue to facilitate quality community outreach and engagement throughout the fulfillment of the Consent Decree.

*Public Engagement Regarding Cleanup Data*

One commenter expressed concerns about data transparency, stating "[t]he role of the EPA in this disaster and its historical lack of transparency and integrity in swearing to the safety of the community's air and water should have been fully examined before the EPA became a

---

respondents were people who came to the Health Assessment Clinic and already had questions or health concerns. ATSDR also conducted an ACE investigation in collaboration with the Pennsylvania Department of Health from late February to March 31, 2023. Pennsylvania Assessment of Chemical Exposures Investigation, https://www.health.pa.gov/topics/Documents/Environmental%20Health/PA%20ACE%20Community%20Fact%20Sheet.pdf (last updated June 1, 2023).  At the request of the Ohio Department of Health, ATSDR also conducted an ACE investigation to understand first responders' experiences. Ohio First Responder Assessment of Chemical Exposures (ACE) Investigation Results, https://www.columbiana-health.org/wp-content/uploads/RES-OH-ACE-fact-sheet-print-version_FINAL.pdf (last visited April 19, 2024).

party joined with the Department of the Interior in bringing suit" (A-25).  Since EPA took over

on February 21, 2023, and continuing throughout the response action, EPA has strived to be fully

transparent with the community regarding potential impacts on the community's air, water, and

soil.  Durno Decl. at ¶ 9.  EPA has provided sampling results and evaluations for air, water, soil,

and sediment to the public via a dedicated website.[16]  *Id*. at ¶ 20.  The website features a variety

of tools, including photos, maps, and videos.  Approved workplans, and a variety of letters,

directives, and orders issued by EPA are also on the website.  *Id*.

*Negotiation of the Consent Decree*

Comment A-35 asked about the negotiation of the proposed Consent Decree and

expressed concerns about public input: "This decree seems to have been negotiated behind

closed doors without sufficient public input or scrutiny?  Which raises concerns about

transparency and accountability. . .  Were the key stake holders such as community

organizations, local government officials, and residence involved in the negotiation process?"

Similarly, Comment A-79 suggested that the United States "[host] a public hearing to fully

understand community impacts and include a meaningful and detailed community engagement

plan in the settlement."  And attorney Richard Shenkan commented that "[w]hile the Department

of Justice had public meetings to obtain public comment locally, they were not advertised and

they included Mark Durno's attendance, which was a chilling effect for the attendance and

candid speaking-out about the critical nature of this settlement."

As discussed above, since February 2023, EPA has taken significant steps to hear

community concerns regarding all aspects of the federal response to the derailment.  This

includes specific outreach to the community regarding the proposed Consent Decree.  In July

---

[16]  https://www.epa.gov/east-palestine-oh-train-derailment

2024, DOJ and EPA staff provided two days of availability sessions at the EPA Welcome Center in East Palestine while the Consent Decree was open for public comment.  Durno. Decl. at ¶ 16. The availability sessions were attended 39 by people.  *Id*.  At these sessions, individuals had the opportunity to meet with DOJ and EPA staff to discuss the proposed settlement.  *Id*.  The availability sessions were advertised via a Fact Sheet in EPA's newsletter, which is sent to over 8,000 addresses in and around East Palestine and is also available on EPA's website dedicated to the derailment response.  *Id*. at ¶¶ 18, 20.  The Fact Sheet is separately posted in a prominent location on EPA's website.  *Id*. at ¶ 16.  EPA also advertised these sessions and the Fact Sheet through its community stakeholder group to further disseminate this information to different populations in the community.  *Id*.

*Requests for Additional Public Engagement in the Consent Decree*

In its comment, the Environmental Defense Fund urged the United States to uphold the principle of "meaningful engagement with impacted communities" and to "help the affected community to the maximum extent possible," suggesting that the Consent Decree include public comment on every plan that EPA will review or approve (A-109).  To date, EPA has posted approved plans under its administrative orders on its website and intends to continue that practice for plans that Norfolk Southern is required to submit under the Consent Decree.  *Id*. at ¶¶ 20-21.

Providing for a formal public comment process for every plan, however, would be unwieldly, cause delays, and result in slower cleanup and delay in providing benefits to residents. EPA intends to continue publishing approved plans on its website for the public to access, as described above.  Through this process, EPA will keep the community informed as Norfolk Southern fulfills its responsibilities under the Consent Decree.

In addition, several components of the proposed Consent Decree provide for community engagement.  Paragraph 52 of the Consent Decree requires Norfolk Southern to submit a

Community Facilitation Plan that includes establishment of a Coordination Committee, which will be representative of East Palestine and will advise, coordinate, and facilitate implementation of the Community Health Program.  The Committee will include representatives from vulnerable populations, such as seniors and children, farmworkers, community-based organizations and local governments.  CD ¶ 52.

In its comment, the State of Ohio protested that the proposed Consent Decree does not provide for review and approval of certain items by Ohio or local agencies, namely, aspects of the Community Health Program (referencing CD ¶¶ 49, 50, 51, 52, 54, and 55) and the Local Waterways Remediation Plan (CD ¶ 94).  (A-116).  Given the now longstanding role of the EPA in overseeing the on-the-ground response here and its familiarity with requirements for the various plans, the United States is better positioned as the determining reviewer and approver for compliance in this case.  Despite that, the United States has made efforts to include the State of Ohio in various aspects of the Consent Decree implementation.  The proposed Consent Decree specifically provides that prior to submission of the Local Waterways Remediation Plan to EPA, Norfolk Southern "will make good faith efforts to consult with the State of Ohio," as well as Pennsylvania, the Village, and other local stakeholders.  CD ¶ 94.

Additionally, consent decrees where EPA and a state are both plaintiffs in the action generally give only EPA approval authority, albeit in consultation with the State.  Having one approval authority maintains efficient administration of consent decrees, many of which, like the proposed Decree here, are complex and involve numerous programs and plans.  Nothing in the proposed Consent Decree prohibits consultation with the State of Ohio or other governmental entities as EPA reviews and approves various plans submitted under the proposed Decree.

*Comment Regarding a Possible Conflict of Interest*

The workplans that EPA approved under the removal orders require specific data quality, data verification, and data validation consistent with EPA's data quality systems and guidance. *See* Dollhopf Decl. at ¶ 21.  Additionally, Consent Decree Paragraph 27 requires Norfolk Southern's Supervising Contractor to have a quality assurance system that complies with the most recent version of EPA's *Quality Systems for Environmental Data and Technology Programs*.  EPA has engaged with other community groups and community contacts to discuss community concerns as well as cleanup activities.  Durno Decl. at ¶ 23.  These interactions have similarly informed EPA's wider public outreach strategy and work in East Palestine.  *Id*.  For example, EPA has received information and data from community members regarding areas of concern in Sulphur Run.  *Id*.  As a result, EPA directed action to more closely assess certain areas in the creek.  *Id*.  And, in February 2023, after residents raised concerns about the need for dioxin testing in soil throughout the community, EPA ordered Norfolk Southern to develop and implement a comprehensive soil sampling plan to test the soil at more than one hundred locations in and around East Palestine.  *Id*.

EPA is aware of concerns about the presence of hazardous substances which are based on the results of third-party nongovernment testing.  *Id*. at ¶ 25.  In each case, EPA has reviewed the information and provided feedback and follow-up as necessary.  *Id*.  Through this process, EPA has not encountered any data indicating that chemicals released by the derailment, vent-and-burn, or subsequent cleanup are present at unsafe levels in the community away from the derailment area.  *Id*.

Further, EPA's role in oversight of the removal actions is to ensure that the work is performed to its satisfaction, regardless of the contractor who does the work.  The proposed Consent Decree allows for an EPA work takeover if Norfolk Southern were to cease

69

implementing cleanup work, was seriously or repeatedly deficient or late in performing cleanup work or was implementing work in a manner that may cause an endangerment to public health or welfare or the environment.  CD ¶ 42.

Comment A-35 asked:

> Does the DOJ consider the relationship between Norfolk Southern and quest diagnostics a conflict of interest considering the two major shareholders of both of these companies are Vanguard and Blackrock?  Were you aware that quest refused to test for vinyl chloride in the residence's?  How do we know that the medical monitoring program and results will be done with a code of ethics and integrity?  . . .  Do you think this is a conflict of interest that the EPA allowed NFS to manage and hire their own contractors for environmental testing and cleanup?  Especially after the NTSB report came out on how they try to manipulate and change documentations and reports?  This question also stems from the independent scientist, toxicologist and researchers demonstrating much different results.

The provisions and practices described above will ensure that all work under the Consent Decree will be performed in a way that is reliable and with proper oversight.  In addition, regarding medical monitoring, under Paragraph 49 of the proposed Consent Decree, EPA will review Norfolk Southern's selection of an Administrator of the Community Health Program Plan.  If EPA has concerns with that person's qualifications, including ethics and integrity, EPA can disapprove the plan.  Further, under Paragraph 54, Norfolk Southern will be required to report to EPA on the Community Health Program, including the medical monitoring program, annually.

## <u>Comment Not Directly Related to the Proposed Consent Decree</u>

**The United States received a comment questioning the decision not to pursue a claim under the Clean Air Act relating to emissions from the vent-and-burn.**

The United States sued Norfolk Southern under CERCLA and the Clean Water Act to hold the company liable for the environmental damage caused by the derailment, including the damage caused by the vent-and-burn.  *See* Amended Complaint at ¶ 67.  The United States considered also pleading a claim for violation of the Clean Air Act (CAA) but determined that

the facts of the derailment and emergency response do not support bringing such a claim at this time.

 The United States received a comment questioning that decision:

> The statement by the DOJ that the facts of the chemical vent and burn did not support a Clean Air Act violation is ludicrous, and totally false.  Scientific authority on this subject describes in detail the enormous damage to the atmosphere and to land which was done by the East Palestine bomb.  (A-25).

The CAA regulates two main sources of air pollution: stationary sources (*e.g.*, factories and refineries) and mobile sources (*e.g.*, car and truck engines).  While EPA's mobile source regulations apply to modes of transport such as trucks, cars, and trains, and EPA has promulgated regulations specific to locomotives, these regulations relate to emission standards, emission control systems, and engine manufacturing – none apply to emissions from burning rail cars or the vent-and-burn of vinyl chloride as occurred here.  *See* 40 C.F.R. § 1033.

 CAA Section 112 and its implementing regulations address emissions of hazardous air pollutants from stationary sources.  While vinyl chloride is a hazardous air pollutant under Section 112(b), none of the standards or requirements of the hazardous air pollutant program appear to apply to the derailment.  42 U.S.C. § 7412(b).  The emission standards for vinyl chloride only apply to stationary sources that produce vinyl chloride and related chemicals, and thus do not apply to the derailed cars in East Palestine.  40 C.F.R. § 61.60(a).  The emission standards for hazardous air pollutants for other source categories are similarly inapplicable, as these apply to specific industrial categories, none of which encompass the derailed cars in East Palestine.  40 C.F.R. Part 63.

 Although EPA has authority to issue orders under CAA Section 303 to address an imminent and substantial endangerment to the public health or welfare, or the environment, such an order in this case would not have provided any greater protection of the environment and

public health beyond what is being accomplished under EPA's Clean Water Act and CERCLA Orders issued here.  In summary, while the United States appreciates the commenter's concerns, the proposed Consent Decree uses the Clean Water Act and CERCLA to hold Norfolk Southern fully accountable for the environmental damage caused by the incident.  The Consent Decree only resolves the civil claims in the Complaint through the date of lodging.  CD ¶¶ 130-132. And because the United States did not bring a claim under the CAA, Norfolk Southern is not receiving a release from liability under the CAA pursuant to the Consent Decree.