UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION


STATE OF OHIO and
UNITED STATES OF AMERICA,

        Plaintiffs,        Case No. 4:23CV517
                         Akron, Ohio
   vs.               Tuesday, July 15, 2025
                         2:00 p.m.
NORFOLK SOUTHERN
CORPORATION, ET AL.,

        Defendants.


        TRANSCRIPT OF TELEPHONE STATUS CONFERENCE
        BEFORE THE HONORABLE JOHN R. ADAMS
          UNITED STATES DISTRICT JUDGE


APPEARANCES:

For the State of    Amber D. Wootton Hertlein
Ohio:              Catherine Ann English
                 Katherine Anne Walker
                 Nora M. Baty
                 William C. Becker, Jr.
                 Office of the Attorney General
                 Environmental Enforcement Section
                 30 East Broad Street, 25th Floor
                 Columbus, Ohio 43215
                 (614) 466-2766

For the United     Lauren D. Grady
States of America:  U.S. Department of Justice
                 P.O. Box 7611
                 Washington, DC 20044-7611
                 (202) 514-5794

                 Brendan F. Barker
                 Office of the U.S. Attorney - Cleveland
                 Northern District of Ohio
                 801 Superior Avenue, W, Suite 400
                 Cleveland, Ohio 44113
                 (216) 622-3795

For Norfolk            Edward O'Callaghan
Southern Corporation: Cahill Gordon & Reindel - Washington
                       900 16th Street, N.W., Suite 500
                       Washington, DC 2006
                       (202) 862-8970

                       Christopher A. Rheinheimer
                       Wilmer, Cutler, Pickering, Hale & Dorr
                       50 California Street, Suite 3600
                       San Francisco, California 94111
                       (628) 235-1002

                       Lee A. Slone
                       McMahon Degulis - Columbus
                       1335 Dublin Road, Suite 216A
                       Columbus, Ohio 43215
                       (614) 678-5372

Court Reporter:        Caroline Mahnke, RMR, CRR, CRC
                       Federal Building & U.S. Courthouse
                       2 South Main Street, Suite 568
                       Akron, Ohio 44308
                       (330) 252-6021

Proceedings recorded by mechanical stenography; transcript produced by computer-aided transcription.

Tuesday, July 15, 2025

THE COURT:  All right, counsel.  This is Judge Adams.  We're here today regarding Case Number 4:23CV517.  The case is captioned State of Ohio, United States of America versus Norfolk Southern Corporation.

The purpose of today's proceeding is a status conference regarding the matter.

There is a record being kept, so it's important that you identify yourself before you begin to speak.  I would ask that only one counsel address the Court on behalf of each party.

My law clerk obtained a list of counsel who is appearing for the court reporter, so she has that information.  But again, it's important that you identify yourself so we have an accurate record.

So with regard to the matter, I've reviewed the most recent status reports filed by the parties.  I'm aware that fact discovery as it relates to the State claims has been completed.  Ten to 15 expert depositions have been completed.

Is there any information that was learned through that discovery that would impact the federal decree proposal, counsel for the plaintiffs, please?

We'll start with counsel for the State of Ohio.

MS. HERTLEIN:  Your Honor, Amber Hertlein for the

State of Ohio.

The federal government has not been present at the depositions, so I won't purport to speak for them, obviously.

But from the State's perspective, the proposed federal consent decree has been discussed during depositions. The State is seeking relief that is above and beyond what is in the proposed federal consent decree as outlined in our expert report which I believe the Court has.

So that does not affect the State's position in one way or another about the federal consent decree, just that the State is seeking more.

THE COURT: Thank you.

When you say "more," can you be more specific? When you say more, more in terms of monetary relief or relief related to future possible health issues, things of that nature?

MS. HERTLEIN: Specifically with regard to the expert discovery, Your Honor, we would be seeking more in terms of long-term healthcare and monitoring for the residents of East Palestine.

Additionally, we would have our own separate civil penalties, but that's not particularly the subject of the expert discovery.

THE COURT: All right. Counsel for the United

5

States.

MS. GRADY:  Good afternoon, Your Honor.  Lauren Grady for the United States.

As Ms. Hertlein said, the United States did not participate in discovery.  We had reached a settlement with Norfolk Southern.

From our team what we learned, those claims that we have, Clean Water Act and Superfund, both of those claims are fully satisfied by the consent decree.  And therefore we are not looking for any information from the discovery, do not think that there is anything that we would be looking for.

Again, those claims are fully satisfied.

Anything that the State of Ohio is able to obtain above and beyond our settlement we would welcome.  However, we see no reason to deviate from the settlement that is before the Court, and we would ask the Court to enter that settlement.

THE COURT:  Just, I guess I'm curious.  My question was whether there is anything that might have been learned from the discovery that would have a bearing on the consent decree.

The consent decree hasn't been entered, so I guess I'm a little bit shocked -- I guess shocked is not too strong of a term -- to learn that the government didn't decide to at

least avail themselves of the opportunity to glean and/or learn more about all the details here.

MS. GRADY:  Your Honor, the United States does have, for example, copies of both parties' expert reports and has taken a look at those reports as well as some of the discovery that has been passed back and forth, although we did not actively participate in that discovery.

There is nothing we have seen in either party's expert reports that changes our mind or makes us feel that there is anything in the consent decree that is lacking or needs to be changed.

THE COURT:  Okay.  So one folds into the other. So before I hear from the defendants, of course I think I've called it to your attention, there has been a number of we can just use the word media accounts regarding e-mails, other information regarding the health concerns, health risks, to the residents of East Palestine.

Have you reviewed all of that information, counsel for the State of Ohio?

MS. HERTLEIN:  We have reviewed media accounts as they have come out, Your Honor.  We believe the media accounts support the State of Ohio's request for additional relief above and beyond limits in the federal consent decree.

THE COURT:  I don't want to characterize them

other than to say review of them would be, some would say causes some concerns about certain matters.

So, counsel for the United States, what about your view of those accounts, those media accounts, those e-mails, the references to particularly health concerns for the residents?

MS. GRADY:  Yes, Your Honor.  We have reviewed and are familiar with those various media accounts.  We did indicate that we would take a look at the ones that you mentioned in your order.

Having reviewed those accounts, we see that there are really no issues being raised.  We do understand that there are concerns about future health harms, however, those are not new concerns.

EPA did a lot of outreach in this case, as well as our comment period, as well as going out to East Palestine while the consent decree public commentary period took place.

So we are aware that that is something that is on the public's mind; however, we were -- these articles aren't raising concerns we have not heard before.

THE COURT:  Can I ask a question?  I'm sorry.  But the concerns, as I read them, is not from the residents.  These are -- this is internal, purportedly, allegedly internal e-mails from individuals within various entities that have questioned whether or not the health concerns, the

health issues, are much more serious than have been portrayed or has been -- I guess we'll leave it at that.

So it's a bit different.  It's not the residents here. This is internal, allegedly internal communications, saying how much more serious the risks are to the residents.

MS. GRADY:  And Your Honor, we did look into that as well.  We were able to identify one e-mail from a FEMA staff person who was the federal coordinator who made a comment in an e-mail voicing their concern that there could, you know, potentially be some health risk.

However, the relief in the consent decree is meant to address exactly that sort of potential, you know, future risk.

We have specifically the medical monitoring, the exams --

THE COURT:  But that's all -- but counsel, that's all limited.  That's not a lengthy period of time.  It's all limited.  There is not an extensive period of time.

MS. GRADY:  Your Honor, it goes out 20 years which we feel is appropriate in this case.

THE COURT:  Okay.  So this is something that comes to mind.  I haven't decided anything yet because I haven't heard from all the parties.  I'm just calling to your attention issues as I see them here.

So without delving into the decree yet, all of it, so

9/11 happened obviously how many decades ago?  And so how many residents -- just how many individuals are still suffering from adverse health consequences from an event of that sort back in 9/11?

We still have individuals who are still suffering from the health consequences, do we not?

MS. GRADY:  Your Honor, I was not prepared to discuss that event.

THE COURT:  We don't have to discuss it other than it is potentially, could be, could be, an analogy, or analogous to the situation we have before us, about how long the health risks are and how far out they may occur and how unknown they were at the time of the events in question.

It took some time and some years after the event in question before health professionals and others began to understand the full implications of that environmental disaster.  It took decades, or certainly many years, before the full implications of that horrific event occurred.

So that's my sort of point here because as I read the decree, it's fairly limited in terms of the amount of time, the amount of resources for healthcare and monitoring and screening for these residents.

MS. GRADY:  Your Honor, in addition to the 20 years of the community health program in the consent decree, as I believe was mentioned in Your Honor's order, there is

funding from NIH and looking at the public aspect of this that is complimentary to what's in the consent decree. There were also six NIH studies in the last year, and those are studies looking at long-term affects.

So we do believe that the relief in the consent decree it appropriate here, but we would also point out there is other relief out there.  There is also the class actions which I believe there is a number of people who are going to choose some of these or opt-out and bring their own cases if they believe that's appropriate.

And Your Honor, in this case we only have the Clean Water Act claim and the Superfund claim.  And so these broad health relief or individual health relief remedies are something that we have limited availability to seek, and what is in the consent decree and what we negotiate for is at the limits of what those environmental statutes can get us.

THE COURT:  Well, obviously I haven't heard from the parties, so I'm not passing any judgment, nor have I heard from any potential objectors/intervenors who might want to come forward and present evidence/testimony, what have you, either for or against this consent decree.

So on behalf of Norfolk, what would you like to call to my attention here?

MR. O'CALLAGHAN:  Thank you, Your Honor.  Edward

O'Callaghan from Cahill, Gordon & Reindel on behalf of Norfolk Southern.

I would just reiterate the point that counsel for the DOJ just made in that there are portions of the consent decree that is pending before Your Honor that are -- that exceed the relief that the DOJ could have received even if they had taken their claims to trial.

And importantly, to address Your Honor's main concerns, the medical monitoring program, which is a 20-year program that is already fully funded by Norfolk Southern and prepared to kick in once the consent decree is approved, that provides for medical testing for eligible individuals up to a 20-year period.  That is one area that I wanted to address Your Honor's long-term effect and impact.

And then, Your Honor --

THE COURT:  What's --

MR. O'CALLAGHAN:  I am obligated to say --

THE COURT:  What's the parameters of that 20 years?  To whom does it apply?  Is there geographical parameters?

Can you give me some -- refresh my recollection.

MR. O'CALLAGHAN:  Sure.  It's styled as a 20-year program that provides medical exams and medical health services to eligible East Palestine community residents and of course first responders.  And it is funded by a $25

million fund that is already being funded by the company.

And the program also includes a provision that funds a community facilitator.  That community facilitator has already been approved by the EPA.  That's someone that will help to identify and bring some awareness to those eligible of the fact that the medical examinations are available for them to obtain.

Further, Your Honor, as the DOJ, Lauren Grady, mentioned, the $600 million class action settlement that has been approved contains provisions that provide personal injury payouts as a large chunk of the $600 million to the eligible recipients there.  And those personal injury payouts are to be used however the recipient, whoever opts in or gets it, wants to use it.

So there is another provision there that will provide long-term funding for these -- for the residents.

And finally, Your Honor, to answer your first question, you know, through the discovery in the Ohio AG litigation, there is nothing that has come up in that litigation in the discovery that would implicate the relief that the DOJ has obtained through negotiation and agreement with Norfolk Southern in the consent decree.

And while we believe that the Ohio AG will have a tough row to hoe to actually prove their claims and any damages related to those claims, it is separate and apart

from what the DOJ was able to agree to in the consent decree.

So it's, you know, certainly parallel, but it is supplemental to what would be achievable if the consent decree got approved.

So the community health fund that is part of the consent decree, that would not have been obtained.

And importantly, Your Honor, as part of the consent decree there are rail safety provisions that the government -- excuse me, that the company has agreed to provide which again would not have been relief available to the federal government under its environmental law claims.

So we do believe that this consent decree is a suite of relief for the residents that some of which is really just waiting to be triggered by the approval from the Court after the fairness hearing is conducted.

THE COURT:  What about the media accounts? Again, I'm not going to characterize them other than I think they cause some concern about some of the health risks, health concerns, possible health risks going forward to these residents.

I guess I would call it, as I've read them vaguely, that perhaps the health issues and concerns are much more series than have been either portrayed or -- let's put it that way.

MR. O'CALLAGHAN:  Absolutely, Your Honor.  And the company has been very fixed on being responsive to the community and their concerns.  And of course any issues that are raised by any vehicle are important, and the company has been seeking to address them.

All of what I said, Your Honor, doesn't take into account the over $110 million that has already been paid directly to the East Palestine community through the Family Assistance Center, through a $25 million project for the park, through other multi million dollar investments that the company made in water filtration systems and other things that have been already done.

Specifically with regard to these newspaper accounts, news accounts, Your Honor, while we're not prepared to quibble with the sourcing of these things, you know, the fact of the matter is that all of the scientific data and the results of air, water, and soil sampling have concluded that there is no exposure as a result of the derailment that is known to lead to long-term health affects.

That is the state of the data now.

One thing, Your Honor, that the medical monitoring community health program could actually facilitate is beginning to get and collect data.  For example, that NIH study that's referenced there, you know, if folks do participate in this medical examination program, the intent

of that would be to share whatever the results of that are with research like the NIH.

And so we actually believe that implementing this consent decree that has the community health component as part of it would actually help facilitate some of those ongoing research efforts.

So we really do believe that, you know, getting the fairness hearing scheduled and done and, you know, addressing any concerns that may be raised is in everyone's best interest and most especially the community residents to start getting some of the benefits of the consent decree.

THE COURT:  Well, okay, I understand that. Again, I'm still conflicted about waiting until we have all of the discovery, all the experts, and all the information the State of Ohio is apparently developing, whether that is important as well as I consider the consent decree because, unfortunately, the class action, I think is still on appeal. Right?

MR. O'CALLAGHAN:  Your Honor, there is a portion of the class action that is on appeal.  That's the direct payment portion.  That had to do with I believe objections to the attorney fees.

But the personal injury payment portion that I described, that is available for those who want to make those claims.  That is up and running, and payments have

been paid out.

THE COURT:  Okay.  So we will review the matter. I don't know whether these media accounts warrant any further notice to the class or to the -- I should say to the parties because of -- again, I've read them.  I take them for what they are.  Media accounts can sometimes be inaccurate, incomplete, things of that nature.  Some of them seem to be from legitimate media outlets.  I'm not talking about blogs and things of that nature.

So I'm not sure whether that is information that someone who is interested in the case is going to want to review, consider, whether discovery regarding that kind of information, e-mails, might be appropriate.

State of Ohio think about that at all?

MS. HERTLEIN:  That's not been something, Your Honor, that the State of Ohio has considered, especially given the fact that discovery, the fact discovery period was closed.

If that's something Your Honor is interested in, we would be happy to engage in that on a revised schedule.

THE COURT:  Well, I'm going to go back and look at what was -- again, some of the references that were made and see whether or not there is other information that we should be made aware of, so-called in-house or inter-agency communication that might be relevant in the matter.

And again, it should be no surprise to anyone who has been in this Court, this is not a rubber stamp court. You're not going to come in here and just expect me to rubber stamp a consent decree without there being a lot of information presented, parties who have an interest being given an opportunity to be heard.  And so it's not a pro forma, oh, gee, I'm just going to rubber stamp it.  That's not going to occur.

So we'll look it over.

MS. GRADY:  Your Honor, if I may.  Lauren Grady for the United States.

We did look into, you know, behind the media account, what the source of information were.  And as I mentioned we saw, you know, one e-mail from a FEMA staff person.  And we are, you know, happy to perhaps provide a letter and some additional follow-up to the Court explaining that context if that would be helpful to the Court.

THE COURT:  Well, maybe we need to hear from that person.  Does that person still work for the EPA?

MS. GRADY:  It's a FEMA staff person, and he is still on staff there.

THE COURT:  Or FEMA, okay.  I'm sorry.

So he still works there.

So I want to go back and look at the articles and see if there is a reference to any specific person who has

expressed views or opinions regarding health risks and see whether those are, again, how we address those.  That's my concern.

If there is someone inside the I'll use the word agency or agencies that has a differing view of the health risks and has called it to the attention of his superiors, his or her superiors, that's important information to know. That person should be -- again, we should hear from that person, if, again, if that's the case.

MR. GRADY:  Your Honor, based on the e-mail that we have reviewed, that does not appear to be the case, you know, vis-a-vis one comment from someone who, frankly, did not have any sort of medical or scientific background and seemed to be part of the discussion in the context of the health study that we talked about, the public health investigation at NIH and perhaps some Norfolk studies.

THE COURT:  Okay.  Again, there is a lot of unknowns yet.  So we'll review what has been presented here, and then my clerk and I will confer and then we'll decide when we can set aside two or three days for a hearing at the appropriate time as soon as my schedule permits.

We have had an influx of cases lately, criminal matters, immigration matters, so we'll have to deal with those.

But we'll set the matter at a time that's convenient

for all of you.  We may reach out and ask for dates regarding dates for a hearing.

And again, it will take, based on what I know and what I've seen here, it's going to take some time.  And depending on whether the parties wish to object, raise objections, and if there are experts, what have you, we'll need a full hearing.

So any questions on behalf of the State of Ohio?

MS. HERTLEIN:  Nothing, Your Honor.  Thank you.

THE COURT:  On behalf of the United States?

MS. GRADY:  Your Honor, we would just ask that if there is any follow-up that the Court would like to see from the United States for a written order just so we're clear on what we're asked to do.

THE COURT:  I will do that.  I'll put up an order.  And again, some of that may be subject to any new information that we may learn.  I'm always cautious about media accounts.

In this instance, what I read gave, again, gave some pause about exactly what it is that, you know, concerns about the health component of this proposal going forward.

All right.  Thank you very much.

Everyone have a good day.

MR. O'CALLAGHAN:  Your Honor.

THE COURT:  Yes, go ahead.  I'm sorry.  I didn't

mean to overlook you.

MR. O'CALLAGHAN:  This is counsel for Norfolk Southern, Your Honor, just clarifying one point Your Honor is making.  I want to make sure I'm understanding Your Honor.

Do you want us to send proposed dates to Mr. Little, or are we meant to wait to hear from the Court.

THE COURT:  No.  You'll wait to hear from the Court.

MR. O'CALLAGHAN:  Got it.  Thank you, Judge.

THE COURT:  Thank you very much.  Have a good afternoon everyone.  Thank you very much.

(Proceedings concluded at 2:30 p.m.)

C E R T I F I C A T E

I certify that the forgoing is a correct transcript from the record of proceedings in the above-entitled matter.

S/Caroline Mahnke          7/26/25

Caroline Mahnke, RMR, CRR, CRC     Date