**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | | |
|---|---|---|
| **STATE OF OHIO,** | : | **CASE NO.  4:23-CV-00517-JRA** |
| | : | |
| **UNITED STATES OF AMERICA,** | : | **JUDGE JOHN R. ADAMS** |
| | : | |
| **Plaintiffs,** | : | |
| | : | |
| **v.** | : | |
| | : | |
| **NORFOLK SOUTHERN** | : | |
| **CORPORATION, et al.,** | : | |
| | : | |
| **Defendants.** | : | |

---

**STATE OF OHIO'S MEMORANDUM IN SUPPORT OF ITS
MOTION FOR PARTIAL SUMMARY JUDGMENT**

---

## TABLE OF CONTENTS

I.      INTRODUCTION ................................................................................................................... 1

II.     STATEMENT REGARDING ORAL ARGUMENT............................................................. 2

III.    ISSUES TO BE DECIDED ................................................................................................... 3

IV.    SUMMARY OF THE ARGUMENT .................................................................................... 3

V.     FACTUAL BACKGROUND ................................................................................................ 6

    A.    The Norfolk Southern Train 32N Derailment.................................................... 6

    B.    The Emergency Response.................................................................................... 9

    C.    The Vinyl Chloride Tank Cars............................................................................ 9

    D.    The Vent and Burn Decision Exacerbated the Environmental Harm. ..................... 10

    E.    Norfolk Southern Prioritized Returning to Business as Usual over Addressing Environmental Contamination. ................................................................................................. 11

    F.    The Derailment Resulted in Widespread Environmental Contamination. .................... 13

    G.    The Environmental Impacts of the Derailment Lingered for Years. ......................... 16

    H.    Norfolk Southern is Solely Liable for the Damages Caused by the Derailment and the Vent and Burn. ......................................................................................................... 17

VI.    STANDARD OF REVIEW ................................................................................................ 18

VII.   ARGUMENT ....................................................................................................................... 18

    A.    The Source of Water Pollution is Each Railcar that Discharged. ............................. 19

    B.    Liability for Civil Penalties Accrues until Contamination is Fully Removed. ......................... 21

    C.    Norfolk Southern is Bound by the Jury Verdict that Found them Entirely Responsible for the Derailment. ......................................................................................................... 24

    D.    The Attorney General's *Parens Patriae* Status Entitles Him to Seek Relief to Protect the Health of the East Palestine Residents. ................................................................. 25

       1.    The State's Quasi-Sovereign Interest in Protecting the Health of Residents........................... 27

       2.    The State Requested Relief for Impacts to a Substantial Portion of the Population................. 29

E. Norfolk Southern is Strictly Liable for Environmental Violations............................................. 30

1. Norfolk Southern is Strictly Liable for its Hazardous Waste Violations Resulting from the Derailment. ........................................................................................................................................ 32

a. Norfolk Southern is Strictly Liable for Illegally Disposing of Hazardous Waste. ............... 33

b. Norfolk Southern is Strictly Liable for Establishing and Operating a Hazardous Waste Facility Without a Permit............................................................................................................. 33

c. Norfolk Southern is Strictly Liable for Violating the Requirements Imposed on a Hazardous Waste Facility's Operator. ............................................................................................................ 34

2. Norfolk Southern is Strictly Liable for its Water Pollution Violations. ................................... 35

3. Norfolk Southern is Strictly Liable for the Open Dumping of Nonhazardous Solid Waste..... 38

4. Norfolk Southern is Strictly Liable for the Air Pollution Violations Resulting from the Derailment. ....................................................................................................................................... 39

VIII. CONCLUSION ..................................................................................................................... 40

# TABLE OF AUTHORITIES

**Cases**                                                                                                          **Page(s)**

*Alexander v. 5 CareSource*,
    576 F.3d 551 (6th Cir. 2009) ................................................................................................18

*Alfred L. Snapp & Son, Inc. v. Puerto Rico*,
    458 U.S. 592 (1982)................................................................................... *passim*

*Anderson v. Liberty Lobby, Inc.*,
    477 U.S. 242 (1986)................................................................................................18

*Decker v. Nw. Envtl. Fef. Ctr.*,
    568 U.S. 597 (2013)................................................................................................35

*State ex rel. DeWine v. ARCO Recycling, Inc.*,
    2022-Ohio-1758, (8th Dist. May 26, 2022), (judgment affirmed).....................................4, 23

*State ex rel. DeWine v. Musleh*,
    2013-Ohio-4323 (7th Dist.) ........................................................................................39

*State ex rel. DeWine v. Osborne Co., Ltd. (Osborne I)*,
    2018-Ohio-3109, 104 N.E.3d 843 (11th Dist.) ..........................................................4, 22, 23

*Dudee v. Philpot*,
    2019-Ohio-3939, 133 N.E.3d 590 (1st Dist.)..........................................................................24

*Estados Unidos Mexicanos v. DeCoster*,
    229 F.3d 332 (1st Cir. 2000) .....................................................................................26

*Georgia v. Tenn. Copper Co.*,
    206 U.S. 230 (1907)................................................................................................27

*Heiby Oil Co. v. Schregardus*,
    92 Ohio App. 3d 46, 634 N.E.2d 234 (10th Dist.1993)....................................................22, 23

*Hicks v. De La Cruz*,
    52 Ohio St. 2d 71, 369 N.E.2d 776 (1977) .........................................................................5, 25

*Kentucky v. Biden*,
    23 F.4th 585 (6th Cir. 2022) ........................................................................................27, 30

*Lowe's Home Ctrs., Inc. v. Washington Cty. Bd. of Revision*,
    154 Ohio St. 3d 463, 2018-Ohio-1974, 116 N.E.3d 79 .......................................................25

*Maine v. M/V Tamano*,
    357 F. Supp. 1097 (D. Me. 1973) ......................................................................................28

*McHone v. Montgomery Ward & Co.*,
    406 F. Supp. 484 (S.D. Ohio 1975) ........................................................................24

*Missouri v. Illinois*,
    180 U.S. 208 (1901) ....................................................................................................27

*State ex rel. Ohio Att'y Gen. v. Shelly Holding Co.*,
    135 Ohio St. 3d 65, 2012-Ohio-5700, 946 N.E.2d 295 ........................................5, 24

*Ohio Att'y Gen v. Suwinski (In re Suwinski)*,
    509 B.R. 568 (Bankr. S.D. Ohio 2013) ..............................................................26, 29

*Pro. Rental, Inc. v. Shelby Ins. Co.*,
    75 Ohio App.3d 365, 599 N.E.2d 423 (11th Dist. 1991) ..........................................31

*People ex rel. Ryan v. Volpert (In re Volpert)*,
    175 B.R. 247 (Bankr. N.D. Ill. 1994) ......................................................................29

*State v. Cheraso*,
    43 Ohio App. 3d 221, 540 N.E.2d 326 (11th Dist. 1988) ........................................31

*State v. Gastown, Inc.*,
    360 N.E.2d 970 (Perrysburg Mun. Ct. 1975) ..........................................................31

*State v. Mercomp, Inc.*,
    167 Ohio App. 3d 64, 2006-Ohio-2729, 853 N.E. 2d 1193 (8th Dist.) ........6, 30, 32

*Street v. J.C. Bradford & Co.*,
    886 F.2d 1472 (6th Cir. 1989) ..................................................................................18

*Thompson v. Wing*,
    70 Ohio St. 3d 176, 637 N.E.2d 917 (1994) ........................................................5, 24

*United States v. Liviola*,
    605 F.Supp. 96 (N.D. Ohio 1985) .........................................................................6, 31

*United States v. U.S. Steel Corp.*,
    328 F.Supp. 354 (N.D. Ind. 1970) ........................................................................6, 31

*United States v. Winchester Mun. Utils.*,
    944 F.2d 301 (6th Cir. 1991) ....................................................................................31

**Statutes**

33 U.S.C. § 1311(a) ..........................................................................................................35

33 U.S.C. § 1344 ..............................................................................................................36

33 U.S.C. § 1362(7) ..........................................................................................................35

Ohio Rev. Code §§ ................................................................................................ *passim*

Ohio Rev. Code § 1.59 ................................................................................................ 32

Ohio Rev. Code § 1.59(C) ........................................................................................... 31

Ohio Rev. Code § 3704.01(O) ...................................................................................... 39

Ohio Rev. Code § 3704.05 .................................................................................. 6, 22, 30

Ohio Rev. Code § 3704.05(G) ...................................................................................... 39

Ohio Rev. Code § 3704.06 ........................................................................................... 22

Ohio Rev. Code § 3734.02(E) ...................................................................................... 34

Ohio Rev. Code § 3734.02(F) ............................................................................. 22, 33, 34

Ohio Rev. Code § 3734.03 ..................................................................................... 22, 38

Ohio Rev. Code § 3734.11 ........................................................................................ *passim*

Ohio Rev. Code § 3734.13 ........................................................................................... 22

Ohio Rev. Code § 3734.13(C) ...................................................................................... 39

Ohio Rev. Code § 3745.011(F) ..................................................................................... 31

Ohio Rev. Code § 6111.01(I) ....................................................................................... 31

Ohio Rev. Code § 6111.01(V) ...................................................................................... 36

Ohio Rev. Code § 6111.01(B) ...................................................................................... 36

Ohio Rev. Code § 6111.01(C) ...................................................................................... 36

Ohio Rev. Code § 6111.01(D) ...................................................................................... 36

Ohio Rev. Code § 6111.01(H) ...................................................................................... 36

Ohio Rev. Code § 6111.04 .................................................................................. 6, 20, 30

Ohio Rev. Code § 6111.04(A) ............................................................................. 20, 31, 35

Ohio Rev. Code § 6111.04(A)(1) ........................................................................ 3, 19, 21, 36

Ohio Rev. Code § 6111.04(A)(2) ................................................................................... 35

Ohio Rev. Code § 6111.07 ................................................................................... 6, 22, 30

Ohio Rev. Code § 6111.07(A) ...................................................................21, 22, 31, 36

Ohio Rev. Code § 6111.07(B) ...................................................................36

Ohio Rev. Code § 6111.09...........................................................................22

**Other Authorities**

40 C.F.R. § 122.2 ..........................................................................................4, 21

40 C.F.R. § 261 .............................................................................................28

49 C.F.R. § 661.3 ..........................................................................................4, 21

Fed. R. Civ. P. 56(a) ......................................................................................18

NTSB Haz Mat Group Chair's Factual Rep. 78 .............................................11

Ohio Admin. Code 3745-33-01 (P)(1) ...........................................................4

Ohio Admin. Code § 3745-15-07 ...................................................................22

Ohio Admin. Code § 3745-15-07(A) ...............................................................39

Ohio Admin. Code § 3745-33-01 (P)(1) ...........................................................21

Ohio Admin. Code § 3745-50-10(D)(7) ...........................................................33

Ohio Admin. Code § 3745-50-10(F)(1) ............................................................34

Ohio Admin. Code § 3745-51-02 ....................................................................33

Ohio Admin. Code § 3745-51-03 ....................................................................33

Ohio Admin. Code § 3745-51-33 ....................................................................33

Ohio Admin. Code § 3745-54-51 ....................................................................35

Ohio Admin. Code § 3745-55-11 ....................................................................34

Ohio Admin. Code § 3745-55-12 ....................................................................34

Ohio Admin. Code § 3745-55-42 ....................................................................34

Ohio Admin. Code § 3745-55-43 ....................................................................34

Ohio Admin. Code § 3745-55-47 ....................................................................34

Press Release, Governor DeWine, East Palestine Update: Residents Can Safety Return
    Home (Feb. 8, 2023), https://governor.ohio.gov/media/news-and-media/East-
    Palestine-Update-Residents-Can-Safely-Return-Home-02082023 .........................................12

U.S. Env't Prot. Agency, *EPA Train 32N Spreadsheet,*
    https://www.epa.gov/system/files/documents/2023-
    02/TRAIN%2032N%20%20EAST%20PALESTINE%20-
    %20derail%20list%20Norfolk%20Southern%20document.pdf;.............................................14

## I.  INTRODUCTION

Norfolk Southern is strictly liable for discharging over one million gallons of wastes (hazardous and non-hazardous), materials, and other pollutants into Ohio's air, land, and water. The fallout strains comprehension in the normal human experience—over 39 million gallons of wastewater collected with over 38 million gallons removed for offsite disposal and another 175,224 tons of contaminated soil (more than 350 million pounds) excavated and shipped out of East Palestine for disposal. Impacts were observed as far downstream as Cincinnati.

Norfolk Southern Train 32N's derailment on February 3, 2023, spawned days of burning hazardous and non-hazardous waste with the resulting air pollution enveloping the Village of East Palestine. Three days later, Norfolk Southern made things significantly worse through their campaign to intentionally "vent and burn" five tank cars containing vinyl chloride, a listed hazardous substance and known carcinogen. The company set fire to all of it. Norfolk Southern's deliberate detonation created a massive cloud of phosgene gas, a byproduct of burning vinyl chloride and a lethal chemical employed during World War I. But the resulting air pollution was not the only harmful side-effect: Vinyl chloride is mobile in soil and can migrate into groundwater. Norfolk Southern's post-derailment decision only aggravated the environmental and health crisis for the roughly 5,000 residents of East Palestine.

The devastation unleashed on this community serves as the background to this litigation. Through this motion for summary judgment, the State seeks five rulings from this Court that will begin to hold Norfolk Southern accountable for the disaster.

First, the State is entitled to a ruling as a matter of law that each railcar serves as a separate source of water pollution. In other words, the train is not just one source of pollution. Ohio's water pollution control law and federal law support a ruling that each railcar is a separate source of water pollution.

1

Second, liability for violations accrue on a daily basis until the pollution is no longer present. Under Ohio statutes and by Ohio case law, it is clear that liability for civil penalties endures as long as the pollution remains in the environment.

Third, Norfolk Southern's negligence has been established, so there is no genuine issue of material fact here. The jury's verdict in *In re: East Palestine Train Derailment* (Case No. 4:23-CV-242, N.D. Ohio) assigned 100% of the liability to Norfolk Southern for the train derailment and the vent and burn. Thus, Norfolk Southern is now estopped from relitigating its negligence in this case.

Fourth, Ohio has a right to seek relief to protect the health of the impacted residents. A community is in despair with concern about the long-term health effects that may linger from the chemicals, the smoke, and the contamination that engulfed their town. The State's *parens patriae* authority ensures the right to recovery in aid.

Fifth and finally, the State is entitled to strict liability against Norfolk Southern for numerous statutory violations. Those include violations of Ohio's water pollution control statute, Ohio's solid waste statute, Ohio's hazardous waste statute, and Ohio's air pollution control statute. The plain language of Ohio statutes, reinforced by case law, ensures strict liability, and Norfolk Southern is strictly liable for its violations.

For these reasons and the reasons below, Ohio is entitled to summary judgment.

## II. STATEMENT REGARDING ORAL ARGUMENT

Ohio notes the Court's standing Civil and Criminal Practices and Procedures indicate that oral argument on motions is rarely heard. Norfolk Southern's Motion for Partial Summary Judgment requested a hearing. If the Court is inclined to grant Norfolk Southern's request, Ohio respectfully requests the opportunity to present as well.

### III. ISSUES TO BE DECIDED

1. Each railcar that released any of its contents is a potential separate source of pollution, not the train itself;

2. Liability for civil penalties continue to accrue each day until Norfolk Southern has completely removed the pollution;

3. The jury's verdict in *In re: East Palestine Train Derailment* (Case No. 4:23-CV-242, N.D. Ohio) precludes Norfolk Southern from arguing against a finding of negligence in this case;

4. Ohio has a right to seek appropriate relief to protect the health of residents impacted by the derailment; and

5. Norfolk Southern is strictly liable for the environmental violations enumerated in Section VII below.

### IV. SUMMARY OF THE ARGUMENT

Norfolk Southern's liability derives from five legal principles: (1) Ohio law traces water pollution to the source, and in this case, the source of the water pollution is each railcar; (2) Ohio law imposes continuous liability as long as pollution remains; (3) the class action verdict settled any issue of negligence in the State's favor, finding Norfolk Southern 100 percent liable; (4) Ohio has the right to seek relief to protect the health of impacted residents; and (5) Norfolk Southern is strictly liable for the enumerated environmental violations.

*Railcars are separate sources of water pollution.* This Court should hold that each railcar that lost some or all of its contents is a potential separate source of pollution for purposes of calculating days of violation. For example, the railcars containing vinyl chloride continue to accrue daily violations until vinyl chloride is no longer present at the derailment site.

Ohio Revised Code § 6111.04 prohibits causing pollution to Ohio's waters of the state or placing or causing to be placed any "wastes in a location where they cause pollution of any waters of the state." Ohio Rev. Code § 6111.04(A)(1). The pollution or placement of waste tracks to each

car, not the train itself. Consider the variety of chemicals that discharged from the separate cars to waters of the state. The relationship between car and chemical illustrates that each car is a separate source of pollution. So does federal law, defining rolling stock to include railcars, 49 C.F.R. § 661.3, and then referring to the railcars as separate point sources for water pollution discharges from permitted sources. 40 C.F.R. § 122.2, *see also* Ohio Admin. Code 3745-33-01 (P)(1) ("Point source means any discernible, confined, and discrete conveyance, including . . . rolling stock . . . from which pollutants are or may be discharged."). Thus, Norfolk Southern's source of water pollution is each railcar, not the train.

*Liability for civil penalties continues as long as pollution is present.* Ohio's regulatory scheme imposes daily, continuing sanctions in the form of statutorily mandated civil penalties. Ohio law is clear: Norfolk Southern is responsible for *each and every day* of violation for *each and every railcar* that caused pollution until the pollution is removed. Norfolk Southern's liability did not end after the vent and burn or after the pool fires were extinguished. The well-established law in Ohio means that Norfolk Southern continues to accrue liability until it has cleaned up the mess it caused.

Ohio appellate courts have upheld penalties for continuous violations while pollution remains unabated. One court held that placing dredged material on the bank of a river accrued daily penalties as long as the pile remained. *State ex rel. DeWine v. Osborne Co., Ltd. (Osborne I)*, 2018-Ohio-3109, 104 N.E.3d 843, at ¶ 8 (11th Dist.). Another appellate court affirmed maximum civil penalties for each day an unlicensed construction debris operator illegally disposed of debris, which spanned several years. *State ex rel. DeWine v. ARCO Recycling, Inc.*, 2022-Ohio-1758, at ¶ 87 (8th Dist. May 26, 2022), (judgment affirmed). The Supreme Court of Ohio ruled in the context of an air permit and in light of the Clean Air Act that the operator remains in violation

and subject to penalties until the operator proves the violation ceases. *State ex rel. Ohio Att'y Gen. v. Shelly Holding Co.*, 135 Ohio St. 3d 65, 77-78, 2012-Ohio-5700, 946 N.E.2d 295. Therefore, the State is entitled to summary judgment to establish liability for civil penalties accruing as long as the pollution is present.

*Norfolk Southern's negligence has already been established.* Issue preclusion bars Norfolk Southern from defending against Ohio's negligence claim because the issue was adjudicated in a prior case by a court of competent jurisdiction, and privity applies to Norfolk Southern. *See Thompson v. Wing*, 70 Ohio St. 3d 176, 183, 637 N.E.2d 917, 923 (1994). Norfolk Southern chose to litigate a case in which a jury found the company *entirely responsible* for Train 32N's derailment and its aftermath, including the black mushroom cloud that resulted from the intentional vent and burn of five vinyl chloride cars. The jury heard the evidence and assigned all liability to Norfolk Southern.

The fact that Ohio was not a party to the class action does not save Norfolk Southern's defense to negligence. *Hicks v. De La Cruz*, 52 Ohio St. 2d 71, 74, 369 N.E.2d 776, 778 (1977) ("[a] party precluded under this principle from relitigating an issue with an opposing party likewise is precluded from doing so with another person unless he lacked full and fair opportunity to litigate that issue in the first action, or unless other circumstances justify according him an opportunity to relitigate that issue."). Norfolk Southern should be barred from seeking to relitigate their negligence in this case.

*Ohio may seek recovery to protect the public health of East Palestine residents.* The residents of East Palestine were exposed to a chemical cocktail of spilled and burned materials. These chemicals, some of which are genotoxic, have the potential to cause long-term harm to East Palestine's residents. The Attorney General is uniquely situated to protect and advocate for the

public health. *Alfred L. Snapp & Son, Inc. v. Puerto Rico*, 458 U.S. 592, 607 (1982). ("[A] State has a quasi-sovereign interest in the health and well-being—both physical and economic—of its residents in general."). This *parens patriae* authority allows the Attorney General to act in the best interest of the public in situations where, as here, the public health is threatened, and a substantial population has been impacted. This Court should affirm the Attorney General's traditional powers and find he is authorized to seek relief to redress the threats created by Norfolk Southern.

*Norfolk Southern is strictly liable for environmental violations.* The vast majority of Ohio's claims are strict-liability environmental violations. The plain, statutory language, "no person shall," establishes that strict liability attaches to each environmental violation. Ohio Rev. Code §§ 6111.04 and 6111.07 (water); Ohio Rev. Code § 3704.05 (air); Ohio Rev. Code § 3734.11 (solid and hazardous waste). *See, e.g.*, *State v. Mercomp, Inc.*, 167 Ohio App. 3d 64, 2006-Ohio-2729, 853 N.E. 2d 1193 (8th Dist.); *United States v. Liviola*, 605 F.Supp. 96, 100 (N.D. Ohio 1985). At the heart of strict liability is the principle that "[t]he public is injured just as much by unintentional pollution as it is by deliberate pollution." *United States v. U.S. Steel Corp.*, 328 F.Supp. 354, 356 (N.D. Ind. 1970). There can be no dispute that Norfolk Southern has violated Ohio's environmental laws. This Court should hold Norfolk Southern liable for daily violations of Ohio's hazardous waste, water pollution, solid waste, and air laws until the violations are eliminated.

## V. FACTUAL BACKGROUND

### A. The Norfolk Southern Train 32N Derailment

Norfolk Southern's Train 32N left Madison, Illinois on February 1, 2023, bound ultimately for Conway, Pennsylvania. Ex. 1, NTSB Hr'g Day 1 Tr. 20:24-25; Ex. 2, NTSB Hazardous Materials Grp. Chair's Factual Rep. 6 (Group B Exh 10). The Train included 149 railcars, three locomotives, and was approximately 1.76 miles long when fully assembled. Defs.' Answer to Compl. ¶ 30, Dkt. No. 29 ("Answer"). Norfolk Southern Railway Company operated the Train and

owned the locomotives and the tracks on which it ran. *Id.* at ¶ 18. Norfolk Southern Railway Company is a Class I railroad and is the wholly-owned, principal operating subsidiary of Norfolk Southern Corporation (collectively, "Norfolk Southern"). *Id.* at ¶ 16. Norfolk Southern operates in 22 states and the District of Columbia and operates over 16,000 route miles, serving every major container port in the Eastern United States. *Id.*

On February 3, 2023, Train 32N was traveling east on the Fort Wayne line of Norfolk Southern's Keystone Division, with 46 trains passing through East Palestine per day. Answer ¶ 28; Ex. 3, Bedell Dep. 72:2-6. Unbeknownst to the train crew, a wheel bearing on Car 23 began to fail as the Train traversed northeast Ohio. Ex. 4, Stauffer Dep. 200:23-25, 201:1-2. Norfolk Southern utilizes hot box detectors ("HBD") at varying intervals along its rail lines to detect overheating wheel bearings and alert the train crew with real-time warnings. Answer, ¶ 32. Car 23 traveled past three HBDs that revealed an escalating temperature prior to derailing in East Palestine. Ex. 5, NTSB Mech. Grp. Factual Rep. 16 (Group B Exh. 5). The HBD at milepost 79.9 in Sebring recorded a temperature of 38 degrees above ambient temperature for the suspected wheel bearing on Car 23. Bedell Dep. 59:15-24. Ten miles later, the HBD at milepost 69.01 in Salem recorded 103 degrees above ambient temperature. Ex. 6, Schnautz Dep. 178:19-25. A series of cameras captured apparent sparks or fire emanating from Car 23 well in advance of East Palestine. Bedell Dep. 57:7-13.

The next HBD was twenty miles away at milepost 49.81 in the Village of East Palestine. Stauffer Dep. 185:15-22. That HBD, just three-tenths of a mile from the derailment location, recorded 253 degrees above ambient temperature and transmitted an alert to the train crew for the first time. Answer ¶ 33; NTSB Hr'g Day 1 Tr. 24:7-8. Just past milepost 49.81, Train 32N's crew was notified by an audible alarm of a mechanical failure, causing the engineer to apply dynamic

braking, as well as emergency braking, to bring the Train to a stop. Answer ¶¶ 36-37. It was there, at about the North Pleasant Drive Crossing in the Village of East Palestine, that Train 32N derailed at 8:54 p.m. on February 3, 2023 (the "Derailment"). *Id.* at ¶¶ 1, 28. Upon derailing, Car 23 was discharging fire and smoke. *Id.* at ¶ 38. Train 32N's "critical" alarm for the train crew to stop Train 32N was too late to avoid disaster.

The Derailment occurred in a mixed-use residential, commercial, and industrial area of East Palestine, Columbiana County, Ohio. Answer ¶ 29. The nearest residences are located less than 1,000 feet from the derailed wreckage. *Id.* at ¶ 29. One hour later at 9:53 p.m., East Palestine residents within one mile of the railcar wreckage were advised to shelter in place. *Id.* at ¶ 63.

Thirty-eight of Train 32N's 146 railcars derailed. Answer ¶ 41. Twenty-seven were tank cars and eleven were freight or hopper railcars. *See infra* Chart, pp. 13-14. The derailed cars had different owners, designs, and contents. *See* NTSB Hazardous Materials Grp. Chair's Factual Rep. 30-54 (Group B Exh. 10). There were pressure tank cars with thermal survivability, non-pressure general service tank cars, and others. *Id.* Some cars contained hazardous or flammable liquids, solid polyethylene pellets, grain, malt liquor, or other products. *See infra* Chart, pp. 13-14. Immediately upon impact, at least three of the railcars ruptured, their contents poured and burned. Ex. 7, NTSB, Railroad Investigation Rep., RIR-24-05, p. 1 (2024). The fires, fed by Train 32N's spilled lading, burned and smoldered for days following the Derailment. NTSB Hazardous Materials Grp. Chair's Factual Rep. 80.

Norfolk Southern's train wreckage discharged over one million gallons of wastes, materials, and other pollutants into Ohio's air, waters, and soil. Answer ¶ 1. It was just one among 20 Norfolk Southern derailments since 2015 that involved chemical releases, which in some

instances have resulted in injuries, death, and/or property damage. *Id.* at ¶¶ 19-23, 25-26. This one, however, has many distinguishing factors.

Train 32N's Derailment is unique: the preceding and subsequent events make it even more egregious than Norfolk Southern's other derailments. The actual environmental harm has been devastating, and its effects are long-lasting. The environmental consequences remain, and the human health consequences for the people of East Palestine, first responders, and emergency response personnel are far beyond unnerving—they are frightening.

### B.    The Emergency Response

The Derailment was first reported to East Palestine's 911 operator at 8:56 p.m. on February 3. Ex. 8, NTSB, Hazard Commcns. and Emergency Responder Preparedness for the Initial Emergency Response Grp. Chair's Factual Rep. 17. First responders were on scene within minutes. *Id.* at 18. The fire department immediately began attempts to extinguish the fires with water, but quickly discovered the chemical fires were not responsive to water. NTSB, RIR-24-05, pp. 9-10. During this initial response, the East Palestine Fire Department attempted to acquire the complete train consist—a listing of the chemicals and materials loaded on a train. *Id.* at 10. The consist was provided to the Columbiana County Emergency Management Agency director around 10:00 p.m. Ex. 9, Clark Dep. 45:14-46:9. This information is critical to first responders, as it shapes the way they approach emergencies and how they fight fires. *Id.* at 46:15-23.

### C.    The Vinyl Chloride Tank Cars

The day after the Derailment, February 4, 2023, Norfolk Southern turned its attention to the five tank cars carrying vinyl chloride monomer. Ex. 10, NTSB Group Chair's Factual Report – Supplemental (October 25, 2023), p. 6. Four of the vinyl chloride cars were exposed to fire. Ex. 11, McCarty Dep. 310:1-6. All five tank cars were equipped with pressure relief devices, which are designed to release excess pressure and avoid an explosion. NTSB Hazardous Materials Group

9

Chair's Factual Report, p. 60. The devices activated and released pressure from the four fire-exposed vinyl chloride cars beginning shortly after midnight on February 4. Ex. 12, Wood 30(b)(6) Dep. 109:9-13; McCarty Dep. 169:20-23. The pressure relief devices cycled on and off into mid-afternoon, when most of the pool fires had subsided. McCarty Dep. 181: 4-6, 344:11-16. Around 5:30 p.m. the device on car OCPX80179 vented continuously for at least an hour. Wood 30(b)(6) Dep. 113:5-10. Following this event, no additional venting was observed from any of the vinyl chloride cars. McCarty Dep. 183:5-6.

Despite the activation of at least four of the pressure relief devices, Norfolk Southern and its contractors advised the only option was to perform a vent and burn, a process that includes blowing holes in the side of a tank car with explosives and immediately burning or flaring the chemical as it is released through the hole. NTSB, RIR-24-05, pp. 17-18.; Ex. 13, Kollar Dep. 72:1-12. Norfolk Southern and its contractors began discussing a possible vent and burn as early as February 4. McCarty Dep. 197:6-11. By February 5, they presented it as the only option and pushed Chief Drabick to authorize the vent and burn. McCarty Dep. 200:11-16. Norfolk Southern claimed that without a vent and burn, the vinyl chloride risked polymerizing—a process by which the chemical undergoes a reaction and becomes PVC, a hard plastic. NTSB, RIR-24-05, p. 18. In the case of a pressurized tank car, polymerization could lead to a catastrophic explosion. McCarty Dep. 199:10-200:2.

### D. The Vent and Burn Decision Exacerbated the Environmental Harm.

OxyVinyls, LP was the owner of the tank car that vented for over an hour (OCPX80179) and the manufacturer of the stabilized vinyl chloride monomer that was inside the car. NTSB, RIR-24-05, pp. 31, 57. After the Derailment, Norfolk Southern consulted with OxyVinyls regarding the tank car and the issue of polymerization. Ex. 14, Brenon Dep. 58:4-20, January 19, 2024. OxyVinyls unequivocally told Norfolk Southern that polymerization was *not* occurring. *Id*. at

61:7-12. John Brenon, OxyVinyls' Vice President of Manufacturing, plainly stated, "Let me be clear, our position is that polymerization is not occurring…[D]on't [vent and burn] because of concerns of polymerization." *Id*. at 61:7-12. And when OxyVinyls reiterated this stance, Norfolk Southern's contractors openly mocked Brenon for it. Ex. 15, Steven Smith Dep. 110-118. But Norfolk Southern did not relay this information to anyone. NTSB, RIR-24-05, p. 29. Instead, Norfolk Southern and its contractors presented the vent and burn as the only option, and the Incident Commander, East Palestine Fire Chief Keith Drabick, gave the go-ahead to proceed. Ex. 16, Vogel Dep. 55:14-19; 58:15-19.

Despite the decreasing temperature of the tank cars and lack of complete information given to Fire Chief Drabick, Norfolk Southern's contractors blew up the tank cars at 4:37 p.m. on February 6, 2023. NTSB Haz Mat Group Chair's Factual Rep. 78. So the vent and burn went forward, with vinyl chloride pouring into trenches dug alongside the cars before it was quickly ignited and largely flared into the air. Answer, ¶ 48, Kollar Dep. 123:1-10. The explosion released an untold volume of chemicals into the air.



NTSB Investigative Hearing, Group B, Exhibit 2

### E.   Norfolk Southern Prioritized Returning to Business as Usual over Addressing Environmental Contamination.

Immediately following the vent and burn, Norfolk Southern turned its attention not to containing the environmental disaster, but to reopening its tracks. Norfolk Southern's CEO reported to a board member that he expected to have the track back in service by 11:00 a.m. the next day, beating his estimate by about 36 hours. Ex. 16, Shaw Dep. 274. But the Derailment site

was essentially a swamp of chemicals, spilled lading, firefighting water, and mud. Norfolk Southern struggled to contain runoff. Kollar Dep. 27-28; 32-33. And Norfolk Southern continued to struggle with containment through at least July 2023. *Id*. Even Norfolk Southern's own employee admitted that containment in the immediate aftermath of the Derailment "could have been installed better," and that they were not capturing all of the material they were intended to capture. Ex. 17, Scoble Dep., 57-58.

Norfolk Southern was focused on reopening the tracks. So focused that they brought in heavy equipment and hauled away the five scorched vinyl chloride tank cars under the cover of night on February 6 and began laying temporary track in the lingering chemical swamp the very next morning on February 7. Ex. 18, Gortner Dep. 86; Kollar Dep. 119:7-120:23.

But the personnel on the ground (Norfolk Southern, Ohio EPA, USEPA) previously agreed to a plan that would remove the top few feet of muck *before* re-establishing train traffic. Kollar Dep. 119;126; Ex. 19, Eberle Dep. 102 -104; Scoble Dep. 52; 86. The purpose of this initial step was two-fold: (1) limit the potential scope of the environmental contamination; and (2) make it easier to complete the remediation without tracks in the way. Scoble Dep. 52.

By 4:46 p.m. on February 8, Norfolk Southern's trains passed through the Derailment site on the temporary tracks. NTSB, RIR-24-05, p. 31. Notably, the evacuation order that displaced residents from their homes ahead of the vent and burn was not lifted until 45 minutes later. Press Release, Governor DeWine, East Palestine Update: Residents Can Safety Return Home (Feb. 8, 2023), https://governor.ohio.gov/media/news-and-media/East-Palestine-Update-Residents-Can-Safely-Return-Home-02082023. Norfolk Southern was back to business as usual before the residents of East Palestine were even notified that they could return home. *Id*.; NTSB, RIR-24-05, p. 31. Norfolk Southern's push to resume operations meant that the pollutants spilled in the

12

Derailment languished for months, migrating to surface water and leaching into the soil beneath the tracks. Kollar Dep. 119-120; Gortner Dep. 92-94.

### F.      The Derailment Resulted in Widespread Environmental Contamination.

Eleven tank cars contained hazardous materials, hazardous substances, hazardous wastes, and/or other harmful pollutants, including but not limited to vinyl chloride, butyl acrylate, ethylene glycol monobutyl ether, ethylhexyl acrylate, isobutylene, and petroleum lube oil. NTSB Haz Mat Group Chair's Factual Report, pp. 6-7. These materials, whether flammable liquid, combustible liquid, or flammable gas, were housed in the individual railcar vessels that breached either on impact or from Norfolk Southern's own actions post-derailment, which subsequently ignited and damaged an additional 12 railcars. Answer ¶ 41.

The hopper cars and box cars also spilled their lading. NTSB Haz Mat Group Chair's Factual Rep. 7. Plastic pellets, flour, frozen vegetables, and other items were sprinkled throughout the chemical swamp, migrating to streams and soil. *Id.* at 7, 80; Kollar Dep. 117:4-8. In short, the majority of the derailed cars lost at least some of their contents in the Derailment, which were left to pollute the air, soil, and water around the site:

| Line # | Car # | Commodity | Car Type | Status |
|---|---|---|---|---|
| 23 | ARSX 4145 | Polypropylene | Hopper | Lading Spilled |
| 24 | BRKX 66738 | Polypropylene | Hopper | Lading Spilled |
| 25 | GPLX 75465 | Polyethylene | Hopper | Destroyed by Fire |
| 26 | ECUX 860375 | Polyethylene | Hopper | Destroyed by Fire |
| 27 | UTLX 684543 | Residue Lube Oil | Tank Car | No Breach |
| 28 | TILX 402025 | Vinyl Chloride | Tank Car | Vent and Burn |
| 29 | OCPX 80235 | Vinyl Chloride | Tank Car | Vent and Burn |
| 30 | OCPX 80179 | Vinyl Chloride | Tank Car | Vent and Burn |
| 31 | GATX 95098 | Vinyl Chloride | Tank Car | Vent and Burn |
| 32 | RACX 51629 | Dipropylene Glycol | Tank Car | Burned, no Breach |
| 33 | LYBX 5191 | Propylene Glycol | Tank Car | Burned, no Breach |
| 34 | RACX 51435 | Propylene Glycol | Tank Car | Lading Spilled |
| 35 | UTLX 671772 | Diethylene Glycol | Tank Car | No Breach |
| 36 | SHPX 211226 | Ethylene Glycol Monobutyl Ether | Tank Car | Lading Spilled, Burned |
| 37 | TILX 331319 | Semolina | Hopper | Lading Spilled, Burned |
| 38 | DOWX 73168 | Ethylhexyl Acrylate | Tank Car | Lading Spilled, Burned |
| 39 | ROIX 57036 | Polyvinyl | Hopper | Destroyed by Fire |
| 40 | NCUX 40057 | Polyvinyl | Hopper | Destroyed by Fire |

| 41 | UTLX 100055 | Petroleum Lube Oil | Tank Car | Lading Spilled, Burned |
| 42 | XOMX 110664 | Petroleum Lube Oil | Tank Car | Lading Spilled, Burned |
| 43 | UTLX 684798 | Petroleum Lube Oil | Tank Car | No Breach |
| 44 | UTLX 671310 | Petroleum Lube Oil | Tank Car | Lading Spilled, Burned |
| 45 | CERX 30072 | Polypropyl Glycol | Tank Car | Lading Spilled, Burned |
| 46 | SHPX 211106 | Propylene Glycol | Tank Car | No Breach |
| 47 | NATX 231335 | Diethylene Glycol | Tank Car | Lading Spilled |
| 48 | UTLX 671913 | Diethylene Glycol | Tank Car | No Breach |
| 49 | NATX 35844 | Isobutylene | Tank Car | No Breach |
| 50 | UTLX 205907 | Butyl Acrylates | Tank Car | Lading Spilled |
| 51 | UTLX 661296 | Petrol Oil | Tank Car | No Breach |
| 52 | COCX 287059 | Fuel Additives | Tank Car | No Breach |
| 53 | ROIX 59396 | Polyvinyl | Hopper | Destroyed by Fire |
| 54 | ROIX 57782 | Polyvinyl | Hopper | Destroyed by Fire |
| 55 | OCPX 80370 | Vinyl Chloride | Tank Car | Vent and Burn |
| 56 | TBOX 640019 | Cotton Balls | Box Car | Destroyed by Fire |
| 57 | BKTY 152621 | Sheet Steel | Box Car | Destroyed by Fire |
| 58 | LINX 7278 | Frozen Vegetables | Box Car | Destroyed by Fire |
| 59 | DPRX 259013 | Benzene | Tank Car | No Breach |
| 60 | DPRX 258671 | Benzene | Tank Car | No Breach |
| 61 | XOMX 110236 | Paraffin Wax | Tank Car | No Breach |
| 62 | ELTX 7458 | Powder Flakes | Hopper | No Breach |
| 63 | ELTX 3421 | Powder Flakes | Hopper | No Breach |
| 64 | NDYX 892049 | Hydraulic Cement | Hopper | No Breach |
| 65 | TTGX 953815 | Passenger Automobiles | Auto Rack | Destroyed by Fire |
| 66 | TBOX 889334 | Malt Liquors | Box Car | Spilled During Cleanup |
| 67 | NOKL 603412 | Malt Liquors | Box Car | Spilled During Cleanup |

*Id.* at 7; U.S. Env't Prot. Agency, *EPA Train 32N Spreadsheet,* https://www.epa.gov/system/files/documents/2023-02/TRAIN%2032N%20%20EAST%20PALE STINE%20-%20derail%20list%20Norfolk%20Southern%20document.pdf; Kollar Dep. 117: 4-8; 156:4-9.

The release of Train 32N's lading resulted in pollution across a geographically broad spectrum. Ex. 20, Klei Dep. 75:2-4. Hazardous materials, hazardous substances, hazardous wastes, and/or other harmful pollutants were released on the ground, into stormwater infrastructure, and into surface waters. Answer ¶ 69; Kollar Dep. 143:24-175:12. Pollutants flowed to the ditch located to the south of main track 1, which flows west for approximately 1,000 feet before it empties into Sulphur Run, then joining Leslie Run, which then flows to Bull Creek, then to North

Fork Little Beaver Creek, into Little Beaver Creek, before emptying into the Ohio River, all of which are waters of the State of Ohio. Answer ¶ 66.

Water sampling detected butyl acrylate and ethylhexyl acrylate in Leslie Run and ethylhexyl acrylate in North Fork Little Beaver Creek. Answer ¶ 69; Ex. 21, Declaration of Ann Jones, Ph.D.; Ex. 22, Declaration of Sam Dinkins, Appendix A. Wetlands and State Line Lake located immediately northeast of the Derailment site were also impacted. Answer ¶ 67. Elevated levels of hazardous materials, hazardous substances, hazardous wastes, and/or other harmful pollutants have been detected in and around the Derailment, including but not limited to Sulphur Run, Leslie Run, Bull Creek, North Fork Little Beaver Creek, and/or Little Beaver Creek. Answer ¶ 68; Dinkins Decl., Appendix A.

In addition, contaminated soil and free liquid were observed following the Derailment. Kollar Dep. 119:7-120:23. Almost immediately after the pool fires stopped burning and as early as February 7, 2023, butyl acrylate was detected in the Ohio River as far downstream as Steubenville, Ohio, which is 25.7 river miles downstream of the Little Beaver Creek joinder. Dinkins Decl., Appendix A. Two days later, on February 9, 2023, butyl acrylate was detected in the Ohio River as far downstream as Wheeling, West Virginia, which is downstream from the Little Beaver Creek joinder. *Id.* And ten days after that, on February 19, 2023, trace levels of ethylhexanol were detected in the Ohio River near Cincinnati. *Id.* As of February 21, 2023, visible impact to sediment extended approximately six miles downstream from the Derailment. Kollar Dep. 40:19-41:9.

Acrylate odors were noted and reported by responders along Sulphur Run, Leslie Run, Bull Creek, North Fork Little Beaver Creek, and Little Beaver Creek during sampling and containment activities. Kollar Dep. 136:5-137:17. Acrylate odors were also reported by responders following

indoor air monitoring in the area around the Derailment. Ex. 23, Hunsicker Dep. 177:9-22. Tens of thousands of aquatic animals including but not limited to small suckers, minnows, darters, and sculpin, were killed as a result of the contamination from the Derailment, in Sulphur Run, Leslie Run, Bull Creek, and a portion of the North Fork of Beaver Creek. Ex. 24, Declaration of Scott Angelo, pp. 3,13,18.

### G. The Environmental Impacts of the Derailment Lingered for Years.

The remediation efforts at the Derailment site stretched for over two years, with excavation of contaminated soil continuing into 2025. Jones Decl. (see chart, which summarizes the voluminous data compiled between February 2023 and November 2024 pursuant to Fed. R. Evid. 1006). And the contaminants of concern lingered in the soil, where they can migrate to ground water or wetlands. *Id*. Vinyl chloride, ethyl hexyl acrylate, butyl acrylates, butoxyethanol, and diethylene glycol all remained detectable for *at least* 600 days after the Derailment. *Id.* Propylene glycol was detected as late as 567 days after the Derailment. *Id*. Dipropylene glycol lingered for at least 207 days. *Id.*



Jones Decl.

There is no intervening act that placed these chemicals at the Derailment site. Jones Decl.

Their long-term presence is attributable solely to Norfolk Southern. *Id.*

### H. Norfolk Southern is Solely Liable for the Damages Caused by the Derailment and the Vent and Burn.

The Derailment produced a slew of litigation, including a class action case in which

Norfolk Southern sought contribution from GATX (the owner of the railcar that led to the

Derailment) and OxyVinyls (the owner of the vinyl chloride that was the subject of the vent and

burn performed by Norfolk Southern's contractors). *See* Ex. 25, Third-Party Complaint, *In re: East*

*Palestine Train Derailment* (Case No. 4:23-CV-242, N.D. Ohio). Norfolk Southern admitted at

trial that it was responsible for this Derailment and the vent and burn:

> 18          The fact of the matter is, Norfolk Southern has
> 19     taken full responsibility here.  It has agreed to pay the
> 10:51:08  20     residents and businesses in and around East Palestine, and
> 21     it has accepted responsibility for the derailment and the
> 22     vent and burn that followed.

*See* Ex. 26, Trial Tr. vol. 2, 470:18-22, April 1, 2025.

After a 16-day trial, the jury returned a verdict finding that Norfolk Southern was 100%

responsible for the Derailment of its train in East Palestine, Ohio, as well as its intentional decision

to blow up the derailed, hazardous, chemical tank cars. The jury found as follows:

Question B: Has Norfolk Southern proven by a preponderance of the evidence that it has

paid more than its proportionate share of any common liability for harm to the Class

Members?

**Answer: No.**

Question C: Allocate the percentage of fault attributable to Norfolk Southern, OxyVinyls, and GATX that there was a direct or proximate cause of harm to the Class Members.

**Answer: The percentage affixed for GATX is 0.**

**The percentage affixed for OxyVinyls is 0.**

**The percentage affixed for Norfolk Southern is 100.**

**The total is 100.**

*See* Ex. 27, Trial Tr. vol. 16, 4162:6-25, April 23, 2025.

Norfolk Southern's negligence has been established by a jury in the Northern District, and Norfolk Southern is now bound by the jury's findings.

## VI. STANDARD OF REVIEW

A motion for partial summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the initial burden of establishing that there is no genuine issue of fact as to an essential element of the non-moving party's case. *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479 (6th Cir. 1989). The responding party must then "set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). To defeat a motion for summary judgment, the opposing party must point to affirmative admissible evidence in the record to show that there are indeed material issues of fact. *Alexander v. 5 CareSource*, 576 F.3d 551, 558 (6th Cir. 2009).

## VII. ARGUMENT

This Motion asks the Court to grant the State of Ohio partial summary judgment against Norfolk Southern and enter several rulings as a matter of law.

First, the State is entitled to a ruling as a matter of law that each railcar serves as a separate source of water pollution.

Second, the State is entitled to a ruling as a matter of law that liability for violations accrues on a daily basis until the pollution is no longer present.

Third, the State is entitled to a ruling as a matter of law that Norfolk Southern's negligence has been established, so there is no genuine issue of material fact here, and Norfolk Southern is estopped from disputing their negligence (Count Fifty-Five) since the company has already tried this case to a jury.

Fourth, the State is entitled to a ruling as a matter of law that Ohio has a right to seek appropriate relief to safeguard the health of East Palestine's residents.

Fifth and finally, the State is entitled to a ruling as a matter of law that Norfolk Southern is strictly liable for numerous statutory violations as set forth herein. Specifically, the State moves for summary judgment on the hazardous waste violations (Counts Four through Ten), the water pollution violations (such as those alleged in Counts Eleven through Thirty-Nine), the open dumping violations (Count Fifty-Two), and the air nuisance violations (Count Fifty-Three) of the State's Complaint. These are *all* strict liability claims for which the State is entitled to summary judgment because the undisputed facts show that Norfolk Southern violated the prohibitions against causing these kinds of pollution. The Court should hold Norfolk Southern liable and grant the State's Motion for Partial Summary Judgment.

Because there is significant overlap in Ohio's Memorandum in Opposition to Norfolk Southern's Motion for Partial Summary Judgment (filed September 29, 2025), Ohio incorporates by reference the facts and arguments contained therein.

### A.    The Source of Water Pollution is Each Railcar that Discharged.

Ohio Revised Code § 6111.04(A)(1) states that "[n]o person shall cause pollution or place or cause to be placed any sewage, sludge, sludge materials, industrial waste, or other wastes in a location where they cause pollution of any waters of the state." Each of Train 32N's individual

pieces of rolling stock—each railcar—was a self-contained separate source that placed pollution on the ground and in Ohio's waters.

The railcars had different owners, different designs, different safety parameters, and different contents. Most of them were engineered pressure vessels of varying types. Train 32N included twenty-seven tank cars and eleven freight or hopper railcars, some pressure tank cars with thermal survivability, and some non-pressure general service tank cars. Among them were an array of design specifications, three regulated (DOT), one unregulated (AAR), with differing crash survivability, protective housing, pressure relief devices, and burst thresholds DOT-105 (6 tank cars), DOT-111 (16 tank cars), DOT-117 (3 tank cars), and AAR-211 (2 tank cars). *See* NTSB Hazardous Materials Grp. Chair's Factual Rep. 30-56 (Group B Exh. 10). And each contained different contents such as hazardous or flammable liquids, solid polyethylene pellets, other commercial products, grain, and malt liquor. *See supra* Chart, at 13-14.

Thus, the variety in the cars themselves and the contents that discharged to Ohio's environment prove that each subject railcar was the source of the water pollution under Ohio Rev. Code § 6111.04. But even if Train 32N's railcars were uniform in design with the same contents that would not change their status as separate sources.

The circumstance of their discharge is legally irrelevant. It matters not whether each of those railcars discharged their contents from leaky valves while sitting idle in a rail yard, slowly spilling, leaking or dumping their contents or in a derailment, as here, upon impact with railcars ruptured where their contents poured and then burned. The net effects are identical, both factually and as a matter of law—pollutants whose discrete sources placed their "industrial wastes" or "other wastes" under Ohio Rev. Code § 6111.01 in a location where they cause pollution to Ohio's waters. Ohio Rev. Code § 6111.04(A).

Here, Norfolk Southern's Train 32N caused pollution or placed wastes in a location that caused pollution from discrete railcars to waters of the state. All told, 38 pieces of Train 32N's rolling stock derailed, and many discharged pollution to waters of the State, including Leslie Run, Sulphur Run, the Ohio River, Bull Creek, North Fork Little Beaver Creek, and Little Beaver Creek. Immediately upon impact, at least three of the railcars ruptured, their contents poured and burned. NTSB, RIR-24-05, p. 1. The fires fed by Train 32N's spilled lading burned and smoldered for days following the Derailment. The rest polluted Ohio's soil and ultimately water, geographically dispersing to creeks, streams, rivers, and wetlands over the course of the ensuing two plus years.

Federal transportation law, defining "rolling stock" to include railcars, further supports that Train 32N's railcars operated as separate sources of pollution. 49 C.F.R. § 661.3. And federal law calls out rolling stock as a point source for water pollution discharges from permitted sources. 40 C.F.R. §122.2 ("Point source means any discernible, confined, and discrete conveyance, including . . . rolling stock . . . from which pollutants are or may be discharged."); *see also* Ohio Admin. Code § 3745-33-01 (P)(1) (defining point source in precisely the same way federal law does by including rolling stock). The nature of both the railcars and the water pollution with support from federal and Ohio law all demonstrate that each railcar that discharged is a source of water pollution. The State is entitled summary judgment on this legal principle as a matter of law.

## B. Liability for Civil Penalties Accrues until Contamination is Fully Removed.

Establishing liability for each day until the pollution is no longer present starts with Ohio Rev. Code § 6111.04(A)(1). "No person shall cause pollution or place or cause to be placed any . . . wastes in a location where they cause pollution of any waters of the state." *Id.* But the statutory analysis does not stop there. Ohio Rev. Code § 6111.07(A) also prohibits any "person" from violating or failing "to perform any duty imposed by sections 6111.01 to 6111.08 of the Revised Code" and from violating or failing to comply with any order or rule under Ohio Rev. Code

Chapter 6111. Notably, "[e]ach day of violation is a separate offense." *Id.* The statutory link between placing waste and causing water pollution shows the continuing nature of water pollution violations.

The same is true for violations of the other Ohio environmental prohibitions. *Compare* Ohio Rev. Code § 3704.05 and Ohio Admin. Code § 3745-15-07 (air nuisance); Ohio Rev. Code § 3734.03 and Ohio Rev. Code § 3734.11 (open dumping solid waste); and Ohio Rev. Code § 3734.02(F) and Ohio Rev. Code § 3734.11 (illegal disposal of hazardous waste). Each of these statutes have provisions for daily penalties for each day of each violation. Ohio Rev. Code §§ 3704.05 and 3704.06 (air); Ohio Rev. Code §§ 6111.07 and 6111.09 (water); Ohio Rev. Code §§ 3734.11 and 3734.13 (solid and hazardous waste). Thus, Ohio statutory text establishes that daily violations continue as long as pollution remains.

Case law further proves that artificial limits on the duration of water pollution violations do not exist, as long as the pollution remains in state waters or in locations where it causes pollution. In *Heiby Oil Co. v. Schregardus*, 92 Ohio App. 3d 46, 634 N.E.2d 234 (10th Dist.1993), a bulk petroleum facility leaked ten thousand gallons of gasoline onto the ground, soaked the surrounding soil, and some of the gasoline slowly seeped into groundwater. *Id.* at 48. Heiby argued that the gasoline discharge was only the direct effect of the leakage and not "any subsequent natural movement of the released pollutant." *Id.* at 50. The Ohio court was unpersuaded, as the company's argument would narrow the objective of Ohio's water pollution control laws, especially with the agency's mandate to protect waters of the state. *Id.* at 52.

Likewise, in *Osborne I*, the defendants took excavated sand and gravel and placed it at the edge of the river, on its banks, and in the middle of the river. 2018-Ohio-3109 at ¶ 8. The State sued the defendant under Ohio Rev. Code §§ 6111.04 and 6111.07 and sought civil penalties for

each day the material remained in state waters. *Id.* at ¶ 41. That material was "other wastes" and hence pollution under Ohio law. *Id.* at ¶ 44. As did the company in *Heiby Oil,* Osborne argued its liability was limited to direct deposits in the river, but the Ohio appellate court very specifically disagreed with the limitations based on direct discharges—"[T]o accept appellants' argument would be to ignore the purpose of Ohio's Water Pollution Control Act and the problems it intends to remedy. * * * [citation omitted] It defies all sense to conclude that the discharge of pollutants into a portion of a river that is fortuitously dry [i.e., river bank] at the time of such discharge, but is at other times filled with water, falls outside the rubric of Ohio's Water Pollution Control Act." *Id.* at ¶ 51.

That court's textual analysis was based on Ohio Rev. Code § 6111.04(A)(1)'s plain language—causing, placing, or causing to be placed the fill material in locations where they pollute the state's waters. *Id.* at ¶ 53. Thus, violations under Ohio Rev. Code § 6111.04(A) may be "*either direct[] or indirect[].*" *Osborne I*, 2018-Ohio-3109 at ¶ 53 (emphasis added). Elaborating on the facts, the court ruled "appellants indirectly caused pollution by placing dredged materials *in a location* that resulted in some of that material ending up in the river * * * either due to storm water runoff or due to the river rising up to the location." *Id.* at ¶ 54 (emphasis in original). Simply put, the location of the placement "is irrelevant" under the terms Ohio Rev. Code § 6111.04(A). *Osborne I*, 2018-Ohio-3109 at ¶ 54. What matters are the effects on waters of the state.

Continuous days of violation extend beyond water pollution. An Ohio appellate court upheld civil penalties for each day an unlicensed construction debris operator disposed of debris illegally over a period of years. *ARCO Recycling, Inc.*, 2022-Ohio-1758, at ¶ 87. And the Supreme Court of Ohio held, albeit with a nexus to the federal Clean Air Act, that the operator remains in violation of an air permit and subject to penalties until the operator proves the violation ceases.

*Shelly Holding Co.*, 135 Ohio St. 3d at 77-78. The statutory text and case law show that the State is entitled to summary judgment to establish liability for civil penalties accruing until Norfolk Southern ensures the pollution they caused is no longer present.

### C. Norfolk Southern is Bound by the Jury Verdict that Found them Entirely Responsible for the Derailment.

Under the doctrine of collateral estoppel, Norfolk Southern should not be permitted to travel 50 miles south, in the same Federal District, and hope a new jury will view the same facts differently. Rather, in Ohio, collateral estoppel, also known as issue preclusion, "prevents parties or their privies from relitigating facts and issues in a subsequent suit that were fully litigated in a prior suit." *Thompson*, 70 Ohio St. 3d at 183. It applies where "the fact or issue (1) was actually and directly litigated in the prior action, (2) was passed upon and determined by a court of competent jurisdiction, and (3) when the party against whom collateral estoppel is asserted was a party in privity with a party to the prior action." *Id.* All these factors apply to Norfolk Southern, given that it sued a car owner and a chemical company to share the blame in the class action and Norfolk Southern lost. *In re: East Palestine Train Derailment* (Case No. 4:23-CV-242, N.D. Ohio). The jury found Norfolk Southern fully responsible for the train derailment and the vent and burn. Thus, Norfolk Southern is now estopped from relitigating its negligence in this case.

Federal courts in Ohio have applied estoppel in this same context. *McHone v. Montgomery Ward & Co.*, 406 F. Supp. 484, 485 (S.D. Ohio 1975) (applying issue preclusion and granting summary judgment as to liability, where the defendant had previously been found solely liable in a case brought by a different plaintiff regarding same injury). So have Ohio courts. *See, e.g., Dudee v. Philpot*, 2019-Ohio-3939, 133 N.E.3d 590, at ¶¶ 12-13 (1st Dist.) ("Where the defendant clearly had his day in court on the specific issue brought into litigation at the later proceeding, he is estopped from relitigating the issue.").

The fact that the State was not a party to Norfolk Southern's contribution case does not prevent the Court from applying the doctrine of issue preclusion here. The Supreme Court of Ohio has recognized that issue preclusion can apply even when there is not strict mutuality of parties. Indeed, "[a] party precluded under this principle from relitigating an issue with an opposing party likewise is precluded from doing so with another person *unless* he lacked full and fair opportunity to litigate that issue in the first action, or unless other circumstances justify according him an opportunity to relitigate that issue." *Hicks*, 52 Ohio St. 2d at 74 (emphasis added); *Lowe's Home Ctrs., Inc. v. Washington Cty. Bd. of Revision*, 154 Ohio St. 3d 463, 2018-Ohio-1974, 116 N.E.3d 79, at ¶ 36, citing *Hicks* for the same proposition that full and fair opportunity to litigate precludes subsequently relitigating the same issues.

Norfolk Southern settled with a class of plaintiffs for personal injuries sustained as a result of the Derailment. Norfolk Southern affirmatively sued the other parties that it believed were also at fault and should have contributed to that settlement. But after a 16-day jury trial in the Northern District of Ohio, a jury returned a verdict finding that Norfolk Southern was 100% responsible for the Derailment and subsequent vent and burn. Norfolk Southern had full control of the nature and timing of its contribution claim. And as a result of that decision, Norfolk Southern had the opportunity to fully litigate its negligence. It is understandable that Norfolk is unhappy with the jury's verdict and now seeks to retry its case in this Court, but it is not permissible. Norfolk Southern should not get a second bite at the apple to retry Ohio's negligence claim when a jury has already spoken on Norfolk Southern's negligence.

### D. The Attorney General's *Parens Patriae* Status Entitles Him to Seek Relief to Protect the Health of the East Palestine Residents.

The State filed this action expressly "pursuant to its inherent *parens patriae* authority to remedy injury to its 'quasi-sovereign interests' in the physical and economic health and well-being

of a substantial segment of its population and the protection of its natural resources." *See* Pl.'s Complaint ¶ 13, Dkt. No. 1. The State further alleged that "[t]he Derailment and the Defendants' subsequent release of hazardous materials, hazardous substances, hazardous wastes and/or other harmful pollutants into the surrounding environment have adversely affected the health and wellbeing of Ohio residents and contaminated Ohio's natural resources." *Id.* at ¶ 14.

The *parens patriae* doctrine "creates an exception to normal rules of standing applied to private citizens in recognition of the special role that a State plays in pursuing its quasi-sovereign interests in 'the well-being of its populace.'" *Ohio Att'y Gen v. Suwinski (In re Suwinski)*, 509 B.R. 568, 573 (Bankr. S.D. Ohio 2013); *see also Estados Unidos Mexicanos v. DeCoster*, 229 F.3d 332, 335 (1st Cir. 2000) (quoting *Alfred L. Snapp & Son, Inc. v. Puerto Rico*, 458 U.S. 592, 602 (1982). The "Ohio Supreme Court has long recognized the attorney general's power in 'contesting infringements on the rights of the general public via the doctrine of *parens patriae*.'" *Suwinski*, 509 B.R. at 572 (quoting *Ohio v. United Transp., Inc.*, 506 F. Supp. 1278, 1281–82 (S.D. Ohio 1981)). Notably, *parens patriae* interests must be identified on a case-by-case basis and are not limited to a fixed or exhaustive list. *Suwinski*, 509 B.R. at 572–73 (citing *Snapp*, 458 U.S. at 607).

There can be no question that "a State has a quasi-sovereign interest in the health and well-being—both physical and economic—of its residents in general." *Snapp*, 458 U.S. at 607. To establish *parens patriae* standing, a state must show two elements: (1) the existence of a *quasi-sovereign interest*—distinct from the interests of individual private parties—and (2) injury to a sufficiently *substantial segment* of the state's population. *See Suwinski*, 509 B.R. at 572–73 (emphasis added). Both elements are satisfied here. The State has a quasi-sovereign interest in protecting the health, safety, and environment of its residents—interests that are not reducible to

26

any one person or group. And the exposure of thousands of Ohioans to toxic pollutants and irritants unquestionably affects a substantial segment of the population.

### 1. The State's Quasi-Sovereign Interest in Protecting the Health of Residents

As outlined above, because of the well-documented impacts of the Derailment on both the health of its citizens and the environment, the State has a vital *quasi-sovereign interest* in this matter. States undeniably have a quasi-sovereign interest in protecting the health and welfare of the people residing within their borders and are thus empowered to bring actions in their capacity as *parens patriae*. *See, e.g., Georgia v. Tenn. Copper Co.*, 206 U.S. 230, 237 (1907) (recognizing the State's interest in ensuring that "its inhabitants shall breathe pure air."); *Missouri v. Illinois*, 180 U.S. 208, 241 (1901) ("[I]f the health and comfort of the inhabitants of a state are threatened, the state is the proper party to represent and defend them"). Courts have also recognized that one key indicator of whether a State has *parens patriae* standing is whether the injury alleged is one the State would ordinarily seek to address through its own sovereign lawmaking powers. *Snapp & Son*, 458 U.S. at 607. In other words, each environmental resource Norfolk Southern contaminated had indiscriminate impacts on public health and welfare.

The State's claims here fall squarely within the traditional scope of *parens patriae*. As the Sixth Circuit recently reaffirmed discussing State authority, "[t]he classic cases involve public nuisances, in which a state sues to prevent pollution that not only injures its citizens but also invades the state's prerogative to superintend the public health." *Kentucky v. Biden*, 23 F.4th 585, 596 (6th Cir. 2022) (citing *Tenn. Copper Co.*, 206 U.S. at 237). Notably, *parens patriae* does *not* mean the State is simply asserting personal injury or property damage claims in a representative capacity, standing in the shoes of Ohio residents. Instead, States have an "interest independent of and behind the titles of its citizens" to protect "its domain" and ensure the "health, comfort, and

welfare" of its people. *Kentucky,* 23 F.4th at 596 (quoting *Pennsylvania v. West Virginia*, 262 U.S. 553, 592 (1923)); *see also Snapp*, 458 U.S. at 604 (recognizing *parens patriae* standing in cases of public nuisance where "the injury to the public health and comfort was graphic and direct."); *Maine v. M/V Tamano*, 357 F. Supp. 1097, 1101 (D. Me. 1973) ("The conclusion is inescapable that if injury to Maine's coastal waters and marine life has occurred as a result of this spill, the environment of the State and the recreational opportunities and welfare of all her citizens have seriously suffered.").

Here, the State's action to seek programmatic health-based relief given the thousands of affected residents falls within these well-established principles. It is undisputed that various hazardous wastes and substances were released during and after the Derailment. Among the most concerning chemicals is vinyl chloride, a toxic hazardous waste. *See* 40 C.F.R. § 261.

After the Derailment, residents reported respiratory, nervous system, cardiac, and other issues. Ex. 28, Dickerson Dep. (Exh. 5). Headache, anxiety, and coughing were the most commonly reported symptoms. *Id*. More than half of the first responders reported new or worsening health symptoms following the Derailment. Ex. 29, Dickerson Dep. (Exh. 6). Ear, nose, and throat issues were among the most common. *Id*.

Importantly, the health impacts of the Derailment also extend beyond physical illness, as many community members expressed and experienced significant mental health distress, such as "tiredness, difficulty sleeping, nervousness, agitation, feeling hopeless, [and] unexplained fear." Dickerson Dep. (Exh. 5). Residents also reported the long-term health effects as a specific concern. *Id*. Those injuries undoubtedly remain "graphic and direct," providing the State *parens patriae* standing to seek health-related relief. *Snapp*, 458 U.S. at 604

### 2. The State Requested Relief for Impacts to a Substantial Portion of the Population.

The Derailment continues to impact the physical well-being of a substantial segment of Ohio's population. Any argument to the contrary is both factually and legally flawed and should be rejected.

Although the Supreme Court has not defined a specific threshold for what constitutes "a sufficiently substantial segment of the population," "such determination must be made based on the particular facts and circumstances of each case." *People ex rel. Ryan v. Volpert (In re Volpert)*, 175 B.R. 247, 257 (Bankr. N.D. Ill. 1994) (citing *Snapp*, 458 U.S. at 607). In making this assessment, courts are instructed to consider both the "direct" and "indirect" effects of the alleged injury. *Id*. Importantly, the numerosity requirement for *parens patriae* standing has been satisfied in cases involving as few as 64, 51, 20, even *six* affected individuals. *See e.g., Suwinski*, 509 B.R. at 574 (citing *In re Taibbi*, 213 B.R. 261, 270–71 (Bankr. E.D. N.Y. 1997) (64 defrauded individuals); *In re De Felice*, 77 B.R. 376, 381 (Bankr. D. Conn. 1987) (51 consumer creditors); *In re Hemingway*, 39 B.R. 619 (N.D. N.Y. 1983) (six named consumers); *Volpert*, 175 B.R. at 257 (55 people equated to "a substantial segment of the population"); *Massachusetts v. Bartel (In re Bartel)*, 403 B.R. 173, 177 (Bankr. D. Mass. 2009) (20 homeowners); *Massachusetts v. Bull HN Info. Sys., Inc.*, 16 F. Supp. 2d 90, 101 (D. Mass. 1998) (barring the Attorney General from suing over illegal age discrimination waivers for 50 employees would "functionally immunize" the employer from any legal challenges)). The people of East Palestine impacted by Norfolk Southern lies entirely within the *Snapp* doctrine and its *parens patriae* progeny.

Here, there are an estimated 5,412 residents within two miles of the Derailment who were potentially impacted by hazardous exposure. *See* Paschal Decl. ¶ 7, Dkt. No. 162-5. A combination of binding precedent and common sense confirms that the well-documented harm to thousands of

Ohio residents, including those first responders, volunteers, and others from different parts of the State, easily meets the threshold for *parens patriae* standing and leaves no genuine issue for trial.

Importantly, the State is not asserting claims for personal injury for any particular resident and is not somehow displacing the class claims. Rather, this case exemplifies the "classic" invocation of *parens patriae* authority, where the State brought suit "to prevent pollution that not only injures its citizens but also invades the state's prerogative to superintend the public health." *Kentucky*, 23 F.4th at 596. In doing so, the State is rightfully exercising its sovereign responsibility to protect the health, safety, and welfare of Ohioans. That includes the pursuit of health-related, or "medical" relief—alongside all other forms of relief detailed in the Complaint—on behalf of the State's citizens, whether that number is 5,412 or otherwise.

Because Ohio has established a quasi-sovereign interest in its request and proven a substantial population affected by the Derailment in line with precedent, this Court should enter summary judgment in favor of Ohio's request to seek appropriate relief to aid the health of the people in East Palestine.

### E.    Norfolk Southern is Strictly Liable for Environmental Violations.

Ohio statutes impose strict liability for violations of the State's environmental laws. *See* Ohio Rev. Code §§ 6111.04 and 6111.07 (water); Ohio Rev. Code § 3704.05 (air); Ohio Rev. Code § 3734.11 (solid and hazardous waste). The strict liability language, "no person shall," appears in all the statutory prohibitions violated by Norfolk Southern when Train 32N derailed in the Village of East Palestine on February 3, 2023, and later when Norfolk Southern performed the unnecessary vent and burn.

Environmental protection statutes have long been recognized as strict liability laws designed to prohibit public welfare offenses. *See, e.g.*, *Mercomp*, 167 Ohio App. 3d at ¶¶ 40-41;

*Liviola*, 605 F. Supp. at 100. This is because "[t]he public is injured just as much by unintentional pollution as it is by deliberate pollution." *U.S. Steel Corp.*, 328 F. Supp. at 356.

When a statute requires that "no person shall" act or not act in a specified way, without any reference to degree of culpability, that statute is interpreted to clearly indicate the legislature's intent to impose strict liability. *See State v. Cheraso*, 43 Ohio App. 3d 221, 223, 540 N.E.2d 326 (11th Dist. 1988). No prior knowledge of the law is required for Defendants to be held liable. *See, e.g.*, *Pro. Rental, Inc. v. Shelby Ins. Co.*, 75 Ohio App.3d 365, 376, 599 N.E.2d 423 (11th Dist. 1991). And thus, no intent-based requirement exists for environmental violations. *State v. Gastown, Inc.,* 360 N.E.2d 970, 973 (Perrysburg Mun. Ct. 1975). As a result, the Clean Water Act, an analog to the state law at issue here, does not require fault to support a penalty. *United States v. Winchester Mun. Utils.*, 944 F.2d 301, 304 (6th Cir. 1991) (applied to the Clean Water Act).

Ohio Rev. Code § 6111.04(A) states that "[n]o person shall cause pollution or place or cause to be placed any… other wastes in a location where they cause pollution of any waters of the state" without a valid, unexpired permit issued by the Director of Ohio EPA. Ohio Rev. Code § 6111.04(A). Ohio Rev. Code § 6111.07(A) also prohibits any "person" from violating or failing "to perform any duty imposed by sections 6111.01 to 6111.08 of the Revised Code" and from violating or failing to comply with any order or rule. The term "person" includes both individuals and corporations alike. Ohio Rev. Code §§ 6111.01(I) and 1.59(C). Thus, Ohio Rev. Code §§ 6111.04, 6111.07, and 6111.09 impose strict liability against the "person"—whether human or corporate—committing the violation. The same strict liability applies to the State's air, solid waste, and hazardous waste pollution claims under Ohio Rev. Code §§ 3704.05 and 3734.11. Strict liability is rooted in the legislative intent, as well. *See* Ohio Rev. Code § 3745.011(F) (Ohio EPA

shall "Provide for enforcement of the right of the people to environmental quality consistent with human health and welfare.").

The moment Norfolk Southern's Train 32N derailed and the moment Norfolk Southern detonated railcars containing vinyl chloride, the company became automatically liable for all the environmental harm they wrought in East Palestine, its environs, and on the public health and welfare.

### 1. Norfolk Southern is Strictly Liable for its Hazardous Waste Violations Resulting from the Derailment.

Ohio Revised Code Section 3734.11 mandates that "[n]o person shall violate any section of [Chapter 3734], any rule adopted under it, or any order issued under section 3734.13 of the Revised Code." ("Person" includes a "corporation." Ohio Rev. Code § 1.59.) Courts have uniformly held that this language imposes strict liability for violations of waste laws and rules. *E.g., Mercomp*, 167 Ohio App. 3d at ¶ 40 ("R.C. Chapter 3734 is a public welfare statute providing strict liability for anyone who violates it."). The only liability requirement for a strict liability claim is proof that "the violations occurred . . . ." *Id.*

The State's burden in this Motion is to prove that Chapter 3734 and the rules adopted under it prohibited Norfolk Southern's actions. The State seeks summary judgment on seven counts:

- Norfolk Southern's Illegal Disposal of Hazardous Waste (Count Five);

- Norfolk Southern's Establishment and Operation of a Hazardous Waste Facility without a Permit (Count Four);

- Norfolk Southern's Failure to have a Written Closure Plan (Count Six);

- Norfolk Southern's Failure to Maintain a Written Estimate of Closure Cost (Count Seven);

- Norfolk Southern's Failure to Maintain Adequate Financial Assurance (Count

Eight);

- Norfolk Southern's Failure to Maintain Liability Coverage (Count Nine); and

- Norfolk Southern's Failure to Have a Contingency Plan (Count Ten).

### a. Norfolk Southern is Strictly Liable for Illegally Disposing of Hazardous Waste.

Ohio law defines "disposal" as (among other things) a spill. Ohio Admin. Code § 3745-50-10(D)(7). And that is what happened here. Under Ohio's hazardous waste laws, hazardous waste may only be disposed of at a licensed hazardous waste facility. Ohio Rev. Code § 3734.02(F). Disposal is defined broadly, and includes "the discharge, deposit . . . dumping, spilling, leaking, or placing of any hazardous waste . . . into or on any land or water. . . so that such hazardous waste or any constituent thereof may enter the environment or be emitted into the air or discharged into any waters[.]" Ohio Admin. Code § 3745-50-10(D)(7). Hazardous wastes are materials that are disposed or discarded and qualify as hazardous under Ohio's rules. Ohio Admin. Code § 3745-51-02; Ohio Admin. Code § 3745-51-03.

Here, it is undisputed that Norfolk Southern discharged, deposited, dumped, leaked, or spilled hazardous waste into the land and water near East Palestine. Cars from Norfolk Southern's train emitted or discharged, *among other wastes*, vinyl chloride and diethylene glycol, both of which are listed hazardous wastes under Ohio Admin. Code § 3745-51-33. That hazardous waste entered the environment, was emitted into the air, and was discharged into waters of the state. Norfolk Southern should be held strictly liable for illegally disposing of hazardous waste as a result.

### b. Norfolk Southern is Strictly Liable for Establishing and Operating a Hazardous Waste Facility Without a Permit.

By disposing of hazardous waste at the Derailment location, the surrounding area, and beyond, Norfolk Southern unlawfully established and operated a hazardous waste facility without

a permit, in violation of Ohio Rev. Code §§ 3734.05 and 3734.02(E), and Ohio Admin. Code §§ 3745-50-41(A), and 3745-50-45(A). A "hazardous waste facility" includes "[a]ll contiguous land, and structures, other appurtenances . . . used for treating, storing, or disposing of hazardous waste . . . ." Ohio Admin. Code § 3745-50-10(F)(1). A facility "may consist of several treatment, storage, or disposal operational units (e.g., one or more landfills, surface impoundments, or combinations of these)." *Id.* Here, Norfolk Southern is strictly liable for their unlawful hazardous waste facility and disposing of hazardous waste at the Derailment location, the surrounding area, and beyond. And this facility was not covered by a required hazardous waste installation and operation permit.

### c. Norfolk Southern is Strictly Liable for Violating the Requirements Imposed on a Hazardous Waste Facility's Operator.

When Norfolk Southern spilled hazardous waste, the company met the definition of a hazardous waste facility owner or operator under Ohio law, which subjected the company to the written closure plan requirements. Ohio Rev. Code §§ 3734.02(E), (F); Ohio Admin. Code § 3745-55-12. The closure plan must provide for closure of the facility in a way that minimizes the need for future maintenance and controls at the facility. Ohio Admin. Code § 3745-55-11. The plan must also provide for closure of the facility in a way that minimizes or eliminates post-closure releases of hazardous waste and its byproducts to the extent necessary to prevent threats to human health and the environment. Ohio Admin. Code § 3745-55-11.

Further, Norfolk Southern must (1) keep a written estimate of how much it will cost to close the hazardous waste facility, updated annually, Ohio Admin. Code § 3745-55-42, (2) establish and keep adequate financial assurance as needed to pay for closing the hazardous waste facility, Ohio Admin. Code § 3745-55-43, (3) establish liability coverage, including coverage for sudden accidental occurrences at the facility of at least one million dollars per occurrence, and at least two million dollars annually, Ohio Admin. Code § 3745-55-47, and (4) have a contingency

34

plan for the facility designed to minimize hazards to human health or the environment and immediately implement that plan whenever there is a fire, explosion, or release of hazardous waste or hazardous waste constituents, which could threaten human health or the environment, Ohio Admin. Code § 3745-54-51.

In sum, Norfolk Southern's illegal disposal of hazardous wastes rendered them the operator of a hazardous waste disposal facility under Ohio law—thus incurring strict liability for failing to follow the requirements that Ohio imposes on hazardous waste disposal facilities. Norfolk Southern should be held liable for failing to meet the State requirements and pay State civil penalties from the date that the company triggered those obligations through illegal disposal until the date Norfolk Southern satisfied those requirements.

### 2. Norfolk Southern is Strictly Liable for its Water Pollution Violations.

Congress passed the Clean Water Act in 1972 to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters." *Decker v. Nw. Envtl. Fef. Ctr.*, 568 U.S. 597, 602 (2013) (citing 33 U.S.C. § 1251(a)). The goals of the Clean Water Act are principally achieved by prohibiting "the discharge of any pollutant" into "waters of the United States," including federally regulated (or "jurisdictional") wetlands and streams. *See* 33 U.S.C. §§ 1311(a) and 1362(7).

Similarly, under Ohio law, no person may discharge sewage, industrial waste, or other wastes into waters of the state, or place sewage, industrial waste, or other wastes in a location where they could enter waters of the state, unless that person holds a valid, unexpired permit authorizing the discharge. Ohio Rev. Code § 6111.04(A). To do so is a public nuisance. Ohio Rev. Code § 6111.04(A)(2).

Under the statute, "sewage" means any liquid waste containing sludge, sludge materials, or animal or vegetable matter in suspension or solution, and may include household wastes as

commonly discharged from residences and from commercial, institutional, or similar facilities. Ohio Rev. Code § 6111.01(B). "Industrial waste" means any liquid, gaseous, or solid waste substance resulting from any process of industry, manufacture, trade, or business, or from the development, processing, or recovery of any natural resource, together with such sewage as is present. Ohio Rev. Code § 6111.01(C). "Other wastes" means "garbage, refuse, decayed wood, sawdust, shavings, bark, and other wood debris, lime, sand, ashes, offal, night soil, oil, tar, coal dust, dredged or fill material, or silt, [or] other substances that are not 'sewage' . . . [or] 'industrial waste." Ohio Rev. Code § 6111.01(D).

"Waters of the state" is broadly defined in Ohio law to include nearly all bodies or accumulations of surface or underground water, whether natural or manmade but excludes "ephemeral features," or "surface water flowing or pooling only in direct response to precipitation, such as rain or snow" as exempted from permit under 33 U.S.C. § 1344. Ohio Rev. Code §§ 6111.01(H), (V). Notably, "ephemeral features" do not include wetlands, which are covered without exception under the definition of "waters of the state." *Id.* The streams, wetlands, and water bodies at issue here are "waters of the state" as defined in Ohio Rev. Code § 6111.01(H).

Per Ohio's water pollution control laws, "each day of violation is a separate offense" . . . [for] "any person who violates, or who fails to perform any duty imposed by, sections 6111.01 to 6111.08 . . . or who violates any order, rule, or condition of a permit issued or adopted by the director." Ohio Rev. Code §§ 6111.07(A) and (B). Ohio's omnibus water pollution prohibitions, Ohio Rev. Code § 6111.04(A)(1) (no person shall cause pollution . . .") and Ohio Rev. Code § 6111.07(A) ("no person shall violate . . . any duty imposed by [6111.01] . . . or any . . . rule."), prohibit pollution and carry strict liability for any violation.

In East Palestine, over two dozen railcars derailed and discharged numerous wastes, forming the bases for Counts Eleven through Thirty-Nine of the State's Complaint. Those wastes constitute pollution under Ohio Rev. Code §§ 6111.01 (A), (C), and (D). All told, at least 29 distinct pieces of rolling stock lost all or a portion of their contents and discharged pollution directly to waters of the State or to areas where they could enter nearby waters of the state, including Leslie Run, Sulphur Run, the Ohio River, Bull Creek, North Fork Little Beaver Creek, and Little Beaver Creek. *See supra* Chart, at 13-14. Immediately following the Derailment, at least three of the railcars ruptured: their contents poured and burned. The rest polluted Ohio's soil and ultimately waters over the course of the full Derailment and subsequent events.

Those discharges included both hazardous and nonhazardous waste released on the ground, into stormwater infrastructure, and indirectly and directly into surface waters. Water quality sampling has shown butyl acylate and ethylhexyl acrylate in Leslie Run and ethylhexyl acrylate in North Fork Little Beaver Creek. Answer ¶ 69. Elevated levels of hazardous materials, hazardous substances, hazardous wastes, and other harmful pollutants have been detected in and around the railcar wreckage, including but not limited to Sulphur Run, Leslie Run, Bull Creek, North Fork Little Beaver Creek, and/or Little Beaver Creek. Answer ¶ 68. According to U.S. EPA, materials released during the Derailment were observed and detected in samples taken from Sulphur Run, Leslie Run, Bull Creek, North Fork Little Beaver Creek, Little Beaver Creek, and the Ohio River. In addition, contaminated soil and free liquid were observed following the Derailment.

Almost immediately after the initial pool fires stopped burning, and as early as February 7, 2023, butyl acrylate was detected in the Ohio River as far downstream as Steubenville, Ohio, which is 25.7 river miles downstream of the Little Beaver Creek joinder. Two days later, on February 9, 2023, butyl acrylate was detected in the Ohio River as far downstream as Wheeling, West Virginia,

which is downstream from the Little Beaver Creek joinder. And ten days after that, on February 19, 2023, trace levels of ethylhexanol were detected in the Ohio River near Cincinnati. As of February 21, 2023, visible impacts to sediment extended approximately six miles downstream and in the Ohio River.

Five of Train 32N's railcars contained vinyl chloride. It is undisputed that Norfolk Southern breached those tank cars, releasing vinyl chloride into the environment. But the vinyl chloride did not only dissipate into the air. Vinyl chloride was detected in the air, ground water, sediment, soil, and surface water. In fact, vinyl chloride was detected in the soil, where it can easily migrate to ground water, as many as 644 days following the Derailment, and potentially longer. And in fact, vinyl chloride was detected in ground water in July 2024. Norfolk Southern is strictly liable for the pollution caused by the intentional breach of each of those railcars until vinyl chloride is no longer present in East Palestine.

Based on the undisputed facts, Norfolk Southern is strictly liable for water pollution violations such as those that the State asserts in Counts 11 through 39, and Ohio is entitled to summary judgment.

### 3. Norfolk Southern is Strictly Liable for the Open Dumping of Nonhazardous Solid Waste.

Like Ohio's water pollution control laws, Ohio's solid waste laws impose strict liability. Ohio Rev. Code § 3734.11 mandates that "[n]o person shall violate any section of [Chapter 3734], any rule adopted under it, or any order issued under section 3734.13 of the Revised Code." Ohio Rev. Code § 3734.03 states that "[n]o person shall dispose of solid wastes by . . . open dumping . . . ."

Here, beginning with the Derailment, Norfolk Southern conducted, permitted, and/or allowed the open dumping of waste at the Derailment location. This included material from at least

29 railcars, including pollutants like propylene glycol, petroleum lubricating oil, and diethylene glycol, and other wastes including grain, malt liquor, polypropylene, and others. *See supra* Chart, pp. 13-14. Norfolk Southern is therefore strictly liable for the open dumping of nonhazardous solid waste. Norfolk Southern should be held liable for open dumping these wastes and pay State civil penalties from the date that these wastes were dumped until the date Norfolk Southern removed them all. Ohio Rev. Code § 3734.13(C).

Given the undisputed facts, the State is entitled to summary judgment against Norfolk Southern for Count 52 of the State's Complaint.

### 4. Norfolk Southern is Strictly Liable for the Air Pollution Violations Resulting from the Derailment.

Norfolk Southern is also liable for causing a public air pollution nuisance, a violation of Ohio Admin. Code § 3745-15-07(A). This, too, is a strict liability offense. Ohio's air pollution control statute, Ohio Rev. Code Chapter 3704, has been recognized as imposing strict liability for the violation of the statute. *See State ex rel. DeWine v. Musleh*, 2013-Ohio-4323, at ¶ 39 (7th Dist.). Because Ohio Rev. Code § 3704 imposes strict liability, the State must only prove that the violations occurred. Under Ohio Rev. Code § 3704.05(G), "[n]o person shall violate an order, rule, or determination of the director issued, adopted, or made under [Ohio Rev. Code 3704]". A "person" includes any public or private corporation. Ohio Rev. Code § 3704.01(O).

Here, Norfolk Southern violated the State's prohibition against causing a public air pollution nuisance by emitting "into the open air from any source or sources whatsoever, of smoke, ashes, dust, dirt, grime, acids, fumes, gases, vapors, or any other substances or combinations of substances, in such manner or in such amounts as to endanger the health, safety or welfare of the public . . . .". Ohio Admin. Code § 3745-15-07(A). Norfolk Southern created a statutory public nuisance—beginning with Train 32N's Derailment and its pool fires that were exponentially

compounded by the unnecessary "vent and burn" three days later on February 6, 2023. The series of events prompted evacuation orders that lasted through February 8, 2023. *See* Press Release, Governor DeWine, *supra*. This Court should rule that Norfolk Southern is strictly liable for violating Ohio Admin. Code § 3745-15-07(A).

## VIII.      CONCLUSION

The State respectfully requests the Court grant its motion for partial summary judgment and rule as follows:

- The State is entitled to summary judgment as a matter of law that each railcar that caused pollution or placed or caused to be placed waste in a location that caused pollution is a separate source of Norfolk Southern's water pollution.

- The State is entitled to summary judgment as a matter of law that liability for Norfolk Southern's violations accrue on a daily basis until the pollution or contamination is no longer present.

- The State is entitled to summary judgment as a matter of law that Norfolk Southern's negligence already has been established, so there is no genuine issue of material fact, and Norfolk Southern is estopped from disputing their negligence (Count Fifty-Five) since the company has already tried this case to a jury.

- The State is entitled to summary judgment as a matter of law that Ohio has a right to seek appropriate relief to protect the health of East Palestine residents.

- The State is entitled to summary judgment that Defendants, Norfolk Southern Corporation and  Norfolk Southern Railway Company, are strictly liable for the hazardous waste violations (Counts Four through Ten), the water pollution violations (such as those alleged in Counts Eleven through 39), the open dumping

violation (Count Fifty-Two), and the air nuisance violation (Count Fifty-Three) of the State's Complaint.

Respectfully submitted,

**DAVE YOST**
**OHIO ATTORNEY GENERAL**

 **s/ Amber Wootton Hertlein**
**AMBER WOOTTON HERTLEIN (0083858)**
**KATHERINE A. WALKER (0093850)**
**NORA M. BATY (0102678)**
**CATHERINE A. ENGLISH (0096910)**
**IAN F. GAUNT (0097461)**
Assistant Attorneys General
Environmental Enforcement Section
30 East Broad Street, 25th Floor
Columbus, Ohio 43215
Telephone: (614) 466-2766
Fax: (614) 644-1926
Amber.Hertlein@OhioAGO.gov
Katherine.Walker@OhioAGO.gov
Nora.Baty@OhioAGO.gov
Catherine.English@OhioAGO.gov
Ian.Gaunt@OhioAGO.gov

**WILLIAM C. BECKER (0013476)**
Assistant Attorney General
Court of Claims Defense Section
30 East Broad Street, 16th Floor
Columbus, OH 43215
Telephone: (614) 466-7447
Fax: (614) 644-7447
William.Becker@OhioAGO.gov

*Counsel for Plaintiff, the State of Ohio*

## **Local Rule 7.1(f) Certification**

This certifies that this case, *State of Ohio ex rel. Yost v. Norfolk Southern Corp., et al.*, NO.

4:23-CV-00517-JRA, has been assigned to the complex case track, and that the State of Ohio's

Motion for Partial Summary Judgment complies with Local Rule 7.1 and the expanded page limits

for dispositive motions as set forth in the Court's August 12, 2025 Order granting the Parties' Joint

Motion for Leave to File Briefs in Excess of Page Limits (Doc. 223).

**s/ Amber Wootton Hertlein**
AMBER WOOTTON HERTLEIN
Assistant Attorney General

*Counsel for Plaintiff, the State of Ohio*

## **Certificate of Service**

This certifies that on September 30, 2025, I served the State of Ohio's Memorandum in Support of its Motion for Partial Summary Judgment by filing through the Court's CM/ECF system, which electronically notified all parties of record.

**s/ Amber Wootton Hertlein**
AMBER WOOTTON HERTLEIN
Assistant Attorney General

*Counsel for Plaintiff, the State of Ohio*
