IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| THE STATE OF OHIO,<br>Environmental Enforcement Section<br>30 E. Broad Street, 25th Floor<br>Columbus, Ohio 43215<br><br>and<br><br>THE UNITED STATES OF AMERICA,<br>950 Pennsylvania Avenue, NW<br>Washington, DC 02530<br><br>        Plaintiffs,<br><br>v.<br><br>NORFOLK SOUTHERN RAILWAY<br>COMPANY<br>650 W. Peachtree Street NW<br>Atlanta, GA 3038<br><br>and<br><br>NORFOLK SOUTHERN<br>CORPORATION,<br>c/o Corporation Service Company<br>3366 Riverside Drive, Suite 103<br>Upper Arlington, Ohio 4321<br><br>        Defendants.<br><br>And<br><br>ROBERT FIGLEY<br>171 South Pleasant Drive,<br>East Palestine, OH 44413<br><br>BARBARA ADAMS<br>3275 Sycamore Drive<br>New Waterford, Ohio 44445<br><br>        Proposed-Intervenors | Civil Case No. 23-cv-517<br>Hon. John R. Adams |

1

_____)

## MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR LEAVE TO INTERVENE

Robert Figley and Barbara Adams hereby move to intervene as a matter of right in the above-captioned action pursuant to Fed. R. Civ. P. 24(a)(1) and (a)(2), and Clean Water Act ("CWA") § 505(b)(1)(B), 33 U.S.C. § 1365(b)(1)(B). Alternatively, Movants seek permissive intervention under Rule 24(b). In support of this motion, Movants respectfully submit the following memorandum of points and authorities.

## I. FACTUAL BACKGROUND AND TIMELINE OF RELEVANT EVENTS
### A. THE DERAILMENT – THE FIRST RELEASE OF HAZARDOUS CHEMICALS INTO THE AIR, WATER AND SOIL.

Between 2013 and 2022, Defendants Norfolk Southern Railway Company and Norfolk Southern Corporation's ["Norfolk"] crash rate increased by almost 81% nationwide. In 2021, Norfolk had 38 incidents in the State of Ohio, alone. As Norfolk's incident rate has nearly doubled in the past 10 years, at least 20 of those derailments since 2015 have involved chemical releases.

On February 1, 2023, a Norfolk train departed from Madison, Illinois bound for Conway, Pennsylvania. Two days later, on February 3, 2023, the train consisting of three locomotives and 149 train cars and measuring 9,309 feet long, left Toledo, Ohio headed east. 11 of the 149 train cars were carrying hazardous chemicals. Norfolk Southern chose to transport 5 of the 11 train cars full of hazardous materials in DOT-

2

111 tank cars, which are known to fail and release hazardous materials in a derailment.[1]

Overheated wheel bearings are the most common mechanical or electrical cause of rail incidents. Because overheated bearings are so dangerous, railroad tracks have Hot Bearing Detectors ("HBDs") along the tracks that detect when wheel bearings are overheating and at risk of failing and causing a derailment. As Norfolk's train traveled through Salem, Ohio, the HBD detected an overheating wheel bearing at 103 degrees Fahrenheit, and video footage shows the wheel bearing was on fire. The HBD sent an alarm but Norfolk Southern chose not to notify the train crew that the wheel bearing was overheating and on fire. Instead, Norfolk chose to wait to take any action until the train traveled over the HBD in East Palestine 40 minutes later, at which time the wheel bearing was up to 253 degrees Fahrenheit. Although the train crew was finally notified of the excessive temperature, it was too late—38 cars derailed just 560 yards past the many homes along the train tracks.

Of the 11 derailed hazardous materials cars, three carrying flammable and combustible liquids were cracked or punctured during the derailment and released the contents. Those three derailed and breached tank cars were DOT-111 tank cars.

A fire broke out during the derailment, fed by the spilled flammable and combustible liquids that spilled from the DOT-111 tank cars. The fire spread to other

---

[1] *See* National Transportation Safety Board, Norfolk Southern Railway Derailment and Hazardous Materials Release, East Palestine, Ohio, February 2, 2023, NTSB SPC-24-06 Illustrated Digest, (June 25, 2024).

3

tank cars and freight cars. The fire burned and smoldered, continuing to release hazardous materials, for several days.



Photo courtesy of Eric's Train Yard

## B. THE VENT AND BURN – THE SECOND RELEASE OF HAZARDOUS CHEMICALS INTO THE AIR, WATER AND SOIL

But that was not the only hazardous materials release.  Five pressurized tank cars carrying vinyl chloride survived the initial derailment intact but were exposed to fire. If tank cars carrying vinyl chloride reach 185 degrees, polymerization can occur, potentially causing an explosion. Yet temperatures below 185 degrees make polymerization unlikely.

On February 5, 2023, representatives of Oxy Vinyls, the vinyl chloride owner, determined that polymerization was not occurring and a vent and burn was not necessary. Oxy informed Norfolk that monitoring showed decreasing temperatures well below 185 degrees in all five tank cars. Later that evening, Norfolk told federal and state authorities that polymerization was occurring and began preparations for a vent and burn.

On February 6, Norfolk met with incident command and advocated for approval of a vent and burn. Norfolk did not invite Oxy Vinyls and did not disclose Oxy's conclusion that polymerization was not occurring. Norfolk gave the incident commander only 13 minutes to decide. Incident command approved the vent and burn based on Norfolk's recommendation.

Residents were evacuated from a one-mile by two-mile area. On February 6, 2023, at 4:47 p.m., Norfolk opened the five tank cars, drained the vinyl chloride, and lit it on fire, creating a persistent toxic cloud.



**Figure 10.** The vent and burn 3 minutes after detonation. (Courtesy of NS.)

## C. STATE OF OHIO AND UNITED STATES FILE LAWSUIT FOR VIOLATIONS AND DAMAGES PURSUANT TO CLEAN WATER ACT AND CERCLA.

In March 14, 2023, the State of Ohio filed a Complaint against Norfolk Southern Corporation and Norfolk Southern Railway Company ("Norfolk Southern"). (ECF 1.) On May 19, 2023, an Amended Complaint was filed adding the United States of America as a co-plaintiff alongside the State of Ohio, with the federal government acting through the EPA and the Department of Interior (Fish & Wildlife Service). (ECF 22.) The Amended Complaint included the following causes of action and claims

for relief: Clean Water Act Section 301 Violations; Clean Water Act Section 311 Violations; CERCLA Cost Recovery; and CERCLA Declaratory Judgment. (ECF 22.)

**D. EPA AND NORFOLK STRIKE A DEAL AND SAY NO AIR, SOIL OR WATER IS CONTAMINATED DUE TO THE DERAILMENT OR VENT AND BURN.**

On May 23, 2024, the United States EPA filed a Notice of Lodging of Proposed Consent Decree. (ECF 138.) On October 10, 2024, the EPA filed its Motion to Enter Consent Decree. (ECF 162.) In support of its Motion, the EPA states the derailment and vent and burn caused no long-term contamination of East Palestine and the surrounding areas. The EPA states air monitors "did not detect any contaminates of concern above screening levels [for identifying potential risks to human health]." (ECF 162-2, ¶ 13.) Also, soil samples "showed levels of dioxins and semi-volatile organic compounds within typical background ranges for the area," and that any samples that tested higher than the EPA's determined "background" samples were "outlier[s]." "[T]here was no discernable soil contamination caused by the derailment at the 121 locations tested." (ECF 162-2, ¶ 33.) And that there has been no contamination attributable to the derailment detected in treated water." (ECF 162-2, ¶ 39.)

**E. INDEPENDENT SOURCES SAY NORFOLK AND EPA TESTING DATA IS UNRELIABLE.**

Several sources raise serious concerns about the reliability of EPA statements that there is no contamination.

**1) Norfolk's, Its Contractor's, and the EPA's Soil Sampling Plan and Results Are Fundamentally Flawed and Were Not Designed to Determine Risk to Public Health.**

6

Stephen Lester, a toxicologist with over 40 years of experience evaluating contaminated sites who has participated in U.S. EPA activities on dioxins since 1994 and served as Science Director at the Center for Health, Environment & Justice since 1983, reviewed the EPA's dioxin testing at the request of the Unity Council for the East Palestine Train Derailment. (*See* ECF 162-9, p. 37 of 160, Stephen Lester letter.)

Lester reviewed 130 surface soil samples and 133 subsurface sample results and found the sampling plan fundamentally flawed. The EPA approved a "walk and look" approach—simply walking the area and inspecting surface soil for evidence of ash or debris—rather than systematic sampling based on scientific principles. Lester stated that in over 40 years of evaluating contaminated sites, he has "never seen EPA approve a soil sampling plan that was this vague and subjective." *Id.* at p. 38-39, 47.

Critical failures include: (1) EPA failed to produce Total Dioxin Equivalent (TEQ) values, "the gold standard for analyzing potential health risks posed by dioxin"; (2) testing excluded polychlorinated biphenyls (PCBs), which form during vinyl chloride burning and cause dioxin-like toxicity; (3) EPA failed to disclose sampling locations, preventing independent evaluation of public health risks; (4) over 65% of samples were below detection limits despite the magnitude of chemical releases; and (5) EPA provided no analysis of health risks posed by detected dioxin concentrations and refused additional testing despite finding levels exceeding guidelines. *Id.* at p. 36, 40, 44-48.

### 2) <u>Background (control) samples taken from contaminated areas.</u>

Norfolk Southern, its contractors, and the EPA took background (control) soil samples from areas that were contaminated and test samples from areas that were not contaminated—the exact opposite of what should have been done.

On the morning of February 6, 2023, winds came from the northwest to the southeast, leading to a decision to evacuate an area two miles deep and one mile wide to the southeast. (Ex. A, Stephen Petty Aff., ¶ 28-29.) Even so, between noon and 1:00 p.m., the winds changed, becoming calm and coming from the west/southwest or southeast/south. At no time during the vent and burn did winds blow from the northwest to the southeast as anticipated. Norfolk Southern, its contractors, and the EPA have never acknowledged these significant wind changes. *Id.* at ¶ 33.

Despite the wind change, Norfolk's dioxin soil sampling plan, approved by EPA, assumed toxic pollutants deposited in the one-mile by two-mile evacuation zone to the southeast. Based on this faulty assumption, Norfolk's contractors took background samples from areas outside the evacuation zone and test samples from areas inside the evacuation zone—backwards from actual toxic plume fallout. *Id.* at ¶ 33-34. Because EPA ignored the wind pattern reversal and did not determine sampling locations based on actual toxic plume fallout, EPA's conclusions regarding dioxin levels are questionable at best.

### 3) **Newly released FOIA documents show certain chemicals were not even tested and baseline samples were taken from contaminated areas as suspected by Petty.**

Documents released in July 2025 through Freedom of Information Act (FOIA) raise additional concerns about the integrity of Norfolk's and the EPA's soil sampling plan. (Ex. B, EPA Letter dated March 6, 2023.)

In a March 6, 2023 letter, the EPA approved two material changes to Norfolk Southern's soil sampling plan. First, it approved the removal of five chemical compounds from the testing list:

1. 2,3,4,6-Tetrachlorophenol
2. 1,2,4,5-tetrachlorobenzene
3. Pentachlorobenzene
4. 1,2,3-trichlorobenzene
5. 1,2,4-trichlorobenzene

*Id.* This means, soil samples would not even be tested for these chemical compounds, including the benzene compounds listed. Why does this matter? These benzene compounds are known carcinogens and their exclusion from testing prevented assessment of significant cancer risks to the community.

Second, the EPA changed the baseline sample locations directing that baseline samples be taken farther west and in areas potentially impacted by the toxic plumes, which compromised the entire sampling plan. *Id.*

### 4) EPA's Reported Results That Samples Were "Less Than Reporting Limit" Obscured Whether Actual Contamination Levels Exceed Environmental Health Screening Levels.

The EPA modified laboratory results in a way that obscures whether contamination exceeds environmental screening levels and poses potential health risks. The Eurofins laboratory provided three distinct values for each sample tested: Actual Value, Reporting Limit (the amount the lab can accurately measure), and Minimum Detection Limit (the minimum amount the lab can detect). (Ex. A, Petty Aff., ¶ 22.) Results are reported in three categories: Above the Reporting Limit, Between the Limits (detected but below reliable quantification), and Below Detection. *Id.* at ¶ 23.

9

Rather than disclose each category, EPA combined categories 2 and 3 into a single "less than Reporting Limit" category and did not report actual values for samples below the Reporting Limit. *Id.* at ¶ 23-24. This is extremely problematic because Environmental Screening Levels—the level of toxin determined to pose potential health risks—are often significantly less than the lab's Reporting Limit. *Id.* at ¶ 24. EPA's failure to release actual testing data prevents independent assessment of whether contamination posed health risks—a serious transparency and public health failure. *Id.* at ¶ 21-27.

## F. SCIENTIST SCOTT SMITH FINDS PERSISTENT AND WORSENING SOIL AND WATER CONTAMINATION

Scott Smith, an independent environmental testing expert, has conducted serial testing in East Palestine from February 2023 through August 2025, more than two and a half years after the derailment. His affidavit, on October 12, 2025, documents that contamination not only persists but, in many locations, has worsened over time. (Ex. C, Scott Smith Aff. ¶¶ 1-10.)

Smith has independently collected and reviewed testing samples from over 80 distinct sites in and around East Palestine, focusing on dioxins, furans, and semi-volatile organic compounds including polycyclic aromatic hydrocarbons (PAHs). Smith's most recent testing in August 2025, reveals contamination at levels that can only be described as catastrophic. Smith states:

> 5. Recent soil samples collected in August 2025 continue to show dioxins, furans and PAHs that far exceed background (control) samples. For example, one sample in the impact zone resulted in **3,973** total semi-volatile organic compounds as compared to the control sample with 136 total semi-volatile organic compounds. The sample from the impact zone is 29.21 times (2,821%) higher than the control sample. Another sample in the impact zone resulted in **6,698** total semi-volatile organic compounds, which is 49.25 times (4,825%) higher than the control sample.

10

6. Recent sediment and creek bank testing in Sulphur Run at Taggart Street in August 2025 resulted in 294 ppt (parts per trillion), **4,895 ppt** total semi-volatile organic compounds on the right creek bank and **6,444 ppt** total semi-volatile organic compounds on the left bank. This clearly illustrates how the creek banks remain significantly more contaminated than the sediment by a factor of at least 15X.

7. In numerous instances, tested soils and creek bank samples show persistent or increased contamination over time, particularly in locations subject to visible remediation and/or heavy rainfall/flooding. For example, I have tested the same locations over time that appear to show increasing contamination from what I refer to as the third event, the remediation of the most contaminated soil and other impacted areas after April 18, 2023 – when to the best of my knowledge the EPA and/or other Norfolk Southern dioxin testing ended.

8. Multiple samples over time show TEQs (toxic equivalency – the number used to express the combined toxicity of multiple related chemicals as a single number) far in excess of standardized thresholds.

9. For example, samples taken in June 2024 resulted in the following Dioxin TEQs, all of which are well over the background (control) sample of 1.7 parts per trillion (ppt) and the Norfolk Southern contractor, Arcadis Characterization Work Plan for Derailment-Area Soil which set forth a dioxin RSL (regional screening level) of 4.8 ppt:

| | |
|---|---|
| ZG Soil: | 23 ppt |
| TF Soil: | 26 ppt |
| SW Soil: | 27 ppt |
| BD Soil: | 27.6 ppt |
| RTO Soil: | 30 ppt |
| KH Soil: | 34 ppt |
| SG Soil: | 49 ppt |
| Enchanted Salon Soil: | 59 ppt |
| Brushville Supply Soil (1): | 460 ppt |
| Brushville Supply Soil (2): | 1,900 ppt |

10. Similarly, samples taken in June 2024 resulted in the following PAH and Dioxin TEQs, all of which are also well over the background (control) sample of 30.6 ppt and 1.7 ppt:

| Soil Testing | PAH TEQ (ppb) | Dioxin TEQ (ppt) |
|---|---|---|
| EM Control | 30.6 | 1.7 |
| JS | 119.7 | 5.3 |
| RT | 129.7 | 30 |
| VL | 143.6 | 5.6 |
| BD | 155.7 | 27.6 |
| RK | 291.5 | 9.1 |
| SW | 346.4 | 27.0 |
| LM | 348.6 | 10.0 |
| ZG | 398.7 | 23.0 |
| SG | 420.5 | 8.8 |
| NV | 428.6 | 7.1 |
| AG | 493.1 | 6.8 |
| SMc | 496.3 | 9.4 |
| KF | 506.5 | 10.0 |

(*Id.*, ¶¶ 5-10.)

The significance of Smith's August 2025 findings cannot be overstated. This is not historical contamination that has dissipated. This is active, ongoing exposure to cancer-causing dioxins and toxic organic compounds at levels up to 400 times safety standards, occurring right now, in locations where Movants and their families live.

### G. PERSISTENT SOIL, WATER, AND AIR CONTAMINATION DOCUMENTED BY INDEPENDENT SCIENTISTS AND AGENCIES

Groundbreaking research by Kent State and Louisiana State Universities, published in the Royal Society of Chemistry's Environmental Science: Processes & Impacts, reveals continued presence of carcinogenic dioxins, furans, and environmentally persistent free radicals in soil samples collected up to thirteen months post-derailment. Nearly half of tested locations exceeded EPA's own cancer risk Regional Screening Levels, with two samples surpassing non-cancer risk benchmarks for 30-year exposure—contradicting EPA's conclusion of effective remediation.[2]

EPA and Ohio EPA testing documented that Sulphur Run and Leslie Run remain subject to "do not contact" warnings well into 2025. Monitoring continues to detect hazardous substances including acrylates and other persistent contaminants even after removal of over 74 million gallons of contaminated water.[3]

Peer-reviewed air monitoring studies by University of Kentucky, Texas A&M, and Carnegie Mellon used mass spectrometry methods orders of magnitude more sensitive than EPA's field meters and repeatedly identified elevated concentrations

---

[2] https://pubs.rsc.org/en/content/articlelanding/2025/em/d4em00609g
[3] https://www.epa.gov/east-palestine-oh-train-derailment/qualitative-sheen-assessment-results

12

of hazardous volatile organic compounds (VOCs), including acrolein (at up to six times normal background levels), benzene, and vinyl chloride, months after EPA declared air "safe." Nearly half of detected VOCs were classified as "high hazard" for skin and respiratory irritation."[4]

## H. DIRECT HUMAN EXPOSURE AND WIDESPREAD HEALTH IMPACTS ARE CONCLUSIVELY ESTABLISHED

A federally funded, peer-reviewed population health study led by Dr. Erin Haynes at the University of Kentucky demonstrated that over 60% of residents tested months after the accident had vinyl chloride metabolites in their urine, sharply contrasting with national rates (5%) and control-site rates (0%)—direct biological proof of ongoing toxic exposure.[5]

Multiple federal, state, and academic health tracking surveys document that approximately 74% of residents reported new or worsening health symptoms correlated to chemical exposure, including respiratory, neurological, dermatological, reproductive, and gastrointestinal harms. Rates of menstrual irregularity among women of childbearing age reached 33%. Comprehensive occupational cohort analyses establish that vinyl chloride exposure causes statistically significant increases in liver cancer, angiosarcoma, cirrhosis, and cardiovascular disease. Peer-

---

[4] https://link.springer.com/article/10.1007/s10661-025-14038-x

[5] https://www.wosu.org/2025-10-23/east-palestine-train-derailment-early-research-shows-health-impacts-more-study-needed; https://www.youtube.com/watch?v=xkRtNMAoqKs

reviewed studies establish that rates of post-traumatic stress disorder and depression in the region are more than double baseline U.S. rates."[6]

## I.  FEMA AND EPA KNEW ABOUT POTENTIAL CANCER-CLUSTER AND OTHER SERIOUS HEALTH ISSUES FROM THE EXPOSURE

Concerns about serious health risks from the derailment and vent and burn were validated in May 2025 when FEMA and EPA emails obtained by the Government Accountability Project through a Freedom of Information Act (FOIA) request revealed that government officials knew about potential cancer clusters and other serious health issues that would result from the vent and burn but failed to inform residents. (Ex. D, FEMA Emails.)

In the internal FEMA communications, James McPherson, appointed by President Biden to assess unmet needs in East Palestine, explicitly referred to a "really toxic plume." McPherson's emails also reference the potential occurrence of a "cancer cluster" in East Palestine. These communications demonstrate that high-level government officials were fully aware of the toxic nature of the chemical release as well as both the immediate health risks and long-term carcinogenic effects on the community. (Ex. D, FEMA Emails.)

## J.  RESIDENTS ARE SUFFERING SEVERAL HEALTH ISSUES

---

[6] https://epohio.org/health-tracking-study-results-and-epa-updates-shared/;
https://www.cambridge.org/core/journals/disaster-medicine-and-public-health-preparedness/article/abs/using-an-electronic-selfadministered-survey-among-first-responders-to-evaluate-the-potential-human-health-effects-of-hazardous-substances-released-as-a-result-of-a-train-derailment-incidenteast-palestine-ohio-usa-februarymarch-2023/4299882EEF357B8010F48C64A98009E8;
https://onlinelibrary.wiley.com/doi/10.1002/ajim.22922;
https://onlinelibrary.wiley.com/doi/10.1002/jts.70003

Residents are suffering from severe health issues, including rashes, seizures, and new cancers. Ex. F, Barbara Adams Affidavit. (*See also* ECF 162-7, p. 44 of 300, Professor Andrew Welton letter; ECF 162-9, p. 72-134 of 160, citizen affidavits collected by Government Accountability Project attesting to ongoing health nightmares.)

The United States EPA told this Court on July 16, 2025 that "there really are no issues being raised" in the recent media accounts, even though the recently revealed documents call into question the reliability of Norfolk's and the EPA's claims that the derailment and vent and burn caused no toxic contamination and therefore concerns for long-term health risks are minimal. Individual citizens Robert Figley and Barbara Adams will be adversely affected by the disposition of this action against Norfolk Southern, as discussed below.  Accordingly, Figley and Adams move this Court for an Order allowing them to intervene as a matter of right under 33 U.S.C. § 1365(b)(1)(B); Fed. R. Civ. P. 24.

## **ARGUMENT**

## II. **FIGLEY AND ADAMS MEET THE REQUIREMENT FOR INTERVENTION OF RIGHT UNDER RULE 24(a)(1) and (a)(2)**

Rule 24 of the Federal Rules of Civil Procedure sets out the circumstances by which a person may intervene in an action. Rule 24(a) requires the Court to permit intervention as a matter of right in two circumstances:

> **(a) Intervention of Right.** On timely motion, the court must permit anyone to intervene who:
> **(1)** is given an unconditional right to intervene by federal statute; or
> **(2)** claims an interest relating to the property or transaction which is the subject of the action and the applicant is so situated that the disposition of the action may as a practical matter impair or impede the applicant's ability to protect that interest, unless the applicant's interest is adequately represented by existing parties.

15

Fed. R. Civ. P. 24(a).

Figley and Adams meet all the requirements for Intervention of Right under both Rule 24(a)(1) and Rule 24(a)(2). Their motion is timely and they have an unconditional right to intervene by federal statute. Additionally, they have a unique property interest that is not adequately represented by the existing parties.

### A. <u>Figley's and Adams' Motion is Timely</u>

Under Rule 24, an application for intervention must be timely. *See* Fed. R. Civ. P. 24; *Triax Co. v. TRW, Inc.,* 724 F.2d 1224 (6th Cir. 1984). For purposes of intervention of right under Fed. R. Civ. P. 24(a)(1) based on the unconditional right to intervene under CWA § 505(b)(1)(B), "intervention of right without prior notice is to be allowed if all the prerequisites to such intervention are met," and "any pre-suit inaction does not preclude intervention." *United States v. Ketchikan Pulp Co.,* 74 F.R.D. 104, 106 (D. Alaska 1977). The Southern District previously "wholeheatedly" agreed with the analysis *Ketchikan Pulp Co.*, albeit dealing with a separate issue in *Frilling v. Village of Anna,* 924 F. Supp. 821, fn. 22 (S.D. Ohio 1996).

This motion is timely for several compelling reasons. First, the United States filed its Motion to Enter Consent Decree on October 10, 2024. (ECF 162.) Since that filing, critical new evidence has emerged that fundamentally undermines the factual predicates of the proposed Consent Decree.

In July 2025, a previously undisclosed EPA letter dated March 6, 2023, confirmed that EPA approved Norfolk's request to remove several key chemical compounds from the sampling plan and directed that baseline soil samples be taken from locations

16

heavily impacted by the toxic plumes—thereby compromising the entire testing protocol. (Ex. B.)

In May 2025, FEMA and EPA emails obtained through FOIA revealed that government officials knew about potential cancer clusters and serious health risks from the vent and burn but failed to inform residents. (Ex. D.)

In August 2025, independent testing by environmental expert Scott Smith documented catastrophic contamination levels—up to 4,825% higher than control samples and 49 times higher than safety thresholds—demonstrating that contamination persists and has worsened over time. (Ex. C, Smith Aff.) Additionally, peer-reviewed scientific studies published in 2024 and 2025 directly contradict EPA's assertions that no long-term contamination exists.

Second, at the July 15, 2025 Status Conference, this Court specifically inquired whether counsel for Plaintiffs had considered the effect of recent information released by the media on the adequacy of the proposed Consent Decree. Counsel indicated they did not believe the information changed anything and continued to seek the Court's approval. This response made clear that the existing parties would not adequately represent Movants' interests, thereby triggering the need for intervention.

Third, no final judgment has been entered, and the Consent Decree has not been approved. Movants' intervention at this juncture will not unduly delay proceedings or prejudice existing parties.

Finally, the critical new evidence of the soil sampling data performed by Scott Smith has not been able to be reviewed by any of the experts. The Court should allow

the experts to review the new data and whether this changes, confirms, or if the experts have additional opinions that need to be fleshed out. The Court, in its task to determine reliability, would want the experts to review the new data to understand the potential impact. *In re Scrap Metal Antitrust Litig.*, 527 F.3d 517 (6th Cir.) *citing* Fed. R. Evid. 702 ("The task for the district court in deciding whether an expert's opinion is reliable is not to determine whether it is correct, but rather to determine whether it rests upon a reliable foundation, as opposed to, say speculation.").

Accordingly, this motion is timely filed.

### B. Figley and Adams Have An Unconditional Right to Intervene by Federal Statute, Satisfying Rule 24(a)(1)
#### 1. The Clean Water Act confers an unconditional right to intervene upon citizens.

Figley and Adams have an unconditional right to intervene since the Clean Water Act (CWA) confers an unconditional right to intervene upon citizens. *See* 33 U.S.C. § 1365(b)(1)(B).

The Clean Water Act provides an unconditional right for citizens to intervene in enforcement actions initiated by the state or federal government. 33 U.S.C. § 1365(b)(1)(B) states that "in any such action in a court of the United States any citizen may intervene as a matter of right." 33 U.S.C. § 1365(b)(1)(B). This statutory right to intervene ensures that private citizens can participate in federal enforcement actions to help ensure compliance with environmental standards. "The purpose of these citizen suit provisions is to create an avenue for 'vigorous enforcement' of the Clean Water Act . . . if 'Federal, State, and local agencies fail to exercise their enforcement responsibility.'" *Starlink Logistics, Inc., v. ACC, LLC.*, 101 F.4th 431, 447 (6th Cir.

18

2024), quoting S. Rep. No. 92-414, at 64 (1971) (discussing the Clean Water Act's citizen suit provisions). The primary responsibility for enforcement lies with the government, "but when the government fails, citizen suits serve as an important role in environmental enforcement, permitting individual plaintiffs to step into the government's shoes and function as 'private attorneys general.'" *Id.*, quoting *Ellis v. Gallatin Steel Co.,* 390 F.3d 461, 477 (6th Cir. 2004). The Sixth Circuit has recognized that citizen involvement in government enforcement actions can and does lead to more comprehensive outcomes. *See Sierra Club v. Hamilton County Bd. Of County Com'rs,* 504 F.3d 634, 645 (6th Cir. 2007).

Courts have consistently upheld a citizen's right to intervene, emphasizing that intervention is limited to actions that citizens could have initiated independently if the government had not acted first. For example, in *Department of Nat. Resources & Env't Control v. Mountaire Farms of Delaware, Inc.*, the court held that individuals residing near a poultry processing plant had an unconditional statutory right to intervene in a state-initiated enforcement action under the CWA. *Dept. of Natural Resources & Environmental Control*, 375 F.Supp.3d 522 (D.Del.2019). Similarly, in *Friends of the Earth, Inc., v. Laidlaw Env't Services (TOC), Inc.*, the court noted that the absence of meaningful opportunities for citizen intervention in state enforcement actions triggers heightened scrutiny of settlements under the CWA. *Friends of the Earth, Inc. v. Laidlaw Env't Services (TOC), Inc.,* 890 F.Supp. 470 (D. S.C. 1995).

**2. The Comprehensive Environmental Response, Compensation and Liability Act ("CERCLA") confers an unconditional right to intervene upon citizens.**

Figley and Adams also have an unconditional right to intervene under CERCLA, which provides that 'any person' meeting four requirements can intervene 'as a matter of right' in 'any action' commenced under CERCLA. 42 U.S.C. § 9613(i). Section 113(i) was enacted to protect those living near hazardous waste sites who would be most affected by proposed remedial schemes. *United States v. Vasi*, 1991 WL 557609, at *3 (N.D. Ohio Mar. 6, 1991).

### 3.  <u>Figley and Adams are Citizens with Standing to Intervene</u>

For purposes of intervention under CWA § 505, 'the term "citizen" means a person or persons having an interest which is or may be adversely affected.' 33 U.S.C. § 1365(g). This definition is interpreted considering *Sierra Club v. Morton*, 405 U.S. 727 (1972), where the Court held persons have requisite interest if they allege, they have been or will be harmed by the challenged action. *Ohio v. Callaway*, 497 F.2d 1235, 1242 (6th Cir. 1974).

Property owners whose land was contaminated or who suffered personal injury from environmental contamination generally have standing by demonstrating concrete injuries such as property damage, personal injury, or interference with use and enjoyment of property. *See LaBauve v. Olin Corp.*, 231 F.R.D. 632 (S.D. Ala. 2005) (property owner satisfied injury-in-fact requirement by alleging diminished property value due to mercury contamination for a chemical plant); *Adinolfe v. United Technologies Corp.*, 768 F.3d 1161 (11th Cir. 2014) (plaintiffs who alleged contamination of their land resulting in personal injury or diminution in property value had standing); *Severa v. Solvay Specialty Polymers USA, LLC*, 524 F.Supp.3d 381 (D.N.J. 2021) (town residents alleged that contamination of their water supply

20

required them to purchase water filtration systems and exposed them to health risks, which constituted concrete injuries sufficient for Article III standing).

Robert Figley is a resident and business owner in East Palestine, Ohio who was and continues to be directly affected by the derailment and vent and burn. (Ex. E, Figley Aff.) Mr. Figley's business and residential property has been greatly affected by contamination of nearby waterways.

Barbara Adams is a resident of New Waterford, Ohio who also was and continues to be directly affected by the derailment and vent and burn. (Ex. F, Adams Aff.) Ms. Adams has suffered significant health effects, including two kinds of cancer, because of exposure to contamination.

Thus, Figley and Adams have a direct and substantial interest in the outcome of this lawsuit and fall within the category of citizens entitled to intervene as a matter of right under CWA § 505(b)(1)(B) and Fed. R. Civ. P. 24(a)(1).

### C. Figley and Adams Have an Unconditional Right to Intervene Because Their Unique Interests Are Not Adequately Represented by the Existing Parties, Satisfying Rule 24(a)(2)

While not required to meet both Rule 24(a)(1) and (a)(2), Figley and Adams also meet the requirements for intervention of right under Rule 24(a)(2) of the Federal Rules of Civil Procedure, which provides for intervention of right to anyone who:

> (2) claims an interest relating to the property or transaction which is the subject of the action and the applicant is so situated that the disposition of the action may as a practical matter impair or impede the applicant's ability to protect that interest, unless the applicant's interest is adequately represented by existing parties.

Thus, "[a] party seeking intervention of right [under Rule 24(a)(2)] must show 'interest, impairment of interest, and inadequate representation.'" *In re Sierra Club*,

945 F.2d 776, 779 (4th Cir. 1991); *Newport News Shipbuilding & Drydock Co. v. Peninsula Shipbuilders' Ass'n*, 646 F.2d 117, 121 (4th Cir. 1981).

Under Rule 24(a)(2), a proposed intervenor must establish four elements to be entitled to intervene:

    (1)    That the motion to intervene is timely;

    (2)    That the intervenor has a substantial legal interest in the subject matter of the case;

    (3)    That the intervener's ability to protect that interest may be impaired in the absence of intervention; and

    (4)    the interest is not adequately protected by an existing party.

*Ohio v. United States EPA*, 313 F.R.D. 65, 68 (S.D.Ohio 2016), citing *Northland Fam. Plan. Clinic, Inc. v. Cox*, 487 F.3d 323, 343 (6th Cir. 2007). Rule 24 is broadly construed in favor of potential intervenors. *State of Ohio*, 313 F.R.D. at 68, citing *Purnell v. City of Akron*, 925 F.2d 941, 950 (6th Cir. 1991). Figley and Adams satisfy each of these requirements.

### 1.   <u>Figley and Adams' Motion is Timely</u>

As established above, Figley's and Adams' motion is timely.

### 2.   <u>Figley and Adams Demonstrate an Interest Sufficient to Permit Intervention of Right under Rule 24(a)(2).</u>

The Sixth Circuit "subscribe[s] to a rather expansive notion of the interest sufficient to invoke intervention of right" and therefore, "[t]he inquiry into the substantiality of the claimed interest is necessarily fact-specific." *Benalcazar v. Genoa Twp.*, No. 2:18-cv-01805, 2020 WL 1853212, at *4 (S.D. Ohio Apr. 13, 2020), citing *Grutter v. Bollinger*, 188 F.3d 394, 398 (6th Cir. 1999). As discussed above, Figley and Adams have legally protected interests that are or may be harmed by the Defendants' hazardous chemical discharges. Therefore, Figley and Adams meet the

interest requirement under Rule 24(a)(2) and should be allowed to intervene as of right.

3. **Disposition of the Case Absent Figley's and Adams' Participation May Impair or Impede Their Ability to Protect Their Interests**.

To satisfy the requirement that the disposition of the case without the intervenor's participation may impair or impede their ability to protect their interests, "a would-be intervenor must show only that impairment of its substantial legal interest is possible if intervention is denied." *Grutter v. Bollinger,* 188 F.3d 394, 399 (6th Cir. 1999). This burden is minimal. *Id.* Intervenors need not show that substantial impairment of their interest will result, *Nuesse v. Camp*, 385 F.2d 694, 701–02 (D.C.Cir.1967), nor, from the language of Rule 24(a), that impairment will inevitably ensue from an unfavorable disposition; the would-be intervenors need only show that the disposition "may ... impair or impede [their] ability to protect [their] interest." Fed.R.Civ.P. 24(a)(2) (emphasis added).

Disposition of this action in the absence of the Figley's and Adam's participation may, as a practical matter, impair or impede their ability to protect their unique interests in this matter. Figley and Adams bring to this case decades of knowledge and experience in living and working in the impacted area. And Figley and Adams have direct knowledge and experience of the impact to their lives by the Defendants' actions and the resulting contamination.

Because the EPA's action may result in a preclusive effect, Figley's and Adams' ability to protect its unique interests through a CWA citizen suit could be impaired by the ultimate disposition of this case. *See Sagebrush Rebellion, Inc. v. Watt*, 713

23

F.2d 525, 528 (9th Cir. 1983) ("An adverse decision in this suit would impair the society's interest in the preservation of birds and their habitats"); *U.S. v Reserve Mining Co.*, 56 F.R.D 408, 414 (D. Minn. 1972):

> Any judgment entered by this Court, whether maintaining the status quo or forcing [the defendant] to take corrective action, would be of binding force, and would leave the applicants without apparent judicial recourse to assert their claimed interests . . . . [H]owever, the availability of an alternative forum is not necessarily controlling. It should be sufficient to say that the ability of these applicants to represent their interests in the face of a final judgment by the Court or a settlement of this case, would be substantially impaired or impeded.

### 4. <u>Figley and Adams' Interests Are Not Adequately Represented by the Current Parties.</u>

The applicant for intervention bears the burden of showing his representation is inadequate. *Bradley v. Milliken,* 828 F.2d 1186, 1192 (6th Cir.1987). As noted by the Supreme Court:

> The requirement of the Rule is satisfied if the applicant shows that the representation of his interest "may be" inadequate; and the burden of making that showing should be treated as minimal.

*Trbovich v. Mine Workers,* 404 U.S. 528, 538 n. 10 (1972).

When a proposed intervenor and an existing party to the suit share the same ultimate objective in the litigation, courts presume that the existing party adequately represents the intervener's interests. *Id.*, citing *Bradley v. Milliken*, 828 F.2d 1186, 1192 (6th Cir. 1987). A proposed intervenor can overcome this presumption of adequacy by showing "that there is substantial doubt about whether [the intervener's] interests are being adequately represented by an existing party." *Id.* "That there is a slight difference in interests between the proposed intervenors and the supposed representative does not necessarily show inadequacy, if they both seek the same outcome. However, interests need not be wholly adverse before there is a

24

basis for concluding that existing representation of a different interest may be adequate." *Id.*, quoting *Nuesse v. Camp*, 385 F.2d 694, 703 (D.C.Cir. 1967) (internal quotations omitted.) "It may be enough to show that the existing party who purports to seek the same outcome will not make all of the prospective intervener's arguments." *Id.*, quoting *Mich. State AFL-CIO v. Miller*, 103 F.3d 1240, 1247 (6th Cir. 1997).

The State of Ohio and the EPA do not adequately represent the interests of Figley and Adams for several reasons. First, Figley and Adams have a more specific interest in the matter than that of the State or the EPA. While the State of Ohio and the EPA in theory represent the interests of all citizens of the State and the United States, Figley and Adams are actual citizens and property owners concerned with the hazardous chemicals in their literal and proverbial back yards who would prefer that few to no hazardous chemicals contaminate their land and make them sick. Second, Figley and Adams are not beholden to the same variety of considerations that the state and federal agencies consider. Figley and Adams need not consider the interests of all Ohio citizens or the impact of the outcome of this action on the relationship with Norfolk Southern and other defendants. Consequently, the two parties' interests, though overlapping in part, would diverge on some issues. *In re Sierra Club*, 945 F.2d 776, 777 (4th Cir. 1991). *See also Kentuckians for the Commonwealth v. Rivenburgh*, 204 F.R.D. 301, 306 (S.D. W.Va. 2001) (allowing intervention holding an industry association, and owners and lessors of surface and mineral rights had "interests in

the action that are divergent from those named Defendants, who are regulators, such that representation of their interests may be inadequate.")

These reasons supporting intervention apply equally here. Although Figley and Adams, share the general aim of enforcing CWA and CERCLA, their interests may diverge on subsequent issues. Figley and Adams are not required, as the State and EPA may be, to accord consideration or weight to a variety of factors not related to water quality or hazardous waste in advocating remedies or schedules for compliance. Therefore, within the meaning of Rule 24(b), representation of Figley and Adams' interests by the State and EPA "'may be' inadequate." *See Kentuckians for the Commonwealth*, 204 F.R.D. at 306.

The divergence of interests between Movants and the existing parties is particularly acute in this case. The proposed Consent Decree accepts EPA's conclusory assertions that air, soil, and water contamination are within acceptable levels—assertions contradicted by independent scientific evidence. (Ex. A, Petty Aff.; Ex. C, Smith Aff.) The State of Ohio and EPA, as government entities, may have institutional interests in avoiding findings that their own sampling protocols were fundamentally flawed or that their public safety assurances were premature. Figley and Adams, by contrast, have no such institutional constraints and are motivated solely by ensuring their properties and health are protected from ongoing toxic exposure.

The existing parties have shown no inclination to challenge the scientific validity of the sampling protocols or to demand comprehensive re-testing based on

26

newly available evidence. At the July 15, 2025 Status Conference, counsel for Plaintiffs stated they did not believe recent revelations about EPA's compromised testing protocols warranted reconsideration of the proposed settlement. This demonstrates a fundamental divergence: the existing parties are prepared to accept a settlement that Movants view as scientifically and legally inadequate to address ongoing contamination and health risks.

Thus, for all the reasons discussed above, Figley and Adams meet all requirements for intervention as a matter of right under Fed. R. Civ. P. 24(a)(2).

## III.  INTERVENORS ALSO MEET THE REQUIREMENTS FOR PERMISSIVE RIGHT TO INTERVENE

Alternatively, Figley and Adams meet the requirements for permissive intervention under Rule 24(b)(2), which permits intervention when "an applicant's claim or defense and the main action have a question of law or fact in common." Fed. R. Civ. P. 24(b)(2). As established, Figley and Adams have an interest in the same waters that may be impaired by hazardous contamination and share the State and EPA's goal of addressing Defendants' CWA violations. Accordingly, they should be allowed to intervene by permission.

## CONCLUSION

For all the foregoing reasons, Movants respectfully request that this Court enter an Order:

1. Granting Movants Robert Figley and Barbara Adams leave to intervene as a matter of right pursuant to Fed. R. Civ. P. 24(a)(1) and (a)(2), and Clean Water Act § 505(b)(1)(B), 33 U.S.C. § 1365(b)(1)(B);

2. In the alternative, granting Movants leave to intervene by permission pursuant to Fed. R. Civ. P. 24(b);

3. Permitting Movants to file their proposed Complaint-in-Intervention; and

4. Granting such other and further relief as the Court deems just and proper.

Respectfully submitted,

***/s/ Jedidiah I. Bressman***
Jedidiah I. Bressman (0096637)
David A. Bressman (0047128)
Richard "Tre" P. Bogetich (0105143)
**Law Office of David A. Bressman**
2727 Tuller Parkway, Suite 100
Dublin, OH 43017
(614)538-1116
Fax: (614)761-8399
Jedidiah@Bressmanlaw.com
David@Bressmanlaw.com
Tre@Bressmanlaw.com
Attorneys for Plaintiffs

**Certificate of Service**

This is to certify that the foregoing was served upon all counsels by efile, on Nov 17, 2025.

/s/ Jedidiah I. Bressman
Jedidiah I. Bressman (0096637)
David A. Bressman (0047128)

28